# ATTACHMENT

# B

# AAPL Practice Guideline for the Forensic Psychiatric Evaluation of Competence to Stand Trial

Douglas Mossman, MD, Stephen G. Noffsinger, MD, Peter Ash, MD, Richard L. Frierson, MD, Joan Gerbasi, JD, MD, Maureen Hackett, MD, Catherine F. Lewis, MD, Debra A. Pinals, MD, Charles L. Scott, MD, Karl G. Sieg, MD, Barry W. Wall, MD, and Howard V. Zonana, MD

## Statement of Intent and Development Process

This document is intended as a review of legal and psychiatric factors to give practical guidance and assistance in the performance of competence to stand trial evaluations. This Guideline was developed through the participation of forensic psychiatrists who routinely conduct evaluations of competence to stand trial and have expertise in this area. Some contributors are actively involved in related academic endeavors. The process of developing the Guideline incorporated a thorough review that integrated feedback and revisions into the final draft. This Guideline was reviewed and approved by the Council of the American Academy of Psychiatry and the Law on October 17, 2007. Thus it reflects a consensus among members and experts about the principles and practice applicable to the conduct of evaluations of competence to stand trial. This Practice Guideline should not be construed as dictating the standard for this type of evaluation. It is intended to inform practice in this area. This Guideline does not present all acceptable current ways of performing these forensic evaluations, and following this Guideline does not lead to a guaranteed outcome. Differing fact patterns, clinical factors, relevant statutes, administrative and case law, and the psychiatrist's judgment determine how to proceed in any individual forensic evaluation.

The Guideline is directed toward psychiatrists and other clinicians who are working in a forensic role in conducting evaluations and providing opinions related to competence to stand trial. It is expected that any clinician who agrees to perform forensic evaluations in this domain have appropriate qualifications.

## Overview

Adjudicative competence, or competence to stand trial, is a legal construct that usually refers to a criminal defendant's ability to participate in legal proceedings related to an alleged offense. Although no precise U.S. statistics are available, the best estimates suggest that the frequency of evaluations of competence to stand trial has risen significantly in recent years.[1] The often-cited 1973 estimate by McGarry[2] put the number of competence evaluations at 25,000 to 36,000 each year in the United States. Estimates from 1998[3] and 2000[4] put the annual number of competence evaluations at 50,000 and 60,000, respectively. The frequency of these evaluations makes determining whether a defendant meets a jurisdiction's criteria for competence to stand trial a core skill in forensic psychiatry.

This document provides practical guidance to psychiatrists who agree to perform forensic evaluations of adjudicative competence. Psychiatrists in active private sector, public sector, or academic practice developed this Practice Guideline after an in-depth review of relevant professional publications and case law and after comparing actual practices of clinicians in a broad range of geographic and work settings. Interested members of the American Academy of Psychiatry and the Law (AAPL) have also reviewed the document and have provided substantive and

editorial suggestions. The contents of and recommendations in this Guideline address only evaluations of competence to stand trial and not other types of evaluations that psychiatrists undertake.

The Guideline distinguishes between the legal requirements of various jurisdictions and the principles of ethics that govern clinicians' actions. Differences in jurisdictional rules concerning discovery, hearsay evidence, and other legal matters may require psychiatrists to adopt different practices.

## Definitions

*Competence to stand trial*: the legally determined capacity of a criminal defendant to proceed with criminal adjudication. Jurisdictional statutes and case law set out the criteria for competence to stand trial.

*Adjudicative competence*: The terms "adjudicative competence," "competence to proceed with adjudication," "competence to stand trial," and "fitness to stand trial" are used interchangeably throughout the Guideline. Competence to stand trial is the phrase that U.S. criminal courts have traditionally used to designate the set of legal concerns that will be discussed herein. As some[5] have noted, however, these concerns encompass a defendant's participation, not only in a courtroom trial, but in all the other proceedings in the course of a criminal prosecution. Also, for most criminal defendants whose cases are disposed of through guilty pleas and without trials, the terms adjudicative competence and fitness to proceed are more relevant and appropriate than is competence to stand trial.

*Collateral data*: information about the defendant that comes from sources other than the defendant's statements during the psychiatrist's interview. Such sources include police reports, medical records, statements by the defendant's attorney, and reports from the defendant's family members.

## I. Background

### A. History of the Competence Requirement

Anglo-American legal doctrine concerning competence to stand trial extends back at least as far as the

mid-17th century in England.[6] According to some commentators, the requirement for mental competence originally arose in English courts as a reaction to those defendants who, rather than enter a plea of guilt or innocence, stood mute. In such cases, courts impaneled juries to decide whether the accused was "obstinately mute, or whether he be dumb *ex visitatione Dei* [by visitation of God]" (Ref. 7, Book 4, Chap 25, p 477). Those defendants found "obstinately mute" were subjected to *peine forte et dure*, a procedure (continued, albeit rarely, as late as the 18th century) in which increasingly heavy weights were placed on the defendant's chest until he responded or died.[7,8] Defendants found mute *ex visitatione Dei*, however, were spared this ordeal. This category originally referred to individuals who were literally deaf and mute, but over time, it came to include persons with mental illness.[1]

By the time Blackstone wrote his famous *Commentaries*, competency in defendants was regarded as intrinsic to the fairness of a trial process in which the use of attorneys was often forbidden. Thus, common law held that a defendant who was "mad" should "not to be arraigned . . . because he is not able to plead to [the charge] with that advice and caution that he ought," nor should he undergo trial, "for how can he make his defense?" (Ref. 7, Book 4, Chap. 289). In a late 18th-century case in England, the trial was postponed until the defendant "by collecting together his intellects, and having them entire, . . . shall be able to model his defense and to ward off the punishment of the law" (Ref. 9, p 307).

Historically, courts and commentators in English-speaking jurisdictions have offered several reasons for requiring mental fitness of criminal defendants during their legal proceedings. A defendant who lacked competence might fail to communicate exculpatory information to defense counsel.[10] If trials are conceived of as contests, then a courtroom battle in which an accused could not present evidence in his own defense seems like combat between unequal adversaries: one overpowering, the other defenseless.[9] The requirement for adjudicative competence also has been justified as a way to avoid cruel treatment of defendants: "It would be inhumane, and to a certain extent a denial of a trial on the merits, to require one who has been disabled by the act of God from intelligently making his defense to plead or to be tried for his life or liberty" (Ref. 11, p 328).

In an era when even poor criminal defendants have access to legal counsel, the practical requirement that an accused be able to formulate his own defense no longer holds in many cases. Nonetheless, the U.S. Supreme Court still regards the competence requirement as an important safeguard that assures the fairness, accuracy, and dignity of the trial process.[12]

One of the earliest and most cited English formulations for judging adjudicative competence appears in *King v. Pritchard*, 173 Eng. Rep. 135 (1836),[13] in which the court instructed a jury first to consider whether a defendant was "mute of malice or not; secondly, whether he can plead to the indictment or not; thirdly, whether he is of sufficient intellect to comprehend the course of proceedings on the trial." During the 19th century, U.S. jurisdictions continued English common law tradition, explicitly recognizing the competence requirement and formulating their own tests for it. In 1899 one federal appeals court noted that requiring defendants to be competent at trial was a fundamental protection guaranteed by the U.S. Constitution: "It is not 'due process of law' to subject an insane person to trial upon an indictment involving liberty or life" (Ref. 14, p 941).

In the early 20th century, another federal appeals court articulated the following test for deciding whether a defendant is competent:

> Does the mental impairment of the prisoner's mind, if such there be, whatever it is, disable him . . . from fairly presenting his defense, whatever it may be, and make it unjust to go on with his trial at this time, or is he feigning to be in that condition . . . ? (Ref. 10, p 298).

A later test asked courts to consider whether the defendant was "capable of properly appreciating his peril and of rationally assisting in his own defense" (Ref. 15, p 725).

### B. Landmark U.S. Cases

#### 1. The U.S. Constitutional Standard

In 1960, *Dusky v. U.S.*, 362 U.S. 402 (1960),[16] established what is usually taken to be the minimal constitutional standard for adjudicative fitness in the United States. The appellant, Milton Dusky, faced a charge of unlawfully transporting a girl across state lines and raping her. A pretrial psychiatric evaluation rendered a diagnosis of "schizophrenic reaction, chronic undifferentiated type." A separate psychiatric report and psychiatric testimony at trial stated

that Dusky could not "properly assist" counsel because of suspicious thoughts, including a belief that he was being "framed." Yet, the trial court found that Dusky was competent to stand trial. He was convicted of rape, and the Eighth Circuit Court of Appeals affirmed his conviction.

The U.S. Supreme Court held, however, that the trial court's determination that Dusky was oriented and could recall events was not sufficient to establish his competence to stand trial. Instead, the Court stated that the test for his competence to stand trial was "whether he [had] sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he [had] a rational as well as factual understanding of the proceedings against him" (Ref. 16, p 402). Taking note of "the doubts and ambiguities regarding the legal significance of the psychiatric testimony in this case and the resulting difficulties of retrospectively determining the petitioner's competency of more than a year ago" (Ref. 16, p 403), the Supreme Court remanded the case to the trial court to ascertain Dusky's present competence to stand trial and to retry him if he was found competent.

Several points about the *Dusky* standard deserve noting (see Ref. 1):

> Adjudicative competence hinges on a defendant's present mental state, in contrast with other criminal forensic assessments (e.g., assessments of criminal responsibility or of competence to waive *Miranda* rights at the time of arrest), which refer to past mental states.

> The *Dusky* Court was silent about what conditions may make a person incompetent to stand trial Although mental illness, mental retardation, and neurologically based impairments in cognition would all be plausible candidates, the *Dusky* standard leaves open the possibility that other factors, such as cultural differences or immaturity, could justify a finding of incompetence. Most jurisdictions' statutes require the presence of some mental abnormality for a finding of incompetence, thereby limiting the range of conditions for which defendants may be found incompetent to stand trial. For example, the Insanity Defense Reform Act (IDRA) of 1984[17] holds that a criminal defendant in federal court is incompetent to stand trial if a preponderance of the evidence shows that he "is presently suffering

from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense."[18]

The attention of the courts (and, implicitly, the attention of the psychiatrist) is directed to the defendant's "ability" to consult rationally with an attorney, rather than the defendant's willingness to consult rationally.

The term "reasonable" connotes flexibility in determining competence, while the phrase "rational as well as factual understanding" requires the courts and psychiatrists to consider broadly how the defendant exercises his cognitive abilities.

Evaluating clinicians are given no guidance concerning what level of capacity justifies a finding of competence. In stating that the defendant must have "sufficient present ability" to work with his attorney, the Court leaves it to the trial court to decide, in a given case, whether a defendant's abilities suffice for a finding of adjudicative competence.

A subsequent decision, *Drope v. Missouri*, 420 U.S. 162 (1975),[19] amplified on the requirement in *Dusky* for the defendant to be capable of consultation with an attorney, stating that a criminal defendant must be able "to assist in preparing his defense" (Ref. 19, p 171). In *Godinez v. Moran*, 509 U.S. 389 (1993),[20] the Supreme Court declared explicitly that states may adopt criteria for competence that are more elaborate than *Dusky*'s formulation. However, the Court stated that "the Due Process Clause does not impose these additional requirements" (Ref. 20, p 402).

In observing that "all criminal defendants . . . may be required to make important decisions once criminal proceedings have been initiated" (Ref. 20, p 398), the majority opinion in *Godinez* appears to interpret *Dusky* as requiring that a defendant have certain decision-making capacities to be deemed competent to stand trial. As examples, *Godinez* notes that standing trial often requires defendants to make choices about whether to have a jury trial, to testify, and to cross-examine witnesses. Before trial, defendants may have to decide whether and how to put on a defense and whether to raise an "affirmative defense" (e.g., a claim of self-defense or an insanity

plea). In stating that the *Dusky* definition of competence to stand trial encompasses such decision-making, *Godinez* suggests that the courts (and therefore the psychiatrist) may have to evaluate at least some of a defendant's decision-making abilities when making judgments about adjudicative competence.[21]

## 2. Required Hearings

Six years after establishing the constitutional standard for adjudicative competence, the United States Supreme Court issued a decision regarding when a hearing on competence should occur. *Pate v. Robinson*, 383 U.S. 375 (1966),[22] concerned a man found guilty of homicide. Two to three months before the trial, a psychiatrist had examined Robinson and found that he understood the charges against him and could cooperate with counsel. During the trial, however, defense counsel asserted that Robinson was not competent to stand trial and asked for additional psychiatric testimony on the matter. The trial court refused the request, despite uncontroverted testimony about Robinson's history of head injuries, hearing voices, hallucinating, and "pronounced irrational behavior" (Ref. 22, p 386).

The Supreme Court ruled that the refusal was improper, holding that the Due Process Clause of the Fourteenth Amendment requires trial courts to hold a suitable hearing on competence to stand trial whenever there is a "*bona fide* doubt" (Ref. 22, p 385) about a defendant's adjudicative capacity. *Bona fide* doubt sets a low threshold for holding a competence hearing, implying that, to protect all defendants' rights to a fair trial, many competent defendants may have to undergo evaluation, to avoid the prosecution of a defendant who is not competent.

*Drope v. Missouri*,[19] dealt with what level of evidence should trigger a hearing regarding a defendant's competence. Drope faced a charge of raping his wife. Before trial, defense counsel filed a motion for a continuance, attaching a psychiatrist's report stating that Drope needed psychiatric treatment. On the second day of trial, Drope shot himself in a suicide attempt and was hospitalized for three weeks. The trial continued in his absence. Although Drope's attorney moved for a mistrial, the trial court denied the motion, stating that Drope shot himself voluntarily in a specific effort to avoid trial. Drope was convicted. After a series of appeals, the U.S. Supreme Court heard his case.

In a unanimous decision that reversed Drope's conviction and remanded his case for a new trial, the Supreme Court held that the trial court had violated the defendant's due process right to a fair trial by not suspending the trial to hold a hearing on his competence. Referring to *Pate v. Robinson*,[22] the Court found that data available at the time of the trial—the psychiatrist's report, the defendant's suicide attempt, and his wife's testimony—were sufficient to raise genuine doubts about Drope's competence. The Supreme Court said:

> The import of our decision in *Pate v. Robinson* is that evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant in determining whether further inquiry is required, but that even one of these facts standing alone may, in some circumstances, be sufficient. There are, of course, no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed; the question is often a difficult one in which a wide range of manifestations and subtle nuances are implicated [Ref. 19, p 180].

Although Drope may have appeared competent at the beginning of his trial, the Supreme Court held that "a trial court must always be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial" (Ref. 19, p 181). Because Drope's absence at trial precluded courtroom observations about his demeanor and ability to engage with his attorney, the proper course would have been to suspend the trial until Drope could undergo evaluation.

### 3. Competence Evaluations and the Fifth Amendment

In virtually all jurisdictions, a defendant may be ordered to undergo a mental health evaluation as a prelude to a hearing on his competence to stand trial. Such evaluations may implicate a defendant's Fifth Amendment protection against self-incrimination, because defendants may admit to certain actions either spontaneously or in response to the psychiatrist's question. Whether a court can convict a defendant based on information in a competence assessment became the subject of two U.S. Supreme Court cases.

*Estelle v. Smith*, 451 U.S. 454 (1981),[23] arose from the murder conviction and death sentence of Ernest Smith who, while being held in jail before trial, had undergone a court-ordered psychiatric examination to assess his competence to stand trial. After being found competent, he was found guilty of murder and then underwent a separate sentencing proceeding held before the convicting jury. To impose a death sentence under Texas law, jurors had to find that a defendant was likely to commit future criminal acts of violence that would constitute a continuing threat to society. At the sentencing hearing the psychiatrist testified that, based on his pretrial competence examination, Smith lacked remorse, was untreatable, and was destined to commit more violent criminal acts. The testimony supported the death penalty, and the jurors imposed it.

After unsuccessful appeals in state courts, a federal district court vacated Smith's death sentence, finding that the trial court made a constitutional error in admitting the psychiatrist's testimony at the penalty phase. The U.S. Court of Appeals affirmed, as did the U.S. Supreme Court.

The Supreme Court found that the psychiatrist's use of the competency evaluation violated Smith's right to avoid self-incrimination, because the Fifth Amendment applied to the sentencing as well as the guilt phase of the trial. Because the psychiatrist had neither advised Smith of his right to remain silent nor warned him that his statements could be used during capital sentencing, Smith's death sentence was overturned. The Court also held that admitting the psychiatrist's testimony at the penalty phase had violated Smith's Sixth Amendment right to assistance of counsel. Defense counsel had not known in advance that the psychiatric examination would encompass the question of future dangerousness, and thus Smith was prevented from receiving legal advice about the competence examination and its possible consequences.

In *Buchanan v. Kentucky*, 483 U.S. 402 (1987),[24] the Supreme Court expressly limited the protections in *Smith* to situations in which the defendant did not initiate the psychiatric examination or attempt to introduce psychiatric evidence at trial. Buchanan was one of three youths charged with the murder of a young woman. At his murder trial, his attorney attempted to establish the affirmative defense of "extreme emotional disturbance," calling a social worker as his sole witness. During her testimony, the social worker read from several reports and letters concerning evaluations of Buchanan's mental condition that had been prepared following an arrest on a previous burglary charge. On cross-examination, the prosecutor had the social worker read another report from a psychological evaluation that defense counsel and the prosecutor had jointly requested and that had been prepared while Buchanan had been institution-

alized before the murder trial. When defense counsel objected on the basis that the evaluation concerned only Buchanan's competence to stand trial and had nothing to do with his emotional disturbance, the prosecutor responded that the report dealt with the same matters raised by having the social worker read other reports from earlier evaluations. Defense counsel also argued that the psychological report would violate Buchanan's Fifth and Sixth Amendment rights because an attorney had not been present during the evaluation, and no one had told Buchanan that the results could be used against him at trial. The trial judge allowed the social worker to read an edited version of the report, commenting, "You can't argue about his mental status at the time of the commitment of this offense and exclude evidence when he was evaluated with reference to that mental status" (Ref. 24, p 412).

The Supreme Court held that using the report solely to rebut psychological evidence had not violated Buchanan's Fifth and Sixth Amendment rights as established in *Estelle v. Smith*. The privilege against self-incrimination was not violated, because the defendant had requested a psychological evaluation. In addition, unlike the situation in *Smith*, Buchanan's attorney himself had requested the mental health evaluation and presumably discussed it with his client. *Smith* had put defense counsel on notice that, if he intended to present such a mental-state defense, he could anticipate the use of psychological evidence in rebuttal.

### 4. Burdens of Persuasion and Standards of Proof

Legal decisions in the 1960s and 1970s made it clear that trial courts must be vigilant about the competence of criminal defendants. Yet it was not until the 1990s that the U.S. Supreme Court clarified, in two separate cases, who bears the burden of persuasion in a competence hearing and the level of proof needed to show that a defendant lacks adjudicative competence.

In the first case, *Medina v. California*, 505 U.S. 437 (1992),[25] a defendant faced several criminal charges, including three counts of first-degree murder. Defense counsel requested and the trial court granted a hearing on his client's competence, which took place pursuant to a California statute that presumes defendants are competent and gives the party claiming incompetence the burden of proving it by a preponderance of the evidence. Over a six-day pe-

riod, a jury heard conflicting expert testimony about Medina's mental condition. He had made several verbal and physical outbursts during the hearing; on one occasion, he overturned a table.

The jury found Medina competent to stand trial, and following a trial at which he raised the insanity defense, a different jury found him guilty and recommended the death sentence. The trial court imposed the death penalty for the murder convictions and sentenced Medina to prison for the remaining offenses.

In appeals to the California and U.S. Supreme Courts, Medina argued that the statutory presumption of competence and placing the burden of proof on the defendant violated his right to due process. The California Supreme Court rejected these contentions, and the U.S. Supreme Court, after granting *certiorari*, affirmed. Reasoning that preventing and dealing with crime is primarily the business of states (rather than the federal government), and, finding that there is "no settled tradition on the proper allocation of the burden of proof in a proceeding to determine competence" (Ref. 25, p 446), the Court concluded:

> Once a State provides a defendant access to procedures for making a competency evaluation. . . . we perceive no basis for holding that due process further requires the State to assume the burden of vindicating the defendant's constitutional right by persuading the trier of fact that the defendant is competent to stand trial [Ref. 25, p 449].

Four years later, however, the U.S. Supreme Court ruled unconstitutional an Oklahoma law that presumed that a defendant was competent to stand trial unless he proved otherwise by clear and convincing evidence. *Cooper v. Oklahoma*, 517 U.S. 348 (1996)[12] challenged the conviction and death sentence of a man whose competence had been considered on five separate occasions. Cooper spent time in a psychiatric facility after an initial finding of incompetence and then was ruled competent despite conflicting testimony by mental health experts. One week before trial, Cooper's lawyer reported that the defendant was still behaving oddly and refusing to communicate. On the first day of trial, Cooper's bizarre behavior prompted the trial court judge to hold another competence hearing that included testimony of several lay witnesses, a psychologist, and Cooper himself (who remained in prison overalls for the trial because he thought regular clothes were "burning" him). On the witness stand, Cooper expressed fear

that the lead defense attorney wanted to kill him, and during the hearing, Cooper talked to himself and to an imaginary "spirit" who, he said, gave him counsel. The trial judge concluded:

> My shirtsleeve opinion of Mr. Cooper is that he's not normal. Now, to say he's not competent is something else. I think it's going to take smarter people than me to make a decision here. I'm going to say that I don't believe he has carried the burden by clear and convincing evidence of his incompetency and I'm going to say we're going to go to trial [Ref. 12, p 352].

In his appeals, Cooper claimed that Oklahoma's presumption of competence and its requirement that a criminal defendant establish incompetence by clear and convincing evidence placed too heavy a burden on the defendant and therefore violated his right to due process. After a lower court rejected his argument, the U.S. Supreme Court heard the case and agreed with Cooper. The Court interpreted early English and U.S. case law as suggesting that the common-law standard of proof for incompetence is only a preponderance of the evidence (that is, more likely than not), and that the preponderance standard was being used in federal courts and 46 of the states. Holding that regulation of the procedural burden falls within the Due Process Clause of the Fourteenth Amendment, the Court concluded that the standard of clear and convincing failed to safeguard the fundamental right not to stand trial while incompetent, because it allowed criminal courts to try defendants who had shown that they were probably incompetent. The Court noted that "difficulty in ascertaining whether a defendant is incompetent or malingering may make it appropriate to place the burden of proof on him, but it does not justify the additional onus of an especially high standard of proof" (Ref. 12, p 366).

## 5. Pretrial Management of Mentally Disabled Defendants

As the Supreme Court addressed questions related to standards and procedures for determining a defendant's incompetence to stand trial, it also issued rulings regarding pretrial management of mentally disabled defendants. *Jackson v. Indiana*, 406 U.S. 715 (1972),[26] concerned "a mentally defective deaf mute with a mental level of a preschool child" (Ref. 26, p 717) who, at age 27 years, faced two separate robbery charges involving a combined value of nine dollars. Upon receiving guilty pleas from Jackson, the trial court followed Indiana procedures for determination of his competence to stand trial. The court-

appointed psychiatrists opined that Jackson's deficits left him unable to understand the nature of the charges against him or to participate in his defense, and that his ability was unlikely to improve. The trial court found Jackson incompetent to stand trial and committed him to the Indiana Department of Mental Health until he could be certified sane.

Jackson's defense counsel asked for a new trial and contended that Jackson's commitment, given the unlikelihood of his improvement, amounted to a life sentence in the absence of any conviction. As such, Jackson's confinement violated his Fourteenth Amendment right to due process and equal protection and his Eighth Amendment protection from cruel and unusual punishment. After the trial court and the Indiana Supreme Court rejected these arguments, the U.S. Supreme Court heard Jackson's case.

The Court held that when Jackson was committed because he was deemed incompetent to stand trial, he had been subjected to a more lenient standard for confinement but a more stringent standard for release than those persons who are committed under civil statutes, and this imbalance constituted a violation of the Fourteenth Amendment's Equal Protection Clause. The Court also held that indefinite commitment of a pretrial defendant solely because of his incompetence to stand trial violated Jackson's right to due process. Writing for the Court, Justice Blackmun stated that a trial-incompetent defendant might not "be held more than the reasonable period of time necessary to determine whether there is a substantial probability that he will attain that competency in the foreseeable future" (Ref. 26, p 738). If treatment could not restore a defendant to competence, the state must initiate either initiate civil commitment proceedings or release the defendant.

In two U.S. Supreme Court cases, the right of a pretrial defendant to refuse antipsychotic medications has been examined. *Riggins v. Nevada*, 504 U.S. 127 (1992),[27] concerned a man charged with murder and robbery who, a few days after his apprehension, told a jail psychiatrist that he was hearing voices and having trouble sleeping. Riggins reported that he had previously taken the antipsychotic drug thioridazine, and the psychiatrist prescribed the drug, gradually increasing the dose to 800 mg a day.

A few months later, Riggins underwent evaluation and was found competent to stand trial. The defense then moved for suspension of the thioridazine (and phenytoin, which Riggins was also receiving) during

the trial, arguing that his taking the drugs "infringed upon his freedom and that the drugs' effect on his demeanor and mental state during trial would deny him due process" (Ref. 27, p 130). The defense also argued that Riggins had a right to show jurors his "true mental state" in the presentation of a planned insanity defense. The trial court denied the motion to terminate the medication, the trial continued, Riggins was found guilty, and he received the death sentence.

After Riggins' Nevada appeals failed, the U.S. Supreme Court granted *certiorari* to "decide whether forced administration of antipsychotic medication during trial violated rights guaranteed by the Sixth and Fourteenth Amendments" (Ref. 27, pp 132–3). The Court found that due process would have been satisfied if the trial court had found that antipsychotic medication was medically appropriate and essential for the sake of Riggins' safety or the safety of others, taking into account "less intrusive" alternatives. The Court also stated that the state might have been able to justify medically appropriate involuntary medication for Riggins if the trial court had found that no less-intrusive measures would have permitted adjudication of his case.

However, the trial court's ruling requiring Riggins to keep taking antipsychotic medication neither established that thioridazine would ensure that he could be tried nor showed that safety considerations or some other compelling concern outweighed his interest in being free of unwanted drugs. Thus, forced administration of antipsychotic medication during trial may have violated his trial-related rights under the Sixth and Fourteenth Amendments. The Supreme Court reversed his conviction and remanded his case for further proceedings.

*Riggins* left open the question of whether a defendant can be forcibly medicated solely to render him competent to stand trial. Eleven years after *Riggins*, *Sell v. U.S.*, 539 U.S. 166 (2003),[28] provided the answer. Charles T. Sell, a dentist, was charged in May 1997 with submitting false insurance claims. After he was found incompetent to stand trial, Sell refused to accept the antipsychotic medication that his doctors believed would be likely to restore his competence. A federal magistrate and a district court judge both authorized administration of medication over Sell's objections, ruling that Sell's behavior in the hospital showed that he posed a danger to others. A divided panel of the court of appeals affirmed the

district court's decision to authorize forced medication, but found that Sell was not dangerous while institutionalized. Therefore, in accepting Sell's case for review, the U.S. Supreme Court had to decide whether psychotropic medication can be forced on a nondangerous defendant solely to render him competent to stand trial.

In developing criteria for imposing competence-restoring medication on unwilling defendants, the Court turned to *Washington v. Harper*, 494 U.S. 210 (1990),[29] (which had dealt with involuntary medication of prison inmates) and *Riggins*.[27] Taken together, said the Court, these cases implied that:

> . . . the Constitution permits the Government to involuntarily administer antipsychotic drugs to a mentally ill defendant facing serious criminal charges to render that defendant competent to stand trial, but only if the treatment is medically appropriate, is substantially unlikely to have side effects that may undermine the fairness of the trial, and, taking account of less intrusive alternatives, is significantly necessary to further important governmental trial-related interests [Ref. 28, p 179].

Before imposing involuntary medication, said the *Sell* majority, trial courts must address four points:

> Whether the government has an interest in prosecuting the defendant, by considering the seriousness of the charges; how long the defendant has already been confined (time that would count against a possible sentence); and whether the defendant might, if not treated, be confined to a psychiatric hospital for a lengthy period, which "would diminish the risks that ordinarily attach to freeing without punishment one who has committed a serious crime" (Ref. 28, p 180).

> Whether the proposed medication would "be substantially likely" to render the defendant competent without causing side effects that would interfere with his ability to work with his attorney.

> Whether there is a less intrusive treatment that would restore the defendant's competence.

> Finally, whether the proposed involuntary medication would be "*medically appropriate*, i.e., in the patient's best medical interest in light of his medical condition" (Ref. 28, p 181; emphasis in original).

The Court also held that, before ordering forced medication to restore competence, trial courts should consider other possible grounds for forced

medication, including a patient's dangerousness to himself or others and situations in which the patient's refusal to take medication poses a risk to his health. If medications were authorized on these grounds, it would not be necessary to decide whether to force medication to restore trial competence. The Court commented:

> . . . [M]edical experts may find it easier to provide an informed opinion about whether, given the risk of side effects, particular drugs are medically appropriate and necessary to control a patient's potentially dangerous behavior (or to avoid serious harm to the patient himself) than to try to balance harms and benefits related to the more quintessentially legal questions of trial fairness and competence [Ref. 28, p 182].

In *Sell*, the Court ruled that the existing orders for forced medication could not stand, because lower courts had not adequately considered trial-related side effects, the impact on the sentence of Sell's already-lengthy confinement, and any potential future confinement that might lessen the importance of prosecuting him. The Court therefore remanded Sell's case for further proceedings in accordance with its ruling.

### 6. Standards for Waiving Constitutional Rights

Whether there should be a separate, higher standard of competence for defendants who want to waive their constitutional rights to counsel and enter a plea of guilty was settled in *Godinez v. Moran*,[20] in which the U.S. Supreme Court stated that fitness to stand trial implies competence to waive counsel and plead guilty. After being charged with three counts of first-degree murder, Moran had initially pleaded not guilty, and two psychiatrists who evaluated Moran opined that he was depressed but competent to stand trial. Moran then told the Nevada trial court that he wanted to change his plea to guilty and dismiss his attorneys—his purpose being to prevent the presentation of mitigating evidence at his sentencing. The trial court found that Moran understood the charges against him, was capable of assisting his lawyers, had waived his right to counsel knowingly and intelligently, and had entered his guilty pleas freely and voluntarily. Moran was subsequently sentenced to death on all three murder counts.

In a postconviction appeal hearing, a trial court rejected Moran's claim that he had been mentally incompetent to represent himself. The Nevada Supreme Court denied Moran's appeal for dismissal, and a federal district court rejected his *habeas corpus*

application. The federal court of appeals reversed, however, holding that the district court should have held a hearing regarding Moran's competence before accepting his guilty plea and his decision to waive counsel. Further, the court of appeals held that competence to waive constitutional rights requires a higher level of mental functioning than that needed to stand trial. The correct standard for such a waiver required that the defendant have the capacity to make a "reasoned choice" among the available alternatives.

Rulings from various federal circuit courts had disagreed about whether a higher standard of competence was necessary for pleading guilty or waiving the right to counsel, and the U.S. Supreme Court granted *certiorari* in *Godinez* to resolve the matter. A Court majority, per Justice Thomas, "reject[ed] the notion that competence to plead guilty or to waive the right to counsel must be measured by a standard that is higher than (or even different from) the *Dusky* standard" (Ref. 20, p 398), and cited the language of *Dusky* as the proper criterion in these situations. When a defendant waives the right to counsel, he must do so "competently and intelligently." To be competent to waive counsel, however, the defendant need only have the capacity to make an "intelligent and voluntary" decision to choose self-representation. The defendant need not have the "technical legal skills" or heightened mental abilities necessary to represent himself capably in a criminal proceeding. The Court also found that the decision to plead guilty is "no more complicated than the sum total of decisions that a defendant may have to make during the course of a trial, such as whether to testify, whether to waive a jury trial, and whether to cross-examine witnesses for the prosecution" (Ref. 20, p 398). The Supreme Court therefore upheld Moran's conviction and death sentence. Moran's later appeals were unsuccessful, and the state of Nevada executed him in March 1996.

## II. Special Topics in Recent U.S. Case Law

### A. Mental Conditions and Adjudicative Incompetence

As explained in the previous section, the U.S. Supreme Court has construed the Sixth and Fourteenth Amendments as forbidding trial of incompetent defendants and as requiring courts to hold hearings about a defendant's fitness for trial whenever suffi-

cient doubt about competence arises. There is no bright-line threshold about what constitutes sufficient doubt, but the Court has recommended that trial courts consider "a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion" (Ref. 19, p 180) in weighing whether to hold a hearing on competence.

In applying *Drope*, federal appeals courts have faulted trial courts for failure to hold hearings on competence to stand trial in cases in which:

> The defendant could not communicate intelligently, had a family history of mental disturbance, and had sustained a severe head injury.[30]

> The trial judge was informed that the defendant had several mental disorders, had undergone many psychiatric hospitalizations, and probably had used antipsychotic medication, and defense counsel had repeatedly asked for assistance from mental health experts.[31]

> The defendant who displayed odd, self-defeating behavior in court had believed his lawyer and the judge were part of a conspiracy.[32]

> The defendant claimed to have experienced auditory and visual hallucinations at the time of the offense, his family had a history of mental illness, psychiatrists found that he had severe paranoid schizophrenia, and the judge had written a letter to the state department of corrections expressing concern about his competence.[33]

Appellate courts have been clear, however, that "the presence of some degree of mental disorder in the defendant does not necessarily mean that he is incompetent to . . . assist in his own defense" (Ref. 34, p 445). Neither a past nor a current mental disorder—be it mental retardation, mental illness, brain damage, or substance abuse—necessarily makes a defendant incompetent.[35–37] Thus, for example, appeals courts have ruled that:

> Despite indications of grandiose or paranoid delusions, the defendant was competent because an examining psychologist found no need for treatment and a psychiatrist testified that the defendant understood the legal proceedings and could assist counsel.[38]

> despite a history of depression, severe learning impairment, and suicidal tendencies, the defendant was competent because he showed that he understood legal proceedings and the appeals process.[39]

> although the defendant had brain damage caused by multiple head injuries and drug addiction, he was competent because the he had assisted counsel in preparing for trial; had given appropriate responses in interviews; and had written letters to the jury, counsel, and his wife and because neither the defendant's family nor counsel had doubted his competence.[40]

> Despite the presence of structural brain abnormalities and a history of behavioral problems, the defendant was fit because a prosecution psychiatrist had testified to that effect.[41]

> Although the defendant had mild mental retardation and organic brain damage and had engaged in substance abuse, the opinion of the government's mental health experts, the defendant's own coherent testimony, his confession to police, and his two escapes all had represented evidence that he was competent.[42]

> Although he had narcolepsy, the defendant had testified coherently at trial, and the trial court had verified that, throughout the trial, he had taken notes and conversed with counsel.[43]

> Although the defendant gave "rambling and often nonresponsive answers to questions that he was asked," most of the his statements showed "that he simply wanted his day in court and wanted an opportunity to tell his story his way."[44]

### B. Competence and Criminal Responsibility

Courts have also repeatedly distinguished between findings regarding fitness for trial (which reflects a defendant's present mental capabilities during adjudication) and criminal responsibility (which is related to a defendant's mental state when the alleged offense took place), holding that these are independent determinations on distinct ultimate issues.[45,46] A finding that a defendant is competent to stand trial cannot not prevent him from trying to establish an insanity defense, and such a finding is not admissible at trial.[47]

### C. Attorney's Failure to Challenge Competence

Occasionally, forensic clinicians encounter referrals for competence evaluations that seem frivolous,

because the defendant is obviously competent. Clinicians should recognize, however, that when a defendant displays signs of a competence-impairing mental disorder, defense counsel is obligated to question whether the client can proceed with adjudication.[48]

The leading case in this area is *Curry v. Zant*, 371 S.E.2d 647 (Ga. 1988),[49] a Georgia Supreme Court *habeas corpus* ruling that set aside the guilty plea and death sentence of a defendant charged with committing murder in the course of a rape and burglary. The first of two attorneys appointed to represent the defendant believed that his client had a severe mental illness, and the trial court told this attorney that it would grant funds for an independent evaluation of the defendant's competence to stand trial. On its own motion, the trial court also had clinicians at a state hospital evaluate the defendant. The hospital's examining physician reported that the defendant was "not hitting on all cylinders" and had a borderline personality disorder, but might be malingering and manipulative.

A second appointed attorney ultimately represented the defendant, who entered a plea of guilty at trial and subsequently received the death sentence. The attorney never asked for the independent evaluation because, given his observations of the defendant and the report from the state hospital, he felt that a second evaluation "would be futile" (Ref. 49, p 649). At the *habeas corpus* hearing, however, a psychologist testified that the defendant had not been competent to waive his right to trial and that information from "an independent evaluation would have been invaluable to a jury trying his case" (Ref. 49, p 648). The Georgia Supreme Court believed that the second attorney had been conscientious. He had thoroughly discussed with the defendant and his family the decision to plead guilty and had prepared well for the trial's sentencing phase. Nonetheless, concluded the court, the attorney's failure to get a second psychiatric evaluation constituted ineffective assistance of counsel, because a second opinion might well have provided crucial information about incompetence and insanity, and may have resulted in death penalty mitigation.

### 1. Other Cases

Recent cases from other jurisdictions support the view that a defense attorney's failure to investigate *bona fide* signs of incompetence constitutes ineffec-

tive assistance of counsel and grounds for reversal of a criminal conviction.

*Hull v. Kyler*, 190 F.3d 88 (3rd Cir. 1999),[50] concerned another defendant charged with murder who was found incompetent soon after his arrest and was hospitalized for four years. The trial court found the defendant competent based on testimony from a court-appointed psychiatrist who had seen the defendant three months earlier and who said the defendant could understand proceedings and assist counsel "at that time." Defense counsel did not cross-examine the expert and conceded competence, and the defendant pleaded guilty to murder. In finding defense counsel ineffective, the appeals court noted that during his hospital stay, at least eight doctors had found the defendant incompetent because of mental retardation and schizophrenia and that an evaluation two weeks before the court-appointed expert had found no change in him from previous examinations.

*Woods v. State*, 994 S.W.2d 32 (Mo. Ct. App. 1999),[51] concerned a defendant with a manic-depressive disorder who tried to commit suicide the on day of his sentencing. The defendant seemed as depressed as usual to the attorney when she talked with him after the suicide attempt, and she thought he was competent. "This was not counsel's call," said the appeals court (Ref. 51, p 39), and ruled that counsel was ineffective in her failure to seek a competence evaluation after the suicide attempt.

*In the Matter of Fleming*, 16 P.3d 610 (Wash. 2001) (en banc),[52] concerned the potential impact of findings by a defense expert, who was retained to investigate the possibility of a diminished-capacity defense, but who thought that the defendant was incompetent to stand trial. Defense counsel did not inform the trial judge of the expert's opinion, and the defendant pleaded guilty to a burglary charge. The Washington Supreme Court held that the defense attorney's failure to inform the judge constituted ineffective assistance of counsel because the defendant "might have been found incompetent and should have had a competency hearing before entering a plea of guilty" (Ref. 52, p 615).

### D. Personality Disorders

Personality disorders usually are not conditions that render defendants incompetent to stand trial, and numerous appellate cases affirm convictions of defendants whom trial courts found competent despite their personality problems. However, several

cases suggest that personality disorders could cause adjudicative incompetence and that failure to recognize this possibility could result in reversal of a conviction.

### 1. State Court Cases

In *State v. Stock*, 463 S.W.2d 889 (Mo. 1971),[53] the Missouri Supreme Court held that the trial court had erred in failing to hold a hearing concerning the defendant's competence to stand trial for selling marijuana. After conviction but before sentencing, the defense attorney moved for a new trial because he had just learned that Stock had previously received psychiatric treatment. At a hearing on the motion, the treating psychiatrist testified that his former patient "had schizoid traits . . . and a tendency to be withdrawn, hostile, and sometimes paranoid" (Ref. 53, p 893). A court-appointed physician examined the defendant and submitted a written report that said that the defendant had "a personality disorder characterized by general inadequacy," but that this "would not interfere with his ability to participate in his defense in a trial" (Ref. 53, p 893). Defense counsel contested the court-appointed physician's conclusion. However, the trial court believed that the period during which competence could be considered had lapsed, and concluded—without holding a hearing—that there was no basis for finding that the accused lacked the mental capacity to proceed. The Missouri Supreme Court found, however, that the defendant was entitled under the state's statutes to a hearing on his competence: "the trial court apparently considered that it had reasonable cause to believe that the appellant had a mental disease or defect excluding fitness to proceed, because it exercised its discretion and appointed a private physician to make an examination and report" (Ref. 53, p 894).

*Hayden v. Commonwealth*, 563 S.W.2d 720 (Ky. 1978),[54] concerned the appeal of a Kentucky defendant after his conviction for manslaughter and robbery. Before trial, defense counsel had expressed doubt about his client's competence. An examining psychiatrist thought the defendant had a schizoid personality, would probably decompensate into a psychotic episode when under stress, and could participate only in trial procedures that were "very concrete" and in which participants used only "extremely" simple phrases to express simple ideas (Ref. 54, p 722). Though the defendant had testified at trial, this did not constitute evidence sufficient to overcome the trial court's previous doubts about the defendant's competence. Holding that the trial judge erred when he failed to conduct an evidentiary hearing on the defendant's competence, the Kentucky Supreme Court reversed the defendant's conviction. The court remanded the case for an evidentiary hearing on the defendant's competence to stand trial, indicating that the defendant might be retried were he found competent. (A subsequent Kentucky case, *Thompson v. Commonwealth*, 56 S.W.3d 406 (Ky. 2001),[55] overruled the portion of *Hayden* that required vacating a defendant's sentence, holding that a retrospective hearing on whether a defendant had been competent was permissible.)

### 2. Federal Court Cases

Two cases illustrate the potential role that personality disorders may play in federal court determinations of competence.

In *U.S. v. Wayt*, 24 Fed.Appx. 880 (10th Cir. 2001), a Wyoming federal court indicted Glen Wayt on charges of conspiracy and distributing methamphetamine, and eventually he pleaded guilty to the conspiracy charge. Before Wayt had entered his plea, the district (trial) court had heard testimony from two experts, one of whom testified that although Wayt understood the proceedings against him, his drug-induced paranoia would significantly affect his ability to assist counsel and prevent him from providing adequate information for his defense. Wayt appealed the district court's decision finding him competent to stand trial, contending that the court incorrectly concluded, as a matter of law, that a personality disorder derived from long-term substance abuse cannot constitute a "mental disease or defect" under federal statute 18 U.S.C. § 4241, which sets forth criteria of adjudicative incompetence. The government countered that a personality disorder indeed should not be considered to be "a mental disease or defect" for the purpose of finding a defendant incompetent to stand trial.

The appeals court accepted neither the appellant's nor the government's position.[56] Before trial, the district court considered the evidence before it and concluded that even if Wayt had a personality disorder with paranoid features, the disorder, in his particular case, did not meet the statutory criteria for finding that Wayt was incompetent to stand trial. "Contrary to Mr. Wayt's contentions," wrote the appeals court, "the district court's ruling does not convey a gener-

alized legal rule that personality disorders do not qualify for consideration" when a defendant's competence is in question (Ref. 56, p 883). This language seems to imply that had the district court based its decision on such "a generalized legal rule," it would have been in error, which, in turn, implies that a personality disorder could be a "mental disease or defect" for the purpose of finding a defendant incompetent to stand trial.

A district court ruling in *U.S. v. Veatch*, 842 F.Supp. 480 (W.D. Okla. 1993),[57] illustrates how a court might conclude that a personality disorder renders a defendant incompetent to stand trial. The court heard testimony that the defendant's "paranoid thinking and mistrust of the judicial system in general prevented him from participating in the proceeding with the requisite degree of rationality" (Ref. 57, p 482). The defendant believed, for example, that "his current incarceration was the direct result of the persistence of the government in persecuting him for other acts." Although Veatch understood what was happening in his criminal proceedings, "his severe personality disorder, which both experts agree is wrought with paranoid, narcissistic and antisocial traits, rendered him incapable of effectively assisting counsel in his defense or conducting his own defense. In sum, the defendant's irrational thoughts prevented him from being competent to stand trial" (Ref. 56, p 482).

### E. Defendants With Impaired Hearing

For several decades, courts have held that defendants with impaired hearing are constitutionally entitled to special accommodations during legal proceedings. In 1925, an Alabama appeals court ruled that a hearing-impaired defendant:

> . . . must not only be confronted by the witnesses against him, but he must be accorded all necessary means to know and understand the testimony given by said witnesses. The constitutional right [to confront one's accuser] would be meaningless and a vain and useless provision unless the testimony of the witnesses against him could be understood by the accused. Mere confrontation of the witnesses would be useless, bordering upon the farcical, if the accused could not hear or understand their testimony [Ref. 58, p 387].

More recently, a Louisiana court held, in *State v. Barber*, 617 So.2d 974 (La. Ct. App. 1993),[59] that:

> . . . the Constitution requires that a defendant sufficiently understand the proceedings against him to be able to assist in his own defense. Clearly, a defendant who has a severe hearing impairment, without an interpreter, cannot under-

stand the testimony of witnesses against him so as to be able to assist in his own defense [Ref. 59, p 976].

Decisions from Ohio and New York liken the situation of a hearing-impaired defendant with that of a defendant who cannot understand English:

> Clearly, a non-English speaking defendant could not meaningfully assist in his/her own defense without the aid of an interpreter. A hearing impaired person is similarly deprived of due process in court proceedings conducted without assistance [Ref. 60, p 509].

> A defendant who cannot hear is analogous to a defendant who cannot understand English, and a severely hearing-impaired defendant cannot be tried without adopting reasonable measures to accommodate his or her disability [Ref. 61, p 672].

The Arizona Supreme Court said that without some form of assistance, hearing-impaired defendants were forced to view "proceedings from a soundproof booth" (Ref. 62, p 733).

Once the trial court decides that a hearing-impaired defendant requires some assistance, the trial court has broad discretion in accommodating the defendant's right to that assistance. However, two cases illustrate the potential sensitivity that trial courts must display concerning the competence of defendants with hearing impairments.

*Holmes v. State*, 494 So.2d 230 (Fla. Dist. Ct. App. 1986),[63] appealed the second-degree murder conviction of a deaf and mute defendant who, as a 17-year-old student, stabbed a teacher. Before trial, the judge considered the opinions of seven experts before concluding that Holmes was competent, and took "every possible precaution to assure that Holmes' due process rights were protected" (Ref. 63, p 232). At trial, Holmes admitted that he had stabbed the victim, but claimed self-defense. Holmes' lawyer tried to show that Holmes had stabbed the teacher because the teacher had held Holmes around the upper body, effectively cutting off Holmes' air supply, and that his client had believed he would be injured or killed if not released by the teacher. But when the defense attorney tried to question Holmes about what he thought would have happened if the teacher had continued to exert pressure, Holmes could not respond. The trial judge noted that Holmes could not answer questions crucial to his defense, and subsequently, Holmes' attorney moved for a hearing to present psychological testimony concerning Holmes' ability to present the defense of self-defense. However, the trial judge declined to conduct another hearing on Holmes' com-

petence to stand trial. The appeals court held that Holmes' problems in testifying had raised a *bona fide* doubt about his competence to stand trial and that the trial court abused its discretion in denying Holmes' motion. The appeals court vacated Holmes' conviction and sent the case back to the trial court for a reevaluation of Holmes' competence to stand trial.

The kinds of courtroom accommodations that would preserve a hearing-impaired defendant's conviction appear in *Shook v. State*, 552 So.2d 841 (Miss. 1989), writ of *habeas corpus* denied, Shook v. Mississippi, 2000 U.S. Dist. LEXIS 8851 (N.D. Miss. 2000).[64] In this appeal, a deaf defendant who had been convicted for aggravated assault and firing into a dwelling contended that (1) he should not have been tried until he had learned sign language, and (2) he had been tried while he was physically (and possibly mentally) incompetent.

The appeals court rejected both claims. Concerning the first, the court noted that Shook could read and that an interpreter had "kept him well informed as the trial progressed. He is a high school graduate and was a college student. During the trial he was kept advised of what was being argued and what the testimony was" (Ref. 64, pp 844–5). The second claim, said the appeals court, was "totally refuted by the facts" (Ref. 64, p 845). At the trial, the judge had appointed an interpreter who sat at defense counsel's table during the trial and wrote notes to the defendant. Lay witnesses had testified that they could communicate with Shook, and he could communicate with them. The trial court also had allowed members of the defendant's family to be with the defendant at counsel table to assist in communication, even though they might have been witnesses in the case. At a subsequent *habeas corpus* hearing, a federal court affirmed that Shook's criminal trial proceedings had adequately protected his due process rights because the trial court had taken all reasonable measures to compensate for Shook's hearing impairment and had also delayed the trial while Shook underwent a competence evaluation at the state hospital.

Hearing and communication impairment may be the basis for a court's finding of incompetence to stand trial, even when no evidence is presented concerning the defendant's mental disorder. For example, *State v. Burnett*, 2005 Ohio 49 (Ohio Ct. App. 2005),[65] affirmed the trial court's finding that a "deaf mute" defendant was incompetent to stand trial. The defendant's concrete thinking and idiosyncratic method of communication (which involved use of gestures, American Sign Language, and a system of "home signing" established among his family members) precluded having interpreters function as intermediaries between him and legal personnel. No mental health expert ever evaluated the defendant. The trial court based its finding on the testimony of a master's-level social worker who also had an associate's degree in sign language. In another case (*U.S. v. Jones*, 2006 U.S. Dist. LEXIS 9257 (E.D. Tenn. 2006))[66] involving a hearing-impaired defendant who could not understand standard sign language, a federal district court declared that the defendant was "physically incompetent" (Ref. 66, p 17) to stand trial under the *Dusky* standard.

### F. Amnesia

Many U.S. cases have addressed whether trying a defendant who cannot remember the events that led to his arrest constitutes a denial of due process or of the right to effective assistance of counsel. The most-cited case in this area is *Wilson v. U.S.* 391 F.2d 460 (D.C. Cir. 1968).[67] Wilson and an accomplice stole a car and held up a pharmacy. Police pursued the pair in a high-speed chase that ended when the alleged thieves' vehicle left the road and crashed into a tree. The accomplice died, and Wilson fractured his skull and ruptured several blood vessels in his brain. He remained unconscious for three weeks, and at the time of trial, he could remember nothing that had happened from the afternoon of the robberies until he had regained consciousness. However, his mental condition was otherwise "normal," and he had only minor neurological sequelae (partial paralysis and a slight speech defect). The trial court found Wilson competent to stand trial, and he was found guilty of assault with a pistol and robbery. Wilson appealed his conviction on the grounds that he had been incompetent to stand trial and that his being tried while amnesic had violated his constitutional rights.

The appeals court remanded the case to the trial court for more extensive posttrial findings about whether Wilson's amnesia had indeed deprived him of his rights to a fair trial and effective assistance of counsel under the Fifth and Sixth Amendments. The appeals court held that to have a fair trial, a defendant must be competent under the *Dusky* standard. A trial court would have to predict before trial at a competence hearing whether an amnesic defendant has the capacities required under *Dusky*. But after a trial has

taken place, continued the appeals court, "the trial judge should determine whether the defendant has in fact been able to perform the functions" (Ref. 67, p 463) required by *Dusky*. Further, the trial court should "make detailed written findings" (Ref. 68, p 463) concerning how the defendant's amnesia had actually affected the fairness of the trial, taking into account six factors:

> The effect of the amnesia on the defendant's ability to consult with and assist his lawyer;
>
> the effect of the amnesia on the defendant's ability to testify;
>
> how well the evidence could be extrinsically reconstructed, including evidence relating to the alleged offense and any plausible alibi;
>
> the extent to which the government assisted the defense in this reconstruction;
>
> the strength of the prosecution's case, including the possibility that the accused could, but for his amnesia, establish an alibi or other defense; and
>
> "[a]ny other facts and circumstances which would indicate whether or not the defendant had a fair trial" (Ref. 67, p 464).

Though many other courts have adopted features of the reasoning and approach in *Wilson* to the problem of the amnesic defendant (e.g., Refs. 68–73), some have declined to do so (e.g., Refs. 74–76).

*U.S. v. Stubblefield*, 325 F.Supp. 485 (D.C. Tenn. 1971),[77] illustrates the potential impact of the fourth point. The court held that a defendant's memory impairment and incapacity to testify were such as to require the prosecution to help the defense in reconstructing evidence relating to the crime charged and various possible defenses. To this end, the court ordered the prosecution to open its files to defense counsel and to keep those files open continually throughout the trial.

*Wilson* clearly implies that amnesia for the events that led to an arrest could be a ground for a finding of incompetence and that a trial court may have to examine whether a defendant is incompetent prospectively (before trial) and/or retrospectively (after adjudication has occurred). Thus, appellate courts have reversed convictions or remanded cases after finding that amnesia, coupled with other factors, may have prevented the defendant from intelligently testifying or remembering matters needed to make his defense.

Courts have remanded or reversed in cases in which the amnesia had diverse causes, including traumatic brain injury,[67] "a psychotic type of regression,"[78] drugs administered by a sheriff,[79] self-administered narcotics,[80] and psychogenic causes.[81,82]

However, these cases held only that memory impairments may entitle defendants to trial court assessments of their competence to proceed with adjudication or to postconviction reviews of whether their amnesia had adversely affected their defense. In a 1967 case (*Bradley v. Preston*, 263 F.Supp. 283 (D.C. Dist. 1967), *cert. den.* 390 U.S. 990 (1967)),[83] the court stated that it was "unable to locate any case to support the contention that amnesia does preclude mental competency as a matter of law" (Ref. 83, p 285), nor was there any record of a court's holding a defendant incompetent to stand trial solely because of amnesia. In subsequent years, courts have consistently hewed "to the well-accepted principle that a loss of memory of the alleged offense does not in and of itself preclude fitness to proceed" (Ref. 81, p 566; see also Ref. 84). "[C]ases without exception reject the notion that an accused possesses that ability [to stand trial] only if he is able to remember the circumstances of the crime with which he is charged" (Ref. 85, p 301).

By itself, amnesia is only one factor for the trial court to consider when determining whether a defendant is competent and will receive a fair trial.[86] Indeed, courts have held this, even in cases in which defendants' cognitive problems arose from gunshot wounds to the head.[87–90] In one of these cases, *State v. McClendon*, 437 P.2d 421 (Ariz. 1968),[87] the Arizona Supreme Court concluded that limited amnesia would not totally incapacitate the defense or prevent the defendant from assisting counsel in numerous ways, commenting, "We believe that a defendant is entitled to a fair trial, but not necessarily to a perfect trial" (Ref. 87, p 425). *McClendon* noted that amnesia was nothing more than a failure of memory concerning facts or events to which an individual has been exposed, that everyone's memory is marked by some postevent distortion, that no one's memory is ever complete, and that therefore, everyone is amnesic to some degree. The ruling in *McClendon* also voiced a persistent concern of the courts in this area: that defendants could easily feign amnesia and that discovery and proof of feigning and malingering are difficult, especially if a defendant refuses to take the stand.

## G. The Pro Se Defense

### 1. Historical Background

The notion that an attorney should represent a criminal defendant is a recent historical development. Western literature contains many important historical accounts of individuals (e.g., Socrates and Thomas More) who defended themselves against various types of criminal charges. Old English law traditionally denied the aid of counsel to felony defendants, and only after an 1836 act of Parliament were persons accused of felonies granted the full right to legal representation.[91,92]

In the United States, the Sixth Amendment established a criminal defendant's right to be represented by attorneys. Though a 1932 decision[91] mandated counsel in death penalty cases under the Due Process Clause, it was not until 1963[93] that the U.S. Supreme Court held that the Sixth Amendment guarantees indigent felony defendants the right to court-appointed counsel in state criminal trials.

U.S. law does not require criminal defendants to use lawyers in criminal proceedings, however. In *Faretta v. California*, 422 U.S. 806 (1975),[92] the U.S. Supreme Court recognized a constitutionally protected right, derived from the Sixth Amendment as made applicable to the states by the Fourteenth, that lets a defendant proceed without counsel in a state criminal prosecution if the defendant voluntarily and intelligently elects to do so. The *Faretta* court held that the right to self-representation is implicit in the structure of the Sixth Amendment, which states that "the accused [and not his attorney] shall enjoy the right to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; [and] to have compulsory process for obtaining witnesses in his favor."

### 2. Legal Criteria for Permitting a Pro Se Defense

Because *pro se* defendants relinquish many of the traditional benefits associated with the right to counsel, *Faretta* requires that accused persons knowingly and intelligently forgo those relinquished benefits before being permitted to represent themselves. Subsequent cases have held that when the defendant chooses self-representation, the record should show that "he knows what he is doing and his choice is made with eyes open" (Ref. 92, p 835). A Connecticut appeals court held that a trial record sufficiently supported a valid waiver of right to counsel when it showed that the defendant was literate, competent,

and understanding and that he had voluntarily exercised his informed free will.[94] The Nevada Supreme Court has held that the record should establish that a defendant has been made aware of the dangers and disadvantages of self-representation.[95]

To make a knowing and intelligent decision to represent oneself, the defendant must have the mental competence to make a valid waiver of the right to counsel. In the United States, a self-representing criminal defendant has the right to have "a fool for a client," and the wisdom of representing oneself does not have a legal bearing on whether a decision to proceed *pro se* is intelligent and knowing.[96] Further, when trial courts assess whether a defendant is making a knowing and intelligent decision to defend himself, it does not consider his lack of skill or technical legal knowledge to be relevant, because it is the defendant who will experience the consequences of a conviction.[97,98] Even in capital cases, defendants who are competent to stand trial and who knowingly, intelligently, and voluntarily waive the right to an attorney are entitled to represent themselves.[99]

Exactly what trial courts must do when a defendant asks to proceed *pro se* appears to vary between, and even within, jurisdictions.

In a 1987 case (*People v. Burnett*, 234 Cal. Rptr. 67 (Cal. Ct. App. 1987)),[100] a California court of appeal held that when a trial court has doubts about a defendant's competence to represent himself, the court must make a careful inquiry into the matter, ordinarily by ordering a psychiatric evaluation.

In a 2001 case, however (*People v. Williams*, 111 Cal. Rptr. 2d 732 (Cal. Ct. App. 2001)),[101] another California court of appeal deemed a defendant's waiver of counsel and request for self-representation to have been voluntary, knowing, and intelligent, even though the defendant's lawyer and a psychologist said that self-representation would be "a disaster." The defendant was convicted. The trial court had neither questioned Williams about whether his request to represent himself was voluntary, knowing, and intelligent, nor made any expressed finding on those points. Yet the court of appeal found that Williams had been competent to stand trial and had executed a form acknowledging that he was advised of various problems associated with self-representation. Thus, Williams' conviction stood.

The Indiana Supreme Court has held that, generally, trial courts should respond to a defendant's request for self-representation by having a pretrial

hearing to determine the defendant's competence to proceed *pro se* and to establish a record of the defendant's waiver of his right to counsel.[102]

The Florida Supreme Court has held that a trial court must determine whether a defendant is competent to choose *pro se* representation and has knowingly and intelligently waived the right to counsel.[103]

Some jurisdictions have spelled out specific factors to be considered when deciding whether a waiver of counsel is valid. The Rhode Island Supreme Court suggested that trial courts consider: (1) the defendant's background, experience, behavior at the hearing, age, education, and physical and mental health; (2) the defendant's contact with lawyers before the hearing; (3) the defendant's knowledge of the proceedings and the sentence that may be imposed; (4) whether standby council has been appointed and is available; (5) whether mistreatment or coercion have occurred; and (6) whether the defendant is trying to manipulate the events of the hearing.[104] A Wisconsin appellate court held that the trial court must consider the defendant's education, literacy, fluency in English, and any physical or psychological disability that may significantly affect communication.[105]

### 3. Deportment and Rationality of Pro Se Defendants

Although the *Faretta* decision permits a criminal defendant to act *pro se*, it is not a license to abuse the dignity of the courtroom, and a trial judge may terminate self-representation by a defendant who does not behave acceptably. Thus, several appellate decisions (e.g., Refs. 106–109) have found that trial courts properly revoked the right to self-representation in cases in which *pro se* criminal defendants engaged in disruptive behavior at trial.

Several courts have held that a history or current presence of mental illness is not, by itself, a reason to deny the right to self-representation. In a 1975 Texas case (*Stepp v. Estelle*, 524 F.2d 447 (5th Cir. 1975)),[110] the appeals court found that the fact that the defendant had attempted suicide two or three days before his trial did not by itself mean that he lacked the appropriate mental capacity. In a 1981 Arizona case, the court held that granting of the defendant's request to represent himself at trial was not an error, although the defendant had history of mental illness, had been confined several times in mental institutions, and was at times disruptive in court.[111] In an appeal of a capital murder conviction, the Nevada Supreme Court held that the defendant's waiver of his right to counsel had been valid, knowing, voluntary, and intelligent, although the defendant had a narcissistic personality disorder.[112]

However, trial courts must recognize when mental illness actually affects a defendant's competence and ability to choose self-representation. Granting a defendant's request to proceed *pro se* was held improper in a case in which the defendant said that his five different public defenders were incompetent and in which his disruptive behavior and claims of ineffective assistance raised questions about his understanding of legal proceedings.[113] The Michigan Supreme Court held that a defendant was properly found to be incompetent to represent himself at trial when he wanted his appointed lawyer dismissed for "lack of evidence" and told the trial judge that this evidence consisted of a "mask ruling of Jesse James' case concerning the Supreme Court" (Ref. 114, p 860). If a defendant wants to represent himself, but his statements or behavior give the trial judge sufficient cause to doubt his competence to make a knowing, intelligent waiver of counsel, the court must appoint an attorney to represent the defendant, and the attorney must serve until the question of competence is resolved.[115]

Although the legal literature contains numerous appellate cases and articles about *pro se* defendants, mental health publications contain very little empirical research on such individuals. In what they believe was the first effort to characterize *pro se* defendants systematically, Mossman and Dunseith[116] found that, although newspaper descriptions of individuals who represented themselves often contained indicia of mental problems, a substantial fraction of *pro se* defendants had rational reasons for wanting to represent themselves. In a few cases, *pro se* defendants were skillful and successful in representing themselves and took advantage of opportunities (e.g., establishing rapport with jurors) that are not available to attorney-represented defendants.

### H. Malingering

Many defendants referred for evaluations of competence to stand trial are found to be malingering. Two reports from the 1990s suggest that at least ten percent of defendants referred for competence evaluations attempt to feign mental problems that would impair competence.[117,118] Judges persistently raise the possibility of malingering as a reason for skepticism about the defendant's having a genuine

mental disorder.[119,120] In at least two federal cases, appeals courts have held that deliberate efforts to feign mental problems could be grounds for imposing a longer prison term under federal sentencing guidelines.

*U.S. v. Greer*, 158 F.3d 228 (5th Cir. 1998)[121] concerned the sentencing of a defendant found guilty of kidnapping and several firearms charges. The bizarre behavior that Greer exhibited after his arrest led to stays at two federal facilities. Psychiatrists at both facilities concluded that he was competent and malingering mental illness, though he also had "a personality disorder with antisocial and borderline tendencies that could not be treated" (Ref. 121, p 231).

On the first day of his trial, Greer tried to flush his clothing down the holding-cell toilet and spat up blood. Evaluation at a local hospital suggested that the blood came from self-inflicted mucosal abrasions likely induced by Greer's gagging himself with his inch-long fingernails. Outside the presence of the jury, the district court (trial) judge told Greer that he was a malingerer and that he should "get with the program, and stop acting like a fool" (Ref. 121, p 232). During testimony toward the end of the day, however, Greer leapt up from his chair and shouted, leading to his removal from the courtroom.

During a meeting before the second day of the trial, Greer used an obscenity and tried to hit his lawyer. On learning about this occurrence, the trial judge ruled that Greer had "consciously, deliberately, and voluntarily" (Ref. 121, p 233) waived his right to be present during trial. The trial continued with Greer absent from the courtroom, and he was convicted on all counts against him. The government then recommended that, because Greer had faked mental illness before and during his trial, he should receive a two-level enhancement of his prison sentence, as is required under the federal sentencing guidelines when a defendant "willfully" attempts to obstruct justice. The trial judge agreed, and Greer received a 210-month sentence. Without the enhancement for obstruction of justice, the maximum sentence would have been 185 months.

Greer appealed the enhancement, but lost. The appeals court acknowledged that the sentencing guidelines did not specifically list malingering as an action meriting a longer sentence. However, feigning mental symptoms was similar in purpose to other actions aimed at avoiding punishment, such as lying on the stand about one's mental state, or submitting a willfully disguised handwriting sample, that courts have held are forms of obstruction that justify a sentence enhancement. In upholding the district judge's ruling, the appeals court was not saying "that every instance of feigned mental illness justifies an enhancement for obstruction of justice." Greer's conduct, however, represented "a sustained pattern of appearing considerably more impaired than he was, and when he was told that certain actions would not convince the experts that he was in fact insane, he modified his behavior" (Ref. 121, p 241).

Greer argued that enhancing sentences of defendants who feign incompetence interfered with their constitutional right not to be tried while incompetent, because defense attorneys would be reluctant to seek evaluations of their clients. But the appeals court countered this by saying that:

> . . . defense counsel should warn his client that feigning incompetency, whether to create doubt as to his competency so as to prod his attorney into requesting competency hearings or to convince the court that he cannot stand trial, will trigger a [sentence] enhancement. The defendant and his attorney need not choose between a competency hearing and avoiding an obstruction enhancement (Ref. 121, pp 237–8).

Greer also argued that because his faking had been a manifestation of his personality disorder, he had not acted "willfully" in trying to mislead the trial court. The appeals court responded that before imposing a sentence enhancement for malingering, the trial court must be certain that the defendant's conduct was a "calculated attempt to derail justice." However, the appeals court noted that the criminal justice system consistently holds persons "who are 'antisocial' or 'borderline'" accountable for their criminal conduct. "Thus, the mere fact that a defendant suffers from a personality disorder does not make him immune to a [sentencing] enhancement" (Ref. 121, p 239).

In the second case, defendant Dammeon Binion (*U.S. v. Binion*, 132 Fed.Appx. 89 (8th Cir. 2005), *cert.* denied, 546 U.S. 919 (2005))[122] faced a charge of being a felon in possession of a firearm. He filed a *pro se* motion requesting an examination of his competence to stand trial, which a magistrate judge granted. Binion underwent evaluation at the U.S. Medical Center for Federal Prisoners in Springfield, Missouri, where doctors concluded that he had no present mental illness and that his reports of past symptoms sounded implausible. The evaluating psychiatrist believed that Binion's dishonesty probably

was a form of recreation, and that Binion did not seem to be planning his false complaints for a specific material gain. After Binion entered a guilty plea, a presentence investigation report recommended a sentence enhancement because Binion's fabrication of mental illness had necessitated a labor-intensive, time-consuming, costly evaluation. Although Binion objected, the district court added a two-level increase to Binion's charge for obstruction of justice and sentenced him to six and one-half years in prison followed by two years of supervised release.

In appealing his sentence, Binion argued that the two-level increase violated the U.S. Supreme Court's ruling in *U.S. v. Booker,* 543 U.S. 220 (2005).[123] In *Booker,* which addressed the application of federal sentencing guidelines, the Court held that, under the Sixth Amendment, no fact other than a prior conviction could be used to support a sentence exceeding the maximum one authorized by the offense elements established by a guilty finding, unless that fact was admitted by the defendant or was proved to a jury beyond a reasonable doubt.

The appeals court disagreed with Binion's claim, however. Although the appeals court believed that the sentencing error under *Booker* was clear, Binion had not cited relevant Supreme Court decisions or the Sixth Amendment when objecting to his sentence. He therefore had failed to preserve his claim under *Booker,* and he could not show that the sentencing error affected his substantial rights, because he could not show a reasonable probability that he would have received a more favorable sentence had the trial court followed *Booker.*

The appeals court also held that the facts in Binion's case supported the trial court's conclusion that, by faking a mental illness, Binion had knowingly obstructed justice to affect his case favorably. Binion filed a *pro se* motion requesting an evaluation for competency to stand trial, and the examining psychiatrist told him that the evaluation was to determine whether he was competent to proceed with adjudication. Binion clearly knew why he was undergoing evaluation, and the appeals court concluded that the trial court did not err in finding that Binion had tried to hinder his prosecution by malingering and in enhancing his sentence accordingly.

Like *Greer, Binion* raises concerns for psychiatrists about how courts may use their findings. Ordinarily, a psychiatrist who undertakes an evaluation of adjudicative competence does so in the belief that information obtained during the evaluation will not be used for purposes unrelated to fitness for trial, unless the defendant places his mental condition at issue during his defense or during sentencing. Binion pleaded guilty without claiming a mental illness defense, yet the court used psychiatrists' findings and opinions to enhance his sentence. As Darani[124] points out, the *Binion* ruling raises important questions of ethics for psychiatrist:

> [I]s it necessary to inform the defendant that information gathered as part of the evaluation may be used for purposes outside of the competency evaluation? Would it also follow that the defendant should be advised that uncooperativeness or feigning of symptoms could lead to a finding of obstruction of justice and, therefore, a harsher sentence? [Ref. 124, p 128].

## III. Agency Relationships

Defense attorneys, prosecutors, and trial courts may all request that a criminal defendant undergo an evaluation of his competence to stand trial. Before beginning a competence evaluation, the psychiatrist should know who requested it, because the source of the referral may affect how the psychiatrist will report findings and the psychiatrist's obligation to maintain confidentiality.

Every state has some mechanism that allows criminal courts to obtain an evaluation of a defendant's competence to stand trial.[125] When performing court-ordered evaluations, psychiatrists should anticipate that they will report their findings and opinions to the court and that their reports will be available to the defendant's lawyer and the prosecutor. In all U.S. jurisdictions, statutes or case law prohibit using information obtained during a competence evaluation to prove criminal culpability, unless the defendant places his mental state at issue.[23,126] If the defendant later testifies, however, some courts may permit the prosecution to use contents of a competence report for impeachment purposes if the report affords evidence of the defendant's prior inconsistent statements.[127–129] For this reason, whenever possible, a competence report should not mention potentially incriminating information obtained from interviewing a defendant.

Courts may request a competence evaluation for reasons other than wanting to obtain an expert opinion about a defendant's ability to proceed with adjudication. For example, requests for competence evaluations occasionally reflect the court's desire to facilitate prompt treatment of a severely impaired

Practice Guideline: Evaluation of Competence to Stand Trial

defendant. Rather than arrange for inpatient treatment of a mentally ill defendant by using civil commitment procedures, courts may arrange for inpatient treatment based on incompetence to stand trial. Sometimes courts confuse questions of criminal responsibility with questions of competence to stand trial.[130,131] In such cases, the psychiatrist can clarify with the court the specific assessment question and can recommend additional (or different types of) evaluations, if indicated.

When retained by the defense, the psychiatrist should communicate data and opinions completely and honestly to the retaining attorney. In many jurisdictions, verbally communicated opinions of defense experts are covered under attorney work-product doctrine,[132,133] which means that if the expert's opinions are not helpful to the defense, they are not discoverable by the prosecution or the court, though a subsequent defense decision to retain other experts and have them testify may obviate this protection.[134] The psychiatrist may want to clarify with the retaining defense attorney whether privilege protects the information obtained during the forensic evaluation and whether the attorney has discussed this matter with the defendant. The defense-retained psychiatrist should know whether information obtained during a competence evaluation would later be discoverable by the prosecution. In cases in which the defense desires mental health expertise related to matters besides competence (e.g., information that might address criminal responsibility or aid in plea bargaining) and believes that these other matters are covered in competence evaluations, the psychiatrist can educate the defense attorney about the limited scope of competence examinations and recommend additional types of evaluations. The defense-retained psychiatrist also may actively consult with and advise the defense attorney, a role explicitly countenanced by the U.S. Supreme Court in *Ake v. Oklahoma*, 470 U.S. 68 (1985).[135] Some attorneys prefer to engage consultants who are not psychiatrists, and some experts feel that consultants should not testify because of the risk that the consultant's identification with the defense would lead to excessive advocacy.[136]

In unusual circumstances, prosecution-retained experts may face special ethics-related concerns. A psychiatrist's duty to be honest and to strive for objectivity requires communicating findings and opinions completely and honestly to the retaining attorney. But in cases in which only the defendant's adjudicative competence has been questioned (that is, in cases in which the defendant will not enter or has not yet entered an insanity defense), an examining psychiatrist should not tell prosecutors the defendant's detailed account of the offense, incriminating information obtained from collateral sources, or information about the defendant's trial strategy. In such situations, the examining psychiatrist should comment only on the defendant's functional capacities without disclosing the detailed information that the defendant or collateral sources revealed during interviews. For example, the psychiatrist would comment on whether a defendant could give a rational and coherent account of the events that led to his arrest or could formulate a realistic defense plan. The psychiatrist would not disclose specific information, however, such as what the defendant said concerning his actions on the day of the alleged offense. (Further consideration of incriminating collateral data appears later, in Section VI.B.)

From time to time, psychiatrists may sense that courts or attorneys are using their expertise or findings for reasons other than establishing whether a defendant is competent to stand trial. For example, the prosecution sometimes questions a defendant's adjudicative competence, seeking to delay proceedings and get additional time to prepare the state's case, to avoid a possible insanity acquittal, or to bring about confinement of a mentally impaired defendant when there is insufficient evidence to convict him.[137,138] Judges may order competence evaluations to avoid having to release defendants on bail or as a way of confining defendants accused of minor charges who do not meet criteria for civil commitment.[139] Defense attorneys may invoke the incompetence evaluation process to get more time for trial preparation, to allow the passage of time to weaken the prosecution's case, or to seek psychiatric data that may help with plea negotiations or with obtaining a disposition more favorable than imprisonment.[138,139] Although addressing such matters is properly the concern of the judicial system, psychiatrists may prefer to decline referrals or withdraw from cases in which they sense potential misuse of their expertise.

Evaluating a defendant in a case in which the prosecution plans to seek the death penalty raises additional concerns regarding ethical behavior for court-appointed, defense-retained, and prosecution-

retained psychiatrists. When there is a *bona fide* doubt about a defendant's competence to stand trial, a criminal court is constitutionally obligated to arrange for a hearing, which frequently requires input from mental health experts. These experts must realize that, under *Buchanan v. Kentucky* (discussed in Section I),[24] if the defendant later raises his psychiatric status during trial or sentencing, the prosecution may use mental state findings and detailed behavioral data that psychiatrists obtained during a competence evaluation to persuade jurors to impose the death penalty.[140]

The psychiatrist has a duty to pursue objectivity, regardless of the identity of the retaining party. Prosecution or court-retained psychiatrists should be particularly careful to follow the standards of ethics and legal guidelines that protect the defendant's rights.[141,142]

The *American Psychiatric Association's Ethical Principles* (§ 4, Annotation 13)[143] and the *AAPL Ethics Guidelines* (Ref. 144, Section III) preclude evaluation of a defendant before he is afforded access to defense counsel. While it is not necessary that the defendant have actually conferred with counsel before the evaluation, appointed counsel must be available for the defendant to have a consultation, either directly or by telephone, before or during the competence evaluation. As is the case with evaluations of criminal responsibility,[145] it is best that the defense attorney know about an upcoming competence evaluation before the psychiatrist initiates the evaluation. A nondefense psychiatrist should not evaluate a criminal defendant's adjudicative competence until the trial court has issued an order for the evaluation. If a defendant needs emergency medical or psychiatric evaluation or treatment, however, a psychiatrist may ethically provide such services before the defendant has had access to counsel.

Section 7-4.4(b) of the America Bar Association's *Criminal Justice Mental Health Standards*[138] recommends that the defendant's mental condition at the time of the alleged offense not be combined in any evaluation to determine adjudicative competence unless the defense requests it or unless good cause is shown. The Standards also recommend that judicial orders make a clear distinction between these two legal issues and the reasons for evaluation.[130] Not all jurisdictions follow this practice, however. Many states have psychiatrists conduct joint evaluations of competence to stand trial and criminal responsibility, and some states permit combining evaluations of competence and criminal responsibility in the same document. This practice may create ethics-related problems for a prosecution-retained or court-appointed psychiatrist when it appears that an evaluee is incompetent to stand trial and is revealing potentially incriminating information. Some jurisdictions provide legal protection concerning potentially incriminating information obtained from incompetent defendants. In the absence of such protections, however, we recommend that the psychiatrist complete only an evaluation that informs the retaining party of the defendant's incompetence, not of the defendant's mental condition at the time of the alleged offense.

## IV. Ethics

### A. The Ethics Framework

The ethics framework that guides forensic psychiatric evaluations has several sources. The Hippocratic tradition in medical ethics informs physicians that their primary duties are beneficence and nonmaleficence, which implies that clinical efforts should be to help patients and, above all, to do no harm (*primum non nocere*).[146] Within the Hippocratic framework, one might regard competence evaluations as benefiting defendants by protecting them from being tried and convicted when they cannot assist counsel or participate rationally in their defense. In addition, determinations that defendants are competent to stand trial may allow them to proceed to trial and gain an acquittal.

In many instances, however, undertaking a competence evaluation appears to conflict with traditional Hippocratic obligations because findings supporting competence to stand trial may enable the criminal court to try, convict, and impose punishment on the defendant. Moreover, the lack of a physician-patient relationship during most evaluations of trial competence suggests that Hippocratic obligations may not be relevant or should not apply in the way that they do in contexts in which an evaluation takes place solely for purposes of treatment. Indeed, the psychiatrist is not the patient's caregiver; the psychiatrist's goal is not to treat or diminish the suffering of a patient, but to provide the court or retaining attorney with psychiatric expertise that will assist in a legal determination. For this reason, many psychiatrists regard evaluating trial competence as a task for which the physician's traditional concerns about helping pa-

rients and alleviating their pain are not paramount. When psychiatrists function as medicolegal experts, the values that assume primacy include truth-telling, objectivity, and respect for the humanity of the evaluee.[142,147,148] The physician's responsibility to "assist in the administration of justice" receives endorsement in guideline E-9.07 of the American Medical Association's Code of Ethics.[149]

Though they are not functioning as treating physicians when they assess adjudicative competence, psychiatrists still should act responsibly concerning their evaluees' health needs, in a manner analogous to ethics guidelines for work-related independent medical examinations set out by the American Medical Association. That is, psychiatrists should conduct objective psychiatric evaluations, even though they will not be monitoring evaluees' health over time or providing treatment. AMA opinion E10.03[150] states, "a limited patient-physician relationship should be considered to exist during isolated assessments" of a defendant's competence to stand trial. Within this limited relationship, a psychiatrist may elect to tell an evaluee about important health information or problems discovered during an examination or to recommend that an evaluee seek treatment from a qualified caregiver. If necessary (e.g., if the evaluee is confined in jail and needs treatment urgently or poses a high risk of harming himself or someone else), a psychiatrist should facilitate the evaluee's receiving further evaluation and follow-up care. In such cases, the psychiatrist should also notify the defendant's attorney and, if the evaluation was initiated by the court or prosecution, the court.[138] In taking such health-related actions for a defendant-evaluee, the psychiatrist should disclose the minimum information necessary to permit appropriate management.

Since 1987, AAPL has promulgated ethics guidelines for psychiatrists that are applicable to evaluations of adjudicative competence. *The Principles of Medical Ethics With Annotations Especially Applicable to Psychiatry* published by the American Psychiatric Association (APA)[143] also contains guidelines that are of particular importance to psychiatrists conducting assessments of competence to stand trial. These include:

> the obligation to practice within the bounds of one's professional competence (§ 2, No. 3);

the obligation to release information only under proper legal compulsion (§ 4, No. 2);

the obligation to disclose only the information that is relevant to a given situation and to avoid offering speculation as fact (§ 4, No. 5);

the obligation not to evaluate (for purposes other than providing treatment) a person charged with criminal acts before that person has had access to counsel (§ 4, No. 13); and

the obligation to refrain from offering a professional opinion about an individual without conducting or attempting to conduct a personal examination (§ 7, No. 3).

## B. Conflicting Roles

When conducting evaluations of adjudicative competence, psychiatrists apply their skills to satisfy legal needs rather than clinical goals. Psychiatrists who function in forensic roles therefore have a primary duty to serve the criminal justice system properly rather than to serve the interest of defendants.[142] In general, treating psychiatrists should try to avoid conducting forensic evaluations on their own patients; ideally, independent, nontreating psychiatrists should perform such evaluations.[144,151] In the context of evaluations of competence to stand trial, role conflicts can arise when a psychiatrist who has been treating a patient serves as the forensic psychiatrist, because the responsibility to "do no harm" within a physician-patient relationship may not be consonant with the forensic psychiatrist's obligation to be objective and truthful, regardless of the effect on the ultimate legal outcome for the defendant. Performance of these evaluations by a psychiatrist who has been treating a patient can also adversely affect the therapeutic relationship, especially if the defendant-patient disagrees with the psychiatrist's opinion. In addition, a treating psychiatrist may be aware of a great deal of potentially damaging, incriminating, or embarrassing information that he or she could elicit in the role of psychiatrist. Finally, evaluating adjudicative competence may require a psychiatrist to interview persons outside of the treatment relationship, and reporting a defendant's competence may involve disclosure of information obtained in the course of psychiatric treatment. If the psychiatrist were also the treating physician, such collateral contact or disclosure of personal health information might raise concerns about breaching doctor-patient confidentiality.[152]

The problem of having treating psychiatrists serve as psychiatrists arises most often in public (government-operated) psychiatric hospitals. Indeed, statutes in many states require public institutions and their clinicians to function simultaneously as treatment providers, competence restorers, and competence assessors. Trying to fulfill these multiple roles may require psychiatrists to satisfy conflicting obligations. As treating physicians, psychiatrists have fiduciary relationships to act in their patients' best medical interests, yet at the same time, psychiatrists' statutorily prescribed duty to provide data and opinions to courts may run counter to the patient's perception of his or her best interest. If sufficient forensic mental health expertise is available, it may be possible to eliminate (or at least mitigate the impact of) these role conflicts by assigning the evaluating and treating roles to different clinicians at a mental health facility, and the authors recommend doing so.

In some settings and situations, however, psychiatrists cannot avoid acting as both treatment providers and psychiatrists. In inpatient settings to which patients have been referred under court order for competence restoration and where the principal goal of treatment is to render patients competent to stand trial, treatment is guided by assessments of whether patients are moving toward competence. Under these circumstances, treating psychiatrists cannot and should not ignore the impact of their treatment on patients' competence-related mental capacities. In addition, records created to document treatment frequently are relevant to and used in formulating an assessment of an inpatient's adjudicative competence. Finally, statutes sometimes specify that the individual (or institution) who provides treatment must submit a report concerning the patient's competence, and courts sometimes require the testimony of the treating psychiatrist. When the separation of evaluating and treating roles is impractical or is precluded by courts' expectations, psychiatrists should disclose their potential dual roles at the beginning of treatment and should remind defendant-patients of their dual functions at key points (e.g., before an upcoming court hearing) during the course of clinical care.

In most states, a legal finding of adjudicative incompetence may lead to court-ordered treatment (and usually, psychiatric hospitalization) to restore the defendant's competence.[153] As noted in Section I, recent court decisions have approved the use of involuntary medications for competence restoration under certain circumstances.[28,154] The use of psychotropic drugs to bring about trial competence nonetheless remains a controversial subject. Some critics argue that so-called chemical competence is artificial, that involuntary psychotropic medication may not be effective, and that side effects of psychotropic medication may prevent an involuntarily treated defendant from receiving a fair trial.[155–157] Although most psychiatrists support providing appropriate treatment to psychotic defendants (involuntarily, if necessary), forced treatment for competence restoration confronts treating physicians with the potential problem in ethics of "dual loyalty."[158] On the one hand, a treating physician's ethical duty is to act in ways that benefit the patient. On the other hand, when medication is forced on a defendant-patient to make him fit for prosecution, the government is seeking to have the patient medicated irrespective of his wishes, with the goal of making the patient eligible for prosecution and the possibility of punishment, and doctors are participating in this process.[159] The American Psychiatric Association nonetheless advocates the forced use of medications when they are medically appropriate and represent the best hope of restoring adjudicative competence.[160]

### C. Scope of Participation

The American Medical Association's Code of Ethics (Opinion 9.07)[161] states, "As a citizen and as a professional with special training and experience, the physician has an ethical obligation to assist in the administration of justice." The legal basis for expert participation in legal proceedings is articulated in Federal Evidence Rule 702 ("Testimony by Experts"), which states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.[162]

Most states and other jurisdictions have a comparable rule governing expert testimony in general. Concerning expert psychiatric testimony, the *Criminal Justice Mental Health Standards* of the American Bar Association state that:

> . . . expert testimony, in the form of an opinion or otherwise, concerning a person's present mental condition or mental condition in the past should be admissible whenever

the testimony is based on and is within the specialized knowledge of the witness and will assist the trier of fact [Ref. 138, § 7-3.9, p 117].

Psychiatrists with specialized training and experience in the forensic setting may consult, and indeed are encouraged to consult, within the criminal justice system regarding competence to stand trial. By serving as experts, psychiatrists can help legal decision-makers understand how mental illness affects a defendant's ability to assist an attorney and negotiate the adversarial process of a criminal trial.

Psychiatrists who undertake examinations of adjudicative competence should conduct these evaluations properly. They should know the legal definitions of competence to stand trial in the jurisdictions where they practice. They should understand the essential elements of a competence evaluation and should have sufficient professional education, training, and experience to acquire the clinical data relevant to an evaluation of competence to stand trial. They should know how to apply their specialized knowledge in a way that permits them to address the specific legal issues related to adjudicative competence (Ref. 138, § 7-3.10, p 130). At the same time, psychiatrists are ethically obliged to refrain from testifying about matters that lie outside their expertise.[152,161]

### D. Honesty and Objectivity

Psychiatrists should strive to provide courts with opinions and testimony that are honest and as objective as possible (Ref. 144, § IV). When retained by one side in a criminal matter, experts may feel or actually experience pressure to arrive at an opinion that is useful to the retaining party. The pressure may manifest itself in several ways, including the retaining party's assuming what the expert's opinion will be, withholding of information by the retaining party, excessive flattery of the retained expert, subtle or overt bribery, or extortion.[149] Psychiatrists should guard against the potential for bias or distortions of their opinions that may arise unintentionally out of a desire to satisfy the retaining attorney. The U.S. Supreme Court decision in *Ake v. Oklahoma*[135] endorses a psychiatric expert's acting as a consultant to the defendant's attorney. Advocacy for one's opinion is ethical if the opinion is based on careful, thoughtful, disinterested examination of available data. Psychiatrists should not knowingly give false or misleading testimony.

Psychiatrists should make sure that they have adequately considered sufficient relevant data in formulating their opinions on competence. They should arrange with courts or retaining attorneys to obtain any additional information needed to arrive at an accurate opinion. They should note in their reports if they have requested but have not received information (e.g., hospital records or information from defense counsel) that may be relevant to their conclusions.

Despite their best efforts to remain objective, forensic experts are human and cannot avoid developing biases. One source of highly significant bias that forensic experts have identified in criminal cases is working exclusively for either the defense or the prosecution.[163] This source of bias may be avoided by accepting referrals for competence evaluations from both defense and prosecuting attorneys. Countertransference can also represent a significant source of bias.[164] Techniques for addressing possible countertransference include discussion of cases with colleagues or supervisors, presenting one's work to peers, and taking time to think about potential countertransference reactions before reaching a final opinion.

### E. Confidentiality, Notice, and Assent

When beginning an examination of competence to stand trial, the psychiatrist should attempt to communicate the following to the evaluee:

the reason for the evaluation;

the party who has appointed or retained the psychiatrist;

the lack of confidentiality of the interview and findings;

the persons who will receive the psychiatrist's report;

the possibility of the psychiatrist's testifying about the results of the evaluation; and

the right of the evaluee to decline to answer particular questions, with a warning that the psychiatrist may have to report noncooperation or refusal to answer questions to the retaining attorney or to the court.

In addition to the verbal warning, the psychiatrist may also provide evaluees with a written document summarizing these points and ask the interviewee to

sign it. Psychiatrists who are "covered entities" or employees of covered entities (as defined in 45 CFR 160.103, the section of the federal regulations governing the Health Insurance Portability and Accountability Act of 1996 (HIPAA))[165] should also consider whether they must offer the evaluee a copy of the covered entity's privacy statement.

When a psychiatrist serves strictly as an psychiatrist, he or she should also tell the defendant-evaluee that he or she is not the defendant's treating physician—that is, the psychiatrist is not there to "help" the evaluee. Despite hearing such warnings, even a competent evaluee may come to view the psychiatrist as a therapist during the course of an examination. If this occurs to a significant degree during a forensic examination, the psychiatrist should remind the evaluee that the psychiatrist is functioning only as a psychiatrist, not as the evaluee's therapist or treatment provider.

According to the AAPL *Ethics Guidelines for the Practice of Forensic Psychiatry*,[144] absent a court order, psychiatrists should not perform forensic evaluations for the prosecution or the government of criminal defendants who have not consulted with legal counsel. This principle would apply to evaluations of adjudicative competence. Many defendants referred for competence evaluations are too impaired to understand why the evaluation is taking place or otherwise lack the capacity to consent to the examination. In these circumstances, a court order or the expressed permission of the defendant's attorney make it ethically acceptable for the psychiatrist to proceed with the evaluation.

Occasionally, defendants engage in little or no conversation with psychiatrists. In some of these cases, the psychiatric expert still obtains enough information about adjudicative competence to render an opinion with reasonable medical certainty. However, experts' reports or testimony should clearly describe any paucity or lack of direct communication with the defendant and should state how limited interaction with the defendant may have affected the opinion.

Competence evaluations require a personal examination of the defendant. If the defendant refuses a court-ordered competence evaluation, the psychiatrist should try to explain to the defendant that the court has ordered the evaluation and that the defendant's refusal to participate will be communicated to the court. Before so informing the

court, however, the psychiatrist may choose to ask defense counsel to encourage the defendant's participation. Psychiatrists who have not been retained by the defense may also want to tell the evaluee that noncooperation may have legal consequences.[166] For example, in many states, a defendant's refusal to undergo a competence evaluation may lead to psychiatric hospitalization for prolonged observation, to allow psychiatrists to attempt to reach an opinion regarding competence.

If retained by the defense attorney, psychiatrists are ethically obliged to safeguard the contents of the opinion within the constraints of the law (Ref. 143, § 4). Defense-retained experts should not discuss their evaluations with opposing experts or opposing counsel unless the defense attorney approves such a discussion or the expert is legally compelled to reveal the results.

### F. Knowledge of the Jurisdiction's Standard

Though most jurisdictions have standards for competence to stand trial that are consonant with *Dusky*,[16] there are minor jurisdictional differences. An evaluating psychiatrist should know the legal definition of competence in the jurisdiction where the defendant is facing prosecution.

### G. Interaction with Other Professions

Psychiatric expert witnesses should be polite and respectful in their dealings with opposing counsel and opposing experts. Experts should generally avoid disclosure of personal information about opposing experts, as such revelations do little to advance the interests of ascertaining truth in the courtroom.[167] Experts may share with retaining attorneys information about opposing experts that is relevant to the matter at hand and that could arise in cross-examination. Before doing so, however, experts should consider the relevance of the information and whether the potential disclosure would constitute a lapse in objectivity or unreasonable advocacy.

### H. Fees

A psychiatrist may charge a different fee for work in the forensic setting than for clinical work. It is ethical and often desirable for a psychiatrist to request payment of a retainer fee or to receive payment before conducting a forensic evaluation. A psychiatrist who serves as an expert witness should clarify the fee arrangement with the retaining attorney before

beginning the forensic evaluation. If psychological consultation, imaging studies, or laboratory tests are needed to support an opinion, the psychiatrist should discuss the need for the examinations with the retaining attorney before arranging for them to be performed.

Some jurisdictions or courts pay a fixed fee for forensic evaluations. The amount is often insufficient to cover the costs of tests such as MRI or psychological testing that may be necessary for a competent evaluation. If fixed fees represent inadequate compensation for one's time and expertise, the psychiatrist may (consciously or unconsciously) be resentful or have other reactions that would result in failure to perform an adequate evaluation. Clarifying compensation before accepting the referral may help the psychiatrist to decide whether to undertake the evaluation.[145]

Psychiatrists should not perform evaluations of adjudicative competence (or for that matter, any type of forensic evaluation) on a contingency-fee basis—that is, with the fee conditional on the outcome of the evaluation or of the litigant's legal case (Ref. 144, § IV). Though contingency payments may be appropriate for attorneys, such fee arrangements may undermine the psychiatrist's objectivity and are unethical.

### I. Acknowledging Limitations of the Evaluation

Any limitations of an opinion should be expressed in the written report and, when possible, during testimony. When the psychiatrist has requested materials (e.g., records of past treatment) that are not received in time to be considered in writing the report, he or she may still render an opinion if one can be rendered with reasonable medical certainty. The psychiatrist may also tell the courts or retaining attorneys that he or she reserves the right to alter an opinion should the additional materials become available. If the requested materials are necessary to reach a conclusion about competence, however, the psychiatrist should not offer opinions until the materials are received and examined. If the required data are ultimately not accessible, the psychiatrist may inform the referral source that the evaluation is incomplete.

Psychiatrists should be willing to disclose limitations in their training or experience and to subject their testimony to scrutiny and critique by peers. AAPL has a standing committee established for the purpose of peer review.

When providing expert testimony, psychiatrists may, and often should, act as advocates for their opinions. However, experts should not overstate the certainty of their findings and should acknowledge the limitations of their opinions. Evaluations of competence to stand trial involve assessments of defendants' capacities for logical communication and factual and rational understanding of the proceedings against them. These capacities typically are present to various degrees, rather than being completely uncompromised or missing. Thus, many defendants display relative strengths and weaknesses in the mental capacities needed for adjudicative competence. Ideally, an expert should describe the strengths and weaknesses of the defendant, regardless of whether the jurisdiction allows or requires an opinion on the ultimate issue. In so doing, the expert provides the information needed for the trial court to make an independent ruling on a defendant's competence.

### J. Complaints of Ethics Violations

The AAPL refers complaints of unethical behavior by its members to the American Psychiatric Association for resolution. Usually, the APA district branch where the accused individual is a member reviews such complaints. Those regarding nonmembers of the AAPL or APA are usually filed with the medical board where the psychiatrist practices.

Although expert witnesses have traditionally received quasi-legal immunity for their testimony, a few physician experts have been held accountable through sanctions by professional organizations and through tort liability actions.[168] In recent appellate cases, courts have ruled that psychiatrists practicing in a forensic capacity can be found negligent for revealing confidential information to nonparties[169] and for inappropriate conduct during an evaluation,[170] though the psychiatrists had no doctor-patient treatment relationship with the evaluee.

## V. Cultural Considerations

### A. The Cultural Context of Adjudicative Competence

When psychiatrists consider competence to stand trial, they usually think the phrase refers to a legal concept or to a mental capacity that a criminal defendant may have or lack. Competence to stand trial is also a cultural notion, however, or at least a notion that reflects a set of cultural values.

Notwithstanding awareness of and sensitivity to the situations of criminal defendants (who typically are much less fortunate than most persons), most North American psychiatrists share and identify with the dominant culture's view of criminal proceedings. In the dominant culture's view, criminal proceedings are adequately fair (though far from perfectly fair) efforts at rendering just decisions about the guilt of accused criminals. These efforts come about through an adversarial process that gives the accused many rights, among which is the right to confront and challenge one's accusers. Firmly embedded in Anglo-American legal tradition, the right to confront would be meaningless were the defendant not physically and mentally present in court, aware of the proceedings against him, and capable of responding rationally. Competence to stand trial thus embodies a cultural notion that the legal system is reasonably fair, that accused persons will get fair treatment and a reasonable chance to defend themselves, and that the dignity and fairness of criminal proceedings are vindicated when an accused person is a capable adversary of the prosecution.[171]

A message implicit in popular television programs from *Perry Mason* to *Law and Order* is that criminal defendants may be bad because of the crimes they commit, but not because they retain attorneys and challenge the state's evidence against them. In Anglo-American legal tradition and in mainstream North American culture, the act of raising a criminal defense is not a challenge to dominant social mores, but an affirmation of them. By raising a defense, an accused criminal reinforces cultural values that encourage innovation and individual expression, that endorse speaking one's mind and verbally challenging one's opponents, and that treat the state as having limited power that must be kept in check.

Things that North American psychiatrists take for granted as essential features of fair criminal proceedings may puzzle and seem strange to individuals who come from social backgrounds that endorse conformity or deference to authority. When such individuals become criminal defendants in North America, they may have difficulty saying things that disagree with authority, or they may be reluctant to ask for clarification of explanations and procedures that they do not understand.[172] Individuals who come from countries or cultures where governmental systems are all-powerful or corrupt may believe that persons in or appointed by authority do not have their interests at

heart. For reasons other than psychopathology, therefore, such persons may be wary or suspicious of defense attorneys who purport to be on their side and say that they are trying to help them. Even defendants who have always lived in North America may come from social, class, religious, or ethnic contexts that give them attitudes and perspectives that differ from the well-educated, predominantly upper-middle-class attorneys and judges who control legal proceedings—contexts that also differ from the fortunate, upper-middle-class backgrounds and lives of most psychiatrists.

Though North American criminal courts honor their roots in English common law, the histories of the United States and Canada are those of nations forged from ongoing multicultural diversification. Much of North America's recent population growth has come from immigrants, whose arrival insures that cultural diversity will not diminish. Shifts in ethnic diversity are not just about the number of persons and the cultures from which they come, but the impact of cultural differences, too. An increasingly multicultural America is generating new demands, challenges, and stresses for many areas of human endeavor, including psychiatric assessment and the law.

Judges, attorneys, and legislators must understand the interplay between social, political, and cultural forces that shape the development and implementation of the law. In providing forensic services, psychiatrists must recognize and understand the nuances of the multicultural population with whom they interact in the criminal justice system. To do this, psychiatrists must have available and use a repertoire of behavior, attitudes, procedures, and policies that allow them to work effectively in cross-cultural situations. By developing culturally sensitive clinical and evaluative practices, psychiatrists can improve their evaluative skills and awareness of their personal assumptions, while reducing barriers to accurate psycholegal determinations.

### B. Cultural Competence

In the clinical area, cultural competence is a requisite for sensitive, effective delivery of service. Cultural competence includes acceptance and respect for persons' differences, continuous self-assessment regarding one's own cultural assumptions, attention to how cultural differences affect the dynamics of therapeutic encounters, ongoing development of cultural

Practice Guideline: Evaluation of Competence to Stand Trial

knowledge, and development of resources and flexibility to provide services to minority populations.[173] According to Davis,[174] a culturally competent clinician integrates knowledge and information about individuals and groups of people into clinical encounters, service approaches, and techniques that fit an individual's cultural background, thereby enhancing the quality and appropriateness of health care. The notion of a culturally competent clinician expresses the hope that better knowledge of folkways, traditions, customs, helping networks, and rituals can allow clinicians and organizations to provide services that better meet patients' needs.[175]

## C. Culturally Competent Evaluations

Psychiatrists can find several articles[176–179] and an entire text[172] that describe the effect of cultural differences on forensic practice and that discuss ways that experts can improve the cultural competence of their assessments. The general mental health literature contains hundreds of articles on delivering culturally sensitive care. It is beyond the scope of this Guideline to summarize this ever-developing body of literature. The following points illustrate how recognizing the potential impact of cultural background and social differences may allow psychiatrists to provide more accurate descriptions of defendants' adjudicative competence and, in turn, more useful information for courts.

### 1. Common Interview Situations

In North America, the most commonly occurring cross-cultural interview situation involves an evaluee from an ethnic minority group and a psychiatrist from mainstream U.S. culture. As earlier discussion in the section suggests, the cross-cultural component adds complexity to the forensic psychiatric evaluation if the evaluee evinces a cultural value system concerning legal proceedings that differs from the value system of the examining clinician. Suspecting that this is the case may require the psychiatrist to become acquainted with the evaluee's social background and specific cultural assumptions.

Culture does not exist in a vacuum; it manifests itself in specific environments and is actuated by psychological factors and specific circumstances. Understanding rules of moral conduct within the evaluee's culture may help the psychiatrist interpret the evaluee's behavior, attitudes, or choices concerning his defense. To return to an earlier example, an evaluee's

reluctance to speak openly with defense counsel may not reflect paranoia, but an expectation that disclosing information would be pointless or would make matters worse for the evaluee and loved ones.

### 2. Acceptance of Cultural Identity

Psychiatrists must strive to feel comfortable with and accepting of an evaluee's cultural identity. They need not jettison their own values and ideas in this process. Yet if the psychiatrist approaches an interview with prejudicial and hostile ideas regarding the evaluee's ethnic membership, the forensic assessment and conclusions may be jeopardized. A psychiatrist's unexplored or unconscious fears about an evaluee's culture may interfere with data gathering and objectivity and ultimately may affect conclusions. Prejudice-based difficulties in establishing cultural respect may contribute to the evaluee's conclusion that he should not trust or be honest with the psychiatrist. Such conclusions may be reinforced by those who seem (or are) resentful, ignorant, or uncomfortable when interacting with persons from cultures different from their own.

### 3. Knowledge, Skills, and Attributes

Saldaña[175] has identified several areas of knowledge that can improve clinicians' efforts to work with persons from difference cultures. Adapted for the forensic context, these include:

knowledge of the patient's culture, including history, traditions, values, and family systems;

awareness of how experiencing racism and poverty may affect behavior, attitudes, and values;

knowledge of how ethnically different evaluees may seek help and express mental distress;

awareness of how language, speech patterns, and communication styles differ among cultural communities;

recognition of how professional values may conflict with or accommodate the emotional and legal needs of evaluees from different cultures; and

awareness of how community and institutional power relationships affect persons in different cultures.

### 4. Communication Styles

Cultures differ in their nonverbal communication styles as well as the type of contact deemed accept-

able. Common cultural differences in nonverbal communication styles include:

Personal space: how far away to stand when talking.

Tone and volume: how loudly to speak in ordinary conversation.

Making eye contact: whereas in the United States, middle-class individuals are taught to look at each other and provide feedback (e.g., smiling or nodding), in other cultures not making eye contact is a way of showing deference or respect.

Gesturing: hand and arm movements that may seem excessive to North Americans may be ordinary for persons of other backgrounds.

Physical contact: North Americans touch interlocutors less than do persons of many other cultures. As a result, we may come across as aloof to others; to us, persons from other cultures may appear intrusive or uninhibited.

### 5. Transference and Countertransference

Though we usually regarded transference and countertransference as clinical, psychodynamic phenomena, they affect all types of human interactions, including forensic evaluations.[164] Acknowledging the potential cultural contributions to transference and countertransference may help psychiatrists recognize how these phenomena arise and their possible influence on the evaluation. Here are some examples of how transference and countertransference may occur in forensic assessments:

When the both the psychiatrist and the defendant belong to the same racially or culturally defined minority, some defendants may overidentify with the psychiatrist and disclose incriminating information or information not relevant to the assessment. Some psychiatrists may overidentify with defendants at the expense of objectivity.

Culture-bound syndromes may go unrecognized, may be misread, or may be devalued.

Racial and ethnic differences influence the presentation of psychiatric disorders, but unconscious processes may interfere with the communication needed to sort through such matters.

### 6. Language and Testing

Although it might be ideal for defendants to be assessed in their native languages, it is often impossible to do so. Moreover, given the way that criminal justice proceedings are conducted in North America, it may be important to assess how a defendant who is not a native English speaker can communicate and understand criminal proceedings conducted in English. Interpreters can help bridge the language gap for defendants who do not speak English well or are not comfortable or confident about their English skills. However, psychiatrists should recognize that the interaction between psychiatrist and evaluee is altered by involving a third party in the evaluative dialogue. Interpreters may introduce other forms of bias related to their own perspectives. Such bias may be introduced through translation choices that omit, add, condense, or replace some of the content expressed by the interviewer or the evaluee.

Section VIII of the Guideline describes various instruments for conducting structured interviews of competence evaluees. It is often the case that these instruments have been neither translated nor normed in languages other than standard American English. Individuals from other cultures vary in their use of local or idiomatic terms that may not correspond well with a particular way of translating an instrument, making it important to be sure that an evaluee actually understands the concepts and knowledge areas being assessed. Also, it may be misleading to interpret test results from evaluees of other cultures according to norms established by administering the tests to North Americans.

### 7. The Examination Context

Finally, the backgrounds of some individuals from other cultures may leave them unfamiliar with what psychiatrists do or with the basic idea of a medical interview that explores thoughts, feelings, and beliefs. Some individuals may not previously have undergone formal testing and may not understand its purpose or uses. In such cases, psychiatrists may have to make special efforts to explain the purpose of interviewing and testing, along with the potential relevance of these procedures to the evaluee's situation.

## VI. The Interview

Evaluations of adjudicative competence are clinical assessments of a defendant's ability to participate

in criminal proceedings. Competence evaluations are neither retrospective (as are evaluations of criminal responsibility) nor prospective (as are postconviction evaluations); they focus on the defendant's present functional level, and they emphasize the evaluee's mental functioning and capacities rather than the psychiatric diagnosis.

## A. Preparing for the Interview

Before interviewing a defendant, the psychiatrist should learn about the state's allegations and the reasons or actions that led the referring attorney or court to question the defendant's competence. He or she should review copies of relevant court orders, available discovery materials (including the arrest reports prepared by police), criminal court filings, and indictments. When available, transcripts or recordings of hearings, depositions, or interrogations may contain information relevant to understanding a defendant's current mental condition and competence. Collateral records, including medical and psychiatric treatment records, can provide a longitudinal view of a defendant's mental illness and can thereby shed diagnostic light on current symptoms. Reviewing these materials may also help the psychiatrist to decide whether collateral interviews will be necessary. A defendant's attorney will often have information that is not otherwise available, such as what has happened during previous attorney-client contacts and the reasons that the attorney believes the defendant may be incompetent to stand trial. Information about the quality of the attorney-client relationship may be especially valuable, as is information about behavioral disturbances that the attorney has observed.

## B. General Considerations

The psychiatrist should interview the defendant for enough time and with enough thoroughness to permit assessment of the functional characteristics relevant to the jurisdiction's legal criteria for adjudicative competence. If reasonable attempts to examine the defendant fail because of lack of cooperation or other factors, the he or she should report such limitations to the referral source, recognizing that poor performance or lack of participation are not, by themselves, determinative of incapacity. In cases in which the psychiatrist anticipates that language barriers, religious beliefs, sensory impairments (e.g., hearing impairments), or other communication factors will create impediments to accurate assessment,

he or she should arrange (with the prior agreement of the referring attorney or court) to use interpreters or other individuals who can facilitate communication. The interview should always be conducted in a secure location.

Although the primary purpose of a competence evaluation is neither diagnosis nor treatment, the examination should follow the *American Psychiatric Association Practice Guideline for the Psychiatric Evaluation of Adults*.[180] The goal is to learn whether and how mental symptoms impair competence-related abilities. The relevance of even severe symptoms to the question of competence varies from case to case. Nevertheless, it is still valuable to obtain enough information about a defendant's condition to allow identification of the diagnoses that are relevant to the expert's opinion. In cases in which the psychiatrist believes that the defendant lacks adjudicative competence, diagnostic information will inform the judgments about the defendant's restorability and the proper setting for restoration.

## C. Providing Notice

The psychiatrist should begin the interview with the notifications described in Section IV.E. of the Guideline. If the clinical examination is taking place for multiple purposes (i.e., to evaluate criminal responsibility), the psychiatrist should tell the defendant of these additional uses of information obtained during the interview. To find out whether evaluees have understood this information, many psychiatrists ask evaluees to paraphrase what they have told them about the nature, purpose, and conditions of the interview. The defendant's repeating the information tells the psychiatrist whether the defendant has understood what the examination is about and simultaneously provides an initial indication of how well the defendant can assimilate verbally communicated information.

## D. Obtaining Background Information

After hearing about the reason for the examination, some defendants immediately begin telling the psychiatrist about their legal situations and how they incurred their criminal charges. However, in many interviews, focusing initial questions on the defendant's background, including personal and family history, current living arrangements, academic history, and occupational history, accomplishes several things:

It helps the psychiatrist establish rapport while simultaneously providing a helpful perspective on the defendant's intelligence and social functioning.

While gathering this information, the psychiatrist can also assess the defendant's behavior and verbalizations, which may permit inferences about mood, self-control, thought content, mental organization, and concentration.

The psychiatrist can compare the defendant's version of events with information available from independent, verifiable sources. Such a comparison may help the psychiatrist to assess the defendant's willingness and ability to report background information accurately.

Taking a social history may provide insight into how the defendant establishes or sustains relationships, which may help the psychiatrist gauge the defendant's capacity to relate to the defense attorney.

Inquiry into the defendant's medical, psychiatric, and substance use history may aid the psychiatrist in reaching a diagnosis and may direct the psychiatrist to additional sources of collateral data about the defendant.

The defendant's psychiatric history helps the psychiatrist compare how the defendant reports current symptoms with symptoms reported in past episodes of illness.

Asking the defendant about earlier experiences with the criminal justice system (including previous arrests, charges, and convictions) provides the psychiatrist with clues about the defendant's first-hand experience with and knowledge of criminal proceedings.

### E. Mental Status Examination

A systematic mental status examination provides the psychiatrist with specific information about psychiatric symptoms, thought content, mood, memory, information processing, and concentration that may not be apparent in more conversational portions of the interview. Typically, a psychiatrist's mental status examination supplements clinical observations and the evaluee's spontaneous reports, by including questions about several types of symptoms (e.g., current mood, possible delusional beliefs, and perceptual disturbances) and brief tests (e.g., arithmetic,

repeating and recalling items, and assessment of orientation). Although these inquiries yield data helpful in reaching a psychiatric diagnosis, they may also help the psychiatrist to assess the defendant's mental strengths, along with any vulnerabilities that stem from cognitive limitations or psychiatric syndromes—the objective being to identify, characterize, and quantify the severity of any substantive psychopathology that might impair trial participation or courtroom demeanor.

In evaluating defendants suspected of malingering, the psychiatrist may focus the interview, asking for more details about symptoms and looking for inconsistencies between reporting and behavior.[181] Collateral information may help guide the psychiatrist's inquiries and place in perspective any responses that suggest deception.

### F. Questions Specific to Adjudicative Competence

The distinguishing feature of a competence evaluation is the assessment of the functional abilities needed to proceed with criminal adjudication. To make such an assessment, the psychiatrist asks questions that will lead to a determination of whether competence-related abilities are "sufficiently present." Bonnie[182] has characterized these abilities as falling into two key functional domains: "competence to assist counsel" and "decisional competence."

> Competence to assist counsel encompasses the defendant's abilities to understand criminal charges, the implications of being a defendant, the adversarial nature of criminal proceedings, and the role of defense counsel. Competence to assist also includes the defendant's ability to work with and relate pertinent information to defense counsel.

> Decisional competence refers to the ability for the defendant to participate autonomously in making important decisions that arise in the course of adjudication. Among these decisions are whether to testify, whether to plead guilty, and, if the case goes to trial, what strategy should be used.

Examinations of adjudicative competence are concerned with defendants' case-specific capacity to proceed with criminal adjudication, as distinguished from their general legal knowledge, actual current

knowledge about the case, or willingness to proceed with adjudication. A defendant's ignorance of some aspects of how the legal system works, the charges faced, or possible penalties does not necessarily imply incompetence. The defendant may simply not have been provided this information, but may be able to incorporate and use information in making decisions after being told these things. To distinguish mere ignorance from incapacity to learn, the psychiatrist may use structured interviews (discussed later) or other teaching and retesting approaches that involve instruction on factual legal matters. In cases in which the psychiatrist has learned that a defendant has had problems in collaborating with defense counsel, the psychiatrist should try to learn whether the defendant could work with an attorney and participate in defense planning, but has chosen not to do so for reasons not related to mental illness, mental retardation, or developmental limitations.

Assessing and documenting a defendant's functional status usually requires asking specific questions that systematically explore the defendant's general knowledge about criminal proceedings, his understanding of matters specific to his legal case, and his ability to relate to defense counsel. Areas that the psychiatrist typically assesses during an interview include the defendant's:

knowledge about the roles of principal courtroom personnel (the judge, jury, witnesses, defense attorney, and prosecutor) and of the evaluee's role as a defendant;

awareness of being charged with a crime and facing prosecution;

knowledge of specific charges, the meanings of those charges, and potential penalties if convicted;

knowledge about what specific actions the state alleges ("what the police say you did" to generate the charges);

ability to behave properly during court proceedings and at trial;

capacity to appraise the impact of evidence (e.g., adverse witness testimony) that could be adduced;

understanding of available pleas and their implications, including plea bargaining;

perceptions and expectations of defense counsel; and

description of the quality and quantity of previous interactions with defense counsel.

Along with gathering specific information about the defendant's grasp of factual knowledge, the psychiatrist can make inquiries and observations that will help elucidate:

the defendant's capacity for and willingness to engage in appropriate, self-protective behavior;

if present, the extent and impact of the defendant's self-defeating behavior, and the reasons for the behavior;

the defendant's ability to retain and apply new information effectively;

the defendant's capacity to pay attention at trial and remember what has occurred;

the defendant's capacity to use information to make reasonable decisions related to his defense; and

whether the defendant has sufficient impulse control to maintain proper courtroom decorum.

Questions should be open-ended and not assume involvement in the alleged offense. Often, however, defendants may do better at displaying their understanding of and capacities to manipulate information when discussing concrete matters arising in their own cases. For example, they may not be able to provide good definitions of legal terms, but they may demonstrate their understanding of key legal concepts by describing how they anticipate that events will unfold as the case proceeds. Having defendants recount past experiences in the courtroom may also reveal details about how well they understand their current legal circumstances.

Competence interviews should reach beyond defendants' factual understanding of legal terms and procedures to examine the ability to reason about the cases and appreciate the legal situation.[183,184] Evaluating reasoning ability may include questions that assess how well the defendant distinguishes between information with more or less legal relevance, and the defendant's capacity to weigh advantages and disadvantages of available legal options. In assessing the defendants' appreciation of their circumstances, psychiatrists should analyze the rationality of the defendants' beliefs about how they expect the case to pro-

ceed, how they perceive their relationship with their attorneys, and how they anticipate being treated by the legal system. Psychiatrists should keep in mind that delusional beliefs may seriously influence a defendant's reasoning or appreciation of the situation, while leaving factual understanding and knowledge of the legal system unimpaired.[185]

Although this Guideline cannot anticipate all the situations that psychiatrists may encounter, the following comments address some of the special circumstances that they encounter:

Competence to stand trial relates to a defendant's capacity to proceed with adjudication on a specific criminal charge. Defendants who might not be competent to undergo trial in a complex tax case might be competent to proceed with adjudication of a misdemeanor assault.

Occasionally, psychiatrists may encounter defendants with multiple charges who are incompetent to proceed on some charges but are competent to proceed on others. Thus, for an evaluee facing multiple charges, a psychiatrist should anticipate what behavioral and cognitive abilities will be necessary for a defense on each charge and should formulate questions to assess the evaluee's capacity to accomplish these tasks.

Individually tailored interview techniques may help with certain types of evaluees. For example, using illustrations of a courtroom or sketches of crime scenes may help defendants who have limited verbal capacity to convey what they know, understand, and appreciate.

In evaluating individuals with mental retardation, psychiatrists may want to devote extra time to explaining concepts and testing defendants' knowledge later, to find out how well these individuals can retain information and apply it to their specific legal circumstances.

As explained in Section II, amnesia for the period surrounding an alleged offense does not preclude the defendant's being competent to stand trial on that offense. In some cases, a defendant's comments or collateral information signal the psychiatrist that a claim of amnesia is not genuine. In such cases, the psychiatrist can record and later adduce the information concerning the defendant's actual capacity to recall and relate events that led to his arrest. In other cases, psychiatrists

discover clinical information that supports a defendant's claim of amnesia. The psychiatrist can still assess the defendant's capacity to consult with the attorney and understand the criminal process (which may remain well intact), along with the defendant's ability to evaluate the prosecution's evidence depicting alleged conduct at the time of the offense. The psychiatrist should also attempt to obtain information from the defendant and collateral sources that will delineate the scope and likely cause of the defendant's amnesia.

## G. Eliciting the Defendant's Account of Events That Led to the Charge

A key factor in many defendant-attorney interactions is the defendant's ability to provide a rational, consistent, and coherent account of the offense to his attorney. Most of the members of this Practice Guideline committee, along with others,[139] recommend that psychiatrists assess this ability by asking evaluees to describe their versions of events before, during, and after the alleged offense. Psychiatrists should also ask defendants to describe how their activities have been or will be described by victims or witnesses and (especially) by the police. Having a defendant relate his or her recollection of the events that led to the arrest helps the psychiatrist assess (among other things) the defendant's understanding of the reasons for the charges and his or her ability to communicate key information to defense counsel. The defendant's description of events often provides information about whether he or she rationally perceives the reasons for the prosecution and can realistically appraise available defenses (including the insanity defense). Hearing the defendant's description of events leading to the allegations may also help the psychiatrist to assess the defendant's memory and ability to identify others who might testify on the defendant's behalf.

If a psychiatrist is barred from a direct inquiry about the offense or does not want to make such an inquiry (discussed later), an alternative action would be to contact the defense attorney to ask how well the defendant has been able to communicate details related to the alleged offense. When seeking such information, however, psychiatrists should remember that attorneys owe their allegiance to their clients and should have this in mind when formulating their responses.

Practice Guideline: Evaluation of Competence to Stand Trial

When asked by psychiatrists to describe the events that led to their arrest, some defendants decline to answer because they fear that what they say will be used against them or because their attorneys have instructed them not to discuss the matter. In such cases, the psychiatrist can ask about a defendant's reason for withholding information. The psychiatrist also can ask whether the defendant recalls and can relate this information to defense counsel. The defendant's responses, coupled with other information from the interview, may help the psychiatrist decide whether the defendant has the capacity to communicate satisfactorily with defense counsel. For example, if a defendant calmly explains that he recalls arrest-related events clearly and that counsel has forbidden him from discussing his actions, and if the defendant also gives a logical, reality-based description of what the police allege against him, that defendant has demonstrated satisfactory ability to communicate with defense counsel (not to mention good capacity to follow his attorney's instructions).

Though many psychiatrists follow the practice of asking defendants for their account of events, some experts believe that, when conducting an evaluation of adjudicative competence only, a psychiatrist should assess whether an evaluee understands what the police and witnesses say he did, but should not ask the defendant to give his own version of arrest-related events. One reason is that, even if the report omits what the defendant said about the alleged offense, some jurisdictions allow a testifying psychiatrist to be asked in court about what the defendant said. Even if the psychiatrist's testimony is barred from being used later as direct evidence to convict the defendant, some jurisdictions may still allow the testimony to be adduced as a "prior inconsistent statement" to impeach a defendant who testifies at his trial.[128,186,187] Also, testifying about a defendant's statements concerning events that led to the arrest could undermine the defense by revealing information about potential legal tactics of the prosecution.[188]

Obviously, one way to avoid these potential problems is not to ask the defendant what he recalls about why the police arrested him. In many cases, however, this approach is not practicable because (for example), a court has ordered examinations of competence and criminal responsibility, which psychiatrists usually perform during the same interview or set of interviews. Except in those unusual circumstances in which the psychiatrist can determine quickly that a defendant is not competent, the psychiatrist often has elicited or been told the defendant's version of the events that led to his arrest before realizing that the defendant may not be competent. Also, getting a defendant's version of arrest-related events as close as possible to the time those events occurred is the best way to learn what a defendant did and why. Defendants' memories (like those of everyone else) may fade with time, are reconstructive, and reflect the current state of mind. For many psychotic defendants—that is, those most likely to merit the insanity defense—obtaining their version of events before they receive competence-restoring treatment can address the possibility that, once their rationality improves, they will recast their actions and motives into behavior and reasons that seem more plausible, but that are also less exculpatory.

If a psychiatrist believes that asking the defendant about his or her version of events is important, the psychiatrist can deal with concerns about having to testify about the defendant's statements by preparing a response that will alert the court to the matters that are at stake. For example, if the prosecution asks the psychiatrist to testify at a competence hearing about what the defendant said concerning the alleged offense, the psychiatrist may wish to respond, "Before I answer that question, I must ask whether the defense attorney or the court objects, because if I do answer, I may reveal information that will incriminate the defendant or that might compromise his defense strategy."

## H. Psychological Testing

Melton and colleagues believe that "[r]outine administration of conventional psychological tests (i.e., measures of intelligence and personality) is unlikely to be a cost-efficient means of gathering information in most competency cases" (Ref. 1, p 153). Although some psychologists regard conventional psychological testing as an essential element of a competence evaluation,[189] and although most forensic psychologists recommend IQ testing,[190] this Guideline takes the same position as do Melton and colleagues.[1] Psychiatrists can usually ascertain the crucial psychological data relevant to functioning as a competent criminal defendant directly from interviewing defendants and evaluating information provided by collateral sources.

Psychological testing can play an important role in clarifying some diagnostic questions or in evaluating cognitive disability, however, especially when records are scant and interview findings are ambiguous. Other circumstances in which testing may prove useful include those in which there is a question of neuropsychological impairment or mental retardation. Neuropsychological testing often can help the mental health professional to sort out and characterize subtle cognitive impairments—for example, problems in a defendant's abilities to consider alternatives or process complex verbal information.

Because a substantial fraction of competence evaluees feign or exaggerate emotional or cognitive impairment, psychiatrists may find that the MMPI-2 and tests specifically designed to detect malingering are frequently useful. Although interpretation of MMPI results is beyond the knowledge and skills of most psychiatrists, psychiatrists can learn to administer and score several of the available measures designed specifically to assess malingering.

### I. Instruments Specifically Designed to Aid Assessment of Adjudicative Competence

Over the past four decades several instruments for assessing adjudicative competence have been developed, including structured interviews with standardized instructions for scoring and interpreting a defendant's responses. A discussion of several currently available assessment instruments appears in Section VIII. Use of these instruments is not mandatory. In some cases, attempting to use a structured competence-assessment tool will be impossible (e.g., when the evaluee is catatonically mute or has a manic psychosis) or pointless (e.g., when examining a defendant who is also an attorney). Psychiatrists should be familiar with the strengths and weaknesses of these instruments in various evaluation contexts (Pinals *et al.*[191]). Some potential advantages of structured instruments include the following:

Using a structured instrument assures that the psychiatrist will consistently cover relevant topic areas.

Some defendants who are reluctant to discuss their personal situation may respond to hypothetical inquiries such as those used in the assessment tool developed by the MacArthur group.[184]

Some competence-assessment instruments use standardized scoring systems that make possible comparisons between a specific defendant's performance and the performances of groups of previously evaluated defendants.

When using a structured instrument, the psychiatrist should be familiar with the instrument's instructions for administration and should follow those instructions as closely as possible. Although a flexible approach to administration may seem desirable, too much deviation from proper test procedure may reduce the instrument's reliability and validity and may make it difficult to assess the evaluee's performance in relation to the instrument's published norms.

The designers of structured instruments do not intend that the instruments be used as diagnostic tests that decide whether an individual is capable of proceeding with adjudication. Rather, the instruments' designers recommend that psychiatrists treat test results as one source of information, interpreting those results in light of the full clinical interview and other available data. A discussion of several currently available assessment instruments appears later in the Guideline.

## VII. Collateral Data

### A. Value and Scope

In most competence evaluations, collateral data can help psychiatrist formulate and support their opinions. By providing additional perspectives on the defendant, collateral sources help the evaluating psychiatrist gain a more comprehensive understanding of the information about the defendant's current mental state and mental abilities than was derived from the interview. Often, defendants' accounts of symptoms, past treatment, and other relevant events differ substantially from the reports of witnesses or other informants. Defendants may deny or not want to discuss their participation in an offense, or they may claim to have amnesia for events related to the offense. Collateral sources may corroborate or fail to confirm elements of the defendant's account of his symptoms and functioning, which may help in assessing the defendant's accuracy and truthfulness about his mental condition.

Because the competence evaluation focuses on the defendant's current mental state and ability, it generally requires less evaluation of collateral data than

does a retrospective evaluation (e.g., evaluations of criminal responsibility). At a minimum, however, the psychiatrist should review police records when they are available and the indictment concerning alleged incidents leading to the criminal charges.

### B. Incriminating Information

Psychiatrists must recognize that the collateral data that they obtain may occasionally include incriminating information that was previously unknown to the prosecution. The prosecution and the trial court can initiate an evaluation of adjudicative competence, and the defendant may not invoke his or her right against compelled incrimination to avoid submitting to a competence examination.[188] Although most states prohibit introduction of information from the competence evaluation into the trial itself, in other states this protection extends only to statements made by defendants. Attorneys in states that do not have protective provisions may insert language in a court order to limit the use of report information from a competence assessment. Despite these safeguards, concerns about the possibly incriminating effect of collateral data lead some psychiatrists to favor focused assessments of adjudicative competence in which only limited collateral information is presented. If an psychiatrist chooses to use collateral sources in conducting an evaluation of adjudicative competence, such sources serve primarily for obtaining or supplementing information about past or current psychiatric symptoms, but not for gaining information that might facilitate prosecution and criminal conviction.

### C. Obtaining Collateral Information

In many cases, the referring attorney or court will obtain documents containing collateral information and will provide these to the examining psychiatrist. When retained by either the prosecuting or defense attorney, the psychiatrist may include a statement in the retainer agreement that the attorney will give the psychiatrist access to all relevant information available and that the attorney will make reasonable efforts to obtain any additional information requested by the psychiatrist. Sometimes a court order is necessary to compel opposing counsel to produce information deemed relevant by the psychiatrist.

When retained by the defense or directly by the court, the psychiatrist may obtain written consent directly from the defendant for the release of the defendant's medical records, provided that the defendant is competent to authorize the release. Those who have been retained by the defense or prosecution should not contact opposing counsel or other persons who could provide collateral data before consulting with the retaining attorney. After obtaining approval of retaining counsel, defense- or prosecution-retained psychiatrists may then interview collateral sources. Court-appointed psychiatrists may want to speak with both the prosecution and defense attorneys.

Ideally, when using collateral sources of information, the psychiatrist should personally review any critical information that is summarized or referred to in other documents and should not simply accept another clinician's summary of original documents. Besides obtaining original sources when appropriate, the psychiatrist may identify missing information that may help formulate the forensic opinion. For example, the psychiatrist may realize that educational records would serve to verify mental retardation when it appears that cognitive limitations affect a defendant's competence to stand trial.

If requested information did not arrive before submission of the report, the psychiatrist should note this in the report, along with the reason that the psychiatrist did not have access to the information. In some cases, the psychiatrist may want to include in the report a statement reserving the right to change an opinion, should any conflicting information subsequently become available.

### D. Managing Collateral Information

All material reviewed by the psychiatrist is considered confidential and under the control of the court or the attorney providing it, and it should not be disclosed or discussed without the consent of the referring party. The psychiatrist should realize that notations made on this material may be subject to direct and cross-examination if referred to during testimony. Material generated by the psychiatrist during an evaluation (e.g., interview notes, videotapes) is initially considered the work product of the referring attorney. As such, it should not be disclosed or discussed without the defendant's, attorney's, or court's consent. The psychiatrist should furnish copies of this material to the referring attorney or court, however, if requested to do so.

## E. Common Types of Collateral Information

### 1. Written Records

Police reports and the indictment describing the instant offense (or equivalent information that formally document the allegations and charges), should be reviewed, paying particular attention to police documentation of underlying facts and the correspondence between this documentation and any statements by the defendant about events that led to the charges. Statements made by the defendant, victim, and witnesses can provide valuable background information to facilitate discussion with the defendant about his understanding of the charges and evidence against him. When provided, a defendant's arrest and plea history can be helpful in learning about his experiences with the legal system.

Psychiatric, substance abuse, and medical records may help the psychiatrist understand the defendant's psychiatric symptoms and diagnosis, past responses to treatment, and previous levels of psychiatric impairment. These records may also help clarify elements of the family history that may prove useful in arriving at a diagnosis.

School records may shed light on when psychiatric symptoms (especially cognitive impairment) first developed or were identified and can help the psychiatrist evaluate a defendant's reports concerning possible mental retardation or borderline intellectual function. Special education records, including psychological testing, are specifically helpful in evaluating claims of mental retardation.

Employment records may corroborate or contradict a defendant's account of impairment from psychiatric disability and level of work performance. Disciplinary actions and improvement plans may provide additional insights into a defendant's past problems and functioning.

Military records may also corroborate or contradict a defendant's account concerning past levels of functioning and the time of onset and the severity of psychiatric symptoms. The data found in military records include descriptions of medals received, honors earned, promotions, disciplinary actions, and the type of military discharge.

Other expert evaluations and testimony by other mental health experts can help in assessing the consistency of the defendant's reports and scores on psychometric testing. Expert evaluations and testimony relating to previous crimes may also be considered.

Jail and prison records may document behavioral problems, medical treatment, and mental health interventions during incarceration. These records also will describe total length of incarceration and compliance with custodial requirements (e.g., disciplinary actions or time spent in administrative segregation). When available, prison work and school records may provide further information about past functioning.

Personal records can also help a psychiatrist corroborate or disprove statements made during the interview. For example, records of sophisticated financial transactions would argue against the presence of mental retardation. Diaries or journals may provide insights into a defendant's prearrest level of cognitive functioning.

### 2. Collateral Interviews

Useful information may be obtainable in interviews with several persons other than the defendant.

The psychiatrist retained by the court or the defense attorney may speak directly with the defense attorney to obtain information about counsel's reasons for the referral and experiences relevant to the defendant's ability to assist in the defense.[1,192] If retained by the prosecution, the psychiatrist can request permission through the prosecutor to speak with the defense attorney. A brief interview with the defense attorney may provide valuable information about the attorney's specific concerns about the defendant's competence and examples of the defendant's limitations related to trial proceedings.

Other sources such as family members, friends, and employers can provide information about a defendant's level of functioning and visible symptoms. Though the potential for self-incrimination is not generally at issue, it may be important to inform the interviewee of the intended use and nonconfidential nature of the information. Interviewees should receive an explanation similar to the one that the defendant receives (see Section IV.E.), with the added warning that providing information to the psychiatrist may lead to his or her being called to testify in court. Besides providing a verbal warning, the psychiatrist may also ask an interviewee to sign a written nonconfidentiality statement.

## VIII. Assessment Instruments

One of the first instruments specifically designed for assessing adjudicative competence was Robey's

Checklist for Psychiatrists.[193] When Robey's checklist appeared in 1965, psychiatrists who were evaluating defendants often rendered opinions based on the presence of symptoms, without reference to legal criteria for adjudicative competence.[194–196] In subsequent years, forensic experts have developed a variety of instruments that range from screening tools and checklists to elaborate guides for conducting entire evaluations. Descriptions of several of these instruments, all amenable to use by psychiatrists, appear in the following sections.

The *Competency to Stand Trial Screening Test* (CST) is a 22-item, sentence-completion test developed as part of a research project conducted by the National Institute of Mental Health.[2,197] Each item of the CST is scored from 0 to 2, with higher scores indicating higher levels of legal comprehension. The CST has standardized administration (completion takes about 25 minutes) and standardized scoring. Examples of test items include, "When I go to court, my lawyer will . . ." and "When they say a man is innocent until proven guilty, I . . .."The CST is a screening test; if the total CST score is less than 20, further evaluation with the Competency Assessment Instrument (described in the next section) is recommended. Strengths of the CST include ease of administration and a high true-negative rate. Weaknesses include low validity due to a high rate of false positives, difficulty assessing defendants who have a high degree of cynicism about the system,[198] and limited and unproven reliability of the test. Also, the test provides a numerical result rather than a detailed description of a defendant's abilities. A subsequent version of this measure, the Competency to Stand Trial Assessment Instrument (CAI), appeared in 1980.

The *Competency to Stand Trial Assessment Instrument* (CAI) is a semistructured comprehensive interview developed by McGarry and colleagues[199] that yields five-point Likert scale scores (1, total incapacity, to 5, no incapacity) on 13 areas of competence-related functioning (e.g., capacity to testify relevantly, appraisal of available legal defense). The CAI came from the same National Institute of Mental Health study as the CST. When a majority of scores are 3 or lower, inpatient hospitalization for restoration or observation is potentially helpful. The strengths of the instrument include its usefulness in structuring an interview[200] and its provision of sample interview questions and case examples. Its weak-

nesses include nonstandardized administration, nonstandardized scoring, limited empirical validation, and no norms.

The *Georgia Court Competency Test* (GCCT) is a popular screening instrument originally developed for rapid identification of defendants who are obviously competent. The GCCT evaluates a defendant's factual knowledge about general criminal court procedure and factual knowledge related to the defendant's specific case.[201,202] The original version of the GCCT had 17 questions grouped as follows:

> 7 questions about an illustration of the layout of a courtroom (e.g., "Where does the judge sit?"); 5 questions about functions of courtroom personnel (e.g., "What does a witness do?");
>
> 2 questions about the defendant's current charges;
>
> 1 question about helping the defense attorney;
>
> 1 question about the alleged crime; and
>
> 1 question about the consequences about being found guilty of the alleged crime.

The test's instructions allow the examining clinician to assign scores to the defendant's responses which, added together, yield a sum between 0 and 50. The sum is then doubled to obtain a final score between 0 and 100.

A 1992 modification of the GCCT by the Mississippi State Hospital (GCCT-MSH) has 21 questions. The GCCT-MSH includes questions about ability to assist counsel ("What is your attorney's name?"), and expectations of appropriate courtroom behavior in addition to questions contained in the original GCCT. A score of 70 or higher on the GCCT (or GCCT-MSH) suggests that a defendant has adequate factual knowledge of courtroom proceedings, but does not necessarily imply that the defendant is competent to stand trial.

Strengths of the GCCT include its ease of administration, which takes about 10 minutes, and ability to make a rapid assessment of the defendant's factual knowledge about how courtroom personnel function and why he was charged. The GCCT's weaknesses include questionable content validity (a full one-third of the questions are about the drawing of the courtroom) and lack of meaningful assessment of a defendant's ability to assist in his defense. Users of the GCCT-MSH should also recognize that it is focused on factual understanding and offers limited

insight into a defendant's rationality or appreciation of his legal situation.

Although the GCCT was never officially published, it has become one of the more commonly used screening tools for competency to stand trial.[203] Many currently circulated versions of the GCCT-MSH include the Atypical Presentation Scale (APS) by Gothard and colleagues,[118] an eight-item screening tool for detection of feigned psychosis. Although intended only as a screening instrument for malingering, the APS has acceptable sensitivity and specificity (more than 80% when a score of 6 is used as the cutoff).[118]

The *Interdisciplinary Fitness Interview* (IFI) and the *IFR-Revised* (IFI-R) are semistructured interviews designed for joint administration by an attorney and a mental health professional,[204,205] although they may be administered by a mental health professional alone.[206] The IFI contains questions that specifically address capacity to assist in one's defense and one's factual and rational understanding of the proceedings. It examines current psychopathology related to six types of symptoms (rated as present or absent) and psycholegal abilities in the following areas:

    ability to appreciate charges;

    ability to disclose relevant information;

    courtroom demeanor;

    ability to understand the adversarial nature of proceedings;

    quality of the relationship between defendant and attorney;

    appreciation of legal options and consequences; and

    ability to make reasoned choices concerning legal options and consequences.

Psychiatrists score aspects of these psycholegal abilities on a scale of 0 (no or minimal incapacity) to 2 (substantial incapacity). The Influence of Decision Scale is used to record a rating (also 0, 1, or 2) of the importance that the psychiatrist accorded each dimension in forming the opinion. The rationale for the Influence of Decision Scale is that the significance of a given factor should vary depending on the facts specific to the defendant's case. Thus, for example, a defendant's courtroom demeanor is viewed as more important in cases in which testimony is necessary for a proper defense than in cases in which the defendant is unlikely to testify. The IFI-R scoring manual[205] is available online.

Limited research on the IFI suggests that its results correlate strongly with experts' and judges' ultimate conclusions about adjudicative competence.[207,208] Additional strengths of the IFI include its interdisciplinary nature and relatively short administration time (45 minutes). Its weaknesses include the practical difficulty of having an attorney present at each evaluation and the limited amount of research on its validity and reliability.

The *Computer-Assisted Determination of Competency to Stand Trial* (CADCOMP) is a 272-item objective test that assesses social history, psychological functioning, and legal knowledge.[209] The test takes about 90 minutes to complete and produces a computer-generated narrative report. The report is not meant to be conclusory but to form the basis for subsequent clinical interviews. Weaknesses of the CADCOMP include administration time (complete testing includes assessment of reading level with the Wide Range Achievement Test, orientation to the computer, and the clinical interview after the test), reliance on the defendant's self report, and unfeasibility of administration in certain settings (e.g., a jail).

The *Competence Assessment for Standing Trial for Defendants With Mental Retardation* (CAST*MR) was developed specifically for evaluating adjudicative competence in defendants with mental retardation.[210,211] The developers of the CAST*MR believed that the open-ended questions used in other instruments (e.g., the CAI) might not properly assess mentally retarded individuals with limited ability to express themselves. The developers also thought that the vocabulary of other tests might be too advanced for mentally retarded defendants and that the emphasis on psychiatric symptoms might not be appropriate for such defendants.

The CAST*MR has 50 items divided into three sections and takes 30 to 45 minutes to administer. The majority of questions are multiple choice. The first two sections require a fourth-grade reading level. The first section includes 25 questions assessing basic legal knowledge ("What does the judge do?") and the second section uses the same format to assess the defendant's ability to assist in his or her defense. The last section has 10 items designed to assess the defendant's account of events surrounding the charges

(e.g., "What were you doing that caused you to get arrested?"). A weakness of the CAST*MR is that it does not assess the defendant's understanding of legal proceedings in depth. Also, the recognition format of the test may result in overestimation of a defendant's abilities.

In 1989, the MacArthur Research Network on Mental Health and the Law began the MacArthur Adjudicative Competence Project, the purpose of which was to measure psychological abilities relevant to competence to proceed to adjudication (rather than just competence to stand trial).[212] The project emphasized appreciation and rationality as important features of adjudicative competence and favored assessment of the defendant's abstract as well as case-specific knowledge base.

The ultimate product of the MacArthur Adjudicative Competence Project was the *MacArthur Competence Assessment Tool-Criminal Adjudication* (Mac-CAT–CA), a 22-item test that takes 30 to 45 minutes to administer. It has three sections:

> Items 1 through 8 assess the defendant's understanding (e.g., role of the defense attorney, elements of the offense, pleading guilty). These items include educational components that allow evaluation of a defendant's ability to grasp basic, orally presented information about legal proceedings.

> Items 9 through 16 assess the defendant's reasoning (e.g., concepts such as self-defense, possible provocation, and ability to seek information that informs a choice).

> Items 17 through 22 address the defendant's appreciation of his specific circumstances (e.g., his beliefs about the likelihood of being treated fairly and his rationale for these beliefs).

In administering the MacCAT–CA, the psychiatrist has the evaluee listen to and answer questions about a hypothetical criminal case in which two men get into an argument at a bar, one man hits the other with a pool cue, and an aggravated assault charge results. The MacCAT–CA uses the bar fight vignette for the first 16 test items (i.e., those items dealing with understanding, appreciation, and reasoning); the third section, appreciation, concerns the defendant's beliefs about his case, rather than the vignette.

Each MacCAT–CA item is scored 0, 1, or 2, using instructions and examples of responses from the test's *Professional Manual*. The total scores for items 1 through 8, 9 through 16, and 17 through 22 provide indices of a defendant's understanding, reasoning, and appreciation, respectively. Tables in the *MacCAT–CA* Professional Manual and the test administration booklet help the psychiatrist to see how an evaluee's performance on these indices compares with large groups of competent and incompetent defendants who underwent evaluation during the design of the MacCAT–CA. Scores from the understanding, appreciation, and reasoning scales are not combined for a total score, however.

Results of research using the MacCAT–CA suggest that it compares favorably with other measures of competence to stand trial with regard to validity, reliability, and ease of administration.[213] The strengths of the MacCAT–CA include its derivation from a psycholegal theory of competence, assessment of multiple psycholegal abilities, assessment of the capacity to assimilate new information, standardized administration, objective criterion-referenced scoring, and availability of normed data for the purpose of comparison. Also, an emerging body of literature on MacCAT–CA performance by adolescents may permit meaningful assessment of minors' competence to proceed with adjudication in juvenile court.[214,215]

Weaknesses of the MacCAT–CA include its limited focus on the complexity of the defendant's case, the defendant's memory of events, and legal demands such as appropriate behavior in court. Although the MacCAT–CA was designed for and evaluated in individuals with low-average intelligence, its verbal demands may exceed the expressive capabilities of mentally retarded defendants who nonetheless understand their charges and can converse satisfactorily with counsel. Evaluees with severe thought disorders, memory impairment, or problems with concentration may not be able to complete assessments with the instrument. The MacCAT–CA also does not formally address dubious claims of amnesia or malingering. Pinals and colleagues[191] provide a valuable discussion of the practical advantages of using the MacCAT–CA, along with the problems that psychiatrists may encounter if they try to administer the instrument to all competence evaluees.

As with all other instruments for evaluation of adjudicative competence, the MacCAT–CA is not supposed to function as a stand-alone assessment of competency to stand trial. Rather the test's creators

Practice Guideline: Evaluation of Competence to Stand Trial

intend that the MacCAT–CA be regarded as an assessment tool that "should enhance the thoroughness and quality of clinical investigations of adjudicative competence" (Ref. 212, p 143).

The *Evaluation of Competency to Stand Trial-Revised* (ECST-R) is a recently developed competence-assessment instrument that became available for purchase in 2005. Eighteen items and three scales of the ECST-R address the defendant's factual and rational understanding of legal proceedings and ability to consult with counsel, which are the criteria for adjudicative competence propounded in *Dusky*.[16] Another 28 test items address various "atypical" styles of symptom presentation, including feigning of psychosis, nonpsychotic disorders, and cognitive impairment.

The ECST-R is intended for use with adults facing charges in criminal court, including individuals with IQs in the 60 to 69 range. The designers of the ECST-R believe that their instrument is superior to other structured assessment tools because they structured the ECST-R to track the three elements of adjudicative competence described in *Dusky*, rather than a theoretical, nonjudicial conceptualization of adjudicative competence. Unlike other assessment instruments, the ECST-R includes scales that screen for feigned or exaggerated mental problems. The ECST-R designers believe that their studies of the ECST-R provide error rates relevant to test admissibility under evidentiary rules laid out in the U.S. Supreme Court's decision in *Daubert v. Merrell Dow*, 509 U.S. 579 (1993).[216]

Data supporting the design, use, and accuracy of the ECST-R appear in the test's instruction manual. As of late 2006, four articles[217–220] that evaluate the ECST-R had appeared in peer-reviewed academic journals.

Whether to use structured assessment instruments for adjudicative competence remains a matter of personal choice for psychiatrists. When psychiatrists use these instruments, however, they should be aware of their responsibility to maintain the security of the text's contents. The value of many psychological tests and assessment instruments rests in part on the public's ignorance of their specific contents. If, for example, test items from intelligence scales were publicly available, evaluees could obtain and study the questions, and those scales would no longer be indicators of individuals' native intelligence. For this reason, psychologists' ethics guidelines prescribe that test us-

ers safeguard "the integrity and security of test materials" (Ref. 221, No. 9.11), by, for example, preventing persons who are not authorized to administer tests from obtaining the content of specific test items and instruction manuals. Also, psychologists often are urged not to release raw test data—an individual evaluee's responses—if doing so would create a risk that the data would be misused or misrepresented (Ref. 221, No. 9.04). It is permissible, however, to release raw data in response to a court order. Psychiatrists' official ethics guidelines do not discuss this question. If psychiatrists choose to use competence-assessment instruments, they should take appropriate precautions to preserve the instruments' value and integrity.[148]

Instruments designed specifically for assessing competence to stand trial have variable reliability, validity, and usefulness. Designers of these instruments intend that they be used in concert with, rather than as a substitute for, a more comprehensive clinical examination. When the results of clinical examination appear discordant with the results of a competence-assessment measure, the evaluating clinician must resolve the conflict, which may involve obtaining additional information necessary to render an opinion with a reasonable degree of medical certainty.

Psychiatrists should recognize that most competence assessments give little or no consideration to the commonly encountered question of malingering. Assessment of problems such as reported amnesia, neurocognitive impairment, and mental retardation may require additional testing.

Ideally, regular use of assessment instruments would enhance clinical evaluations by giving psychiatrists reliable, valid data. Given the limitations of existing instruments and their potential for being attacked as inadequate in *Daubert*-type hearings, however (see, e.g., *State v. Griffin*, 869 A.2d (Conn. 2005),[222] psychiatrists should not overvalue the information that they provide. Instead, psychiatrists should interpret results of testing in light of all other data obtained from clinical interviews and collateral sources.

## IX. Formulating the Forensic Opinion

In formulating an opinion about adjudicative competence, the psychiatrist usually considers three questions:

Practice Guideline: Evaluation of Competence to Stand Trial

What symptoms does the defendant have, and what is the defendant's psychiatric diagnosis?

What is the relationship, if any, between the symptoms or diagnosis and the mental capabilities required under the jurisdiction's standard for competence to stand trial?

If the defendant appears incompetent to proceed with adjudication, how likely is it that appropriate restoration services would restore his competence, and what is the appropriate, least restrictive setting for such services?

## A. Psychiatric Symptoms or Diagnosis

### 1. General Considerations

As explained in Section I, the substantive constitutional standard for adjudicative competence (as articulated in Dusky[16]) does not make having a mental disorder a requirement for finding a defendant incompetent. With minor variations in language or terminology, every U.S. jurisdiction uses the Dusky standard. Though several jurisdictions do not require a predicate mental illness, federal courts and most states require the establishment of a formal diagnosis.

Therefore, psychiatrists working in jurisdictions with statutes that require a predicate diagnosis should indicate such a diagnosis in individuals whom they believe are not competent.

Most adult defendants found incompetent to stand trial meet criteria for a mental disorder as defined in the recent editions of the American Psychiatric Association's DSM (DSM). Psychotic disorders are the most common diagnoses among criminal defendants referred for competence evaluations and subsequently found incompetent to stand trial. Studies have shown that among defendants who undergo evaluations of adjudicative competence, 45 to 65 percent of those with schizophrenia or other psychotic illnesses,[207,223–226] 23 to 41 percent of those with affective or organic disorders,[223,226] and 12.5 to 36 percent of individuals with mental retardation[223,224,227] are found incompetent.

Also, in a study by the MacArthur Foundation Research Network on Mental Health and the Law 65 percent of defendants hospitalized for restoration to competence were found to have a diagnosis of schizophrenia, and 28 percent had an affective disorder.[184]

In many jurisdictions, insanity statutes require the presence of a severe mental disorder and exclude diagnoses of substance abuse or personality disorders as potential bases for insanity defenses.[143] However, mental disorders that are not severe are still permissible bases for findings of incompetence to stand trial. While the U.S. Supreme Court does not regard the insanity plea as a constitutional right that states must make available to defendants,[228] A criminal defendant has a constitutional right to be tried only while competent.[22,229] It thus makes sense not to have an absolute lower limit on "seriousness" of disorders that could constitute the basis of a finding that a defendant is incompetent to stand trial.

In theory, therefore, any diagnosis or symptom cluster could be the cause of a defendant's incompetence. In practice, however, few defendants who have neither an Axis I diagnosis nor a diagnosis of mental retardation are incompetent. Though some personality disorders may affect a defendant's competence abilities (e.g., magical thinking in an individual with schizotypal personality disorder), any psychiatrist who believes that a defendant is not competent should carefully consider whether an Axis I diagnosis is present. In all cases, psychiatrists should record observations about symptoms and render opinions about diagnoses with a view toward how those symptoms affect the defendant's functioning. The particular diagnoses or symptoms that affect the defendant's trial-related abilities should receive further explanation in the opinion section of the psychiatrist's report. It may not be possible to make a definitive diagnosis if there is not a clear history or there are new ambiguous symptoms.

### 2. Special Diagnostic Consideration

When a defendant claims amnesia for an alleged crime, questions about competence to stand trial are likely to arise. From a practical and theoretical standpoint, true inability to remember circumstances surrounding an alleged offense certainly impairs the defendant's ability to assist in his defense. For example, a defendant may be the only person who has knowledge of an alibi that could form the basis of an acquittal. In the previous section, Wilson v. U.S.[67] and other case law surrounding the criminal courts' handling of amnesic defendants was reviewed. Courts generally have held that a defendant's amnesia is not a bar, per se, to understanding criminal proceedings or standing trial.

In evaluating claims of amnesia, the psychiatrist should consider the purported genesis of the memory deficit and collateral information (e.g., hospi-

Practice Guideline: Evaluation of Competence to Stand Trial

tal records or reliable witness statements from the time surrounding the alleged offense) in attempting to determine the plausibility and genuineness of the amnesia. Medical records may also provide the psychiatrist with data that help determine whether the defendant's presenting symptoms are compatible with his medical history. Findings from psychological testing (including assessments of malingering) may also help the psychiatrist to evaluate a defendant's assertions about amnesia.

Mental retardation is a diagnosis commonly associated with a finding of incompetence to stand trial.[223,224,227] Before making that diagnosis, the psychiatrist should be familiar with relevant definitions of mental retardation. For example, in the DSM-IV-TR,[230] the criteria for a diagnosis of mental retardation include:

an IQ of approximately 70 or below;

deficits or impairments in at least two areas of present adaptive functioning; and

an onset before age 18 years.

With respect to adjudicative competence, however, the psychiatrist should remember that, theoretically at least, an isolated low IQ score—without any deficits in adaptive functioning—may form the basis of an opinion that a particular defendant is not competent to stand trial.

Evaluation of juvenile defendants with respect to competence to stand trial presents several complicated problems, as described in Section XI.

The diagnostic rules of DSM-IV-TR allow entry of a diagnosis of malingering as a V code on Axis I. A substantial fraction of defendants malinger incompetence to avoid prosecution. For example, Gothard and colleagues[231] report a 12.7 percent rate of feigned mental disorder among their competence referrals.

Malingering has very negative connotations, and an opinion that a defendant is feigning or exaggerating can adversely affect the defendant's treatment in ensuing criminal proceedings. Because of this, one should not offer a diagnosis of malingering lightly. Psychiatrists should base diagnoses of malingering on solid evidence rather than mere clinical suspicion. Potential sources of confirmatory evidence include:

psychological testing or specialized instruments for detecting malingering;

medical, psychological, and/or custodial records;

interviews with family, friends, police, custodial officers, and others who have had contact with the defendant; and

a previous history with the criminal justice system without any evidence or suspicion of incompetence.

If the psychiatrist suspects that a defendant is malingering but cannot confirm it with a high level of confidence, the psychiatrist may conclude (and state in the forensic report) that the defendant should undergo a psychiatric hospitalization, where around-the-clock professional observation may help clarify whether reported symptoms are genuine or feigned.

### B. Relationship Between Psychiatric Impairment and Trial-Related Abilities

Once the presence of indicia of mental disorder is established, the psychiatrist focuses on any relationship between signs or symptoms of any mental condition and the defendant's trial-related abilities. Knowing a defendant's psychiatric history may help to substantiate noted symptoms or to clarify their diagnostic significance, but a history of impairment does not imply that a defendant currently is incompetent to stand trial. The psychiatrist must decide whether any current mental symptoms are causing impairment in the defendant's trial-related abilities.

Because U.S. jurisdictions use competence standards that closely follow the *Dusky* decision,[16] forensic clinicians can use *Dusky*'s three prongs—factual understanding of the proceedings, rational understanding of the proceedings, and ability to consult with counsel—as a guide for thinking about how a defendant's psychiatric impairments affect adjudicative competence.

#### 1. Factual Understanding

To evaluate factual understanding of the legal proceedings, the psychiatrist assesses a defendant's knowledge about the charges, the roles of various courtroom participants, possible penalties, the concept of plea bargaining, the adversarial nature of the legal process, and legal rights during the trial process. Defendants who lack some factual knowledge regarding aspects of the trial process may still be competent if the psychiatrist can show that the defendant could learn the necessary information and that any noted deficits are not due to psychiatric impairment.

As an illustration, consider a defendant who does not know the maximum number of years attached to

a possible sentence. Once provided the information, however, the defendant accurately states the potential length of imprisonment that might follow conviction. In this situation, the defendant's initial deficits only indicate a lack of information rather than any impairment stemming from a mental disorder. Conditions that can result in a defendant's having a competence-impairing lack of factual understanding include cognitive deficits from mental retardation, head trauma, medical illnesses, severe depression, and thought disorders, such as those experienced by persons with schizophrenia.

Psychiatrists should also recognize those situations in which defendants appear to have a factual understanding of the trial process but actually do not. For example, some individuals with mental retardation who have undergone competence training may provide memorized answers to questions about trial facts without developing an understanding of the issues. A defendant's ability to answer questions about hypothetical courtroom scenarios that differ from his case may tell the psychiatrist whether the defendant has an actual factual understanding of the legal process or is simply parroting words learned by rote.

### 2. Rational Understanding

Some defendants may have an adequate factual grasp of trial-related matters yet have irrational beliefs about the legal process that render them incompetent to stand trial. Consider, for example, a defendant who has grandiose religious delusions and who therefore believes that no earthly court can punish him. This defendant may have an accurate factual understanding of the legal process as it applies to "ordinary" humans but cannot recognize that he faces potential imprisonment if found guilty. In this situation, the psychiatrist should describe how the delusions affect the defendant's ability to participate rationally in the legal process.

By contrast, a defendant may display indicia of mental illness (including signs or symptoms of a psychosis) that do not impair rational understanding of the trial process. For example, a defendant's persistent delusional belief that his ex-wife had an affair 10 years ago may cause no impairment in his ability to understand and proceed with adjudication on a burglary charge.

### 3. Ability to Assist Counsel

In many evaluations of adjudicative competence, the psychiatrist should contact the defendant's attor-

ney to assess the defendant's ability to assist counsel. Potentially useful information provided by defense counsel may include the defendant's behavior with the attorney, the defendant's ability to follow instructions provided by the attorney, the defendant's behavior during any prior courtroom proceedings, and other effects of psychiatric symptoms on the defendant's interactions with counsel. A defendant who refuses to speak with his attorney because he delusionally believes his attorney is an undercover FBI agent working for the prosecution provides an example of how a psychiatric symptom can impede collaboration with defense counsel. The psychiatrist may have to determine whether a defendant's refusal to assist counsel is a result of voluntary noncooperation or an impaired ability to cooperate caused by a mental disorder.

The psychiatrist should also assess the defendant's capacity to make legal decisions in collaboration with defense counsel and to participate in other activities that counsel may require. Examples of such activities include the defendant's ability to plea bargain, to waive a jury trial, and to testify. The psychiatrist should focus on how well the defendant can appreciate the situation, manipulate information related to the trial process, and work with counsel in making rational decisions.

In conducting this three-prong analysis, psychiatrists should be familiar with and should keep in mind the exact statutory language in their jurisdictions. In general, a finding of competence to stand trial requires only that the defendant have sufficient present ability rather than perfect ability to satisfy the requirement of *Dusky*. The psychiatrist can best aid the court by synthesizing specific information about and providing clear examples of the nature and severity of a defendant's deficits and by showing how these deficits relate to the prongs of the *Dusky* test.

### C. Potential for Restoration: Least Restrictive Alternative

Although not required by the *Dusky* standard, most statutes (following *Jackson v. Indiana*[26]; see Section I) explicitly require that the psychiatrist formulate an opinion about whether restoration of competence is likely within some statutorily designated time frame (usually linked to the severity of the potential penalty for the alleged crime) and whether restoration services should take place in an inpatient or outpatient setting.

Practice Guideline: Evaluation of Competence to Stand Trial

In addressing the probability of restoration in a specific case, the psychiatrist should consider several factors, including:

whether the defendant's incompetence results from a "treatable" deficit such as lack of prior exposure to information about the trial process or psychiatric symptoms caused by an illness that typically responds to medication, as opposed to a static and relatively irremediable condition such as mental retardation;

the defendant's previous psychiatric treatment and responses to treatment; and

the character of presenting symptoms and current scientific knowledge about how well those symptoms respond to treatment.

When assessing restorability, psychiatrists should bear in mind that research on competence restoration shows that most individuals referred for treatment after being found incompetent do in fact become competent to stand trial.[232–236] Summarizing previous research findings in the mid-1990s, Nicholson and colleagues concluded that "the ability of clinicians to predict competency restoration is poor, at least when compared with the base rate of failed restoration" (Ref. 209, p 373). Studies of defendants from Los Angeles,[232] Michigan,[233] Ohio,[234,235] and Oklahoma[236] have shown that most defendants hospitalized for competence restoration regain their competence. Because of the high base rate of successful restoration, it is difficult to determine which defendants have very low likelihoods of achieving competence if provided with treatment.[237–239]

An Illinois study found that clinicians were wrong in predicting the treatment outcomes of 85 percent of the defendants who ultimately were not restored to competence,[238] and Florida researchers concluded that a discriminant function they developed had "little or no better than chance utility in predicting" restorability (Ref. 239, p 73). A retrospective Oklahoma study[209] found that having a previous criminal record and alcohol use at the time of the offense modestly increased the likelihood of competence restoration; impairment in psycholegal ability, having psychotic symptoms, and aggression toward others after arrest correlated with failure to attain competence. Nonetheless, the study's authors concluded that their results were "consistent with prior research

in suggesting that psychiatrists should exercise caution in providing feedback to courts concerning [the likely success of] competency restoration" (Ref. 209, p 377). A recent Alabama study[226] found few differences between defendants who the psychiatrist predicted were restorable or nonrestorable. Those differences that did exist reflected mainly nonpsychiatric variables such as criminal record, current criminal charge, and understanding of the legal process. The most recent study of this topic, from Ohio,[240] showed that two types of incompetent evaluees had probabilities of being restored that were well below average: chronically psychotic defendants with histories of lengthy inpatient hospitalizations and defendants whose incompetence stems from irremediable cognitive disorders (such as mental retardation). Psychiatrists should recognize, however, that courts may regard a "low" but greater-than-zero probability of success to be "substantial" enough to warrant a trial of restoration.

If successful restoration appears likely, psychiatrists in some jurisdictions must also render an opinion about the range of services that will be necessary to restore the defendant to competence. Restoration usually involves two simultaneous processes: education about the court process and treatment (usually, with psychotropic medication[241]) of psychiatric symptoms that are interfering with the defendant's competence-related abilities. The potential sites for restoration treatment services may vary depending on local customs, state law, court (juvenile versus adult), and jurisdiction (e.g., federal versus state) and may be available in inpatient facilities, outpatient settings, or jails. In states that allow both inpatient and outpatient restoration services, the psychiatrist may have to form an opinion about which treatment setting represents the least-restrictive alternative—that is, which setting is necessary to maximize the chances of restoration while preserving the defendant's liberty rights to the greatest extent possible. In most jurisdictions, the psychiatrist may recommend inpatient treatment, even for defendants who do not meet statutory criteria for inpatient commitment. For example, in the case of a psychotic defendant who has a history of a good response to treatment in the hospital followed by repeated episodes of substance abuse and noncompliance with medication while living in the community, a recommendation for inpatient restoration services may be appropriate.

## X. Preparing the Written Report

### A. General Considerations

Because competence evaluations often do not result in courtroom testimony, a written report usually is the chief product of the psychiatrist's evaluative efforts. The report provides the referring party with the psychiatrist's opinions relevant to adjudicative competence and the basis for those opinions. The report must provide a meaningful response to the competence inquiry and direct the response to the particular problems that led to the evaluation. Because the report's principal users are attorneys, the psychiatrist should describe data and express opinions in jargon-free language that a layperson can understand.[192] When the report must include clinical or technical terms that a well-informed nonclinician might not understand, the report writer should provide parenthetical or other forms of explanatory language (e.g., "haloperidol, an antipsychotic medication").

The psychiatrist's report should serve an organizing function that helps readers grasp the significance of information gathered from the clinical interview and collateral sources. Whatever format the writer chooses, the written presentation should convey all relevant information concisely, allowing the reader to apprehend the facts and reasoning the expert used in formulating the opinion. The report should be a stand-alone document, that is, a document that provides or reproduces the data needed to support the opinions that the psychiatrist expresses. The report should also state clearly any limitations or qualifications of which the psychiatrist is aware. For example, if a defendant's poor cooperation leaves the psychiatrist with some doubt about the defendant's diagnosis, if the psychiatrist had limited access to important collateral information, or if the psychiatrist requested but did receive records that might alter the opinion, the report should describe these limitations.

### B. Report Formats

There is no single correct style or format for the report. Available examples include the Group for the Advancement of Psychiatry report format[242] and the outline suggested by Melton and colleagues.[1] Many state forensic mental health systems have manuals describing a preferred style for reporting the results of a competence evaluation. Jurisdictions vary in whether the psychiatrist's report should provide an explicit opinion on the ultimate legal issue (i.e., whether the defendant is competent to stand trial). A suggested report outline appears at the end of this section.

### C. Introductory Material

Besides providing the defendant's name and the legal identification of the case, the report should identify the referring or requesting party, and state the purpose of the evaluation. The report may reference the jurisdiction's legal standard for adjudicative competence. It should provide the date, location, and length of any interview(s) conducted. (For example: "I examined the defendant at the Gevalt County Jail on June 30, 2006, for three hours.") The introduction should include descriptions of how the defendant received information about the interview's purpose and lack of confidentiality and how well the defendant understood that information. The report also should list all data sources used for the evaluation, including records and other materials that the psychiatrist has read, the names of collateral informants (besides the principal examinee), the psychological tests or assessments administered, and any other sources of information.

### D. Background Material

The background sections typically need not be as detailed or extensive as the background section of reports on criminal responsibility or nonforensic evaluations completed for treatment purposes. Instead, background sections should include just those facts that are pertinent to adjudicative competence and (in the case of incompetent defendants) restoration. In the background section and subsequent portions of the report, the psychiatrist should not reveal incriminating information gleaned from what the defendant said about the alleged offense, because prosecuting attorneys often receive a copy of the report. Even if the law prohibits the use of the competence report at trial or sentencing, courts may permit its entrance if the defendant later testifies and his prior statements are inconsistent with his testimony.

Findings from a physical examination, imaging studies, or laboratory tests should be included when they play a role in guiding the psychiatrist's opinion. If the psychiatrist has used psychological testing or assessment instruments, the report should include dates of administration of the initial and repeated

tests, along with comments about nonstandard instructions or administration.

## E. Description of Mental Status

The report should contain clinical data regarding the nature of the defendant's mental and emotional condition that are specifically relevant to the competency analysis.[243] All findings relevant to adjudicative competence should appear in the report, irrespective of the weight or priority that the clinician accords to any specific finding. The psychiatrist should also comment on any contradictions or inconsistencies. A mental status examination is an important component of a competence report, but it does not by itself provide a description of those functional abilities and limitations that are relevant to adjudicative competence. A defendant who is psychotic or has amnesia for events is not necessarily incompetent to stand trial.[184]

## F. Description of Functioning Related to Adjudicative Competence

Competence reports should go beyond describing signs and symptoms of mental impairment and should discuss how those signs and symptoms affect functional abilities relevant to the legal construct of competence. The heart of a competence report is a description of the defendant's abilities and deficits concerning the tasks that the defendant must perform during a criminal defense.[189] Using competence-assessment instruments during the interview can facilitate enumeration and description of these key abilities and deficits,[212] because those instruments help focus the psychiatrist's attention on what the defendant knows and can do related to working with counsel in preparation for or participation in criminal proceedings. Psychiatrists should not base their opinions on the results of these instruments alone, however. Information obtained from the use of competence-assessment instruments may not be automatically admissible in court[191] and may affect admissibility of other information. Often, the best use of information from assessment instruments is to provide specific examples that illustrate the defendant's strengths or weaknesses with respect to reasoning and understanding, along with other types of data that allow the psychiatrist to convey key information about the defendant.

## G. Diagnosis

A few psychiatrists (e.g., Ref. 244) argue that psychiatric diagnoses generally should not appear in forensic reports. In the context of adjudicative competence, they argue that the legal issue is not whether an individual has a recognized mental disorder. Rather, the question is whether a mental condition (which need not be an officially recognized disorder) prevents the individual from functioning properly as a defendant.

This guideline disagrees with the position of those who are against including psychiatric diagnoses in forensic reports. Although we acknowledge that the position has some merit in that it encourages appropriate circumspection, psychiatric diagnoses serve valuable purposes in reports on adjudicative competence.

First, the federal standard and standards in many jurisdictions require that the psychiatrist state whether the defendant has a mental disorder (sometimes using the phrase "mental disease or defect"). Providing a diagnosis assures that the psychiatrist satisfies the statutory guidelines for competence evaluations. Specifying the diagnosis identifies a defendant's symptom pattern as matching the profession's recognized definition of a mental disorder, though the psychiatrist may have to explain this to the court.

Second, including diagnoses helps the psychiatrist tell nonclinicians what kinds of problems a defendant has and why those problems affect the defendant's competence-related function. If, for example, a defendant does not cooperate with his attorney because he irrationally perceives the attorney as plotting against him, informing the reader that the defendant has paranoid schizophrenia helps the reader understand that the defendant's fears stem from a well-known form of mental illness and not from quirkiness or unwillingness to cooperate.

Third, for defendants who appear incompetent, the specification of a diagnosis and communicating it in the forensic report helps to support an psychiatrist's opinion about whether the defendant is restorable. To return to the example in the previous paragraph, knowledge that a defendant's fears about his attorney are signs of paranoid schizophrenia, coupled with knowledge of that disorder's typical response to pharmacotherapy, would support the psychiatrist's opinion that the defendant is likely to become competent if provided with a course of treatment,

Practice Guideline: Evaluation of Competence to Stand Trial

Psychiatrists take different approaches in relating clinical diagnoses to competence to stand trial. Some experts believe that a formally recognized diagnosis is not necessary when a description of a defendant's mental condition reflects symptom clusters or syndromes that meet the relevant jurisdictional requirements for the presence of a mental disorder. This Guideline recommends, however, that when possible, psychiatrists should offer officially recognized diagnoses in one of the formats described in the current edition of the DSM. A report should include the findings that support the psychiatrist's diagnosis, perhaps referring to criteria in the DSM. If the psychiatrist uses a diagnosis that does not appear in the current DSM or International Classification of Diseases, the psychiatrist should support the diagnosis with citations to relevant publications. After rendering a less-specific diagnosis (e.g., "psychotic disorder not otherwise specified"), psychiatrists may want to include a differential diagnosis of more specific disorders, explaining the reasons why each disorder is a possibility. If the diagnosis turns on a fact in dispute (for example, whether the defendant's symptoms were induced by intoxication), the psychiatrist should provide an explanation of how the disputed fact affects the differential diagnosis.

In jurisdictions where a diagnosis is not required, a description of symptoms that affect the defendant's competence to stand trial may suffice. Acceptable practices include, at a minimum, providing a narrative description of a scientifically based disorder, symptom cluster, or syndrome. Psychiatrists should always keep in mind that "official" DSM diagnoses are often more than a decade old and do not include newly recognized syndromes or illnesses. Yet reference to specific, recognized diagnoses helps the expert organize patterns of symptoms and explain the conclusions drawn. (For further discussion of the methodological value of psychiatric diagnoses in testimony, see the APA's *Task Force Report on the Use of Psychiatric Diagnoses in the Legal Process*.[245])

Comprehensive psychiatric evaluations produced for clinical purposes usually include a five-axis DSM diagnosis. But a report concerning adjudicative competence is often delivered to nonclinicians—typically a judge, defense attorney, and prosecutor. Although defendants are told at the outset of the examination that the interview is not confidential, it is still important to respect a possibly incompetent defendant's privacy rights. A competence report should contain only information necessary and relevant to the legal question at issue. Therefore, it may not be necessary or appropriate to provide a full multiaxial diagnosis in the opinion section. The report should define and explain the diagnosis to the extent that it is relevant to the defendant's presentation and affects the defendant's trial-related capacities.

## H. The Opinion

After presenting the relevant history, examination findings, and diagnostic assessment, the psychiatrist must offer an opinion and carefully explain the reasoning process used to formulate the opinion.[246]

In several publications, the authors have recommended that mental health professionals confine their reports or testimony on adjudicative competence to a description of the evaluee's functional capacities and refrain from giving an explicit opinion on the ultimate issue of whether a defendant is competent to stand trial. They believe that the ultimate question of a defendant's legal competence calls for a court's interpretation of a legal matter and is therefore beyond the special expertise of the forensic clinician.[1,247,248] Because one cannot give a clinical or operational definition of what is fair or unfair in a particular case, the psychiatrist has no clear guidance in making the judgment.[139] Moreover, it is the responsibility of courts, not mental health professionals, to decide whether the degree of disability manifested by a defendant is severe enough that it would be unfair to subject the defendant to criminal proceedings.

In some jurisdictions, psychiatrists are barred from expressing ultimate-issue opinions, or they are directed to offer only opinions about the defendants' competence-specific capacities in language from the jurisdiction's competence statute. For example, statutes in Ohio[249] and South Carolina[250] instruct psychiatrists to state whether a defendant understands the nature and objective of the proceedings against him or her and can assist counsel in preparing a defense, but do not ask psychiatrists to provide their opinion on the ultimate issue of whether the defendant is competent to stand trial. In other jurisdictions (e.g., Rhode Island,[251] South Dakota,[252] and Texas[253]), however, statutes or case law allow or direct psychiatrists to address the ultimate issue explicitly. Irrespective of statutory requirements, some courts and attorneys prefer ultimate-issue testimony.[254,255]

**Practice Guideline: Evaluation of Competence to Stand Trial**

Table 1   Competence to Stand Trial Report: Sample Format

1. Identifying information
2. Source of referral, reason for referral, and statement of the charges
3. Relevant legal standards and criteria
4. Informed consent/statement of nonconfidentiality
5. Dates and durations of examinations
6. Sources of information: third-party information including records reviewed, collaterals sources interviewed
7. Relevant background information
    (a) Family history
    (b) Personal history
    (c) Education history
    (d) Employment history
    (e) Religious history
    (f) Military history
    (g) Sexual, marital, and relationship history
    (h) Medical history
    (i) Drug and alcohol history
    (j) Legal history (juvenile and adult crimes and civil matters)
    (k) Psychiatric history
8. Relevant physical examination, imaging studies, and laboratory tests
9. Psychological testing and assessment instruments administered; dates completed as well as any repeated testing, including notation regarding any nonstandard instruction or administration
10. Current mental status examination (during the evaluation)
11. Competency examination data
12. Clinical conclusions and diagnoses that are relevant to competency
13. Medicolegal conclusions including expert opinion competency if formulated
14. Opinion on restorability and commitability, if formulated
15. Formulation and basis for the expert opinion(s)

charged with certain offenses (e.g., homicides) undergo prosecution as adults if they are older than a specified minimum age. Youths transferred pursuant to such statutes may well be candidates for competence assessment. For youths who undergo evaluation before a waiver hearing, a finding of incompetence will probably forestall transfer to adult court.

**B. Minors Facing Juvenile Delinquency Proceedings**

The question of the trial competence of juveniles in the court system is complex. Juvenile courts were founded in the early 20th century on a rehabilitation model, with the intent that proceedings would be therapeutic rather than punitive. In a series of cases beginning with *In re Gault*, 387 U.S. 1 (1967),[258] however, the U.S. Supreme Court recognized a clear punitive impact of juvenile courts and required that minors in juvenile delinquency proceedings receive many of the due process protections afforded to adult criminal defendants. Yet the Court has never explicitly held that juveniles must be competent to proceed with adjudication in juvenile court.

When a rapid increase in juvenile violent crime in the 1980s and early 1990s led to even more punitive approaches, more states began addressing competence in juvenile court. Currently, more than two-thirds of states have either statutes or appellate decisions on competence to stand trial in juvenile court.[259] Just one state (Oklahoma) has explicitly decided that minors need not be competent to face adjudication in juvenile court.[260] Even in states without statutes or clear case law requiring competence to proceed in juvenile court, some juvenile court judges have begun asking for competence assessments.

Most jurisdictions apply a variant of the *Dusky*[16] standard to the assessment of juveniles' competence, but there is considerable variation in other details. Some states require that the incompetence stem from mental illness or mental retardation and not from simple immaturity alone. Others states envisage modifications of juvenile court procedures to aid impaired defendants. Many legal questions have yet to be resolved:

Should courts recognize or allow different levels of competence for different types of cases?[4] Need a minor who faces a shoplifting charge (and only

Given the preceding considerations, many psychiatrists refrain from expressing their opinions on the ultimate issue unless the jurisdiction requires it (see, e.g., 18 U.S.C. § 4247(c)(4)(A)(2007 Supp.)). (Adopting this practice may require some prior discussion with the judges in the jurisdiction where the psychiatrist works who may otherwise question why psychiatrists have stopped addressing the ultimate issue in their reports.) However, the forensic report should describe how diagnostic conclusions arise from clinical findings and how the clinical findings arise from the defendant's mental disorder (if any), thereby delineating the factual basis for the conclusions relevant to adjudicative competence.[256] Psychiatrists also should explain how their findings affect the defendant's competence-related abilities by linking those findings to elements of the jurisdiction's competence standard. Whatever form the psychiatrist's opinion takes, the written report should explain the psychiatrist's reasoning and the connections between clinical findings and the behavioral components of adjudicative competence. In some cases in which a defendant faces more than one charge, the psychiatrist may have to determine competence for each alleged offense.

Psychiatrists should generally state their opinions with a "reasonable degree of medical certainty" or a "reasonable degree of medical probability," depending on the language used in the jurisdiction. Sometimes, the psychiatrist may not be able to render an opinion with a reasonable degree of medical certainty or probability. When no opinion is reached, the report should clearly communicate this result along with any suggestions for additional data that could allow the psychiatrist or the court to reach an opinion. On some occasions, the psychiatrist may want to point out that more information would increase the level of confidence in the opinion. When this is the case, the report should specify the types or sources of information that would help.

When the opinion suggests lack of adjudicative competence, the report should provide an opinion concerning restorability and the appropriate setting for such restoration. It should also identify any additional requirements for reports in the jurisdiction where the evaluation is conducted. For example, in some jurisdictions (e.g., Massachusetts[257]), a psychiatrist is required to discuss the defendant's eligibility for civil commitment proceedings, along with the basis for the opinions concerning these matters. Even when the opinion does not suggest incompetence, the report may include a discussion of restorability and commitment status if the psychiatrist believes the court might conclude that the defendant is incompetent.

### I. Other Considerations

Reports should be free of gratuitous comments about defendants' behavior, need for incapacitation, dangerousness, or lack of remorse. In general, reports on adjudicative competence should not take up other legal matters (such as future dangerousness or considerations that may make up a presentencing evaluation) unless that jurisdiction's case law or statutes require comments about these matters. In cases in which the court has requested an opinion about another psycholegal matter (e.g., criminal responsibility) and where it is appropriate to provide such an opinion (e.g., the psychiatrist believes the evaluee is competent and can validly consent to an evaluation of criminal responsibility), a separate report about that other matter should be submitted.

### J. Signature

All the professionals involved in preparing the report should sign the document. Such individuals may include supervisors and reviewers, as well as the principal psychiatrist. Under the psychiatrist's signature, the report may summarize special qualifications that characterize the psychiatrist's professional status (e.g., academic degrees, board and society memberships, and academic degrees in related subspecialties) (Table 1).

## XI. The Adjudicative Competence of Minors

### A. Minors Facing Prosecution in Adult Court

Juvenile defendants may face proceedings in both adult and juvenile courts. In almost all states, statutorily defined procedures—variously called waiver, bind-over, certification, or transfer—permit prosecution of minors in adult criminal court under certain circumstances. A minor facing prosecution as an adult receives all the due process protections enjoyed by adult criminal defendants and therefore is evaluated under the same competence standard used for adults in the jurisdiction. Many states have mandatory waiver statutes that require that all minors

a stern warning from a judge) be as capable as a minor who faces several months of detention?

Should competence assessments factor in the availability and use of surrogate decision-makers (such as parents) who could assist the minor in preparing a defense?

What time limits should apply in cases requiring "restoration" of competence for immature defendants? What should the juvenile court to do if a youth is incompetent because of immaturity? May the juvenile court detain or commit the youth and wait for years until he matures?

### C. Factors Affecting the Competence of Minors

Cognitively and emotionally, adolescents are not simply smaller, younger versions of adults. Factors that may affect a minor's competence to stand trial include the following.

One of the most robust research findings has been that age less than 14 years is a strong indicator of likely incompetence.[214,261–265] A large percentage of delinquents under that age (up to about half, depending on definition of impairment) are either clinically incompetent or have impairments in functioning that are likely to have a serious affect on competence. A somewhat smaller fraction of 14- and 15-year-olds is impaired, and 16- and 17-year-olds tend to perform comparably to adults.

In minors younger than 16 years, low IQ is a second robust indicator risk factor for incompetence.[214,262,263,265] Below-average intelligence amplifies the effect of young age, which is particularly significant, given that delinquents on average score lower on IQ tests than do their nondelinquent peers. Learning disabilities also contribute to limited cognitive capacities.

Younger adolescents may exhibit developmental immaturity hold naïve views seldom heard from mature adult defendants. An example would be a 10-year-old who believes, "The judge always finds the truth, so I don't have anything to worry about."

Even when a young adolescent has age-appropriate intellectual capacities, developmental factors can adversely affect maturity of judgment, such as risk-taking, impulsiveness, immature time perspectives, and attitudes toward authority.[214,266,267] For example, a 13-year-old who has internalized his parents' dictum to "always admit when you've done wrong" may have trouble appreciating and using appropriate

safeguards when faced with a decision about whether to plead guilty.

Studies consistently show that juvenile delinquents have high rates of diagnosable mental illness.[268,269] However, compared with adults, psychopathology is less common in adolescents, both in the delinquent population and in those adolescents found incompetent to proceed with adjudication.[270] Research is mixed with regard to the strength of psychopathology as a risk factor for incompetence.[214,265,271]

Although one might suppose that a youth would have learned about legal processes from previous contacts with the juvenile court, research suggests that adolescents are not necessarily well informed about the process.[214,264]

Of course, many never-arrested juveniles have little or no experience with police, lawyers, or juvenile courts. Most never-arrested adults gain some knowledge of how the legal system works from movies and television programs, but many preadolescent or early adolescent children have not seen these types of media depictions, or if they have seen them, they have not understood them well. Thus, many juveniles will not have adult-like capacities or the types of vicarious experiences that would allow them to understand plea bargaining and possible defense strategies or to recognize the significance of certain types of evidence or testimony.

A final factor is the competence standard pertinent to a particular case and whether the court may modify its procedures to take into account the juvenile defendant's limitations.

### D. Assessment

The evaluation of a juvenile encompasses many of the same areas of inquiry and procedures as the evaluation of an adult. The following paragraphs highlight some of the salient differences in and special features of assessments of minors.

#### 1. Breadth of the Referral Question

As with any forensic evaluation, the psychiatrist must know the specific forensic question and legal standard at issue. Because of jurisdictional differences, an evaluation for competence to proceed in juvenile court or an evaluation conducted before a waiver hearing may involve not just an assessment of competence per se. Such evaluations may also involve recommending alterations in procedures to respond

to a youth's limitations, to improve deficiencies in competence, or to respond to other considerations related to how to deal with the case. To make such suggestions, the psychiatrist should be aware of the alternatives, such as the types of altered court procedures available for borderline competent youth, the availability of treatment, and access to educational services.

### 2. Consent: Presence of an Attorney

Although obtaining consent from a minor may raise complex problems, consent is generally not required for court-ordered evaluations, and assent is generally sufficient for evaluations conducted at the request of a defense attorney. Providing notice of the nature of the evaluation is similar to providing notice to an adult defendant.

Attorneys may ask to be present during the evaluation. Although their right to be present varies among jurisdictions, allowing the attorney to be present gives the psychiatrist an opportunity to observe defendant-attorney interaction. Having the attorney present may also help the attorney understand the areas in which his client needs remediation, more careful explanation, or other informational interventions. The psychiatrist should not let the attorney interfere with the conduct of the evaluation, however, and should stop the evaluation if preventing attorney interference becomes difficult.

### 3. Interview

In some publications, the authors have provided detailed suggestions for conducting evaluations of juvenile defendants.[272,273] Interviews of older adolescents of normal intelligence tend to be similar to interviews of adults. With younger adolescents and preadolescents, interviewing techniques may have to be adapted to the defendant's developmental level, and psychiatrists who lack training in interviewing children should not accept such cases.

The psychiatrist should use vocabulary appropriate to the minor's cognitive capacity. In some cases, nonverbal techniques (e.g., touring the juvenile court with the minor and utilizing charts and photographs) may be helpful. Developmental limitations, such as immature judgment, concrete thinking, naïve conceptions of the legal process, a shortened sense of the future, and dependence on authority all may interfere with a minor's competence. The psychiatrist must also assess the evaluee for disorders with considerably higher prevalence rates than are found in adults, such as learning disabilities, attention deficit hyperactivity disorder, and pervasive developmental disorders. If deficiencies in competence are present, the psychiatrist must determine whether appropriate competence-restoring interventions are available. Because some minors are incompetent as a result of psychotic disorders, nonpharmacologic interventions that include educational efforts or courtroom accommodations for learning disabilities or limitations of attention are often recommended.

### 4. Structured Interviews

In cases in which the juvenile's intelligence appears to be a limiting factor, structured competence assessments may be very useful for delineating how the minor's limitations impair specific trial-related knowledge and capacities. The Mac-CAT–CA (discussed in Section VIII.G.) is beginning to receive research attention in adolescent populations[214,215,265] and may be helpful in illuminating competence capacities. Other structured scales have weaker research support in the adolescent population. Formal IQ testing can provide important data in cases in which a clinical evaluation is not sufficient for assessing a juvenile's functional intellectual capacity.

### 5. Collateral Data

In addition to the collateral data used in evaluating an adult, school records (including Individualized Educational Plans, or IEPs), pediatrician records, and treatment records can illuminate the causes of present difficulties in complex juvenile cases. An interview of the youth's attorney, parents, guardian, and case worker may not only provide useful history about the minor but also help inform the psychiatrist of complex social arrangements or other background information that an immature youth has trouble explaining.

### 6. Reports

Reports of evaluations of juveniles follow the same general principles as reports about adults. Reports regarding juveniles may be more extensive when the request for evaluation goes beyond a simple determination of competence to include suggestions for remediation, altered legal procedures, or treatment. In such cases, the report should provide relevant data and explain the psychiatrist's reasoning for the conclusions and recommendations.

### E. Restoration

As is true of adults who are incompetent to stand trial, adjudication of juveniles who are incompetent pauses while their competence is restored. For those youth who are incompetent because of a treatable condition, such as psychosis or a knowledge deficit that can be remedied with education, competence-restoration procedures are similar to those employed with adults (discussed in Section XII). In one study of incompetent juveniles in Florida, most were found to be mentally retarded, and over half the incompetent juveniles were ultimately returned for trial.[270]

A juvenile court that finds a youth incompetent because of factors associated with immaturity, when there is an expectation that the child or adolescent will "grow into" competence with the passage of time, faces a difficult choice. Courts are reluctant to detain a youth simply to wait for him to grow up. With some minors, intensive educational approaches can accelerate improving judgment for the specific decisions at issue, such as weighing whether to accept a plea bargain. Juveniles considered dangerous because of a mental illness may meet the jurisdiction's civil commitment standard. However, although national statistics are currently unavailable, clinical experience suggests that many nondangerous youth who are found incompetent based on immaturity are released with referrals for outpatient services.

## XII. Restoration of Competence to Stand Trial

### A. Number and Description of Competence Restorees

As noted in the introduction, the number of competence evaluations performed in the United States appears to have increased over the past few decades. Not surprisingly, the increase has led to a corresponding increase in the number of defendants adjudicated incompetent to stand trial. In 1973, McGarry[2] estimated that approximately 9,000 defendants were found incompetent. If recent estimates concerning frequency of competence evaluations (60,000 a year) are correct and if around one-fifth of evaluees are deemed incompetent,[1,223,274,275] it implies that around 12,000 U.S. defendants are found incompetent to stand trial each year.

Psychoses and mental retardation are the most frequent causes of adjudicative incompetence.[207,246,274] A smaller number of defendants are rendered incompetent by mood disorders. Courts send most criminal defendants found incompetent to psychiatric hospitals for restoration, that is, for psychiatric treatment and/or education aimed at enabling the defendants to proceed with adjudication. At any point, roughly 4,000 U.S. defendants are hospitalized for this purpose.[139,159]

A brief explanation may be necessary regarding the use of the word restoration in this context. Courts typically apply this term to the potential treatment of any defendant who is not competent, and to simplify exposition, the Guideline follows this practice. However, some incompetent defendants (e.g., some persons with intellectual deficits or limited education) have never been competent and are therefore not having any previous condition restored. In their cases, competence-creating services might better be termed education or habilitation.

### B. Timely and Effective Restoration

In *Jackson v. Indiana*, 406 U.S. 715 (1972),[26] the U.S. Supreme Court held that a defendant found incompetent to stand trial may not be held indefinitely for treatment. There must be a prospect for the defendant's successful restoration within a reasonable time, and "his continued commitment must be justified by progress toward that goal" (Ref. 26, p 738). One can therefore interpret *Jackson* as placing on forensic hospitals some responsibility for developing efficient and effective treatment programs to comply with the limited periods allowed for restoration.

Studies examining the variables that lead to successful restoration have yielded mixed findings. Some studies have suggested that factors associated with failure of efforts at competence restoration and greater lengths of hospital stay include severe impairment in psycholegal ability, aggression toward others after arrest, and more severe psychopathology. A history of criminality and substance abuse at the time of the offense are associated with successful restoration.[209,238,276] Other research suggests that the use of psychotropic medications to treat psychotic symptoms is the only reliable correlate of competence restoration.[239]

### C. Setting

In most jurisdictions, competence restoration takes place in inpatient settings. In 2003, Miller[153] reported that in 18 states, judges were required to hospitalize defendants adjudicated as incompetent to

stand trial, and an additional 21 states permitted hospitalization of incompetent defendants. Only five states required that incompetent defendants meet civil commitment criteria to be hospitalized for competence restoration. Despite the availability of outpatient restoration programs, few states regularly used outpatient restoration.

### D. Methods of Restoration

Restoration of competence to stand trial involves two simultaneous processes. First, clinicians must address treatable underlying mental disorder. This process does not differ from the treatment of mental disorders in nonforensic patients. It involves accurate assessment, appropriate medication when indicated, and psychosocial rehabilitation. Second, incompetent defendants may need instruction in the legal concepts and details of the trial process. Often, defendants' cognitive problems limit their capacities to benefit from instruction. For example, many mentally retarded defendants have difficulty learning and retaining new information. Persons with schizophrenia may have cognitive impairments along with their psychotic symptoms that interfere with their ability to benefit from educational efforts.

A few articles have provided descriptions of nonpharmacologic aspects of successful competence-restoration programs. (Defendants in most of these programs were also exhibiting symptoms of major mental illness and were probably receiving psychotropic medication in addition to the educational components of the program.) The following is a summary of these reports.

In 1980, Pendleton[277] described the competence-restoration program at Atascadero State Hospital (California), which had restored 90 percent of the 205 criminal defendants admitted in 1978. Upon arrival, defendants underwent evaluation with the Competency to Stand Trial Assessment Instrument[199] (discussed in Section VIII.B.). This instrument identified specific deficits in each defendant's competence, and clinicians developed an individualized treatment plan to address each deficit. Defendants attended a competence education class and took a written competence test for which the passing score was 70 percent. Defendants then underwent mock trial proceedings with real judges and attorneys. After a passing the written competence test and successfully completing the mock trial exercise, defendants underwent formal clinical competence assessments by mental health professionals.

In 1985, Davis[278] described the competence-restoration program at a maximum-security forensic hospital in Columbus, Ohio. The hospital used problem-oriented individualized treatment plans for incompetent patients that followed the format used for most other psychiatric problems. Incompetence to stand trial was the first priority of the defendant-patient's treatment and took priority over other psychosocial problems such as poor job skills, lack of education or housing, or residual psychosis. Accordingly, each patient's treatments plan listed the following items that became a focus of treatment:

> knowledge of the charge;
>
> knowledge of the possible consequences of the charge;
>
> ability to communicate rationally with defense counsel;
>
> knowledge of courtroom procedures; and
>
> capacity to integrate and efficiently use the knowledge and abilities outlined herein in either a trial or a plea bargain.

The incompetent defendant-patients became members of one of five groups, with specific treatment programs designed for each group. For example, patients placed in the "psychotic confused" group were those whose thought disturbances interfered with their grasp of the legal process or their ability to communicate. Their treatment programing focused on reality-testing skills and other standard treatment approaches of psychosis. Treatment teams monitored defendants' progress in these groups, and a mock trial took place at the conclusion of the programing.

Brown[279] described competence restoration at the Alton (Illinois) Mental Health and Developmental Center. This program consisted of psychologist-led didactic groups that met daily for 30 to 45 minutes per session. The programing included discrete educational modules that lasted several days each and that addressed topics such as the elements of criminal charges, potential sentences, roles of courtroom participants, sequence of trial events, and consequences of pleas. Each module used handouts, videotapes, and a mock trial, and participants took written tests at the end of each module.

Practice Guideline: Evaluation of Competence to Stand Trial

| Table 2   Learning Formats in a Competence Restoration Curriculum | |
| --- | --- |
| Education | Basic knowledge of the trial process, including the roles of the courtroom personnel, pleas, plea bargaining, charges, sentencing, and how to assist one's attorney |
| Anxiety reduction | Two one-hour sessions per week with a psychologist to teach defendants anxiety management techniques suitable for use in court |
| Guest lectures | Weekly meetings with court personnel (judges, defense attorneys, prosecutors, and probation officers) who speak to the defendants and answer questions |
| Mock trials | Role-playing by defendants of various courtroom personnel in a scripted mock trial, with discussions led by clinical staff |
| Video module | Videotapes of actual courtroom proceedings watched by defendants, with discussions led by clinical staff |
| Post-restoration module | Discussion of court experiences between incompetent defendants and defendants who have been to court |
| Current legal events | Review and discussion of news stories involving criminal trials |

Noffsinger[235] described educational modules used in the competence-restoration curriculum at North-coast Behavioral Health care in Cleveland, Ohio. The following table describes the program's use of learning formats for various subject areas (Table 2).

Wall and colleagues[280] at the Rhode Island Department of Mental Health designed a program for restoring adjudicative competence of individuals with mental retardation. The program included the following five modules presented in sequential order over a variable period: charges, pleas, and potential consequences; the role of courtroom personnel; courtroom proceedings, trial and plea bargaining; communicating with one's attorney, giving testimony, and assisting in one's defense; and tolerating the stress of court proceedings.

Trainers met with defendants one to five days per week in sessions lasting for a few minutes to an hour and reviewed each module a minimum of three times. In the first phase of the program, defendants received basic information about the legal system for them to learn by rote. In the second phase, trainers again presented each module in sequential order, but asked defendants understanding-based questions in addition to knowledge-based questions.

The program was not intended to guarantee that every defendant with mental retardation would be-

come competent. Instead, the goal was to provide consistent education toward competence restoration, to communicate that effort to the courts, and to make accurate competence assessments. An independent psychiatrist assessed each defendant's progress toward competence, applying the same evaluation criteria as were used to evaluate persons with normal intelligence.

### E. Proposed Elements of a Model Competence Restoration Program

#### 1. Systematic Competence Assessment

Various factors can lead to trial incompetence, such as psychosis, mood symptoms, mental retardation, or lack of information. Not all defendants are incompetent for the same reason. Therefore, upon admission to a competence-restoration program, defendants should undergo evaluation to identify the specific deficits or problems that result in incompetence.

#### 2. Individualized Treatment Program

Defendants should have treatment regimens tailored to their specific problems. Deficits identified in the admission competence assessment should appear in a defendant's individual treatment plan and should be addressed by specific treatment interventions.

#### 3. Multimodal, Experiential Competence Restoration Educational Experiences

Defendants are best able to learn when teachers present the material in multiple learning formats. For this reason, learning experiences should involve lectures, discussions, readings, and videos. Participation in activities such as a mock trials and role-playing also enhance learning.

#### 4. Education

For most defendant-patients, competence restoration should include education regarding:

charges and their severity,

sentencing,

pleas and plea bargaining,

roles of courtroom personnel,

adversarial nature of the trial process, and

understanding and evaluating evidence.

#### 5. Anxiety Reduction

Learning anxiety-reduction techniques can help defendants deal with pretrial anxiety and the anxiety that they may experience while in court.

Practice Guideline: Evaluation of Competence to Stand Trial

### 6. Additional Education Components for Defendants With Low Intelligence

Defendants whose incompetence stems from low intelligence can often become competent, but may require additional exposure to the educational material. Their knowledge deficits can be remedied by additional learning experiences, including repeated exposure to information and individual instruction related in simplified terminology.

### 7. Periodic Reassessment of Competence

Clinicians should periodically reassess defendants' progress toward restoration to competence. Periodic assessment helps treatment teams know whether their interventions are working and whether additional treatment elements should be added to patients' treatment plans.

### 8. Medication

Because psychotic and mood disorders are frequent causes of incompetence, patients with these disorders should receive conscientious treatment with appropriate biological therapy. For many incompetent defendants, attempting restoration without providing proper antipsychotic or mood-stabilizing medication is an exercise in futility.

### 9. Capacity Assessments and Involuntary Treatment

Defendants adjudicated incompetent to stand trial may also lack the capacity to give informed consent for medication and other treatments. Because pharmacotherapy often is a necessary component of treatment to restore competence, clinicians must assess possible incompetence to make treatment decisions in accordance with the policies of their local hospitals and jurisdictions. Defendants who refuse medication should undergo evaluation of their competence to make treatment decisions. Procedures for overriding patients' refusals vary from state to state, and clinicians must be knowledgeable or have appropriate legal advice, usually from the attorney general's office in the state. Defendants who assent to taking medication but appear incompetent to make such decisions should also undergo evaluation for competence to make treatment decisions.

## XIII. Summary

Competence to stand trial is a legal construct used to identify those criminal defendants who have the requisite mental capacity to understand the nature and objective of the proceedings against them and to participate rationally in preparing their defense. This Practice Guideline has described how psychiatrists should evaluate individuals concerning their competence to stand trial. The Guideline describes acceptable forensic psychiatric practice for such evaluations. Where possible, it specifies standards of practice and principles of ethics and also emphasizes the importance of analyzing an individual defendant's case in the context of statutes and case law applicable in the jurisdiction where the evaluation takes place.

The recommendations in the Guideline both reflect and are limited by evolving case law, statutory requirements, legal publications, and the current state of psychiatric knowledge. The authors have taken note of nationally applicable case law, federal constitutional standards, statutory language, and federal and state interpretations of the rights or statutes, recognizing that jurisdictions may differ in their specific interpretation or application of statutes or general constitutional standards. The review of cases concerning specific psychiatric diagnoses illustrates general U.S. trends, and psychiatrists must remain cognizant of their jurisdictions' interpretations of statutes or constitutional requirements. By surveying a variety of practices and approaches to data gathering and case analysis, the authors believe that this Guideline will stimulate additional collegial discussion about what is necessary and sufficient for adequate evaluations of adjudicative competence.

The notion that psychiatrists should apply expertise to competence assessments stems from the principal that, before allowing a defendant to face criminal prosecution and possible punishment, courts need reasonable assurance— based, if necessary, on a careful, individualized evaluation—that the defendant has adequate mental capacity to make a defense. At a minimum, a psychiatrist's opinion about adjudicative competence should reflect an understanding of the jurisdictional standard and of how the defendant's mental condition affects competence as defined with the jurisdiction. The psychiatrist's report should clearly describe the opinion and the reasoning that leads to it. Psychiatrists who provide mental health expertise concerning adjudicative competence give trial courts information needed to assure that defendants can appropriately protect themselves and that criminal proceedings will be accurate, dignified, and just.

Practice Guideline: Evaluation of Competence to Stand Trial

Table 3   Key Features of State Statutes

| Jurisdiction | Source of Law | Definition of Incompetence | Who May Evaluate | Test for Restorability | Statutory Provision for Involuntary Treatment for Competence Restoration | Where Restoration May Occur | Maximum Time for Restoration |
|---|---|---|---|---|---|---|---|
| Alabama | ARCrp § 11.1 to 11.8 | Cannot consult with counsel with a reasonable degree of rational understanding of the facts and legal proceedings | Psychiatrist or psychologist appointed by commissioner of Dept. of MH/MR | Substantial probability of restoration in a reasonable time | Not specified | Dept. of MH/MR, or outpatient (if defendant is not dangerous and can consent to treatment) | Indefinite, with annual review |
| Alaska | Alaska Stat. § 12.47.100 to 210 | Cannot understand proceedings or assist with defense | Qualified psychologist or psychiatrist | Substantial probability of regaining competence in a reasonable time | Not specified | Custody of the Commissioner of Health and Social Services | 180 days; 360 days if defendant is charged with violent crime and is presently dangerous |
| Arizona | Ariz. Rev. Stat. § 13-4501 to 17 | Cannot understand the nature and object of proceedings or assist with defense | Two or more mental health experts, including at least one psychiatrist | Substantial probability defendant will regain competence within 21 months of original finding of incompetence | Defendant is incompetent to refuse treatment and should be subject to involuntary treatment | Program designated by county board of supervisors; Arizona State Hospital; jail; outpatient program; any court-approved facility | The lesser of 21 months or the maximum sentence for the offense |
| Arkansas | Ark. Code Ann. § 5-2-301 to 311 | Cannot understand proceedings or assist effectively in own defense | Qualified psychiatrist or psychologist | Not specified | Not specified | Custody of Director of Dept. of Human Services | One year |
| California | Ca. Penal Code § 1367 to 1376 | Cannot understand the nature of criminal proceedings or rationally assist counsel in conducting defense | Psychiatrist, licensed psychologist, or any expert the court deems appropriate | Substantial likelihood that defendant will regain mental competence in the foreseeable future | Defendant lacks capacity and needs treatment; without medication, serious harm will result | State hospital; public or private facility; outpatient program | Felony: lesser of 3 years or the maximum sentence for the most serious offense. Misdemeanor: lesser of 1 year or the maximum sentence for the most serious offense |
| Colorado | Colo. Rev. Stat. § 16-8-110 to 115 | Cannot understand the nature and course of proceedings; or participate or assist in defense; or cooperate with defense counsel | Not specified | Substantial probability that defendant will be restored to competency within the foreseeable future | Not specified | Custody of Dept. of Human Services; outpatient treatment at or under the supervision of a facility | Maximum term of confinement for offenses charged |

Practice Guideline: Evaluation of Competence to Stand Trial

Table 3 Continued

| Jurisdiction | Source of Law | Definition of Incompetence | Who May Evaluate | Test for Restorability | Statutory Provision for Involuntary Treatment for Competence Restoration | Where Restoration May Occur | Maximum Time for Restoration |
|---|---|---|---|---|---|---|---|
| Connecticut | Conn. Gen Stat. § 54-54 to 56d | Cannot understand proceedings or assist in defense | Psychiatrist or clinical team (psychiatrist, psychologist, and either social worker or nurse) | Substantial probability that the defendant, if provided with treatment, will regain competence within maximum period of any placement order permitted | Involuntary medication will render defendant competent; no less intrusive means to achieve adjudication; proposed treatment is narrowly tailored to minimize intrusion on liberty and privacy interests and will not cause unnecessary risk to defendant's health; seriousness of alleged crime is such that state interest in achieving adjudication overrides defendant's interest in self-determination | Custody of the Commissioner of Mental Health and Addiction Services, Commissioner of Children and Families or Commissioner of Mental Retardation, or any appropriate mental health facility or treatment program | Maximum sentence that defendant could receive if convicted, or 18 months, whichever is less |
| Delaware | Del. Code. Ann. tit. 11, § 404 | Cannot understand the nature of proceedings, give evidence, or instruct counsel | Not specified | Not specified | Not specified | Delaware Psychiatric Center | Not specified |
| Florida | Fla. Stat. Ann. § 916.12-145; Fla. R. Crim. P. 3.210 to 215 | Does not meet Dusky criteria | At least two mental health professionals, unless one agrees that the defendant is incompetent and findings are stipulated to | Substantial probability that defendant's illness will respond to treatment and defendant will regain competence in reasonably foreseeable future | Not specified | Defendants are committed for restoration only if incompetent and civilly committable. Otherwise, restoration occurs in community, correctional facility, or another facility. | Felony: 5 years; misdemeanor: 1 year |
| Georgia | Ga. Code Ann. § 17-7-130; Echols v. State, 255 S.E.2d 92 (Ga. Ct. App. 1979) | Cannot participate intelligently in defendant's trial | Not specified | Substantial probability of attaining competence to stand trial in foreseeable future | Not specified | Dept. of Human Resources | One year |
| Hawaii | Haw. Rev. Stat. § 700-403 to 406; State v. Kotis, 984 P.2d 78 (Haw. 1999) | Lacks capacity to understand proceedings or assist in defense | Three qualified psychiatrists in felony cases and 1 qualified psychiatrist in nonfelony cases | Substantial likelihood of becoming fit to proceed in the future | "Detention, care, and treatment" may include a court order authorizing involuntary administration of antipsychotic drugs | Custody of the Director of Health | Not specified |

Practice Guideline: Evaluation of Competence to Stand Trial

Table 3  Continued.

| Jurisdiction | Source of Law | Definition of Incompetence | Who May Evaluate | Test for Restorability | Statutory Provision for Involuntary Treatment for Competence Restoration | Where Restoration May Occur | Maximum Time for Restoration |
|---|---|---|---|---|---|---|---|
| Idaho | Idaho Code Ann. § 18-210 to 212 | Lacks capacity to understand proceedings or to assist with defense | Psychiatrist or psychologist | Substantial probability defendant will be fit to proceed within foreseeable future | Defendant lacks capacity to give informed consent | State hospital, institution, mental health center or Dept. of Corrections | Two hundred seventy days |
| Illinois | 725 Ill. Comp. Stat. 5/104-11 to 104-23 | Cannot understand nature and purpose of proceedings or assist in defense | One or more licensed physicians, clinical psychologists, or psychiatrists | Likelihood of attaining fitness within 1 year if provided with treatment | Not specified | Dept. of Human Services, or other appropriate public or private facility or treatment program | One year |
| Indiana | Ind. Code § 35-36-3 to 4 | Cannot understand proceedings and assist in preparation of defense | Two or 3 disinterested psychiatrists or psychologists at least 1 must be psychologist | Substantial probability of attaining competence in foreseeable future | Not specified | Division of Mental Health and Addiction | Six months |
| Iowa | Iowa Code § 812.1 to 812.9 | Cannot appreciate charge, understand proceedings, or assist effectively in defense | Psychiatrist or psychologist | Substantial probability accused will regain capacity within a reasonable time | Somatic treatment is necessary and appropriate to restore defendant and defendant will not consent; director of facility may request order authorizing treatment | Dangerous defendants: Dept. of Human Services or Dept. of Corrections for placement at Iowa Medical and Classification Center. Others: outpatient treatment | Lesser of maximum term of confinement for alleged criminal offense, or 18 months |
| Kansas | Kan. Crim. Proc. Code Ann. § 22-3301 to 3306 | Cannot understand nature and purpose of proceedings, or cannot make or assist in making a defense | Psychiatrist or psychologist | Substantial probability of attaining competence in foreseeable future | Not specified | State security hospital; any appropriate county or private institution | Six months |
| Kentucky | Ky. Rev. Stat. Ann. § 504.060, 504.090 to 110 | Cannot appreciate nature and consequences of proceedings or participate rationally in defense | Psychiatrist or psychologist | Substantial probability of attaining competency in 360 days | Not specified | Treatment facility; forensic psychiatric facility; Cabinet for Health and Family Services facility | Misdemeanor: 60 days; felony: not specified |
| Louisiana | La. Code Crim. Proc. Ann. art. 641-649 | Lacks capacity to understand proceeding or to assist in defense | Sanity commission | Mental capacity is likely to be restored within 90 days as a result of treatment | Not specified | Jail; Feliciana Forensic Facility | Maximum sentence defendant could receive if convicted |
| Maine | Me. Rev. Stat. Ann. tit. 15, § 101-B; State v. Lewis, 584 A.2d 622 (Me. 1990) | Cannot understand nature and object of charges, comprehend condition in reference thereto, or cooperate with counsel to conduct a rational, reasonable defense | State Forensic Service; independent psychiatrist or psychologist | Substantial probability defendant will be competent in foreseeable future | Not specified | Custody of Dept. of Health and Human Services | One year |

Practice Guideline: Evaluation of Competence to Stand Trial

Table 3. Continued.

| Jurisdiction | Source of Law | Definition of Incompetence | Who May Evaluate | Test for Restorability | Statutory Provision for Involuntary Treatment for Competence Restoration | Where Restoration May Occur | Maximum Time for Restoration |
|---|---|---|---|---|---|---|---|
| Maryland | Md. Code Ann., Crim. proc. § 3-101 to 3-108; Surigete v. State, 541 A.2d 637 (Md. Ct. App. 1988) | Cannot understand the nature of proceedings and assist in defense | Health Dept. or community forensic screening program | Not specified | Not specified | Facility that Health Department designates | Ten years for capital case, 3 years for felony |
| Massachusetts | Mass. Gen. Laws ch. 123, § 15-17; Commonwealth v. Vailes, 275 N.E.2d 893 (Mass. 1971) | Does not meet Dusky criteria | One or more qualified physicians psychologists for initial evaluation | Not specified | Not specified | If civilly committable, hospitalization for treatment | Maximum time of imprisonment that person would serve before becoming eligible for parole for most serious charge |
| Michigan | Mich. Comp. Laws § 330.2020 to 330.2044 | Cannot understand nature and object of proceedings or assist rationally in defense | Center for Forensic Psychiatry; facility certified by Dept. of Mental Health | Likelihood of Defendant's attaining competence, if treatment for statutory time frame | To maintain the competence of the defendant to stand trial, pending and during trial | Dept. of Mental Health or any inpatient mental health facility if commitment is necessary for effective treatment | Lesser of 15 months or one-third of maximum sentence |
| Minnesota | Minn. R. Crim. P. Rule 20.01 | Cannot consult with defense counsel with reasonable degree of rational understanding or cannot understand proceedings and participate in defense | Licensed physician or consulting psychologist, psychologist, knowledgeable, trained, and practicing in the diagnosis/treatment of the alleged impairment | Substantial probability that with treatment or otherwise the defendant will ever attain competence | Not specified | Defendant is civilly committed; place is not specified | Three years, except for murder, for which time frame is not specified |
| Mississippi | Miss. Uniform Rules of Circuit and County Court practice Rule 9.06; Gammage v. State, 510 So.2d 802 (Miss. 1987) | Cannot consult with lawyer with reasonable degree of rational understanding; lacks rational and factual understanding of proceedings | Psychiatrs or psychologist | Substantial probability of becoming competent in the foreseeable future | Defense attorney may authorize treatment | Mississippi State Hospital or other appropriate mental health facility | Within a reasonable time |
| Missouri | Mo. Rev. Stat. § 552.020 | Cannot understand proceedings and assist in defense | Psychiatrists, psychologists, or physicians with >1 year's training or experience in treating the mentally retarded or mentally ill | Substantial probability of attaining fitness to proceed in foreseeable future | Not specified | Commitment to the Director of the Dept. of Mental Health | Not specified |

Practice Guideline: Evaluation of Competence to Stand Trial

Table 3 Continued.

| Jurisdiction | Source of Law | Definition of Incompetence | Who May Evaluate | Test for Restorability | Statutory Provision for Involuntary Treatment for Competence Restoration | Where Restoration May Occur | Maximum Time for Restoration |
|---|---|---|---|---|---|---|---|
| Montana | Mont. Code Ann. § 46-14-103, 202, 206, 221, and 222 | Cannot understand proceedings and assist in defense | At least 1 qualified psychiatrist, licensed clinical psychologist, or advanced-practice RN | Appears that defendant will become fit to proceed in reasonably foreseeable future | Overriding justification for medically appropriate treatment | Dept. of Public Health and Human Services, for placement in appropriate mental health or residential facility | If court determines that so much time has elapsed since the commitment of the defendant that it would be unjust to resume the criminal proceedings, the court may dismiss the charge |
| Nebraska | Neb. Rev. Stat. § 29-1823 | Cannot understand nature and object of the proceedings, comprehend own condition in reference to such proceedings, and make a rational defense | Physician, psychiatrist, or psychologist | Substantial probability of becoming competent in the foreseeable future | Not specified | State hospital for the mentally ill or other appropriate state-owned or -operated facility | Six months initial, maximum length not specified |
| Nevada | Nev. Rev. Stat. § 178.399 to 178.460 | Does not meet Dusky criteria | Two psychiatrists, 2 psychologists, or 1 psychiatrist and 1 psychologist, certified by Division of Mental Health and Developmental Services of the Department of HHS | Substantial probability that treatment can restore competence and that defendant will attain competence or receive pronouncement of judgment in forseeable future | Involuntary administration of medication if appropriate for treatment to restore competence | Committed to Administrator of Division of Mental Health and Developmental Services, or outpatient treatment | Lesser of 10 years or longest period of incarceration provided for alleged crime |
| New Hampshire | N.H. Rev. Stat. Ann. § 135:17 | Does not meet Dusky criteria | Psychiatrist on staff of any public institution, or private psychiatrist | Reasonable likelihood that defendant can be restored to competence through appropriate treatment within 12 months | Not specified | State mental health system; secure psychiatric unit; or outpatient treatment | Twelve months |
| New Jersey | N.J. Stat. Ann. § 2C:4-5, 4-6 | Cannot understand proceedings and assist with defense | At least 1 qualified psychiatrist or licensed psychologist | Substantially probable that defendant could regain competence within foreseeable future | Not specified | Custody of Commissioner of Human Services for inpatient treatment if defendant is dangerous, or outpatient treatment | Initial 3 months, maximum time frame not indicated |

  
Table 3  Continued

| Jurisdiction | Source of Law | Definition of Incompetence | Who May Evaluate | Test for Restorability | Statutory Provision for Involuntary Treatment for Competence Restoration | Where Restoration May Occur | Maximum Time for Restoration |
|---|---|---|---|---|---|---|---|
| New Mexico | N.M. Stat. § 31-9-1 to 31-9-1.5 | Does not meet Dusky criteria | Psychologist, psychiatrist, or other professional recognized by district court as an expert | Probability of defendant's attaining competence within 9 months of original finding of incompetence | Not specified | Dept. of Health in a secure, locked facility | Maximum sentence defendant would have received if convicted |
| New York | N.Y. Crim. Proc. Law § 730.10 to 730.70 | Cannot understand proceedings and assist with defense | Two qualified psychiatrists (psychiatrist or psychologist; if 2 psychiatrists disagree, a 3rd psychiatrist is appointed | Not specified | Not specified | Facility designed by Commissioner of Mental Health or MR/DD | Two-thirds of maximum term for highest-class felony charged |
| North Carolina | N.C. Gen. Stat. § 15A 1001-1009 | Cannot understand nature and object of proceedings, comprehend situation in reference to the proceedings, and assist with defense in a rational or reasonable manner | Impartial medical experts, including forensic psychiatrists approved under rules of the Commission for Mental Health, Developmental Disabilities, and Substance Abuse Services | Likelihood of defendant's gaining capacity to proceed, to the extent that the hospital, institution, or individual can make such a judgment | Not specified | Civil commitment to hospital or other institution, if given bail, custody of designated person or organization agreeing to supervise defendant | Maximum term of confinement for the crime charged or 5 years (misdemeanor) or 10 years (felony) from date of incapacity to proceed |
| North Dakota | N.D. Cent. Code § 12.1-04-04 to 04-09 | Cannot understand proceedings and assist with defense | Psychiatrist or licensed psychologist | Whether defendant will attain fitness to proceed or ability to effectively communicate with counsel in the foreseeable future | Not specified | Civil commitment | Maximum period for which the defendant could be sentenced |
| Ohio | Ohio Rev. Code Ann § 2945.37-39 | Cannot understand nature and object of proceedings and assist with defense | Psychiatrist, or licensed clinical psychologist who satisfies the statutory criteria or works for a certified forensic center | Likelihood of being restored to competence within 1 year if treated | Medication is necessary to restore competence; defendant lacks capacity to give informed consent or refuses medication | State hospital; MR/DD facility; community mental health or Mental retardation facility; psychiatrist or other MI/MR professional | Thirty or 60 days for misdemeanors; 6 months for lesser felonies; 12 months for major felonies |

Practice Guideline: Evaluation of Competence to Stand Trial

Table 3  Continued.

| Jurisdiction | Source of Law | Definition of Incompetence | Who May Evaluate | Test for Restorability | Statutory Provision for Involuntary Treatment for Competence Restoration | Where Restoration May Occur | Maximum Time for Restoration |
|---|---|---|---|---|---|---|---|
| Oklahoma | Okla. Stat. tit. 22, § 1175.1 to 1175.8 | Cannot understand nature of charges and proceedings, and effectively and rationally assist with defense | Psychiatrist, psychologist, or licensed mental health professional with forensic training | Whether person can attain competence within reasonable period of time if given treatment, therapy, or training | Court shall order defendant to undergo treatment, therapy, or give training that will restore competence | Dept. of Mental Health and Substance Abuse Services | Lesser of maximum sentence for most serious offense charged, or 2 years |
| Oregon | Or. Rev. Stat. § 161.360 to 161.370 | Cannot understand nature of proceedings, assist and cooperate with counsel, and participate in defense | Psychiatrist or psychologist | Substantial probability in foreseeable future that defendant will have capacity to stand trial | Not specified | State hospital; outpatient treatment; secure intensive community; inpatient facility for juveniles | So much time has elapsed that it would be unjust to resume criminal proceedings |
| Pennsylvania | Pa. Stat. Ann. § 7402-7406 | Cannot understand the nature or object of proceedings and participate and assist in defense | At least 1 psychiatrist | Substantial probability of attaining competence in the foreseeable future | Court is reasonably certain that involuntary treatment will restore competence | Not specified | Lesser of maximum sentence imposed for the crime charged or 10 years. For murder, no limit on restoration period |
| Rhode Island | R.I. Gen. Laws § 40.1-5.3-3 | Cannot understand character and consequences of proceedings or cannot properly assist with defense | Physician | Whether defendant will regain competence within maximum period of placement | Not specified | Dangerous defendants: facility established pursuant to § 40.1-5.3-1, or to general wards of the Institute of Mental Health; outpatient treatment | Two-thirds of maximum sentence for most serious offense charged |
| South Carolina | S.C. Code Ann. § 44-23-410 to 460 | Cannot understand proceedings or assist defense | Two psychiatrists designated by the Dept. of Mental Health or Dept. of Disabilities and Special Needs | Substantial probability of attaining competence in foreseeable future | Not specified | Appropriate facility of Dept. of Mental Health or Dept. of Disabilities and Special Needs | Maximum period to which the person could have been sentenced if convicted as charged |
| South Dakota | S.D. Codified Laws § 23A-10A-1 to 16 | Cannot understand nature and consequences of proceedings and assist properly in defense | Psychiatrist or psychologist | Substantial probability that in the foreseeable future defendant will attain capacity to permit the trial to proceed | Not specified | Human Services Center; state developmental centers; adjustment training center mental health center; or other facility approved by Dept. of Human Services | Maximum penalty allowable for most serious charge |

Practice Guideline: Evaluation of Competence to Stand Trial

**Table 3** Continued

| Jurisdiction | Source of Law | Definition of Incompetence | Who May Evaluate | Test for Restorability | Statutory Provision for Involuntary Treatment for Competence Restoration | Where Restoration May Occur | Maximum Time for Restoration |
|---|---|---|---|---|---|---|---|
| Tennessee | Tenn. Code Ann. § 33-7-301 to 302 | Does not meet Dusky criteria | Community mental health center, licensed private practitioner, or outpatient evaluation by state hospital | Not specified | Not specified | Forensic services unit or community-based service | Not specified |
| Texas | Tex. Code Crim. Proc. Ann. art. 46B.001 to 171 | Does not meet Dusky criteria | Psychiatrist or psychologist | Whether defendant will obtain competence in foreseeable future | Medication is medically appropriate and in defendant's best interest; state has compelling interest in defendant's being competent; no less invasive means of obtaining competence; medication will not unduly prejudice the defendant's rights or defense theories at trial | Community mental health or MR facility | Maximum term for offense on which defendant would be tried |
| Utah | Utah Code Ann. § 77-15-1 to 6 | Unable to have rational and factual understanding of proceedings him or potential punishment, or cannot consult with counsel and participate in proceedings with a reasonable degree of rational understanding | At least 2 mental health experts not involved in the current treatment of the defendant | Substantial probability that the defendant may become competent in foreseeable future | Not specified | Dept. of Human Services | Maximum period of incarceration that defendant could receive if convicted |
| Vermont | Vt. Stat. Ann. tit. 13, § 4814-4822 | Does not meet Dusky criteria | Designated mental health professionals | Not specified | Not specified | Custody of Commissioner of Developmental and Mental Health Services | Indeterminate, as long as person is civilly committable |
| Virginia | Va. Code Ann. § 19.2-169.1 to 169.3 | Cannot understand proceedings or assist attorney with defense | Psychiatrists, psychologists or master-level psychologists | Restorable in foreseeable future | Not specified | Outpatient; hospital designated by the Commissioner of Mental Health, Mental Retardation and Substance Abuses Services | Lesser of maximum sentence if convicted of charges or 5 years |

Practice Guideline: Evaluation of Competence to Stand Trial

Table 3  Continued

| Jurisdiction | Source of Law | Definition of Incompetence | Who May Evaluate | Test for Restorability | Statutory Provision for Involuntary Treatment for Competence Restoration | Where Restoration May Occur | Maximum Time for Restoration |
|---|---|---|---|---|---|---|---|
| Washington | Wash. Rev. Code § 10.77.010 to 10.77.092 | Cannot understand nature of proceedings and assist with defense | At least 2 qualified experts of professional persons | Further treatment is likely to restore competence | For serious offenses | State hospital; other facility as determined by department or under guidance and control of professional person | Maximum possible penal sentence for any offense charged, or 180 days |
| West Virginia | W. Va. Code § 27-6A-1 to 5 | Cannot participate substantially in defense and understand nature and consequences of trial | One or more psychiatrists, or psychiatrist and psychologist | Substantial likelihood that defendant will attain competence within 6 months | Not specified | Mental health facility | Nine months |
| Wisconsin | Wis. Stat. § 971.13 | Cannot understand the proceedings or assist with defense | One or more psychiatrists having specialized knowledge and deemed appropriate by court to evaluate and report on defendant | Likelihood that defendant, if treated, may be restored to competence within statutory time period | Court may order defendant to receive medication for duration of criminal proceedings | Dept. of Health and Family Services for placement in appropriate institution | Lesser of 12 months or maximum sentence for most serious offense |
| Wyoming | Wyo. Stat. Ann. § 7-11-301 to 303 | Cannot comprehend situation, understand the nature and object of proceedings, conduct defense rationally, or cooperate with counsel to use available defenses | Licensed psychiatrist, or other physician with forensic training, or licensed psychologist with forensic training | Substantial probability that accused will regain fitness to proceed | Not specified | State hospital or other facility designated by the court | Not specified |
| U.S. Federal | 18 U.S.C.S. § 4241 | Cannot understand nature and consequences of proceedings and assist properly with defense | Psychiatrist or psychologist | Substantial probability that in the foreseeable future, defendant will become competent | Sell v. U.S. (2003) | Custody of Attorney General for treatment in a suitable facility | Initial hospitalization for four months; thereafter, for "reasonable period of time" |
| US Military | U.C.M.J. § 876b; R.C.M. 706, 909, 18 U.S.C.S. § 4241 | Cannot understand nature of proceedings or conduct or cooperate intelligently in defense | A board of 1 or more persons; each member must be physician or psychologist; normally, at least one member is psychiatrist or psychologist | Same as federal law | Sell v. U.S. (2003) | Same as federal law | Same as federal law |

Practice Guideline: Evaluation of Competence to Stand Trial

## References

1. Melton GB, Petrilla J, Poythress NG, *et al*: Psychological Evaluations for the Courts: A Handbook for Mental Health Professionals and Lawyers (ed 2). New York: Guilford Press, 1997
2. McGarry AL: Competency to Stand Trial and Mental Illness. Washington, DC: National Institute of Mental Health, 1973
3. Skeem JL, Golding SL, Berge G, *et al*: Logic and reliability of evaluations of competence to stand trial. Law Hum Behav 22: 519–47, 1998
4. Bonnie RJ, Grisso T: Adjudicative competence and youthful offenders, in Youth on Trial: A Developmental Perspective on Juvenile Justice. Edited by Grisso T, Schwartz RG. Chicago: University of Chicago Press, 2000, pp 73–103
5. Poythress NG, Nicholson R, Otto RK, *et al*. The MacArthur Competence Assessment Tool—Criminal Adjudication: Professional Manual. Odessa, FL: Psychological Assessment Resources, 1999
6. Winick BJ, DeMeo TL: Competency to stand trial in Florida. Univ Miami L Rev 35:31, 1980
7. Blackstone W: Commentaries on the Laws of England. Oxford: Clarendon Press, 1765–1769
8. Slovenko R: Psychiatry and Law. New York: Little, Brown, 1974
9. Frith's Case, 22 How. State Trials 307 (1790)
10. United States v. Chisolm, 149 F. 284 (C.C.S.D. Ala. 1906)
11. Jordan v. State, 135 S.W. 327 (Tenn. 1911)
12. Cooper v. Oklahoma, 517 U.S. 348 (1996)
13. King v. Pritchard, 173 Eng. Rep. 135 (1836)
14. Youtsey v. United States, 97 F. 937 (6th Cir. 1899)
15. United States v. Boylen, 41 F.Supp. 724, 725 (D. Or. 1941)
16. Dusky v. United States, 362 U.S. 402 (1960)
17. Pub. L. No. 98-473, 98 Stat. 2057 (1984)
18. 18 U.S.C. § 4241(d)(2007 Supp.)
19. Drope v. Missouri, 420 U.S. 162 (1975)
20. Godinez v. Moran, 509 U.S. 389 (1993)
21. Burt MN, Philipsborn JT: Assessment of client competence: a suggested approach. Champion 22:18–26, 55–8, 1998
22. Pate v. Robinson, 383 U.S. 375 (1966)
23. Estelle v. Smith, 451 U.S. 454 (1981)
24. Buchanan v. Kentucky, 483 U.S. 402 (1987)
25. Medina v. California, 505 U.S. 437 (1992)
26. Jackson v. Indiana, 406 U.S. 715 (1972)
27. Riggins v. Nevada, 504 U.S. 127 (1992)
28. Sell v. United States, 539 U.S. 166 (2003)
29. Washington v. Harper, 494 U.S. 210 (1990)
30. United States v. Nichelson, 550 F.2d 502 (8th Cir. 1977)
31. Cowley v. Stricklin, 929 F.2d 640 (11th Cir. 1991)
32. Torres v. Prunty, 233 F.3d 1103 (9th Cir. 2000)
33. Tiller v. Esposito, 911 F.2d 575 (11th Cir. 1990)
34. Wolf v. United States, 430 F.2d 443 (10th Cir. 1970)
35. Penry v. Lynaugh, 492 U.S. 302 (1989)
36. Miles v. Dorsey, 61 F.3d 1459 (10th Cir. 1995)
37. United States v. Leggett, 162 F.3d 237 (3d Cir. 1998)
38. United States v. Morrison, 153 F.3d 34 (2d Cir. 1998)
39. Burket v. Angelone, 208 F.3d 172 (4th Cir. 2000)
40. Moody v. Johnson, 139 F. 3d 477 (5th Cir. 1998)
41. United States v. Chischilly, 30 F.3d 1144 (9th Cir. 1994)
42. Oats v. Singletary, 141 F.3d 1018 (11th Cir. 1998)
43. People v. Baugh, 832 N.E.2d 903 (Ill. App. Ct. 2005)
44. Lawrence v. State, 169 S.W.3d 319 (Tex. Crim. App. 2005)
45. United States v. Gold, 790 F.2d 235 (2d Cir. 1986)
46. United States v. Williams, 998 F.2d 258 (5th Cir. 1993)
47. United States v. Santos, 131 F.3d 16 (1st Cir. 1997)
48. Blum GL: Adequacy of defense counsel's representation of criminal client—issues of incompetency. ALR 5th. 70:1, 1999

49. Curry v. Zant, 371 S.E.2d 647 (Ga. 1988)
50. Hull v. Kyler, 190 F.3d 88 (3rd Cir. 1999)
51. Woods v. State, 994 S.W.2d 32 (Mo. Ct. App. 1999)
52. In the Matter of Fleming, 16 P.3d 610 (Wash. 2001) (en banc)
53. State v. Stock, 463 S.W.2d 889 (Mo. 1971)
54. Hayden v. Commonwealth, 563 S.W.2d 720 (Ky. 1978)
55. Thompson v. Commonwealth, 56 S.W.3d 406 (Ky. 2001)
56. United States v. Wayt, 24 Fed.Appx. 880 (10th Cir. 2001)
57. United States v. Veatch, 842 F.Supp. 480 (W.D. Okla. 1993)
58. Terry v. State, 105 So.386 (Ala. Ct. App. 1925)
59. State v. Barber, 617 So.2d 974 (La. Ct. App. 1993)
60. People v. Doe, 602 N.Y.S.2d 507 (N.Y. Crim. Ct. 1993)
61. State v. Schaim, 600 N.E.2d 661 (Ohio 1992)
62. State v. Natividad, 526 P.2d 730 (Ariz. 1974)
63. Holmes v. State, 494 So.2d 230 (Fla. Dist. Ct. App. 1986)
64. Shook v. State, 552 So.2d 841 (Miss. 1989), writ of habeas corpus denied, Shook v. Mississippi, 2000 U.S. Dist. LEXIS 8851 (N.D. Miss. 2000)
65. State v. Burnett, 2005 Ohio 49 (Ohio Ct. App. 2005)
66. United States v. Jones, 2006 U.S. Dist. LEXIS 9257 (E.D. Tenn. 2006)
67. Wilson v. United States, 391 F.2d 460 (D.C. Cir. 1968)
68. United States v. Rinchack, 820 F.2d 1557 (11th Cir. 1987)
69. United States v. Borum, 464 F.2d 896 (10th Cir. 1972)
70. United States v. Davis, 1999 U.S. App. LEXIS 1030 (10th Cir. 1999)
71. State v. Ferguson, 547 P.2d 1085 (Ariz. Ct. App. 1976)
72. State v. Gilbert, 640 A.2d 61 (Conn. 1994)
73. State v. Martens, 521 N.W.2d 768 (Iowa Ct. App. 1994)
74. United States v. Swanson, 572 F.2d 523 (5th Cir. 1978)
75. State v. Owens, 807 P.2d 101 (Kan. 1991)
76. People v. Palmer, 31 P.3d 863 (Colo. 2001)
77. United States v. Stubblefield, 325 F.Supp 485 (D.C. Tenn. 1971)
78. People v. Stanhope, 254 N.E.2d 512 (Ill. 1969)
79. Carter v. State, 21 So.2d 404 (Miss. 1945)
80. Hansford v. United States, 365 F.2d 920 (D.C. Cir. 1966)
81. State v. Madden, 33 P.3d 549 (Haw. Ct. App. 2001)
82. Casey v. State, 924 S.W.2d 946 (Tex. Crim. App. 1996)
83. Bradley v. Preston, 263 F.Supp. 283 (D. D.C. 1967), cert. den. 390 U.S. 990 (1968)
84. Purver JM: Amnesia as affecting capacity to commit crime or stand trial. ALR 3d. 46:544, 1972
85. Morrow v. State, 47 A.2d 251 (Md. Ct. Spec. App. 1980)
86. State v. Kleypas, 40 P.3d 139 (Kan. 2001)
87. State v. McClendun, 437 P. 2d 421 (Ariz. 1968)
88. Rector v. State, 638 S.W.2d 672 (Ark. 1982), later app. 659 S.W.2d 168 (Ark. 1983), cert. den. 466 U.S. 988 (1984)
89. State v. Forsyth, 547 N.W.2d 833 (Iowa Ct. App. 1996)
90. State v. Leming, 3 S.W.3d 7 (Tenn. Crim. App. 1998)
91. Powell v. Alabama, 287 U.S. 45, 60 (1932)
92. Faretta v. California, 422 U.S. 806 (1975)
93. Gideon v. Wainwright. 372 U.S. 335 (1963)
94. State v. Taylor, 776 A.2d 1154 (Conn. App. Ct. 2001)
95. Vanisi v. State, 22 P.3d 1164 (Nev. 2001)
96. Barnes v. State, 528 S.W.2d 370 (Ark. 1975)
97. Com. v. Martin, 683 N.E.2d 280 (Mass. 1997)
98. State v. Vermillion, 51 P.3d 188 (Wash. Ct. App. 2002)
99. Sherwood v. State, 717 N.E.2d 131 (Ind. 1999)
100. People v. Burnett, 234 Cal. Rptr. 67 (Cal. Ct. App. 1987)
101. People v. Williams, 111 Cal. Rptr. 2d 732 (Cal. Ct. App. 2001)
102. Dobbins v. State, 721 N.E.2d 867 (Ind. 1999)
103. Gore v. State, 784 So.2d 418 (Fla. 2001)
104. State v. Briggs, 787 A.2d 479 (R.I. 2001)
105. State v. Coleman, 644 N.W.2d 283 (Wis. Ct. App. 2002)

**Practice Guideline: Evaluation of Competence to Stand Trial**

106. People v. Manson, 139 Cal. Rptr. 275 (Cal. Ct. App. 1977), cert. denied, 435 U.S. 953 (1978)

107. People v. Davis, 234 Cal. Rptr. 859 (Cal. Ct. App. 1987)

108. State v. Plunkett, 934 P.2d 113 (Kan. 1997)

109. People v. Eady, 755 N.Y.S.2d 463 (N.Y. App. Div. 2003)

110. Stepp v. Estelle, 524 F.2d 447 (5th Cir. 1975)

111. State v. Hartford, 636 P.2d 1204 (Ariz. 1981), cert. denied, 456 U.S. 933 (1982), reh. denied, 456 U.S. 1001 (1982), and later app., 651 P.2d 856 (Ariz. 1982)

112. Bridges v. State, 6 P.3d 1000 (Nev. 2000)

113. State v. Rose, 809 A.2d 534 (Conn. App. Ct. 2002)

114. People v. Anderson, 247 N.W.2d 857 (Mich. 1976)

115. United States v. Purnett, 910 F.2d 51 (2d Cir. 1990)

116. Mossman D, Dunseith NW Jr: "A fool for a client": print portrayals of 49 pro se criminal defendants. J Am Acad Psychiatry Law 29:408–19, 2001

117. Rogers R, Sewell KW, Goldstein AM: Explanatory models of malingering: a prototypical analysis. Law Hum Behav 18:543–52, 1994

118. Gothard S, Rogers R, Sewell KW: Feigning incompetency to stand trial: an investigation of the Georgia Court Competency Test. Law Hum Behav 19:363–73, 1995

119. Perlin ML: The Jurisprudence of the Insanity Defense. Durham, NC: Carolina Academic Press, 1994

120. Atkins v. Virginia, 536 U.S. 304 (2002) (Scalia, J., dissenting)

121. United States v. Greer, 158 F.3d 228 (5th Cir. 1998)

122. United States v. Binion, 132 Fed.Appx. 89 (8th Cir. 2005), cert. denied, 546 U.S. 919 (2005)

123. United States v. Booker, 543 U.S. 220 (2005)

124. Darani S: Behavior of the defendant in a competency-to-stand-trial evaluation becomes an issue in sentencing. J Am Acad Psychiatry Law 34:126–8, 2006

125. Fisher WH, Packer IK, Grisso T, et al: From case management to court clinic: examining forensic system involvement of persons with severe mental illness. Ment Health Serv Res 2:41–9, 2000

126. Golding SL, Roesch R: Competency for adjudication: an international analysis, in Law and Mental Health: International Perspectives (vol 4). Edited by Weisstub DN. New York: Pergamon, 1988, pp 73–109

127. People v. Stanfill, 229 Cal. Rptr. 215 (Cal. Ct. App. 1986)

128. People v. Robinson, 61 Cal. Rptr. 2d 587 (Cal. Ct. App. 1997)

129. Randleman v. State, 837 S.W.2d 449 (Ark. 1992)

130. Grisso T: Evaluating Competencies: Forensic Assessments and Instruments (ed 2). New York: Plenum Press, 2003

131. Geller JL, Fisher WH, Kaye NS: Effect of evaluations of competency to stand trial on the state hospital in an era of increased community services. Hosp Community Psychiatry 42:818–23, 1991

132. United States v. Alvarez, 519 F.2d 1036 (3rd Cir. 1975)

133. Maryland v. Pratt, 398 A.2d 421 (Md. 1979)

134. Noggle v. Marshall, 706 F.2d 1408, 1414 (6th Cir. 1983)

135. Ake v. Oklahoma, 470 U.S. 68 (1985)

136. Diamond BL: The forensic psychiatrist: consultant versus activist in legal doctrine. Bull Am Acad Psychiatry Law 20:119–32, 1992

137. Sadoff RL: Practical ethical problems of the forensic psychiatrist in dealing with attorneys. Bull Am Acad Psychiatry Law 12:243–52, 1984

138. American Bar Association Criminal Justice Standards Committee: ABA Criminal Justice Mental Health Standards. Washington, DC: American Bar Association, 1989

139. Gutheil TG, Appelbaum PS: Clinical Handbook of Psychiatry and the Law (ed 3). Philadelphia: Lippincott Williams & Wilkins, 2000

140. Slobogin C: Mental illness and the death penalty. Ment Phys Disabil Law Rep 24:667–77, 2000

141. Appelbaum PS: The parable of the forensic psychiatrist: ethics and the problem of doing harm. Int J Law Psychiatry 13:249–59, 1990

142. Appelbaum PS: A theory of ethics for forensic psychiatry. J Am Acad Psychiatry Law 25:233–47, 1997

143. American Psychiatric Association: The Principles of Medical Ethics: with Annotations Especially Applicable to Psychiatry (2001 rev). Washington, DC: American Psychiatric Association, 2001

144. American Academy of Psychiatry and the Law: Ethics Guidelines for the Practice of Forensic Psychiatry. Adopted May 1987; revised October 1989, 1991, 1995, and 2005

145. Giorgi-Guarnieri D, Janofsky J, Keram E, et al: AAPL Practice guideline: for forensic psychiatric evaluation of defendants raising the insanity defense. J Am Acad Psychiatry Law 30(Suppl): S3–S40, 2002

146. MacKinnon B: On not harming: two traditions. J Med Phil 13:313–28, 1988

147. Shuman DW, Greenberg SA: The expert witness, the adversary system, and the voice of reason: reconciling impartiality and advocacy. Prof Psychol 34:219–24, 2003

148. Mossman D: Forensic psychiatry and forensic psychology: ethics, in Encyclopedia of Forensic and Legal Medicine. Edited by Payne-James J, Byard RW, Corey TS, et al. Oxford, UK: Elsevier, 2005, pp 359–64

149. Gutheil TG, Simon RI: Attorneys' pressures on the expert witness: early warning signs of endangered honesty, objectivity, and fair compensation. J Am Acad Psychiatry Law 27:546–53, 1999; discussion 554–62

150. American Medical Association. Available at www.ama-assn.org. Accessed September 29, 2007

151. Strasburger LH, Gutheil TG, Brodsky A: On wearing two hats: role conflict in serving as both psychotherapist and expert witness. Am J Psychiatry 154:448–56, 1997

152. American Medical Association Council on Ethical and Judicial Affairs. Report 12-A-04, Medical Testimony (December 2004). Chicago: AMA, 2004

153. Miller RD: Hospitalization of criminal defendants for evaluation of competence to stand trial or for restoration of competence: clinical and legal issues. Behav Sci Law 21:369–91, 2003

154. United States v. Gomes, 387 F.3d 157 (2d Cir. 2004)

155. Sell v. United States. No. 02-5664, Brief Amicus Curiae, American Civil Liberties Union of Eastern Missouri in Support of Petitioner, 2002 U.S. Briefs 5664, December 19, 2002

156. Sell v. United States, No. 02-5664, Brief for Amicus Curiae American Psychological Association, 2002 U.S. Briefs 5664, December 19, 2002

157. Sell v. United States, No. 02-5664, Brief Amicus Curiae of the Center for Cognitive Liberty and Ethics in Support of the Petitioner, 2002 U.S. Briefs 5664, December 19, 2002

158. Annas GJ: Forcible medication for courtroom competence–the case of Charles Sell. N Engl J Med 350:2297–301, 2004

159. Mossman D: Is prosecution "medically appropriate"? N Engl J Crim Civil Confine 31:15–80, 2005

160. Sell v. United States, No. 02-5664, Brief for the American Psychiatric Association and American Academy of Psychiatry and the Law as Amici Curiae Supporting Respondent, 2002 U.S. Briefs 5664, January 22, 2003

161. American Medical Association: Opinion E-9.07, Medical Testimony. Chicago: AMA, 1994, E-9.07, August 29, 2005

162. Fed. Rules Evid. 702

163. Commons ML, Miller PM, Gutheil TG: Expert witness perceptions of bias in experts. J Am Acad Psychiatry Law 32:70–5, 2004

Practice Guideline: Evaluation of Competence to Stand Trial

164. Sattar SP, Pinals DA, Gutheil T: Countering countertransference: a forensic trainee's dilemma. J Am Acad Psychiatry Law 30:65–9, 2002; discussion 70–63

165. Health Insurance Portability and Accountability Act of 1996, Pub. Law No. 104-191 (1996)

166. Miller RD, Maier GJ, Kaye M: The right to remain silent during psychiatric examination in civil and criminal cases: a national survey and an analysis. Int J Law Psychiatry 9:77–94, 1986

167. Appelbaum PS: In the wake of Ake: the ethics of expert testimony in an advocate's world. Bull Am Acad Psychiatry Law 15:15–25, 1987

168. Binder RL: Liability for the psychiatrist expert witness. Am J Psychiatry 159:1819–25, 2002

169. Pettus v. Cole, 57 Cal. Rptr. 2d 46 (Cal. Ct. App. 1996)

170. Dalton v. Miller, 984 P.2d 666 (Colo. Ct. App. 1999)

171. Miller RD: Criminal competence, in Principles and Practice of Forensic Psychiatry (ed 2), Edited by Rosner R. London: Arnold, 2003, pp 213–32

172. Tseng W, Matthews D, Elwyn TS: Cultural Competence in Forensic Mental Health: A Guide for Psychiatrists, Psychologists, and Attorneys. New York: Brunner/Routledge, 2004

173. Cross T, Bazron B, Dennis K, et al: Towards a Culturally Competent System of Care: A Monograph on Effective Services for Minority Children Who Are Severely Emotionally Disturbed (vol I). Washington, DC: Georgetown University Child Development Center, 1989

174. Davis K: Race, health status and managed health care, in Cultural Competence for Health Care Professionals Working With African American Communities: Theory and Practice. Edited by Brisbane FL. Bethesda, MD: Center for Substance Abuse Prevention, 1998

175. Sakinsa D. Cultural Competency: A Practical Guide for Mental Health Service Providers. Austin, TX: Hogg Foundation for Mental Health, University of Texas at Austin. 2001

176. Griffith EE: Ethics in forensic psychiatry: a cultural response to Stone and Appelbaum. J Am Acad Psychiatry Law 26:171–84, 1998

177. Griffith EE: Personal narrative and an African-American perspective on medical ethics. J Am Acad Psychiatry Law 33:371–81, 2005

178. Candilis PJ, Martinez R, Dording C: Principles and narrative in forensic psychiatry: toward a robust view of professional role. J Am Acad Psychiatry Law 29:167–73, 2001

179. Pinals DA, Packer IK, Fisher W, et al: Relationship between race and ethnicity and forensic clinical triage dispositions. Psychiatr Serv 55:873–8, 2004

180. American Psychiatric Association: Practice Guideline for Psychiatric Evaluation of Adults. Am J Psychiatry 152(Suppl 11):63–80, 1995

181. Resnick PJ: Malingering, in Principles and Practice of Forensic Psychiatry. Edited by Rosner R. New York: Chapman and Hall, 1994, pp 417–26

182. Bonnie RJ: The competence of criminal defendants: beyond Dusky and Drope. Univ Miami L Rev 47:539–601, 1993

183. Bonnie RJ: The competence of criminal defendants: a theoretical reformulation. Behav Sci Law 10:291–316, 1992

184. Hoge SK, Poythress N, Bonnie RJ, et al: The MacArthur Adjudicative Competence Study: diagnosis, psychopathology, and competence-related abilities. Behav Sci Law 15:329–45, 1997

185. Gutheil TG, Bursztajn H: Clinicians' guidelines for assessing and presenting subtle forms of patient incompetence in legal settings. Am J Psychiatry 143:1020–3, 1986

186. People v. Kashney, 472 N.E.2d 164 (Ill. App. Ct. 1984)

187. People v. Pokovich, 15 Cal. Rptr. 3d 503 (Cal. Ct. App. 2004)

188. People v. Jablonski, 126 P.3d 938 (Cal. 2006)

189. Borum R, Grisso T: Establishing standards for criminal forensic reports: an empirical analysis. Bull Am Acad Psychiatry Law 24:297–317, 1996

190. Lally SJ: What tests are acceptable for use in forensic evaluations?—a survey of experts. Prof Psychol 34:491–8, 2003

191. Pinals DA, Tillbrook CE, Mumley DL: Practical application of the MacArthur competence assessment tool–criminal adjudication (MacCAT-CA) in a public sector forensic setting. J Am Acad Psychiatry Law 34:179–88, 2006

192. Grisso T: Center for Studies of Antisocial and Violent Behavior (U.S.). Evaluating competencies: forensic assessments and instruments. New York: Plenum Press, 1986

193. Robey A: Criteria for competency to stand trial: a checklist for psychiatrists. Am J Psychiatry 122:616–23, 1965

194. Vann CR, Morganroth F: Psychiatry and the competence to stand trial. Univ Det Law J 42:75–85, 1964

195. Hess JH, Thomas HE: Incompetence to stand trial: procedures, results, and problems. Am J Psychiatry 119:713–20, 1963

196. McGarry AL: Competence to stand trial and due process via the state hospital. Am J Psychiatry 122:623–31, 1965

197. Lipsitt PD, Lelos D, McGarry AL: Competency for trial: a screening instrument. Am J Psychiatry 128:105–9, 1971

198. Brakel SJ: Presumption, bias, and incompetency in the criminal process. Wisc Law Rev 1974:1105–30, 1974

199. Harvard Medical School Laboratory of Community Psychiatry: Competency to stand trial and mental illness. New York: Jason Aronson, 1974

200. Grisso T: Five-year research update (1986–1990): evaluations for competence to stand trial. Behav Sci Law 10:353–69, 1992

201. Wildman RW, Batchelor ES, Thompson L, et al: The Georgia Court Competency Test: an attempt to develop a rapid quantitative measure for fitness for trial. Milledgeville, GA: Forensic Services Division, Central State Hospital, 1978

202. Johnson WG, Mullett N: The Georgia Court Competency Test–R, in Dictionary of Behavioral Assessment Techniques. Edited by Hersen M, Bellack AS. New York: Pergamon, 1987, pp 80–92

203. Archer RP, Buffington-Vollum JK, Stredny RV, et al: A survey of psychological test use patterns among forensic psychologists. J Personality Assess 87:84–94, 2006

204. Golding SL, Roesch R, Schreiber J: Assessment and conceptualization of competency to stand trial: preliminary data on the Interdisciplinary Fitness Interview. Law Hum Behav 8:321–34, 1984

205. Golding SL: Interdisciplinary Fitness Interview—Revised (Training Manual and Interview Procedure). State of Utah Division of Mental Health, 1993

206. Skeem J, Golding SL, Emke-Francis P: Assessing adjudicative competency: using legal and empirical principles to inform practice, in Handbook of Forensic Psychology. Edited by O'Donohue W, Levensky E. New York: Elsevier, 2004, pp 175–211

207. Nicholson RA, Kugler KE: Competent and incompetent criminal defendants: a quantitative review of comparative research. Psychol Bull 109:355–70, 1991

208. Schreiber J, Roesch R, Golding S: An evaluation of procedures for assessing competency to stand trial. Bull Am Acad Psychiatry Law 15:187–203, 1987

209. Nicholson RA, Barnard GW, Robbins L, et al: Predicting treatment outcome for incompetent defendants. Bull Am Acad Psychiatry Law 22:367–77, 1994

210. Everington C: The Competence Assessment for Standing Trial for Defendants with Mental Retardation (CAST-MR): a validation study. Crim Just Behav 17:147–68, 1990

Practice Guideline: Evaluation of Competence to Stand Trial

211. Everington C, Dunn C: A second validation study of the Competence Assessment for Standing Trial for Defendants with Mental Retardation (CAST-MR). Crim Just Behav 22:44–59, 1995

212. Poythress NG: Adjudicative Competence: The MacArthur Studies. New York: Kluwer Academic/Plenum Publishers, 2002

213. Otto RK, Poythress NG, Nicholson RA, et al: Psychometric properties of the MacArthur Competence Assessment Tool—Criminal Adjudication. Psychol Assess 10:435–43, 1998

214. Grisso T, Steinberg L, Woolard J, et al: Juveniles' competence to stand trial: a comparison of adolescents' and adults' capacities as trial defendants. Law Hum Behav 27:333–63, 2003

215. Ficke SL, Hart KJ, Deardorff PA: The performance of incarcerated juveniles on the MacArthur Competence Assessment Tool-Criminal Adjudication (MacCAT-CA). J Am Acad Psychiatry Law 34:360–73, 2006

216. Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993)

217. Rogers R, Grandjean N, Tillbrook CE, et al: Recent interview-based measures of competency to stand trial: a critical review augmented with research data. Behav Sci Law 19:503–18, 2001

218. Rogers R, Jackson RL, Sewell KW, et al: An examination of the ECST-R as a screen for feigned incompetency to stand trial. Psychol Assess 16:139–45, 2004

219. Rogers R, Jackson RL, Sewell KW, et al: Assessing dimensions of competency to stand trial: construct validation of the ECST-R. Assessment 10:344–51, 2003

220. Rogers R, Sewell KW, Grandjean NR, et al: The detection of feigned mental disorders on specific competency measures. Psychol Assess 14:177–83, 2002

221. American Psychological Association: Ethical Principles of Psychologists and Code of Conduct (effective June 1, 2003). Washington, DC: American Psychological Association, 2003

222. State v. Griffin, 869 A.2d 640 (Conn. 2005)

223. Warren JI, Fitch WL, Dietz PE: Criminal offense, psychiatric diagnosis, and psycholegal opinion: an analysis of 894 pretrial referrals. Bull Am Acad Psychiatry Law 19:63–9, 1991

224. Reich J, Wells J: Psychiatric diagnosis and competency to stand trial. Compr Psychiatry 26:421–32, 1985

225. Roesch R, Eaves D, Sollner R, et al: Evaluating fitness to stand trial: a comparative analysis of fit and unfit defendants. Int J Law Psychiatry 4:145–57, 1981

226. Hubbard KL, Zapf PA, Ronan KA: Competency restoration: an examination of the differences between defendants predicted restorable and not restorable to competency. Law Hum Behav 27:127–39, 2003

227. Miller RD, Germain EJ: The retrospective evaluation of competency to stand trial. Int J Law Psychiatry 11:113–25, 1988

228. Clark v. Arizona, 126 S. Ct. 2709 (2006)

229. Bishop v. United States, 350 U.S. 961 (1956)

230. American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders (Text Revision): DSM-IV-TR (ed 4). Arlington, VA: American Psychiatric Publishing, 2000

231. Gothard S, Viglione DJ, Meloy JR, et al: Detection of malingering in competency to stand trial evaluations. Law Hum Behav 19:493–505, 1995

232. Lamb HR: Incompetency to stand trial: appropriateness and outcome. Arch Gen Psychiatry 44:754–8, 1987

233. Mowbray CT: A study of patients treated as incompetent to stand trial. Soc Psychiatry 14:31–9, 1979

234. Rodenhauser P, Khamis HJ: Relationships between legal and clinical factors among forensic hospital patients. Bull Am Acad Psychiatry Law 16:321–32, 1988

235. Noffsinger SG: Restoration to competency practice guidelines. Int J Offend Ther Comp Criminol 45:356–62, 2001

236. Nicholson RA, McNulty JL: Outcome of hospitalization for defendants found incompetent to stand trial. Behav Sci Law 10:371–83, 1992

237. Roesch R, Golding S: Competency to Stand Trial. Urbana, IL: University of Illinois, 1980

238. Cuneo DJ, Brelje TB: Predicting probability of attaining fitness to stand trial. Psychol Rep 55:35–9, 1984

239. Carbonell JL, Heilbrun K, Friedman FL: Predicting who will regain trial competency: initial promise unfulfilled. Forensic Rep 5:67–76, 1992

240. Mossman D: Predicting restorability of incompetent criminal defendants. J Am Acad Psychiatry Law 35:34–43, 2007

241. Pinals DA: Where two roads meet: competence to stand trial restoration from a clinical perspective. N Engl J on Criminal & Civil Confinement 31:81–108, 2005

242. Group for the Advancement of Psychiatry, Committee on Psychiatry and Law: Misuse of Psychiatry in the Criminal Courts: Competency to Stand Trial. New York: Group for the Advancement of Psychiatry, 1974

243. Roesch R, Zapf PA, Golding SL: Defining and assessing competency to stand trial, in Handbook of Forensic Psychology (ed 2). Edited by Weiner IB, Hess AK. New York: John Wiley & Sons, 1999, pp 327–49

244. Morse SJ: Law and mental health professionals: the limits of expertise. Prof Psychol 9:389–99, 1978

245. Halleck SJ, Hoge SK, Miller RD, et al: The use of psychiatric diagnoses in the legal process: task force report of the American Psychiatric Association. Bull Am Acad Psychiatry Law 20:481–99, 1992

246. Grisso T: Competency to Stand Trial Evaluations: A Manual for Practice. Sarasota, FL: Professional Resource Exchange, 1988

247. Cruise KR, Rogers R: An analysis of competency to stand trial: an integration of case law and clinical knowledge. Behav Sci Law 16:35–50, 1998

248. Plotnick S, Porter J, Bagby M: Is there bias in the evaluation of fitness to stand trial? Int J Law Psychiatry 21:291–304, 1998

249. Ohio Rev. Code Ann. § 2945.38(G)(3)(2006)

250. S.C. Code Ann. § 44-23-420(2006)

251. R.I. Gen. Laws § 40.1-5.3-3(f)(2006)

252. S.D. Codified Laws § 23A-46-2(a)(2004)

253. Tex. Code of Crim. Proc. Ann. art. 46B.025(2006)

254. Poythress NG: Psychological issues in criminal proceedings: judicial preference regarding expert testimony. Law Hum Behav 10:175–94, 1983

255. Redding RE, Floyd MY, Hawk GL: What judges and lawyers think about the testimony of mental health experts: a survey of the courts and bar. Behav Sci Law 19:583–94, 2001

256. Cooper DK, Grisso T: Five year research update (1991–1995): evaluations for competence to stand trial. Behav Sci Law 15: 347–64, 1997

257. Mass. Gen. Laws ch. 123, § 15(c)(2003)

258. In re Gault, 387 U.S. 1 (1967)

259. Redding RE, Frost LE: Adjudicative competence in the modern juvenile court. Virginia J Soc Policy Law 9:353–409, 2001

260. G.J.I. v. Oklahoma, 778 P.2d 485 (Okla. Crim. App. 1989)

261. Savitsky JC, Karras D: Competency to stand trial among adolescents. Adolescence 1974:349–58, 1984

262. Cowden VL, McKee GR: Competency to stand trial in juvenile delinquency proceedings: cognitive maturity and the attorney-client relationship. J Fam Law 33:629–61, 1995

263. Cooper DK: Juveniles' understanding of trial-related information: are they competent defendants? Behav Sci Law 15:167–80, 1997

Practice Guideline: Evaluation of Competence to Stand Trial

264. McKee GR, Shea SJ: Competency to stand trial in family court: characteristics of competent and incompetent juveniles. J Am Acad Psychiatry Law 27:65–73, 1999

265. Warren JI, Aaron J, Ryan E, et al: Correlates of adjudicative competence among psychiatrically impaired juveniles. J Am Acad Psychiatry Law 31:299–309, 2003

266. Scott ES, Reppucci ND, Woolard JL: Evaluating adolescent decision making in legal contexts. Law Hum Behav 19:221–44, 1995

267. Steinberg L, Cauffman E: Maturity of judgment in adolescence: psychosocial factors in adolescent decision making. Law Hum Behav 20:249–72, 1996

268. Marsteller FA, Brogan D, Smith I, et al: The prevalence of psychiatric disorders among juveniles admitted to regional youth detention centers operated by the Georgia Department of Children and Youth Services. Atlanta, GA: Department of Children and Youth Services, 1997

269. Teplin LA, Abram KM, McClelland GM, et al: Psychiatric disorders in youth in juvenile detention. Arch Gen Psychiatry 59: 1133–43, 2002

270. McGaha A, Otto RK, McClaren MD, et al: Juveniles adjudicated incompetent to proceed: a descriptive study of Florida's competence restoration program. J Am Acad Psychiatry Law 29:427–37, 2001

271. McKee GR: Competency to stand trial in preadjudicatory juveniles and adults. J Am Acad Psychiatry Law 26:89–99, 1998

272. Grisso T: Forensic Evaluation of Juveniles. Juvenile's competence to stand trial. Sarasota, FL: Professional Resource Press, 1998, pp 83–126

273. Barnum R: Clinical and forensic evaluation of competence to stand trial in juvenile defendants, in Youth on Trial: A Developmental Perspective on Juvenile Justice. Edited by Grisso T, Schwartz RG. Chicago: University of Chicago Press, 2000, pp 193–224

274. Warren JI, Murrie DC, Stejskal W, et al: Opinion formation in evaluating the adjudicative competence and restorability of criminal defendants: a review of 8,000 evaluations. Behav Sci Law 24:113–32, 2006

275. Scott CL: Commentary: a road map for research in restoration of competency to stand trial. J Am Acad Psychiatry Law 31:36–43, 2003

276. Pendleton L: Treatment of persons found incompetent to stand trial. Am J Psychiatry 137:1098–100, 1980

277. Davis DL: Treatment planning for the patient who is incompetent to stand trial. Hosp Community Psychiatry 36:268–71, 1985

278. Brown DR: A didactic group program for persons found unfit to stand trial. Hosp Community Psychiatry 43:732–3, 1992

279. Cooper VG, Zapf PA: Predictor variables in competency to stand trial decisions. Law Hum Behav 27:423–36, 2003

280. Wall BW, Krupp BH, Guilmette T: Restoration of competency to stand trial: a training program for persons with mental retardation. J Am Acad Psychiatry Law 31:189–201, 2003