CARLIE CHRISTENSEN, Acting United States Attorney (#0633)
RICHARD N. W. LAMBERT, Assistant United States Attorney (#3971)
DAVE BACKMAN, Assistant United States Attorney (#8044)
DIANA HAGEN,  Assistant United States Attorney (#8205)
ALICIA COOK, Special Assistant United States Attorney (#8851)
Attorneys for the United States of America
185 South State Street, Suite 300
Salt Lake City, Utah 84111
Telephone:  (801) 524-5682
Facsimile:  (801) 524-6926

---

### IN THE UNITED STATES DISTRICT COURT

### DISTRICT OF UTAH, CENTRAL DIVISION

---

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | No. 2:08-CR-00125-DAK |
| Plaintiff, | : | |
| | : | PROPOSED FINDINGS OF FACT |
| vs. | : | AND CONCLUSIONS OF LAW |
| | : | REGARDING  DEFENDANT |
| BRIAN DAVID MITCHELL and | : | BRIAN DAVID MITCHELL'S |
| WANDA EILEEN BARZEE, | : | COMPETENCY TO STAND TRIAL |
| | : | |
| Defendants. | : | |

---

The United States of America, through the undersigned counsel, hereby submits

the following Proposed Findings of Fact and Conclusions of Law Regarding Defendant

Brian David Mitchell's Competency to Stand Trial.

# TABLE OF CONTENTS

PROPOSED INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

PROPOSED FINDINGS OF FACT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.    <u>Abduction of Elizabeth Smart.</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

        1.    *Night of the Kidnaping.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

        2.    *Captivity & Indoctrination.* . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        3.    *Mitchell's Preoccupation with Sex.* . . . . . . . . . . . . . . . . . . . . . 7

        4.    *Religious Manipulation.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        5.    *Capable, Intelligent and Deceptive.* . . . . . . . . . . . . . . . . . . . . 12

        6.    *Turning Religion On and Off.* . . . . . . . . . . . . . . . . . . . . . . . . . 14

        7.    *San Diego Court Appearance.* . . . . . . . . . . . . . . . . . . . . . . . . . 17

        8.    *Arrest.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

    B.    <u>Relevant Life History.</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

        1.    *Adolescence.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

        2.    *Early Adulthood.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

        3.    *Return to Utah.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

        4.    *Marriage to Wanda Barzee.* . . . . . . . . . . . . . . . . . . . . . . . . . . 28

              a.    Breaking Away from the Mainstream. . . . . . . . . . . . . . . 29

              b.    Home Life . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

            c.      Performance and Behavior in the Workplace. . . . . . . . . . . 34

            d.      Desire to Live Off the Grid. . . . . . . . . . . . . . . . . . . . . . . . 36

            e.      Hitchhiking Across Country. . . . . . . . . . . . . . . . . . . . . . . 37

            f.      Parasitic Lifestyle. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

            g.      Panhandling. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

            h.      Soliciting Plural Wives. . . . . . . . . . . . . . . . . . . . . . . . . . . 45

            i.      Excommunication. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

   C.   <u>State Custody</u>. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

        1.     *Post-Arrest Statements*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

            a.      Initial Interview. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

            b.      Subsequent Interviews. . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

            c.      Additions to the BIDI. . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

        2.     *State Proceedings*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

            a.      Behavior at the Jail. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

            b.      Initial Competency Evaluations. . . . . . . . . . . . . . . . . . . . . 56

            c.      Plea Negotiations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

            d.      State Competency Hearing. . . . . . . . . . . . . . . . . . . . . . . . 62

        3.     *Utah State Hospital*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

            a.      Difference In Presentation to Paraprofessional Staff. . . . . 64

            b.      Ability to Negotiate for Self Interest. . . . . . . . . . . . . . . . . 66

|  |  | c. | Interactions with Staff and Patients. | 67 |
|  |  | d. | Ability to Collaborate  and Defer to Others | 68 |
|  |  | e. | Understanding of Legal Process. | 70 |
|  |  | f. | Selective Silence. | 71 |
|  |  | g. | Control Over Singing. | 73 |
|  |  | h. | Lack of Religious Preoccupation or Sincerity. | 74 |
|  |  | i. | Efforts to Avoid Finding of Competency. | 78 |
| 4 | Federal Custody. |  |  | 79 |
|  | 1. | *Dr. DeMier's Evaluation.* |  | 79 |
|  | 2. | *Dr. Welner's Evaluation.* |  | 81 |
|  | 3. | *Behavior in the Federal Courthouse.* |  | 85 |
|  |  | a. | Initial Appearance. | 86 |
|  |  | b. | Interview with Dr. Welner. | 87 |
|  |  | c. | Elizabeth's Testimony. | 88 |

**PROPOSED CONCLUSIONS OF LAW**. 89

| A. | Preliminary Legal Questions. |  | 89 |
|  | 1. | *The Federal Standard for Competency.* | 89 |
|  | 2. | *State vs. Federal Standards of Competency.* | 92 |
|  | 3. | *Burden of Proof.* | 95 |

B.   Conclusions as to Mitchell's Competency to Stand Trial . . . . . . . . . . . . . 99

   1.   *Mitchell Has Chosen to Adopt a Religious Persona*
        *to Control and Manipulate Others..* . . . . . . . . . . . . . . . . . . . . . . . 99

        a.   Mitchell Turns His Religious Persona On and Off.. . . . . . 100

        b.   Mitchell Lacks Sincere Religious Devotion.. . . . . . . . . . . 104

        c.   Mitchell Uses Religion for Power.. . . . . . . . . . . . . . . . . . 107

        d.   Mitchell's Behavior Is Consistent with That of Self-
             Proclaimed Leaders of Destructive Religious Cults.. . . . . 110

   2.   *Even if Some of Mitchell's Professed Religious Beliefs Are*
        *Sincere, He Does Not Suffer from a Mental Disease or*
        *Defect that Would Render Him Incompetent to Stand Trial..* . . . . 116

        a.   Mitchell's Religious Ideas Are Not Delusions.. . . . . . . . . 117

             (1)   Cultural Explanation . . . . . . . . . . . . . . . . . . . . . . . 117

             (2)   Not Fixed. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 124

             (3)   Lack of Preoccupation or Distress. . . . . . . . . . . . . 125

             (4)   Evidence Against "Encapsulation". . . . . . . . . . . . 127

        b.   Mitchell's Presentation and History is Not Consistent
             with a Psychotic Illness.. . . . . . . . . . . . . . . . . . . . . . . . . . 129

             (1)   Presentation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 129

             (2)   History. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 133

        c.   Mitchell Does Not Meet the Diagnostic Criteria for
             Either Delusional Disorder or Schizophrenia; Instead,
             His Behavior is Consistent with Non-Competency
             Limiting Personality Disorders.. . . . . . . . . . . . . . . . . . . . 137

(1)   Delusional Disorder and Schizophrenia . . . . . . . . . . 137

(2)   Personality Disorders . . . . . . . . . . . . . . . . . . . . . . . . 142

(a)   Narcissistic Personality Disorder . . . . . . . . 143

(b)   Antisocial Personality Disorder . . . . . . . . . . 146

3.   *Even if Mitchell's Religious Beliefs Are Delusional,
His Competence to Stand Trial Is Not Impaired* . . . . . . . . . . . . . . . 150

a.   Mitchell Has a Rational as Well as Factual
Understanding of These Proceedings . . . . . . . . . . . . . . . . . . 151

b.   Mitchell Has the Ability to Consult with Counsel
with a Reasonable Degree of Rational Understanding . . . . 155

c.   Mitchell's Uncooperativeness and Disruptive
Behavior Are the Result of Volitional Decision
Not to Participate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 161

PROPOSED CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 167

## PROPOSED INTRODUCTION

Brian David Mitchell is charged with kidnaping in violation of 18 U.S.C.

§ 1201(a)(1), and unlawful transportation of a minor in violation of 18 U.S.C. § 2423(a).

The charges arise from the 2002 kidnaping of Elizabeth Smart.  After the Utah state

courts found Mitchell incompetent to stand trial and ineligible for involuntary medication,

the United States Attorney's Office proceeded with this federal prosecution.

At the federal competency hearing held on October 1, 2009, and November 30

through December 11, 2009, this Court heard a substantial amount evidence that was not

part of the state court record.  Significant evidence was provided by numerous individuals

who had interacted with Mitchell outside the competency evaluation setting, including the

Utah State Hospital staff, who observed Mitchell over the course of his three-year stay;

Wanda Barzee, who spent nearly 20 years as Mitchell's wife; and Elizabeth Smart herself,

who observed Mitchell's behavior during her nine-month ordeal.  New evidence was

presented regarding the context of Mitchell beliefs and their similarity to that of other

leaders of schismatic Mormon sects.  The evidence also included details of Mitchell's

failed plea negotiations with the state that were not revealed in the state competency

hearing.  In addition, the Court had the benefit of three current competency evaluations

and the accompanying reports.

Having fully considered all the evidence presented, the governing law, and the

arguments of counsel, the Court makes the following findings regarding Mitchell's

competence, each of which provide an independent basis for concluding that Mitchell is competent to stand trial:

1.     Mitchell has voluntarily chosen to adopt a fictitious religious persona to control and manipulate others.

2.     Even if some of Mitchell's professed religious beliefs are sincere, he does not suffer from a mental disease or defect that would render him incompetent to stand trial.

3.     Even if Mitchell's religious beliefs are delusional, his competence to stand trial is not impaired.

In support of these determinations, the Court makes the following findings of fact and conclusions of law.

### PROPOSED FINDINGS OF FACT[1]

A.     <u>Abduction of Elizabeth Smart</u>

1.     *Night of the Kidnaping*

In the early morning hours of June 5, 2002, Elizabeth Smart awoke to find Brian David Mitchell in her bedroom holding a knife to her throat.  (10/01/09 Tr. at 5-6.) Elizabeth's younger sister was in the bed next to her and Mitchell placed his hands on Elizabeth's chest (*id.* at 6), presumably to feel whether she was the older, more well-

---

[1]  The consecutively paginated transcript of the hearing held between November 30 and December 11, 2009, is cited herein as (Tr. at ___ ).  The transcript of the October 1, 2009, hearing is cited herein as (10/01/09 Tr. at ___ ).

developed child (Gov't Ex. 20 at 7).  Holding the knife against her neck, Mitchell ordered

Elizabeth to get up quietly and come with him.  (10/01/09 Tr. at 6.)  He threatened to kill

Elizabeth and her family if she did not comply.  (*Id.*)  Mitchell later told Elizabeth that

"'if I would have screamed, he would have killed me, he would have killed my family,

and he would not have had any trouble killing me."  (Gov't Ex. 20 at 8.)

When Elizabeth asked Mitchell why he was taking her, he claimed he was taking

her hostage and holding her for ransom.  (10/01/09 Tr. at 7.)  Days later, when Elizabeth

asked Mitchell why he had told her this, he replied that if he "had told me he was taking

me as his wife I would not have come as easily, and if I thought I was being ransomed, I

would have hope of coming back."  (Gov't Ex. 20 at 8.)

Mitchell continued to threaten Elizabeth and held the knife to her back as he took

her away from her home and led her up into the mountains.  (10/01/09 Tr. at 8.)  When

she told him, "You know, you're going to go to jail for this if you get caught," he replied,

"Yes."  (*Id.* at 10.)  Elizabeth tried to persuade him to release her, promising to speak on

his behalf if he let her go right then.  (*Id.*)  As Elizabeth testified, "He didn't let me go,

and he knew full well he was going to go to jail."  (*Id.*)

Mitchell was careful to avoid being caught.  (10/01/09 Tr. at 9.)  He was dressed in

dark clothing, including sweat pants, a sweat shirt, tennis shoes and a stocking cap.  (*Id.*

at 6-7 & 9.)  He forced Elizabeth to duck down behind some bushes before crossing the

street while he waited for a car to pass.  (*Id.* at 9.)  Then they moved at a quick pace up a

mountain trail and eventually turned off the trail into a more remote area.  (*Id.*)  Mitchell took Elizabeth into a canyon about three miles up, close to the top of the mountain ridge.  (*Id.*)  There, Elizabeth saw a well-established camp surrounded by trees where Wanda Barzee was waiting.  (*Id.*)

Inside the tent, Barzee tried to bathe Elizabeth.  (10/01/09 Tr. at 10.)  When Elizabeth resisted, Barzee relented and simply washed her feet.  (*Id.*)  Barzee then instructed Elizabeth to change out of her pajamas into a robe-type garment.  (*Id.*)  When Elizabeth refused, Barzee threatened to have Mitchell come in and rip her pajamas off.  (*Id.*)  Reluctantly, Elizabeth changed into the robe.  (*Id.*)

Mitchell entered the tent and performed what purported to be a very brief marriage ceremony.  (10/01/09 Tr. at 10.)  Barzee was present and Elizabeth had the impression that the ceremony was to "placate Wanda" by "giving the appearance that he was doing what the Lord had told him to do."  (*Id.* at 67-68.)  Mitchell stated that Elizabeth "would be bound in heaven as [she] would be here on earth to him to be his wife."  (*Id.* at 44.)  Elizabeth "screamed no," but it had no effect on Mitchell.  (*Id.* at 44.)  He threatened that he would kill her if she screamed.  (*Id.* at 44.)  Then he raped the fourteen-year-old girl.  (*Id.* at 10.)

   2. *Captivity & Indoctrination*

To keep her from escaping the camp, Mitchell bolted a large, 10-foot cable onto Elizabeth's leg.  (10/01/09 Tr. at 10.)  The cable connected to a lock that could slide along

a second, 15- to 20-foot cable that was strung between two trees.  (*Id.* at 10-11.)  Mitchell

was able to disconnect the cables by taking off the lock, but he kept the key to the lock

around his neck.  (*Id.* at 10.)  Mitchell would unlock the cable only when the three hiked

to an underground stream.  (Gov't Ex. 20 at 9.)  Elizabeth would be forced to carry the

cable while Mitchell walked in front of her and Barzee behind to make sure she could not

run away.  (*Id.*)

Mitchell told Elizabeth that "he would kill anybody who came into the camp or he

would kill me if I ever tried to escape or yelled out or did anything that was not in

accordance with what he wanted."  (10/01/09 Tr. at 35.)  Once when searchers came near

the camp, Mitchell threatened to kill her or her family if she called out and alerted

searchers to their position.  (Gov't Ex. 20 at 8.)  Barzee reinforced Mitchell's threats by

telling Elizabeth that "'he *will* do it.'"  (*Id.* at 8.)  As time went on, Mitchell would show

Elizabeth newspaper articles about the search efforts to demonstrate that no one was able

to find her despite the massive efforts devoted to her recovery.  (*Id.* at 11.)  Mitchell

forced her to burn the red pajamas she had worn to the camp, told her to refer to her

parents as Ed and Lois, and instructed her that she must cast off her "false traditions."

(*Id.* at 9.)

Elizabeth "began to absorb intense religious indoctrination from Brian Mitchell

from almost immediately after she was taken."  (*Id.* at 8.)  Because of Elizabeth's

upbringing in the LDS church, many of the ideas of which Mitchell spoke were familiar

to her, such as revelations, priesthood blessings, religious missions and believing in scripture beyond the Bible.  (10/01/09 Tr. at 66-67.)  Mitchell and Barzee told Elizabeth that Mitchell was Immanuel David Isaiah, a prophet and the Davidic King, and regularly read to Elizabeth from Mitchell's book of scripture, the Book of Immanuel David Isaiah. (*Id.* at 46-47.)  Mitchell told her that in seven years "he would come forth with Wanda and his seven new wives, and [they] would all testify in his behalf."  (*Id.* at 59.)  He told her "that there would be many people who believed us, but many people who didn't believe us.  And there would be a mob that would come and stone him, and he would lay in the streets for three days being dead, and then he would rise up and he would be untouchable."  (*Id.* at 59.)  He told her that he would then fight and kill the antichrist.  (*Id.* at 59.)

Mitchell and Barzee continually repeated their religious ideas to Elizabeth.  (Gov't Ex. 20 at 11.)  They encouraged her to write in her journal and would review her entries, which eventually began to reflect at least a surface acceptance of the religious beliefs she was being taught.  (*Id.*)  Mitchell even manipulated Elizabeth into disclosing enough information about her 15-year-old cousin to enable Mitchell to attempt to kidnap her as he had Elizabeth.  (*Id.*)

After many weeks of being physically bound, Mitchell released her from the cable. (Gov't Ex. 20 at 10.)  Sometime after the cable was removed, Elizabeth tried to escape while Mitchell and Barzee were arguing.  (*Id.* at 11.)  Mitchell saw her and threatened,

"'[I]f you take one more step further, there will be an angel at the door that will cut you down.  If you ever run away you will be killed and your family will be killed.'"  (*Id.*) Elizabeth returned and did not try to run away again.  (*Id.*)

Mitchell would go into the city to steal provisions – which he referred to as "plundering" – while Barzee stayed in the camp to guard Elizabeth.  (Gov't Ex. 20 at 11.) Eventually, Mitchell and Barzee began going into the city together and took Elizabeth with them because she could not remain alone at the camp.  (*Id.*)  He forced Elizabeth to wear a headdress with a veil and another veil covering her mouth.  (10/01/09 Tr. at 68.) Mitchell ordered her not to speak.  (Gov't Ex. 20 at 11.)  She was convinced that Mitchell would hurt her and her family if she did not obey him.  (*Id.*)

### 3.    *Mitchell's Preoccupation with Sex*

Throughout Elizabeth's captivity, Mitchell's predominant focus was sex. (10/01/09 Tr. at 11.)  Mitchell raped her up to three to four times a day.  (*Id.*)  Elizabeth cannot recall a time when Mitchell did not talk about sex or want sex.  (*Id.* at 12.)  He also used crude and vulgar language.  (*Id.* at 13.)  He showed her pornography and used drugs and alcohol to lower her resistence.  (*Id.* at 12.)  He tried to make her feel that having sex with him was normal and that it was just what a husband and wife do.  (*Id.* at 13.) Once when Elizabeth bit Mitchell as he was raping her, he threatened to stop having sex with her and claimed that she would be "the most miserable woman in the world." (*Id.* at 16.)  But Mitchell continued to rape her on a daily basis.  (*Id.*)

Mitchell would periodically leave the camp to get supplies and "to minister to the world." (10/01/09 Tr. at 13.) Generally, Elizabeth and Barzee were without food until Mitchell returned with something to eat. (*Id.* at 14.) After giving them food, the first thing Mitchell would do was rape Elizabeth. (*Id.*) On several occasions when he returned, he would come up the mountainside yelling, "I'm going to fuck your eyes out." (*Id.*)

"He used religion to get what he wanted. He had an excuse for everything he did with a religious side to it." (10/01/09 Tr. at 12.) For example, when he showed Elizabeth pornography, he said that she "had to be humbled and to sink below all things before rising above all things." (*Id.*) Elizabeth testified, "Anything that I showed resistence or hesitation to, he would turn to me and say, the Lord has commanded you to do this. You have to experience . . . the lowest form of humanity to experience the highest." (*Id.*)

### 4. Religious Manipulation

During her nine months in captivity, Elizabeth experienced Mitchell as "religious but not spiritual, not Christlike." (10/01/09 Tr. at 16.) Instead, she described him as "[e]vil, wicked, manipulative, sneaky, slimy, selfish, greedy, not spiritual, not religious, not close to God." (*Id.* at 42.) Mitchell claimed to be the Davidic King, the Lord's servant, and that he was doing the Lord's work. (*Id.* at 17.) Yet Mitchell never showed empathy for others and never performed an act of charity or kindness toward another person. (*Id.* at 16-17.) One night, Mitchell gave Elizabeth too much alcohol to drink and

she became ill.  (*Id.* at 20.)  Mitchell did not care for her, but instead allowed her to lie face down in her own vomit all night.  (*Id.*)  When she awoke the next morning, Mitchell told Elizabeth that it was showing her "true state."  (*Id.*)

Whenever Elizabeth questioned him on the inconsistencies between his conduct and the principles of his religion, Mitchell told her that "the world was a wicked place and that [she had] been brainwashed by the world, and that he was the Lord's servant and he was doing the Lord's will."  (10/01/09 Tr. at 21.)

Instead of using religion to help others, Mitchell used it to get what he wanted.  (*Id.* at 17.)  Mitchell claimed to receive revelations from God and would also purport to give divinely-inspired blessings to Barzee and sometimes Elizabeth.  (10/01/09 Tr. at 18.)  He even received a "revelation" that "Immanuel may smoke and drink as he chooses according to his desires."  (Gov't Ex. 10)  Whenever "he wanted something, that's when he got revelation."  (10/01/09 Tr. at 64.)

Mitchell employed blessings in a calculated way to "placate Wanda when she was distraught because [Mitchell] was openly having sex with and pursuing sex with, in an unrelenting way, Elizabeth Smart, notwithstanding how distraught his wife was at witnessing this scene and unable to control it."  (Tr. at 829.)  The way that Mitchell "was able to keep this dynamic of the three of them together was in, a very quick fashion, he could produce these elaborate blessings that sounded so spiritual, that sounded so divinely inspired, full of praise for Wanda and her future role, and what was in it for her, her being

the mother of Zion and the sacrifices that she needed to make and that these would have a

placating effect on Wanda."  (*Id.*)  These blessing "were initiated and timed in a way that

struck Elizabeth and had always struck her as manipulative."  (*Id.*)  As Elizabeth

explained:

> Wanda would get very upset with him, and she would just become irate.
> And the only way to calm her down was to turn to her and say that he
> needed to give her a blessing.  And then in the blessing he would just say
> what a wonderful daughter of God she was and she was going to be the
> mother of Zion, and she was going to bring forth his [heir] to the throne and
> just say what a queen she really was.

(10/01/09 Tr. at 19.)  Mitchell never dealt with Elizabeth in that way because "he could

get her to do anything he wanted simply by brute force and threat."  (Tr. at 829.)

Barzee also recalled the way Mitchell manipulated her when Elizabeth was first

kidnaped:

WELNER:     What else were you feeling that you remember?

BARZEE:     Well, we were given specific instructions of what we were to
            do once she got there and how could I do that?

WELNER:     How you could do...

BARZEE:     Demonstrate.

WELNER:     Oh, so you were--you were already told at that point that you
            had to demonstrate how to have sex?

BARZEE:     Yeah, when we were told that we were going to go forth and--

WELNER:     You say "we were told."  Are you saying Brian told you this?

> BARZEE:   Brian told me--Brian told me when we obtained her
> then--what I was supposed–what I was to do once we got her.
> I didn't want to do that.  I didn't want to have to demonstrate
> in front of her.  And at the same time I was told that I was the
> Mother of Zion (inaudible).

(Gov't Ex. 17e.)

On another occasion, Barzee had become distraught over Mitchell's lust for Elizabeth.  (10/01/09 Tr. at 14.)  "And so in order to calm Wanda down," Mitchell told Barzee that he had received a revelation that he was to alternate between Elizabeth and Barzee on a fixed schedule.  (*Id.* at 14-15.)  Under what Mitchell claimed to be a divinely-revealed schedule, approximately every other night was set aside for Mitchell to spend with Barzee, but there was never "an actual 24-period that he wasn't able to rape" Elizabeth.  (*Id.* at 15.)

During one of the times set aside for Barzee to receive Mitchell's attentions, Mitchell took Elizabeth away from camp to an underground stream to get water. (10/01/09 Tr. at 15.)  On the way, Mitchell turned to Elizabeth and told her he needed to have sex with her right then and that "nobody would find out."  (*Id.*)

Mitchell never received a revelation that he should give up anything, such as sex, alcohol or drugs.  (10/01/09 Tr. at 19.)  Mitchell never undertook a religious fast (except when they had no food to eat) nor did he ever refrain from speaking for long periods of time.  (*Id.* at 19-20.)

-11-

In retrospect, Barzee agreed that Mitchell was insincere in his religious belief and was instead manipulative and deceitful:

> WELNER:   Okay.  Now, we talked before about manipulation, and we talked before about your--your own faith.  Now, as--as we meet today, when you reflect on Brian Mitchell, do you feel that his faith was actually false?
>
> BARZEE:   Yes.
>
> WELNER:   Can you explain uh--how you see it now?
>
> BARZEE:   Well, he--he refers to um--that he believes he's the mouthpiece of God, that he is a true prophet.  And uh, yeah, that he has all the keys of the kingdom to do whatever the Lord wills him to do.
>
> WELNER:   What do you think?
>
> BARZEE:   I think that he's false um–
>
> WELNER:   Do you think that he thinks he's false?  Do you think he['s] real--do you think that he knows in his heart that he's manipulative?
>
> BARZEE:   I think he knows in his heart that he's manipulative. . . . Um–it's very subtle.  He's extremely deceitful, I think.

(Gov't Ex. at 17g.)

### 5.   *Capable, Intelligent and Deceptive*

Elizabeth testified that Mitchell was always quick on his feet and lied easily. (10/01/09 Tr. at 34.)  He had the ability to adapt to his surroundings and talk his way out of any situation.  (*Id.* at 37-38.)  He was a convincing liar and Elizabeth had the impression that Mitchell enjoyed fooling others.  (*Id.* at 32-34.)  Mitchell would laugh at

-12-

the way others thought they were so smart, while he "could dance circles around them." (*Id.* at 32.)

Indeed, Elizabeth recognized that Mitchell was very capable and intelligent. (10/01/09 Tr. at 33-34.)  He had the ability to argue on his behalf and was forceful and determined in an argument.  (*Id.* at 38.)  Elizabeth observed that Mitchell thought highly of himself and always had to be right.  (*Id.* at 17 & 32.)  He held himself out as an authority on every topic, whether religious or not.  (*Id.* at 32-33.)  Mitchell spoke about how people thought and mentioned reading books on subjects such as hypnosis.  (*Id.* at 38-39.)  Mitchell spoke about his experiences and knew a great deal about many different subjects.  (*Id.* at 34.)  In particular, Mitchell had knowledge of the legal system and explained what would happen if he were apprehended.  (*Id.* at 42.)

Mitchell knew that what he was doing was against the law and was determined not to get caught. (10/01/09 Tr. at 35, 42 & 68.)  He gave Elizabeth specific instructions on what to do if they were confronted by law enforcement.  (*Id.* at 35.)  He instructed Elizabeth to give her name as Augustine Marshall and to refer to him as her father and to Barzee as her mother.  (*Id.* )  He told her to tell anyone who asked that they were traveling ministers with no permanent address and that she was home-schooled.  (*Id.* )  Mitchell would quiz Elizabeth on what she was to say if they were ever confronted.  (*Id.* at 37.)  Mitchell himself used different aliases during the time he held Elizabeth.  (*Id.* at 36.)

Besides Immanuel David Isaiah, Mitchell also used the names Peter Marshall, David Shirlson, and Michael Jensen.  (*Id.* at 36-37 & 61.)

Mitchell never introduced Elizabeth as his wife.  (10/01/09 Tr. at 37.)  Elizabeth never observed Mitchell tell anyone besides her and Barzee that he had been commanded to marry several young girls and that he was to plunder or steal his brides.  (*Id.*)  There was never a time when Barzee or Elizabeth had to intervene on Mitchell's behalf because he was out of control, bewildered or confused.  (*Id.* at 30 & 32.)

During the nine months of her captivity, Elizabeth, Barzee and Mitchell encountered a number of individuals.  Not one of the people they encountered ever suggested that Mitchell needed professional help or that he should be taken to a hospital.  (10/01/09 Tr. at 33.)

### 6.    *Turning Religion On and Off*

Elizabeth observed that Mitchell was manipulative and turned religion on and off in order to get the things that he wanted.  (10/01/09 Tr. at 21 & 23.)   For example, he used religion as a means to get his basic needs met.  (*Id.* at 17-18.)  It served Mitchell well in panhandling, as people responded generously to his appearance of humble spirituality.  (Gov't Ex. 20 at 13.)  Mitchell also befriended a young man at a grocery store, who would help Mitchell steal food by not passing the items over the scanner at check-out.  (10/01/09 Tr. at 21-22.)   Although the young man drank alcohol and used drugs, Mitchell "never condemned him for doing it."  (*Id.*)  Mitchell spoke to the young

man about religion and spirituality and how "God is no respecter of persons." (*Id.* at 23.) In Elizabeth's estimation, it was because of Mitchell's acceptance that the young man was willing to help him. (*Id.* )

Mitchell also used religion when confronted by a police officer in the Salt Lake City library. (10/01/09 Tr. at 31 & 60.) When the officer asked Elizabeth to remove the veil and head covering that Mitchell made her wear, Mitchell told the officer that wearing the veil was part of their religion and that there was no possible way she could take it off. (*Id.* at 30-31.) Mitchell managed to convince the officer that Elizabeth was his daughter visiting from a school back east and they were allowed to go on their way. (Gov't Ex. 20 at 12.)

After being confronted by the police officer in the Salt Lake City library, Mitchell and Barzee took Elizabeth to southern California. (10/01/09 Tr. at 26.) Using the money Mitchell had collected panhandling, they traveled by bus with Elizabeth disguised in a veil that now included a translucent cover over her eyes. (*Id.* at 12.) Upon arriving in Lakeside, California, Mitchell began "looking for another young girl to kidnap, and he went to an LDS ward posing as an investigator," that is, a person who is interested in learning about the LDS church. (*Id.* at 17 & 52.) Instead of his religious robes, Mitchell donned regular Western clothing and tied back his long hair and beard. (*Id.* at 24.)

In this way, Mitchell "used religion to get into the home of the Kemp family." (10/01/09 Tr. at 17.) On December 8, 2002, Mitchell attended an LDS church service and

-15-

study group led by Virl Kemp.  (Gov't Ex. 20 at 13.)  Kemp did not make any connection

between Mitchell and the man in robes he had seen walking in Lakeside a few weeks

before. ( *Id.*)  Mitchell represented himself as someone unfamiliar with the Mormon faith

and Kemp invited Mitchell to his home for dinner with some LDS missionaries.  (*Id.* at

13.)

At the dinner, Mitchell introduced himself as Peter, said that he was traveling

alone, and provided a back story about having a family in the east where "everything had

fallen apart."  (Gov't Ex. 20 at 13-14.)  Mitchell was rational, composed and polite.  (*Id.*

at 14.)  He did not preach and "'there was nothing shocking he revealed about his beliefs

or habits.'"  (*Id.* )  Religion was discussed and Mitchell "'pretended, quite well, to know

nothing about the Mormon faith.'"  (*Id.* at 13-14.)  Mitchell later boasted to Elizabeth that

he had the Kemps deceived.  (10/01/09 Tr. at 35.)

While at the Kemp home, Mitchell saw a picture of their 12-year-old daughter.

(10/01/09 Tr. at 17; Gov't Ex. 20 at 13.)  Mitchell asked about the girl and was told that

she was Mrs. Kemp's daughter from a previous marriage who spent every other weekend

and every Wednesday with the Kemps.  (10/01/09 Tr. at 24-25.)

Sometime in February, Mitchell returned to the Kemp home at night dressed in

dark clothes in an attempt to kidnap their daughter as he had kidnaped Elizabeth.

(10/01/09 Tr. at 53; Gov't Ex. 20 at 14.)  Mitchell looked for a way to get into the house,

but everything was locked.  (10/01/09 Tr. at 53.)  He eventually found an unlocked

window or sliding door, but as he began to open it, he heard a loud snoring.  (*Id.* )
Fearing that an older male was inside, Mitchell left.  (*Id.* )  When he returned to camp, he
told Elizabeth and Barzee that "the Lord was just preparing him, that it was all in
preparation for the next young woman."  (*Id.* )

On another occasion, Mitchell, Barzee and Elizabeth were invited into the home of
a Seventh-Day Adventist.  (Gov't Ex. 20 at 78.)  "The family spoke about religion all
night, and Brian Mitchell simply agreed with the host."  (*Id.*)  "Elizabeth explained that
they needed a place to stay, and she felt [Mitchell]'s agreeable nature toward a contrary
ideology was affected in order to gain them lodging."  (*Id.*)

Like religion, Mitchell was also capable of turning his singing on and off and
would use it to manipulate people and situations.  (10/01/09 Tr. at 30.)  For example,
Mitchell would sometimes sing when he encountered people who did not agree with him.
(*Id.* at 25.)  According to Elizabeth, he sang when he wanted to sing, not because he could
not contain himself.  (*Id.* at 48.)  Elizabeth never saw Mitchell's singing get in the way of
something he wanted.  (*Id.* at 30.)  For example, he never burst into singing when he was
trying to secure sex, food, drugs, alcohol or transportation.  (*Id.* at 31.)  And Mitchell
never burst into singing when confronted by law enforcement.  (*Id.* at 32.)

### 7. *San Diego Court Appearance*

In mid-February, Mitchell told Barzee and Elizabeth that he was going down to the
town of Lakeside to "minister."  (10/01/09 Tr. at 27.)  Upon arriving in town, the first

thing Mitchell did was buy a beer from a convenience store.  (*Id.*) As he was walking

around Lakeside, he saw a woman pushing a cart containing some prescription

medication.  (*Id.*)  When the woman refused to share the medication with Mitchell, he

waited until she left the cart unattended and then stole the medication and took some of

the pills.  (*Id.*)  Mitchell broke into a nearby church where he passed out from the

combination of the alcohol and drugs.  (*Id.* at 28.)

 The next morning, Mitchell was awakened by police officers who arrested him for

trespassing.  (10/01/09 Tr. at 28.)  Mitchell was booked into jail and provided with an

attorney.  (*Id.* at 28-29.)  Mitchell's court appointed attorney, David Lamb, found

Mitchell to be "a pleasant, pathetic person, who showed no signs of aggression or

violence, and seemed very peaceful, friendly, and remorseful."  (Gov't Ex. 19 at ¶ 1.)

Mitchell understood why he was there, the process he was involved with, and that Mr.

Lamb was his attorney.  (*Id.* at ¶ 4.)  Mr. Lamb and Mitchell discussed the case and the

best way to proceed.  (*Id.* at ¶ 2.)  Mitchell would later tell Elizabeth that his lawyer was a

"bright, young man" who "advised him to plead guilty."  (10/01/09 Tr. at 29.)

 When Mitchell appeared in court, he confirmed that he understood the charges and

provided the judge with "very convincing and appropriate answers that happened to be

completely false."  (Tr. at 655-56.)  He used the alias Michael Jensen and characterized

himself as an itinerant preacher.  (Tr. at 653-54; Gov't Ex. 18.)  He provided no

information that would connect him to Utah, the mainstream or fundamentalist LDS faith,

or plural marriage. (Tr. at 653; Gov't Ex. 18.) He told the judge that he was traveling with his wife and daughter and that they were staying with friends in the area. (Tr. at 655; Gov't Ex. 18.) Mitchell presented himself "as a very repentant individual" and claimed that he had simply fallen off the wagon after not having a drink in 22 years. (*Id.*)

While the judge looked over Mitchell's case file, there was a prolonged silence, which is typically "very stressful when you're sitting there in a very high tense environment." (Tr. at 654; Gov't Ex. 18.) Rather than breaking into singing or causing some other disruption, Mitchell remained very quiet. (Tr. at 654; Gov't Ex. 18.) He not only tolerated the "very long, very uncomfortable silence," he "looked completely relaxed and comfortable." (*Id.*)

During the videotaped court appearance, Mitchell's behavior was entirely appropriate. (Tr. at 653-54; Gov't Ex. 18.) He did not express any rejectionist philosophy or claim that he was subject only to God's law. (Tr. at 939; Gov't Ex. 18.) Instead, Mitchell was respectful and deferential to the authority of the court. (Tr. at 939; Gov't Ex. 18.)

Although Lamb generally avoids having clients address the judge directly, out of fear that they could hurt their chances, "[n]othing Mitchell said sounded inappropriate and there was nothing that made Mr. Lamb think as Mitchell's lawyer that he should stop him." (Gov't Ex. 19 at ¶ 3.) At one point, when Mitchell began to explain about his ministry, Lamb interrupted and redirected him to answer the judge's question. (Tr. at

-19-

656; Gov't Ex. 18.)  Mitchell responded to his attorney and did exactly what he suggested.  (*Id.*)

Mitchell pleaded guilty and was released to return to the camp where Barzee was keeping guard over Elizabeth.  (Gov't Ex. 20 at 14.)

       8.   *Arrest*

Elizabeth realized that she was less likely to be found in San Diego, so she tried to convince Mitchell to return to Utah.  (10/01/09 Tr. at 58.)  Because Mitchell "had used religion to justify . . . pretty much anything he wanted to get away with," Elizabeth "decided to try to use his tactic."  (*Id.*)  She told Mitchell that she had a strong feeling that they needed to go back to Salt Lake City and suggested that they hitchhike so that she could have the experience of "sink[ing] below all things to rise above all things."  (*Id.*)

On March 3, 2003, the three began to make their way back to Utah.  (Gov't Ex. 20 at 15.)  As they passed through Las Vegas, someone reported to police that a young female wearing a wig and heavy makeup was traveling with a robe-clad older couple. (*Id.*)  When an officer responded, Mitchell told him he was a traveling "preacher."  (*Id.*) Mitchell told the officer that their names were Peter, Juliette and Augustine Marshall. (*Id.*)  The officer checked the names and dates of birth Mitchell provided against available records and allowed them to go on their way.  (*Id.*)

Meanwhile, Elizabeth's younger sister, Mary Katherine, had realized that the person she had seen take Elizabeth was "Immanuel," a man who had performed work at

-20-

their home.  (Gov't Ex. 20 at 15.)  A sketch of the suspect was released to the media along with information that "Immanuel" was wanted for questioning in the Elizabeth Smart kidnaping.  (*Id.*)

On March 12, 2003, Mitchell was spotted walking along State Street in Sandy, Utah, with two women dressed in robes.  (Tr. at 436-38.)  Sandy City Police Officer Troy Rasmussen responded and questioned the three individuals about their identities.  (*Id.*) Mitchell provided a false story and stated that his name was Peter Marshall and that Elizabeth was his daughter Augustine. (Gov't Ex. 20 at 15.)  Even when Officer Rassmussen directed questions toward Elizabeth and Barzee, Mitchell would answer. (Tr. at 437-38.)  As a result, Officer Rasmussen separated Mitchell from the group by taking him out of ear shot of the women.  (*Id.*)

During the ensuing private conversation, Mitchell would answer as a normal person would when asked general questions about his name, travels and companions, but would "go into character or persona like he was a preacher" when he was confronted or asked more direct questions.  (Tr. at 439-40.)  To Officer Rasmussen, it seemed that the more he cornered Mitchell with questions, the more he "would be evasive by saying religious things."  When other people came within ear shot, Mitchell "would go into his preacher persona."  (*Id.*)  Officer Rasmussen believed Mitchell "was being deceptive, and the more [he] questioned him and cornered him, caught him in the lies, he would

avoid answering the question and then pretended, started to pretend to be a street preacher." (Tr. at 444.)

Once the three were taken into custody, Elizabeth admitted her true identity. (Gov't Ex. 20 at 15.) Mitchell and Barzee were charged with kidnaping and sexual assault. (*Id.*)

B.      Relevant Life History

1.      *Adolescence*

Mitchell was born in 1953 to Shirl Mitchell, a social worker, and Irene Mitchell, a high school teacher. (Def. Ex. J at 1 & 8.) He and his five siblings were raised in the LDS church. (Def. Ex. J at 8.) His parents, however, were not especially active in church and his father professed religious beliefs that were decidedly out of the mainstream. (Gov't Ex. 20 at 51.) Shirl, who was educated in philosophy, wrote "a 1066 page tome entitled, *Spokesman for the Infant God and Goddess*," in which he "represented himself as a divine emissary." (*Id.*) Shirl was "a proponent of a regimented vegetarian diet as well." (*Id.*) Despite his eccentric beliefs, Mitchell observed that his father "put[] on a good show for people outside the home" and that, when Mitchell went to his office, he could hardly recognize his father at work. (Def. Ex. E at 2.) As an adolescent, Mitchell identified with his father, adopted his father's diet and took on the role of the "black sheep" of the family. (Gov't Ex. 20 at 51; Def. Ex. J at 8; Def. Ex. X at 4-5.)

Even as a young man, Mitchell was "very verbally skilled." (Tr. at 1032.)
Mitchell's sister described him as a "con man" who could "feed [her] a line and stick to it
for a long [time]." (Tr. at 1028-30.) He was also verbally and physically abusive at
home. (Gov't Ex. 20 at 52.) When he was referred for juvenile intervention at age 15, his
family characterized him as "cruel and sadistic toward his mother and siblings." (*Id.*)

Mitchell was described as creative and was known to accomplish grandiose
projects, like building a hot air balloon. (Def. Ex. X at 10.) Despite his bright mind,
Mitchell did poorly in school and dropped out of high school at age 16. (Gov't Ex. 20 at
52.) He later obtained his GED and completed 46 credit hours at the University of Utah
with a 2.6 grade point average. (Gov't Ex. 20 at 53.)

Sexual addiction was also a problem for Mitchell. (Tr. at 1031.) After dropping
out of school, Mitchell was arrested for soliciting sexual activity from his four-year-old
neighbor after he brought her into his home and instructed her to touch his penis. (Gov't
Ex. 20 at 52.) The probation officer assigned to the case became concerned that
Mitchell's behavior was "bordering on psychotic" and referred him to a psychologist.
(Def. Ex. X at 5; Gov't 20 at 52.)

The psychologist, Dr. Tanya Thomas, did not diagnose Mitchell with a psychotic
condition but with "Behavior Disorder of Adolescence." (Def. Ex. E at 7.) Dr. Thomas
worked with Mitchell from July until September 1970. (Gov't Ex. 20 at 52.) During that
time, a marriage counselor expressed concern that Mitchell "is an excellent manipulator

and he is very verbal and he is afraid that during the time that he has been working with Dr. Thomas that he will manipulate her to gain her confidence and try to use her against the family."  (Def. Ex. F at 4.)

Dr. Thomas described Mitchell as a young man "who rather immediately impresses you with his intelligence."  (Def. Ex. E at 2.)  She noted that he seemed to "immediately set up a climate of intellectual superiority relating in a logical, emotionally cool manner."  (*Id.*)  Mitchell "admitted that he knew the areas of psychological vulnerability of the other family members, and apparently he derives much satisfaction out of upsetting the other family members through physical and psychological threats of harm."  (*Id.*)  Dr. Thomas had the impression that "he is quite successful in his manipulative and controlling tactics."  (*Id.*)  "Although highly intelligent, he appears to be destructively using his perceptiveness at home to frighten and humiliate the other family members by pointing out their psychological vulnerabilities."  (*Id.*)

Dr. Thomas performed psychological testing that did not identify any sign of psychosis.  (Gov't Ex. 20 at 52.)  The testing revealed "only one significant elevation on the A-social Index."  (Def. Ex. E at 3.)  This score suggested that "there will be a continuation of the behavioral patterns established unless intervention is achieved."  (*Id.*)

2.     *Early Adulthood*

While Mitchell was still in his teens, his girlfriend, Karen, became pregnant. (Gov't Ex. 20 at 52.)  The two eventually married and had two children together.  (*Id.*)

Mitchell and Karen were heavily into drugs and both were described as irresponsible parents.  (Gov't Ex. 20 at 53; Def. Ex. X at 10-11.)  The two divorced in 1975 and Mitchell was awarded custody of the children.  (Gov't Ex. 20 at 53.)  When Karen remarried in 1977, she petitioned for reconsideration and the court awarded her custody in 1979.  (*Id.*)

After the court awarded custody to Karen, Mitchell kidnaped their two children and moved to the east coast.  (Gov't Ex. 20 at 53.)  During this time, Mitchell moved from place to place and continued to use drugs.  (*Id.*)  At one point, he lived with the Hare Krishna in West Virginia.  (*Id.*)  His second wife, Debbie, recalled that Mitchell later bragged "about how he fooled authorities for when he was not [back] east, he would hide in his mother Irene's home."  (*Id.*)

During this time, Mitchell wrote to his mother in Utah.  In a letter written in November 1977, Mitchell explained his choice to grow a beard and long hair:

> As for my beard and long hair, I think I'm more handsome without them, as well, however, that is not the image I'm after at the moment. Maybe I want to look like a serious fellow and there are other reasons as well, as you know I like acting, my hair and beard is part of a new act.

(Gov't Ex. 24.)

### 3.  *Return to Utah*

Around age 26, Mitchell returned to Utah.  (Gov't Ex. 20 at 54.)  He stopped using drugs, became active in the LDS church, and met his second wife Debbie.  (*Id.*)  In January 1981, Mitchell received the Melchizedek Priesthood in the LDS church.  (*Id.*)

The following month, he married Debbie.  (*Id.*)  Debbie wanted to marry in the LDS

church, but Mitchell "suggested they could not because he had a 'sexual problem.'"  (*Id.*)

When Mitchell married Debbie, she had three daughters from a previous marriage.

(Gov't Ex. 20 at 54.)  One of Mitchell's step-daughters later disclosed that Mitchell had

molested all three sisters.  (*Id.*)  She recalled that "she was repeatedly molested from

within weeks of the marriage, abuse which persisted from age 8-12, and her efforts and

those of her sister . . . were powerless to get him to stop."  (*Id.* at 56.)  According to his

step-daughter, Mitchell told her that no one would believe her if she told.  (*Id.*)

Years later, Barzee's sister, Evelyn Camp, found a photo of two young girls,

approximately seven or six years old, in a box of pictures belonging to Barzee and

Mitchell.  (Tr. at 238-240.)  The two girls were naked, had unhappy expressions on their

faces, and Camp found the photo very disturbing.  (Tr. at  239-40.)

Debbie was resentful of Mitchell's two children from his previous marriage and

the large family was under significant financial strain.  (Gov't Ex. 20 at 54-55.)  In 1983,

Mitchell decided to put his two children up for adoption.  (*Id.* at 55.)  Mitchell ultimately

"opted for foster care and adamantly refused to allow visitation by his mother, Irene."

(*Id.*)

Mitchell's mother and sister challenged Mitchell's decision, claiming he was

mentally ill.  (Gov't Ex. 20 at 54.)  An evaluation was completed by psychologist Randy

Oster on December 22, 1983.  (*Id.* at 55.)  The evaluator concluded that Mitchell was not

mentally ill.  (*Id.*)  Mitchell was allowed to relinquish custody of his children.  (*Id.*)  He and Debbie went on to have two more children of their own.  (*Id.*)

Mitchell and Debbie's marriage was tumultuous and marked by abuse.  (Gov't Ex. 20 at 55-56.)  Mitchell was controlling and frequently belittled Debbie.  (*Id.*)  He also preyed on her fears.  (*Id.* at 55.)  Knowing that Debbie was afraid of mice, he once returned home with a live mouse in a jar.  (*Id.*)  On another occasion, he left 50 dead mice in the oven neatly laid out on a cookie sheet for her to find.  (*Id.*)

Throughout his marriage to Debbie, Mitchell held himself out to be an active LDS church member – he talked like an active church member and accepted church callings. (Tr. at 252.)  However, his LDS Stake President Paul Mecham noticed that Mitchell did not attend church services with Debbie and did not perform the callings as a normal church member would.  (Tr. at 252-53.)

Mecham also noticed that Mitchell was adept at changing his behavior. When Mecham first observed Mitchell at church, he seemed easy going and quiet.  (Tr. at 250.) Later, in a social setting, he was surprised to see Mitchell being very outspoken, speaking loudly, gesturing and smiley faced.  (Tr. at 250.)  Then he noticed that the man to whom Mitchell was speaking was also exuberant and it "dawned on" Mecham that Mitchell was mirroring or mimicking the man's behaviors.  (Tr. at 250-51.)  As Mecham observed Mitchell over time, he discovered this pattern of mirroring was ingrained and allowed Mitchell to ingratiate himself with others quickly and effectively.  (Tr. at 251.)

Eventually, Mecham became aware of allegations of sexual impropriety concerning Mitchell and called him in for an interview.  (Tr. at 253.)  After a preliminary conversation, Mecham raised the issue of the allegations and used the word "improper."  (*Id.*)  Mitchell's normally relaxed demeanor changed "in a flash."  (*Id.*)  He "spoke loudly" to Mecham and within 60 seconds got up and left the office.  (*Id.*)  Within a few days, Mitchell had left Debbie and divorce proceedings were underway.  (Tr. at 254.)

During the divorce, Debbie alleged that Mitchell had sexually abused both of their biological children.  (Gov't Ex. 20 at 55.)  She claimed that their three-year-old son had told her that Mitchell had been masturbating him and that their one-and-a-half year old daughter asked her to tell Mitchell "don't owie my peepee anymore."  (*Id.*)  The evaluating case worker was unable to verify the abuse, but noted that Mitchell and Debbie's son was more sexually interested than would be expected of someone his age.  (*Id.*)  Mitchell later told Elizabeth that he had been accused of molesting his second wife's youngest daughter and that he was able to walkaway from that.  (10/01/09 Tr. at 39.)

### 4.  *Marriage to Wanda Barzee*

Mitchell met Wanda Barzee at an LDS divorce support group.  (Gov't Ex. 20 at 58.)  Barzee was a devout Mormon and an aspiring church organist, but had a myriad of personal problems.  (*Id.*)  Among other things, she just emerged from an abusive relationship to a controlling man and had a history of psychiatric problems.  (*Id.*)

Mitchell married Wanda Barzee in November 1985 on the day his divorce from Debbie became final.  (*Id.*)

> a.      Breaking Away from the Mainstream

After he and Barzee married, Mitchell became increasingly active in the LDS Church and held positions such as counselor in the stake mission presidency, member of the stake high council, and counselor in the bishopric of his ward.  (Gov't Ex. 20 at 59.) He was also an ordinance worker at the LDS Temple.  (Gov't Ex. at 58.)

Mecham, Mitchell's former stake president, was surprised to learn that Mitchell was attending the LDS Temple despite the fact he did not hold a temple recommend at the time he left Mecham's stake under a cloud of sexual abuse allegations.  Although it was Church practice for a moving member's new stake president or bishop to check with the member's former church leaders to ascertain worthiness, no such contact was made in Mitchell's case.  (Tr. at 254.)  Mecham was "amazed that with his background, he was able to obtain a temple recommend.  But he was very capable of keeping up a facade.  It was easy to see him as a good kid, he was polite, very normal, and handled himself well; it's understandable that he could lie and get himself over."  (Gov't Ex. 20 at 59.)

The more appointments he had in the church, the more Mitchell "related with a standing that was beyond what he had achieved."  (Gov't Ex. 20 at 58.)  Mitchell "'would push the limits of bounds, he would jump over others to do things,' and would undercut the LDS infrastructure to advance himself."  (*Id.*)

-29-

At home, Mitchell expressed anger at the church for not giving him a higher calling.  (*Id.*)  By the late 1980s, Mitchell was already referring to himself as a prophet.  (Tr. at 196.)  It "'became an excuse for anything they did because they were higher than that.  Being a prophet meant never admitting anything was wrong.'"  (Gov't Ex. 20 at 60.)

Mitchell began to experience a "deepening identification with fundamentalist LDS."  (Tr. at 896.)  He started attending the American Study Group ("ASG") meetings led by Sterling Allan.  (Tr. at 642; Gov't Ex. 5, Appx. A at 3.)  The ASG was "a fundamentalist LDS group" that was "way out on the edge of the LDS culture."  (Tr. at 644.)  Like other fundamentalist LDS groups, members of the ASG believed that the LDS church was "out of order" and that LDS scripture had prophesized that One Mighty and Strong would come to "set things straight."  (Gov't Ex. 5, Appx. A at 3.)  Indeed, Allan entertained the idea that he was the One Mighty and Strong and personally knows over 100 people who have made such a claim.  (Tr. at 644-55 & 1096; Gov't Ex. 5, Appx. A at 3.)

Mitchell also became involved with C. Samuel West of Orem, Utah.  While the West family regularly attended their LDS church, their beliefs and practices were outside that of the mainstream church.  (Tr. at 266-67.)  Dr. West, as he is known to his adherents, was "a naturopath proponent of his own school of healing called lymphology."  (Gov't Ex. 20 at 63.)   Lymphology focuses on "the role of the Lymphatic system in the body for draining out poisons and keeping the body healthy."  (Gov't Ex. 5, Appx. A at

3.)  The practice of lymphology involves massage, deep breathing, and bouncing.  (Tr. at 263-65.)   The theory is explained in Dr. West's book, *The Golden Seven Plus One*, which his family accepted as scripture.  (Tr. at 266.)  Dr. West founded the International Academy of Lymphology, which is not just a school of healing, "but an actual fundamentalist sect . . . that asserts to reflect the science behind Christ's miracles." (Gov't Ex. 20 at 64.)  Its "teachings were grounded in Mormon theology, [as] were some of its practices, such as giving testimony."  (*Id.* at 69.)

Aside from lymphology, the Wests also espoused fundamentalist LDS beliefs. They believed that Ezra Taft Benson was the last true prophet and that the LDS Church had gone astray.  (Tr. at 268.)  The Wests also believed the LDS church should actively be practicing the law of consecration[2] and polygamy.  (Tr. at 269.)

Mitchell was also "influenced by the Idaho-based Bo Gritz (whom he later characterized as a prophet) Patriot movement, which advocated individual freedoms, gun rights, not paying taxes, and living an undocumented lifestyle with no recorded address or social security number."  (Gov't Ex. 20 at 63.)  Mitchell even traveled north to visit the Bo Gritz group in Idaho.  (Tr. at 206 & 224.)

b.      Home Life

"The home of Wanda Barzee and Brian Mitchell was a study in things are not as they seem."  (Tr. at 894.)  Mitchell "always tried to put on an image for people, whether it

---

[2]  The law of consecration is "cooperative way of pooling resources" in a communal society.  (Tr. at 46-47.)

was church or with his co-workers." (Tr. at 182.)  Mitchell was involved in the church and "would represent a very benign and peaceful patina, but in the home there was everything from the mixture of pornography and open sex, and even solicitation to join in, to deprivation, restriction of privileges," and demands on the children.  (Tr. at 894.)

Mitchell's stepdaughter, LouRee Gayler, began living with Mitchell and Barzee in 1986 when she was twelve years old.  (Tr. at 181-82.)  She described Mitchell as "dominating" and recalled hearing her mother screaming at night as if she was being held down.  (Tr. at 189.)  She described how Mitchell and Barzee forced her to work and would not allow her to go anywhere except work and church.  (Tr. at 183.)  In the home, "[r]eligion was everything."  (Tr. at 187.)  Mitchell locked out the televison, forced them to fast, and insisted that they pray for hours a day.  (Gov't Ex. 20 at 60.)

While she was living at the home, Mitchell frequently did things that gave Gayler a "creepy," "eery feeling."   (Tr. at 183.)  Once while Gayler was praying, Mitchell put pornographic photos in front of her and nudged her so that she would open her eyes.  (Tr. at 191.)  Mitchell would "pierce [her] with his eyes" and would hug her in a way that she felt was inappropriate.  (Tr. at 183 & 190.)  He would also come into her room at night, pull her close to him, and caress her hair.  (Tr. at 190.)  Mitchell and Barzee would openly have sex and Gayler felt that they were trying to include her in their sexual activity. (Gov't Ex. 20 at 61; Tr. at 192.)

During the two years that Gayler lived with Mitchell, they moved three times.  (Tr. at 186.)  Gayler felt that the moves were an effort to conceal the abuse that was occurring in the home.  (*Id.*)  She left the home when she was fourteen, after Mitchell and Barzee served her pet rabbit for dinner and told her that it was chicken.   (Tr. at 192 & 194.) Barzee recalled Mitchell's reaction to fooling Gayler into eating her pet:

> BARZEE:     I kind of remember Brian gloating about the fact that--how LouRee didn't even know she was eating a rabbit, how she thought it was a piece of chicken.  And, you know, now that you mention the rabbit, I kind of remember how he gloated about that, how pleased he was that he got that across to her. And I remember how upset LouRee was when she found out the rabbit was killed, that she'd actually eated it--ate it.
>
> WELNER:     What do you think he was gloating about?  What made him gloat about this?  Was it that he fooled her into thinking that it was chicken?
>
> BARZEE:     Yeah.

(Gov't Ex. 17g.)  Mitchell also shot the family's pet dog in the head and told his co-workers that he had killed his dog because his kids would not take care of it. (Gov't Ex. 20 at 60; Tr. at 391)

Barzee's children also remembered Mitchell as highly intelligent, disciplined and well read.  (Tr. at 184-85; Gov't Ex. 20 at 59.)  During the late 1980s, Mitchell spent a great deal of time at the library and studied topics such as self-sufficiency, wilderness survival, hypnosis and mind control.  (Tr. at 184-85; Gov't Ex. 20 at 59.)

c.      Performance and Behavior in the Workplace

From the mid-1980s until the mid-1990s, Mitchell worked as a die cutter at OC

Tanner.  (Tr. at 380.)  Mitchell's job entailed creating emblems in steel dies that were

then used to stamp logos on items such as pins.  There were never any quality issues with

Mitchell's work, which required him to be smart, detail oriented and patient.  (Tr. at

380-81 & 394.)

At OC Tanner, Mitchell would frequently talk about his religious views, including

his unique interpretation of LDS scripture and criticism of LDS church authorities.

(Gov't Ex. 20 at 61-62.)  Mitchell never used archaic language but used "[j]ust normal

vernacular" during these discussions.  (Tr. at 386-87.)  Although he had assumed the

identity of a prophet at home, he never referred to himself as a prophet or the Davidic

King at the workplace.  (Tr. at 387.)

At least one co-worker, Doug Larsen, "'shared the same dogmatic inflexible

views'" and found Mitchell to be "'devout, followed everything to the letter.'"  (Gov't

Ex. 20 at 61-62.)  Other co-workers, however, were upset by Mitchell's religious

discussions.  (*Id.*)  When other co-workers would argue with Mitchell about his beliefs,

Mitchell would begin to sing or read scriptures aloud to drown them out.  (Tr. at 386-87.)

When his supervisor, Garth Rosenlund, would intervene, Mitchell would bristle at being

told what to do, but would stop singing and disrupting the workplace.  (Tr. at 383-84.)

-34-

Mitchell also told Barzee that he sang loudly at OC Tanner to overpower the music that his co-workers would play.  (Gov't Ex. 17a.)  Barzee described Mitchell as proud and cocky when he told her that those he worked with at OC Tanner could not shut him up. (*Id.*)

Rosenlund never got a sense that Mitchell was disoriented or confused.  (Tr. at 387.)  He described Mitchell as a smart, rational person who appeared to have his faculties with him at all times and was never unstable.  (Tr. at 395.)  Rosenlund explained that Mitchell's singing was a "ploy" that he used when his co-workers annoyed him.  (Tr. at 388.)  Rosenlund's impression was that Mitchell knew what he was doing and chose to go out of touch so he would not have to participate.  (*Id.*)

Mitchell left OC Tanner to take a job at Historical Artifacts.  (Tr. at 1010.)  At his new job, he sang hymns while he worked, but there were no co-workers around to bother him.  (*Id.*)  Mitchell's boss found him to be a capable employee.  (*Id.*)  When Mitchell quit to take another job, he left on good terms and his boss would have been comfortable taking him back.  (*Id.*)

Mitchell left to go to work for Dr. West's International Academy of Lymphology. (Gov't Ex. at 64.)  In his new job selling lymphology products, Mitchell was required to spend a great deal of time "on the phone and interacting with people and having to be socially appropriate and having to engage them and having to manage complex dialogue." (Tr. at 1107.)  "Mitchell was so successful at promoting the lymphology, that, by his

account, he made as much as $14,000 in a month for Dr. West." (Tr. at 1106.)  Based on

Mitchell's ability to persuade and teach people about the benefits of lymphology, Dr.

West "would talk to [Mitchell] about running the academy for him." (Govt. Ex. 17b at

4-6.)  Barzee recalled that "Dr. West didn't have anybody else like Brian." (*Id.* at 4.)

### d.    Desire to Live Off the Grid

Long before Mitchell quit his job and adopted a homeless lifestyle, he had been

reading "literature about tax evasion, living below the grid and unaffiliated, and living in

sort of a survivalist kind of circumstance." (Tr. at 892.)  He "had been reading and giving

a lot of thought to the idea of not paying taxes, not having these kinds of financial

obligations, and in other ways of leading a more unaffiliated life." (*Id.*)  By the late

1980s, Mitchell was discussing his opposition to income taxes and expressed a desire to

be a "free man." (Gov't Ex. 20 at 63.)

Mitchell had ongoing financial problems.  In the late 1980s, Mitchell asked his

sister Laurie and her husband Scott Dean for help paying some bills. (Tr. at 208.)

Mitchell said they were having trouble paying rent, their phone bill and other obligations.

(*Id.*)  The Deans gave Mitchell a few hundred dollars for rent and also paid two phone

bills. (*Id.*)  They later learned from the landlord that Mitchell and Barzee never paid the

rent but had instead moved out of the house. (Tr. at 209.)

The Deans eventually located Mitchell and Barzee and went to their home, but

they were not invited in. (Tr. at 209.)  The next time they came to visit, the house was

dark and a neighbor told them that Mitchell and Barzee had already moved again.  (Tr. at 209-10.)

Mitchell displayed a pattern of trying to avoid his responsibilities.  (Tr. at 218.) He would default on the rent and bills, he would not maintain a relationship with his son, and he "would move, disappear and try not to have any contact at all" with family.  (*Id.*) Mitchell would "just try to get out of [his responsibilities] or walk away if it was uncomfortable."  (Tr. at 217.)  Mitchell himself later told Elizabeth how he walked away from his financial problems.  (10/01/09 Tr. at 39.)

In the mid-90s, he told Barzee's sister that he did not want to have a job, but wanted to live off panhandling as he had done when he was younger.  (Tr. at 237-38.) Eventually, Mitchell and Barzee began a "a gradual divesting of possessions" and moved into a fifth-wheel trailer.  (Tr. at 892.)  For a time, they relocated to Idaho "to live among naturalists and survivalists in an undocumented community where residents live off the land."  (Gov't Ex. 20 at 65.)  Their family did not view the change in lifestyle as irrational, but rather as financially motivated.  (*Id.*)  In the opinion of Barzee's mother, "They went homeless to stop paying child support and stopped working to avoid paying taxes and child support."  (*Id.*)

e.      Hitchhiking Across Country

In 1995, Mitchell and Barzee "took to the road, planning to visit sites of LDS historical significance and to seek 'rest and spiritual healing.'"  (Gov't Ex. 20 at 66.)

Barzee told one of her friends that they were traveling back east so that she could play organ recitals.  (*Id.*)  During their two year journey through the country, Barzee was "'impressed'" to observe Mitchell's "'mental awareness and alertness in his ability to find the way around by following maps and directions.'"  (*Id.*)  Mitchell and Barzee relied on the generosity of others, who would give them handouts, a place to stay, or transportation. (Gov't Ex. 20 at 66-67.)

When Mitchell and Barzee were en route to Nauvoo, Illinois, a site of significance to the LDS faith, they were invited into the home of Phyllis Koch.  (Gov't Ex. 20 at 67.) Mitchell told her that he and Barzee were Mormons and were traveling to the Northeast for Barzee to perform organ recitals.  (*Id.*)  Mitchell was very domineering and controlling toward Barzee and would not allow her to have ice water or any food except fruit because they were "cleansing their bodies."  (*Id.*)  Mitchell and Koch discussed religion, with Mitchell "criticizing her Catholic Church and revisiting the mistakes and failures of different Popes." (*Id.*)  During this discussion, Mitchell was not preaching and did not represent himself as a prophet. (*Id.*)  Koch did not experience Mitchell as "bizarre, irrational, disorganized, or disoriented." (*Id.*)

The couple did travel to the Northeast where Barzee played organ recitals.  (Gov't Ex. 20 at 67.)  They continued on to Florida and California and managed to earn enough money panhandling to travel to Hawaii.  (Gov't Ex. 20 at 67.)

f.      Parasitic Lifestyle

When Mitchell and Barzee returned to Utah in 1997, they "shifted their living situation from various rent-free situations, such as the West compound in Orem, where they would live for weeks or more at a time, or even longer with Mr. Mitchell's mother, or with Barzee's parents, or have periods of homelessness, in which they lived up in the mountains." (Gov't Ex. 20 at 68.)  Elizabeth explained that Mitchell and Barzee "took advantage of other people's generosity" and stayed with and "leached (sic) onto" people. (10/01/09 Tr. at 62.)  Mitchell and Barzee hitchhiked and traveled around during this time, but "would always come back and stay at someone's house for a while and then go out again." (10/01/09 Tr. at 63.)  When they took Elizabeth "was the first time that they stayed in a camp, so to speak, for an extended period of time . . . without outside help, without, like going back to his mother or his father or her mother." (*Id.*)

On September 21, 1997, Mitchell and Barzee formed the Seven Diamonds Plus One Study and Fellowship Society, which sought to emphasize the importance of seven texts – the Bible, the Book of Mormon, the words of LDS prophets, *The Golden Seven Plus One* by Dr. West, *Embraced by the Light* by Betty Eadie, *The Literary Message of Isaiah* by Avraham Gileadi, and *The Final Quest* by Rick Joiner – plus "inspired sacred music and song and the testimonies of all the humble followers of Jesus Christ by the power of the Holy Ghost." (Gov't Ex. 20 at 68.)  The date had significance as September

-39-

21st is the day Mormons believe Joseph Smith was visited by the angel Moroni.  (Tr. at 41-42.)

Mitchell approached Barzee's mother, Dora Corbett, about using her home as a meeting place.  Mitchell appealed to her by saying that it would be an opportunity for Barzee to play the organ for an audience.  (Tr. at 893.)  Corbett concluded that Mitchell was trying to establish some kind of sect and needed a place to attract followers.  (*Id.*)  When Corbett refused, Mitchell took Barzee and stormed out of the house.  (*Id.*)

In late 1997 and early 1998, Mitchell and Barzee stayed for several months at the West home.  (Gov't Ex. 20 at 68.)  Mitchell later told Elizabeth that the Wests had a policy of not turning away anyone in need and that he took advantage of that.  (10/01/09 Tr. at 69.)  Mitchell and the Wests had daily discussions about their shared religious views.  (Tr. at 270-71.)  The Wests admired Mitchell "as a man of selfless piety, someone who practiced as he preached, and who was willing to make sacrifices to the level of extreme conjured by scripture."  (Gov't Ex. 20 at 68.)  Mitchell assumed a subtle leadership role in the West family group and the Wests believed he was potentially the one who would lead the LDS Church back to the right path.  (Tr. at 269-70.)   At the time, Mitchell and Barzee "had built a handcart and urged the West family to join them in a life of renouncing material possessions."  (Gov't Ex. 20 at 69.)  Mitchell and the Wests ultimately diverged over the speed at which the law of consecration and polygamy should

be implemented, Mitchell wanting more rapid progress toward the implementation of these practices than the Wests.  (Tr. at 270.)

In late 1999 and early 2000, Mitchell and Barzee were staying at the home of Mitchell's mother.  (Tr. at 210.)  Mitchell and Barzee came and went, living out of their handcart, which they kept at the side of his mother's house.  (Tr. at 211.)  Although Mitchell had indicated that he and Barzee were just going to "do their own thing" and not bother anyone, Mitchell was frequently in the house "eating food, taking things, using things in the house, and such."  (*Id.*)  Barzee, on the other hand, spent almost all of her time in the handcart.  (Tr. at 212.)

Mitchell's family began to be concerned because his mother was "a very gentle and kind person, and if someone wants to take advantage of her, it's not difficult."  (Tr. at 212.)  They were also concerned about Barzee, who was "cooped up in a little hand cart."  (Tr. at 220.)  In the 1980s, Barzee had been a vivacious, active and upbeat person who was always smiling and happy.  (*Id.*)  "By 2000, she was very worn, rather withdrawn, not willing to chat a lot. Very few smiles. So, it was a much different Wanda."  (*Id.*)

One day, Mitchell announced to his family that he wanted everyone to start calling him David.  (Tr. at 213-14.)  Dean suspected that Mitchell owed someone money and decided to change his name to avoid the debt.  (Tr. at 232.)  Mitchell's sister Laurie laughed it off and said, "Well, you're always going to be Brian to me, so I'll just call you Brian."  (Tr. at 214.)  Mitchell said that he wanted to be David, but when Laurie again

refused, Mitchell relented.  (*Id.*)  Mitchell acted differently to other family members.  He would "insist that he be called David, and sometimes he wouldn't even speak to people."  (Tr. at 216.)

Mitchell told Dean that he was working on some new beliefs and was writing a book.  (Tr. at 214-15.)  Mitchell's beliefs were not what Dean "would consider radical or unusual" and "would have easily fit into . . .  a number of religions that are out there as far as not being too far off from what others believe."  (Tr. at 228.)  When talking about his beliefs, Mitchell never used archaic language or exhibited any distress.  (Tr. at 214-15 & 221.)

When Dean indicated that he was not interested in hearing Mitchell's religious ideas, Mitchell "was fine with it" and would usually move on to a different topic of conversation.  (Tr. at 215.)  Whenever Mitchell was challenged, he "would just back off on trying to put up whatever thing he was trying to get people to go along with."  (Tr. at 214.)  Mitchell seemed to feel "more comfortable if he had full control of what was going on, and when he didn't feel comfortable, he would withdraw," that is, "physically leave the conversation or the situation."  (Tr. at 216 & 226.)

The Deans never felt that Mitchell was mentally ill and needed medical help.  Mitchell "always seemed to be completely in charge of what he was thinking or doing or talking about."  (Tr. at 221.)  Mitchell was "very rational" and his "ideas were well thought out."  (Tr. at 233.)  He was never incoherent, illogical, confused or disoriented,

and there was never a time when Dean had to explain something that Mitchell did not understand.  (Tr. at 233.)  Dean testified that Mitchell "did not appear to me to be extreme or in any way outside of normal from my experiences with him.  He was consistent in the way he would act with me."  (Tr. at 226.)  The only real change that Dean ever observed was when Mitchell "decided to go into this back-to-basics lifestyle for us."  (Tr. at 228.)  Other than Mr. Mitchell's odd choice of lifestyle, there was nothing about the way he acted that seemed unusual or out of the ordinary.  (Tr. at 234.)  Another brother-in-law, Tom Holbrook, said that the idea of getting Mitchell psychiatric care was never even raised for discussion.  (Gov't Ex. 20 at 71.)

Barzee recalled that, throughout all of the years she and Mitchell were together, no one – not his family, friends, the various strangers they routinely encountered, nor the several police officers that questioned them – ever believed Mitchell had mental issues or referred him for psychiatric help.  (Govt. Ex. 17b at 1-2.)  Some people "felt that his faith was extreme and they couldn't relate to it, but nobody experienced him as psychotic or ill, sick."  (Tr. at 890-91.)

g.    Panhandling

During this time, Mitchell was unemployed and earning money by begging in downtown Salt Lake City.  (Tr. at 210.)  Mitchell told Dean that "he just wanted to get back to basics or a simpler lifestyle, more rustic, you know, not be caught up in society and all the worldly things, so he wanted to just take a simpler approach to life."  (Tr. at

213.)  When Dean encouraged  Mitchell to find work at a temporary employment agency or as a day laborer, Mitchell said that "he was working on something."  (*Id.*)  Holbrook observed that Mitchell made good money panhandling and did not pay income taxes.  (Tr. at 1035.)

"In downtown Salt Lake City, [Mitchell] and [Barzee] now became a familiar sight in their white robes, panhandling passers by."  (Gov't Ex. 20 at 71.)  After the terrorist attacks on September 11, 2001, however, passers by began to associate their dress with that of Osama Bin Laden, which was "accompanied by a drop in donations."  (Gov't Ex. 20 at 73.)  "This less charitable climate prompted them, according to [Barzee], to wear regular attire for the next several months."  (*Id.*)

Mitchell would sometimes beg for money around the Crossroads Mall in downtown Salt Lake City.  (Tr. at 275-76.)  Julie Adkison, a mall employee, testified that she was once engaged in a normal conversation with Mitchell when he suddenly changed his behavior as another person approached.  In an effort to obtain money, Mitchell threw his arms out and hummed or sang hymns.  (Tr. at 276.)  Adkison described Mitchell's change as "really unexpected" and recalled that it "really threw me off."  (Tr. at 277.)  When the person left, Mitchell put his arms down and resumed the normal conversation he was having with Adkison.  (Tr. at 278.)  Adkison observed that when Mitchell would change character, some people would put money in his outstretched hands.  (Tr. at 276.)

h.      Soliciting Plural Wives

On November 23, 2000, Mitchell "announced to [Barzee] that he had received the revelation that plural marriage was to be restored." (Gov't Ex. 20 at 72.)  He told Barzee that she "'must heed and obey the law of celestial marriage or suffer eternal consequences.'"  (*Id.*)  Barzee "ultimately encouraged him to fulfill this calling."  (*Id.*)

Mitchell later told Elizabeth about an African-American woman named Kelly whom he had hoped to make a plural wife.  (10/01/09 Tr. at 55-56.)  Mitchell said that Kelly was in her 30's and "wasn't practicing monogamy."  (*Id.* at 56.)  Mitchell had a relationship with her, but became angry when he caught her with another man.  (*Id.* at 53.)  Nonetheless, he invited her to spend the weekend with him and Barzee in their mountain camp, but she declined.  (*Id.* at 56.)

Mitchell also told Elizabeth that he had met a young woman named Julie who had run away from a polygamist family and knew a lot about the polygamist lifestyle. (10/01/09 Tr. at 56-57.)  Julie Adkison was born and raised in the Kingston polygamist community.  In August of 1999, when she was 19 years old, she left the community. Within the next year, she met Mitchell at the shoe store in the mall where she worked. (Tr. at 275.)  When she first met Mitchell, she told him that she had recently left the Kingston community.  (Tr. at 279.)  Mitchell decided that Julie was to be one of his wives.  (10/01/09 Tr. at 57.)

In the early part of 2001, Mitchell requested to meet with Adkison and she agreed. (Tr. at 278-80.)  Adkison, Mitchell, and Barzee went to a sitting area near the mall.  For the next four hours, Adkison sat between Mitchell and Barzee and listened while Mitchell did most of the talking.  (*Id.*)  Mitchell's focus during the meeting was on starting plural marriage in his family.  He did not state that he had received a revelation about polygamy, but instead indicated that it was "something that he and his wife had talked about and decided it was time to do."  (Tr. at 882.)  Mitchell was interested in Adkison because she might be receptive to the idea, having recently left a polygamist community.  (Tr. at 282.) Mitchell was also interested in Adkison's diamond engagement ring.  He told Adkison "to sell this ring and we could all live off it nicely for quite a few months."  (*Id.*)  Eventually, Mitchell directly propositioned Adkison to become his second wife, stating that God would direct her away from her fiancee and into plural marriage with him.  (Tr. at 284.) Adkison declined the invitation, but, based on her upbringing, she did not find Mitchell's views odd.  (Tr. at 293.)

Following Adkison's refusal, Mitchell claimed to receive a revelation to "plunder" girls ages 10 to 14 to be his wives because they were more malleable.  (Gov't Ex. 20 at 73.)  Prior to kidnaping Elizabeth, Mitchell would "minister downtown, looking for young women."  (Gov't Ex. 17d at 1.)  However, he was not able to determine where the girls lived.  For example, Mitchell tried to get on the same bus as a young girl he was targeting, but the girl became scared and got away.  (*Id*. at 1-2.)  Mitchell targeted other

-46-

young girls and "would stalk them and try to follow them."  Mitchell knew where

Elizabeth lived because he had worked at her house.  (*Id.* at 2.)

                i.     Excommunication

On April 6, 2002, Mitchell delivered his Book of Immanuel David Isaiah ("BIDI")

to his family members and close friends.  (Gov't Ex. 20 at 75.)  The date had significance

as April 6th is the date the LDS Church was founded.  (Tr. at 17-18.)  Mitchell acted

aggressively toward his mother and insisted that she must accept the BIDI or be

destroyed.  (Gov't Ex. 20 at 73.)  When Mitchell and Barzee became physical, his mother

obtained a protective order against them.  (*Id.* at 75.)

The family did not seek any psychiatric care for Mitchell, but instead turned the

BIDI over to the LDS Church committee on apostate activity.  (Gov't Ex. 20 at 76.)  The

family believed that the release of the BIDI was "just the next level of Brian 'just being

Brian,' creating a debate, getting people stirred and provoking their sensitivities."  (*Id.*)

After receiving the BIDI, the LDS Church initiated excommunication proceedings

against Mitchell and Barzee.  (Gov't Ex. 20 at 76.)  Mitchell's stake president located

Mitchell downtown and attempted to serve him with written notification, but Mitchell

"defiantly rejected him."  (*Id.*)  Mitchell told Elizabeth that the LDS church had called an

excommunication hearing and he just walked away from that by never showing up.

(10/01/09 Tr. at 38-39.)

The committee voted unanimously to excommunicate Mitchell.  (Gov't Ex. 20 at 76.)  A few days later, Mitchell kidnaped Elizabeth from her home.  (*Id.*)  Barzee recalled that Mitchell "acted totally surprised when he--when we were told to go forth in five weeks and that most assuredly we would obtain the wife on the 5th of June, he acted totally surprised that he was going to go get Elizabeth." (Gov't Ex. 17d at 2-3.)  In retrospect, Barzee realized that "he had it planned and--well, that he just knew who the--what he was going to do."  (*Id.*)

    C.    <u>State Custody</u>

        1.    *Post-Arrest Statements*

                b.    Initial Interview

After he was apprehended, Mitchell was questioned by two investigators in videotaped interview.  The interview was characterized by one expert as the "ultimate psychiatric stress test."  (Tr. at 651.)  Mitchell was on no medication and was not being treated for a psychiatric condition at the time he was interviewed.  (Gov't Ex. 20 at 16; Gov't Ex. 15 at ¶ 3.)  Yet during the interview, Mitchell's demeanor was calm, collected and confident.  (Tr. at 976-78.)  He sat slouched in his chair and, about 20 minutes into the interview, put his feet up on another chair.  (Ex. 16 at 19:26; Tr. at 976-78.)  His demeanor was "noticeably more relaxed than even the investigators" and he did not appear to be intimidated or in any distress when answering the investigators' questions.

(Tr. at 977-78.)  He was respectful to the authority of the officers and did not become angry or confrontational.  (Tr. at 990.)

Mitchell expressed his understanding that the investigators were trying to get answers they could use against him.  (Ex. 16 at 17:39 & 18:41; Tr. at 981.)  He reminded the investigators that he had the right to a lawyer and was acting as his own lawyer and defending himself.  (Ex. 16 at 17:08.)  He told the investigators, "Every single one of your questions are trick questions, every question is meant to trap me and you're lying." (Ex. 16 at 45:02.)

Although Mitchell generally engaged in a give and take with the investigators, he would not answer incriminating questions.  (Tr. at 982 & 986-89.)  When the investigators asked Elizabeth's age, Mitchell initially claimed it was irrelevant but then stated that she was 18.  (Ex. 16 at 16:26; Tr. at 976.)  When asked if he "married" her, Mitchell said that Elizabeth was sealed to him as his wife, but refused to say whether they had sex.  (Ex. 16 at 17:08.)  Later, when pressed, he denied that he ever had sex with Elizabeth.  (Ex. 16 at 58:05; Tr. at 997.)  When asked, "Did you take this girl out of her house at knife point," Mitchell refused to answer.  (Ex. 16 at 24:41; Tr. at 976.)  In response to repeated questioning, Mitchell would only say that he "received" Elizabeth as his wife.  (Ex. 16 at 36:35 & 44:42; Tr. at 986-89.)  He sidestepped questions about whether he had physically restrained Elizabeth by saying, "The whole world is in bonds and chains of wickedness."  (Ex. 16 at 51:35.)

When it was clear they were getting nowhere, one of the investigators changed his approach and told Mitchell that he had never met someone who actually read the Bible and sold all their worldly possessions.  (Ex. 16 at 46:26.)  Mitchell recognized the ploy and said, "I think now you've changed your tactics to use flattery because earlier you accused me of being anything but a servant of the Lord."  (Ex. 16 at 46:26.)  At another point in the interview, one of the investigators touched him on the shoulder, to which Mitchell calmly replied, "What is this leading to?"  (Ex. 16 at 58:54-59:15; Tr. at 996.)

The interview became increasingly intense and, after an hour and fifteen  minutes of questioning, Mitchell asked to use the restroom and get another drink of water.  (Ex. 16 at 1:17:55.)  After returning to the room, Mitchell closed his eyes and began singing as soon as the investigator started to speak.  (Ex. 16 at 1:23:30.)  For the remainder of the interview, Mitchell either sang, sat quietly with his eyes closed, yelled "Get thee behind me, Satan," or otherwise refused to engage in the interview.  (Ex. 16 at 1:23:30.)  The investigators eventually gave up and ended the interview.  (Ex. 16; Tr. at 998-99.)

b.    Subsequent Interviews

After the initial interview had completely broken down, FBI Special Agent George Dougherty and another FBI agent went into the interview room where Mitchell was alone with his eyes closed.  (Tr. at 404-05.)  During the initial interview, Agent Dougherty had been in another room watching on a monitor and reviewing the BIDI to learn more about Mitchell.  (Tr. at 404.)  The agents told Mitchell they would like to discuss the BIDI with

-50-

him.  Mitchell immediately engaged in conversation and asked Agent Dougherty if he read the entire book.  When Agent Dougherty said he had just skimmed through it and that he had some questions, Mitchell told Agent Dougherty he should read the entire book and then he would answer some questions.  (Tr. at 406.)

That night, Agent Dougherty read the entire BIDI.  On March 14, 2003, Agent Dougherty, accompanied by another officer, returned to the Salt Lake County jail to speak with Mitchell.  (Tr. at 407.)  Mitchell waived his *Miranda* rights and agreed to speak with the agents.  (Tr. at 408; Govt. Ex. 7.)  During the interview, Mitchell claimed Elizabeth could have returned to her family at any time.  He said he gave Elizabeth a different name and instructed her to use it if ever questioned.  (Tr. at 410.)  He was willing to talk about his past and openly shared his upbringing and several experiences.  (Tr. at 411-12.)  At the end of the interview, Mitchell again welcomed another visit from Agent Dougherty. (Tr. at 413.)

The next day, March 15, 2003, Agent Dougherty and the other officer returned and visited with Mitchell.  Mitchell again waived his *Miranda* rights, but did not want to discuss his case.  (Tr. at 413-14 & 419-20.)  Instead, Mitchell asked about what would happen to him in the legal process.  (Tr. at 414 & 418.)  Agent Dougherty explained in great detail what happens, step by step, in a federal case.  (Tr. at 415-16.)  Agent Dougherty described the conversation as an open dialogue; Mitchell continued to ask relevant questions throughout.  (Tr. at 416-17.)  It appeared to Agent Dougherty that

Mitchell fully understood the discussion and was especially inquisitive and attentive.  (Tr. at 417-18.)  During the conversation, Mitchell did not speak at all about religion.  Agent Dougherty described the conversation as like one between normal people.  At the end of the interview, Agent Dougherty again confirmed that it would be alright if they returned. (Tr. at 419.)

On March 17, 2003, Agent Dougherty and the officer returned and Mitchell again waived his *Miranda* rights.  (Tr. at 419-21; Govt. Ex. 8.)  During this conversation, Mitchell said that he knew the world would view him as "a child predator, sexual deviant and a monster" if he were caught.  (Tr. at 422.)  He said Barzee became very jealous of Elizabeth and was upset with the amount of time he spent with Elizabeth.  He said he had arguments with Barzee and that he would constantly have to console her, mostly by praying together.  (Tr. at 423.)  When Agent Dougherty asked about the break in at the home of Elizabeth's cousin, Mitchell shut down the interview and said he did not want to talk anymore.  That was the last interaction Agent Dougherty had with Mitchell.  (Tr. at 424.)

During the interviews, Mitchell came across as "[s]oft spoken, intelligent and extremely, extremely careful."  (Tr. at 427.)  He "was very careful about the way he answered the questions, almost like he was on a witness stand.  He thought about his answers very carefully, and he was very calculated."  (Tr. at 426-27.)  Agent Dougherty

-52-

testified that it is fairly unusual for someone being interviewed to be so careful with his answers.  (Tr. at 434.)

Agent Dougherty testified that Mitchell turned religion on and off "pretty regularly" during their conversations.  (Tr. at 435.)  Mitchell would deflect the tough, more direct questions by talking about the BIDI.  When that occurred, Agent Dougherty would ask the question in a different way, which sometimes worked in getting Mitchell to respond.  Mitchell would eventually realize what had happened and would smile at Agent Dougherty and say, "That was a good one, George."  Agent Dougherty would ask what Mitchell meant and Mitchell would say, "You got me to say that, and I didn't want to answer that."  Other times when Agent Dougherty would ask the question in a different way, Mitchell would say, "I know what you're trying to do."  (Tr. at 425.)

For example, when Agent Dougherty asked Mitchell if he had sexual intercourse with Elizabeth, Mitchell said it was not an appropriate question.  Agent Dougherty apologized and asked if they had gotten married, and Mitchell said they had.  Agent Dougherty asked about the marriage ceremony and then asked if they consummated the marriage.  Mitchell said they did.  A short time later, Mitchell said, "You got me to say something.  You asked it a different way, but you got me to say something."  (Tr. at 426.)

      c.      Additions to the BIDI

Within weeks of his arrest, Mitchell wrote a supplement to the BIDI in which he responds to the charges against him.  (Gov't Ex. 20 at 17.)  In an "addition to the Book of IDI" he writes:

> Yea Immanuel is accused of coming as a thief in the night and so will I come as a thief in the night. He is accused of taking by force a virgin daughter of Zion … is accused of humbling a virgin daughter of Zion and bringing her low in the dust and binding her to him with a cord that could not be broken ... accused of subjecting her to his will and to all his ways …
>
> … it is I, even Jesus Christ that has done by my righteous right hand all that which has truly been done unto ShearJashub and this I did that it might be for a sign and for a portent unto all the world … the only force that was used … was the force and power of my spirit and the only weapon … was my words in his mouth saith the Lord, and my words in Immanuel's mouth are sharper than a two edged sword …
>
> ... the holy spirit did work upon ShearJashub's heart and she did open the window for Immanuel to enter her home just before she retired to her bed on the night she was taken … the holy spirit did work upon the hearts of ShearJashub's earthly parents and they did invite Immanuel into their home, for in their spirits they knew ShearJashub would be taken by the hand of the Lord for a glorious purpose … Yea, shortly before ShearJashub was taken, her earthly parents removed the lock from ShearJashub's bedroom door and … turned off the security alarm to the back door of their home …
>
> ShearJashub did arise from her bed and did come forth upon hearing her Lord's command, for she knew in her heart, … that to disobey would cause the loss of great and eternal blessings for herself and for her family.
>
> ShearJashub followed Immanuel ... fell into the arms of Hephzibah with great joy and peace and exultation.  … ShearJashub and Hephzibah recognized each other … as the dearest and choicest of friends from all eternity, and behold, it was ShearJashub's wedding day!

And ShearJashub humbled herself before the Lord and in great faith and courage she gave herself unto her husband Immanuel.

Yea, and in truth, the only way that ShearJashub was bound was by the power of the Holy Spirit, confirming the truth of the words of God in her heart.

Yea, ShearJashub wore the key to unlock herself around her own neck, next to her own heart … False traditions were truly the only bonds she wore, and these bonds fell away in grace and truth and in a most miraculous way, and she was free!

... On the third day when ShearJashub's earthly family came up into the mountains searching for her and they called out to her, ShearJashub sat still with tears in her eyes, not because of any threat from Immanuel or Hephzibah, for there was none, and ShearJashub knew she could have called out and she would have been found, but … she knew the great sacrifice that I the Lord God Almighty had called upon her to make and she in great faith and courage remained silent.

Behold, thus saith your Lord and Savior Jesus Christ, ShearJashub's earthly parents knew in their hearts that ShearJashub was alright after she was taken … in their terrible weakness and great sorrow and grief, they gave into the tremendous weight of fear and doubt that the whole world pressed upon them and they began to suspect and accuse my true servant Immanuel.

(Gov't Ex. 1 at 26-27.)

The explanations given in this portion of the BIDI were different from the responses Mitchell gave to the officers after he was arrested.  (Tr. at 903.)  In addition, prior to his arrest, Mitchell never tried to convince Elizabeth that he had not used a weapon when he kidnaped her, that she held the key to unlock the cable that held her captive, that she could have gotten away whenever she wanted, that her parents had invited him into their home on the night of the kidnaping, that her parents had turned off

the security alarm and removed the lock from her bedroom door, that she had opened the window for him, or that she heard the Lord's command to go with him and complied. (10/01/09 Tr. at 40-41.)

>    2.    *State Proceedings*

>        a.    Behavior at the Jail

While being held at the jail, Mitchell experienced no distress that required clinical intervention.  (Gov't Ex. 20 at 19.)  Jail records describe him as coherent and lucid, without any irrational inferences or changes in mood.  (*Id.*)

Mitchell was bothered by other inmates who would say crass things or play music that Mitchell disliked.  (Tr. at 862.)  As he did at OC Tanner, Mitchell would sing loudly to drown them out.  (Tr. at 862.)  "At some point when these inmates had really upset him, [Mitchell] started getting up at 2:00 in the morning and singing at the top of his lungs, and they were furious."  (Tr. at 862.)  When Mitchell's cell mate asked him about the late night singing, Mitchell said, "I do it to retaliate."  (Tr. at 862.)

Since he was arrested on March 12, 2003, Mitchell has required no clinical intervention and has taken no psychotropic medications.  (Gov't Ex. 15 at ¶¶ 1-2.)

>        b.    Initial Competency Evaluations

Shortly after his arrest, Mitchell was referred to the Utah State Hospital for a competency evaluation.  (Gov't Ex. 20 at 20.)  Mitchell refused to speak to either Stephen

Golding, Ph.D., who was retained by the defense, or Noel Gardner, M.D., who was retained by the prosecution.  (*Id.*)

During Dr. Gardner's interview, Mitchell sat and "stared directly into [Dr. Gardner's] eyes with great intensity for a very prolonged period of time that was very uncomfortable."  (Tr. at 618.)  Dr. Gardner has "personally talked to hundreds if not thousands of psychotic patients during his career" (Tr. at 648), and that was something he had "never seen a psychotic patient be able to do"  (Tr. at 618).  Dr. Gardner "had the distinct impression that [Mitchell] was trying to intimidate [him] with the intensity of his stare directly into [his] eyes."  (*Id.*)

In September 2003, Dr. Golding opined that Mitchell suffered "from a disorder within the psychotic spectrum" and was incompetent to stand trial.  (Def. Ex. X at 41.)  Dr. Gardner diagnosed Mitchell with narcissistic personality disorder and concluded that he was competent to stand trial.  (Def. Ex. I at 25.)

c.      Plea Negotiations

In August 2004, Mitchell was engaged in plea negotiations with the state.  (Tr. at 1850.)  On August 31, 2004, both the prosecution and defense counsel stipulated that Mitchell was competent to stand trial.  (Tr. at 921-22; Gov't Ex. 20 at 22.)  Defense counsel represented that the stipulation was "based on information that we discovered while preparing for this case" and that the "information supercedes Dr. Golding's report."  (Gov't Ex. 20 at 22.)

On September 2, 2004, Mitchell was arraigned.  (Gov't Ex. 42; Tr. at 923.)
Mitchell did not sing or otherwise disrupt the proceeding.   (Gov't Ex. 42; Tr. at 923.)
When the judge asked how he intended to plead on each of the charges, Mitchell
responded, "Not guilty."  (Gov't Ex. 42; Tr. at 923.)

On September 16, 2004, Jennifer Skeem, Ph.D., who had interviewed Mitchell in
July and August 2004, submitted a report in which she opined that Mitchell was
competent to stand trial.  (Gov't Ex. 20 at 23; Tr. at 923.)  Although Dr. Skeem diagnosed
Mitchell with Delusional Disorder, she found that his competency abilities were not
significantly impaired.  (Def. Ex. J at 21-27.)  At the time of the report, Mitchell was
"engaged" and had even asked to review evidence against him, including the videotaped
interviews of Elizabeth and Barzee.  (Tr. at 1688.)

On September 17, 2004, the District Attorney's Office extended a plea offer that
would allow Mitchell to enter an *Alford* plea to aggravated kidnaping, aggravated sexual
assault, and aggravated burglary.  (Gov't Ex.  11 at 1; Tr. at 923-24.)  On September 23,
2004, the defense submitted a counteroffer proposing that Mitchell enter an *Alford* plea to
aggravated kidnaping and two counts of aggravated burglary, instead of pleading to the
aggravated sexual abuse charge.  (Gov't Ex. 11 at 1; Tr. at 923-24.)   The prosecution
responded by rejecting the counteroffer, reiterating the original offer, and setting a
deadline for acceptance of the offer by October 15th.  (Gov't Ex. 11 at 2-3; Tr. at 924.)

On October 13, 2004, defense counsel informed Dr. Skeem that Mitchell originally wanted to accept the offer, but was now concerned that the *Alford* plea was "appealing to the carnal man in him."  (Tr. at 1678.)  According to defense counsel, Mitchell "had mentioned waiting until trial and then pleading guilty to all charges, with the idea that he is guilty because he didn't carry this out in perfect faith to God."  (*Id.*)

On October 15, 2004, the defense sent a letter to the prosecution stating, "After fully advising Mr. Mitchell about your offer, he has authorized us to inform you that he will not accept your offer of September 27, 2004."  (Gov't Ex. 11 at 4; Tr. at 924.)  The defense stated, "We remain willing to resolve this case. . . .  We therefore re-submit our counteroffer and remain willing to engage in discussion regarding the terms of that offer. . . ."  (Gov't Ex. 11 at 4; Tr. at 924.)  On October 18th, prosecutors responded by rescinding the concessions made in the initial offer and giving Mitchell a deadline of October 22nd to either plead guilty to the charges or go to trial.  (Gov't Ex. 11 at 6-7; Tr. at 924.)

Defense attorneys met with Mitchell on October 21, 2004.  (Tr. at 925.)  That same day, they submitted a letter to prosecutors indicating that they had kept their client "fully informed of any plea offers" and that "the acceptance or rejection of any plea offer and when it occurs is in the sole discretion of our client."  (Gov't Ex. 11 at 8; Tr. at 925.)  The defense recognized that "there are instances where negotiations need to begin anew.  We are certainly willing to keep open that possibility."  (Gov't Ex. at 9; Tr. at 1041.)  The

letter mentioned nothing about "any psychiatric deterioration or concern about Mr.

Mitchell's mental state." (Tr. at 926.)

That same day, Mitchell's attorneys told Dr. Skeem that Mitchell "wanted to plead

guilty on all six charges." (Tr. at 1682.) Mitchell had reportedly told them that the "Lord

was giving him direction" and "wanted him to move forward as quickly as possible and

was hoping to have this completely wrapped up by December." (*Id.*)

The jail visitor logs show the defense team did not visit Mitchell again until

October 27, 2004. (Tr. at 927.) That day, defense counsel contacted Dr. Skeem again

and described Mitchell "as sort of rambling, religious." (Tr. at 1682.)

On October 29, Dr. Skeem re-interviewed Mitchell at defense counsel's request.

During the interview, Mitchell discussed the plea negotiations. (Tr. at 1047-48; Gov't

Ex. 28.) Mitchell was disappointed that the Smart family had apparently had a change of

heart about dropping the sexual assault charges. (Tr. at 1823-25.) He referenced a letter

from the prosecution indicating that the State was no longer willing to allow him to plead

to charges that did not include a sex offense. (Tr. at 1695 & 1834.) He referred to "the

letter and the counter plea, feeling that he should not accept the offer." (Tr. at 1694.) He

characterized the prosecution's letter as "hateful, condemning" and said that the Lord had

"revealed clearly drawn battle lines." (Tr. at 1695.) "We plead for mercy and they gave

none." (*Id.*) Mitchell explained that the federal government would prosecute if he were

not sentenced to at least 30 years on the state charges. (Tr. 1695 & 1838.)

Mitchell told Dr. Skeem that he wanted to bear his testimony and "the Lord said stronger still would be to go to trial." (Tr. at 1696.) Mitchell said, "My crucifixion is my testimony, like Christ." (*Id.*) He clarified that he would not die, but that the trial would "[d]estroy [his] character" and "[s]tir up the whole world's contempt with a lie." (*Id.*) Mitchell knew, "The jury will convict me." (*Id.*) He stated that the Lord would deliver him in nine years and that there were seven years left. (*Id.*)

After this interview, Dr. Skeem helped defense attorneys prepare a draft of a petition for inquiry into competency to proceed. (Tr. at 928.) Among other things, the petition, filed on November 9, 2004, asserted that Mitchell lacked the "ability to manifest appropriate courtroom behavior." (Gov't Ex. 37.) Up until this time, Mitchell had never behaved inappropriately in court. (Tr. at 930-31.)

The next day, Dr. Skeem met with Mitchell and told him that she believed he was incompetent. After that, he refused to speak with her. (Tr. at 1000.)

At his very next court appearance on December 2, 2004, Mitchell sang and shouted repentance. (Tr. at 932 & 1687.) Mitchell has sung at every court appearance since. (Tr. at 932.)

Dr. Skeem filed a second report on February 1, 2005, based on her evaluation of Mitchell on October 29th. (Def. Ex. K.) In her first report, dated September 23, 2004, Dr. Skeem addressed nine competency abilities and found Mitchell's level of impairment in seven areas to be "none," in one area to be "mild," and in one area to be "moderate."

(Def. Ex. J; Tr. at 731.)  In her second report, she concluded that, by October 2004, Mitchell's impairment in six of the nine areas had increased – one  to "moderate" and remaining five to "severe."  (Def. Ex. K; Tr. at 732-34.)  The report did not address the possibility that Mitchell's presentation might have changed because plea negotiations had broken down and he was facing the prospect of trial and conviction.  (Tr. at 933.)

> d.    State Competency Hearing

 A competency hearing was held in state court between February and July 2005. (Gov't Ex. 20 at 30.)  The evidence was limited to testimony about the reports from Drs. Gardner, Golding and Skeem.  (Gov't Ex. 20 at 30.)  During her testimony, Dr. Skeem erroneously testified that Mitchell began singing in October rather than December.  (Tr. at 1830.)  She also testified that she did not "know when plea negotiations shut down" and did not know much about the plea negotiation process at all.  (Tr. at 1832.)

On July 22, 2005, the state court judge issued an opinion finding Mitchell incompetent to stand trial.  (Gov't Ex. 20 at 30.)  The judge accepted the defense theory that Mitchell's religious ideas were delusional and rendered him unable to rationally assist his attorneys.  (*Id.*)  As a result of the decision, Mitchell was sent to the Utah State Hospital for competency restoration.  (*Id.*)

> 3.    *Utah State Hospital*

At the Utah State Hospital, Mitchell was assigned to area one of the forensic unit. On area one, patients each have their own bedroom and are free to leave their room at any

time and may also freely roam the unit.  When Mitchell was on the unit, there were three

televisions, an X-Box video game console, games and other activities for the patients.

(Tr. at 127-28.)  Mitchell seemed to be "very comfortable" at the hospital and did not

seem to be in a particular hurry to leave.  (Tr. at 322.)  During his stay, he gained 6

pounds.  (Exhibit 15 at ¶ 4.)

When Mitchell entered the hospital, special protocols were put in place as a result

of his status as a high profile patient, including restrictions on who could work on the unit

and protocols for ensuring Mitchell's safety.  (Tr. at 296-97.)  Charting procedures were

reviewed with the staff, who were reminded about "keeping their opinions out of it,

keeping it very objective."  (Tr. at 297.)  As a result of this training, at least one staff

member, Nurse Jane Jakeman, was not as detailed in her charting as she would have

otherwise been.  (Tr. at 357-58.)

Psychiatric technicians, or psych techs, spend far more time than other hospital

staff with the patients.  The psych techs are charged with the patients' day to day care and

supervision.  (Tr. at 125.)  In comparison, members of Mitchell's treatment team, were

supposed to meet with Mitchell just once a week.  (Tr. at 126.)

Psych tech Brigham Andrew was assigned to chart Mitchell's behavior during the

first few weeks of Mitchell's three-year stay at the hospital.  After those first few weeks,

Andrew's impression was that Mitchell "was competent and shouldn't be at a state

hospital. . . .  there was nothing in his behavior that suggested he was incompetent."  (Tr.

at 449-50.)  Andrew testified that if the first week of Mitchell's stay at the hospital had been recorded to show his conversations and behavior, "I don't believe his competency would even be in question."  (Tr. at 457.)

Mitchell was very high functioning when he entered the hospital and remained that way throughout his stay.  (Tr. at 129-30.)  He was self-sufficient and did not require any assistance.  (Tr. at 451.)  In contrast to other patients who were mentally ill, Mitchell "stood out in the fact that he was not actively psychotic and that he was very easily redirected."  (Tr. at 321-22.)  Mitchell showed no "indication that he was depressed or anxious or . . . any other major symptoms of mental illness."  (Tr. at 324.)  In fact, Judith Fuchs, who has worked with patients for over 40 years (Tr. at 368), described Mitchell as "the most normal patient I was ever around"  (Tr. at 365.)

### a.    Difference In Presentation to Paraprofessional Staff

Mitchell's treating physician, Dr. Paul Whitehead, described Mitchell as "fairly naive and inept" and characterized Barzee as the "more erudite of the two."  (Tr. at 1412-13 & 1448.)  When Dr. Whitehead interacted with Mitchell, he was frequently left with the impression that "this guy just isn't getting it."  (Tr. at 1415.)  Dr. Whitehead testified that, "if anyone allows him to speak for any length of time, it's really not going to make sense to people."  (Tr. at 1433-34.)  "[B]ecause of his social ineptitude, people lose interest in what he has to say and sort of move along and don't want to listen to him for

-64-

any length of time."  (Tr. at 1435.)  Another member of the treatment team, social worker

Greg Porter, described Mitchell as "boring."  (Gov't Ex. 20 at 45.)

As psych tech Cam McGarry observed, there were "two different Brian Mitchells."

(Gov't Ex. 20 at 45.)  Psych tech Andrew testified that Mitchell could have normal,

back-and-forth, casual conversations with anyone if he so chose.  Mitchell understood

"everything perfectly."  (Tr. at 450.)  McGarry had lengthy conversations with Mitchell

regarding Robert Jordan's *Wheel of Time* series.  (Gov't Ex. 20 at 45.)  Andrew talked to

Mitchell about his past and Mitchell told Andrew about his past drug use and some of his

experiences camping.  (Tr. at 453.)

Psych tech Tye Jensen described Mitchell as a "breath of fresh air."  (Tr. at 140.)

Jensen testified that he "could have conversations with [Mitchell] I couldn't have with

other patients," who "just honestly couldn't hold a deep conversation very long."  (Tr. at

140-41.)  One day, Mitchell described the book *Silas Marner* to Jensen for approximately

three hours.  (Tr. at 142.)  Jensen explained that Mitchell "went on to tell me this just

elaborate, exquisite description of the story.  And so when the hour was up, I was so

almost captivated by it, he was such a good story teller, he animated his voice between

going high and low, eye contact, he was very excited about it, and so for the next hour I

just told the other person I am - - look, I'll take your one-on-one watch, you know, so he

can finish telling me about this book."  (Tr. 142-43.)  Jensen further testified that "it was

just very kind of refreshing and was really almost entertaining.  He just painted a

beautiful picture of the book for me almost as if I had read it."  While describing the book

in detail, Mitchell did not talk much, if at all, about religion.  (Tr. at 143.)

b.        Ability to Negotiate for Self Interest

Mitchell would negotiate with staff for things he wanted.  For example, because

patients were limited to one snack, Mitchell would argue that he should have both a

banana and ice cream because a banana split was just one snack.  (Tr. at 453-54 &

466-67.)  He also successfully negotiated for things such as dental floss and movies.  (Tr.

at 468.)  When Mitchell learned that psych tech Fuchs frequented the Provo library, he

began approaching her about obtaining books for him.  (Tr. at 359.)  Fuchs acquiesced

and Mitchell became the only patient for whom she would check out books.  (Tr. at 359-

61.)

Mitchell was also able to negotiate complex television viewing arrangements.

Mitchell's low status level limited his television viewing to the day room.  Without a staff

member sponsor, a patient had to be at least level C to watch television in the kitchen and

level D to watch in the group room.  (Tr. at 132.)  Mitchell would figure out which shows

the patients wanted to watch, the patients' level, and which staff were available to

sponsor patients who did not have high enough levels to watch television in the kitchen

and group room.  He would even prepare flow sheets to negotiate with staff about

sponsoring the different rooms.  (Tr. at 132-34.)  Whenever Mitchell went to this extent,

he was successful in getting a staff member to sponsor the other rooms so he could watch his program in the day room.  (Tr. at 134.)

        c.      Interactions with Staff and Patients

Mitchell tended to come out of his room in the afternoon when the unit was staffed by mostly college students.  (Tr. at 305.)  The day staff had been there a long time and was an "older, mature crowd."  (Tr. at 304-05.)  Mitchell paid the most attention to the young women staff members who worked in the afternoons and evenings.  (Tr. at 305, 372 & 374.)

Mitchell "would always look and see who was around before he would come out" of his room.  (Tr. at 308.)  When he was in the common areas, he would watch "who was around" and "was always very particular as to noting that the staff weren't overhearing him."  (*Id.*)  Mitchell would talk very quietly or move to an area on the unit where he could not be overheard.  (*Id.*)  Psych tech Jessica Hardy observed that Mitchell "would act differently if he thought he were being observed."  (Gov't Ex. 20 at 45.)

Mitchell knew the schedules of the staff members with whom he enjoyed spending time.  (Tr. at 305.)  A staff member would be assigned to specific areas at certain times during their shift as part of a line rotation.  (*Id.*)  Nursing Director Leslie Miles recalled that "staff members commented several times [that Mitchell] knows exactly, he knows people's rotations and how they work."  (*Id.*)  Because Mitchell could anticipate staff

members' next rotation, he would sometimes wait for them in their next assigned area.
(*Id.*)

One of the young female staff members was psych tech Taryn Nielsen.  (Tr. at 306.)  Nielsen was a college student, but appeared much younger than her age. (*Id.*)  In fact, she was more "more adolescent looking."  (*Id.*)  Mitchell knew Nielsen's schedule and could predict where she would be on the unit during her shift based on her first line rotation.  (Tr. at 306-07.)  Staff members were concerned about Mitchell's interest in Nielsen and about possible grooming behaviors.  (Tr. at 307.)

The staff were also concerned about Mitchell's interactions with lower functioning patients.  Mitchell began spending time with a patient named James, who had schizophrenia and was very vulnerable and suggestible.  (Tr. at 302.)  James was "the only patient on the unit that had off-unit privileges and actually went out to work with an on grounds crew."  (*Id.*)  The staff was concerned that Mitchell was "selectively picking out James and James would be an easy target to getting access to things."  (*Id.*)

#### d.  Ability to Collaborate and Defer to Others

Mitchell also developed a close relationship with a patient named John, a "religious zealot" (Tr. at 169), who has been described "as Brian Mitchell on steroids." (Tr. at 1018.)  Mitchell's relationship with John was different than his relationship with other patients where "[h]e would always take the lead, take the charge, control the conversations."  (Tr. at 134.)  Instead, "John was the mentor and Brian was kind of taking

the lessons." (Tr. at 133.)  John would correct Mitchell and he "would take the criticism, the advice, into heart."  (Tr. at 135.)

Mitchell sought advice from John, about both religious and legal matters. (Tr. at 168-69.)  John would explain how things worked in the legal system and Mitchell would listen and take notes.  (Tr. at 168.)  Mitchell would ask questions and John would respond by taking out his legal papers and explaining them to Mitchell.  (Tr. at 169.)  Mitchell and John spent a lot of time talking to each other, and John generated a thirteen-page document containing the names of Elizabeth Smart and Brian Mitchell.  (Tr. at 345-346.)  Mitchell would sometimes talk to  John at the end of the hall where he was out of the staffs' hearing range.  (Tr. at 308.)

On one occasion, psych tech Tracy Killpack overheard Mitchell and John talking about how when a woman is given to you by God, like Eve was to Adam, you can do whatever you want with her.  (Tr. at 372.)   Killpack also overheard Mitchell and John discussing how if a woman does not call out for help when she is being raped, she is the sinner or the one in the wrong.  (*Id.*)

Mitchell changed his appearance and behavior in response to his association with John.  (Tr. at 345.)  Mitchell stopped wearing standard issue sweats and started wearing nice slacks and shirts.  (Tr. at 135-36.)  He even cut his hair and beard with a pair of fingernail clippers.  (Tr. at 135-36.)  Mitchell's interactions with other peers increased and he began watching a lot of movies and television.  (Tr. at 135-36.)  The only time

Mitchell attended the weekly unit meeting was when John moved to remove the unit president and Mitchell seconded the motion.  (Tr. at 469.)

Dr. Whitehead also observed that Mitchell "seemed to demonstrate an ability to trust and work with a treatment team which might be extrapolated as a capacity to work with his legal defender team. . . . "  (Tr. at 1466.)

e.      Understanding of the Legal Process

Mitchell demonstrated a full understanding of what both the prosecutor and defense were arguing during competency proceedings.  (Tr. at 1464.)  He also showed a sound factual understanding of court personnel and the functions they provide as well as the seriousness of his charges.  (*Id.*)

Mitchell understood how the hospital worked and once explained the hierarchy and each person's function to psych tech David Talley; Mitchell started with the psych techs "and he went up the line until he got to the governor."  (Tr. at 171.)  He also explained how the hospital fit into the legal system and that the function of the forensics unit was to help return people to competency.  (Tr. at 172.)  He explained the role of the courts and the attorneys and opined that it was a corrupt system because both sides just want to win. (Tr. at 172-73.)  He stated that he would not participate because "he would never be judged of man."  (Tr. at 173.)

Mitchell also showed an awareness and understanding of the involuntary medication proceedings that were underway in the state court.  One evening, right after

another patient had taken his medications, Mitchell caught him and asked how the medications made him feel.  (Tr. at 141-42.)  Mitchell explained he was asking "because most likely they're going to force me to take medications."  (Tr. at 142.)  A staff member also memorialized a conversation between Mitchell and his father about involuntary medication legislation in which Mitchell asserted that the law could not be applied to him ex post facto.  (Gov't Ex. 20 at 47.)  Social worker Porter noted that Mitchell "'asked pertinent questions about medication hearings without religious overtone.'"  (*Id.*)

Mitchell was observed advising other patients about competency hearings.  (Gov't Ex. 20 at 36.)  He also told a fellow patient, "'do not talk to judges – they can't condemn you if you don't speak.'"  (*Id.*)  Mitchell indicated that he would not talk to the media about his case because "'if they don't have any information, they can't hurt my case.'"  (*Id.*)  Mitchell would frequently have discussions with other patients while walking the halls but would stop talking when he approached the staff zone.  (Tr. at 138-39.)

f.     Selective Silence

Mitchell would often go through short periods of time when he refused to speak to staff.  (Tr. at 151-54.)  Mitchell began a prolonged "word fast" lasting approximately eighteen months the day following a staff comment to patient Eric.  (Tr. at 147.)  At that time, Eric and Mitchell interacted frequently; Eric would walk the halls with Mitchell and would listen to Mitchell talk.  (Tr. at 145-46.)  The staff members were just leaving a meeting at which they were congratulated for observing and documenting behaviors that

had resulted in proving that a patient was malingering.  (Tr. at 146 & 149-50.)  As they emerged from the meeting, one of the psych techs told Eric that as long as Mitchell kept doing what he was doing, they would be able to prove him competent, too.  (Tr. at 147 & 150.)  The very next day, Mitchell stopped talking.  (Tr. at 147.)

During this prolonged period of silence, Mitchell was still observed selectively speaking to other patients.  (Tr. at 148.)  For example, prior to the period of silence, Mitchell and a patient named Bernie would talk a lot and even laugh together.  When Mitchell stopped talking, he would pass notes to communicate.  Bernie did not like the notes and told Mitchell that if he had something to say to him, he should just say it. Mitchell would then talk with Bernie in the courtyard when no staff were present.  (Tr. at 148.)  Psych Tech Heather Houghton opined that Mitchell was silent around staff "'because he did not want staff to see he wasn't crazy, did not want them to see through his facade.'"  (Gov't Ex. 20 at 44.)

Mitchell would speak to staff, however, if he needed something, such as salt and pepper or hygiene items.  (Tr. at 300.)  Mitchell tried to avoid speaking by doing "some charades type thing" to indicate what he wanted.  (*Id.*)  Nursing Director Miles spoke to Mitchell and told him that the staff were not going to respond to that and that he needed to speak.  (*Id.*)  After that, the behavior was no longer a problem.  (*Id.*)

Mitchell never gave a religious justification for choosing not to speak.  (Tr. at 301.)

g.      Control Over Singing

When Mitchell returned to the hospital after being found incompetent, he reduced

his singing significantly.  (Tr. at 298-99.)  When he did sing, he could be redirected "very,

very, very easily."  (Tr. at 299 & 456.)  When staff expressed concern that Mitchell's

"singing was agitating some of our very mentally ill sensitive clients," Nursing Director

Miles told Mitchell that he was bothering other patients and asked him to stop out of

concern for his safety.  (Tr. at 299.)  After that, Mitchell stopped singing in the main hall.

(*Id.*)

There was a distinct correlation between Mitchell's singing and his court

appearances.  As a court date approached, Mitchell would begin to sing more frequently

at the hospital.  (Tr. at 377.)  When officers arrived on the unit to transport Mitchell to

court, he would start singing.  (Tr. at 299.)  When he returned following the court

appearance, Mitchell  "wouldn't sing when he came on the unit.  That was the end of it."

(Tr. at 299.)  Psych tech Fuchs found it "totally ridiculous" when, the very afternoon after

getting kicked out of court, Mitchell came up to her and gave her a note requesting a

book.  (Tr. at 363.)  Fuchs testified that Mitchell seldom had to be redirected from singing

at the hospital.  (Tr. at 362.)

Mitchell also used singing as a "defense mechanism."  (Tr. at 376.)  When other

patients would confront Mitchell, he would sing very loudly and the patient would walk

away.  (*Id.*)  When Mitchell did not want to listen to staff, he would either give them a

"stare down" look for a few seconds and then walk away or he would start singing.  (Tr. at 301.)  This allowed Mitchell to effectively control or shut down a conversation.  (*Id.*)

Psych tech Andrew followed the media reports about how Mitchell would begin singing right when he entered the courtroom and would get kicked out of court.  Andrew testified that Mitchell "wouldn't behave like that on the unit."  (Tr. at 456.)  On September 25, 2005, psych tech David Talley asked Mitchell why he sang in court.  (Tr. at 174-75.)  Mitchell responded that he would not be judged of man and would not participate in the process.  (Tr. at 175.)  Talley asked if he was "just disrupting the process on purpose," to which Mitchell responded, "yes, absolutely."  (Tr. at 175-76.)

During the state involuntary medication proceedings, Mitchell asked his treatment team whether his disruptions in court could be grounds to medicate him against his will.  (Gov't Ex. 20 at 47.)  Dr. Whitehead observed that Mitchell's singing is not a competency-limiting behavior and that Mitchell has the capacity to come into court and behave appropriately.  (Tr. at 1469-70.)

> h.      Lack of Religious Preoccupation or Sincerity

When Mitchell first arrived at the hospital, he largely spoke about religion, but it diminished over time.  (Tr. at 144.)  Mitchell's use of archaic speech also soon disappeared.  (Tr. at 144 & 298.)  Most staff members never heard Mitchell refer to himself as a prophet or the Davidic King, and those who did said it quickly stopped.  (Gov't Ex. 20 at 36.)

Mitchell typically engaged in "normal conversation like just kind of anybody else." (Tr. at 145.)  He also respected requests not to discuss religion.  When psych tech Fuchs first met Mitchell, he asked her what faith she was.  Fuchs told Mitchell that she never talked religion at work.  Mitchell honored her wishes and no longer talked to her about religion.  (Tr. at 355.)  When he would ask her for books, he did not use religious language.  (Tr. at 360.)

Even when Mitchell did talk about religion on the unit, he did not make grandiose claims.  For example, Mitchell spoke to psych tech McGarry about the works of LDS authors and about his time as an ordinance worker in the LDS temple.  (Gov't Ex. 20 at 46.)  Yet McGarry never heard Mitchell refer to himself as a prophet.  (Gov't Ex. 20 at 46.)  Mitchell frequently spoke with patient John about religion and the interpretation of scripture but there is no evidence that he ever claimed to be prophet when speaking to John.  (Tr. at 661-62.)  Mitchell never told anyone at the hospital that he was receiving divine revelation.  (Gov't Ex. 20 at 37.)

During his three-year stay at the hospital, Mitchell read dozens of books, yet he never asked for a religious text.  (Tr. at 361; Govt' Ex. 20 at 40-41.)  Although he watched countless hours of television and films, Mitchell only rarely watched a religious program.  (Tr. at 137 & 454; Gov't Ex. 20 at 38-40.)  After he began associating with John, Mitchell watched four to five hours of television per day.  (Tr. at 131.)  He particularly enjoyed the show *Charmed.*  (Tr. at 136-37 & 470.)  "And how."  (Tr. at

361.)  Nearly every day, Mitchell would spend hours watching the show, which had "[a]

lot of skin and witches."  (Tr. at 136-37.)  Nurse Jakeman also observed Mitchell playing

chess and testified that Mitchell was skilled enough to "beat" some of the staff members

and several patients.  (Tr. at 346.)

The hospital staff doubted Mitchell's sincerity because his behaviors were

inconsistent with his beliefs.  (Tr. at 348-49 & 374-75.)  Besides his preoccupation with

non-religious subjects, Mitchell was not very friendly and on several occasions would get

angry and swear directly at others.  (Tr. at 374-75.)

Nursing Director Miles has a masters degree in nursing and a psychiatric

speciality, teaches psychiatric nursing at Brigham Young University, and has worked in

psychiatric nursing for over 25 years.  (Tr. at 294-95.)  During that time, she has worked

with many patients suffering from delusional symptoms.  (Tr. at 309-10.)  In her

experience, delusional patients generally "stay very fixated particularly if it is a religious

delusion they -- they won't veer from their belief, you know, to the point of not drinking

water or not eating, you know, they'll stay very firm in it."  (Tr. at 310.)  A delusional

person will stay true to their delusion "and it doesn't change according to what context

they're put in if they're put in different situations."  (Tr. at 310.)  Patients with religious

delusions typically want to share their beliefs "with everybody at any cost" and "it is very

difficult to redirect them."  (Tr. at 310-11.)

-76-

In contrast, Miles observed that Mitchell would "change according to the situation." (Tr. at 311.) Mitchell would comply whenever the staff set limits, such as on his singing and his charades. (Tr. at 311-12.) Mitchell could also turn his singing and silence on and off. (Tr. at 311-12.) If these behaviors were a manifestation of an "encapsulated" religious delusion, Miles would expect the patient to "be set in their way in expressing it. If they were going to express it, they would have the same consistent behavior in all settings." (Tr. at 322.) In other words, they would act consistent with the delusion in a situation where the delusional system is engaged. (Tr. at 329.) Instead, Mitchell's "delusional system kind of came and went." (Tr. at 324.) If Mitchell was delusional, Miles would not have expected it to be so easy for Mitchell "to back down on it and be as changeable in his beliefs and his directions and his behaviors." (Tr. at 331-32.) Miles never saw Mitchell in any distress about his religious beliefs. (Tr. at 312.)

Mitchell was selective about the people with whom he shared his beliefs and "was very quiet about it and could be redirected." (Tr. at 311.) Mitchell "wasn't preaching in the dayroom," as occurs with some patients. (*Id.*) Miles observed that "as soon as you put a limit on him, that you weren't going to discuss it, he would shut down." (*Id.*) In Miles' 25 years of experience in psychiatric nursing, patients with a fixed religious delusion would persist, but Mitchell would stop. (*Id.*)

Dr. Whitehead similarly observed that Mitchell's "degree of conviction in his beliefs was not 100 percent. There were some gray zones there. He seemed to change his

beliefs over time. He wasn't necessarily fully preoccupied 24 hours 7 days a week with

his religious ideas." (Tr. at 1423.)

i.      Efforts to Avoid Finding of Competency

Nursing Director Miles testified that it is rare to have a patient who will not engage

in treatment. (Tr. at 323.) Most patients want to move on, but Mitchell "wouldn't

participate in any type of treatment, or any type of discussion that we could work with

him towards, you know, competency. It was his refusal that was a big red flag that he

was faking." (*Id.*)

At the hospital, rewards and incentives are determined by a level system. (Tr. at

128-32.) On one occasion, Mitchell asked psych tech Andrew how he could attain higher

levels to gain certain privileges. Andrew explained that his level advancement depended

on his behavior and participation in treatment. Mitchell responded that he would only

attend the groups the Lord would have him attend. (Tr. at 452.) Although Mitchell

attended other groups involving such topics as movies and geography, he never attended a

single competency restoration group. (Gov't Ex. 20 at 83, 11 & 150-51.) Miles

experienced Mitchell's refusal to engage in any competency restoration as manipulative.

(Tr. at 323.) "He seemed to be very comfortable" where he was. (*Id.*)

Mitchell refused to speak with Gerald Berge, Ph.D., who was charged with

periodically reassessing Mitchell's competence. (Tr. at 1000.) Dr. Berge told at least two

staff members that he would not find Mitchell competent if Mitchell would not speak

with him.  (Tr. at 1000.)  Mitchell told psych tech Talley that he understood Dr.

Whitehead's job and that he was "not going to participate in any of that."  (Tr. at 170.)

During his stay at the Utah State Hospital, Mitchell was overheard telling a patient,

"if people think you're crazy, then you can get away with more."  (Tr. at 338.)

4.    Federal Custody

In October 2008, the state court determined that Mitchell could not be involuntary

medicated to restore his competency.  (Gov't Ex. 20 at 47.)  With the case effectively

stalled in the state, the United States Attorney's Office proceeded with federal charges

against Mitchell.  (Gov't Ex. 20 at 47; Docket No. 6.)

1.    *Dr. DeMier's Evaluation*

The United States moved for a competency evaluation and requested that the

evaluation be performed in an in-patient setting by the Bureau of Prisons ("BOP").

(Docket No. 9, 18 & 23.)  Judge Samuel Alba subsequently granted the government's

motion and ordered the BOP to conduct a competency evaluation pursuant to 18 U.S.C. §

4241.  (Docket No. 26.)  Mitchell was transferred to the Springfield Medical Center, and

Richart DeMier, Ph.D., was assigned to perform the evaluation.  (Def. Ex. BB.)

Mitchell interacted with Dr. DeMier on his own terms.  (Tr. at 1582.)  During his

first interview, Mitchell refused to respond to almost all questions about his past.  (Tr. at

1577; Gov't Ex. 33a.)  Mitchell even refused to repeat Dr. DeMier's explanation of the

examination.  (Tr. at 1583.)  The bulk of Mitchell's responses were religious, even when

Dr. DeMier's questions did not touch on the subject of religion.  (Tr. at 1577.)  Mitchell

repeatedly responded to questions using archaic language such as "like unto him,"

"confirmeth" or "it mattereth not."   (Tr. at 1577-78.)

When Dr. DeMier asked Mitchell about his living arrangements at the Utah State

Hospital, however, Mitchell spoke in a clear and logical manner, used no archaic

language, and made no references to religion.   (Tr. at 1578-79; Gov't Ex. 33b.)  During a

later interview, Mitchell volunteered a description about the competency evaluation

process.  (Tr. at 1579; Gov't Ex. 33c.)  The description reflected an "accurate factual

understanding of the proceedings."  (Tr. at 1579.)  Dr. DeMier observed Mitchell to be

"articulate."  (Tr. at 1581.)

At the end of the third videotaped interview, Dr. DeMier challenged Mitchell

about why he used archaic language only occasionally.   (Tr. at 1580; Gov't Ex. 33d.)

Immediately after that exchange, the interview ended.  (Tr. at 1580.)  The very next time

Dr. DeMier attempted an interview, Mitchell refused to speak with him.  (Tr. at 1580-

81.)  Mitchell later spoke with Dr. DeMier again, but refused to speak on camera.  (Tr. at

1581.)

Mitchell told Dr. DeMier that he would be content to minister wherever the Lord

placed him, yet there is no evidence that he ever ministered to other patients during his

time at Springfield.  (Tr. at 1588.)  Near the end of the evaluation period, Dr. DeMier saw

Mitchell in the recreation yard where numerous patients were interacting.  (*Id.*)  Mitchell

was not ministering to other patients, but was sitting alone at a table reading.  (Tr. at 1589.)  He was reading not scripture, but an Isaac Asimov science fiction book.  (*Id.*)

During his interviews with Dr. DeMier, Mitchell claimed he had never spoken to his attorneys and would be even less likely to do so after the evaluation.  (Tr. at 1585.) However, he indicated that there was a man that he would like to have represent him who was a prophet and an expert in Constitutional law.  (Tr. at 1598.)  He explained that if he were to go to trial, the prosecutor would object to his testimony as irrelevant.  (Tr. at 1599.)  Mitchell also said he knew he would be convicted if he went to trial.  (Tr. at 1593.)  He never told Dr. DeMier that he wanted to be found competent or that he wanted to be martyred.   (Tr. at 1600.)

Based on his evaluation, Dr. DeMier authored a report concluding that Mitchell is suffering from paranoid schizophrenia and is incompetent to stand trial.  (Def. Ex. BB.)

### 2.    *Dr. Welner's Evaluation*

In the summer of 2008, the United States contacted Michael Welner, M.D., to assist in evaluating Mitchell's competency.  (Tr. at 800-01.)  Dr. Welner is a board certified forensic psychiatrist.  (Tr. at 757-59; Gov't Ex. 44.)  In 1992, he began practicing forensic psychiatry both in private practice and as a full-time attending physician at Bellvue hospital in Manhattan where he conducted complex evaluations of competency to stand trial.  (Tr. at 759-60; Gov't Ex. 44.)  In addition to maintaining a private practice, Dr. Welner is currently the Chairman of the Forensic Panel, a practice of

over thirty eminent physicians and forensic scientists based in New York City.  (Tr. at 778-79; Gov't Ex. 44.)  Dr. Welner has conducted competency evaluations on several hundred people charged with major crimes.  (Tr. at 763-64.)  He serves on the New York State Supreme Court's Panel of Highly Qualified Independent Psychiatrists who are appointed by the court to consult to both sides.  (Tr. at 766-67.)  He has also been retained as an expert witness or independent consultant by both prosecutors and defendants in dozens of significant and complex cases.  (Tr. at 764; Gov't Ex. 44.)

In addition to reviewing the materials relied upon by the prior examiners, Dr. Welner's efforts uncovered a substantial amount of additional information.  Among other things, Dr. Welner considered the observations of witnesses who had observed and interacted with the defendant, including the victim in this case, Utah State Hospital personnel, family members, former co-workers, church leaders, and other friends and acquaintances.  (Gov't Ex. 20 at 2-6.)  In forming his opinion, Dr. Welner relied upon at least 161 sources of information.  (*Id.*)

On April 28, 2009, Mitchell was transported to the federal courthouse to meet with Dr. Welner.  (Tr. at 493.)  Prior to the interview, Mitchell was quiet and compliant with Deputy U.S. Marshal Dan Burnett, who took Mitchell to the interview room and stayed to provide security.  (Tr. at 493.)

Dr. Welner was aware that defense counsel had previously expressed an unwillingness to allow him to interview Mitchell.  (Tr. at 833.)  Before the interview

began, Dr. Welner spoke with Mitchell's attorney, who indicated that the defense team had been talking to Mitchell for some time.  (Tr. at 834.)  The attorney indicated that the last time they spoke with Mitchell was the night before and that they anticipated that Mitchell would talk to Dr. Welner.  (Tr. at 834.)

When Mitchell entered the room, however, he already had his eyes closed, demonstrating that "he was shut down before the interview even started."  (Tr. at 840.) Mitchell kept his eyes closed through almost the entire interview, which "was reflective along with his silence of his intention to not participate in the interview."  (*Id.*)  Given that Mitchell's attorneys had resisted the interview, Dr. Welner surmised that either Mitchell "intended not to speak to me, or he was coached not to speak to me."  (Tr. at 843-44.)  Despite having his eyes closed, "Mitchell demonstrated a vigilance and a responsiveness" during the interview that showed "he was certainly alert and quite vigilant at all times."  (Tr. at 842.)

Dr. Welner initially attempted to engage Mitchell in different, non-threatening ways.  (Tr. at 844.)  When Mitchell responded by singing, Dr. Welner would simply turn to some work he had brought along.  (Tr. at 845.)  When Mitchell would stop singing, Dr. Welner would ask another question and Mitchell would begin singing another hymn. (*Id.*)  The singing became louder and more defiant and at one point Mitchell yelled out "repent."  (Tr. at 494 & 498.)  The outburst "startled" Deputy Burnett, who had always

observed Mitchell to be quiet and compliant.  (Tr. at 492 & 498.)  Dr. Welner perceived

Mitchell's behavior as "aggressive."  (Tr. at 861.)

After about 20 minutes or so, Mitchell's singing stopped entirely.  (Tr. at 845.)

For the next two to three hours, Mitchell did not engage in any singing at all.  (*Id.*)

Instead, he was "composed, alert, vigilant and quiet and behaving perfectly

appropriately."  (*Id.*)

Significantly, Mitchell maintained his composure "in an atmosphere of increasing

stress."  (Tr. at 845.)  In particular, Mitchell maintained his composure when Dr. Welner

played a videotape in which Elizabeth described her kidnaping and the sexual attack that

followed.  (Tr. at 846.)  The videotape was intended to simulate the act of confronting

one's accuser in court, which many defendants find to be the most stressful part of legal

proceedings.  (Tr. at 846-47.)

Mitchell's response to the videotape was "pretty striking."  (Tr. at 847.)  As the

video began to play on a television platform behind him, Mitchell "immediately swivelled

his chair, opened his eyes and very intently engaged the television in a very eager, leery

way."  (*Id.*)  Mitchell was "locked in" to the video.  (Tr. at 847 & 849.)  Although he was

already sitting quite close to the television, Mitchell scooted his chair even closer to the

screen.  (Tr. at 849.)  Mitchell's reaction reminded Dr. Welner of the descriptions of

Mitchell watching *Charmed* at the Utah State Hospital, where he would move right up

next to the television to watch the girls on the show.  (*Id.*)

-84-

As Elizabeth began to reveal details of the first sexual assault, Mitchell began to show more concern.  (Tr. at 854.)  Mitchell never displayed a reaction that was not congruent to what was being shown on the video, as a psychotic patient might.  (Tr. at 848-49.)  He was not "disoriented and disengaged, and there was no sign of confusion."  (Tr. at 864.)  As Mitchell watched Elizabeth describe what had happened to her, Mitchell was "quiet, composed, appropriate, not disruptive, [and] did not sing."  (Tr. at 854-55.)

Following the video, Dr. Welner raised the issue of Mitchell's pedophilia, the "elephant in the living room" that had not been broached by other examiners.  (Tr. at 856.)  Mitchell did not sing, but remained quiet and "perfectly appropriate," just as he had been for a few hours beforehand.  (Tr. at 856.)

Dr. Welner ultimately issued a 206-page report in which he set forth the extensive factual data he had collected.  (*Id.* at 6-79.)  The report was reviewed by two other experts in the field of forensic pshychology, David Walker, M.D., and Eric Drogin, J.D., Ph.D., "to ensure maximum diligence, objectivity in analysis, and adherence to [professional] standards."  (Gov't Ex. 20 at 206.)  Dr. Welner opined that Mitchell does not suffer from a psychotic illness and is competent to stand trial.  (*Id.* at 80-205.)

### 3. *Behavior in the Federal Courthouse*

When Mitchell is brought to the federal courthouse by the U.S. Marshals, he is very compliant and mild mannered.  (Tr. at 492.)  Mitchell always follows the deputies' directions and even anticipates what they want him to do.  (Tr. at 475 & 492.)

Outside the courtroom, the only difference between Mitchell and other prisoners is that Mitchell "walks around with his eyes half closed most of the time." (Tr. at 474.) Because the deputies do not "put hands on him to lead him around throughout the courthouse and throughout the cell block," Mitchell must have his eyes partly open in order to navigate. (*Id.*)

Mitchell has attempted to communicate with the deputies through gestures or by nodding his head. (Tr. at 475.) However, once the deputies inform him that he needs to answer verbally, Mitchell complies like any other prisoner. (Tr. at 475-76.) Mitchell will initiate conversation with the officers only when he wants or needs something. (Tr. at 476 & 492.) He never uses archaic, Biblical speech. (Tr. at 476 & 492.)

Mitchell sometimes sings outside the courtroom, seemingly when "he thinks he's being observed by somebody." (Tr. at 476 & 484.) However, Mitchell is quiet at the Salt Lake County Jail and does not typically sing in the marshal's holding cell. (Tr. at 484.) When Mitchell does sing, the deputies will ask him to stop if they need him to pay attention to what they are saying. (Tr. at 476-77.) Mitchell always complies. (Tr. at 476-77.)

a.     Initial Appearance

When Mitchell arrived at the courthouse for his initial appearance before Judge Alba, he was compliant, calm and quiet. (Tr. at 479.) Before entering the courtroom, Mitchell responded to all of the deputies' commands. (Tr. at 479-80.)

Once he entered the courtroom, Mitchell's behavior changed and he began to sing. (Tr. at 480.)  When Judge Alba took the bench, Mitchell began to sing louder.  (*Id.*)  Judge Alba ordered Mitchell to stop singing, but Mitchell would not comply.  (*Id.*)  Judge Alba then ordered the deputies to remove Mitchell from the courtroom and attempt to silence him.  (*Id.*)

At that point, Deputy Dan Juergens gave Mitchell a command to stand up.  (Tr. at 480.)  In response, Mitchell collapsed in his chair and "acted like he couldn't walk."  (Tr. at 481.)  Deputy Juergens and another deputy picked up Mitchell under his arms, a position that is very uncomfortable for a prisoner in shackles, and carried him from the courtroom.  (Tr. at 481-82.)  As soon as they were out of the courtroom, Mitchell stopped singing and began walking on his own.  (Tr. at 481.)

In the cell block, Mitchell complied when he was told to sit in a chair.  (Tr. at 482.)  He was quiet and compliant while the deputies gagged him.  (*Id.*)  The deputies gave Mitchell the option of walking back into the courtroom or being carried and Mitchell chose to walk.  (*Id.*)

Once back in the courtroom, Mitchell's behavior changed again and he began to sing through the gag.  (Tr. at 482.)

        b.     Interview with Dr. Welner

When Mitchell was brought to the federal courthouse for his interview with Dr. Welner on April 28, 2009, he was quiet and compliant as usual.  (Tr. at 493.)  In contrast,

at one point in the interview with Dr. Welner, Mitchell was disruptive and defiant.  (Tr. at 493-94.)

During the lunch break, when Mitchell was returned to the holding cell, he resumed his quiet, compliant demeanor.  (Tr. at 495.)  Mitchell tried to communicate with Deputy Burnett by gesturing, but when Deputy Burnett asked what he wanted, Mitchell said, "Can you get me a lunch?"  (Tr. at 495-96.)

After the interview was over, Mitchell was again quiet and compliant.  (Tr. at 496.) He was brought back down to the cell block and placed in the attorney/client booth to speak with members of the defense team.  (Tr. at 478.)  When Deputy Juergens would periodically check on Mitchell through the window, Mitchell had his eyes fully open and appeared to be having a normal conversation with counsel.  (Tr. at 479.)  After his counsel left, Mitchell continued to sit normally for a while, but as soon as he noticed that Deputy Juergens was watching him, Mitchell closed his eyes again.  (*Id.*)

### c.    Elizabeth's Testimony

Mitchell has never acted agitated or distressed in the cell block.  (Tr. at 477.) However, he did appear agitated when the deputies arrived to transport him to court on the day of Elizabeth's testimony.  (Tr. at 477-78.)

When Mitchell arrived in the courtroom on October 1, 2009, he was "singing very softly in a very kind of devout quality."  (Tr. at 650.)  He was singing hymns "generally reserved for deeply spiritual events" that were "filled with humility and submission to

God." (*Id.*) The courtroom, which had been bustling and noisy only moments before, "became suddenly quiet, and it's almost like he had the whole courtroom in his hands as they listened to him sing." (*Id.*)

Mitchell continued to sing until he was removed from the courtroom. (Tr. at 650.) As the deputies escorted him out, he suddenly stopped singing when he reached the witness stand and did not sing the rest of the way. (Tr. at 650-51.)

When Mitchell was taken back to the holding cell with the live audio/video feed, he sang and "acted out." (Tr. at 496.) Deputy Burnett testified that it was the only time Mitchell had acted out in his presence outside the courtroom. (Tr. at 496.)

That same day, Mitchell refused to come out of the holding cell to speak with his attorneys. (Tr. at 487-90.) Mitchell has, however, been observed talking to his attorneys on other occasions. (Tr. at 489 & 496.) In November 2009, for example, Mitchell spoke with his attorneys for over one hour. (Tr. at 497.)

## PROPOSED CONCLUSIONS OF LAW

### A.    Preliminary Legal Questions

#### 1.    *The Federal Standard for Competency*

"The Constitution forbids the trial of a defendant who lacks mental competency." *United States v. DeShazer*, 554 F.3d 1281, 1285 (10th Cir. 2009). The standard for competency to stand trial was articulated by the United States Supreme Court in *Dusky v. United States*, 362 U.S. 402 (1960), and requires that a defendant have a rational as well

as factual understanding of the proceedings and the ability to consult with counsel with a

reasonable degree of rational understanding.  The requirement of competency "has a

modest aim: It seeks to ensure that [the defendant] has the capacity to understand the

proceedings and to assist counsel."  *Godinez v. Moran*, 509 U.S. 389, 402 (1993).

Under 18 U.S.C. § 4241, a defendant is not competent to stand trial if "the court

finds by a preponderance of the evidence that the defendant is presently suffering from a

mental disease or defect rendering him mentally incompetent to the extent that he is

unable to understand the nature and consequences of the proceedings against him or to

assist properly in his defense."  *See also United States v. Parsons*, 967 F.2d 452, 455

(10th Cir. 1992).  "A defendant lacks the requisite rational understanding if his mental

condition precludes him from perceiving accurately, interpreting, and/or responding

appropriately to the world around him."  *Lafferty*, 949 F.2d at 1551.  "Although the facts

in each case vary, the circuits addressing competency after *Dusky*, including our own,

have used a sufficient contact with reality as the touchstone for ascertaining the existence

of a rational understanding."  *Id*. (citing cases).

A defendant is competent to stand trial if he "has sufficient present ability to

consult with his lawyer with a reasonable degree of rational understanding and a rational

as well as factual understanding of the proceedings against him."  *Cooper v. Oklahoma*,

517 U.S. 348, 354 (1996); *see also DeShazer*, 554 F.3d at 1283 (same); *United States v.*

*Herrera*, 481 F.3d 1266, 1272 (10th Cir. 2007) (same); *Lafferty v. Cook*, 949 F.2d 1546,

1550 (10th Cir. 1992) (same).   The fact that "a defendant suffers from some degree of

mental illness or disorder does not necessarily mean that he is incompetent to assist in his

own defense." *DeShazer*, 554 F.3d at 1286.

      In determining competency, this Court "'may rely on a number of factors,

including medical opinion and the court's observation of the defendant.'"   *United States*

*v. Boigegrain*, 155 F.3d 1181, 1189 (10th Cir. 1998) (quoting *United States v. Nichols*, 56

F.3d 403, 411 (2d Cir. 1995)).   "[T]he Court may rely on, in addition to expert testimony,

lay witness testimony concerning the [defendant's] rational behavior, and cross

examination of [defendant's] expert." *Bundy v. Dugger*, 675 F. Supp. 622, 634 (M.D.

Fla. 1987) (citing *United States v. Mota*, 598 F.2d 995, 998-1000 (5th Cir. 1979)).   Lay

witness testimony is especially important where the evidence indicates a defendant may

be malingering or manipulating the system.   *See, e.g., United States v. Gigante*, 925 F.

Supp. 967, 976 (E.D.N.Y. 1996) (relying on lay witness testimony to find that defendant's

"his actions and decisions were wholly inconsistent with the behavior observed by the

doctors . . . and that his motive for putting on a 'crazy act' for all those years was to avoid

apprehension by law enforcement"); *United States v. Birdsell*, 775 F.2d 645, 650-51 (5th

Cir. 1985) (affirming finding of competency based in part on the district court's reliance

on "the observations of those witnesses in long-term daily contact with the patient rather

than conclusions based on a relatively brief period of examination"); *State v. Robertson*,

932 P.2d 1219, 1224 (Utah 1997), *overruled on other grounds by State v. Weeks*, 61 P.3d

1000 (Utah 2002) (affirming finding of competency based in part on district court's

reliance of law witness testimony from a police officer, a nurse and a clinical worker).

The district court's determination of competence to stand trial is reviewed for clear

error on appeal. *DeShazer*, 554 F.3d at 1286. It is not clear error for a district court to

find a defendant competent by adopting the findings of one expert and discounting the

contrary findings of another. *Miles v. Dorsey*, 61 F.3d 1459, 1472-74 (10th Cir. 1995); *see*

*also Deshazer*, 554 F.3d at 1287 (citing *Mackovich*, 209 F.3d at 1232).

### 2.    *State vs. Federal Standards of Competency*

In *Godinez*, the Supreme Court stated that while the States are free to adopt more

elaborate standards than the *Dusky* formulation, the Due Process Clause does not impose

these additional requirements. 509 U.S. at 402. The State of Utah accepted the invitation

to adopt a more elaborate standard and in 1994 enacted a statute that requires competency

evaluators to address a lengthy list of psycholegal capabilities. In Utah state courts,

competency evaluators must analyze the defendant's ability to: (1) comprehend and

appreciate the charges or allegations against him; (2) disclose to counsel pertinent facts,

events and states of mind; (3) comprehend and appreciate the range and nature of possible

penalties; (4) engage in reasoned choice of legal strategies and options; (5) understand the

adversary nature of the proceedings against him; (6) manifest appropriate courtroom

behavior; and (7) testify relevantly, if applicable. U.C.A. § 77-15-5(4)(a). The evaluators

must also consider the impact of the mental disorder on the nature and quality of the

defendant's relationship with counsel, and address questions related to psychotropic medication. *Id.* at (4)(b) and (4)(c). In addition to these requirements, the statute authorizes the evaluators to consider "any other factors determined to be relevant by the experts." *Id.* at (4).

Utah's statute requires evaluators to conduct an analysis that is over and above what is mandated by *Dusky*. The capacity to "engage in reasoned choice of legal strategies and options," for example, is not found in *Dusky* or 18 U.S.C. § 4241. This language directs competency evaluators to essentially place themselves in the role of a defense attorney, consider the possible strategies and options available in a criminal case and then determine whether a defendant can make reasonable decisions about those variables. The Utah statute also invites evaluators to consider extra-constitutional abilities by permitting the consideration of any factors that the evaluators consider to be relevant. U.C.A. § 77-15-5(4).

The difference between the federal standard and Utah's statute is illustrated by the testimony of a defense witness who, as a forensic psychiatrist employed by the Utah State Hospital, is quite familiar with the statute and is charged with applying it in his daily practice. Dr. Whitehead described "the Utah state statute" as "somewhat supercharged over the *Dusky* standard" and opined that "many would read the Utah state statute as elevated over the *Dusky* standard." (Tr. at 1481.) Another defense witness, Dr. Golding, co-authored an article in which Utah's statute is described as having "the most

comprehensive range of psycholegal abilities to be addressed by evaluators." (Gov't Ex. 39, "Defining and Assessing Competency to Stand Trial," at 9).

Any elaboration or extra-constitutional requirement in the Utah scheme becomes important in the instant case because the defendant is already considered to be "close to competent" by the State hospital treatment team. (Tr. at 1461.) As Dr. Whitehead testified, Mitchell displays a number of competency abilities and may in fact be competent under a standard that does not mandate the same psycholegal capabilities as the Utah statute. (Tr. at 1482.)

Furthermore, once a defendant is determined to be incompetent under Utah's statutory scheme, the burden of proving competence shifts to the proponent of competence. U.C.A. §77-15-6(4). In other words, when a defendant is sent to the Utah State Hospital as incompetent, it is the hospital's obligation to garner enough evidence about each of the psycholegal capabilities in Utah's statute to overcome a presumption that the defendant is impaired in those areas. As Dr. Whitehead testified, the hospital must "build up a good case" to overcome the presumption. (Tr. at 1463.) This task becomes exponentially more difficult with a defendant like Mitchell, who refused to even speak with the competency evaluator, Dr. Berge. In his 2005 report, Dr. Berge wrote that he had "insufficient data to overcome the presumption." (Tr. at 1463.) In a letter addressed to the Third District Court, the Utah State Hospital clinical director explained

that, "[d]ue to the unwillingness of the patient to be examined, it is not possible to determine competency at this time."  (Tr. at 1464.)

In addition, the hospital anticipated that the high profile nature of Mitchell's case guaranteed that any assessment of competence would receive close scrutiny and create an "adversarial issue."  (Tr. at 1463.)  Dr. Whitehead testified that, based on his experience with the involuntary medication proceeding in *Utah v. Wanda Barzee*, he expected that even "relatively straightforward issues" in Mitchell's case would be "very contentious." (Tr. at 11-12.)  Dr. Whitehead also observed that Dr. Berge tends to be conservative.  (Tr. at 1462.)  In light of this, it is not surprising that the hospital took the conservative step of opining that defendant Mitchell's competency could not be determined without his cooperation.

### 3.    *Burden of Proof*

Congress has not explicitly addressed which party bears the burden of proving whether a defendant is competent to stand trial.  *See United States v. Wayt*, 24 Fed. Appx. 880, 883 (10th Cir. Nov. 27, 2001) (unpublished) (noting that the "federal statute providing for competency hearings does not allocate the burden of proof"); *see also United States v. Whittington*, 586 F.3d 613, 617 (8th Cir. 2009) (stating "Congress has not set forth which party has the burden of proving whether a defendant is competent to stand trial").  However, the federal statute does require the court to find "by a preponderance of the evidence that the defendant is presently suffering from a mental disease or defect

rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." 18 U.S.C. § 4241.  The directive that the court must find incompetence – rather than competence – by a preponderance of the evidence suggests that the burden would lie with the party asserting incompetence.

Nonetheless, the Circuits are split on the issue of who bears the burden of proof in a federal competency determination.  The Fourth Circuit places the burden of proof on the defendant to prove his incompetency.  *United States v. Robinson*, 404 F.3d 850, 856 (4th Cir. 2005) (finding that "[u]nder federal law the defendant has the burden, 'by a preponderance of the evidence [to show] that the defendant is presently suffering from a mental disease or defect rendering him incompetent").  In contrast, the Third, Fifth, Seventh and Ninth Circuits place the burden on the government to prove competence.  *See United States v. Teague*, 956 F.2d 1427, 1431 n.10 (7th Cir. 1992); *United States v. Frank*, 956 F.2d 872, 875 (9th Cir. 1991); *United States v. Velasquez*, 885 F.2d 1076, 1089 (3d Cir. 1989); *United States v. Hutson*, 821 F.2d 1015, 1018 (5th Cir. 1987).  The Eleventh Circuit has taken the position that "arguably [§ 4241] contemplates that the burden will lie with the party making a motion to determine competency."  *United States v. Izquierdo*, 448 F.3d 1269, 1276 (11th Cir. 2006).

The Supreme Court has not expressly resolved the Circuit split but has stated in dicta that the defendant bears the burden on proving his incompetence in a federal

proceeding.  In *Cooper v. Oklahoma*, 517 U.S. 348, 362 (1996), the Supreme Court held

that an Oklahoma statute requiring defendants to prove incompetence to stand trial by

clear and convincing evidence violated a defendant's due process rights under the

Fourteenth Amendment.  In the context of discussing the various burdens of proof

required by the states, the Supreme Court noted:

> Indeed, a number of States place no burden on the defendant at all, but
> rather require the prosecutor to prove the defendant's competence to stand
> trial once a question about competency has been credibly raised.  The
> situation is no different in federal court.  Congress has directed that the
> accused in a federal prosecution must prove incompetence by a
> preponderance of the evidence.  18 U.S.C. § 4241.

*Id*. at 361-62.

Citing *Cooper*, the Tenth Circuit has previously stated that the burden of proving

incompetency is on the defendant.  *See United States v. Sanchez-Gonzalez*, 109 Fed.

Appx. 287, 290 (10th Cir. Sept. 9, 2004) (stating that the "Government may presume the

defendant is competent and require him to shoulder the burden of proving his

incompetence by a preponderance of the evidence"); *United States v. Montoya*, No. 95-

8052, 1996 WL 229188 * 2 (10th Cir. May 7, 1996) (stating that the "burden is on the

defendant to prove incompetence by a preponderance of the evidence"); *see also United*

*States v. Smith*, 521 F.2d 375, 377 (10th Cir. 1975) (noting that the test for competency

"raises issues of fact as to which the defendant has the burden of proof").  However,

because the allocation of the burden of proof was not challenged in these cases, the Tenth

Circuit did not have occasion to grapple with the issue.

In *United States v. Wayt*, 24 Fed. Appx. 880 (10th Cir. Nov. 27, 2001), however, the defendant argued that the district court had committed plain error by allocating the burden of proof to the defense. The court held that it "need not resolve the question here, because the district court's allocation of the burden of proof did not affect the outcome of its competency determination." *Id.* at 883. The court noted that the "'allocation of the burden of proof to the defendant will affect competency determinations only in a narrow class of cases where the evidence is in equipoise, that is, where the evidence that a defendant is competent is just as strong as the evidence that he is incompetent.'" *Id.* (quoting *Medina v. California*, 505 U.S. 437, 441 (1992)). Because the evidence was not in equipoise, the allocation of the burden of proof had no impact on the district court's decision that the defendant was competent. *Id.*

The Second and Eighth Circuit have taken similar positions. In *United States v. Whittington*, 586 F.3d 613 (8th Cir. 2009), the Eighth Circuit recognized that "[g]uidance of the Supreme Court, and the recent precedent of this circuit, support the government's position that the burden is on the defendant to prove incompetence." *Id.* at 618. The court nevertheless declined to reach the issue because the "district court's finding of competency in this case did not depend upon the allocation of the burden of proof." *Id.* Similarly, in *United States v. Nichols*, 56 F.3d 403 (2d Cir. 1995), the Second Circuit declined to reach the issue given the district court's written finding that "its competency

-98-

ruling did not depend on whether the government or the defendant bore the burden of proof." *Id.* at 410.

Although the guidance from the Supreme Court and the Tenth Circuit suggest that the burden of proof rests with the defendant, the law on this issue is not settled.  This Court need not weigh in on the issue, however, as the evidence in this case is not in equipoise.  The allocation of the burden of proof would have no effect on this Court's conclusion as to the defendant's competency to stand trial.  *See United States v. Lyttle*, 2009 WL 2390608 * 6 (W.D.N.Y. July 31, 2009) (finding that "whether the Government or the defendant bears the burden would not change the Court's conclusion" as to defendant's competency to stand trial).

    B.    <u>Conclusions as to Mitchell's Competency to Stand Trial</u>

        *1.    Mitchell Has Voluntarily Chosen to Adopt a Fictitious Religious Persona to Control and Manipulate Others.*

Mitchell's religious persona is neither the product of mental illness nor the expression of sincere religious beliefs.  Instead, Mitchell seeks the power associated with religious authority and uses that power to achieve his own ends. As the following evidence demonstrates, Mitchell turns his religious persona on and off, lacks genuine religious devotion, and uses religion as a vehicle to control others and satisfy his antisocial desires.  In that way, Mitchell is no different from any other self-proclaimed leader of a religious cult who seeks the power associated with religious authority.

a.      Mitchell Turns His Religious Persona On and Off.

The most compelling evidence that Mitchell's religious persona is neither sincere nor the product of mental illness is his demonstrated ability to turn it on and off in self-serving ways.  (Tr. at 535.)  His use of his religious persona is strategic.  (Tr. at 746.) Depending on the vulnerabilities of his audience, he consciously changes the image he projects in order to serve his purposes.

Mitchell's history shows that he is adept at assuming different personas at will for self-serving reasons.  Paul Mecham, Mitchell's stake president during his marriage to Debbie, noticed that Mitchell had the ingrained ability to adapt his behavior to mirror the person to whom he is speaking.  (Tr. at 250-51.)  As Mitchell's stepdaughter LouRee Gayler observed, Mitchell was skilled at projecting a different image in different settings. (Tr. at 182.)  Despite his increasingly radical religious views and his alleged sexual abuse, he presented himself as a good Mormon and was so convincing that he managed to obtain significant positions in the church.  (Gov't Ex. 20 at 58-59.)  Mitchell himself once expressly acknowledged that he had made a conscious decision to assume a different persona that suited his needs.  When Mitchell was a young man panhandling back east, he wrote to his mother that a more clean cut look was "not the image I'm after at the moment."  (Gov't Ex. 24.)  Mitchell wrote,  "I like acting, my hair and beard is part of a new act."  (*Id.*)

Just as when he was a young man, Mitchell more recently donned robes, grew long hair and a beard, and assumed the role of a street preacher as "part of a new act." Mitchell's lifestyle was a deliberate choice to assume a self-serving persona.  "His writings, travels, religious persona of a 'suffering servant' who ministers 'without purse or script', is a studied attempt to claim legitimacy."  (Gov't Ex. 5 at 27.)  He also found that the image of a "humble spirituality" was an effective way to solicit handouts from passers by.  (Gov't Ex. 20 at 13.) Because this was merely an image, however, he could cast it aside whenever it was expedient.

Mitchell's encounter with Virl Kemp provides a vivid illustration of how Mitchell "like a chameleon can transform from the identity of Immanuel David Isaiah to Peter Marshall."  (Tr. at 880.)  Mitchell discarded his robes and "suffering servant" persona and "walked into an LDS home, clean, scrubbed, totally appropriate and . . . [did] not arouse any suspicion in a home full of LDS officials."  (*Id.*)  Mitchell concealed his connections to the LDS church, "asked innocuous curious questions and gave a fictitious story, was completely convincing, did not portray any abnormality, was not singing, was not doing anything unusual and even had gone so far as to tie down his beard so it would be that much neater and clean."  (*Id.*)  Most remarkable, Kemp had seen Mitchell wandering about in his robes "and his appearance was so dramatically different that he didn't even know it was the same person who had been in his home."  (Tr. at 881.)

When arrested for trespassing and brought before a judge, Mitchell dropped his Immanuel persona and claimed to be Michael Jensen, an itinerant preacher traveling with his wife and daughter and staying with friends.  Mitchell mentioned his ministry and referred to Jonah and the whale, which was consistent with his traveling preacher persona.  However, he carefully concealed his fundamentalist LDS beliefs and his rejectionist philosophy.  In order to secure his speedy release, he took his attorney's advice, projected the appropriate remorseful attitude, and behaved perfectly appropriately in court.

Moreover, "[i]t is clear from the record that Mr. Mitchell had the ability to 'turn off' his homeless persona and 'turn on' his clean cut 21st century persona, in order to work on Ed Smart's roof."  (Gov't Ex. 5 at 41.)  "Lois Smart didn't see him wearing [robes] when she met him and gave him the wherewithal to have work at the Smart home.  She experienced him as scrubbed, clean . . . someone who was down on his luck and who needed a job."  (Tr. at 1888.)

Not only does Mitchell change his persona, he does so in a way that exploits the vulnerabilities of his audience.  With the Kemps, he pretended to be "an individual exploring and looking for truth" because he "knows that the LDS people are always looking for seekers of truth."  (Tr. at 674.)  In reality, Mitchell was seeking an invitation to dinner in order to "scope out the possibility of taking their daughter."  (Tr. at 674.)  In the home of a Seventh-day Adventist, he pretended to "be interested in the Seventh-day

Adventist religion because they're providing him a meal and a place to [stay]."  (Tr. at 674.)  With the police officer in the Salt Lake City library, Mitchell exploited the officer's desire to be sensitive to religious minorities by claiming that their religion prohibited Elizabeth from removing her veil.  (Tr. at 674.)  With the Smarts, he exploited their generosity by pretending to a man down on his luck and looking for work – a ploy that successfully allowed him to work on the Smart home and target Elizabeth.

Throughout his entire life, Mitchell has had an extraordinary ability to read peoples' vulnerabilities and exploit their weaknesses for his own purposes.  This "capacity to accurately read the vulnerabilities of a wide range of highly diverse individuals with highly diverse motivations and needs in ways that provided Mr. Mitchell the information needed to optimally adapt his behavior in order to achieve his desired ends is a mental capacity that is completely impossible for a person with a psychotic mental illness."  (Gov't Ex. 5 at 36.)

Mitchell also has a history of being effectively misleading.  Until Elizabeth's sister Mary Katherine identified him as the kidnapper, Mitchell managed to talk his way out of every encounter with police.  Likewise, when he appeared in court in San Diego, he convincingly portrayed himself as a repentant itinerant preacher who had fallen off the wagon and was effective in securing his release.

Even more recently, he has been remarkably effective in misleading mental health professionals.  After he failed to cut a deal with state prosecutors to drop the sexual

assault charges, Mitchell successfully changed his presentation so dramatically as to convince Dr. Skeem that he had gone from competent to incompetent in the span of a single month.  At the Utah State Hospital, he successfully presented himself as "naive," "inept" and "boring," to the treatment team, while the paraprofessional staff knew him to be intelligent, well-read and sometimes an enthralling conversationalist.  When sent to Springfield for a federal competency evaluation, he managed to turn on a preoccupation with religion that had been entirely absent during most of his stay at the Utah State Hospital.

The religious persona that Mitchell displays in court and to evaluators is part of an act designed to derail his criminal proceedings.  Mitchell has accurately read and exploited the vulnerability in the system, which protects mentally incompetent defendants from standing trial.  "All he had to do was to strategically present his prophetic persona in places like the courtroom and at the US Medical Center for federal prisoners in Springfield, Missouri, or at any other time he thought he might be under evaluation regarding his mental state or competence."  (Gov't Ex. 5 at 38.)  In so doing, Mitchell has been effective in stalling the administration of justice for nearly seven years.

b.      Mitchell Lacks Sincere Religious Devotion.

Despite his professed religious beliefs, Mitchell "did not function and behave like a genuinely devout religious person."  (Tr. at 741.)  "[U]sually genuine religion will cause people to see the importance of other human beings, their dignity and value, and would

cause them to perform some sort of altruistic service as part of their religious life."  (Tr. at

665.)  Yet, as Elizabeth explained, Mitchell never showed empathy for others and never

performed an act of charity or kindness toward another person.  (10/01/09 Tr. at 16-17.)

"He was not spiritual.  He was not religious.  He was a manipulator."  (Tr. at 741.)  Even

Barzee, in retrospect, realized that Mitchell's faith was false.  (Gov't Ex. at 17g.)

Mitchell used religious explanations to justify his carnal desires.  Despite LDS

doctrine prohibiting the use of alcohol, tobacco and drugs, Mitchell received "revelation"

that "Immanuel may smoke and drink as he chooses according to his desires."  (Gov't Ex.

10.)  He received "revelation" that God had commanded him to kidnap virgin wives and

that the wives were required to "demonstrate" sexual acts in each other's presence.

(Gov't Ex. 10 at 3-5 & 46.)  He explained his sexual appetite and treatment of Barzee and

Elizabeth as a necessary process of bringing them low to the dust so that they could be

exalted.

"[W]hatever the religious aura of some of the discussions and preaching of Brian

Mitchell, that . . . took a back seat to his sexual libido, [his] decisions were made with that

as a first priority."  (Tr. at 831.)  One example was Mitchell's revelation of the schedule

for sexual relations.  The revelation had the effect of assuaging Barzee's jealousy, but

Mitchell did not feel compelled to adhere to the schedule.  When Elizabeth told Mitchell

that it was not her day, Mitchell responded that nobody would find out.  This incident

shows that Mitchell is not passively driven by what he perceives to be God's will.  (Tr. at

831.)  "[S]omeone who is a man of God saying 'who will know,' when he is referencing a calendar that is supposed to be ordained by God and revelation, well, it's just phoney.  It's just a lie." (Tr. at 831.)  For Mitchell, "lust trumped religion."  (*Id.*)  He simply used religion to justify his sexual desires.

During his three years of observation at Utah State Hospital, it was evident that religion was not at the forefront of Mitchell's mind.  While Mitchell was preoccupied with reading books and watching movies and television, he never requested a religious book and rarely watched a religious program.  Shortly into Mitchell's stay, the staff noticed a sharp drop off in Mitchell's religious rhetoric.  Mitchell was not "preaching in the day room" and respected requests not to discuss religion.  When he did discuss religion, he never claimed to have received revelation.  He did not claim to be the One Mighty and Strong or the person who would fight and defeat the antichrist.  Indeed, his deference to patient John demonstrates that Mitchell did not truly believe himself to be the most powerful religious figure on the planet.  The staff who had daily contact with Mitchell noticed that his behavior was inconsistent with his professed beliefs and doubted his sincerity.

After three years of having no "revelations," Mitchell suddenly began to write a Second BIDI after the federal government decided to pursue charges against him.  (Tr. at 12-13.)  When he was transferred to Springfield for an evaluation, he provided "all of this material about being the Davidic King to Dr. DeMier who obviously takes that

information and uses it with his interpretation that those are psychotic delusions." (Tr. at 746.) The sudden reinvigoration of his religious persona when the federal case commenced exposes Mitchell's lack of sincerity.

c.     Mitchell Uses Religion for Power.

Mitchell has always used religion "as a vehicle for his own advancement, power, or another self-serving agenda." (Gov't Ex. 5 at 24.) It is striking that, "even during his more conventional mainstream LDS period, religion was a vehicle for acquiring a position of privilege, power, or importance." (*Id.*) Mitchell projected a false image that enabled him to obtain significant positions in the church, yet he constantly sought to exceed his authority. By the late 1980s, Mitchell was angry with the church because he was not progressing quickly enough in obtaining the level of authority and power he wanted.

Mitchell married Barzee, an emotionally unstable and deeply religious woman, and preyed on her religious fervor, setting himself up in the household as a prophet in order to ensure that she would acquiesce to his will. "Once Wanda fully accepted his religious authority, he had complete and absolute power over her." (Gov't Ex. 5 at 30.) "[R]eligion and religious authority became increasingly a convenient vehicle from which [he] could derive power and through which he could exercise power, power that could then be exercised in any way he chose." (*Id.* at 27.)

-107-

Mitchell set out to kidnap 10 to 14 year old girls for the express reason that they were more malleable.  He targeted only LDS girls because he could exploit their faith in revelation and the authority of the priesthood.  He used culturally accepted religious authority to control and dominate Barzee and later Elizabeth.

During Elizabeth's captivity, Mitchell used religion to brainwash Elizabeth and press her into submission.  Mitchell's tales of his role in the last days, including his battle with the antichrist and his martyrdom, were designed to reinforce his all-powerful image in the camp.  He never told these stories outside of that setting – not in his post-arrest interviews, not in his competency evaluations, and not during his three years at the Utah State Hospital.  These "prophecies" were not the product of a delusion or of a sincere belief, but another means by which he controlled others.

Mitchell's use of religion for power was also evident in the way he received revelation whenever "he wanted something."  (10/01/09 Tr. at 64.)  He received revelation that he was permitted to smoke and drink and that he was to kidnap virgin brides.  He used religious authority to dominate Barzee through blessings, which were successful in overcoming Barzee's resistence to the kidnaping, to "demonstrating" in front of Elizabeth, and to Mitchell's pursuit of his insatiable sexual appetites.

After he was caught, Mitchell used religion to justify Elizabeth's forcible kidnaping.  In the Addition to the BIDI, Mitchell claimed that the Smarts had heard the voice of the holy spirit and had left their doors unlocked and turned off the security alarm.

-108-

(Gov't Ex. 1 at 26-27.)  He claimed that Elizabeth had heard and followed the Lord's command and left with Mitchell willingly and met her "wedding day" with "great joy and peace and exultation."  (*Id.*)  He further claimed that Elizabeth was free to return to her family at any time and that the only thing that bound her was "the power of the Holy Spirit, confirming the truth of the words of God in her heart."  (*Id.*)  The fact that he never told this story to Elizabeth and did not provide these explanations to investigators demonstrates that they are not delusions or sincere beliefs but merely the type of cognitive distortions most sex offenders use to justify their behavior.

Cognitive distortions are an "established, well understood phenomenon among sex offenders."  (Tr. at 943.)  They are "ways in which sex offenders explain their actions in a way to manage the impressions of others and in a way to make themselves more socially palatable."  (*Id.*)  Cognitive distortions are not considered psychotic because they are "not a reflection of the inner state.  It's not a reflection of inner mind.  It is what a person does in order to take on the beliefs that they need to do in order to deny, justify, minimize and rationalize."  (Tr. at 945.)

Cognitive distortions of a religious nature have been documented in studies focusing on Catholic priests who have molested children.  The studies have found that molesting priests "routinely and dramatically distort their relationship with God and exploit how they represent their relationship with God to the child in their custody in

-109-

order to facilitate sex offending and sometimes grooming and otherwise molesting and other pedophilic behavior." (Tr. at 959.)

Both these priests and Mitchell hold themselves out as men of faith and "exaggerate their closeness to God and the special relationship they have with God." (Tr. at 961.) In order to convince the child that the behavior is acceptable, the offender "has to represent to the child that his relationship to God is special and this facilitates this exploitative behavior." (Tr. at 961.) Mitchell's claim of religious authority is not reflective of genuine belief or of a psychotic delusion, but instead serves as a tool that enables him to both satisfy and justify his base, antisocial desires.

> d.    Mitchell's Behavior Is Consistent with That of Self-Proclaimed Leaders of Destructive Religious Cults.

Destructive religious cults – such as the Manson Family, the LeBaron group, Heaven's Gate, Jim Jones' People's Church, and David Koresh's Waco group – share similarities. (Tr. at 516.) Such cults are lead by "a powerful communicator or someone with the strength of communicating that gathers those around him who will listen to him." (*Id.*) Once a person is brought into the group, they are separated from society. (*Id.*) That isolation allows for a period of "more powerful indoctrination." (*Id.*) Once the person is indoctrinated and begins to believe, the leader "will insert into the indoctrination the fact that he is receiving revelations from God." (*Id.*) Most religious cult leaders have "exemplified that trait where they would convince those people that they were doing what they were doing because God told them to do it, and they believed that, and they would

then, as a result of their indoctrination, delve into any acts that the leader of that

organization may request of them." (*Id.*)   The size of the cult does not alter its basic

character. (Tr. at 569.)  For example, the Sybionese Liberation Army that kidnaped Patty

Hearst was a small group, yet shared the same basic methods of controlling people who

belonged to the organization. (*Id.*)

The facts in this case reveal a similar pattern.  Throughout his life, Mitchell has

been described as highly intelligent and verbally skilled.  In his thirties, Mitchell became

fascinated with religious ideas and spent countless hours "marinating his intellect" in

religious texts. (Gov't Ex. 5 at 18.)  He enjoyed intellectual sparring with others over

religious ideas and was always known to be a smooth and convincing talker.

He became involved with fringe groups, such as Sterling Allen's American Study

Group, which espoused fundamentalist ideas revolving around the idea of One Mighty

and Strong who would set the affairs of the LDS Church in order. (Tr. at 644-45.)

Mitchell was drawn to the Bo Gritz Patriot Movement and to the fundamentalist rejection

of medical, legal and societal institutions. (Tr. at 814-15.)  He was deeply involved with

the Wests, who believed not only in unconventional healing, but also in the law of

consecration and polygamy.  It is perhaps not surprising that Mitchell was attracted to the

fundamentalist idea of polygamy, especially as it is practiced in many modern

communities "where older men, supported by claims of religious authority, exercise

enormous power over their communities, especially over the women and young girls."

(Gov't Ex. 5 at 31.)  Well-known schismatic LDS groups include the LeBarons, the Laffertys and the Singer/Swapp clan.  (Tr. at 18-19.)  In addition, there are "a lot of independent practitioners out there who don't affiliate in large groups, but they nevertheless withdraw from the mainstream church."  (Tr. at 19.)

Mitchell, too, set out to become "the head of a polygamist fundamentalist religious movement."  (Gov't Ex. 5 at 31.)  He converted Barzee who, "[w]ith her very low self-esteem and eagerness to be important and significant," "latch[ed] on to the idea of [Mitchell's] importance and her special role as the Mother of Zion."  (*Id.*)  Mitchell then "progressively utilize[d] blessings and his reported prophecies to move her further and further toward his extreme ideas, and utilize[d] a pattern of highly sophisticated behavioral control in which he used his religious authority to demand from her increasing sacrifices and at times used threats of divine punishment to gain ever increasing control over her."  (*Id.*)  Throughout this process, he always used "forms of religious authority which were familiar to her (priestly blessings), which [grew] directly out of forms of religious authority she had already accepted."  (*Id.*)

Mitchell ultimately attempted to "create a whole religious movement patterned after the writings, beliefs, rituals, and language of the LDS history and movement, but which[,] consistent with other FLDS claimants to the role of 'one mighty and strong,' places himself at the top and center of this movement."  (Gov't Ex. 5 at 31.)  "Patterning his new organization after what he has already participated in and seen from other fringe

-112-

fundamentalist groups, he create[d] the Seven Diamonds Plus One Testaments of Jesus Christ Study and Fellowship Society on September 21, 1997." (Gov't Ex. 5 at 31.) He tried to convince Barzee's mother to allow the group to meet in her home, but she recognized that Mitchell was attempting to start a cult that would be antithetical to the mainstream LDS Church.

Mitchell went on to create his own set of "scripture," closely patterning the BIDI on accepted religious texts. Mitchell assumed the trappings of a devout spiritual leader and set out to create a "sacred history" while traveling the country. (Gov't Ex. 5 at 32.) He then set about trying to establish a polygamist community by appealing to women whom he perceived to be less resistant to the idea of plural marriage – including a sexually promiscuous woman and a 19-year-old who had recently emerged from a polygamist community. When those efforts failed, Mitchell decided to gain adherents by force and preyed upon 10 to 14 year old girls precisely because they were more susceptible to the indoctrination that was to follow.

As typically occurs in other cults, Elizabeth was isolated and exposed to intense indoctrination. She was forcibly separated from her family and physically bound in a mountainside camp in order to completely isolate her from the world. Mitchell further separated her psychologically by forcing her to burn her clothes, adopt a new name and refer to her parents as Ed and Lois. He subjected her to sexual assault, degradation and humiliation in order to break her spirit. All the while, Mitchell and Barzee preached a

-113-

religious doctrine containing familiar elements from Elizabeth's LDS upbringing but twisted to achieve Mitchell's own ends.

As in other cults, Mitchell used the concept that he was receiving revelations from God to establish control over his "followers." He claimed to be a powerful prophet, the One Mighty and Strong and the right hand of God. He strategically used revelations and priesthood blessings, which are, in a sense, personal revelation mediated through another person. (Tr. at 80-81.) At least with Barzee, these tactics worked to ensure her obedience, even when she experienced a deep aversion to engage in the behaviors Mitchell required.

Although Mitchell was apprehended while the group had only three members, he had designs to expand their numbers. Mitchell planned to kidnap other young girls and actually engaged in two attempted kidnapings during the nine month period in which Elizabeth was held captive. In addition, Mitchell intended for Elizabeth to bear him children, who would have been similarly indoctrinated into the group. Such a small family group would have been consistent with other well-known schismatic groups such as the Singer /Swapp clan and the Laffertys.

In his testimony, Richard Forbes, a former investigator and an expert in religious cults and crime, drew parallels between the behavior, conduct and claims of Ervil Le Baron and Mitchell:

> Ervil LeBaron and Brian David Mitchell were [both] raised in an LDS environment. The progression after apostasy and subsequent

excommunication [led] both to delve into a violation of the civil laws of the United States, the tenants of the LDS faith and God's commandments. Each of them, although living in a state of separation from the Church of Jesus Christ of Latter Day Saints, they maintained their beliefs in Joseph Smith's teachings, his status as a prophet in the restoration of the gospel of Jesus Christ through Joseph Smith.

Each chose, however, to obey only those teachings that satisfied their means and needs. Each sought to control those around them and justified their relationships through their own interpretation of Bible, Book of Mormon and Doctrine and Covenant scriptures. Each claimed direct revelation on behalf of the welfare of those they controlled. They used similar terminology in so doing, i.e., thus sayeth the Lord, one mighty and strong, prophet, God's spokesman on earth and so forth and so forth and so forth.

Each used the instant as well as the written method of communicating revelations to their followers. Although LeBaron and Mitchell used religious indoctrination, they also followed a pattern of behavior similar and often parallel to the control devices of traditional destructive cult leadership. Examples of those same methods are evident in the Jim Jones Jamestown massacre, the Waco Branch Davidians, the Heaven's Gate suicides, Patty Hurst and the Charles Manson murders.

The methods used by LeBaron and Mitchell included persuasive recruitment, although Mitchell preferred the use of force, separation, isolation and indoctrination leading to the destruction of past personal traditions and alliances, including family, friendships and environment.

The constant and persistent indoctrination led to the followers' belief in LeBaron's and Mitchell's authentic divine revelation and God-given authority. Each of those men delved into serious violations of God's laws and the laws of men in the acts of robbery, theft, lies, threats of death, rape and kidnapping.

Those violations were justified by their ecclesiastical interpretation of scripture and personal revelation, both verbal and in extensive written documents.

> LeBaron and Mitchell each taught justification for and practiced
> polygamy, using partriarchial authority to control and force criminal acts to
> be perpetrated by loyal wives.

(Tr. at 543-45.)

Like so many before him, Mitchell was in the process of establishing a schismatic

Mormon cult in which he would enjoy unquestioned power as leader and prophet. As Dr.

Gardner correctly observed, Mitchell's "involvement in, and use of religion is best

explained not by a psychotic mental illness, but by his authoritarian, narcissistic

personality and drive to power." (Gov't Ex. 5 at 23.)

> 2.  *Even if Some of Mitchell's Professed Religious Beliefs Are
>     Sincere, He Does Not Suffer from a Mental Disease or Defect
>     that Would Render Him Incompetent to Stand Trial.*

Even if the Court were to find that Mitchell genuinely holds his professed religious

beliefs, the evidence does not support the conclusion that those beliefs are a manifestation

of a mental illness. Mitchell's beliefs do not constitute delusions because they are

consistent with his culture and, as Mitchell's behavior demonstrates, the beliefs are not

fixed, do not cause him to be preoccupied or distressed and are not merely "encapsulated"

delusions. In addition, neither Mitchell's presentation nor history points to a finding of a

psychotic illness. Finally, Mitchell's symptoms are inconsistent with delusional disorder

or schizophrenia but highly consistent with one or more non-competency limiting

personality disorders. Because Mitchell does not suffer from a competency limiting

"mental disease or defect," he is competent to stand trial.

-116-

a.      Mitchell's Religious Ideas Are Not Delusions.

Mitchell's religious beliefs are not delusional because they are highly consistent with the fundamentalist Mormon subculture to which he belongs.  Moreover, the evidence establishes that Mitchell's religious beliefs are not delusions because his beliefs are not "fixed," he is not "preoccupied" with his beliefs, and his beliefs do not cause him any significant "distress."  The defense theory that his delusions are encapsulated is conclusively rebutted by evidence of Mitchell's ability to "turn off" his beliefs in situations where a religious delusion would have been firmly engaged.

(1)      Cultural Explanation

To the extent that Mitchell sincerely holds any of his extreme, idiosyncratic beliefs, they are religious ideas that cannot be classified as delusions.  Because all religious ideas deal with things that are not susceptible to proof, Dr. Gardner explained that the "distinguishing feature is not how unusual or unrealistic they are, but how they are taken in, processed and incorporated.  That is, are these ideas part of one's environment, whether it is shared by a lot of other people or not?  It doesn't require 50 people, 100 people, 1,000 people or 1 million people believing those ideas.  It is that those ideas are taken from the real world, taken in a normal way, the way we take information and process it and incorporate it, modify it, change it from real world experience."  (Tr. at 688.)

"To suggest, as Dr. Golding, Dr. Skeem, and Dr. DeMeir have done, that Brian Mitchell's ideas have occurred de novo from a delusional disorder, rather than from shared cultural and sub-cultural experiences, is simply false."  (Gov't Ex. 5 at 31.) Mitchell "took in these ideas in the same way all learning is done, through exposure, processing, discussion, and incorporation."  (Gov't Ex. 5 at 31.)

Mitchell's beliefs are "highly consistent with a small but vigorous group of fundamentalist extremists that are on the fringe of mainstream LDS life."  (Tr. at 689.) As explained in John-Charles Duffy's article *The Making of Immanuel: Brian David Mitchell and the Mormon Fringe* (Gov't Ex. 5, Appx. G), "just because Brian Mitchell's ideas seem strange or even bizarre to even mainstream LDS, it does not mean that he didn't get those directly from a subculture that he was very involved and very active in." (Tr. at 690.)  "The worldview laid out in the writings of Elizabeth Smart's alleged abductor is entirely derivative.  Every one of his views that is likely to strike mainstream Latter-day Saints as bizarre has a precedent in beliefs that thrive on the margins of the LDS community itself."  (Gov't Ex. 5, Appx. G at 1; Tr. at 690.)

As Brigham Young University Professor Daniel Peterson explained, to understand the religious ideas contained in the BIDI,[3] it is essential to understand foundational LDS doctrines and tradition, without which Mitchell's ideas would not make sense.  (Tr. at 13.)

---

[3]  Because Mitchell has either refused to speak to evaluators or has been guarded about his beliefs, the content of those beliefs have been primarily ascertained from reading the BIDI. (Tr. at 1612-13.)

"Mormonism sees itself as a restoration of ancient Christianity, and that proposes an idea of apostasy, that there is an apostasy [into] which the Christian world has gone, so the whole truth had to be restored."  (Tr. at 14.)  In addition, true priesthood authority, or priesthood keys, also had to be restored.  (*Id.*)

Mormonism reflects the "notion is that God acts in sort of a dispensational way, that there are successive revelations and apostasies and re-revelations building on the previous ones or restoring what was lost."  (Tr. at 14.)  Revelation is to come through "a new prophet, and one of the things that a new prophet does is to in many cases, particularly the opener of a new prophetic dispensation, if you will, is to reveal new scripture to produce new written texts."  (*Id.*)  In addition to the Bible, Mormons accept other texts as divine scripture, including the Book of Mormon, the Doctrine and Covenants (which consists of revelations received by Joseph Smith, Brigham Young and others), the Pearl of Great Price and more modern revelation such as a 1978 revelation on the priesthood.  (Tr. at 16-17.)

Another central concept in LDS theology is "the idea that we're living in the last days."  (Tr. at 14-15.)  There is also "the sense of the church being separated out, in some case having to physically remove itself from among the wicked or gentiles or whatever term you might use."  (Tr. at 15.)

Schismatic groups that break off from the LDS Church build on those core beliefs to give legitimacy to their claims of authority.  These groups "typically have certain features in common:"

> The idea that the mainstream LDS Church has gone over to apostasy often over the issue of plural marriage, the keys of authority that belong uniquely or exercised uniquely by the President of The Church of Jesus Christ of Latter-Day Saints has now been transferred to someone else.  Usually the claim to authority, the leader  of the new fundamentalist group, they often are connected with plural marriage.  They've restored polygamy.  They have a strong  . . .  apocalyptical view.  They're living the last days.  There's often quite separationists in their social views.

(Tr. at 18-19.)

Like many other adherents of fundamentalist LDS beliefs, Mitchell claims that the mainstream LDS Church has gone into apostasy.  (Tr. at 50-51.)  He claims succession to the keys held by LDS Church President Ezra Taft Benson.  (Tr. at 50-51.)  The idea that the LDS Church went astray after the passing of President Benson is a common notion among schismatic groups and claiming the keys of authority is the classic claim of all schismatic groups in Mormon history.  (*Id.*)

Indeed, Mitchell's claim to be the One Mighty and Strong places Mitchell squarely in the mainstream of Mormon schismatics.  (Tr. at 39.)  The concept of One Mighty and Strong originated in the Doctrine and Covenants and refers to one who would be raised up by the Lord to set the church in order.  (Tr. at 38-40.)  Around 1905, when the LDS Church renounced polygamy, a number of individuals came forward claiming to be the One Mighty and Strong.  (Tr. at 40-41.)  Such claims have been made by dozens, if not

-120-

hundreds, of people since that time.  (Tr. at 644-55 & 1096; Gov't Ex. 5, Appx. A at 3.)

Mitchell is just one in a long line of claimants.  (Tr. at 40-41.)

Even Mitchell's claim to be the Davidic King is firmly rooted in tradition and

scripture.  The idea that, in the last days, someone would sit on David's throne is "a topic

that is particularly discussed again in certain elements sort of within mainstream

Mormonism but over toward the edge . . . that had spawned several schismatic

movements."  (Tr. at 31.)  Like Mitchell, these people claim that "they are the Davidic

king or their sons who they've named David will be the Davidic king."  (Tr. at 31.)

Mitchell's use of his middle name, David, furthered his claim.

Although Mitchell claimed to receive personal revelation, he did not claim to have

visions or hear voices.  (Tr. at 112-14; 1614-15.)  In his interview with Dr. DeMier,

Mitchell gave the following description of revelation: "The holy spirit brings an inward

peace.  A confirmation of the spirit brings a feeling of surety."  (Tr. at 1614.)  This is

consistent with the manner of revelation accepted by the LDS Church, where revelation

comes mostly through spiritual impressions.  (Tr. at 16.)  In the mainstream church, such

revelation can be written down and subsequently be accepted as scripture.  (Tr. at 16.)

Thus, Mitchell's writing of the BIDI, which purports to be divine revelation, is also

consistent with LDS tradition.

The BIDI itself reflects several themes that are common in LDS and, more

specifically, fundamentalist LDS culture.  References to the last days are "omni present

and, of course, they're connected in many cases with his role as prophet with his future status of Davidic king with the events of the last days that will separate the wicked from the righteous and so on." (Tr. at 23.) These ideas are "very much in line with themes not only of Mormon schismatic movements, but of Mormons themselves, that have, although, been possibly muted a little bit in recent decades." (Tr. at 23.)

The BIDI also refers to the system of law being "'greatly corrupted and perverted far away from the constitutional laws that inspired and noble fathers established and set forth.'" (Tr. at 27.) Mitchell's constitutionalist ideas reflect his exposure to schismatic Mormon groups, including Bo Gritz' Patriot Movement. (Tr. at 74 (noting that Bo Gritz was a one-time member of the LDS church and "is on the constitutionalist schismatic side of things").) "There has been a tendency within Mormonism and fringe of Mormonism[,] for all time[,] sort of what's called constitutionalist movement, seeing the government as hanging by a thread, that sort of thing." (Tr. at 27.) Although LDS doctrine speaks to the Founding Fathers and the Constitution as divinely inspired, schismatic Mormons commonly believe that the "government [that] has gone so far beyond the Constitution must be rejected." (Tr. at 28.) There have been "tax refusers, for example, growing out of that side of this schismatic tradition, if you will, seeing the government as being too corrupt to pay any attention to any more. It's lost its legitimate authority." (*Id.*) Mitchell's rejectionist beliefs are "very much in line with that sort of thing." (*Id.*)

The BIDI further discusses the reestablishment of polygamy and the law of consecration under the authority of Immanuel David Isaiah.  (Tr. at 23-24 & 46-49.)  The restoration of plural marriage is connected with many schismatic movements.  (Tr. at 23-24.)  The law of consecration is a "cooperative way of pooling resources," which is also based on fundamental LDS beliefs.  (Tr. at 46-47.)  Such communal living was tried during the Church's early history and its prophets "lamented the fact that people are not able to live this law."  (Tr. at 47.)  There are also modern "communities in Southern Utah like Orderville and so on that really made an effort at it."  (*Id.*)

The beliefs expressed in Mitchell's writings "fall clearly within a schismatic Mormon tradition."  (Tr. at 11.)  Within the BIDI, "it's astonishing how [many] references there are to previous canonized scriptures."  (Tr. at 21-22.)  For example, like the Book of Mormon itself, the BIDI extensively cites to the Book of Isaiah in the Bible.  This is a common technique called "intertextuality where one text cites another and sort of trades off the power, the potential that's already buil[t] up in a certain record in a generated text."  (Tr. at 17.)  The BIDI is "heavily derivative" from accepted LDS scripture.  (Gov't Ex. 5, Appx. D at 2; 109-10.)  It is evident that the BIDI was written using research materials at hand, including a dictionary, Bible, Book of Mormon, Doctrine & Covenants and Avraham Gileadi's translation of Isaiah.  (Tr. at 112-14.)

In the BIDI, there is not one religious idea that is unique to Mitchell.  (Tr. at 689.)  These are not spontaneous ravings, but a deliberate construction of a text using building

-123-

blocks from other texts.  (Tr. at 118-19.)  Mitchell's writings reflect a deep knowledge of the texts, traditions and themes consistent with the Mormon  tradition in which Mitchell participated.  (Tr. at 109-10.)  Because Mitchell's professed religious beliefs are purely a reflection of his culture, they do not qualify as delusions.

(2)     Not Fixed

Delusions are "fixed, false beliefs that are held tenaciously, even in the face of evidence to the contrary.  (Tr. at 1601-02; *see also* Tr. 944 & 1095 ("A delusion is a fixed false idea.").)  "One of the things that's a characteristic, a fundamental characteristic of psychotic illnesses, and that's true whether it's delusional disorders or whether it's schizophrenic illness, is those delusions tend to be very ridged and very fixed.  It's the reason that these people are so profoundly impaired."  (Tr. at 651.)  A delusional individual cannot chose to do something different because such beliefs are rigid.  (Tr. at 652.)

The record is replete with examples showing that Mitchell's religious beliefs are not fixed.  For instance, Mitchell's claim to be a prophet, the Davidic King or the One Mighty and Strong, manifests only when it serves his purpose.  When he encountered law enforcement or people from whom he could obtain money, food or shelter, he made no such grandiose claims.  In the San Diego courtroom, he claimed to be merely a traveling preacher.  During his initial interrogation, he twice corrected the investigators and asserted that he never said he was a prophet.  "He comes into the hospital, references

-124-

himself as a prophet and within a matter of weeks, maybe months, stops.  No longer

characterizes himself in any special way" – except to evaluators.  (Tr. at 1095.)

A delusion about a person's religious role cannot be turned on and off.  (Tr. at

676.)  Yet that is precisely what Mitchell has done repeatedly.  Since "the ideas

themselves are not fixed, they are not delusional."  (Tr. at 1095.)

### (3)   Lack of Preoccupation or Distress

In Dr. Skeem's opinion, extreme religious ideas can be distinguished from

delusional beliefs based on the manner in which they are held.  She opined that

"delusional beliefs are held with excessive distress, preoccupation and floridity."[4]  (Tr. at

1738-39.)  "When it comes to distinguishing religious eccentricity from delusion, it's not

so much [what] you believe, it's how you believe it."  (Tr. at 1738.)

Mitchell certainly presents himself as preoccupied with religious themes when he

is being evaluated.  However, his behavior during his three years of observation at the

Utah State Hospital "exhibits the antithesis of being preoccupied with religion, let alone

religious ideas of a pathological nature."  (Gov't Ex. 20 at 185.)

During his time at the Utah State Hospital, Mitchell did not openly minister or

aggressively seek to share his religious ideas with others.  (Gov't Ex. 20 at 186.)  He also

respected requests not to talk about religion.  Before his prolonged silence, Mitchell

spoke with others about a variety of non-religious topics, including literature, music and

---

[4]  Dr. Skeem does not contend that Mitchell's beliefs are associated with floridity.  (Tr. at 1740.)

health.  Unlike when he spoke with evaluators, Mitchell did not always bring the conversation back to religion.  Even when speaking with patient John, who was especially devout, Mitchell spoke not only of religion but of politics, chess, television, movies and pop culture.  (Tr. at 187.)

Mitchell did not listen to liturgical music, request books on religious subjects or watch more than an occasional religious program.  Instead, his activities were almost entirely of a non-religious nature.  He "read extensively – not religious books or scripture – but novels and biographies."  (Gov't Ex. 20 at 186.)  He watched countless movies and hours of television per day.  He listened to opera, symphony and classical music.  He participated in karaoke and groups on movies and geography.  "The range of [Mitchell's] daily activities had nothing to do with his controversial religious beliefs."  (*Id.* 20 at 187.)

In addition, the evidence supports the conclusion that Mitchell's beliefs do not cause him distress.  Elizabeth testified that she never saw Mitchell in any distress over his religious beliefs during her nine months of captivity.  Similarly, the Utah State Hospital staff have not observed Mitchell in distress and he has never required any clinical intervention for agitation during his nearly seven years in custody.  As Dr. Whitehead observed, there was no "robust information that would suggest that he was particularly distressed a significant amount of the time."  (Tr. at 1458.)  To the contrary, Mitchell described himself as "at peace" to Dr. DeMier, and maintained an "unflappable demeanor

over the course of his entire custody.  There is no evidence for him having been distressed as a general proposition."  (Tr. at 1098.)

(4)    Evidence Against "Encapsulation"

The defense has suggested that Mitchell's normal functioning and lack of preoccupation with religion is a result of his delusions being "encapsulated."  The facts, however, do not support this theory.  The record shows that the defendant has full control of his thoughts and deliberately chooses when to use religion.

Dr. Gardner explained that is possible for delusions to be "quite walled off.  And individuals will try to keep them out of normal discourse.  As such they can go to work and do some activities and be quite functional."  (Tr. at 1875.)  A person with "encapsulated" or "circumscribed delusions" may "try to hide those."  (Tr. at 740.)  "However, if they really have a delusional disorder, it is one that they think about that is sort of brewing just under the surface, it is like an itch waiting to be scratched."  (Tr. at 1875.)

Dr. Whitehead described encapsulation as "wherein a person basically has two gears."  (Tr. at 1432.)  "[I]n non-delusional mode they appear completely ordinary," and "[t]hey're completely making sense to a point."  (Tr. at 1432.)  "And there's delusional mode, where someone is much more intense rambling in their discussions, tedious to listen to, doesn't make a lot of sense, has difficulties reaching the point and has behaviors reflective of the delusion."  (Tr. at 1432.)  In contrast to this description, the recordings

-127-

that were played in court of Mitchell explaining his religious beliefs to Dr. DeMier show a man who spoke clearly, calmly and was completely comprehensible.  Even Dr. DeMier experienced Mitchell as articulate and described Mitchell as "quite articulate in his verbal abilities suggesting above average intelligence."  (Tr. at 1582.)

Moreover, a delusional person would always be expected to act consistent with the delusion when they are in a "situation [where] the delusional system is engaged."  (Tr. at 329.)  Yet Mitchell's "delusions" do not consistently manifest themselves even during religious discussions.  The most stunning illustration of this was Mitchell's ability to conceal his religious beliefs in order to gain access to the Kemp home for the purpose of targeting their daughter.  Mitchell met Kemp when he attended services at an LDS church – a church from which he had been excommunicated for apostacy – yet Kemp noticed "'nothing shaky about him.'"  (Gov't Ex. 20 at 13.)  After the services, Mitchell enjoyed a lengthy visit at the Kemp home, along with "a number of missionaries" who were under the impression that Mitchell was an investigator interested in the LDS church.  (*Id.*)  During the visit, Mitchell had a "'nice conversation,'" which included a discussion of the Mormon faith.  (*Id.*)  In spite of his religious beliefs being directly engaged, Mitchell was composed, rational and polite.  He did not preach; he did not call them to repentance.  Instead, "'He pretended, quite well, to know nothing about the Mormon faith,' recalled Mr. Kemp, who added, 'there was nothing shocking he revealed about his beliefs or habits.'"  (*Id.*)

-128-

Similarly, Mitchell feigned interest in and agreement with Seventh-Day Adventist's beliefs to secure food and lodging. He discussed religion and the history of Catholicism with Phyllis Koch, yet never mentioned his eccentric religious beliefs. He even sparred with investigators using religious themes and yet expressly denied any claim that he was a prophet.

As Dr. Gardner explained, this evidence showed that Mitchell had "extensive discussions about religion. Now if he were delusional, that would have scratch[ed] that itch and out would have come out all of these ideas if he truly believed in them." (Tr. at 1875.) This evidence conclusively rebuts any claim that Mitchell's lack of preoccupation is due to "encapsulation." These were situations where his religious beliefs should have been fully "engaged," and yet he was able to turn off those beliefs to serve his purposes.

> b.    Mitchell's Presentation and History is Not Consistent with a Psychotic Illness.

Neither Mitchell's presentation nor history supports a finding that he is suffering from a psychotic illness. Mitchell displays none of the cognitive impairments associated with psychosis and functions in a manner inconsistent with a severe mental illness. Moreover, Mitchell's family history, prior mental health evaluations and decision to go off the grid do not support the conclusion that Mitchell is psychotic.

> (1)    Presentation

"It is impossible to think and function the way Mr. Mitchell has demonstrated repeatedly over time if he had a severe psychotic illness." (Tr. at 633.) During his career,

Dr. Gardner has treated hundreds, if not thousands, of psychotic patients.  (Tr. at 613-14.)
In his opinion, Mitchell has "repeatedly demonstrated patterns of behavior and thinking"
that are "simply incompatible" with psychosis.  (Tr. at 633.)

Research has shown that all "schizophrenics have significant measurable cognitive
deficits" independent of their hallucinations, delusions or other symptoms.  (Tr. at 626-27
& 703.)  Yet Mitchell has demonstrated a remarkable ability for abstract, complex
thinking as well as sophisticated cognitive/emotional capacities.

The writing of the BIDI itself is strong evidence that Mitchell's cognitive
processes are not impaired.  Dr. Peterson, an expert in the study and analysis of religious
texts, explained that the writing shows rational organization, research and deep
knowledge of texts.  (Tr. at 109-10 & 112-14.)  Mitchell's interpretation of biblical
imagery and symbolism into the BIDI is very sophisticated and his allegorical efforts
display "an extraordinarily skillful bit of writing."  (Tr. at 54-55.)  Mitchell's
incorporation of other texts, including Avraham Gileadi's book *The Literary Message of
Isaiah*, is "very skillful.  It's very well done."  (Tr. at 53.)  Dr. Gardner, who has read
Gileadi's book, observed that it is not "light reading," but an "extraordinary text" and
could not "imagine [a] psychotic patient reading this kind of text and then incorporating it
with the kind of sensitivity and application that Mr. Mitchell does."  (Tr. at 641.)

In addition, Mitchell's stay at the Utah State Hospital provides evidence of his
cognitive capacities.  He played games such as chess and *Axis and Allies*, both of which

require significant concentration and strategic thinking.  Mitchell spent countless hours at the hospital reading lengthy, complex books and having extensive conversations about them with hospital staff.  As Dr. Gardner explained, "These are not things that schizophrenics do, period.  They simply don't have the cognitive processing to do these abstract kind of things.  It's been well known for a long time they are rigid, concrete.  They lose their ability for abstract kind of thinking.  And what part of their core cognitive deficits underlie the fact that they don't spend time reading complex material and discussing them with other individuals."  (Tr. at 659.)

Mitchell has also repeatedly demonstrated an ability to make diverse, self-serving decisions in a variety of contexts.  (Tr. at 637.)  There are "many complex cognitive emotional processes that underlie the ability to accurately read situations and to modulate appropriately one's behavior to be able to serve one's own interests."  (*Id.*)

As Dr. Gardner observed, "Perhaps the most compelling direct evidence of Brian Mitchell's ability to sustain intense focused attention[,] his ability to modulate emotional responses while processing complex cognitive and interpersonal data[,] and his ability to adapt to constantly changing environmental queues and challenges while recognizing and responding to overt and subtle cognitive emotional changes is his videotaped interview of the day of his arrest by the FBI."  (Tr. at 646.)  As Dr. Welner observed:

> Let's keep in mind, he is wandering all over the west before he actually gets picked up.  He is on the road with Elizabeth and Wanda.  They get arrested unexpectedly and brought in.  He hasn't seen an attorney.  He has no

> preparation. And he sits down and he dispatches the questions that they
> have like a matador.
>
> . . . [H]is demeanor is calm, relaxed. He is engaged with the
> interrogators, but he is confident. He comes back at them. He doesn't at all
> reflect to be intimidated and he most significantly derails them from
> discussions about how she came to be with him.

(Tr. at 978.) No psychotic individual could have handled himself the way Mitchell did in

that interrogation.

Another telling example is Mitchell's self-serving behavior during his San Diego

court appearance. Mitchell provided "very convincing and appropriate answers that

happened to be completely false." (Tr. at 655-56.) Mitchell was able to "present himself

to the judge as a very repentant individual" and "some kind of an evangelical itinerant

preacher." (Tr. at 653.) He gave no hint of his true identity or his connections to Utah.

As Dr. Welner observed, Mitchell's answers portrayed him as someone with

> family, contrition, connectedness, harmlessness, religion, sobriety. All
> false, but all sympathetic qualities. So he had the presence of mind to
> understand that if he represented himself this way to a judge, he not only
> would be effectively misleading, but the effectiveness was in how he helped
> his defense by making himself a sympathetic character. He is especially
> able to be whom he needs to be for whatever his audience happens to be.

(Tr. at 952.) This court appearance demonstrated that Mitchell is "very savvy for the

purpose of taking care of his own needs, very capable." (Tr. at 655.) "He wasn't acting

out of his own detached disorganized or preoccupied psychotic process. He was very

appropriately engaged in his environment and adapting cognitively and emotionally

appropriately to his environment." (Tr. at 655.)

Mitchell has repeatedly demonstrated such an ability to perceive and accurately interpret and respond appropriately to the world around him.  (Tr. at 1013.)  When Mitchell was trying to brainwash and control Barzee and Elizabeth, "[i]t was very useful to be this Immanuel David Isaiah."  (Tr. at 656-57.)

> But that wouldn't be useful for him in the courtroom, so he suddenly changes, and he's Mr. Jensen.  And he's later stopped by police, and now he's Peter Marshall.  Now he turns one name off and turns on another name, and turns off one persona and turns on another.  And each time they are completely appropriate to the situation in a way that helps him to avoid responsibility for his behavior so that he doesn't have to confront his anti-social potential predicaments.

(Tr. at 657.)  As Dr. Welner observed, Mitchell has demonstrated an ability to "pick[] up on the environment" and respond in a way that is "not just believable and rational but persuasive in his capacity to be sympathetic, portraying him in a sympathetic way."  (Tr. at 1014.)  Such complex cognitive abilities are incompatible with a diagnosis of psychotic illness.

### (2)    History

The defense experts have focused on three facts in Mitchell's history to suggest that his religious fanaticism is psychotic and not simply a product of his culture: (1) his family history; (2) his behavior as an adolescent; and (3) his decision to quit his job and become homeless in the mid-1990s.

First, the defense has suggested that Mitchell has inherited a mental illness that runs in his family.  His grandfather was diagnosed with paranoid schizophrenia and his

-133-

father, despite having never been diagnosed with a mental illness, "certainly holds some very unusual beliefs, as reflected in his writings." (Tr. at 1543.) Although psychotic illness has some genetic component, the frequency of transmission within families is relatively small – roughly 10 percent from parent to child and only 2 or 3 percent from grandparent to grandchild. (Tr. at 1115.) Instead, it is far more likely that Mitchell was influenced by his exposure to his father's eccentric religious ideas. Mitchell's father, Shirl, considered himself an elect man of God and wrote an extensive religious manifesto. (Tr. at 872-73.) Not surprisingly, Mitchell fashioned himself after his father.

> Dr. Welner has had the opportunity
>
> to study over 60 fundamentalist sect leaders who refer to themselves as one mighty and strong or some variable. And one of the things I've come to learn is that there's an unusually high incident of children of these sect leaders who take on the mantle and see in themselves some special purpose. The royalty seems to pass down in the family. And so ultimately we have to offset that against the inheritability of psychotic illness.
>
> You offset that against the inheritance of the prophet mantle from father to son amongst people who are within the fundamentalist culture, and the evidence is far greater from Brian Mitchell having caught the fundamentalist bug as opposed to mental illness.

(Tr. at 1115.) In this case, it is far more probable that Mitchell's increasingly radical religious views grew out of his exposure to such views as a child. Like so many other fundamentalists, Mitchell believed that he, like his father, was an elect man of God.

The presence of a psychotic disorder is also far less probable given Mitchell's diagnosis of pedophilia – a diagnosis that has not been disputed. "Research on pedophilia

shows that the incidence of pedophilia occurring at the same time with schizophrenia, delusional disorder or any other psychotic condition combined, if you combined all those categories, they only occur with pedophilia 2.2 percent of the time." (Tr. at 1074.) In contrast, the co-morbidity rate of pedophilia and antisocial personality disorder is over 20 percent. (*Id.*) Thus, it is "very, very uncommon" for psychotic people to be pedophiles. (Tr. at 1075.)

Second, defense experts claim that Mitchell's referral to a psychologist in his teens was evidence of an incipient psychotic disorder. (Tr. at 1223.)  The defense relies heavily on the statement by the referring probation officer – not a mental health professional – that Mitchell's "behavior is bordering on psychotic." (Tr. at 716.) However, that suspicion was not borne out by the evaluation and psychological testing performed by Dr. Thomas.  Instead, Dr. Thomas diagnosed Mitchell with Behavioral Disorder of Adolescence, a type of conduct disorder.  The psychological testing revealed no significant mental disorder and "only one significant elevation on the A-social Index." (Def. Ex. E at 3; Tr. at 1625 & 1897.)  In her report, "Dr. Thomas articulated a number of unusually aggressive and sadistic features." (Tr. at 1898.)  Dr. Thomas' observations are consistent with Dr. Welner's conclusion that Mitchell is not psychotic, but a psychopath.

While it is still possible that Mitchell's behavior could have been an early indicator of psychosis, his subsequent history did not bear that out. (Tr. at 714-15.)  When he was evaluated by Dr. Thomas, there was evidence that he had molested a neighbor girl, was

displaying aggressive and sadistic behavior and was highly manipulative.  Although there

are "other references that suggest possibly some early paranoia, some social withdrawal,"

those features did not progress into psychosis.  Significantly, Mitchell underwent an

evaluation and psychological testing thirteen years later in connection with the adoption

of his children and was found to have no mental illness.  (Gov't Ex. 20 at 55.)  "He went

on to have an extended employment at O.C. Tanner, he ended up in the Bishopric.  He did

many things that would not reflect the progression from that point to what might have

shown progression into psychosis and clearly didn't."  (Tr. at 714-15.)

Finally, Mitchell's decision to become homeless is not evidence that he "fell off

the cliff" in 1995.  Instead, it was a calculated decision that enabled him to be a "free

man."  Mitchell had been studying how to live off the grid for nearly ten years before he

made the decision to leave his home, job and other responsibilities behind.  He had a

history of financial problems and was opposed to paying taxes.  He told his sister-in-law

that he did not want to work, but wanted to live off  panhandling as he did when he was

younger.  As Dr. Welner explained:

> The available information provided to me is twofold.  First of all, that this
> functional period [for Mitchell] with Wanda Barzee was cosmetically
> functioning.  The available information from the inside of the home was
> that there was a lot of dysfunction and deterioration even as he was working
> at OC Tanner.  The debts mounted and his identification with the patriot
> movement and essentially rejection of institution[s] intensified.  And so for
> years, and I'm talking about from even before 1990, he was reading and
> anticipating going off the grid, not having to pay taxes, not having to pay
> child support, not having to [tithe] and increasingly identifying with the

-136-

more fundamentalist strands of the LDS.  And that coincided with the
life-style choices he made.

(Tr. at 1888-89.)  The evidence shows that Mitchell's unusual lifestyle was a conscious

choice, made after years of study and deliberation, and not evidence of a psychotic break.

> c.  Mitchell Does Not Meet the Diagnostic Criteria for
> Either Delusional Disorder or Schizophrenia;  Instead,
> His Behavior is Consistent with Non-Competency
> Limiting Personality Disorders.

In order to find a defendant incompetent to stand trial, this Court must find "by a

preponderance of the evidence that the defendant is presently suffering from a mental

disease or defect rendering him mentally incompetent" to stand trial.  18 U.S.C. § 4241.

After weighing the evidence presented, the Court accepts the psychiatric expert opinion

that Mitchell does not suffer from a psychotic mental illness, but rather one or more

personality disorders that do not impact his competency to stand trial.

> (1)  Delusional Disorder and Schizophrenia

As Dr. Gardner explained, the conflicting diagnoses among the defense experts

reflect that "the clinicians were inferring that these were mental illness rather than

religion and they were an inference in search of a diagnosis."  (Tr. at 1874.)  "[E]ach of

them worked at finding a diagnosis that best met their need, but none of them really fit

well at all."  (*Id.*)

The two diagnoses[5] of psychotic mental illness that have been suggested –

schizophrenia and delusional disorder – "are mutually exclusive." (Tr. at 1611 & 1870.)

"The primary or the essential criterion for delusional disorders is that it is a non-bizarre

delusion." (Tr. at 1611-12.) As Dr. DeMier explained, "the distinction between a bizarre

and a non-bizarre delusion is not whether or not they are odd or strange beliefs, but

whether or not they are physically possible." (Tr. at 1532-33.) A nonbizarre delusion is

one that is capable of happening in the real world. (Tr. at 1612.) "[I]n other words,

something that is possible, no matter how unlikely it seems." (Tr. at 1533.) Dr. DeMier

eliminated a diagnosis of delusional disorder because Mitchell's religious beliefs "are not

possible. And, if I strictly adhere to the diagnostic criteria in the DSM, that's where I

have to go." (Tr. at 1538.) For example, Mitchell's "revelation" in the BIDI that Barzee,

who had undergone a hysterectomy, would have her womb opened up would be classified

as "bizarre" because it is not possible in the real world. (Tr. at 1612.)

Because he classified Mitchell's delusions as bizarre, Dr. DeMier concluded that

Mitchell met the diagnostic criteria for schizophrenia. (Tr. at 1612.) Under the

Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision

("DSM-IV"), two or more symptoms (such as delusions, hallucinations, or grossly

disorganized speech) are generally necessary to support a diagnosis of schizophrenia.

---

[5] Dr. Golding did not commit to a specific diagnosis but simply stated that Mitchell suffered from "a disorder within the psychotic spectrum." (Def. Ex. X at 41.)

DSM-IV at 312.  However, only one symptom is required "if delusions are bizarre."

DSM-IV at 312.  The DSM-IV contains this cautionary note:

> Although the determination of whether delusions are bizarre is
> considered to be especially important in distinguishing between Delusional
> Disorder and Schizophrenia, "bizarreness" may be difficult to judge,
> especially across different cultures.  Delusions are deemed bizarre if they
> are clearly implausible, not understandable, and not derived from ordinary
> life experiences (e.g., an individual's belief that a stranger has removed his
> or her internal organs and replaced them with someone else's organs
> without leaving any wounds or scars).  In contrast, nonbizarre delusions
> involve situations that can conceivably occur in real life (e.g., being
> followed, poisoned, infected, loved at a distance, or deceived by one's
> spouse or lover).

DSM-IV at 324.

In this sense, religious ideas are "not possible."  (Tr. at 688.)  "They're magical
ideas that . . . deal with miracles that don't follow the rules of science and history.  They
deal with unseen reality that cannot be disproved."  (Tr. at 688.)  However, the DSM-IV
recognizes that it is important to take cultural differences into account when assessing the
symptoms of schizophrenia.  "Ideas that may appear delusional in one culture (e.g.,
sorcery and witchcraft) may be commonly held in another.  In some cultures, visual or
auditory hallucinations with a religious content may be a normal part of religious
experience (e.g., seeing the Virgin Mary or hearing God's voice)."  DSM-IV at 306.

Even if sincere, Mitchell's professed beliefs are not delusions, but religious ideas
that stem from his culture.  While a delusional person's culture may "bleed into their
psychotic ideas," a delusion will necessarily be inconsistent with shared belief. (Tr. at

743-44).  Mitchell's ideas are not just derivative of his culture or experience, but entirely consistent with the religious doctrine of his culture and subculture.  (Tr. at 743.)

In his report, Dr. DeMier rejected a cultural explanation for Mitchell's beliefs.  He wrote, "Certainly his beliefs are in conflict to the mainstream LDS church.  Moreover, I am unaware that his beliefs are shared by any fringe or radical element of that (or any other) church."  (Def. Ex. BB at 34.)  Dr. Peterson, an expert in LDS beliefs and scriptural texts, testified that he could not disagree more strongly with that conclusion.  (Tr. at 77.)  Mitchell's beliefs are explainable within a cultural context and have parallels within the LDS and schismatic LDS groups.  (*Id.*)  Richard Forbes an expert in religious cults, also disagreed with Dr. DeMier's assessment.  For example, Ervil LaBaron shared Mitchell's beliefs – "they talked the same things, they spoke the same words...they controlled people with those religious beliefs."  (Tr. at 547.)

During his testimony, Dr. DeMier recognized that the bulk of Mitchell's beliefs were shared by fringe Mormon groups, but maintained that Mitchell's delusions were bizarre because he "has placed himself, in his belief system, into this divinely ordained role."  (Tr. at 1533.)  These "bizarre delusions" include Mitchell's belief that he is "divinely ordained to fulfill a special role at the end of the world involving battling the Antichrist and putting himself on par with Jesus or God."  (Tr. at 1545.)

First, Dr. DeMier testified that he considered it "a bizarre belief that one has been divinely ordained and appointed by God to play a role in the end times, wherein he will

battle the Antichrist and lead -- be the Davidic King or the Father of Zion, or he referenced it in different ways." (Tr. at 1539.) However, this claim about battling the antichrist appears nowhere in the BIDI. Mitchell never made the claim to Dr. Whitehead (Tr. at 1485) or Dr. DeMier (Tr. at 1600). In fact, there is no evidence that Mitchell made this claim to anyone except Barzee and Elizabeth as part of Elizabeth's indoctrination and brainwashing. (Tr. at 1207-09.) The idea that an antichrist will arise in the latter days and that the followers of God will battle the antichrist is a "recurring theme" in LDS scripture and belief as well as in Christian religions. (Tr. at 64.) To the extent that Mitchell believed he would take part in a battle with the antichrist, this was consistent with beliefs in his LDS culture and fundamentalist LDS subculture. Themes involving a final battle with the antichrist are found "throughout New Testament apocalyptic literature. It's repeated in Mormon literature and Mormon belief more widely. And it's very common beyond Mormons, as well, the idea of Antichrist." (Tr. at 64.) Mitchell's claim that he, personally, would be the one to fight and kill the antichrist was a manipulation of Elizabeth's existing beliefs to create the illusion that he was all-powerful.

Second, Dr. DeMier relied on the fact that Mitchell put "himself on par with Jesus or God." (Tr. at 1545.) This conclusion is based on a misreading of the BIDI. As Dr. Peterson explained, Mitchell never equated himself with God or Christ in the BIDI. (Tr. at 79.) The revelatory voice of the BIDI is represented as Jesus Christ, not Immanuel David Isaiah. (Tr. at 30.)

-141-

As evidence that Mitchell believes "he has powers greater than God's or that he will control God," Dr. DeMier quotes the following passage from the BIDI: "Behold, thou art Immanuel, and I am God. . . . And behold, if ye shall say that God shall smite this people, it shall come to pass." (Def. Ex. BB at 31-32.) As Dr. Peterson explained, that part of the BIDI is almost a direct quotation from Helaman Chapter 10 of the Book of Mormon. Further, in the context of LDS and other biblical scripture this statement does not imply that Mitchell is claiming power greater than God. (Tr. at 63-73.)

It is true that Mitchell claims that he has been given great authority from God, including the promise he will be a Davidic King, but that is true of other schismatic groups as well. (Tr. at 31.) Mitchell's claim to be the One Mighty and Strong places him squarely in the mainstream of Mormon schismatics. (Tr. at 39.) This is not a delusion, but an oft-repeated claim to religious authority made by like-minded individuals seeking to establish new religious sects.

(2)     Personality Disorders

Mitchell's behavior is best explained as a manifestation of one or more personality disorders, not of psychotic illness. Unlike psychoses, personality disorders do not impair a person's ability to accurately interpret reality. (Tr. 629-30.) "A personality disorder is a collection of personality traits that are maladaptive, that don't serve the person well." (Tr. 1556.) These individuals "have a pattern of learned and relearned behavior, a pattern of responses to thinking and feeling about themselves and the others in their world that are

-142-

maladaptive."  (Tr. at 630.)   In other words, these individuals "have the ability for a

rational and factual understanding of the issues they face but may make very maladaptive

choices, based on their interpretation of the world."  (Tr. at 630-31.)

 A "personality disorder is separate and distinct from a mental disease or defect,

and thus, does not ordinarily constitute the basis of incompetency for purposes of a

federal criminal trial."  In this case, the experts agree that the presence of a  personality

disorder would not be a basis for a finding of incompetency.  (Tr. at 632, 816 & 1879.)

However, it does provide a context for understanding Mitchell's behavior.

(a) Narcissistic Personality Disorder

 Both Dr. Welner and Dr. Gardner diagnosed Mitchell with Narcissistic Personality

Disorder.  (Gov't Ex. 5 at 42-44; Gov't Ex. 20 at 142-44.)  "The essential feature of

Narcissistic Personality Disorder is a pervasive grandiosity, need for admiration, and lack

of empathy."  (Gov't Ex. 20 at 142.)  Malignant narcissism "is a much more severe form

of narcissism than we see in DSM, but it is widely used in the literature."  (Tr. at 679.)

As Dr. Gardner explained, Mitchell readily meets the description of a malignant

narcissist.  (*See* Gov't Ex. 5 at 43.)

 First, the "'behavior of these narcissists is characterized by an arrogant sense of

self-worth and indifference to the welfare of others.'"  (Tr. at 681 (quoting Theodore

Millon, *Disorders of Personality: DSM IV and Beyond*).) Mitchell fits this characteristic

"based not only on his grandiose claim to a prophetic identity and insistence on power

-143-

and control, but also on his shameless use of sacred religious practices to manipulate vulnerable others for his personal power, sexual gratification, and avoidance of responsibility." (Gov't Ex. 5 at 44.) He described his plans to kidnap young girls from their families and "rescuing them from Babel." (Tr. at 681.) Yet he took them to "use them for his sexual purposes," which included being "initiated into this religious cult by what sounds like group sex in which they observe each other having sex with [Mitchell]." (Tr. at 681-82.) Mitchell expressed "no sense of how that impacts these young girls between the ages of 10 and 14, how it impacts their families. No concern for that, these separate individuals. It's all about what [Mitchell] wants and needs for himself." (Tr. at 682.)

These narcissists also display "'a fraudulent and intimidating social manner.'" (Tr. at 682 (quoting Millon).) As Elizabeth recalled, Mitchell can be forceful and determined in an argument. (10/01/09 Tr. at 38.) At the hospital, Mitchell would "stare down" staff when he did not like what they were saying. (Tr. at 301.) Mitchell similarly attempted to intimidate Dr. Gardner "with the intensity of his stare directly into [Dr. Gardner's] eyes." (Tr. at 618.) He also acted aggressively toward Dr. Welner by singing loudly and shouting "Repent!" (Tr. at 861.) When dealing with investigators after his arrest, Mitchell was not intimidated by the officers, but was verbally combative. (Tr. at 682.)

Malignant narcissists also show "'a desire to exploit others, to expect special recognition and considerations without assuming reciprocal responsibilities.'" (Tr. at 682

-144-

(quoting Millon).)  For example, while Mitchell was in the mainstream LDS church, he wanted high-ranking positions and "authority, but didn't provide commensurate service to the community."  (Tr. at 682-83.)  For years, he led a parasitic lifestyle "leeching onto" others and providing nothing in return.

Moreover, the more "severe forms of malignant narcissism have strong sadistic elements consistent with psychopathy."  (Gov't Ex. 5 at 44.)  Mitchell's sadism is evident in the pleasure he derives from "humiliating and debasing his victims (the pornography, use of intoxication to promote prohibited [activities], the use of dead mice to horrify his wife, and the feeding of a pet rabbit to his step-daughter in the guise of chicken dish) as well as the pleasure he derives in deceiving his victims (including the court and law enforcement -  bragging to other inmates of the Utah State Hospital, overhead by staff, that he will never be found competent.)"  (Gov't Ex. 5 at 44.)

Finally, in malignant narcissists, a "'deficient social conscience is evident in the tendency to flout conventions to engage in actions that raise questions of personal integrity, and to disregard the right of others.  Achievement deficits and social irresponsibilities are justified by expansive fantasies and frank prevarications.'"  (Tr. at 683 (quoting Millon).)  Mitchell's professed religious beliefs are precisely that – "expansive fantasies that justify his social deviance."  (Tr. at 683.)

(b)    Antisocial Personality Disorder

Both Dr. Welner and Dr. Gardner also agree that Mitchell meets the criteria for

Antisocial Personality Disorder.  (Gov't Ex. 5 at 42 & Gov't Ex. 20 at 120.)  Mitchell

demonstrates (1) failure to conform to social norms of lawful behaviors; (2) deceitfulness;

(3) reckless disregard for the safety of others; (4) consistent irresponsibility; and (5) lack

of remorse.  (Gov't Ex. 20 at 120.)

Psychopathy is a construct within Antisocial Personality Disorder that is noted in

the DSM-IV, but is developed much more extensively in the scientific literature.  (Tr. at

1075.)  Psychopathy captures "a much more selfish and grandiose and parasitic

personality."  (*Id.*)  It is similar to narcissistic personality disorder in the qualities of

"grandiosity, lack of empathy, and explotiveness."  (Gov't Ex. 20 at 120.)

As explained in Dr. Welner's report, Mitchell displays all the symptoms of

psychopathy contained in the PCL-R, a "twenty item inventory for the assessment of

psychopathy in clinical and forensic settings."  (Gov't Ex. 20 at 122-42.)  Several of those

symptoms are of particular note.

One of the qualities of psychopathy is glibness.  Mitchell is known to be verbally

skilled, articulate and convincing.  Elizabeth noted his ability to adapt to his surroundings

and talk his way out of any situation.  (10/01/09 Tr. at 37-38.)  Indeed, he was able to talk

his way out of trouble on numerous occasions, including his arrest in San Diego, his

encounter with the officer in the Salt Lake City library and the run in with police in Las

Vegas.  As his initial interview with investigators shows, Mitchell is quick on his feet and can skillfully parry questions.  Mitchell also demonstrates his glibness in "how effectively he can communicate yet say as little about himself as possible."  (Gov't Ex. 20 at 123.)

A second prominent feature of Mitchell's psychopathy is grandiosity, which is evident in his portrayal of himself as a prophet and the One Mighty and Strong.  Throughout his life, Mitchell has always sought power and importance.  Even as an adolescent, he related to others "with an air of intellectual superiority."  (Gov't Ex. 20 at 124.)  Elizabeth noted that Mitchell thought highly of himself, held himself out as an authority on every topic and always had to be right.  (10/01/09 Tr. at 17 & 32-33.)

Mitchell exhibits pathological lying, another feature of psychopathy.  He presents a variety of facades to serve his purposes, including a repentant preacher in San Diego, an LDS church investigator in the Kemp home, a religious minority who could not permit Elizabeth to remove her veil in the Salt Lake City library, a couple traveling with their daughter from back east in Las Vegas and a "naive and inept" patient when speaking to Dr. Whitehead.  He used a series of aliases and instructed Elizabeth on exactly what to say if approached.  Elizabeth observed that Mitchell was a convincing liar and enjoyed fooling others.  (10/01/09 Tr. at 32-34.)

Mitchell is also highly manipulative.  As Dr. Welner observed, "it takes an unusual individual to single handedly brainwash two people."  (Tr. at 1077.)  Not only did Mitchell "significantly brainwash Wanda Barzee over the course of their relationship," he

was successful, "to a degree, [in] brainwash[ing] Elizabeth Smart, while she was in their custody." (Tr. at 1078.)  "The whole, who, what, when and where of Elizabeth Smart's life was reconfigured singlehandedly by Brian David Mitchell." (Tr. at 1078.)  Mitchell purposefully targeted Elizabeth because her young age would make her more malleable and her Mormon upbringing would make her  more susceptible to his brand of religious manipulation.  (Tr. at 1078; Gov't Ex. 20 at 129-31.)

In addition, Mitchell has clearly lived a parasitic lifestyle, taking advantage of the generosity of others.  Mitchell is a man who preferred panhandling to working.  He "took advantage of other people's generosity" and "leached (sic) onto" people.  (10/01/09 Tr. at 62.)  He told Elizabeth that he had taken advantage of the West family policy of not turning away anyone in need.  (10/01/09 Tr. at 69.)  He stole what he needed and referred to it as "plundering."  (Gov't Ex. 20 at 140.)

Finally, Mitchell has demonstrated not only callousness and a profound lack of empathy, but also sadistic behaviors.  "Sadism manifested in Brian Mitchell from early in life." (Tr. at 1080.)  Remarkably, Dr. Thomas actually characterized Mitchell as "sadistic" when he was seventeen based on the way he used his intellect to frighten people and exploit their weaknesses.  (Tr. at 1080-81.)

A pattern of sadism continued across his life.  "He kidnapped the children of his first marriage and cut off all contact from their mother." (Tr. at 1081.)  "And then, when he put his children up for adoption, the same children he kidnapped, he sought to prohibit

any contact that they would have with their grandmother, his own mother, so again inflicting this emotional consequence and pain on her by preventing her from having access to her children," not to mention the emotional damage these acts inflicted on the children themselves.  (Tr. at 1081.)

Because Mitchell knew that his second wife was terrified of mice "he filled up an entire cookie sheet in the oven with mice laid neatly in rows, just so she could open up the oven door and have, you know, a panic-stricken reaction and did the same not only with mice but with roaches during the course of their marriage."  (Tr. at 1081-82.)  He served his step-daughter her pet rabbit for dinner and later gloated over having tricked her into thinking it was chicken.  (Tr. at 1082; Gov't Ex. 17f.)

Lastly, Mitchell's sadism was evident in his dehumanizing treatment of Elizabeth. First, he "took her name, then her virginity, then her identity, then her red pajamas, then her ties to her parents, then her dignity . . . as she was being made 'humble.'"  (Gov't Ex. 20 at 138.)

All of these qualities, along with others detailed in Dr. Welner's report, support the conclusion that Mitchell is not a psychotic, but a psychopath.

In sum, Mitchell's behaviors do not fit a diagnosis of delusional disorder or schizophrenia, but are entirely consistent with a personality disorder.  Narcissistic and antisocial personality disorders are not competency limiting and therefore do not constitute a "mental disease or defect rendering him mentally incompetent to the extent

that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." 18 U.S.C. § 4241. Because Mitchell lacks such a "mental disease or defect," he is competent to stand trial.

### 3.   *Even if Mitchell Has Religious Delusions, His Competence to Stand Trial Is Not Impaired.*

Even if the Court were to accept the contrary expert opinion that Mitchell suffers from a psychotic mental illness, Mitchell nonetheless possesses the requisite competency abilities. "That a defendant suffers from some degree of mental illness or disorder does not necessarily mean that he is incompetent to assist in his own defense." *United States v. DeShazer*, 554 F.3d 1281, 1286 (10th Cir. 2009); *see also United States v. Vamos*, 797 F.2d 1146, 1150 (2d Cir. 1986) ("It is well-established that some degree of mental illness cannot be equated with incompetence to stand trial.").

As both Dr. Skeem and Dr. DeMier readily acknowledged, a person suffering from delusional disorder or schizophrenia may still be competent to stand trial. (Tr. at 1601 & 1812.) To render a person incompetent, the "mental illness must deprive the defendant of the ability to consult with his lawyer 'with a reasonable degree of rational understanding' and to understand the proceedings against him rationally as well as factually." *United Stated v. Nichols*, 56 F.3d 403, 412 (2d Cir. 1995) (quoting *Dusky*, 362 U.S. at 402).

The evidence establishes that Mitchell has both a rational and factual understanding of the nature and consequences of the proceedings against him, and a sufficient present ability to consult with his lawyer with a reasonable degree of rational

understanding.  Mitchell's disruptive and uncooperative behavior is nothing more than an intentional attempt to derail these proceedings.

>    a.    Mitchell Has a Rational as Well as Factual
>            Understanding of These Proceedings.

To be competent to stand trial, a defendant must have "a rational as well as factual understanding of the proceedings against him." *Dusky*, 362 U.S. at 402.  The record is replete with evidence that Mitchell has such a rational and factual understanding.

As an initial matter, Mitchell has clearly demonstrated an intellectual capacity to understand these proceedings.  He is a well-read, largely self-educated man who has consistently been described as highly intelligent by the people who have known him outside a forensic setting.  He has the ability to understand, process and interpret complex information, as demonstrated by the construction of the BIDI.  This is also reflected in his ability to "read books of  great length and depth and substance and then to have extensive conversations with [clinical staff] which they found to be full of insight, very thoughtful, and in certain instances very compelling."  (Tr. at 902.)  While at the hospital, he learned chess, "a game of strategy and he learned it so well that he was playing it competitively with staff."  (Tr. at 902.)  Mitchell even orchestrated a complex television viewing arrangement based on staff schedules, show times, patient privilege levels, requirements for each room and viewing preferences in order to ensure that he could watch his favorite television program.  To "organize all of these people into a neat symphony," to "organize these moving parts in a way to harmoniously meet his needs," required "a lot of

organization and thinking." (Tr. at 901.)  Mitchell has more than sufficient cognitive capacity to understand these legal proceedings.

Indeed, Mitchell's own words demonstrate that he does fully understand the proceedings in which he is engaged.  While at the Utah State Hospital, Mitchell advised other patients about competency hearings (Gov't Ex. 20 at 36), and explained the role of the hospital, the courts, and the attorneys in the legal system (Tr. at 171-73).  During his interview with Dr. DeMier, Mitchell described the evaluation process.  He accurately explained that there is an initial one month evaluation, that the court rules as to competency, that a finding of competence would lead to trial and that a finding of incompetence would lead the court to consider whether to order involuntary medication. (Gov't Ex. 33c; *see also* Tr. at 909.)  As Dr. DeMier testified, this exchange showed that Mitchell has an "accurate factual understanding of the proceedings." (Tr. at 1579.)

During the state proceedings, Mitchell expressed an understanding of and particular interest in the involuntary medication hearing.  Mitchell's social worker noted that Mitchell "'asked pertinent questions about medication hearings without religious overtones.'" (Govt' Ex. 20 at 47.)  Mitchell and his father discussed the application of new involuntary medication legislation.  (*Id.*)  Mitchell also asked another patient how his medications made him feel because it was likely that he would be forced to take medications.  (Tr. at 141-42.)  Mitchell even had the foresight to ask his treatment team whether his singing in court would cause the judge to order him involuntarily medicated.

-152-

Mitchell showed "an awareness of the consequence of his singing in a court proceeding and how it could have broader legal ramifications." (Tr. at 910.)

The Addition to the BIDI also shows that Mitchell has a keen awareness and understanding of the charges. The Addition, which was written after Mitchell was arrested, interrogated and advised by counsel, "eloquently addresses every one of his charges with a defense." (Tr. at 903.) "He accounts for burglary. He accounts for sexual assault. He accounts for kidnaping." (Tr. at 903.) "He's not writing randomly. He's writing about his charges. And so intellectually he's reflecting an understanding of his charges because he's writing a defense to them." (Tr. at 904.) In fact, Mitchell displayed an understanding of the potential charges even in his very first law enforcement interview in which he skillfully avoided answering incriminating questions about Elizabeth's age, his entry into the Smart home, the manner in which Elizabeth was restrained and the sexual assaults.

Mitchell also displays a rational understanding of the seriousness of the charges and the potential sentence. Mitchell recognizes the high-profile nature of his case (Gov't Ex. 33b), and that the world is likely to view him as "a child predator, sexual deviant and a monster" (Tr. at 422). During the plea negotiations, he had clear knowledge of the potential sentence and explained to Dr. Skeem that the state was seeking at least 30 years. (Tr. at 1695 & 1838.) He told his social worker that he expected to be locked up for the rest of his days. (Gov't Ex. 20 at 35.)

Finally, Mitchell has a rational appreciation for the strength of the evidence against him.  He told both Dr. Skeem and Dr. DeMier that he knew he would be convicted if he went to trial.  (Tr. at 1593 & 1696.)  As Dr. DeMier recognized, Mitchell's statement "reflects the factual assessment, and I think a rational assessment, he understands the evidence against him is extremely strong."  (Tr. at 1594.)  Mitchell even displays an accurate understanding of the type of evidence admissible at trial and told Dr. DeMier that the prosecutors would likely object to his testimony as immaterial.  (Tr. at 1599.)

While the defense concedes that Mitchell appears to have "a clear, factual understanding of the charges," they maintain that his "rational appreciation is limited . . . by the belief that he is only being held according to God's will and that he may be miraculously released."  (Tr. at 1904.)  But Mitchell's claims of a belief in God's will and divine deliverance ring hollow.  He has stated that he expects to spend the rest of his life in custody.  His reaction to the state prosecutor's letter stating that the federal government would prosecute if he was sentenced to less than 30 years expressed a rational understanding of and concern with the sentence he faced.  His engagement in plea negotiations itself shows that he was interested in seeking a lower sentence.  Mitchell has also expressed a keen interest in his housing arrangements and concern for his safety if placed in the general prison population.  If Mitchell was compelled to passively submit to God's will, there would be no reason for him to engage in plea negotiations for a lower sentence or to raise the issue of protective custody.  Mitchell's selective engagement

when he stands to benefit demonstrates that his rational appreciation of the proceedings is not impaired.

> b.      Mitchell Has the Ability to Consult with Counsel
> with a Reasonable Degree of Rational Understanding.

Mitchell also has a sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding. Mitchell has a demonstrated ability to cooperate with counsel when it serves his purposes. In San Diego, for example, Mitchell discussed his case with his lawyer and the best way to proceed. (Gov't Ex. 19 at ¶ 2.) In his dealings with his lawyer, Mitchell was "a pleasant, pathetic person" who "seemed very peaceful, friendly and remorseful." (Gov't Ex. 19 at ¶ 1.) His lawyer advised Mitchell to plead guilty and Mitchell followed that advice and was successful in securing his release. (10/01/09 Tr. at 29.) During the hearing itself, when his lawyer interrupted and directed him to answer the court's question, Mitchell responded to his lawyer and followed his direction. (Tr. at 656; Gov't Ex. 18.) Mitchell showed the capacity to cooperate with counsel where it was in his best interests to do so.

Mitchell has also demonstrated a capacity to have relevant legal discussions without resorting to religious rhetoric or breaking into song. For example, during his third interview with Agent Dougherty, Mitchell engaged in an open dialogue about the legal process. He asked relevant questions, was especially attentive and inquisitive, and appeared to fully understand. (Tr. at 415-18.) During this conversation, Mitchell did not speak at all about religion. (Tr. at 419.) Mitchell discussed the involuntary medication

proceedings with his treatment team "'without religious overtones.'"  (Govt' Ex. 20 at

47.)  Similarly, when Mitchell was describing the competency proceedings to Dr. DeMier

he was "articulate and coherent" and did not speak in religious terms.  (Tr. at 1579.)

These examples show that Mitchell has the ability to engage in legal discussions without

singing or speaking religiously.

     In addition, Mitchell has the ability to disclose pertinent facts about his case to

counsel.  Mitchell knows full well what facts are pertinent to his case as illustrated by his

response to the charges in the Addition to the BIDI.  (Tr. at 1012.)  This knowledge was

also demonstrated in his initial law enforcement interview through his skillful avoidance

of key facts while responding to more innocuous questions.  (Tr. at 1012-13.)  Moreover,

"in his communication with staff about a whole range of issues, Brian Mitchell was

known to be able to communicate with great detail and great insight.  If you can

communicate with great detail and great insight about the sophisticated literary work, you

can certainly disclose pertinent facts about your case."  (Tr. at 1013.)  Finally, Mitchell

has no history of brain damage or memory loss that would impede his ability to recall and

communicate pertinent facts.  (Tr. at 1013.)  Therefore, the "available evidence reflects

that Brian Mitchell has the organic brain capacity as well as the demonstrated competence

in disclosing pertinent, very specific details as they relate to his case."  (Tr. at 1013.)

     Mitchell has also demonstrated the ability to work with and take advice from

others.  His relationship with patient John is significant in this regard.  It shows that if

Mitchell is "working with someone who he respects, that he changes, that he evolves." (Tr. at 1018.)  Mitchell and John spoke not only of religion, but also of legal matters. Mitchell would listen and take notes when John explained how things worked in the legal system.  (Tr. at 168.)  Mitchell would ask questions and John would respond by taking out his legal papers and explaining them to Mitchell.  (Tr. at 169.)  Mitchell and John did not discuss legal matters merely in general, but specifically collaborated on this case, as evidenced by the thirteen-page document John generated containing references to both Mitchell and Elizabeth.  (Tr. at 345-46.)  Mitchell later told Dr. DeMeir that he would like to be represented by an inmate who was a prophet and expert in constitutional law, a clear reference to John.  (Tr. at 1598.)  Mitchell's desire to be represented by someone who not only shares similar religious beliefs, but also has expertise in constitutional law shows his capacity to work within the legal system.  (Tr. at 1021.)

Furthermore, the evidence shows that Mitchell has demonstrated the ability to work with his attorneys on the present charges when he chooses to do so.  The most significant example is Mitchell's collaboration with his attorneys during the state plea negotiations.  "Because the decision whether or not to plead guilty is of paramount importance, and tests the defendant's ability to communicate with counsel and assist in his own defense, evidence surrounding a defendant's decision not to accept a plea bargain is relevant to the competency determination."  *United States v. Montoya*, 1996 WL 229188, *2 (10th Cir. 1996) (internal citation omitted).

During plea negotiations, Mitchell was actively engaged and even asked to review the evidence against him.  (Tr. at 1688.)  Mitchell was amenable to pleading guilty, but not to the sexual assault count.  (Gov't Ex. 11 at 1; Tr. at 923-24.)  After the state rejected this proposal, Mitchell told Dr. Skeem that he was disappointed that the Smart family had apparently had a change of heart and that the state was no longer willing accept a plea that did not include the sexual assault charge.  (Tr. at 1695, 1823-25 & 1834.)  Mitchell further explained that the federal government would prosecute if he were not sentenced to at least 30 years on the state charges.  (Tr. at 1695 & 1838.)

In correspondence with the State, Mitchell's attorneys stated, "After fully advising Mr. Mitchell about your offer, he has authorized us to inform you that he will not accept your offer. . . ."  (Gov't Ex. 11 at 4; Tr. at 924.)  In a separate letter, defense counsel represented that they had kept their client "fully informed of any plea offers" and that "the acceptance or rejection of any plea offer and when it occurs is in the sole discretion of our client."  (Gov't Ex. 11 at 8; Tr. at 925.)

The evidence demonstrates that Mitchell was actively engaged in plea negotiations, communicating with counsel and controlling the terms on which he would plead guilty.  There is nothing irrational about a defendant finding a plea to sexual assault unpalatable.  Likewise, there is nothing irrational about a 50-year-old defendant choosing to take his chances at trial when the only plea offer on the table comes with a 30-year

sentence.  Mitchell has demonstrated an ability to work with counsel when he perceives it
to be in his best interests and to shut down when it is no longer so.

More recently, Mitchell has been working with his federal defense team.  Although
he told Dr. DeMier that he had never spoken to counsel and was unlikely to do so,
Mitchell has been observed talking with his defense team for long stretches of time and
behaving normally.  (Tr. at 479 & 497.)  In addition, defense counsel informed Dr.
Welner that Mitchell had been speaking to them for some time.  (Tr. at 834.)  Even as
recently as last August, defense counsel represented that Mitchell "has started to review
these [FBI 302] reports and, for purposes of the competency hearing, has not discovered
any dispute with the facts related by the lay witnesses."  (Docket No. 73 at 2.)  This
"demonstrates that he was working with defense and relied upon by defense in order to go
through evidence and to give any indication as to whether he had a contradictory account
or whether there was any problem with that evidence."  (Tr. at 955.)

At the competency hearing, the defense presented no evidence regarding the
defense team's interaction with Mitchell despite the fact that this evidence is uniquely in
the possession of the defense.  The only representation made by the defense occurred
during closing argument when Mr. Steele stated that his "interaction with Mr. Mitchell
has reflected an indifference to the task faced by the defense team and to the outcome
here, and evidenced nonparticipation" similar to that displayed to Dr. DeMier and in
courtroom.  (Tr. at 1904.)  In light of the evidence showing Mitchell's capacity to work

-159-

with an attorney, this representation simply reinforces the conclusion that Mitchell makes a volitional decision whether to participate based on whether he perceives it to be in his best interests to do so.

Finally, Mitchell is "a very effective advocate" and is actively engaged in promoting his best interests. (Tr. at 936.) "At Utah state there is a very extensive record of his getting the food he wants, the special diet considerations, his being able to get staff to obtain books for him even when he otherwise might not have access to them, for his being able to get the movies that he wants to watch, for his being able to negotiate the kind of schedule in which he would meet with and interact with staff." (Tr. at 936.)

Mitchell not only advocates for his needs but "has advocated for himself even in the legal sense." (Tr. at 936.) He has been "very effective in thwarting questioning, and that has assisted his defense. And Mr. Mitchell has been very effective in thwarting any scrutiny that might be cast upon him that would reflect upon his capacity to go to trial." (Tr. at 936.) Mitchell has controlled his message by referring people to the BIDI "the way a corporation would a press release." (Tr. at 903.) He has chosen not to talk to the media for fear it would hurt his case, even though it would provide a platform for his religious ideas. (Gov't Ex. 20 at 36.) Mitchell's professed religious mission "has taken a back seat to his priority and his mission to advance his defense to his best self-interest." (Tr. at 956.)

In sum, the evidence establishes that Mitchell has the capacity to assist in his defense and consult with his lawyer with a reasonable degree of rational understanding. To the extent he refuses to do so, it reflects his perception that cooperation is not in his best interests given the weight of the evidence against him and the length of his potential sentence. It does not reflect on his competency to stand trial.

c.    Mitchell's Uncooperativeness and Disruptive Behavior
Are the Result of Volitional Decision Not to Participate.

The defense claim that Mitchell desperately wants to be found competent so he can stand trial is not borne out by the evidence. Mitchell refused to speak to either Dr. Gardner or Dr. Golding for purposes of determining his competency to stand trial. In contrast, he opened up to Dr. Skeem in order obtain an opinion that he was competent to enter a plea. Once his desired plea fell through, he spoke with Dr. Skeem again and was able to convince her that he was no longer competent. As soon as Dr. Skeem told Mitchell she believed he was incompetent, he did not say "oh, no, Dr. Skeem, please don't find me incompetent, I will speak to you, what can we resolve here?" (Tr. at 1001.) Instead, he refused to speak with her again because he had achieved his purpose.

After he was adjudged incompetent by the state, he refused to speak with Dr. Berge who could have reassessed the finding of incompetence. (Tr. at 1002.) He also consistently refused to attend any competency classes at the Utah State Hospital that could have led to a finding that his competency had been restored. (Tr. at 1876.)

-161-

During the federal proceedings, Mitchell never told Dr. DeMier that he desperately wanted to be found competent or that he wanted to be martyred.  (Tr. at 1600.)  After he discovered that Dr. DeMier considered him incompetent, Mitchell had two more opportunities to disabuse evaluators of this notion.  Nonetheless, he refused to speak with Dr. Welner in April 2009 and refused to speak with Dr. Gardner in November 2009.  (Tr. at 1876.)

Mitchell has also refused to undergo psychological testing that might yield valuable information about his competency to stand trial.  Significantly, Mitchell has been psychologically tested twice before – once as an adolescent and once in the 1980s – and that testing did not reveal any psychological illness.  Mitchell's avoidance of psychological testing is "not because he suspects that testing is to show him to be ill because the previous test[s] did not."  (Tr. at 1008.)  Instead, he refuses such testing for fear it would rebut the conclusion that he is incompetent.

During his stay at the Utah State Hospital, Mitchell went to great lengths to maintain a finding of incompetency.  He "was cunning enough to avoid participating in activities that would reflect some improvement in his condition."  (Tr. at 1004.)  He selectively refused to talk to staff, especially about any issues pertinent to his competency.  (Tr. at 1003.)  He attempted to avoid staff scrutiny by speaking very quietly with others and carrying on conversations outside staff earshot.  (Tr. at 308.)  He was aware of the placement of cameras and the presence of staff and "was always very particular as to

noting that the staff weren't overhearing him." (Tr. at 308.)  He mastered the staff schedules and timed his presence in common areas to coincide with the presence of selected staff. (Tr. at 304-05.)   In Dr. Welner's professional opinion, these are "conscious efforts to avoid detection by people who are in a position to assess competency in the case of no other evidence of paranoia, no other evidence of psychotic disorganization, no other evidence of religious hyper absorption." (Tr. at 1007.)

Mitchell's so-called "word fast" was contrived to thwart a finding of competency. Mitchell began his prolonged period of silence the day after a staff member had bragged that staff charting would be able to prove Mitchell competent if he continued what he was doing. (Tr. at 145-50.)  Notably, Mitchell never claimed that his silence was religiously motivated (Tr. at 301), and there was "no other hyper religiosity going on at the same time" (Tr. at 1003).   Instead, Mitchell maintained his customary activities and continued to speak to select individuals.  (Tr. at 1003-04.)

Mitchell specifically avoided contact with people who would be in a position to evaluate his competency.  Not only did he refuse to meet with Dr. Berge, he also negotiated with his treatment team to meet with them less frequently.  (Tr. at 972.)

When he did meet with his treatment team, Mitchell engaged in "religious babbling."  (*Id.*)  In contrast to his rational and linear conversations with many staff members, when Mitchell "is involved in questioning of a psychologist or someone whom he believes to be in a position to contribute to his examination, his responses are more

wandering and more vague and more replete with these sort of Old English references like mattereth not and thou sayest." (Tr. at 973.) Mitchell showed such a different face to his treatment team that they described him as "inept" and "boring" (Tr. at 1412-13 & 1448; Gov't Ex. 20 at 45), while staff "have characterized him even as the most interesting patient that they have ever had on the unit because he is such a good conversationalist, because he talks about things with depth and substance and personality" (Tr. at 973-74). Staff did observe, however, that Mitchell had a tendency to "steer the discussion to this impenetrable religiosity when he was uncomfortable with a discussion, no matter what it was." (Tr. at 975.) This was not a manifestation of mental illness, but a way for Mitchell to thwart questioning. (*Id.*)

Similarly, singing in court is a contrivance to derail the proceedings and create the false impression that he is unable to control his behavior. (Tr. at 934.) Although the defense has suggested that Mitchell's singing is a psychotic response to stress, Mitchell has repeatedly demonstrated that he has the capacity to be composed and in control, even in stressful situations. Mitchell never broke into song when he was confronted by police while holding Elizabeth captive. (10/01/09 Tr. at 32.) During his court appearance in San Diego, he did not sing or cry repentance, but instead maintained his composure even in the face of a prolonged and stressful silence. (Tr. at 654.)

In addition, during his initial interrogation, Mitchell was calm, collected and confident. (Tr. at 976-78.) In Dr. Welner's professional opinion, there is nothing in the

-164-

courtroom that would approximate the stress that Mitchell was under in that interrogation, and yet in the video "he is not singing, he is maintaining his composure." (Tr. at 991.) Mitchell's lack of distress in the interrogation speaks to "what a cool and composed character he is under stress." (Tr. at 984.) His ability to maintain an unflappable demeanor during such intense questioning shows that his ultimate resort to singing was not an uncontrolled response to stress, but rather a conscious decision to reassert control of the interrogation and shut down further questioning.

Mitchell remained similarly composed and quiet during both the video of Elizabeth's interview and questions about pedophilia during Dr. Welner's evaluation. Watching the video of Elizabeth describing his alleged crimes approximated the experience of confronting one's accuser in court. (Tr. at 846-47.) Mitchell was attentive and pressed close to the screen, but was "quiet, composed, appropriate, not disruptive, [and] did not sing." (Tr. at 855.) In addition, while Mitchell had sung loudly and cried repentance during the most non-threatening part of the interview, he sat calmly and quietly while Dr. Welner asked questions about pedophilia. (Tr. at 856.) Mitchell's composure in such a variety of highly stressful situations shows that "he's perfectly capable of sitting in court quietly if he wishes to." (Tr. at 855.)

Indeed, Mitchell demonstrated his capacity to behave appropriately in court during his early state court appearances. For example, after both sides had stipulated to Mitchell's competency in order to pursue plea negotiations, Mitchell was arraigned and

entered pleas of not guilty without singing or otherwise disrupting the proceeding.  (Gov't

Ex. 42; Tr. at 923.)  The abrupt change in Mitchell's courtroom behavior after plea

negotiations broke down shows that the behavior is "contrived" and "theatrical."  (Tr. at

864-65.)

As Mitchell has admitted, he purposefully sings in court to disrupt the process.

(Tr. at 175-76.)  Dr. Welner correctly concluded that "Mitchell made the decision that he

needed to derail the process because the plea option was unacceptable to him."  (Tr. 934.)

He knew he would be found guilty if he went to trial.  (Tr. 934-35.)  He understood that

"he was approaching trial with evidence very much stacked against him with a sentence

that he was facing to be quite significant so there would be no incentive for him to go to

trial and every incentive to derail the process."  (Tr. at 935.)  "Brian Mitchell stopped this

train in 2004 because he was confronting a situation that was very much not in his interest

and there was no incentive for him to continue with the trial process, and this is what he

figured out to do."  (Tr. at 935-36.)

Mitchell has stated that he will "never be out of the hospital as I will never

acknowledge guilt and they will never parole me nor find me competent as I will not

participate in a corrupt system."  (Gov't Ex. 20 at 35 & 83.)  Mitchell evidently believes

that his refusal to participate will enable him to remain in the hospital and avoid trial.

However, a defendant cannot stop the wheels of justice merely by lying down on the

tracks.  Regardless of whether he chooses to actively participate in the process, Mitchell is competent to proceed and will stand trial for his alleged crimes.

## PROPOSED CONCLUSION

As Dr. Gardner accurately concluded, Mitchell's "presentation of extreme idiosyncratic fundamentalist beliefs, his unconventional lifestyle, and his disruptive courtroom behavior are neither the direct and inevitable expression of an underlying mental illness nor an expression of genuine religious belief and devotion."  (Gov't Ex. 5 at 23.)  Moreover, even if Mitchell does suffer from a mental illness, he nonetheless possesses both a rational and factual understanding of the nature and consequences of the proceedings against him and a sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding.  Therefore, he is competent to stand trial.

DATED this 1st day of February, 2010.

CARLIE CHRISTENSEN
Acting United States Attorney

/s/ Diana Hagen

_____

DIANA HAGEN
Assistant United States Attorney

-167-

CERTIFICATE OF SERVICE

I hereby certify that I am an employee of the United States Attorney's Office for

the District of Utah and that a copy of the foregoing PROPOSED FINDINGS OF FACT

AND CONCLUSIONS OF LAW REGARDING  DEFENDANT BRIAN DAVID

MITCHELL'S COMPETENCY TO STAND TRIAL was mailed postage prepaid,

delivered through interoffice mail, or electronically filed to all parties named below, this

1st day of February, 2010.

Steven B. Killpack
Robert L. Steele
Parker Douglas
Audrey K. James
Utah Federal Defender Office
46 West Broadway, Suite 100
Salt Lake City, Utah 84101

Michael P. O'Brien
Jones Waldo Holbrook & McDonough
170 S. Main Street, Suite 1500
Salt Lake City, Utah  84101

/s/ Diana Hagen
_____