# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

## CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | **MEMORANDUM DECISION & ORDER DETERMINING COMPETENCY** |
| Plaintiff, | |
| v. | |
| BRIAN DAVID MITCHELL, et al., | **Case No. 2:08CR125DAK** |
| Defendants. | **Judge Dale A. Kimball** |

This matter is before the court on the United States' motion, brought pursuant to 18 U.S.C. § 4241, to determine Defendant Brian David Mitchell's competency to stand trial for the charges of kidnaping in violation of 18 U.S.C. § 1201(a)(1), and unlawful transportation of a minor in violation of 18 U.S.C. § 2423(a). This court held an evidentiary hearing on Mitchell's competency on October 1, 2009 and November 30, 2009 through December 11, 2009. At the hearing, the United States was represented by Brett L. Tolman, Richard N.W. Lambert, David F. Backman, Diana Hagen, and Alicia Cook, and Defendant Brian David Mitchell was represented by Robert L. Steele, Parker Douglas, Audrey K. James, and Kent Hart. After the hearing, the parties submitted legal memoranda and proposed findings and conclusions. The court received the parties' final submissions on February 16, 2010. Having carefully considered the evidence admitted at the hearing, including the competency evaluations of Dr. Michael Welner, Dr. Noel Gardner, and Dr. Richart DeMier, the arguments advanced by the parties in their written

memoranda and at the hearing, as well as the law governing a determination of competency, the court enters the following Findings of Fact, Conclusions of Law, Memorandum Decision and Order Determining Competency.

## PRELIMINARY LEGAL ISSUES

### A.  Competency Standard

The standard for determining competency is well established through United States Supreme Court case law.  Federal courts have acknowledged that the Due Process Clause of "[t]he Constitution forbids the trial of a defendant who lacks mental competency." *United States v. DeShazer*, 554 F.3d 1281, 1285 (10th Cir. 2009)*.*  Accordingly, the United States Supreme Court set forth a standard for determining competency in *Dusky v. United States*, 362 U.S. 402 (1960), which requires a defendant to have (1) a rational and factual understanding of the proceedings and (2) the ability to consult with counsel with a reasonable degree of rational understanding.  *Id.*  More recently, the Supreme Court has recognized that requiring a criminal defendant to "be competent has a modest aim: It seeks to ensure that he has the capacity to understand the proceedings and to assist counsel."  *Godinez v. Moran*, 509 U.S. 389, 402 (1993).

In this case, Mitchell's defense counsel recognized at the competency hearing that Mitchell has a factual understanding of the proceedings.  The issue for the court, therefore, is to determine whether Defendant has a rational understanding of the proceedings and the ability to consult with counsel with a reasonable degree of rational understanding.  "A defendant lacks the requisite rational understanding if his mental condition precludes him from perceiving accurately, interpreting, and/or responding appropriately to the world around him." *Lafferty v. Cook*, 949 F.2d 1546, 1551 (10th Cir. 1992).  "Although the facts in each case vary, the circuits addressing

2

competency after *Dusky*, including our own, have used a sufficient contact with reality as the touchstone for ascertaining the existence of a rational understanding." *Id*. (citing cases).

### B. Evidence Relevant to Determining Competency

The court's determination of competency is a factual, rather than legal, determination. *United States v. Makovich*, 209 F.3d 1227, 1232 (10th Cir. 2000). In determining competency, this court "'may rely on a number of factors, including medical opinion and the court's observation of the defendant.'" *United States v. Boigegrain*, 155 F.3d 1181, 1189 (10th Cir. 1998) (quoting *United States v. Nichols*, 56 F.3d 403, 411 (2d Cir. 1995)). In cases, such as this one, with multiple experts, a district court may find a defendant competent by adopting the findings of one expert and discounting the contrary findings of another. *Miles v. Dorsey*, 61 F.3d 1459, 1472-74 (10th Cir. 1995); *Mackovich*, 209 F.3d at 1232; *Deshazer*, 554 F.3d at 1287.

"[T]he Court may rely on, in addition to expert testimony, lay witness testimony concerning the [defendant's] rational behavior, and cross examination of [defendant's] expert." *Bundy v. Dugger*, 675 F. Supp. 622, 634 (M.D. Fla. 1987) (citing *United States v. Mota*, 598 F.2d 995, 998-1000 (5th Cir. 1979)). Lay witness testimony is especially important where the evidence indicates a defendant may be malingering or manipulating the system. *See, e.g., United States v. Gigante*, 925 F. Supp. 967, 976 (E.D.N.Y. 1996) (relying on lay witness testimony to find that defendant's "actions and decisions were wholly inconsistent with the behavior observed by the doctors . . . and that his motive for putting on a 'crazy act' for all those years was to avoid apprehension by law enforcement"); *United States v. Birdsell*, 775 F.2d 645, 650-51 (5th Cir. 1985) (affirming finding of competency based in part on the district court's reliance on "the observations of those witnesses in long-term daily contact with the patient rather than

3

conclusions based on a relatively brief period of examination"); *State v. Robertson*, 932 P.2d 1219, 1224 (Utah 1997), *overruled on other grounds by State v. Weeks*, 61 P.3d 1000 (Utah 2002) (affirming finding of competency based in part on district court's reliance of lay witness testimony from a police officer, a nurse, and a clinical worker).

In several pre-hearing motions, defense counsel sought to preclude lay witness testimony, expert testimony relating to Mitchell's cultural influences, and the report and testimony of Dr. Michael Welner. The court previously denied those motions in written opinions issued prior to the competency hearing. Defense counsel continues to assert that the evidence should not be considered or should be given little, if any, weight. The court, however, having now had the opportunity to view the evidence in context during the competency hearing is more persuaded than before as to the relevance and necessity of this evidence to the court's determination of competency. Mitchell's refusal to participate in the process makes this information necessary to a full understanding of his condition. Mitchell has selectively spoken with mental health evaluators and refused to be psychologically tested. There was no credible evidence that Mitchell's refusal to participate in psychological testing, something that could undermine a finding of incompetence given the results of psychological testing he had when he was younger, was anything other than a self-serving decision. The court, therefore, concludes that there is no basis for revisiting its prior evidentiary rulings.

The defense also takes issue with the court making extensive factual findings in relation to its determination of competency. Defense counsel contends that any findings relating to Mitchell's potential guilt of the charged crimes will prejudice Mitchell at trial. But courts routinely make preliminary factual findings in connection with pre-trial motions, such as motions

4

to suppress, that may relate to the potential guilt of the defendant.  Rule 12(d) of the Federal Rules of Criminal Procedure states that "[w]hen factual issues are involved in deciding a motion, the court must state its essential findings on the record."  Fed. R. Crim. P. 12(d).  Accordingly, the court is required to include any fact it believes essential to its ruling.  As discussed above, the court disagrees as to the scope of relevant evidence relating to Mitchell's competency and Mitchell himself has made the need for extensive information necessary.  Moreover, the court is only making findings relevant to competency, an eventual jury will make findings as to guilt. Under 18 U.S.C. § 4241(f), the court's findings with respect to competency are not admissible at trial and "shall not prejudice the defendant in raising the issue of his insanity as a defense to the offense charged."  Any question as to potential juror prejudice can be dealt with during the jury selection process and in specific jury instructions.

**C.  Burden of Proof**

Under 18 U.S.C. § 4241, a defendant is not competent to stand trial if "the court finds by a preponderance of the evidence that the defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense."  *Id.*; *see also United States v. Parsons*, 967 F.2d 452, 455 (10th Cir. 1992).  While the statute plainly states that the burden of proof is a preponderance of the evidence, it does not state which party bears that burden.  *See United States v. Wayt*, 24 Fed. Appx. 880, 883 (10th Cir. Nov. 27, 2001) (unpublished) (noting that the "federal statute providing for competency hearings does not allocate the burden of proof"); *see also United States v. Whittington*, 586 F.3d 613, 617 (8th Cir. 2009) (stating "Congress has not set forth which party has the burden of proving whether a

5

defendant is competent to stand trial").

In dicta, the United States Supreme Court has indicated that the burden under Section 4241 lies with the defendant. *Cooper v. Oklahoma*, 517 U.S. 348, 362 (1996). *Cooper* dealt specifically with an Oklahoma state statute requiring defendants to prove incompetence by clear and convincing evidence rather than burden of proof under the federal statute. But, in the context of discussing the various burdens of proof required by the states, the Supreme Court noted that "Congress has directed that the accused in a federal prosecution must prove incompetence by a preponderance of the evidence. 18 U.S.C. § 4241." *Id.* at 361-62.

The Tenth Circuit has not directly addressed which party bears the burden of proof under Section 4241.[1] Citing *Cooper*, the Tenth Circuit has previously stated that the burden of proving incompetency is on the defendant, but the burden of proof was not directly challenged in any of these cases. *See United States v. Sanchez-Gonzalez*, 109 Fed. Appx. 287, 290 (10th Cir. Sept. 9, 2004) (stating that the "Government may presume the defendant is competent and require him to shoulder the burden of proving his incompetence by a preponderance of the evidence"); *United States v. Montoya*, No. 95-8052, 1996 WL 229188 * 2 (10th Cir. May 7, 1996) (stating that the

_____

[1] Other Circuits are split on the issue of who bears the burden of proof in a federal competency proceeding. The Fourth Circuit places the burden of proof on the defendant to prove his incompetency. *United States v. Robinson*, 404 F.3d 850, 856 (4th Cir. 2005) (finding that "[u]nder federal law the defendant has the burden, 'by a preponderance of the evidence [to show] that the defendant is presently suffering from a mental disease or defect rendering him incompetent"). In contrast, the Third, Fifth, Seventh and Ninth Circuits place the burden on the government to prove competence. *See United States v. Teague*, 956 F.2d 1427, 1431 n.10 (7th Cir. 1992); *United States v. Frank*, 956 F.2d 872, 875 (9th Cir. 1991); *United States v. Velasquez*, 885 F.2d 1076, 1089 (3d Cir. 1989); *United States v. Hutson*, 821 F.2d 1015, 1018 (5th Cir. 1987). The Eleventh Circuit has taken the position that "arguably [§ 4241] contemplates that the burden will lie with the party making a motion to determine competency." *United States v. Izquierdo*, 448 F.3d 1269, 1276 (11th Cir. 2006).

"burden is on the defendant to prove incompetence by a preponderance of the evidence"); *see also United States v. Smith*, 521 F.2d 375, 377 (10th Cir. 1975) (noting that the test for competency "raises issues of fact as to which the defendant has the burden of proof").

In *United States v. Wayt*, 24 Fed. Appx. 880 (10th Cir. Nov. 27, 2001) the defendant argued that the district court had committed plain error by allocating the burden of proof to the defense. The court held that it "need not resolve the question here, because the district court's allocation of the burden of proof did not affect the outcome of its competency determination." *Id.* at 883. The court noted that the "'allocation of the burden of proof to the defendant will affect competency determinations only in a narrow class of cases where the evidence is in equipoise, that is, where the evidence that a defendant is competent is just as strong as the evidence that he is incompetent.'" *Id.* (quoting *Medina v. California*, 505 U.S. 437, 441 (1992) (applying state law standard)). Because the evidence was not in equipoise, the allocation of the burden of proof had no impact on the district court's decision that the defendant was competent.[2] *Id.*

Although the guidance from the Supreme Court and the Tenth Circuit suggests that the burden of proof in this Circuit rests with the defendant, the law on this issue is not settled. This court concludes, however, as stated in *Wayt*, that it need not weigh in on the issue because the

---

[2]     The Second and Eighth Circuit have taken similar positions. In *United States v. Whittington*, 586 F.3d 613 (8th Cir. 2009), the Eighth Circuit recognized that "[g]uidance of the Supreme Court, and the recent precedent of this circuit, support the government's position that the burden is on the defendant to prove incompetence." *Id.* at 618. The court nevertheless declined to reach the issue because the "district court's finding of competency in this case did not depend upon the allocation of the burden of proof." *Id.* Similarly, in *United States v. Nichols*, 56 F.3d 403 (2d Cir. 1995), the Second Circuit declined to reach the issue given the district court's written finding that "its competency ruling did not depend on whether the government or the defendant bore the burden of proof." *Id.* at 410.

evidence in this case is not in equipoise.  The allocation of the burden of proof would have no

effect on this court's conclusion as to Mitchell's competency to stand trial.

## FACTUAL SUMMARY[3]

The charges against Mitchell arise from the 2002 kidnaping of Ms. Elizabeth Smart, who

was then fourteen years old.  After the Utah state courts found Mitchell incompetent to stand trial

and ineligible for involuntary medication, the United States Attorney's Office proceeded with

this federal prosecution.  At the federal competency hearing, this court heard a substantial

amount of evidence that was not part of the state court record.  Three new competency

evaluations were prepared by mental health experts in connection with the federal proceeding.

And, in addition to the testimony of mental health experts, the court heard evidence from Utah

State Hospital staff, co-Defendant Wanda Barzee, and Ms. Smart.  The court also heard evidence

regarding the cultural context of Mitchell beliefs, their similarity to the beliefs of other leaders of

schismatic fundamentalist Mormon sects, and details of Mitchell's failed plea negotiations with

the State of Utah that were not revealed in the state competency hearing.[4]

---

[3]  The consecutively paginated transcript of the hearing held between November 30 and December 11, 2009, is cited herein as (Tr. at ___ ).  The transcript of the October 1, 2009, hearing is cited herein as (10/01/09 Tr. at ___ ).

[4]  Based on testimony presented at the competency hearing, the court requested the parties to brief whether the Utah state standard for competency was more stringent than the federal standard.  *See Godinez,* 509 U.S. at 402 (acknowledging that states can adopt more elaborate standards than the federal *Dusky* standard).  Utah Code Annotated Section 77-15-2 provides a competency standard consistent with *Dusky*.  *See* Utah Code. Ann. § 77-15-2.  In Section 77-15-5, however, the statute directs competency evaluators to consider several specific factors that appear to be beyond the *Dusky* standard.  *See id.* § 77-15-5.  Dr. Stephen Golding, one of the defense experts, co-authored an article in which Utah's statute is described as having "the most comprehensive range of psycholegal abilities to be addressed by evaluators."  (Gov't Ex. 39, "Defining and Assessing Competency to Stand Trial," at 9).  The court concludes that regardless of whether these additional factors to be considered by evaluators creates a "supercharged"

### A.  Observations of Mitchell's Behavior During Elizabeth Smart's Captivity

Elizabeth Smart testified that in the early morning hours of June 5, 2002, she awoke to find Brian David Mitchell in her bedroom holding a knife to her throat.  (10/01/09 Tr. at 5-6.) Elizabeth's younger sister was in the bed next to her.  (*Id.* at 6).  Elizabeth stated that while holding the knife against her neck, Mitchell ordered her to get up quietly and come with him or he would kill Elizabeth and her family.  (*Id.*)  Elizabeth stated that Mitchell later told her that "'if [she] would have screamed, he would have killed [her], he would have killed [her] family, and he would not have had any trouble killing [her]."  (Gov't Ex. 20 at 8.)

Elizabeth testified that Mitchell claimed he was taking her hostage and holding her for ransom.  (10/01/09 Tr. at 7.)  Days later, when Elizabeth asked Mitchell why he had told her this, he replied that if he "had told [her] he was taking [her] as his wife [she] would not have come as easily, and if [she] thought [she] was being ransomed, [she] would have hope of coming back." (Gov't Ex. 20 at 8.)

Elizabeth further testified that Mitchell continued to threaten her and hold the knife to her back as he took her away from her home and led her up into the mountains.  (10/01/09 Tr. at 8.) When she told him, "You know, you're going to go to jail for this if you get caught," he replied, "Yes."  (*Id.* at 10.)  Elizabeth said that she tried to persuade him to release her, promising to speak on his behalf if he let her go right then.  (*Id.*)  As Elizabeth testified, "He didn't let me go, and he knew full well he was going to go to jail."  (*Id.*)

---

*Dusky* standard under Utah law, the potential difference in governing standards is not what compels a different result in the present case.  Rather, the difference is in the amount of evidence that was available to the state court and the more extensive evidence available to this court.

Elizabeth testified that Mitchell was careful to avoid being caught.  (10/01/09 Tr. at 9.)
She observed that he was dressed in dark clothing, including sweat pants, a sweat shirt, tennis
shoes, and a stocking cap.  (*Id.* at 6-7 & 9.)  He also forced her to duck down behind some bushes
before crossing the street while he waited for a police car to pass.  (*Id.* at 9.)  While they were
hiding, Mitchell prayed that they would not be seen.  They then moved at a quick pace up into the
mountains.  (*Id.*) When they arrived at the remote camp, Wanda Barzee was waiting.  (*Id.*)

Inside the tent, Barzee instructed Elizabeth to change out of her pajamas into a robe-type
garment.  (10/01/09 Tr. at 10.)  When Elizabeth refused, Barzee threatened to have Mitchell
come in and rip her pajamas off.  (*Id.*)  Elizabeth reluctantly changed into the robe.  (*Id.*)
Mitchell entered the tent and performed what purported to be a brief marriage ceremony.  (*Id.*)
Barzee was present and Elizabeth had the impression that the ceremony was to "placate Wanda"
by "giving the appearance that he was doing what the Lord had told him to do."  (*Id.* at 67-68.)
Mitchell stated that Elizabeth "would be bound in heaven as [she] would be here on earth to him
to be his wife."  (*Id.* at 44.)  Elizabeth "screamed no," but Mitchell again threatened that he
would kill her if she screamed.  (*Id.* at 44.)  Elizabeth testified that he then raped her.  (*Id.* at 10.)

Elizabeth testified that to keep her from escaping, Mitchell bolted a large, 10-foot cable
onto her leg.  (10/01/09 Tr. at 10.)  The cable connected to a lock that could slide along a second,
15- to 20-foot cable that was strung between two trees.  (*Id.* at 10-11.)  Mitchell was able to
disconnect the cables by taking off the lock, but he kept the key to the lock around his neck.  (*Id.*
at 10.)

Elizabeth stated that Mitchell told her that "he would kill anybody who came into the
camp or he would kill [her] if [she] ever tried to escape or yelled out or did anything that was not

in accordance with what he wanted." (10/01/09 Tr. at 35.)  When searchers came near the camp, Elizabeth testified that Mitchell threatened to kill her or her family if she called out and alerted searchers to their position.  (Gov't Ex. 20 at 8.)  As time went on, Elizabeth said Mitchell showed her newspaper articles about the search efforts to demonstrate that no one was able to find her despite the massive efforts devoted to her recovery.  (*Id.* at 11.)  Elizabeth also stated that Mitchell forced her to burn the red pajamas she had worn to the camp, told her to refer to her parents as Ed and Lois, and instructed her that she must cast off her "false traditions."  (*Id.* at 9.)

Elizabeth "began to absorb intense religious indoctrination from Brian Mitchell from almost immediately after she was taken."  (*Id.* at 8.)  Because of Elizabeth's upbringing in the Church of Jesus Christ of Latter-day Saints ("LDS Church"), many of the ideas of which Mitchell spoke were familiar to her, such as revelations, priesthood blessings, religious missions, and believing in scripture beyond the Bible.  (10/01/09 Tr. at 66-67.)  Mitchell and Barzee told Elizabeth that Mitchell was Immanuel David Isaiah, a prophet and the Davidic King, and they regularly read to Elizabeth from Mitchell's book of scripture, the Book of Immanuel David Isaiah ("BIDI").  (*Id.* at 46-47.)  Mitchell told her that in seven years "he would come forth with Wanda and his seven new wives, and [they] would all testify in his behalf."  (*Id.* at 59.)  He told her "that there would be many people who believed us, but many people who didn't believe us.  And there would be a mob that would come and stone him, and he would lay in the streets for three days being dead, and then he would rise up and he would be untouchable."  (*Id.* at 59.)  He told her that he would then fight and kill the antichrist.  (*Id.* at 59.)

Mitchell and Barzee continually repeated their religious ideas to Elizabeth.  (Gov't Ex. 20 at 11.)  They encouraged her to write in her journal and would review her entries, which

11

eventually began to reflect at least a surface acceptance of the religious beliefs she was being taught.  (*Id.*)  Elizabeth felt that Mitchell manipulated her into disclosing enough information about her 15-year-old cousin to enable Mitchell to attempt to kidnap her as he had Elizabeth.  (*Id.*)

After many weeks of being physically bound, Mitchell released Elizabeth from the cable.  (Gov't Ex. 20 at 10.)  Sometime after the cable was removed, Elizabeth tried to escape while Mitchell and Barzee were arguing.  (*Id.* at 11.)  Mitchell saw her and threatened, "'[I]f you take one more step further, there will be an angel at the door that will cut you down.  If you ever run away you will be killed and your family will be killed.'"  (*Id.*)  Elizabeth returned and did not try to run away again.  (*Id.*)

Elizabeth further testified that Mitchell would go into the city to steal provisions – which he referred to as "plundering" – while Barzee stayed in the camp to guard Elizabeth.  (Gov't Ex. 20 at 11.)  Eventually, Mitchell and Barzee began going into the city together and took Elizabeth with them because she could not remain alone at the camp.  (*Id.*)  He forced Elizabeth to wear a headdress with a veil and another veil covering her mouth.  (10/01/09 Tr. at 68.)  Mitchell ordered her not to speak.  (Gov't Ex. 20 at 11.)  She was convinced that Mitchell would hurt her and her family if she did not obey him.  (*Id.*)

Throughout Elizabeth's captivity, Elizabeth testified that Mitchell's predominant focus was sex.  (10/01/09 Tr. at 11.)  She recounted that Mitchell raped her up to three to four times a day.  (*Id.*)  Elizabeth cannot recall a time when Mitchell did not talk about sex or want sex.  (*Id.* at 12.)  He also used crude and vulgar language, showed her pornography, and used drugs and alcohol to lower her resistence.  (*Id.* at 12-13.)  He stated that it was to humble her and bring her

12

low to the dust.  She said that Mitchell tried to make her feel that having sex with him was normal and that it was just what a husband and wife do.  (*Id.* at 13.)  Elizabeth recalled that once she bit Mitchell when he was raping her.  He threatened to stop having sex with her and claimed that she would be "the most miserable woman in the world."  (*Id.* at 16.)  But she testified that Mitchell still continued to rape her repeatedly on a daily basis.  (*Id.*)

Mitchell would periodically leave the camp to get supplies and "to minister to the world." (10/01/09 Tr. at 13.)  Generally, Elizabeth and Barzee were without food until Mitchell returned with something to eat.  (*Id.* at 14.)  After giving them food, the first thing Mitchell would do was rape Elizabeth.  (*Id.*)  On several occasions when he returned, Elizabeth remembered him coming up the mountainside yelling, "I'm going to fuck your eyes out."  (*Id.*)

Elizabeth believed that Mitchell "used religion to get what he wanted.  He had an excuse for everything he did with a religious side to it."  (10/01/09 Tr. at 12.)  For example, when he showed Elizabeth pornography, he said that she "had to be humbled and to sink below all things before rising above all things."  (*Id.*)  Elizabeth testified, "Anything that I showed resistence or hesitation to, he would turn to me and say, the Lord has commanded you to do this.  You have to experience . . . the lowest form of humanity to experience the highest."  (*Id.*)

During her nine months in captivity, Elizabeth experienced Mitchell as "religious but not spiritual, not Christlike."  (10/01/09 Tr. at 16.)  Instead, she described him as "[e]vil, wicked, manipulative, sneaky, slimy, selfish, greedy, not spiritual, not religious, not close to God."  (*Id.* at 42.)  Mitchell claimed to be the Davidic King, the Lord's servant, and that he was doing the Lord's work.  (*Id.* at 17.)  Yet Elizabeth observed that Mitchell never showed empathy for others and never performed an act of charity or kindness toward another person.  (*Id.* at 16-17.)  One

night, Mitchell gave Elizabeth too much alcohol to drink and she became ill.  (*Id.* at 20.)

Mitchell did not care for her, but instead allowed her to lie face down in her own vomit all night.

(*Id.*)  When she awoke the next morning, Mitchell told Elizabeth that it was showing her "true

state."  (*Id.*)

Whenever Elizabeth questioned him on the inconsistencies between his conduct and the

principles of his religion, Mitchell told her that "the world was a wicked place and that [she had]

been brainwashed by the world, and that he was the Lord's servant and he was doing the Lord's

will."  (10/01/09 Tr. at 21.)  Instead of using religion to help others, Elizabeth testified that

Mitchell used it to get what he wanted.  (*Id.* at 17.)  Mitchell claimed to receive revelations from

God and would also purport to give divinely-inspired blessings to Barzee and sometimes

Elizabeth.  (10/01/09 Tr. at 18.)  He also received a "revelation" that "Immanuel may smoke and

drink as he chooses according to his desires."  (Gov't Ex. 10)  Elizabeth noticed that whenever

"he wanted something, that's when he got revelation."  (10/01/09 Tr. at 64.)

Mitchell employed blessings in a calculated way to "placate Wanda when she was

distraught because [Mitchell] was openly having sex with and pursuing sex with, in an

unrelenting way, Elizabeth Smart, notwithstanding how distraught his wife was at witnessing this

scene and unable to control it."  (Tr. at 829.)  The way that Mitchell "was able to keep this

dynamic of the three of them together was in, a very quick fashion, he could produce these

elaborate blessings that sounded so spiritual, that sounded so divinely inspired, full of praise for

Wanda and her future role, and what was in it for her, her being the mother of Zion and the

sacrifices that she needed to make and that these would have a placating effect on Wanda."  (*Id.*)

14

These blessing "were initiated and timed in a way that struck Elizabeth and had always struck her

as manipulative." (*Id.*)  As Elizabeth explained:

> Wanda would get very upset with him, and she would just become
> irate.  And the only way to calm her down was to turn to her and
> say that he needed to give her a blessing.  And then in the blessing
> he would just say what a wonderful daughter of God she was and
> she was going to be the mother of Zion, and she was going to bring
> forth his [heir] to the throne and just say what a queen she really
> was.

(10/01/09 Tr. at 19.)  Mitchell never dealt with Elizabeth in that way because "he could get her to

do anything he wanted simply by brute force and threat."  (Tr. at 829.)

Barzee also recalled the way Mitchell manipulated her when Elizabeth was first

kidnaped:

> WELNER:     What else were you feeling that you remember?
>
> BARZEE:     Well, we were given specific instructions of what
>             we were to do once she got there and how could I
>             do that?
>
> WELNER:     How you could do...
>
> BARZEE:     Demonstrate.
>
> WELNER:     Oh, so you were--you were already told at that point
>             that you had to demonstrate how to have sex?
>
> BARZEE:     Yeah, when we were told that we were going to go
>             forth and--
>
> WELNER:     You say "we were told."  Are you saying Brian told
>             you this?
>
> BARZEE:     Brian told me--Brian told me when we obtained her
>             then--what I was supposed–what I was to do once
>             we got her.  I didn't want to do that.  I didn't want to
>             have to demonstrate in front of her.  And at the

15

same time I was told that I was the Mother of Zion (inaudible).

(Gov't Ex. 17e.)

On another occasion, Barzee had become distraught over Mitchell's lust for Elizabeth. (10/01/09 Tr. at 14.) "And so in order to calm Wanda down," Mitchell told Barzee that he had received a revelation that he was to alternate between Elizabeth and Barzee on a fixed schedule. (*Id.* at 14-15.) Under what Mitchell claimed to be a divinely-revealed sex schedule, approximately every other night was set aside for Mitchell to spend with Barzee, but Elizabeth testified that there was never "an actual 24-period that he wasn't able to rape" Elizabeth. (*Id.* at 15.) During one of the times set aside for Barzee to receive Mitchell's attentions, Mitchell took Elizabeth away from camp to an underground stream to get water. (10/01/09 Tr. at 15.) On the way, Mitchell turned to Elizabeth and told her he needed to have sex with her right then and that "nobody would find out." (*Id.*)

Elizabeth further observed that Mitchell never received a revelation that he should give up anything, such as sex, alcohol, or drugs. (10/01/09 Tr. at 19.) Mitchell never undertook a religious fast (except when they had no food to eat) nor did he ever refrain from speaking for long periods of time. (*Id.* at 19-20.)

In retrospect, Barzee stated that Mitchell's religious belief were manipulative and deceitful:

> WELNER:    Okay.  Now, we talked before about manipulation, and we talked
> before about your--your own faith.  Now, as--as we meet today,
> when you reflect on Brian Mitchell, do you feel that his faith was
> actually false?
>
> BARZEE:    Yes.

16

WELNER:     Can you explain uh--how you see it now?

BARZEE:     Well, he--he refers to um--that he believes he's the mouthpiece of
            God, that he is a true prophet.  And uh, yeah, that he has all the
            keys of the kingdom to do whatever the Lord wills him to do.

WELNER:     What do you think?

BARZEE:     I think that he's false um–

WELNER:     Do you think that he thinks he's false?  Do you think he['s]
            real--do you think that he knows in his heart that he's
            manipulative?

BARZEE:     I think he knows in his heart that he's manipulative. . . .  Um–it's
            very subtle.  He's extremely deceitful, I think.

(Gov't Ex. 17g.)

Elizabeth observed that Mitchell was manipulative and turned religion on and off in order

to get the things that he wanted.  (10/01/09 Tr. at 21 & 23.)   For example, he used religion as a

means to get his basic needs met.  (*Id.* at 17-18.)  It served Mitchell well in panhandling, as

people responded generously to his appearance of humble spirituality.  (Gov't Ex. 20 at 13.)

Mitchell also befriended a young man at a grocery store, who would help Mitchell steal food by

not passing the items over the scanner at check-out.  (10/01/09 Tr. at 21-22.)  Mitchell spoke to

the young man about religion and spirituality and how "God is no respecter of persons" even if

they smoke and drink.  (*Id.* at 23.)  In Elizabeth's estimation, it was because of Mitchell's

acceptance that the young man was willing to help him.  (*Id.* )

Mitchell also used religion when confronted by a police officer in the Salt Lake City

library.  (10/01/09 Tr. at 31 & 60.)  When the officer asked Elizabeth to remove the veil and head

covering that Mitchell made her wear, Mitchell told the officer that wearing the veil was part of

17

their religion and that there was no possible way she could take it off.  (*Id.* at 30-31.)  Mitchell

managed to convince the officer that Elizabeth was his daughter visiting from a school back east,

and they were allowed to go on their way.  (Gov't Ex. 20 at 12.)

Elizabeth testified that Mitchell was always quick on his feet and lied easily.  (10/01/09

Tr. at 34.)  He had the ability to adapt to his surroundings and talk his way out of any situation.

(*Id.* at 37-38.)  He was a convincing liar, and Elizabeth had the impression that Mitchell enjoyed

fooling others.  (*Id.* at 32-34.)  Mitchell would laugh at the way others thought they were so

smart, while he "could dance circles around them."  (*Id.* at 32.)

Indeed, Elizabeth recognized that Mitchell was capable and intelligent.  (10/01/09 Tr. at

33-34.)  He had the ability to argue on his behalf and was forceful and determined in an

argument.  (*Id.* at 38.)  Elizabeth observed that Mitchell thought highly of himself and always

had to be right.  (*Id.* at 17 & 32.)  He held himself out as an authority on every topic, whether

religious or not.  (*Id.* at 32-33.)  Mitchell spoke about how people thought and mentioned reading

books on subjects such as hypnosis.  (*Id.* at 38-39.)  Mitchell spoke about his experiences and

knew a great deal about many different subjects.  (*Id.* at 34.)  In particular, Mitchell had

knowledge of the legal system and explained what would happen if he was apprehended.  (*Id.* at

42.)

Elizabeth testified that Mitchell knew that what he was doing was against the law and

was determined not to get caught. (10/01/09 Tr. at 35, 42 & 68.)  He gave Elizabeth specific

instructions on what to do if they were confronted by law enforcement.  (*Id.* at 35.)  He instructed

Elizabeth to give her name as Augustine Marshall and to refer to him as her father and to Barzee

as her mother.  (*Id.* )  He told her to tell anyone who asked that they were traveling ministers with

no permanent address and that she was home-schooled.  (*Id.* )  Mitchell would quiz Elizabeth on

what she was to say if they were ever confronted.  (*Id.* at 37.)  Moreover, Elizabeth testified that

Mitchell never introduced her as his wife.  (*Id.*)  Elizabeth never observed Mitchell tell anyone,

besides her and Barzee, that he had been commanded to marry several young girls and that he

was to plunder or steal his brides.  *(Id.)*

Elizabeth testified that Mitchell himself used several different aliases.  (*Id.* at 36.)

Besides Immanuel David Isaiah, Mitchell also used the names Peter Marshall, David Shirlson,

and Michael Jensen.  (*Id.* at 36-37 & 61.)  There was never a time when Barzee or Elizabeth had

to intervene on Mitchell's behalf because he was out of control, bewildered or confused.  (*Id.* at

30 & 32.)  During the nine months of her captivity, Elizabeth, Barzee and Mitchell encountered a

number of individuals.  Elizabeth stated that not one of the people they encountered ever

suggested that Mitchell needed professional help or that he should be taken to a hospital.  (*Id.* at

33.)

After being confronted by the police officer in the Salt Lake City library, Mitchell and

Barzee took Elizabeth, disguised in a veil, to southern California.  (10/01/09 Tr. at 12, 26.)

Upon arriving in Lakeside, California, Elizabeth testified that Mitchell began "looking for

another young girl to kidnap, and he went to an LDS ward posing as an investigator," that is, a

person who is interested in learning about the LDS church.  (*Id.* at 17 & 52.)  Instead of his

religious robes, Mitchell donned regular Western clothing and tied back his long hair and beard.

(*Id.* at 24.)

Posing as an investigator, Mitchell "used religion to get into the home of the Kemp

family." (10/01/09 Tr. at 17.)  On December 8, 2002, Mitchell attended an LDS church service

and study group led by Virl Kemp.  (Gov't Ex. 20 at 13.)  Kemp did not make any connection

between Mitchell and the man in robes he had seen walking in Lakeside a few weeks before. (*Id.*)

Mitchell represented himself as someone unfamiliar with the Mormon faith and Kemp invited

Mitchell to his home for dinner with some LDS missionaries.  (*Id.* at 13.)

At the dinner, Mitchell introduced himself as Peter, said that he was traveling alone, and

provided a back story about having a family in the East where "everything had fallen apart."

(Gov't Ex. 20 at 13-14.)  Mitchell was rational, composed, and polite.  (*Id.* at 14.)  He did not

preach and "'there was nothing shocking he revealed about his beliefs or habits.'"  (*Id.* )

Religion was discussed and Mitchell "'pretended, quite well, to know nothing about the Mormon

faith.'"  (*Id.* at 13-14.)  Mitchell later boasted to Elizabeth that he had the Kemps deceived.

(10/01/09 Tr. at 35.)

While at the Kemp home, Mitchell saw a picture of their 12-year-old daughter.  (10/01/09

Tr. at 17; Gov't Ex. 20 at 13.)  Mitchell asked about the girl and was told that she was Mrs.

Kemp's daughter from a previous marriage who spent every other weekend and every

Wednesday with the Kemps.  (10/01/09 Tr. at 24-25.)   Sometime in February, Elizabeth testified

that Mitchell returned to the Kemp home at night, dressed in dark clothes, in an attempt to kidnap

their daughter as he had kidnaped Elizabeth.  (10/01/09 Tr. at 53; Gov't Ex. 20 at 14.)  Mitchell

looked for a way to get into the house, but everything was locked.  (10/01/09 Tr. at 53.)  He

eventually found an unlocked window or sliding door, but as he began to open it, he heard a loud

snoring.  (*Id.*)  Fearing that an older male was inside, Mitchell left.  (*Id.*)  When he returned to

camp, he told Elizabeth and Barzee that "the Lord was just preparing him, that it was all in

preparation for the next young woman."  (*Id.*)

20

On another occasion, Mitchell, Barzee and Elizabeth were invited into the home of a Seventh-Day Adventist. (Gov't Ex. 20 at 78.) "The family spoke about religion all night, and Brian Mitchell simply agreed with the host." (*Id.*)   "Elizabeth explained that they needed a place to stay, and she felt [Mitchell]'s agreeable nature toward a contrary ideology was affected in order to gain them lodging." (*Id.*)

Like religion, Elizabeth observed that Mitchell was also capable of turning his singing on and off and would use it to manipulate people and situations. (10/01/09 Tr. at 30.) For example, Mitchell would sometimes sing when he encountered people who did not agree with him. (*Id.* at 25.) According to Elizabeth, he sang when he wanted to sing, not because he could not contain himself. (*Id.* at 48.) Elizabeth never saw Mitchell's singing get in the way of something he wanted. (*Id.* at 30.)   For example, she testified that he never burst into singing when he was trying to secure sex, food, drugs, alcohol, or transportation. (*Id.* at 31.)  And Mitchell never burst into singing when confronted by law enforcement. (*Id.* at 32.)

In mid-February, Mitchell told Barzee and Elizabeth that he was going down to the town of Lakeside to "minister." (10/01/09 Tr. at 27.)  Mitchell later recounted to Elizabeth that upon arriving in town, he bought beer from a convenience store, stole prescription medication from a woman pushing a cart when she left the cart unattended, took some of the pills, and broke into a nearby church. (*Id.* at 27-28)   Mitchell passed out and was awakened the next morning by police officers, who arrested him for trespassing. (*Id.* at 28.)

Mitchell was booked into jail and provided with a court appointed attorney, David Lamb. Lamb found Mitchell to be "a pleasant, pathetic person, who showed no signs of aggression or violence, and seemed very peaceful, friendly, and remorseful." (Gov't Ex. 19 at ¶ 1.)  Mitchell

understood why he was there, the process he was involved with, and that Lamb was his attorney. (*Id.* at ¶ 4.)  Lamb and Mitchell discussed the case and the best way to proceed.  (*Id.* at ¶ 2.) Mitchell would later tell Elizabeth that his lawyer was a "bright, young man" who "advised him to plead guilty."  (10/01/09 Tr. at 29.)

When Mitchell appeared in court, he confirmed that he understood the charges and provided the judge with "very convincing and appropriate answers that happened to be completely false."  (Tr. at 655-56.)  He used the alias Michael Jensen and characterized himself as an itinerant preacher.  (Tr. at 653-54; Gov't Ex. 18.)  He provided no information that would connect him to Utah, the mainstream or fundamentalist LDS faith, or plural marriage.  (Tr. at 653; Gov't Ex. 18.)  He told the judge that he was traveling with his wife and daughter and that they were staying with friends in the area.  (Tr. at 655; Gov't Ex. 18.)  Mitchell presented himself "as a very repentant individual" and claimed that he had simply fallen off the wagon after not having a drink in twenty-two years.  (*Id.*)

While the judge looked over Mitchell's case file, there was a prolonged silence, which is typically "very stressful when you're sitting there in a very high tense environment."  (Tr. at 654; Gov't Ex. 18.)  Rather than breaking into singing or causing some other disruption, Mitchell remained very quiet.  (Tr. at 654; Gov't Ex. 18.)  He not only tolerated the "very long, very uncomfortable silence," he "looked completely relaxed and comfortable."  (*Id.*)

During the videotaped court appearance, Mitchell's behavior was entirely appropriate. (Tr. at 653-54; Gov't Ex. 18.)  He did not express any rejectionist philosophy or claim that he was subject only to God's law.  (Tr. at 939; Gov't Ex. 18.)  Instead, Mitchell was respectful and deferential to the authority of the court.  (Tr. at 939; Gov't Ex. 18.)

Although Lamb generally avoids having clients address the judge directly, out of fear that they could hurt their chances, "[n]othing Mitchell said sounded inappropriate and there was nothing that made Mr. Lamb think as Mitchell's lawyer that he should stop him."  (Gov't Ex. 19 at ¶ 3.)  At one point, when Mitchell began to explain about his ministry, Lamb interrupted and redirected him to answer the judge's question.  (Tr. at 656; Gov't Ex. 18.)  Mitchell understood his attorney's cue, and responded as his attorney wanted.  (*Id.*)  Mitchell pleaded guilty and was released to return to the camp where Barzee was keeping guard over Elizabeth.  (Gov't Ex. 20 at 14.)

Elizabeth testified that she realized that she was less likely to be found in San Diego, so she tried to convince Mitchell to return to Utah.  (10/01/09 Tr. at 58.)  Because Mitchell "had used religion to justify . . . pretty much anything he wanted to get away with," Elizabeth "decided to try to use his tactic."  (*Id.*)  She told Mitchell that she had a strong feeling that they needed to go back to Salt Lake City and suggested that they hitchhike so that she could have the experience of "sink[ing] below all things to rise above all things."  (*Id.*)

On March 3, 2003, the three began to make their way back to Utah.  (Gov't Ex. 20 at 15.)  As they passed through Las Vegas, someone reported to police that a young female wearing a wig and heavy makeup was traveling with a robe-clad older couple.  (*Id.*)  When an officer responded, Mitchell told him he was a traveling "preacher."  (*Id.*)  Mitchell told the officer that their names were Peter, Juliette, and Augustine Marshall.  (*Id.*)   The officer checked the names and dates of birth Mitchell provided against available records and allowed them to go on their way.  (*Id.*)

23

On March 12, 2003, Mitchell was spotted walking along State Street in Sandy, Utah, with two women dressed in robes.  (Tr. at 436-38.)  Sandy City Police Officer Troy Rasmussen responded and questioned the three individuals about their identities.  (*Id.*)  Mitchell provided a false story and stated that his name was Peter Marshall and that Elizabeth was his daughter Augustine. (Gov't Ex. 20 at 15.)  Even when Officer Rasmussen directed questions toward Elizabeth and Barzee, Mitchell would answer.  (Tr. at 437-38.)  As a result, Officer Rasmussen separated Mitchell from the group by taking him out of earshot of the women.  (*Id.*)

During the ensuing private conversation, Mitchell would answer as a normal person would when asked general questions about his name, travels and companions, but would "go into character or persona like he was a preacher" when he was confronted or asked more direct questions.  (Tr. at 439-40.)  To Officer Rasmussen, it seemed that the more he cornered Mitchell with questions, the more he "would be evasive by saying religious things."  When other people came within earshot, Mitchell "would go into his preacher persona."  (*Id.*)  Officer Rasmussen believed Mitchell "was being deceptive, and the more [he] questioned him and cornered him, caught him in the lies, he would avoid answering the question and then pretended, started to pretend to be a street preacher."  (Tr. at 444.)

Elizabeth identified herself as Augustine Marshall and was reluctant to admit who she really was, even though she wanted to be discovered.  But, once the three were taken into custody, Elizabeth admitted her true identity.  (Gov't Ex. 20 at 15.)

**B.  Mitchell's Life History**

To some extent, each of the mental health evaluators provided a life history of Mitchell.  Some appear to have merely used others previous findings without further investigation.  Dr.

24

Welner conducted the most thorough investigation and compiled the most extensive history of Mitchell's life.

### 1.   Adolescence

Mitchell was born in 1953 to Shirl Mitchell, a social worker, and Irene Mitchell, a high school teacher.  (Def. Ex. J at 1 & 8.)  He and his five siblings were raised in the LDS Church.  (Def. Ex. J at 8.)  His parents, however, were not especially active church members and his father professed religious beliefs that were decidedly out of the mainstream.  (Gov't Ex. 20 at 51.)  Shirl, who was educated in philosophy, wrote "a 1066 page tome entitled, *Spokesman for the Infant God and Goddess*," in which he "represented himself as a divine emissary."  (*Id.*)  Shirl was "a proponent of a regimented vegetarian diet as well."  (*Id.*)  Despite his eccentric beliefs, Mitchell observed that his father "put[] on a good show for people outside the home" and that, when Mitchell went to his office, he could hardly recognize his father at work.  (Def. Ex. E at 2.)  As an adolescent, Mitchell identified with his father, adopted his father's diet, and took on the role of the "black sheep" of the family.  (Gov't Ex. 20 at 51; Def. Ex. J at 8; Def. Ex. X at 4-5.)

Even as a young man, Mitchell was "very verbally skilled."  (Tr. at 1032.)  Mitchell's sister described him as a "con man" who could "feed [her] a line and stick to it for a long [time]."  (Tr. at 1028-30.)  He was also verbally and physically abusive at home.  (Gov't Ex. 20 at 52.)  When he was referred for juvenile intervention at age 15, his family characterized him as "cruel and sadistic toward his mother and siblings."  (*Id.*)

Mitchell was described as creative and was known to accomplish grandiose projects, like building a hot air balloon.  (Def. Ex. X at 10.)  Despite his bright mind, Mitchell did poorly in school and dropped out of high school at age 16.  (Gov't Ex. 20 at 52.)  He later obtained his

GED and completed 46 credit hours at the University of Utah with a 2.6 grade point average. (Gov't Ex. 20 at 53.)

Sexual addiction was also a problem for Mitchell. (Tr. at 1031.)  After dropping out of school, Mitchell was arrested for soliciting sexual activity from his four-year-old neighbor after he brought her into his home and instructed her to touch his penis.  (Gov't Ex. 20 at 52.)  The probation officer assigned to the case became concerned that Mitchell's behavior was "bordering on psychotic" and referred him to a psychologist.  (Def. Ex. X at 5; Gov't 20 at 52.)

The psychologist, Dr. Tanya Thomas, did not diagnose Mitchell with a psychotic condition but with "Behavior Disorder of Adolescence."  (Def. Ex. E at 7.)  Dr. Thomas worked with Mitchell from July until September 1970.  (Gov't Ex. 20 at 52.)  During that time, a marriage counselor expressed concern that Mitchell "is an excellent manipulator and he is very verbal and he is afraid that during the time that he has been working with Dr. Thomas that he will manipulate her to gain her confidence and try to use her against the family."  (Def. Ex. F at 4.)

Dr. Thomas described Mitchell as a young man "who rather immediately impresses you with his intelligence." (Def. Ex. E at 2.)  She noted that he seemed to "immediately set up a climate of intellectual superiority relating in a logical, emotionally cool manner."  (*Id.*)  Mitchell "admitted that he knew the areas of psychological vulnerability of the other family members, and apparently he derives much satisfaction out of upsetting the other family members through physical and psychological threats of harm."  (*Id.*)  Dr. Thomas had the impression that "he is quite successful in his manipulative and controlling tactics."  (*Id.*)  "Although highly intelligent, he appears to be destructively using his perceptiveness at home to frighten and humiliate the other family members by pointing out their psychological vulnerabilities."  (*Id.*)

26

Dr. Thomas performed psychological testing that did not identify any sign of psychosis. (Gov't Ex. 20 at 52.)  The testing revealed "only one significant elevation on the A-social Index." (Def. Ex. E at 3.)  This score suggested that "there will be a continuation of the behavioral patterns established unless intervention is achieved."  (*Id.*)

###### 2.    Early Adulthood

While Mitchell was still in his teens, his girlfriend, Karen, became pregnant.  (Gov't Ex. 20 at 52.)  The two eventually married and had two children together.  (*Id.*)  Mitchell and Karen were heavily into drugs and both were described as irresponsible parents.  (Gov't Ex. 20 at 53; Def. Ex. X at 10-11.)  The two divorced in 1975 and Mitchell was awarded custody of the children.  (Gov't Ex. 20 at 53.)  When Karen remarried in 1977, she petitioned for reconsideration, and the court awarded her custody in 1979.  (*Id.*)

After the court awarded custody to Karen, Mitchell kidnaped their two children and moved to the east coast.  (Gov't Ex. 20 at 53.)  During this time, Mitchell moved from place to place and continued using drugs.  (*Id.*)  At one point, he lived with the Hare Krishna in West Virginia.  (*Id.*)  His second wife, Debbie, recalled that Mitchell later bragged "about how he fooled authorities for when he was not [back] east, he would hide in his mother Irene's home." (*Id.*)

During this time, Mitchell wrote to his mother in Utah.  In a letter written in November 1977, Mitchell explained his choice to grow a beard and long hair:

> As for my beard and long hair, I think I'm more handsome without them, as well, however, that is not the image I'm after at the moment. Maybe I want to look like a serious fellow and there are other reasons as well, as you know I like acting, my hair and beard is part of a new act.

27

(Gov't Ex. 24.)

        *3.    Return to Utah*

Around age 26, Mitchell returned to Utah.  (Gov't Ex. 20 at 54.)  He stopped using drugs,

became active in the LDS Church, and met his second wife, Debbie.  (*Id.*)  In January 1981,

Mitchell received the Melchizedek Priesthood in the LDS Church.  (*Id.*)  The following month,

he married Debbie.  (*Id.*)  Debbie wanted to marry in the LDS Church, but Mitchell "suggested

they could not because he had a 'sexual problem.'"  (*Id.*)

When Mitchell married Debbie, she had three daughters from a previous marriage.

(Gov't Ex. 20 at 54.)  One of Mitchell's step-daughters later disclosed that Mitchell had molested

all three sisters.  (*Id.*)  She recalled that "she was repeatedly molested from within weeks of the

marriage, abuse which persisted from age 8-12, and her efforts and those of her sister . . . were

powerless to get him to stop."  (*Id.* at 56.)  According to his step-daughter, Mitchell told her that

no one would believe her if she told.  (*Id.*)

Years later, Barzee's sister, Evelyn Camp, found a photo of two young girls,

approximately seven or six years old, in a box of pictures belonging to Barzee and Mitchell.  (Tr.

at 238-240.)  The two girls were naked, had unhappy expressions on their faces, and Camp found

the photo very disturbing.  (Tr. at  239-40.)

Debbie was resentful of Mitchell's two children from his previous marriage and the large

family was under significant financial strain.  (Gov't Ex. 20 at 54-55.)  In 1983, Mitchell decided

to put his two children up for adoption.  (*Id.* at 55.)  Mitchell ultimately "opted for foster care and

adamantly refused to allow visitation by his mother, Irene."  (*Id.*)

Mitchell's mother and sister challenged Mitchell's decision, claiming he was mentally ill. (Gov't Ex. 20 at 54.)  An evaluation was completed by psychologist Randy Oster on December 22, 1983.  (*Id.* at 55.)  The evaluator concluded that Mitchell was not mentally ill.  (*Id.*)  Mitchell was allowed to relinquish custody of his children.  (*Id.*)  He and Debbie went on to have two more children of their own.  (*Id.*)

Mitchell and Debbie's marriage was tumultuous and marked by abuse.  (Gov't Ex. 20 at 55-56.)  Mitchell was controlling and frequently belittled Debbie.  (*Id.*)  He also preyed on her fears.  (*Id.* at 55.)  Knowing that Debbie was afraid of mice, he once returned home with a live mouse in a jar.  (*Id.*)  On another occasion, he left 50 dead mice in the oven neatly laid out on a cookie sheet for her to find.  (*Id.*)

Throughout his marriage to Debbie, Mitchell held himself out to be an active LDS Church member – he talked like an active church member and accepted church callings.  (Tr. at 252.)  However, his LDS Stake President Paul Mecham noticed that Mitchell did not attend church services with Debbie and did not perform the callings as a normal church member would. (Tr. at 252-53.)

Mecham also noticed that Mitchell was adept at changing his behavior. When Mecham first observed Mitchell at church, he seemed easy going and quiet.  (Tr. at 250.)  Later, in a social setting, he was surprised to see Mitchell being very outspoken, speaking loudly, gesturing and smiley faced.  (Tr. at 250.)  Then he noticed that the man to whom Mitchell was speaking was also exuberant and it "dawned on" Mecham that Mitchell was mirroring or mimicking the man's behaviors.  (Tr. at 250-51.)  As Mecham observed Mitchell over time, he discovered this pattern

of mirroring was ingrained and allowed Mitchell to ingratiate himself with others quickly and effectively.  (Tr. at 251.)

Eventually, Mecham became aware of allegations of sexual impropriety concerning Mitchell and called him in for an interview.  (Tr. at 253.)  After a preliminary conversation, Mecham raised the issue of the allegations and used the word "improper."  (*Id.*)  Mitchell's normally relaxed demeanor changed "in a flash."  (*Id.*)  He "spoke loudly" to Mecham and within 60 seconds got up and left the office.  (*Id.*)  Within a few days, Mitchell had left Debbie and divorce proceedings were underway.  (Tr. at 254.)

During the divorce, Debbie alleged that Mitchell had sexually abused both of their biological children.  (Gov't Ex. 20 at 55.)  She claimed that their three-year-old son had told her that Mitchell had been masturbating him and that their one-and-a-half year old daughter asked her to tell Mitchell "don't owie my peepee anymore."  (*Id.*)  The evaluating case worker was unable to verify the abuse, but noted that Mitchell and Debbie's son was more sexually interested than would be expected of someone his age.  (*Id.*)  Mitchell later told Elizabeth that he had been accused of molesting his second wife's youngest daughter and that he was able to walk away from that.  (10/01/09 Tr. at 39.)

### 4.    *Marriage to Wanda Barzee*

Mitchell met Wanda Barzee at an LDS divorce support group.  (Gov't Ex. 20 at 58.)  Barzee was a devout Mormon and an aspiring church organist, but had a myriad of personal problems.  (*Id.*)  Among other things, she had just emerged from an abusive relationship to a controlling man and had a history of psychiatric problems.  (*Id.*)  Mitchell married Barzee in November 1985, on the day his divorce from Debbie became final.  (*Id.*)

30

After he and Barzee married, Mitchell became increasingly active in the LDS Church and held positions such as counselor in the stake mission presidency, member of the stake high council, and counselor in the bishopric of his ward.  (Gov't Ex. 20 at 59.)  He was also an ordinance worker at the LDS Temple.  (Gov't Ex. at 58.)

Mecham, Mitchell's former stake president, was surprised to learn that Mitchell was attending the LDS Temple despite the fact he did not hold a temple recommend at the time he left Mecham's stake under a cloud of sexual abuse allegations.  Although it was the general Church practice for a moving member's new stake president or bishop to check with the member's former church leaders to ascertain worthiness, no such contact was made in Mitchell's case.  (Tr. at 254.)  Mecham was "amazed that with his background, he was able to obtain a temple recommend.  But he was very capable of keeping up a facade.  It was easy to see him as a good kid, he was polite, very normal, and handled himself well; it's understandable that he could lie and get himself over."  (Gov't Ex. 20 at 59.)

The more appointments he had in the church, the more Mitchell "related with a standing that was beyond what he had achieved."  (Gov't Ex. 20 at 58.)  Mitchell "'would push the limits of bounds, he would jump over others to do things,' and would undercut the LDS infrastructure to advance himself."  (*Id.*)

a.      Breaking Away from the Mainstream

At home, Mitchell expressed anger at the Church for not giving him a higher calling, or leadership role.  (*Id.*)  By the late 1980s, Wanda's daughter, LouRee Gayler, testified that Mitchell was already referring to himself as a prophet.  (Tr. at 196.)  LouRee observed that being

a prophet "'became an excuse for anything they did because they were higher than that.  Being a prophet meant never admitting anything was wrong.'"  (Gov't Ex. 20 at 60.)

Mitchell began to experience a "deepening identification with fundamentalist LDS."  (Tr. at 896.)  He started attending the American Study Group ("ASG") meetings led by Sterling Allan.  (Tr. at 642; Gov't Ex. 5, Appx. A at 3.)  The ASG was "a fundamentalist LDS group" that was "way out on the edge of the LDS culture."  (Tr. at 644.)  Like other fundamentalist LDS groups, members of the ASG believed that the LDS church was "out of order" and that LDS scripture had prophesied that "One Mighty and Strong" would come to "set things straight."  (Gov't Ex. 5, Appx. A at 3.)  Indeed, Allan entertained the idea that he was the One Mighty and Strong and personally knows over 100 people who have made such a claim.  (Tr. at 644-55 & 1096; Gov't Ex. 5, Appx. A at 3.)

Mitchell also became involved with C. Samuel West of Orem, Utah.  While the West family regularly attended their LDS church, their beliefs and practices were outside that of the mainstream church.  (Tr. at 266-67.)  Dr. West, as he is known to his adherents, was "a naturopath proponent of his own school of healing called lymphology."  (Gov't Ex. 20 at 63.)  Lymphology focuses on "the role of the Lymphatic system in the body for draining out poisons and keeping the body healthy."  (Gov't Ex. 5, Appx. A at 3.)  The practice of lymphology involves massage, deep breathing, and bouncing.  (Tr. at 263-65.)   The theory is explained in Dr. West's book, *The Golden Seven Plus One*, which his family accepted as scripture.  (Tr. at 266.)  Dr. West founded the International Academy of Lymphology, which is not just a school of healing, "but an actual fundamentalist sect . . . that asserts to reflect the science behind Christ's

miracles." (Gov't Ex. 20 at 64.) Its "teachings were grounded in Mormon theology, [as] were some of its practices, such as giving testimony." (*Id.* at 69.)

Aside from lymphology, the Wests also espoused fundamentalist LDS beliefs. They believed that Ezra Taft Benson was the last true prophet of the LDS Church and that the LDS Church had gone astray. (Tr. at 268.) The Wests also believed the LDS church should actively be practicing the law of consecration[5] and polygamy. (Tr. at 269.)

Mitchell was also "influenced by the Idaho-based Bo Gritz (whom he later characterized as a prophet) Patriot movement, which advocated individual freedoms, gun rights, not paying taxes, and living an undocumented lifestyle with no recorded address or social security number." (Gov't Ex. 20 at 63.) Mitchell traveled north to visit the Bo Gritz group in Idaho. (Tr. at 206 & 224.)

### b.     Home Life

"The home of Wanda Barzee and Brian Mitchell was a study in things are not as they seem." (Tr. at 894.) LouRee Gayler testified that Mitchell "always tried to put on an image for people, whether it was church or with his co-workers." (Tr. at 182.) Mitchell was involved in the church and "would represent a very benign and peaceful patina, but in the home there was everything from the mixture of pornography and open sex, and even solicitation to join in, to deprivation, restriction of privileges," and demands on the children. (Tr. at 894.)

Mitchell's stepdaughter, LouRee Gayler, began living with Mitchell and Barzee in 1986 when she was twelve years old. (Tr. at 181-82.) She described Mitchell as "dominating" and

---

[5] The law of consecration is a "cooperative way of pooling resources" in a communal society. (Tr. at 46-47.)

33

recalled hearing her mother screaming at night as if she was being held down.  (Tr. at 189.)  She

described how Mitchell and Barzee forced her to work and would not allow her to go anywhere

except work and church.  (Tr. at 183.)  In the home, "[r]eligion was everything."  (Tr. at 187.)

Mitchell locked out the televison, forced them to fast, and insisted that they pray for hours a day.

(Gov't Ex. 20 at 60.)

      While she was living at the home, Mitchell frequently did things that gave Gayler a

"creepy," "eery feeling."   (Tr. at 183.)  Once while Gayler was praying, Mitchell put

pornographic photos in front of her and nudged her so that she would open her eyes.  (Tr. at 191.)

Mitchell would "pierce [her] with his eyes" and would hug her in a way that she felt was

inappropriate.  (Tr. at 183 & 190.)  He would also come into her room at night, pull her close to

him, and caress her hair.  (Tr. at 190.)  Mitchell and Barzee would openly have sex and Gayler

felt that they were trying to include her in their sexual activity.  (Gov't Ex. 20 at 61; Tr. at 192.)

      During the two years that Gayler lived with Mitchell, they moved three times.  (Tr. at

186.)  Gayler felt that the moves were an effort to conceal the abuse that was occurring in the

home.  (*Id.*)  She left the home when she was fourteen, after Mitchell and Barzee served her pet

rabbit to her for dinner and told her that it was chicken.   (Tr. at 192 & 194.)  Barzee recalled

Mitchell's reaction to fooling Gayler into eating her pet:

> BARZEE:    I kind of remember Brian gloating about the fact that--how LouRee
> didn't even know she was eating a rabbit, how she thought it was a
> piece of chicken.  And, you know, now that you mention the rabbit,
> I kind of remember how he gloated about that, how pleased he was
> that he got that across to her.  And I remember how upset LouRee
> was when she found out the rabbit was killed, that she'd actually
> eated it--ate it.

34

WELNER:     What do you think he was gloating about?  What made him gloat about this?  Was it that he fooled her into thinking that it was chicken?

BARZEE:     Yeah.

(Gov't Ex. 17g.)  Mitchell also shot the family's pet dog in the head and told his co-workers that he had killed his dog because his kids would not take care of it. (Gov't Ex. 20 at 60; Tr. at 391)

Barzee's children also remembered Mitchell as highly intelligent, disciplined and well read.  (Tr. at 184-85; Gov't Ex. 20 at 59.)  During the late 1980s, Mitchell spent a great deal of time at the library and studied topics such as self-sufficiency, wilderness survival, hypnosis and mind control.  (Tr. at 184-85; Gov't Ex. 20 at 59.)

5.      Performance and Behavior in the Workplace

From the mid-1980s until the mid-1990s, Mitchell worked as a die cutter at OC Tanner. (Tr. at 380.)  Mitchell's job entailed creating emblems in steel dies that were then used to stamp logos on items such as pins.  There were never any quality issues with Mitchell's work, which required him to be smart, detail oriented, and patient.  (Tr. at 380-81 & 394.)

At OC Tanner, Mitchell would frequently talk about his religious views, including his unique interpretation of LDS scripture and criticism of LDS church authorities.  (Gov't Ex. 20 at 61-62.)  Mitchell never used archaic language but used "[j]ust normal vernacular" during these discussions.  (Tr. at 386-87.)  Although he had assumed the identity of a prophet at home, he never referred to himself as a prophet or the Davidic King at the workplace.  (Tr. at 387.)

At least one co-worker, Doug Larsen, "'shared the same dogmatic inflexible views'" and found Mitchell to be "'devout, followed everything to the letter.'"  (Gov't Ex. 20 at 61-62.)  Other co-workers, however, were upset by Mitchell's religious discussions.  (*Id.*)  When other

35

co-workers would argue with Mitchell about his beliefs, Mitchell would begin to sing or read scriptures aloud to drown them out.  (Tr. at 386-87.)  When his supervisor, Garth Rosenlund, would intervene, Mitchell would bristle at being told what to do, but would stop singing and disrupting the workplace.  (Tr. at 383-84.)

Mitchell also told Barzee that he sang loudly at OC Tanner to overpower the music that his co-workers would play.  (Gov't Ex. 17a.)  Barzee described Mitchell as proud and cocky when he told her that those he worked with at OC Tanner could not shut him up.  (*Id.*)

Rosenlund never got a sense that Mitchell was disoriented or confused.  (Tr. at 387.)  He described Mitchell as a smart, rational person who appeared to have his faculties with him at all times and was never unstable.  (Tr. at 395.)  Rosenlund explained that Mitchell's singing was a "ploy" that he used when his co-workers annoyed him.  (Tr. at 388.)  Rosenlund's impression was that Mitchell knew what he was doing and chose to go out of touch so he would not have to participate.  (*Id.*)

Mitchell left OC Tanner to take a job at Historical Artifacts.  (Tr. at 1010.)  At his new job, he sang hymns while he worked, but there were no co-workers around to bother him.  (*Id.*)  Mitchell's boss found him to be a capable employee.  (*Id.*)  When Mitchell quit to take another job, he left on good terms and his boss would have been comfortable taking him back.  (*Id.*)

Mitchell left to go to work for Dr. West's International Academy of Lymphology.  (Gov't Ex. at 64.)  In his new job selling lymphology products, Mitchell was required to spend a great deal of time "on the phone[,] interacting with people [,] having to be socially appropriate[,] having to engage them and having to manage complex dialogue."  (Tr. at 1107.)  "Mitchell was so successful at promoting the lymphology, that, by his account, he made as much as $14,000 in

36

a month for Dr. West."  (Tr. at 1106.)  Based on Mitchell's ability to persuade and teach people

about the benefits of lymphology, Dr. West "would talk to [Mitchell] about running the academy

for him." (Govt. Ex. 17b at 4-6.)  Barzee recalled that "Dr. West didn't have anybody else like

Brian." (*Id.* at 4.)

> 6.       Living Off the Grid

Long before Mitchell quit his job and adopted a homeless lifestyle, he had been reading

"literature about tax evasion, living below the grid and unaffiliated, and living in sort of a

survivalist kind of circumstance." (Tr. at 892.)  He "had been reading and giving a lot of thought

to the idea of not paying taxes, not having these kinds of financial obligations, and in other ways

of leading a more unaffiliated life." (*Id.*)  By the late 1980s, Mitchell was discussing his

opposition to income taxes and expressed a desire to be a "free man." (Gov't Ex. 20 at 63.)

Mitchell had ongoing financial problems.  In the late 1980s, Mitchell asked his sister

Laurie and her husband Scott Dean for help paying some bills.  (Tr. at 208.)  Mitchell said they

were having trouble paying rent, their phone bill and other obligations.  (*Id.*)  The Deans gave

Mitchell a few hundred dollars for rent and also paid two phone bills.  (*Id.*)  They later learned

from the landlord that Mitchell and Barzee never paid the rent but had instead moved out of the

house.  (Tr. at 209.)    The Deans eventually located Mitchell and Barzee and went to their home,

but they were not invited in.  (Tr. at 209.)  The next time they came to visit, the house was dark

and a neighbor told them that Mitchell and Barzee had already moved again.  (Tr. at 209-10.)

Mitchell displayed a pattern of trying to avoid his responsibilities.  (Tr. at 218.)  He

would default on the rent and bills, he would not maintain a relationship with his son, and he

"would move, disappear and try not to have any contact at all" with family.  (*Id.*)  Mitchell would

"just try to get out of [his responsibilities] or walk away if it was uncomfortable." (Tr. at 217.) Mitchell himself later told Elizabeth how he walked away from his financial problems. (10/01/09 Tr. at 39.)

In the mid-1990s, Mitchell told Barzee's sister that he did not want to have a job, but wanted to live off panhandling as he had done when he was younger. (Tr. at 237-38.) Eventually, Mitchell and Barzee began a "a gradual divesting of possessions" and moved into a fifth-wheel trailer. (Tr. at 892.) For a time, they relocated to Idaho "to live among naturalists and survivalists in an undocumented community where residents live off the land." (Gov't Ex. 20 at 65.) Their family did not view the change in lifestyle as irrational, but rather as financially motivated. (*Id.*) In the opinion of Barzee's mother, "They went homeless to stop paying child support and stopped working to avoid paying taxes and child support." (*Id.*)

In 1995, Mitchell and Barzee "took to the road, planning to visit sites of LDS historical significance and to seek 'rest and spiritual healing.'" (Gov't Ex. 20 at 66.) Barzee told one of her friends that they were traveling back east so that she could play organ recitals. (*Id.*) During their two-year journey through the country, Barzee was "'impressed'" to observe Mitchell's "'mental awareness and alertness in his ability to find the way around by following maps and directions.'" (*Id.*) Mitchell and Barzee relied on the generosity of others, who would give them handouts, a place to stay, or transportation. (Gov't Ex. 20 at 66-67.)

When Mitchell and Barzee were en route to Nauvoo, Illinois, a site of significance to the LDS faith, they were invited into the home of Phyllis Koch. (Gov't Ex. 20 at 67.) Mitchell told her that he and Barzee were Mormons and were traveling to the Northeast for Barzee to perform organ recitals. (*Id.*) Mitchell was very domineering and controlling toward Barzee and would

38

not allow her to have ice water or any food except fruit because they were "cleansing their

bodies." (*Id.*)  Mitchell and Koch discussed religion, with Mitchell "criticizing her Catholic

Church and revisiting the mistakes and failures of different Popes." (*Id.*)  During this discussion,

Mitchell was not preaching and did not represent himself as a prophet. (*Id.*)  Koch did not

experience Mitchell as "bizarre, irrational, disorganized, or disoriented." (*Id.*)

Mitchell and Barzee traveled to the Northeast where Barzee played organ recitals. (Gov't

Ex. 20 at 67.)  They continued on to Florida and California and managed to earn enough money

panhandling to travel to Hawaii. (Gov't Ex. 20 at 67.)

When Mitchell and Barzee returned to Utah in 1997, they "shifted their living situation

from various rent-free situations, such as the West compound in Orem, where they would live for

weeks or more at a time, or even longer with Mr. Mitchell's mother, or with Barzee's parents, or

have periods of homelessness, in which they lived up in the mountains." (Gov't Ex. 20 at 68.)

Elizabeth explained that Mitchell and Barzee "took advantage of other people's generosity" and

stayed with and "leached (sic) onto" people. (10/01/09 Tr. at 62.)  Mitchell and Barzee

hitchhiked and traveled around during this time, but "would always come back and stay at

someone's house for a while and then go out again." (10/01/09 Tr. at 63.)  When they took

Elizabeth "was the first time that they stayed in a camp, so to speak, for an extended period of

time . . . without outside help, without, like going back to his mother or his father or her mother."

(*Id.*)

On September 21, 1997, Mitchell and Barzee formed the Seven Diamonds Plus One

Study and Fellowship Society, which sought to emphasize the importance of seven texts – the

Bible, the Book of Mormon, the words of LDS prophets, *The Golden Seven Plus One* by Dr.

West, *Embraced by the Light* by Betty Eadie, *The Literary Message of Isaiah* by Avraham

Gileadi, and *The Final Quest* by Rick Joiner – plus "inspired sacred music and song and the

testimonies of all the humble followers of Jesus Christ by the power of the Holy Ghost."  (Gov't

Ex. 20 at 68.)  The date had significance as September 21st is the day Mormons believe Joseph

Smith was visited by the angel Moroni.  (Tr. at 41-42.)

       Mitchell approached Barzee's mother, Dora Corbett, about using her home as a meeting

place for the society.  Mitchell appealed to her by saying that it would be an opportunity for

Barzee to play the organ for an audience.  (Tr. at 893.)  Corbett concluded that Mitchell was

trying to establish some kind of sect and needed a place to attract followers.  (*Id.*)  When Corbett

refused, Mitchell took Barzee and stormed out of the house.  (*Id.*)

       In late 1997 and early 1998, Mitchell and Barzee stayed for several months at the West

home.  (Gov't Ex. 20 at 68.)  Mitchell later told Elizabeth that the Wests had a policy of not

turning away anyone in need and that he took advantage of that.  (10/01/09 Tr. at 69.)  Mitchell

and the Wests had daily discussions about their shared religious views.  (Tr. at 270-71.)  The

Wests admired Mitchell "as a man of selfless piety, someone who practiced as he preached, and

who was willing to make sacrifices to the level of extreme conjured by scripture."  (Gov't Ex. 20

at 68.)  Mitchell assumed a subtle leadership role in the West family group and the Wests

believed he was potentially the one who would lead the LDS Church back to the right path.  (Tr.

at 269-70.)   At the time, Mitchell and Barzee "had built a handcart and urged the West family to

join them in a life of renouncing material possessions."  (Gov't Ex. 20 at 69.)  Mitchell and the

Wests ultimately diverged over the speed at which the law of consecration and polygamy should

be implemented, Mitchell wanting more rapid progress toward the implementation of these practices than the Wests.  (Tr. at 270.)

In late 1999 and early 2000, Mitchell and Barzee were staying at the home of Mitchell's mother.  (Tr. at 210.)  Mitchell and Barzee came and went, living out of their handcart, which they kept at the side of his mother's house.  (Tr. at 211.)  Although Mitchell had indicated that he and Barzee were just going to "do their own thing" and not bother anyone, Mitchell was frequently in the house "eating food, taking things, using things in the house, and such."  (*Id.*)  Barzee, on the other hand, spent almost all of her time in the handcart.  (Tr. at 212.)

Mitchell's family began to be concerned because his mother was "a very gentle and kind person, and if someone wants to take advantage of her, it's not difficult."  (Tr. at 212.)  They were also concerned about Barzee, who was "cooped up in a little hand cart."  (Tr. at 220.)  Mitchell's brother-in-law Dean described that in the 1980s, Barzee had been a vivacious, active and upbeat person who was always smiling and happy.  (*Id.*)  But "[b]y 2000, she was very worn, rather withdrawn, not willing to chat a lot. Very few smiles. So, it was a much different Wanda."  (*Id.*)

One day, Mitchell announced to his family that he wanted everyone to start calling him David.  (Tr. at 213-14.)  Dean suspected that Mitchell owed someone money and decided to change his name to avoid the debt.  (Tr. at 232.)  Mitchell's sister Laurie laughed it off and said, "Well, you're always going to be Brian to me, so I'll just call you Brian."  (Tr. at 214.)  Mitchell said that he wanted to be David, but when Laurie again refused, Mitchell relented.  (*Id.*)  Mitchell acted differently to other family members.  He would "insist that he be called David, and sometimes he wouldn't even speak to people."  (Tr. at 216.)

41

Mitchell told Dean that he was working on some new beliefs and was writing a book. (Tr. at 214-15.)  Mitchell's beliefs were not what Dean "would consider radical or unusual" and "would have easily fit into . . .  a number of religions that are out there as far as not being too far off from what others believe."  (Tr. at 228.)  When talking about his beliefs, Mitchell never used archaic language or exhibited any distress.  (Tr. at 214-15 & 221.)

When Dean indicated that he was not interested in hearing Mitchell's religious ideas, Mitchell "was fine with it" and would usually move on to a different topic of conversation.  (Tr. at 215.)  Whenever Mitchell was challenged, he "would just back off on trying to put up whatever thing he was trying to get people to go along with."  (Tr. at 214.)  Mitchell seemed to feel "more comfortable if he had full control of what was going on, and when he didn't feel comfortable, he would withdraw," that is, "physically leave the conversation or the situation." (Tr. at 216 & 226.)

The Deans never felt that Mitchell was mentally ill or needed medical help.  Mitchell "always seemed to be completely in charge of what he was thinking or doing or talking about." (Tr. at 221.)  Mitchell was "very rational" and his "ideas were well thought out."  (Tr. at 233.) He was never incoherent, illogical, confused or disoriented, and there was never a time when Dean had to explain something that Mitchell did not understand.  (Tr. at 233.)  Dean testified that Mitchell "did not appear to me to be extreme or in any way outside of normal from my experiences with him.  He was consistent in the way he would act with me."  (Tr. at 226.)  The only real change that Dean ever observed was when Mitchell "decided to go into this back-to-basics lifestyle."  (Tr. at 228.)  Other than Mr. Mitchell's odd choice of lifestyle, there was nothing about the way he acted that seemed unusual or out of the ordinary.  (Tr. at 234.)

42

Another brother-in-law, Tom Holbrook, said that the idea of getting Mitchell psychiatric care was never even raised for discussion.  (Gov't Ex. 20 at 71.)

Barzee recalled that, throughout all of the years she and Mitchell were together, no one – not his family, friends, the various strangers they routinely encountered, nor the several police officers that questioned them – ever believed Mitchell had mental issues or referred him for psychiatric help.  (Govt. Ex. 17b at 1-2.)  Some people "felt that his faith was extreme and they couldn't relate to it, but nobody experienced him as psychotic or ill, sick."  (Tr. at 890-91.)

During this time, Mitchell was unemployed and earning money by begging in downtown Salt Lake City.  (Tr. at 210.)  Mitchell told Dean that "he just wanted to get back to basics or a simpler lifestyle, more rustic, you know, not be caught up in society and all the worldly things, so he wanted to just take a simpler approach to life."  (Tr. at 213.)  When Dean encouraged Mitchell to find work at a temporary employment agency or as a day laborer, Mitchell said that "he was working on something."  (*Id.*)  Holbrook observed that Mitchell made good money panhandling and did not pay income taxes.  (Tr. at 1035.)

"In downtown Salt Lake City, [Mitchell] and [Barzee] now became a familiar sight in their white robes, panhandling passers by."  (Gov't Ex. 20 at 71.)  After the terrorist attacks on September 11, 2001, however, passers-by began to associate their dress with that of Osama Bin Laden, which was "accompanied by a drop in donations."  (Gov't Ex. 20 at 73.)  "This less charitable climate prompted them, according to [Barzee], to wear regular attire for the next several months."  (*Id.*)

Mitchell would sometimes beg for money around the Crossroads Mall in downtown Salt Lake City.  (Tr. at 275-76.)  Julie Adkison, a mall employee, testified that she was once engaged

in a normal conversation with Mitchell when he suddenly changed his behavior as another person approached.  In an effort to obtain money, Mitchell threw his arms out and hummed or sang hymns.  (Tr. at 276.)  Adkison described Mitchell's change as "really unexpected" and recalled that it "really threw me off."  (Tr. at 277.)  When the person left, Mitchell put his arms down and resumed the normal conversation he was having with Adkison.  (Tr. at 278.)  Adkison observed that when Mitchell would change character, some people would put money in his outstretched hands.  (Tr. at 276.)

        8.      Soliciting Plural Wives

On November 23, 2000, Mitchell "announced to [Barzee] that he had received the revelation that plural marriage was to be restored."  (Gov't Ex. 20 at 72.)  He told Barzee that she "'must heed and obey the law of celestial marriage or suffer eternal consequences.'"  (*Id.*)  Barzee "ultimately encouraged him to fulfill this calling."  (*Id.*)

Mitchell later told Elizabeth about an African-American woman named Kelly whom he had hoped to make a plural wife.  (10/01/09 Tr. at 55-56.)  Mitchell said that Kelly was in her 30's and "wasn't practicing monogamy."  (*Id.* at 56.)  Mitchell had a relationship with her, but became angry when he caught her with another man.  (*Id.* at 53.)  Nonetheless, he invited her to spend the weekend with him and Barzee in their mountain camp, but she declined.  (*Id.* at 56.)

Mitchell also told Elizabeth that he had met a young woman named Julie who had run away from a polygamist family and knew a lot about the polygamist lifestyle.  (10/01/09 Tr. at 56-57.)  Julie Adkison was born and raised in the Kingston polygamist community.  In August of 1999, when she was 19 years old, she left the community.  Within the next year, she met Mitchell at the shoe store in the mall where she worked.  (Tr. at 275.)  When she first met Mitchell, she

told him that she had recently left the Kingston community.  (Tr. at 279.)  Mitchell decided that Julie was to be one of his wives.  (10/01/09 Tr. at 57.)

In the early part of 2001, Mitchell requested to meet with Adkison and she agreed.  (Tr. at 278-80.)  Adkison, Mitchell, and Barzee went to a sitting area near the mall.  For the next four hours, Adkison sat between Mitchell and Barzee and listened while Mitchell did most of the talking.  (*Id.*)  Mitchell's focus during the meeting was on starting plural marriage in his family. He did not state that he had received a revelation about polygamy, but instead indicated that it was "something that he and his wife had talked about and decided it was time to do."  (Tr. at 882.)  Mitchell was interested in Adkison because she might be receptive to the idea, having recently left a polygamist community.  (Tr. at 282.)  Mitchell was also interested in Adkison's diamond engagement ring.  He told Adkison "to sell this ring and we could all live off it nicely for quite a few months."  (*Id.*)  Eventually, Mitchell directly propositioned Adkison to become his second wife, stating that God would direct her away from her fiancee and into plural marriage with him.  (Tr. at 284.)  Adkison declined the invitation, but, based on her upbringing, she did not find Mitchell's views odd.  (Tr. at 293.)

Following Adkison's refusal, Mitchell claimed to receive a revelation to "plunder" girls ages 10 to 14 to be his wives because they were more malleable.  (Gov't Ex. 20 at 73.)  Prior to kidnaping Elizabeth, Mitchell would "minister downtown, looking for young women."  (Gov't Ex. 17d at 1.)  However, he was not able to determine where the girls lived.  For example, Mitchell tried to get on the same bus as a young girl he was targeting, but the girl became scared and got away.  (*Id*. at 1-2.)  Mitchell targeted other young girls and "would stalk them and try to

45

follow them."  Mitchell knew where Elizabeth lived because he had worked at her house.  (*Id.* at 2.)

9.  Excommunication

On April 6, 2002, Mitchell delivered his Book of Immanuel David Isaiah ("BIDI") to his family members and close friends.  (Gov't Ex. 20 at 75.)  The date had significance as April 6th is the date the LDS Church was founded.  (Tr. at 17-18.)  Mitchell acted aggressively toward his mother and insisted that she must accept the BIDI or be destroyed.  (Gov't Ex. 20 at 73.)  When Mitchell and Barzee became physical, his mother obtained a protective order against them.  (*Id.* at 75.)

The family did not seek any psychiatric care for Mitchell, but instead turned the BIDI over to the LDS Church committee on apostate activity.  (Gov't Ex. 20 at 76.)  The family believed that the release of the BIDI was "just the next level of Brian 'just being Brian,' creating a debate, getting people stirred and provoking their sensitivities."  (*Id.*)

After receiving the BIDI, the LDS Church initiated excommunication proceedings against Mitchell and Barzee.  (Gov't Ex. 20 at 76.)  Mitchell's stake president located Mitchell downtown and attempted to serve him with written notification, but Mitchell "defiantly rejected him."  (*Id.*)  Mitchell told Elizabeth that the LDS church had called an excommunication hearing and he just walked away from that by never showing up.  (10/01/09 Tr. at 38-39.)  The committee voted unanimously to excommunicate Mitchell.  (Gov't Ex. 20 at 76.)

A few days later, Mitchell kidnaped Elizabeth from her home.  (*Id.*)  Barzee recalled that Mitchell "acted totally surprised when he--when we were told to go forth in five weeks and that most assuredly we would obtain the wife on the 5th of June, he acted totally surprised that he was

going to go get Elizabeth." (Gov't Ex. 17d at 2-3.) In retrospect, Barzee realized that "he had it planned and--well, that he just knew who the--what he was going to do." (*Id.*)

## C. State Custody

### 1.    Post-Arrest Statements

After he was apprehended, Mitchell was questioned by two investigators in a videotaped interview. The interview was characterized by one expert as the "ultimate psychiatric stress test." (Tr. at 651.) Mitchell was on no medication and was not being treated for a psychiatric condition at the time he was interviewed. (Gov't Ex. 20 at 16; Gov't Ex. 15 at ¶ 3.) Yet, during the interview, Mitchell's demeanor was calm, collected and confident. (Tr. at 976-78.) He sat slouched in his chair and, about twenty minutes into the interview, put his feet up on another chair. (Gov't Ex. 16 at 19:26; Tr. at 976-78.) His demeanor was "noticeably more relaxed than even the investigators" and he did not appear to be intimidated or in any distress when answering the investigators' questions. (Tr. at 977-78.) He was respectful to the authority of the officers and did not become angry or confrontational. (Tr. at 990.)

Mitchell expressed his understanding that the investigators were trying to get answers they could use against him. (Gov't Ex. 16 at 17:39 & 18:41; Tr. at 981.) He reminded the investigators that he had the right to a lawyer and was acting as his own lawyer and defending himself. (Gov't Ex. 16 at 17:08.) He told the investigators, "Every single one of your questions are trick questions, every question is meant to trap me and you're lying." (*Id.* at 45:02.)

Although Mitchell generally engaged in a give and take with the investigators, he would not answer incriminating questions. (Tr. at 982 & 986-89.) When the investigators asked Elizabeth's age, Mitchell initially claimed it was irrelevant but then stated that she was 18.

(Gov't Ex. 16 at 16:26; Tr. at 976.)  When asked if he "married" her, Mitchell said that Elizabeth

was sealed to him as his wife, but refused to say whether they had sex.  (Gov't Ex. 16 at 17:08.)

Later, when pressed, he denied that he ever had sex with Elizabeth.  (Gov't Ex. 16 at 58:05; Tr.

at 997.)  When asked, "Did you take this girl out of her house at knife point," Mitchell refused to

answer.  (Gov't Ex. 16 at 24:41; Tr. at 976.)  In response to repeated questioning, Mitchell would

only say that he "received" Elizabeth as his wife.  (Gov't Ex. 16 at 36:35 & 44:42; Tr. at 986-89.)

He sidestepped questions about whether he had physically restrained Elizabeth by saying, "The

whole world is in bonds and chains of wickedness."  (Gov't Ex. 16 at 51:35.)

When it was clear they were getting nowhere, one of the investigators changed his

approach and told Mitchell that he had never met someone who actually read the Bible and sold

all their worldly possessions.  (Gov't Ex. 16 at 46:26.)  Mitchell recognized the ploy and said, "I

think now you've changed your tactics to use flattery because earlier you accused me of being

anything but a servant of the Lord."  (*Id.*)  At another point in the interview, one of the

investigators touched him on the shoulder, to which Mitchell calmly replied, "What is this

leading to?"  (*Id.* at 58:54-59:15; Tr. at 996.)

The interview became increasingly intense and, after an hour and fifteen  minutes of

questioning, Mitchell asked to use the restroom and get another drink of water.  (Gov't Ex. 16 at

1:17:55.)  After returning to the room, Mitchell closed his eyes and began singing as soon as the

investigator started to speak.  (Ex. 16 at 1:23:30.)  For the remainder of the interview, Mitchell

either sang, sat quietly with his eyes closed, yelled "Get thee behind me, Satan," or otherwise

refused to engage in the interview.  (Ex. 16 at 1:23:30.)  The investigators eventually gave up and

ended the interview.  (Ex. 16; Tr. at 998-99.)

48

After the initial interview had completely broken down, FBI Special Agent George

Dougherty and another FBI agent went into the interview room where Mitchell was alone with

his eyes closed.  (Tr. at 404-05.)  During the initial interview, Agent Dougherty had been in

another room watching on a monitor and reviewing the BIDI to learn more about Mitchell.  (Tr.

at 404.)  The agents told Mitchell they would like to discuss the BIDI with him.  Mitchell

immediately engaged in conversation and asked Agent Dougherty if he read the entire book.

When Agent Dougherty said he had just skimmed through it and that he had some questions,

Mitchell told Agent Dougherty he should read the entire book and then he would answer some

questions.  (Tr. at 406.)

That night, Agent Dougherty read the entire BIDI.  On March 14, 2003, Agent Dougherty,

accompanied by another officer, returned to the Salt Lake County jail to speak with Mitchell.

(Tr. at 407.)  Mitchell waived his *Miranda* rights and agreed to speak with the agents.  (Tr. at

408; Govt. Ex. 7.)  During the interview, Mitchell claimed Elizabeth could have returned to her

family at any time.  He said he gave Elizabeth a different name and instructed her to use it if ever

questioned.  (Tr. at 410.)  He was willing to talk about his past and openly shared his upbringing

and several experiences.  (Tr. at 411-12.)  At the end of the interview, Mitchell again welcomed

another visit from Agent Dougherty.  (Tr. at 413.)

The next day, March 15, 2003, Agent Dougherty and the other officer returned and visited

with Mitchell.  Mitchell again waived his *Miranda* rights, but did not want to discuss his case.

(Tr. at 413-14 & 419-20.)  Instead, Mitchell asked about what would happen to him in the legal

process.  (Tr. at 414 & 418.)  Agent Dougherty explained in great detail what happens, step-by-

step, in a federal case.  (Tr. at 415-16.)  Agent Dougherty described the conversation as an open

dialogue; Mitchell continued to ask relevant questions throughout.  (Tr. at 416-17.)  It appeared to Agent Dougherty that Mitchell fully understood the discussion and was especially inquisitive and attentive.  (Tr. at 417-18.)  During the conversation, Mitchell did not speak at all about religion.  Agent Dougherty described the conversation as similar to one between "normal" people.  At the end of the interview, Agent Dougherty again confirmed that it would be alright if they returned.  (Tr. at 419.)

On March 17, 2003, Agent Dougherty and the officer returned and Mitchell again waived his *Miranda* rights.  (Tr. at 419-21; Govt. Ex. 8.)  During this conversation, Mitchell said that he knew the world would view him as "a child predator, sexual deviant and a monster" if he were caught.  (Tr. at 422.)  He said Barzee became very jealous of Elizabeth and was upset with the amount of time he spent with Elizabeth.  He said he had arguments with Barzee and that he would constantly have to console her, mostly by praying together.  (Tr. at 423.)  When Agent Dougherty asked about the break in at the home of Elizabeth's cousin, Mitchell shut down the interview and said he did not want to talk anymore.  That was the last interaction Agent Dougherty had with Mitchell.  (Tr. at 424.)

During the interviews, Mitchell came across as "[s]oft spoken, intelligent and extremely, extremely careful."  (Tr. at 427.)  He "was very careful about the way he answered the questions, almost like he was on a witness stand.  He thought about his answers very carefully, and he was very calculated."  (Tr. at 426-27.)  Agent Dougherty testified that it is fairly unusual for someone being interviewed to be so careful with his answers.  (Tr. at 434.)

Agent Dougherty testified that Mitchell turned religion on and off "pretty regularly" during their conversations.  (Tr. at 435.)  Mitchell would deflect the tough, more direct questions

by talking about the BIDI.  When that occurred, Agent Dougherty would ask the question in a different way, which sometimes worked in getting Mitchell to respond.  Mitchell would eventually realize what had happened and would smile at Agent Dougherty and say, "That was a good one, George."  Agent Dougherty would ask what Mitchell meant and Mitchell would say, "You got me to say that, and I didn't want to answer that."  Other times when Agent Dougherty would ask the question in a different way, Mitchell would say, "I know what you're trying to do." (Tr. at 425.)

For example, when Agent Dougherty asked Mitchell if he had sexual intercourse with Elizabeth, Mitchell said it was not an appropriate question.  Agent Dougherty apologized and asked if they had gotten married, and Mitchell said they had.  Agent Dougherty asked about the marriage ceremony and then asked if they consummated the marriage.  Mitchell said they did.  A short time later, Mitchell said, "You got me to say something.  You asked it a different way, but you got me to say something."  (Tr. at 426.)

2.      Post-Arrest Additions to the BIDI

Within weeks of his arrest, Mitchell wrote a supplement to the BIDI in which he responds to the charges against him.  (Gov't Ex. 20 at 17.)  In an "addition to the Book of IDI" he writes:

> Yea Immanuel is accused of coming as a thief in the night and so will I come as a thief in the night. He is accused of taking by force a virgin daughter of Zion … is accused of humbling a virgin daughter of Zion and bringing her low in the dust and binding her to him with a cord that could not be broken ... accused of subjecting her to his will and to all his ways …
>
> … it is I, even Jesus Christ that has done by my righteous right hand all that which has truly been done unto ShearJashub and this I did that it might be for a sign and for a portent unto all the world … the only force that was used … was the force and power of my spirit and the only weapon … was my words in his mouth saith

the Lord, and my words in Immanuel's mouth are sharper than a two edged sword …

... the holy spirit did work upon ShearJashub's heart and she did open the window for Immanuel to enter her home just before she retired to her bed on the night she was taken … the holy spirit did work upon the hearts of ShearJashub's earthly parents and they did invite Immanuel into their home, for in their spirits they knew ShearJashub would be taken by the hand of the Lord for a glorious purpose … Yea, shortly before ShearJashub was taken, her earthly parents removed the lock from ShearJashub's bedroom door and … turned off the security alarm to the back door of their home …

ShearJashub did arise from her bed and did come forth upon hearing her Lord's command, for she knew in her heart, … that to disobey would cause the loss of great and eternal blessings for herself and for her family.

ShearJashub followed Immanuel ... fell into the arms of Hephzibah with great joy and peace and exultation.  … ShearJashub and Hephzibah recognized each other … as the dearest and choicest of friends from all eternity, and behold, it was ShearJashub's wedding day!

And ShearJashub humbled herself before the Lord and in great faith and courage she gave herself unto her husband Immanuel.

Yea, and in truth, the only way that ShearJashub was bound was by the power of the Holy Spirit, confirming the truth of the words of God in her heart.

Yea, ShearJashub wore the key to unlock herself around her own neck, next to her own heart … False traditions were truly the only bonds she wore, and these bonds fell away in grace and truth and in a most miraculous way, and she was free!

... On the third day when ShearJashub's earthly family came up into the mountains searching for her and they called out to her, ShearJashub sat still with tears in her eyes, not because of any threat from Immanuel or Hephzibah, for there was none, and ShearJashub knew she could have called out and she would have been found, but … she knew the great sacrifice that I the Lord God Almighty had called upon her to make and she in great faith and courage remained silent.

Behold, thus saith your Lord and Savior Jesus Christ, ShearJashub's earthly parents knew in their hearts that ShearJashub was alright after she was taken … in their terrible weakness and great sorrow and grief, they gave into the tremendous weight of fear and doubt that the whole world pressed upon them and they began to suspect and accuse my true servant Immanuel.

(Gov't Ex. 1 at 26-27.)

The explanations given in this portion of the BIDI were different from the responses Mitchell gave to the officers after he was arrested. (Tr. at 903.) In addition, prior to his arrest, Mitchell never tried to convince Elizabeth that he had not used a weapon when he kidnaped her, that she held the key to unlock the cable that held her captive, that she could have gotten away whenever she wanted, that her parents had invited him into their home on the night of the kidnaping, that her parents had turned off the security alarm and removed the lock from her bedroom door, that she had opened the window for him, or that she heard the Lord's command to go with him and complied. (10/01/09 Tr. at 40-41.)

3.      Behavior at Jail

While being held at the jail, Mitchell experienced no distress that required clinical intervention. (Gov't Ex. 20 at 19.) Jail records describe him as coherent and lucid, without any irrational inferences or changes in mood. (*Id.*) Since he was arrested on March 12, 2003, Mitchell required no clinical intervention and took no psychotropic medications. (Gov't Ex. 15 at ¶¶ 1-2.)

Mitchell was bothered by other inmates who would say crass things or play music that Mitchell disliked. (Tr. at 862.) As he did at OC Tanner, Mitchell would sing loudly to drown them out. (Tr. at 862.) "At some point when these inmates had really upset him, [Mitchell] started getting up at 2:00 in the morning and singing at the top of his lungs, and they were furious." (Tr. at 862.) When Mitchell's cell mate asked him about the late night singing, Mitchell said, "I do it to retaliate." (Tr. at 862.)

4.      Initial Competency Evaluations

Shortly after his arrest, Mitchell was referred to the Utah State Hospital for a competency evaluation.  (Gov't Ex. 20 at 20.)  Mitchell refused to speak to either Stephen Golding, Ph.D., or Noel Gardner, M.D., the two retained mental health evaluators.  (*Id.*)

During Dr. Gardner's interview, Mitchell sat and "stared directly into [Dr. Gardner's] eyes with great intensity for a very prolonged period of time that was very uncomfortable."  (Tr. at 618.)  Dr. Gardner has "personally talked to hundreds if not thousands of psychotic patients during his career" (Tr. at 648), and that was something he had "never seen a psychotic patient be able to do" (Tr. at 618).  Dr. Gardner "had the distinct impression that [Mitchell] was trying to intimidate [him] with the intensity of his stare directly into [his] eyes."  (*Id.*)

In September 2003, Dr. Golding opined that Mitchell suffered "from a disorder within the psychotic spectrum" and was incompetent to stand trial.  (Def. Ex. X at 41.)  Dr. Gardner diagnosed Mitchell with narcissistic personality disorder and concluded that he was competent to stand trial.  (Def. Ex. I at 25.)

5.      Plea Negotiations with State

In August 2004, Mitchell was engaged in plea negotiations with the state.  (Tr. at 1850.)  On August 31, 2004, both the prosecution and defense counsel stipulated that Mitchell was competent to stand trial.  (Tr. at 921-22; Gov't Ex. 20 at 22.)  Defense counsel represented that the stipulation was "based on information that we discovered while preparing for this case" and that the "information supercedes Dr. Golding's report."  (Gov't Ex. 20 at 22.)

On September 2, 2004, Mitchell was arraigned.  (Gov't Ex. 42; Tr. at 923.)  Mitchell did not sing or otherwise disrupt the proceeding.  (Gov't Ex. 42; Tr. at 923.)  When the judge asked

how he intended to plead on each of the charges, Mitchell responded, "Not guilty." (Gov't Ex. 42; Tr. at 923.)

On September 16, 2004, Jennifer Skeem, Ph.D., who had interviewed Mitchell in July and August 2004, submitted a report in which she opined that Mitchell was competent to stand trial. (Gov't Ex. 20 at 23; Tr. at 923.) Although Dr. Skeem diagnosed Mitchell with Delusional Disorder, she found that his competency abilities were not significantly impaired. (Def. Ex. J at 21-27.) At the time of the report, Mitchell was "engaged" and had even asked to review evidence against him, including the videotaped interviews of Elizabeth and Barzee. (Tr. at 1688.)

On September 17, 2004, the District Attorney's Office extended a plea offer that would allow Mitchell to enter an *Alford* plea to aggravated kidnaping, aggravated sexual assault, and aggravated burglary. (Gov't Ex. 11 at 1; Tr. at 923-24.) On September 23, 2004, the defense submitted a counteroffer proposing that Mitchell enter an *Alford* plea to aggravated kidnaping and two counts of aggravated burglary, instead of pleading to the aggravated sexual abuse charge. (Gov't Ex. 11 at 1; Tr. at 923-24.) The prosecution responded by rejecting the counteroffer, reiterating the original offer, and setting a deadline for acceptance of the offer by October 15th. (Gov't Ex. 11 at 2-3; Tr. at 924.)

On October 13, 2004, defense counsel informed Dr. Skeem that Mitchell originally wanted to accept the offer, but was now concerned that the *Alford* plea was "appealing to the carnal man in him." (Tr. at 1678.) According to defense counsel, Mitchell "had mentioned waiting until trial and then pleading guilty to all charges, with the idea that he is guilty because he didn't carry this out in perfect faith to God." (*Id.*)

55

On October 15, 2004, the defense sent a letter to the prosecution stating, "After fully advising Mr. Mitchell about your offer, he has authorized us to inform you that he will not accept your offer of September 27, 2004."  (Gov't Ex. 11 at 4; Tr. at 924.)  The defense stated, "We remain willing to resolve this case. . . .  We therefore re-submit our counteroffer and remain willing to engage in discussion regarding the terms of that offer."  (Gov't Ex. 11 at 4; Tr. at 924.)  On October 18th, prosecutors responded by rescinding the concessions made in the initial offer and giving Mitchell a deadline of October 22nd to either plead guilty to the charges or go to trial.  (Gov't Ex. 11 at 6-7; Tr. at 924.)

Defense attorneys met with Mitchell on October 21, 2004.  (Tr. at 925.)  That same day, they submitted a letter to prosecutors indicating that they had kept their client "fully informed of any plea offers" and that "the acceptance or rejection of any plea offer and when it occurs is in the sole discretion of our client."  (Gov't Ex. 11 at 8; Tr. at 925.)  The defense recognized that "there are instances where negotiations need to begin anew.  We are certainly willing to keep open that possibility."  (Gov't Ex. at 9; Tr. at 1041.)  The letter mentioned nothing about "any psychiatric deterioration or concern about Mr. Mitchell's mental state."  (Tr. at 926.)

That same day, Mitchell's attorneys told Dr. Skeem that Mitchell "wanted to plead guilty on all six charges."  (Tr. at 1682.)  Mitchell had reportedly told them that the "Lord was giving him direction" and "wanted him to move forward as quickly as possible and was hoping to have this completely wrapped up by December."  (*Id.*)

The jail visitor logs show the defense team did not visit Mitchell again until October 27, 2004.  (Tr. at 927.)  That day, defense counsel contacted Dr. Skeem again and described Mitchell "as sort of rambling, religious."  (Tr. at 1682.)

56

On October 29, Dr. Skeem re-interviewed Mitchell at defense counsel's request.  During the interview, Mitchell discussed the plea negotiations.  (Tr. at 1047-48; Gov't Ex. 28.)  Mitchell was disappointed that the Smart family had apparently had a change of heart about dropping the sexual assault charges.  (Tr. at 1823-25.)  He referenced a letter from the prosecution indicating that the State was no longer willing to allow him to plead to charges that did not include a sex offense.  (Tr. at 1695 & 1834.)  He referred to "the letter and the counter plea, feeling that he should not accept the offer."  (Tr. at 1694.)  He characterized the prosecution's letter as "hateful, condemning" and said that the Lord had "revealed clearly drawn battle lines."  (Tr. at 1695.)  "We plead for mercy and they gave none."  (*Id.*)  Mitchell explained to Dr. Skeem that the federal government would prosecute if he were not sentenced to at least 30 years on the state charges.  (Tr. 1695 & 1838.)

Mitchell told Dr. Skeem that he wanted to bear his testimony and "the Lord said stronger still would be to go to trial."  (Tr. at 1696.)  Mitchell said, "My crucifixion is my testimony, like Christ."  (*Id.*)  He clarified that he would not die, but that the trial would "[d]estroy [his] character" and "[s]tir up the whole world's contempt with a lie."  (*Id.*)  Mitchell knew, "The jury will convict me."  (*Id.*)  He stated that the Lord would deliver him in nine years and that there were seven years left.  (*Id.*)

After this interview, Dr. Skeem helped defense attorneys prepare a draft of a petition for inquiry into competency to proceed.  (Tr. at 928.)  Among other things, the petition, filed on November 9, 2004, asserted that Mitchell lacked the "ability to manifest appropriate courtroom behavior."  (Gov't Ex. 37.)  Up until this time, Mitchell had never behaved inappropriately in court.  (Tr. at 930-31.)

The next day, Dr. Skeem met with Mitchell and told him that she believed he was incompetent.  After that, he refused to speak with her.  (Tr. at 1000.)  At his very next court appearance on December 2, 2004, Mitchell sang and shouted repentance.  (Tr. at 932 & 1687.)  Mitchell has sung at every court appearance since.  (Tr. at 932.)

Dr. Skeem filed a second report on February 1, 2005, based on her evaluation of Mitchell on October 29th.  (Def. Ex. K.)  In her first report, dated September 23, 2004, Dr. Skeem addressed nine competency abilities and found Mitchell's level of impairment in seven areas to be "none," in one area to be "mild," and in one area to be "moderate."  (Def. Ex. J; Tr. at 731.)  In her second report, she concluded that, by October 2004, Mitchell's impairment in six of the nine areas had increased – one  to "moderate" and remaining five to "severe."  (Def. Ex. K; Tr. at 732-34.)  The report did not address the possibility that Mitchell's presentation might have changed because plea negotiations had broken down and he was facing the prospect of trial and conviction.  (Tr. at 933.)

6.      State Competency Hearing

 A competency hearing was held in state court between February and July 2005.  (Gov't Ex. 20 at 30.)  The evidence was limited to testimony about the reports from Drs. Gardner, Golding, and Skeem.  (Gov't Ex. 20 at 30.)  During her testimony, Dr. Skeem erroneously testified that Mitchell began singing in October rather than December.  (Tr. at 1830.)  She also testified that she did not "know when plea negotiations shut down" and did not know much about the plea negotiation process at all.  (Tr. at 1832.)

On July 22, 2005, the state court judge issued an opinion finding Mitchell incompetent to stand trial.  (Gov't Ex. 20 at 30.)  The judge accepted the defense theory that Mitchell's religious

ideas were delusional and rendered him unable to rationally assist his attorneys. (*Id.*)  As a result

of the decision, Mitchell was sent to the Utah State Hospital for competency restoration.  (*Id.*)

      7.      Utah State Hospital

At the Utah State Hospital, Mitchell was assigned to area one of the forensic unit.  On

area one, patients each have their own bedroom, are free to leave their room at any time, and may

freely roam the unit.  When Mitchell was on the unit, there were three televisions, an X-Box

video game console, games, and other activities for the patients.  (Tr. at 127-28.)  Mitchell

seemed to be "very comfortable" at the hospital and did not seem to be in a particular hurry to

leave.  (Tr. at 322.)  During his stay, he gained 6 pounds.  (Exhibit 15 at ¶ 4.)

When Mitchell entered the hospital, special protocols were put in place as a result of his

status as a high profile patient, including restrictions on who could work on the unit and

protocols for ensuring Mitchell's safety.  (Tr. at 296-97.)  Charting procedures were reviewed

with the staff, who were reminded about "keeping their opinions out of it, keeping it very

objective."  (Tr. at 297.)  As a result of this training, at least one staff member, Nurse Jane

Jakeman, testified that she was not as detailed in her charting as she would have otherwise been.

(Tr. at 357-58.)

Psychiatric technicians, or psych techs, spend substantially more time than other hospital

staff with the patients.  The psych techs are charged with the patients' day-to-day care and

supervision.  (Tr. at 125.)  In comparison, members of Mitchell's treatment team, were supposed

to meet with Mitchell just once a week.  (Tr. at 126.)

Psych tech Brigham Andrew was assigned to chart Mitchell's behavior during the first

few weeks of Mitchell's three-year stay at the hospital.  After those first few weeks, Andrew's

impression was that Mitchell "was competent and shouldn't be at a state hospital. . . .  there was nothing in his behavior that suggested he was incompetent."  (Tr. at 449-50.)  Andrew testified that if the first week of Mitchell's stay at the hospital had been recorded to show his conversations and behavior, "I don't believe his competency would even be in question."  (Tr. at 457.)

Mitchell was very high functioning when he entered the hospital and remained that way throughout his stay.  (Tr. at 129-30.)  He was self-sufficient and did not require any assistance.  (Tr. at 451.)  In contrast to other patients, Mitchell "stood out in the fact that he was not actively psychotic and that he was very easily redirected."  (Tr. at 321-22.)  Mitchell showed no "indication that he was depressed or anxious or . . . any other major symptoms of mental illness."  (Tr. at 324.)  In fact, Judith Fuchs, who has worked with patients for over 40 years (Tr. at 368), described Mitchell as "the most normal patient I was ever around"  (Tr. at 365).

a.    Difference In Presentation to Paraprofessional Staff

Mitchell's treating physician, Dr. Paul Whitehead, described Mitchell as "fairly naive and inept" and characterized Barzee as the "more erudite of the two."  (Tr. at 1412-13 & 1448.)  When Dr. Whitehead interacted with Mitchell, he was frequently left with the impression that "this guy just isn't getting it."  (Tr. at 1415.)  Dr. Whitehead testified that, "if anyone allows him to speak for any length of time, it's really not going to make sense to people."  (Tr. at 1433-34.)  "[B]ecause of his social ineptitude, people lose interest in what he has to say and sort of move along and don't want to listen to him for any length of time."  (Tr. at 1435.)  Another member of the treatment team, social worker Greg Porter, described Mitchell as "boring."  (Gov't Ex. 20 at 45.)

As psych tech Cam McGarry observed, there were "two different Brian Mitchells." (Gov't Ex. 20 at 45.)  Psych tech Andrew testified that Mitchell could have normal, back-and-forth, casual conversations with anyone if he chose to do so.  Mitchell understood "everything perfectly."  (Tr. at 450.)  McGarry had lengthy conversations with Mitchell regarding Robert Jordan's *Wheel of Time* series.  (Gov't Ex. 20 at 45.)  Andrew talked to Mitchell about his past, and Mitchell told Andrew about his past drug use and some of his experiences camping. (Tr. at 453.)

Psych tech Tye Jensen described Mitchell as a "breath of fresh air."  (Tr. at 140.)  Jensen testified that he "could have conversations with [Mitchell] I couldn't have with other patients," who "just honestly couldn't hold a deep conversation very long."  (Tr. at 140-41.)  One day, Mitchell described the book *Silas Marner* to Jensen for approximately three hours.  (Tr. at 142.) Jensen explained that Mitchell "went on to tell me this just elaborate, exquisite description of the story.  And so when the hour was up, I was so almost captivated by it, he was such a good story teller, he animated his voice between going high and low, eye contact, he was very excited about it, and so for the next hour I just told the other person I am - - look, I'll take your one-on-one watch, you know, so he can finish telling me about this book."  (Tr. 142-43.)  Jensen further testified that "it was just very kind of refreshing and was really almost entertaining.  He just painted a beautiful picture of the book for me almost as if I had read it."  While describing the book in detail, Mitchell did not talk much, if at all, about religion.  (Tr. at 143.)

   b.  Ability to Negotiate for Self Interest

Mitchell would negotiate with staff for small things that he wanted.  For example, because patients were limited to one snack, Mitchell would argue that he should have both a

banana and ice cream because a banana split was just one snack.  (Tr. at 453-54 & 466-67.)  He also successfully negotiated for things such as dental floss and movies.  (Tr. at 468.)  When Mitchell learned that psych tech Fuchs frequented the Provo library, he began approaching her about obtaining books for him.  (Tr. at 359.)  Fuchs acquiesced and Mitchell became the only patient for whom she would check out books.  (Tr. at 359-61.)

Mitchell was also able to negotiate somewhat complex television viewing arrangements. Mitchell's low status level limited his television viewing to the day room.  Without a staff member sponsor, a patient had to be at least level C to watch television in the kitchen and level D to watch in the group room.  (Tr. at 132.)  Mitchell would figure out which shows the patients wanted to watch, the patients' level, and which staff were available to sponsor patients who did not have high enough levels to watch television in the kitchen and group room.  He would even prepare flow sheets to negotiate with staff about sponsoring the different rooms.  (Tr. at 132-34.) Whenever Mitchell went to this extent, he was successful in getting a staff member to sponsor the other rooms so he could watch the program he wanted in the day room.  (Tr. at 134.)

c.      Interactions with Staff and Patients

Mitchell tended to come out of his room in the afternoon when the unit was staffed by mostly college students.  (Tr. at 305.)  The day staff had been there a long time and was an "older, mature crowd."  (Tr. at 304-05.)  Mitchell paid the most attention to the young women staff members who worked in the afternoons and evenings.  (Tr. at 305, 372 & 374.)

Mitchell "would always look and see who was around before he would come out" of his room.  (Tr. at 308.)  When he was in the common areas, he would watch "who was around" and "was always very particular as to noting that the staff weren't overhearing him."  (*Id.*)  Mitchell

62

would talk very quietly or move to an area on the unit where he could not be overheard.  (*Id.*)

Psych tech Jessica Hardy observed that Mitchell "would act differently if he thought he were

being observed."  (Gov't Ex. 20 at 45.)

Mitchell knew the schedules of the staff members with whom he enjoyed spending time.

(Tr. at 305.)  A staff member would be assigned to specific areas at certain times during their

shift as part of a line rotation.  (*Id.*)  Nursing Director Leslie Miles recalled that "staff members

commented several times [that Mitchell] knows exactly, he knows people's rotations and how

they work."  (*Id.*)  Because Mitchell could anticipate staff members' next rotation, he would

sometimes wait for them in their next assigned area.  (*Id.*)

One of the young female staff members was psych tech Taryn Nielsen.  (Tr. at 306.)

Nielsen was a college student, but appeared much younger than her age. (*Id.*)  In fact, she was

more "adolescent looking."  (*Id.*)  Mitchell knew Nielsen's schedule and could predict where she

would be on the unit during her shift based on her first line rotation.  (Tr. at 306-07.)  Staff

members were concerned about Mitchell's interest in Nielsen and about possible grooming

behaviors.  (Tr. at 307.)

The staff were also concerned about Mitchell's interactions with lower functioning

patients.  Mitchell began spending time with a patient named James, who had schizophrenia and

was very vulnerable and suggestible.  (Tr. at 302.)  James was "the only patient on the unit that

had off-unit privileges and actually went out to work with an on grounds crew."  (*Id.*)  The staff

was concerned that Mitchell was "selectively picking out James and James would be an easy

target to getting access to things."  (*Id.*)

d.      Ability to Collaborate and Defer to Others

Mitchell also developed a close relationship with a patient named John, a "religious zealot" (Tr. at 169), who Dr. Whitehead described "as Brian Mitchell on steroids." (Tr. at 1018.) Mitchell's relationship with John was different than his relationship with other patients where "[h]e would always take the lead, take the charge, control the conversations." (Tr. at 134.) Instead, "John was the mentor and Brian was kind of taking the lessons." (Tr. at 133.) John would correct Mitchell and he "would take the criticism, the advice, into heart." (Tr. at 135.)

Mitchell sought advice from John, about both religious and legal matters. (Tr. at 168-69.) John would explain how things worked in the legal system and Mitchell would listen and take notes. (Tr. at 168.) Mitchell would ask questions, and John would respond by taking out his legal papers and explaining them to Mitchell. (Tr. at 169.) Mitchell and John spent a lot of time talking to each other, and John generated a thirteen-page document containing the names of Elizabeth Smart and Brian Mitchell. (Tr. at 345-346.) Mitchell would sometimes talk to John at the end of the hall where he was out of the staffs' hearing range. (Tr. at 308.)

On one occasion, psych tech Tracy Killpack overheard Mitchell and John talking about how when a woman is given to you by God, like Eve was to Adam, you can do whatever you want with her. (Tr. at 372.) Killpack also overheard Mitchell and John discussing how if a woman does not call out for help when she is being raped, she is the sinner or the one in the wrong. (*Id.*)

Mitchell changed his appearance and behavior in response to his association with John. (Tr. at 345.) Mitchell stopped wearing standard issue sweats and started wearing nice slacks and shirts. (Tr. at 135-36.) He even cut his hair and beard with a pair of fingernail clippers. (Tr. at

64

135-36.)  Mitchell's interactions with other peers increased and he began watching a lot of movies and television.  (Tr. at 135-36.)  The only time Mitchell attended the weekly unit meeting was when John moved to remove the unit president and Mitchell seconded the motion.  (Tr. at 469.)

Dr. Whitehead also observed that Mitchell "seemed to demonstrate an ability to trust and work with a treatment team which might be extrapolated as a capacity to work with his legal defender team. . . . "  (Tr. at 1466.)  Mitchell demonstrated a full understanding of what both the prosecutor and defense were arguing during competency proceedings.  (Tr. at 1464.)  He also showed a sound factual understanding of court personnel and the functions they provide as well as the seriousness of his charges.  (*Id.*)

Mitchell understood how the hospital worked and once explained the hierarchy and each person's function to psych tech David Talley; Mitchell started with the psych techs "and he went up the line until he got to the governor."  (Tr. at 171.)  He also explained how the hospital fit into the legal system and that the function of the forensics unit was to help return people to competency.  (Tr. at 172.)  He explained the role of the courts and the attorneys and opined that it was a corrupt system because both sides just want to win.  (Tr. at 172-73.)  He stated that he would not participate because "he would never be judged of man."  (Tr. at 173.)

Mitchell also showed an awareness and understanding of the involuntary medication proceedings that were underway in the state court.  One evening, right after another patient had taken his medications, Mitchell caught him and asked how the medications made him feel.  (Tr. at 141-42.)  Mitchell explained he was asking "because most likely they're going to force me to take medications."  (Tr. at 142.)  A staff member also memorialized a conversation between

Mitchell and his father about involuntary medication legislation in which Mitchell asserted that the law could not be applied to him ex post facto. (Gov't Ex. 20 at 47.) Social worker Porter noted that Mitchell "'asked pertinent questions about medication hearings without religious overtone.'" (*Id.*)

Mitchell was observed advising other patients about competency hearings. (Gov't Ex. 20 at 36.) He also told a fellow patient, "'do not talk to judges – they can't condemn you if you don't speak.'" (*Id.*) Mitchell indicated that he would not talk to the media about his case because "'if they don't have any information, they can't hurt my case.'" (*Id.*) Mitchell would frequently have discussions with other patients while walking the halls but would stop talking when he approached the staff zone. (Tr. at 138-39.)

     e.    Selective Silence

Mitchell would often go through short periods of time when he refused to speak to staff. (Tr. at 151-54.) Mitchell began a prolonged "word fast" lasting approximately eighteen months the day following a staff comment to patient Eric. (Tr. at 147.) At that time, Eric and Mitchell interacted frequently; Eric would walk the halls with Mitchell and would listen to Mitchell talk. (Tr. at 145-46.) The staff members were just leaving a meeting at which they were congratulated for observing and documenting behaviors that had resulted in proving that a patient was malingering. (Tr. at 146 & 149-50.) As they emerged from the meeting, one of the psych techs told Eric that as long as Mitchell kept doing what he was doing, they would be able to prove him competent, too. (Tr. at 147 & 150.) The next day, Mitchell stopped talking. (Tr. at 147.)

During this prolonged period of silence, Mitchell was still observed selectively speaking to other patients. (Tr. at 148.) For example, prior to the period of silence, Mitchell and a patient

named Bernie would talk a lot and even laugh together.  When Mitchell stopped talking, he

would pass notes to communicate.  Bernie did not like the notes and told Mitchell that if he had

something to say to him, he should just say it.  Mitchell would then talk with Bernie in the

courtyard when no staff members were present.  (Tr. at 148.)  Psych Tech Heather Houghton

opined that Mitchell was silent around staff "'because he did not want staff to see he wasn't

crazy, did not want them to see through his facade.'"  (Gov't Ex. 20 at 44.)

Mitchell would speak to staff, however, if he needed something, such as salt and pepper

or hygiene items.  (Tr. at 300.)  Mitchell tried to avoid speaking by doing "some charades type

thing" to indicate what he wanted.  (*Id.*)  Nursing Director Miles spoke to Mitchell and told him

that the staff were not going to respond to that and that he needed to speak.  (*Id.*)  After that, the

behavior was no longer a problem.  (*Id.*)

Mitchell never gave a religious justification for choosing not to speak.  (Tr. at 301.)

f.      Control Over Singing

When Mitchell returned to the hospital after being found incompetent, he reduced his

singing significantly.  (Tr. at 298-99.)  When he did sing, he could be redirected "very, very, very

easily."  (Tr. at 299 & 456.)  When staff expressed concern that Mitchell's "singing was agitating

some of our very mentally ill sensitive clients," Nursing Director Miles told Mitchell that he was

bothering other patients and asked him to stop out of concern for his safety.  (Tr. at 299.)  After

that, Mitchell stopped singing in the main hall.  (*Id.*)

There was a distinct correlation between Mitchell's singing and his court appearances.

As a court date approached, Mitchell would begin to sing more frequently at the hospital.  (Tr. at

377.)  When officers arrived on the unit to transport Mitchell to court, he would start singing.

67

(Tr. at 299.)  When he returned following the court appearance, Mitchell "wouldn't sing when he came on the unit.  That was the end of it."  (Tr. at 299.)  Psych tech Fuchs found it "totally ridiculous" when, the very afternoon after getting kicked out of court, Mitchell came up to her and gave her a note requesting a book.  (Tr. at 363.)  Fuchs testified that Mitchell seldom had to be redirected from singing at the hospital.  (Tr. at 362.)

Mitchell also used singing as a "defense mechanism."  (Tr. at 376.)  When other patients would confront Mitchell, he would sing very loudly and the patient would walk away.  (*Id.*)  When Mitchell did not want to listen to staff, he would either give them a "stare down" look for a few seconds and then walk away or he would start singing.  (Tr. at 301.)  This allowed Mitchell to effectively control or shut down a conversation.  (*Id.*)

Psych tech Andrew followed the media reports about how Mitchell would begin singing right when he entered the courtroom and would get kicked out of court.  Andrew testified that Mitchell "wouldn't behave like that on the unit."  (Tr. at 456.)  On September 25, 2005, psych tech David Talley asked Mitchell why he sang in court.  (Tr. at 174-75.)  Mitchell responded that he would not be judged of man and would not participate in the process.  (Tr. at 175.)  Talley asked if he was "just disrupting the process on purpose," to which Mitchell responded, "yes, absolutely."  (Tr. at 175-76.)

During the state involuntary medication proceedings, Mitchell asked his treatment team whether his disruptions in court could be grounds to medicate him against his will.  (Gov't Ex. 20 at 47.)  Dr. Whitehead observed that Mitchell's singing is not a competency-limiting behavior and that Mitchell has the capacity to come into court and behave appropriately.  (Tr. at 1469-70.)

g.      Lack of Religious Preoccupation

When Mitchell first arrived at the hospital, he largely spoke about religion, but it

diminished over time.  (Tr. at 144.)  Mitchell's use of archaic speech also soon disappeared.  (Tr.

at 144 & 298.)  Most staff members never heard Mitchell refer to himself as a prophet or the

Davidic King, and those who did said it quickly stopped.  (Gov't Ex. 20 at 36.)

Mitchell typically engaged in "normal conversation like just kind of anybody else."  (Tr.

at 145.)  He also respected requests not to discuss religion.  When psych tech Fuchs first met

Mitchell, he asked her what faith she was.  Fuchs told Mitchell that she never talked religion at

work.  Mitchell honored her wishes and no longer talked to her about religion.  (Tr. at 355.)

When he would ask her for books, he did not use religious language.  (Tr. at 360.)

Even when Mitchell did talk about religion on the unit, he did not make grandiose claims.

For example, Mitchell spoke to psych tech McGarry about the works of LDS authors and about

his time as an ordinance worker in the LDS temple.  (Gov't Ex. 20 at 46.)  Yet McGarry never

heard Mitchell refer to himself as a prophet.  (Gov't Ex. 20 at 46.)  Mitchell frequently spoke

with patient John about religion and the interpretation of scripture but there is no evidence that he

ever claimed to be prophet when speaking to John.  (Tr. at 661-62.)  Mitchell never told anyone

at the hospital that he was receiving divine revelation.  (Gov't Ex. 20 at 37.)

During his three-year stay at the hospital, Mitchell read dozens of books, yet he never

asked for a religious text.  (Tr. at 361; Govt' Ex. 20 at 40-41.)  Although he watched countless

hours of television and films, Mitchell only rarely watched a religious program.  (Tr. at 137 &

454; Gov't Ex. 20 at 38-40.)  After he began associating with John, Mitchell watched four to five

hours of television per day.  (Tr. at 131.)  He particularly enjoyed the show *Charmed.*  (Tr. at

69

136-37 & 470.)  Nearly every day, Mitchell would spend hours watching the show, which had

"[a] lot of skin and witches."  (Tr. at 136-37.)  Nurse Jakeman also observed Mitchell playing

chess and testified that Mitchell was skilled enough to "beat" some of the staff members and

several patients.  (Tr. at 346.)

The hospital staff doubted Mitchell's sincerity because his behaviors were inconsistent

with his beliefs.  (Tr. at 348-49 & 374-75.)  Besides his preoccupation with non-religious

subjects, Mitchell was not very friendly and on several occasions would get angry and swear

directly at others.  (Tr. at 374-75.)

Nursing Director Miles has a masters degree in nursing and a psychiatric speciality,

teaches psychiatric nursing at Brigham Young University, and has worked in psychiatric nursing

for over 25 years.  (Tr. at 294-95.)  During that time, she has worked with many patients

suffering from delusional symptoms.  (Tr. at 309-10.)  In her experience, delusional patients

generally "stay very fixated particularly if it is a religious delusion they -- they won't veer from

their belief, you know, to the point of not drinking water or not eating, you know, they'll stay

very firm in it."  (Tr. at 310.)  In her experience, a delusional person will stay true to their

delusion "and it doesn't change according to what context they're put in if they're put in different

situations."  (Tr. at 310.)  She has also experienced that patients with religious delusions typically

want to share their beliefs "with everybody at any cost" and "it is very difficult to redirect them."

(Tr. at 310-11.)

In contrast, Miles observed that Mitchell would "change according to the situation."  (Tr.

at 311.)  Mitchell would comply whenever the staff set limits, such as on his singing and his

charades.  (Tr. at 311-12.)  Mitchell could also turn his singing and silence on and off.  (Tr. at

311-12.)  If these behaviors were a manifestation of an "encapsulated" religious delusion, Miles

would expect the patient to "be set in their way in expressing it.  If they were going to express it,

they would have the same consistent behavior in all settings."  (Tr. at 322.)  In other words, they

would act consistent with the delusion in a situation where the delusional system is engaged.  (Tr.

at 329.)  Instead, Mitchell's "delusional system kind of came and went."  (Tr. at 324.)  If Mitchell

was delusional, Miles would not have expected it to be so easy for Mitchell "to back down on it

and be as changeable in his beliefs and his directions and his behaviors."  (Tr. at 331-32.)  Miles

never saw Mitchell in any distress about his religious beliefs.  (Tr. at 312.)

Mitchell was selective about the people with whom he shared his beliefs and "was very

quiet about it and could be redirected."  (Tr. at 311.)  Mitchell "wasn't preaching in the

dayroom," as occurs with some patients.  (*Id.*)  Miles observed that "as soon as you put a limit on

him, that you weren't going to discuss it, he would shut down."  (*Id.*)  In Miles' 25 years of

experience in psychiatric nursing, patients with a fixed religious delusion would persist, but

Mitchell would stop.  (*Id.*)

Dr. Whitehead similarly observed that Mitchell's "degree of conviction in his beliefs was

not 100 percent.  There were some gray zones there.  He seemed to change his beliefs over time.

He wasn't necessarily fully preoccupied 24 hours 7 days a week with his religious ideas."  (Tr. at

1423.)  Dr. Whitehead further found that Mitchell did not suffer from much distress and that

Mitchell displayed no martyrdom behaviors.

   h.  Refusal to Participate in Competency Restoration

Nursing Director Miles testified that it is rare to have a patient who will not engage in

treatment.  (Tr. at 323.)  Most patients want to move on, but Mitchell "wouldn't participate in

any type of treatment, or any type of discussion that we could work with him towards, you know, competency.  It was his refusal that was a big red flag that he was faking."  (*Id.*)

At the hospital, rewards and incentives are determined by a level system. (Tr. at 128-32.) On one occasion, Mitchell asked psych tech Andrew how he could attain higher levels to gain certain privileges.  Andrew explained that his level advancement depended on his behavior and participation in treatment.  Mitchell responded that he would only attend the groups the Lord would have him attend.  (Tr. at 452.)  Although Mitchell attended other groups involving such topics as movies and geography, he never attended a single competency restoration group. (Gov't Ex. 20 at 83, 11 & 150-51.)  Miles experienced Mitchell's refusal to engage in any competency restoration as manipulative.  (Tr. at 323.)  "He seemed to be very comfortable" where he was.  (*Id.*)

Mitchell refused to speak with Gerald Berge, Ph.D., who was charged with periodically reassessing Mitchell's competence.  (Tr. at 1000.)  Dr. Berge told at least two staff members that he would not find Mitchell competent if Mitchell would not speak with him.  (Tr. at 1000.) Mitchell told psych tech Talley that he understood Dr. Whitehead's job and that he was "not going to participate in any of that."  (Tr. at 170.)  During his stay at the Utah State Hospital, Mitchell was overheard telling a patient, "if people think you're crazy, then you can get away with more."  (Tr. at 338.)

## D.    Federal Custody

In October 2008, the state court determined that Mitchell could not be involuntary medicated to restore his competency.  (Gov't Ex. 20 at 47.)  With the case effectively stalled in

the state, the United States Attorney's Office proceeded with federal charges against Mitchell. (Gov't Ex. 20 at 47; Docket No. 6.)

In this federal case, the United States moved for a competency evaluation and requested that the evaluation be performed in an in-patient setting by the Bureau of Prisons ("BOP"). (Docket No. 9, 18 & 23.)  Judge Samuel Alba subsequently granted the government's motion and ordered the BOP to conduct a competency evaluation pursuant to 18 U.S.C. § 4241.  (Docket No. 26.)  Mitchell was transferred to the Springfield Medical Center, and Richart DeMier, Ph.D., was assigned to perform the evaluation.  (Def. Ex. BB.)

1.      Dr. DeMier's Evaluation

Mitchell interacted with Dr. DeMier on his own terms.  (Tr. at 1582.)  During his first interview, Mitchell refused to respond to almost all questions about his past.  (Tr. at 1577; Gov't Ex. 33a.)  Mitchell even refused to repeat Dr. DeMier's explanation of the examination.  (Tr. at 1583.)  The bulk of Mitchell's responses were religious, even when Dr. DeMier's questions did not touch on the subject of religion.  (Tr. at 1577.)  Mitchell repeatedly responded to questions using archaic language such as "like unto him,"  "confirmeth" or "it mattereth not."  (Tr. at 1577-78.)  The extent to which Mitchell employed his religious persona with Dr. DeMier was in stark contrast to his most recent previous behavior at the Utah State Hospital, in which his use of his religious persona had become quite limited.

When Dr. DeMier asked Mitchell about his living arrangements at the Utah State Hospital, however, Mitchell spoke in a clear and logical manner, used no archaic language, and made no references to religion.   (Tr. at 1578-79; Gov't Ex. 33b.)  During a later interview, Mitchell volunteered a description about the competency evaluation process.  (Tr. at 1579; Gov't

73

Ex. 33c.)  The description reflected an "accurate factual understanding of the proceedings."  (Tr. at 1579.)  Dr. DeMier observed Mitchell to be "articulate."  (Tr. at 1581.)

At the end of the third videotaped interview, Dr. DeMier challenged Mitchell about why he used archaic language only occasionally.  (Tr. at 1580; Gov't Ex. 33d.)  Immediately after that exchange, the interview ended.  (Tr. at 1580.)  The very next time Dr. DeMier attempted an interview, Mitchell refused to speak with him.  (Tr. at 1580-81.)  Mitchell spoke with Dr. DeMier again, but refused to speak on camera.  (Tr. at 1581.)

Mitchell told Dr. DeMier that he would be content to minister wherever the Lord placed him, yet there is no evidence that he ever ministered to other patients during his time at Springfield.  (Tr. at 1588.)  Mitchell told Dr. DeMier it was a burden and a blessing to go out and cry repentance.  Dr. DeMier viewed this as evidence of some distress associated with Mitchell's beliefs, but DeMier was culturally unaware that these are statements used by mainstream LDS missionaries.  Near the end of the evaluation period, Dr. DeMier saw Mitchell in the recreation yard where numerous patients were interacting.  (*Id.*)  Mitchell was not ministering to other patients, but was sitting alone at a table reading.  (Tr. at 1589.)  He was not reading scripture, but an Isaac Asimov science fiction book.  (*Id.*)

Dr. DeMier had the feeling that Mitchell was genuinely trying to reach him on a religious level.  He thought that Mitchell's religious beliefs were sincere and tenaciously held.  He further testified that even though the core delusion is typically fixed, it can adapt.  He disagreed with Dr. Golding that the content of a delusion is irrelevant.  Dr. DeMier recognized that the bulk of Mitchell's beliefs were shared by fringe Mormon groups, but maintained that Mitchell's delusions were bizarre because he "has placed himself, in his belief system, into this divinely

74

ordained role."  (Tr. at 1533.)  These "bizarre delusions" include Mitchell's belief that he is "divinely ordained to fulfill a special role at the end of the world involving battling the Antichrist."  (Tr. at 1545.)   In response to questioning regarding whether the hundreds of leaders of different schismatic groups claiming to be the "One Mighty and Strong" are delusional, Dr. DeMier stated that it would be worth asking the question.

During his interviews with Dr. DeMier, Mitchell claimed he had never spoken to his attorneys and would be even less likely to do so after the evaluation.  (Tr. at 1585.)  Dr. DeMier testified that he does not know whether that was truthful or not.  However, Mitchell indicated to Dr. DeMier that there was a man that he would like to have represent him who was a prophet and an expert in Constitutional law.  (Tr. at 1598.)  He explained that if he were to go to trial, the prosecutor would object to his testimony as irrelevant.  (Tr. at 1599.)  Mitchell also said he knew he would be convicted if he went to trial, which Dr. DeMier acknowledged was a rational assessment of the evidence against him.  (Tr. at 1593.)  He never told Dr. DeMier that he wanted to be found competent and never specifically stated that he wanted to be martyred.   (Tr. at 1600.)

Based on his evaluation, Dr. DeMier authored a report concluding that Mitchell is suffering from paranoid schizophrenia because his religious delusions are bizarre and such condition renders Mitchell incompetent to stand trial.  (Def. Ex. BB.)  Dr. DeMier testified that he does not believe Mitchell can rationally assess his possible sentence if he believes that God will release him from jail in two years.  He also testified that Mitchell's professed beliefs, that the laws of man are corrupt and that he is subject only to the laws of God, interfere with Mitchell's ability to talk to his attorneys.

2.      Dr. Welner's Evaluation

The United States retained Michael Welner, M.D., to assist in evaluating Mitchell's competency.  (Tr. at 800-01.)  In addition to reviewing the materials relied upon by the prior examiners, Dr. Welner's efforts uncovered a substantial amount of additional information. Among other things, Dr. Welner considered the observations of witnesses who had interacted with Mitchell, including the victim in this case, Utah State Hospital personnel, family members, former co-workers, church leaders, and other friends and acquaintances.  (Gov't Ex. 20 at 2-6.) In forming his opinion, Dr. Welner relied upon at least 161 sources of information.  (*Id.*)

On April 28, 2009, Mitchell was transported to the federal courthouse to meet with Dr. Welner.  (Tr. at 493.)  Prior to the interview, Mitchell was quiet and compliant with Deputy U.S. Marshal Dan Burnett, who took Mitchell to the interview room and stayed to provide security. (Tr. at 493.)

Dr. Welner was aware that defense counsel had previously expressed an unwillingness to allow him to interview Mitchell.  (Tr. at 833.)  Before the interview began, Dr. Welner spoke with Mitchell's attorney, who indicated that the defense team had been talking to Mitchell for some time.  (Tr. at 834.)  Mitchell's attorney indicated that the last time they spoke with Mitchell was the night before and that they anticipated that Mitchell would talk to Dr. Welner.  (Tr. at 834.)

When Mitchell entered the room, however, he already had his eyes closed, demonstrating that "he was shut down before the interview even started."  (Tr. at 840.)  Mitchell kept his eyes closed through almost the entire interview.  Dr. Welner considered this "reflective[,] along with his silence[,] of his intention to not participate in the interview."  (*Id.*)  Despite having his eyes

76

closed, "Mitchell demonstrated a vigilance and a responsiveness" during the interview that showed "he was certainly alert and quite vigilant at all times."  (Tr. at 842.)

Dr. Welner initially attempted to engage Mitchell in different, non-threatening ways.  (Tr. at 844.)  When Mitchell responded by singing, Dr. Welner would simply turn to some work he had brought along.  (Tr. at 845.)  When Mitchell would stop singing, Dr. Welner would ask another question and Mitchell would begin singing another hymn.  (*Id.*)  The singing became louder and more defiant and at one point Mitchell yelled out "repent."  (Tr. at 494 & 498.)  The outburst "startled" Deputy Burnett, who had always observed Mitchell to be quiet and compliant.  (Tr. at 492 & 498.)  Dr. Welner perceived Mitchell's behavior as "aggressive."  (Tr. at 861.)

After about 20 minutes or so, Mitchell's singing stopped entirely.  (Tr. at 845.)  For the next two to three hours, Mitchell did not engage in any singing at all.  (*Id.*)  Instead, he was "composed, alert, vigilant and quiet and behaving perfectly appropriately."  (*Id.*)

Significantly, Mitchell maintained his composure "in an atmosphere of increasing stress." (Tr. at 845.)  In particular, Mitchell maintained his composure when Dr. Welner played a videotape in which Elizabeth described her kidnaping and the sexual attack that followed.  (Tr. at 846.)  Dr. Welner testified that the videotape was intended to simulate the act of confronting one's accuser in court, which many defendants find to be the most stressful part of legal proceedings.  (Tr. at 846-47.)

Dr. Welner found Mitchell's response to the videotape to be "pretty striking."  (Tr. at 847.)  As the video began to play on a television platform behind him, Mitchell "immediately swivelled his chair, opened his eyes and very intently engaged the television in a very eager, leery way."  (*Id.*)  Mitchell was "locked in" to the video.  (Tr. at 847 & 849.)  Although he was

77

already sitting quite close to the television, Mitchell scooted his chair even closer to the screen. (Tr. at 849.)  Mitchell's reaction reminded Dr. Welner of the descriptions of Mitchell watching *Charmed* at the Utah State Hospital, where he would move right up next to the television to watch the girls on the show.   (*Id.*)

As Elizabeth began to reveal details of the first sexual assault, Mitchell began to show more concern.  (Tr. at 854.)  Mitchell never displayed a reaction that was not congruent to what was being shown on the video, as a psychotic patient might.  (Tr. at 848-49.)  He was not "disoriented and disengaged, and there was no sign of confusion."  (Tr. at 864.)  As Mitchell watched Elizabeth describe what had happened to her, Mitchell was "quiet, composed, appropriate, not disruptive, [and] did not sing."  (Tr. at 854-55.)

Following the video, Dr. Welner raised the issue of Mitchell's pedophilia, which Dr. Welner characterized as the "elephant in the living room" that had not been broached by other examiners.  (Tr. at 856.)  Mitchell did not sing, but remained quiet and "perfectly appropriate," just as he had been for a few hours beforehand.  (Tr. at 856.)

During the lunch break when Mitchell was at the federal courthouse for his interview with Dr. Welner, Mitchell was returned to the holding cell, where he was quiet and compliant. (Tr. at 495.)  Mitchell tried to communicate with Deputy Burnett by gesturing, but when Deputy Burnett asked what he wanted, Mitchell said, "Can you get me a lunch?"  (Tr. at 495-96.)

After the interview was over, Mitchell was again quiet and compliant.  (Tr. at 496.)  He was brought back down to the cell block and placed in the attorney/client booth to speak with members of the defense team.  (Tr. at 478.)  When Deputy Juergens would periodically check on Mitchell through the window, Mitchell had his eyes fully open and appeared to be having a

normal conversation with counsel.  (Tr. at 479.)  After his counsel left, Mitchell continued to sit

normally for a while, but as soon as he noticed that Deputy Juergens was watching him, Mitchell

closed his eyes again.  (*Id.*)

Dr. Welner ultimately issued a 206-page report in which he set forth the extensive factual

data he had collected.  (*Id.* at 6-79.)  The report was reviewed by two other experts in the field of

forensic psychology, David Walker, M.D., and Eric Drogin, J.D., Ph.D., "to ensure maximum

diligence, objectivity in analysis, and adherence to [professional] standards."  (Gov't Ex. 20 at

206.)  Dr. Welner opined that Mitchell does not suffer from a psychotic illness and is competent

to stand trial.  (*Id.* at 80-205.)

3.       Behavior in the Federal Courthouse

When Mitchell is brought to the federal courthouse by the U.S. Marshals, he is very

compliant and mild mannered.  (Tr. at 492.)  Mitchell always follows the deputies' directions and

even anticipates what they want him to do.  (Tr. at 475 & 492.)  Outside the courtroom, the only

difference between Mitchell and other prisoners is that Mitchell "walks around with his eyes half

closed most of the time."  (Tr. at 474.)  Because the deputies do not "put hands on him to lead

him around throughout the courthouse and throughout the cell block," Mitchell must have his

eyes partly open in order to navigate.  (*Id.*)

Mitchell has attempted to communicate with the deputies through gestures or by nodding

his head.  (Tr. at 475.)  However, once the deputies inform him that he needs to answer verbally,

Mitchell complies like any other prisoner.  (Tr. at 475-76.)  Mitchell will initiate conversation

with the officers only when he wants or needs something.  (Tr. at 476 & 492.)  He never uses

archaic, Biblical speech.  (Tr. at 476 & 492.)

Mitchell sometimes sings outside the courtroom, seemingly when "he thinks he's being observed by somebody." (Tr. at 476 & 484.) However, Mitchell is quiet at the Salt Lake County Jail and does not typically sing in the marshal's holding cell. (Tr. at 484.) When Mitchell does sing, the deputies will ask him to stop if they need him to pay attention to what they are saying. (Tr. at 476-77.) Mitchell always complies. (Tr. at 476-77.)

When Mitchell arrived at the courthouse for his initial appearance before Magistrate Judge Alba, he was compliant, calm, and quiet. (Tr. at 479.) Before entering the courtroom, Mitchell responded to all of the deputies' commands. (Tr. at 479-80.) Once he entered the courtroom, Mitchell's behavior changed and he began to sing. (Tr. at 480.) When Judge Alba took the bench, Mitchell began to sing louder. (*Id.*) Judge Alba ordered Mitchell to stop singing, but Mitchell would not comply. (*Id.*) Judge Alba then ordered the deputies to remove Mitchell from the courtroom and attempt to silence him. (*Id.*)

At that point, Deputy Dan Juergens gave Mitchell a command to stand up. (Tr. at 480.) In response, Mitchell collapsed in his chair and "acted like he couldn't walk." (Tr. at 481.) Deputy Juergens and another deputy picked Mitchell up under his arms, a position that is very uncomfortable for a prisoner in shackles, and carried him from the courtroom. (Tr. at 481-82.) As soon as they were out of the courtroom, Mitchell stopped singing and began walking on his own. (Tr. at 481.)

In the cell block, Mitchell complied when he was told to sit in a chair. (Tr. at 482.) He was quiet and compliant while the deputies gagged him. (*Id.*) The deputies gave Mitchell the option of walking back into the courtroom or being carried and Mitchell chose to walk. (*Id.*)

Once back in the courtroom, Mitchell's behavior changed again and he began to sing through the gag.  (Tr. at 482.)

Mitchell has never acted agitated or distressed in the cell block.  (Tr. at 477.)  However, he did appear agitated when the deputies arrived to transport him to court on the day of Elizabeth's testimony.  (Tr. at 477-78.)   When Mitchell arrived in the courtroom on October 1, 2009, he was "singing very softly in a very kind of devout quality."  (Tr. at 650.)  He was singing hymns "generally reserved for deeply spiritual events" that were "filled with humility and submission to God."  (*Id.*)  The courtroom, which had been bustling and noisy only moments before, "became suddenly quiet, and it's almost like he had the whole courtroom in his hands as they listened to him sing."  (*Id.*)  Mitchell continued to sing until he was removed from the courtroom.  (Tr. at 650.)  As the deputies escorted him out, he suddenly stopped singing when he reached the witness stand and did not sing the rest of the way.  (Tr. at 650-51.)

When Mitchell was taken back to the holding cell with the live audio/video feed, he sang and "acted out."  (Tr. at 496.)  Deputy Burnett testified that it was the only time Mitchell had acted out in his presence outside the courtroom.  (Tr. at 496.)  That same day, Mitchell refused to come out of the holding cell to speak with his attorneys.  (Tr. at 487-90.)  Mitchell has, however, been observed talking to his attorneys on other occasions.  (Tr. at 489 & 496.)  In November 2009, for example, Mitchell spoke with his attorneys for over one hour.  (Tr. at 497.)

### COURT'S FINDINGS REGARDING COMPETENCY

Under the governing standards for determining competency, this court must first determine whether Mitchell presently suffers from a mental disease or defect.  The court must

then determine whether that mental disease or defect renders Mtichell incapable of rationally understanding the nature of the proceedings or assisting in his own defense.

In making these determinations, the court is presented with conflicting expert diagnoses. Drs. Welner and Gardner have prepared reports concluding that Mitchell suffers from one or more personality disorders, also known as Axis II conditions, that are not competency limiting. Whereas Dr. DeMier has prepared a report finding that Mitchell has paranoid schizophrenia, an Axis I condition, which impacts his competency. Drs. Skeem and Golding, who prepared reports for the state court proceedings, did not prepare reports for this proceeding but testified on Mitchell's behalf at the competency hearing. Dr. Skeem testified that Mitchell suffers from delusional disorder, an Axis I condition, that renders him incompetent. And Dr. Golding testified that Mitchell has a mental disorder within the psychotic spectrum that renders him incompetent.

Other federal district courts have recognized a distinction between Axis I and Axis II conditions with respect to competency, finding that a "personality disorder is separate and distinct from a mental disease or defect." *United States v. Riggin*, 732 F. Supp. 958, 964 (S.D. Ind. 1990); *see also United Stated v. Armstrong*, 2008 WL 2963056, *26 (W.D.Pa. 2008) (addressing bipolar disorder versus a personality disorder and finding that "there is uncontradicted evidence in this record that, while [schizophrenia or delusional disorder] is considered a serious 'mental disease or defect' for purposes of establishing an individual's mental incompetence, a personality disorder is not.").

But these cases appear to be at odds with Tenth Circuit case law. *See United States v. DeShazer*, 554 F.3d 1281 (10th Cir. 2009). In *DeShazer*, the defendant argued that the district court erroneously found that an Axis II personality disorder is not a mental illness under 18

U.S.C. § 4241 because there was expert testimony to that effect.  554 F.3d at 1287.  The

government on appeal agreed with defendant that a mental disease or defect under § 4241 did not

need to be an Axis I condition.  *Id.*  The Tenth Circuit recognized that the district "court did not

reference [the expert]'s erroneous legal conclusion."  *Id.*  While the Tenth Circuit characterized a

distinction between Axis I conditions and Axis II conditions for purposes of determining

competency an "erroneous legal conclusion," given the government's agreement on appeal that it

was error, the court did directly or fully address the issue.  The court appears to have merely

agreed with both parties that there should not be a distinction.  Nonetheless, the court ultimately

found that because the district court did not rely on the expert's distinction in determining

competency, but rather relied on testimony that the defendant could rationally assist in his

defense, "[w]hether or not [the defendant] could be diagnosed with an Axis I or Axis II illness is

irrelevant."  *Id.*

Applying *DeShazer* to this case, the court finds that it is not particularly necessary for the

court to determine a specific diagnosis in determining competency.  Under *DeShazer*, either an

Axis I or Axis II condition could potentially render a defendant incompetent.  And, on the other

hand, a defendant could have an Axis I and/or Axis II condition and still be competent.  In

*Makovich*, the Tenth Circuit recognized that "this circuit has long recognized that '[t]he presence

of some degree of mental disorder in the defendant does not necessarily mean that he is

incompetent to . . . assist in his own defense."  209 F.3d at 1233 (quoting *Wolf v. United States*,

430 F.2d 443, 445 (10th Cir. 1970)).  The most relevant determination, therefore, is whether

Defendant's condition, whatever it may be, impacts his rational understanding of the proceedings

and his ability to participate in his defense.  Accordingly, in this case, the court will analyze

whether Mitchell presently suffers from any of the conditions suggested by the competing experts, and then, most significantly, the court will determine whether that condition impacts his competency.

In cases such as this, with competing and conflicting expert evaluations, the Tenth Circuit has repeatedly determined that a district court may "declare a defendant competent by adopting the findings of one expert and discounting the contrary findings of another." *Mackovich*, 209 F.3d at 1232 (citing *Miles*, 61 F.3d at 1472-74).  In this case, after reviewing all the evidence, the court finds that the reports and testimony of Drs. Gardner and Welner are substantially more persuasive and credible than the testimony of the other mental health evaluators.[6]

## A.  Mental Disease of Defect

The first determination for the court is whether Mitchell presently suffers from a mental disease or defect.  While Mitchell's religious beliefs are clearly extreme, the totality of the evidence does not support a finding that Mitchell's beliefs are a manifestation of a mental illness. For Mitchell's beliefs to be the product of delusional disorder or paranoid schizophrenia his beliefs must be delusions.  The experts provide differing frameworks in which to decide that question.  However, under each of the frameworks presented, the evidence shows that the beliefs are not delusions.  Mitchell's beliefs do not constitute delusions or the manifestations of mental illness for the following reasons: (1)  they are consistent with his subculture; (2) Mitchell's behavior demonstrates his beliefs are not fixed because they change to meet his needs; (3) Mitchell's beliefs do not cause him to be preoccupied or distressed; (4) Mitchell's beliefs are not

---

[6]  The court notes that Mitchell's refusal to participate in psychological testing and selective refusal to participate in interviews and evaluations has handicapped each of the evaluators in conducting a full analysis of his condition.

merely "encapsulated" delusions because Mitchell has the ability to turn off his beliefs in situations where a religious delusion would have been firmly engaged; (5) Mitchell's presentation and history demonstrates that his beliefs have not resulted in any deterioration in functioning; and (6) Mitchell's symptoms are inconsistent with delusional disorder or schizophrenia but highly consistent with personality disorders.  Mitchell voluntarily uses his extreme beliefs in a manipulative, self-interested way to gain power and authority over a given situation and voluntarily denies his beliefs when it is in his own self-interest to do so.

      1.      Mitchell's Religious Ideas Are Not Delusions.

Delusions are "fixed, false beliefs that are held tenaciously, even in the face of evidence to the contrary."  (Tr. at 1601-02; *see also* Tr. 944 & 1095 ("A delusion is a fixed false idea.").) "One of the things that's . . . a fundamental characteristic of psychotic illnesses, and that's true whether it's delusional disorders or whether it's schizophrenic illness, is those delusions tend to be very ridged and very fixed.  It's the reason that these people are so profoundly impaired."  (Tr. at 651.)  A delusional individual cannot chose to do something different because such beliefs are rigid.  (Tr. at 652.)

The defense concedes that the diagnostic definition of delusions is "fixed false beliefs, " but contends that this definition is "not helpful" because "[o]ne cannot use objective indicators to determine whether religious beliefs are true or false."  (*Id.* at 52.)  This is certainly true and is one of the principle reasons why classifying religious beliefs as delusions is so problematic.  *See*, *e.g.*, Joseph M. Pierre*, Faith or Delusion? At the crossroads of Religion and Psychosis*, 7 Journal of Psychiatric Practice 163-72 (2001) ("Determining whether a religious belief is delusional is

especially difficult because there is no objectively observable (empirical) evidence to prove or disprove the belief").

Mitchell also contends that "the content of a belief is not helpful in distinguishing between religious beliefs and delusions." (Def. Br. at 52.) But under the DSM, the content of the beliefs is key to determining whether religious beliefs are delusional. As the manual explains, "Ideas that may appear delusional in one culture (e.g., sorcery and witchcraft) may be commonly held in another." DSM-IV at 306. Therefore, the content of Mitchell's beliefs and the similarity of those beliefs to Mitchell's fundamentalist LDS subculture is highly relevant. *See, e.g.,* Mike C. Jackson & K.W.M. Fulford, *Spiritual Experience and Psychopathology*, 1 Philosophy, Psychiatry, and Psychology 41-65 (1997) ("Spiritual experiences need to be understood in the context of a person's spiritual or religious tradition, which psychiatrists may not be qualified to evaluate on the basis of their professional experience alone").[7]

Because all religious ideas deal with things that are not susceptible to proof, Dr. Gardner explained that the "distinguishing feature is not how unusual or unrealistic they are, but how they are taken in, processed and incorporated. That is, are these ideas part of one's environment, whether it is shared by a lot of other people or not? It doesn't require 50 people, 100 people, 1,000 people or 1 million people believing those ideas. It is that those ideas are taken from the real world, taken in a normal way, the way we take information and process it and incorporate it, modify it, change it from real world experience." (Tr. at 688.)

---

[7] Moreover, the defense appears to contradict its own assertion that the content of a belief is irrelevant. The defense relies on the content of Mitchell's supposed belief system, such as his professed belief that he will be miraculously delivered from jail to fulfill a divinely ordained role, to argue that he is unable to rationally understand the consequences of the proceedings. (*See* Def. Br. at 61.)

"To suggest, as Dr. Golding, Dr. Skeem, and Dr. DeMeir have done, that Brian Mitchell's ideas have occurred de novo from a delusional disorder, rather than from shared cultural and sub-cultural experiences, is simply false."  (Gov't Ex. 5 at 31.)  Mitchell "took in these ideas in the same way all learning is done, through exposure, processing, discussion, and incorporation." (Gov't Ex. 5 at 31.)

    a.    Cultural Explanation

Mitchell's beliefs are "highly consistent with a small but vigorous group of fundamentalist extremists that are on the fringe of mainstream LDS life."  (Tr. at 689.)  As explained in John-Charles Duffy's article *The Making of Immanuel: Brian David Mitchell and the Mormon Fringe* (Gov't Ex. 5, Appx. G), "just because Brian Mitchell's ideas seem strange or even bizarre to even mainstream LDS, it does not mean that he didn't get those directly from a subculture that he was very involved and very active in."  (Tr. at 690.)  "The worldview laid out in the writings of [Mitchell] is entirely derivative.  Every one of his views that is likely to strike mainstream Latter-day Saints as bizarre has a precedent in beliefs that thrive on the margins of the LDS community itself."  (Gov't Ex. 5, Appx. G at 1; Tr. at 690.)

As Brigham Young University Professor Daniel Peterson explained, to understand the religious ideas contained in the BIDI,[8] it is essential to understand foundational LDS doctrines and tradition, without which Mitchell's ideas would not make sense.  (Tr. at 13.)  "Mormonism sees itself as a restoration of ancient Christianity, and that proposes an idea of apostasy, that there

---

[8]  Because Mitchell has either refused to speak to evaluators or has been guarded about his beliefs, the content of those beliefs have been primarily ascertained from reading the BIDI. (Tr. at 1612-13.)

is an apostasy [into] which the Christian world has gone, so the whole truth had to be restored."

(Tr. at 14.)  In addition, true priesthood authority, or priesthood keys, also had to be restored.

(*Id.*)  Mormonism reflects the "notion that God acts in sort of a dispensational way, that there are

successive revelations and apostasies and re-revelations building on the previous ones or

restoring what was lost."  (Tr. at 14.)

Revelation is to come through "a new prophet, and one of the things that a new prophet

does is to, in many cases, particularly the opener of a new prophetic dispensation, if you will, is

to reveal new scripture, to produce new written texts."  (*Id.*)  In addition to the Bible, Mormons

accept other texts as divine scripture, including the Book of Mormon, the Doctrine and

Covenants (which consists of revelations received by Joseph Smith, Brigham Young and others),

the Pearl of Great Price, and more modern revelation such as a 1978 revelation on the priesthood.

(Tr. at 16-17.)  Another central concept in LDS theology is "the idea that we're living in the last

days."  (Tr. at 14-15.)  There is also "the sense of the church being separated out, in some case

having to physically remove itself from among the wicked or gentiles or whatever term you

might use."  (Tr. at 15.)

Schismatic groups that break off from the LDS Church build on those core beliefs to give

legitimacy to their claims of authority.  These groups  "typically have certain features in

common:"

> The idea that the mainstream LDS Church has gone over to apostasy often over
> the issue of plural marriage, the keys of authority that belong uniquely or
> exercised uniquely by the President of The Church of Jesus Christ of Latter-Day
> Saints has now been transferred to someone else.  Usually the claim to authority,
> the leader of the new fundamentalist group, they often are connected with plural
> marriage.  They've restored polygamy.  They have a strong  . . .  apocalyptical

view.  They're living the last days.  They're often quite separationists in their
social views.

(Tr. at 18-19.)

Like many other adherents of fundamentalist LDS beliefs, Mitchell claims that the

mainstream LDS Church has gone into apostasy.  (Tr. at 50-51.)  He claims succession to the

keys held by LDS Church President Ezra Taft Benson.  (Tr. at 50-51.)  The idea that the LDS

Church went astray after the passing of President Benson is a common notion among schismatic

groups and claiming the keys of authority is the classic claim of all schismatic groups in Mormon

history.  (*Id.*)

Indeed, Mitchell's claim to be the "One Mighty and Strong" places Mitchell squarely in

the mainstream of Mormon schismatics.  (Tr. at 39.)  As in other sects, Mitchell used the concept

that he was receiving revelations from God to establish control over his "followers."  He claimed

to be a powerful prophet, the One Mighty and Strong and the right hand of God.  He strategically

used revelations and priesthood blessings, which are, in a sense, personal revelation mediated

through another person.  (Tr. at 80-81.)  At least with Barzee, these tactics worked to ensure her

obedience, even when she experienced a deep aversion to engage in the behaviors Mitchell

required.

The concept of One Mighty and Strong originated in the Doctrine and Covenants and

refers to one who would be raised up by the Lord to set the church in order.  (Tr. at 38-40.)

Around 1905, when the LDS Church renounced polygamy, a number of individuals came

forward claiming to be the One Mighty and Strong.  (Tr. at 40-41.)  Such claims have been made

by dozens, if not hundreds, of people since that time.  (Tr. at 644-55 & 1096; Gov't Ex. 5, Appx. A at 3.)  Mitchell is just one in a long line of claimants.  (Tr. at 40-41.)

Even Mitchell's claim to be the Davidic King is firmly rooted in tradition and scripture. The idea that, in the last days, someone would sit on David's throne is "a topic that is particularly discussed again in certain elements sort of within mainstream Mormonism but over toward the edge . . . that had spawned several schismatic movements."  (Tr. at 31.)  Like Mitchell, these people claim that "they are the Davidic king or their sons who they've named David will be the Davidic king."  (Tr. at 31.)  Mitchell's use of his middle name, David, furthered his claim.

Although Mitchell claimed to receive personal revelation, he did not claim to have visions or hear voices.  (Tr. at 112-14; 1614-15.)  In his interview with Dr. DeMier, Mitchell gave the following description of revelation: "The holy spirit brings an inward peace.  A confirmation of the spirit brings a feeling of surety."  (Tr. at 1614.)  This is consistent with the manner of revelation accepted by the mainstream LDS Church, where revelation comes mostly through spiritual impressions.  (Tr. at 16.)  In the mainstream church, such revelation can be written down and subsequently be accepted as scripture.  (Tr. at 16.)  Thus, Mitchell's writing of the BIDI, which purports to be divine revelation, is also consistent with LDS tradition.

The BIDI itself reflects several themes that are common in LDS and, more specifically, fundamentalist LDS culture.  References to the last days are "omnipresent and, of course, they're connected in many cases with his role as prophet with his future status of Davidic king with the events of the last days that will separate the wicked from the righteous and so on."  (Tr. at 23.) These ideas are "very much in line with themes not only of Mormon schismatic movements, but

of Mormons themselves, that have, although, been possibly muted a little bit in recent decades."

(Tr. at 23.)

The BIDI also refers to the system of law being "'greatly corrupted and perverted far

away from the constitutional laws that inspired and noble fathers established and set forth.'" (Tr.

at 27.)  Mitchell's constitutionalist ideas reflect his exposure to schismatic Mormon groups,

including Bo Gritz' Patriot Movement.  (Tr. at 74 (noting that Bo Gritz was a one-time member

of the LDS church and "is on the constitutionalist schismatic side of things").)  "There has been a

tendency within Mormonism and fringe of Mormonism[,] for all time[,] sort of what's called

constitutionalist movement, seeing the government as hanging by a thread, that sort of thing."

(Tr. at 27.)  Although LDS doctrine speaks to the Founding Fathers and the Constitution as

divinely inspired, schismatic Mormons commonly believe that the "government [that] has gone

so far beyond the Constitution must be rejected."  (Tr. at 28.)  There have been "tax refusers, for

example, growing out of that side of this schismatic tradition, if you will, seeing the government

as being too corrupt to pay any attention to any more.  It's lost its legitimate authority."  (*Id.*)

Mitchell's rejectionist beliefs are "very much in line with that sort of thing."  (*Id.*)

The BIDI further discusses the reestablishment of polygamy under Mitchell's authority.

(Tr. at 23-24 & 46-49.)  The restoration of plural marriage is connected with many schismatic

movements.  (Tr. at 23-24.)  Although Mitchell was apprehended while the group had only three

members, he had designs to expand their numbers.  Elizabeth testified that Mitchell actually

engaged in two attempted kidnapings to obtain more plural wives.  In addition, Mitchell intended

for Elizabeth to bear him children, who would have been similarly indoctrinated into the group.

Such a small family group would have been consistent with other well-known schismatic groups.

Fundamentalist LDS groups have invariably been built from the family unit outward.  (Gov't Ex. 20 at 178.)

The BIDI also discusses the reestablishment of the law of consecration.  The law of consecration is a "cooperative way of pooling resources," which is also based on fundamental LDS beliefs.  (Tr. at 46-47.)  Such communal living was tried during the Church's early history and its prophets "lamented the fact that people are not able to live this law."  (Tr. at 47.)  There are also modern "communities in Southern Utah like Orderville and so on that really made an effort at it."  (*Id.*)

The beliefs expressed in Mitchell's writings "fall clearly within a schismatic Mormon tradition."  (Tr. at 11.)  Within the BIDI, "it's astonishing how [many] references there are to previous canonized scriptures."  (Tr. at 21-22.)  For example, like the Book of Mormon itself, the BIDI extensively cites to the Book of Isaiah in the Bible.  This is a common technique called "intertextuality where one text cites another and sort of trades off the power, the potential that's already buil[t] up in a certain record in a generated text."  (Tr. at 17.)  The BIDI is "heavily derivative" from accepted LDS scripture.  (Gov't Ex. 5, Appx. D at 2; 109-10.)  It is evident that the BIDI was written using research materials at hand, including a dictionary, Bible, Book of Mormon, Doctrine & Covenants and Avraham Gileadi's translation of Isaiah.  (Tr. at 112-14.)

In the BIDI, there is not one religious idea that is unique to Mitchell.  (Tr. at 689.)  These are not spontaneous ideas or ravings, but a deliberate construction of a text using building blocks from other texts.  (Tr. at 118-19.)  Mitchell's writings reflect a deep knowledge of the texts, traditions, and themes consistent with the Mormon  tradition in which Mitchell participated.  (Tr. at 109-10.)  Patterning his new organization after what he has already participated in and seen

from other fringe fundamentalist groups, Mitchell attempted to "create a whole religious movement patterned after the writings, beliefs, rituals, and language of the LDS history and movement, but which[,] consistent with other FLDS claimants to the role of 'one mighty and strong,' places himself at the top and center of this movement."  (Gov't Ex. 5 at 31.)  Because Mitchell's professed religious beliefs are purely a reflection of his culture, it does not suggest that his beliefs are delusions.

            b.      Fixed, False Beliefs

Delusions are fixed, false beliefs.  The beliefs are held tenaciously and a delusional individual cannot chose to do something different because such beliefs are rigid.  (Tr. at 652.)  In this case, the record is replete with examples showing that Mitchell's religious beliefs are not fixed but, rather, used strategically.  For instance, Mitchell's claim to be a prophet, the Davidic King or the One Mighty and Strong, manifests only when it serves his own self-interested purpose.  When he encountered law enforcement or people from whom he could obtain money, food or shelter, he made no such grandiose claims.  In the San Diego courtroom, he claimed to be merely a traveling preacher.  During his initial interrogation, he twice corrected the investigators and asserted that he never said he was a prophet.

The most compelling evidence that Mitchell's religious persona is not the product of mental illness is his demonstrated ability to turn it on and off in self-serving ways.   (Tr. at 535.)  Mitchell turns his religious persona on and off and uses religion as a vehicle to control others and satisfy his antisocial desires.  In that way, Mitchell is no different from any other self-proclaimed leader of a religious cult who seeks the power associated with religious authority.  His use of his

religious persona is strategic.  (Tr. at 746.)   Depending on the vulnerabilities of his audience, he consciously changes the image he projects in order to serve his purposes.

Mitchell's history shows that he is adept at assuming different personas at will for self-serving reasons.  Paul Mecham noticed that Mitchell had the ingrained ability to adapt his behavior to mirror the person to whom he is speaking.  (Tr. at 250-51.)  As Mitchell's stepdaughter LouRee Gayler observed, Mitchell was skilled at projecting a different image in different settings.  (Tr. at 182.)  Despite his increasingly radical religious views and his alleged sexual abuse in the home, he presented himself publicly as a member in good standing within the LDS Church and managed to be called to and entrusted with significant positions in the church.  (Gov't Ex. 20 at 58-59.)  Mitchell himself once expressly acknowledged that he had made a conscious decision to assume a different persona that suited his needs.  When Mitchell was a young man panhandling back east, he wrote to his mother that a more clean cut look was "not the image I'm after at the moment."  (Gov't Ex. 24.)  Mitchell wrote,  "I like acting, my hair and beard is part of a new act."  (*Id*.)

Just as when he was a young man, Mitchell later donned robes, grew long hair and a beard, and assumed the role of a street preacher as "part of a new act."  Mitchell's lifestyle was a deliberate choice to assume a self-serving persona.  Because this was merely an image, however, he could cast it aside whenever it was expedient. "It is clear from the record that Mr. Mitchell had the ability to 'turn off' his homeless persona and 'turn on' his clean cut 21st century persona, in order to work on Ed Smart's roof."  (Gov't Ex. 5 at 41.)  "Lois Smart didn't see him wearing [robes] when she met him and gave him the wherewithal to have work at the Smart home.  She experienced him as scrubbed, clean . . . someone who was down on his luck and who needed a

job." (Tr. at 1888.) As a street preacher, he also chose not to wear his robes after 9/11 when he felt that the robes caused donations to fall.

Mitchell's encounter with Virl Kemp illustrates how Mitchell, "like a chameleon[,] can transform from the identity of Immanuel David Isaiah to Peter Marshall." (Tr. at 880.) Mitchell discarded his robes and "suffering servant" persona and "walked into an LDS home, clean, scrubbed, totally appropriate and . . . [did] not arouse any suspicion in a home full of LDS officials." (*Id.*) Mitchell concealed his connections to the LDS church, "asked innocuous curious questions and gave a fictitious story, was completely convincing, did not portray any abnormality, was not singing, was not doing anything unusual and even had gone so far as to tie down his beard so it would be that much neater and clean." (*Id.*) Most remarkable, Kemp had seen Mitchell wandering about in his robes "and his appearance was so dramatically different that he didn't even know it was the same person who had been in his home." (Tr. at 881.)

When he was arrested for trespassing and brought before a judge, Mitchell dropped his Immanuel persona and claimed to be Michael Jensen, an itinerant preacher traveling with his wife and daughter and staying with friends. Mitchell mentioned his ministry and referred to Jonah and the whale, which was consistent with his traveling preacher persona. However, he carefully concealed his fundamentalist LDS beliefs and his rejectionist philosophy. In order to secure his release, he took his attorney's advice, projected the appropriate remorseful attitude, and behaved appropriately in court. The defense claims that it is likely he would have been released in any event. But, Mitchell had no way of knowing that prior to the hearing. Had he engaged his rejectionist philosophy and refused to stop singing during that appearance, it is likely

that he would have been returned to jail and not released even if the judge had planned to release him.

Not only does Mitchell turn his religious person on and off, he does so in a way that exploits the vulnerabilities of his audience. With the Kemps, he pretended to be "an individual exploring and looking for truth" because he "knows that the LDS people are always looking for seekers of truth." (Tr. at 674.) In reality, Mitchell was seeking an invitation to dinner in order to "scope out the possibility of taking their daughter." (Tr. at 674.) In the home of a Seventh-day Adventist, he pretended to "be interested in the Seventh-day Adventist religion because they're providing him a meal and a place to [stay]." (Tr. at 674.) With the police officer in the Salt Lake City library, Mitchell exploited the officer's desire to be sensitive to religious minorities by claiming that their religion prohibited Elizabeth from removing her veil. (Tr. at 674.) With the Smarts, he exploited their generosity by pretending to be a man down on his luck and looking for work – a ploy that successfully allowed him to work on the Smart home and target Elizabeth.

Throughout his life, Mitchell has been able to read peoples' vulnerabilities and exploit their weaknesses for his own purposes. This "capacity to accurately read the vulnerabilities of a wide range of highly diverse individuals with highly diverse motivations and needs in ways that provided Mr. Mitchell the information needed to optimally adapt his behavior in order to achieve his desired ends is a mental capacity that is completely impossible for a person with a psychotic mental illness." (Gov't Ex. 5 at 36.) A delusion about a person's religious role cannot be turned on and off (Tr. at 676.), especially in the seemingly voluntary, self-interested manner that Mitchell does. The evidence is replete with Mitchell doing so. Because "the ideas themselves are not fixed, they are not delusional." (Tr. at 1095.)

96

The United States presented convincing evidence and expert testimony that the religious persona that Mitchell displays in court and to evaluators is designed to derail his criminal proceedings.  Mitchell has accurately read and exploited the vulnerability in the system, which protects mentally incompetent defendants from standing trial.  "All he had to do was to strategically present his prophetic persona in places like the courtroom and at the US Medical Center for federal prisoners in Springfield, Missouri, or at any other time he thought he might be under evaluation regarding his mental state or competence."  (Gov't Ex. 5 at 38.)  In so doing, Mitchell has been effective in stalling the progress of his legal case for nearly seven years.

At the Utah State Hospital, he negotiated to meet less frequently with his treatment team.  When he did meet with his treatment team, Mitchell engaged in "religious babbling."  (*Id.*)  In contrast to his rational and linear conversations with many staff members, when Mitchell "is involved in questioning of a psychologist or someone whom he believes to be in a position to contribute to his examination, his responses are more wandering and more vague and more replete with these sort of Old English references like mattereth not and thou sayest."  (Tr. at 973.) Mitchell showed such a different face to his treatment team that they described him as "inept" and "boring" (Tr. at 1412-13 & 1448; Gov't Ex. 20 at 45), while staff "have characterized him even as the most interesting patient that they have ever had on the unit because he is such a good conversationalist, because he talks about things with depth and substance and personality" (Tr. at 973-74).  Staff did observe, however, that Mitchell had a tendency to "steer the discussion to this impenetrable religiosity when he was uncomfortable with a discussion, no matter what it was." (Tr. at 975.)  This was not a manifestation of mental illness, but a way for Mitchell to thwart questioning.  (*Id.*)

97

c.       Distress or Preoccupation

In Dr. Skeem's opinion, extreme religious ideas can be distinguished from delusional beliefs based on the manner in which they are held.  She opined that "delusional beliefs are held with excessive distress, preoccupation and floridity."[9]  (Tr. at 1738-39.)  "When it comes to distinguishing religious eccentricity from delusion, it's not so much [what] you believe, it's how you believe it."  (Tr. at 1738.)

(1)       Distress

The defense notes that "psychotic individuals selectively attend to threatening cues, assume malevolent intent, and jump to conclusions" and that these "misinterpretations create considerable anxiety, distress, and efforts to avoid feared people and events."  (Def. Br. at 55.) Mitchell, on the other hand, has demonstrated no such anxiety.  If anything, his history shows that he was fearless – he chose to earn a living as a panhandler, preached his beliefs on the street, approached random people to ask for money, and chose to travel about the country accepting transportation, meals, and shelter from strangers.

As proof of the distress caused by Mitchell's religious beliefs, the defense points to evidence that Mitchell "angrily delivered" a copy of the BIDI to his mother in 2002.  (Def. Br. at 56.)  This evidence is of limited utility, however, given that the evidence also shows that Mitchell had several discussions with family members regarding his beliefs and did not appear to be distressed during those conversations.  There is also evidence that he had religious discussions

---

[9]  Dr. Skeem does not contend that Mitchell's beliefs are associated with floridity.  (Tr. at 1740.)

with psych techs and other patients at the Utah State Hospital and there was no evidence of distress.

Elizabeth testified that she never saw Mitchell in any distress over his religious beliefs during her nine months of captivity.  Similarly, the Utah State Hospital staff have not observed Mitchell in distress and he has never required any clinical intervention for agitation during his nearly seven years in custody.  As Dr. Whitehead observed, there was no "robust information that would suggest that he was particularly distressed a significant amount of the time."  (Tr. at 1458.)  And in federal custody, Mitchell described himself as "at peace" to Dr. DeMier, and maintained an "unflappable demeanor over the course of his entire custody.  There is no evidence for him having been distressed as a general proposition."  (Tr. at 1098.)

Despite Mitchell's self-serving statements in the Second BIDI, not a single witness has observed his "heart rending prayers and anguished pleadings and gushing tears."  (*See* Def. Br. at 56.)  While Mitchell was occasionally observed singing, there is no evidence to support the defense assertion that he was "singing to soothe himself." (Def. Br. at 56.)  To the contrary, there is substantial evidence that Mitchell has used singing to create conflict–singing to drown out other employees' music at OC Tanner, singing in the middle of the night in the jail, singing to keep someone from making a point in a discussion, and singing to disrupt court proceedings.

 Similarly, it is speculation that Mitchell's pacing and sleep problems are evidence of distress, let alone distress caused by his religious beliefs.  Although there are numerous references to Mitchell exercising, running, and generally "lymphologizing," these activities are consistent with Mitchell's belief in lymphology, not with his alleged delusional belief in his

divine role or martyrdom.  In addition, there is evidence that his difficulty sleeping may be related to a prostate problem.  (*See* Tr. at 1458-59.)

The defense also claims that Mitchell's distress was evidenced in the Utah State Hospital by the manner in which he "actively avoided staff" and "engaged in passive activities" such as watching television.  (Def. Br. at 56.)  Mitchell's refusal to speak to staff or participate in certain groups and activities was nothing more than a calculated attempt to avoid scrutiny.  Even during his prolonged "word fast," Mitchell did not deny himself the opportunity to speak to other patients, nor did he maintain his silence with staff when he needed something.  In addition, he never provided a religious justification for his silence during the entirety of the 18-month "word fast."  It was not until writing the Second BIDI – after the commencement of these federal proceedings – that Mitchell first described his silence as "an act of faith."  Mitchell's involvement in "passive activities" is more likely due to his deliberate refusal to participate in any activity that might reflect positively on his competence to stand trial than it is distress.

Moreover, distress associated with his legal predicament does not equate to distress over his religious beliefs.  The witnesses who testified to actually observing Mitchell in some distress were the marshals who described Mitchell's agitated demeanor on the day Elizabeth Smart testified.  This distress was not triggered by his religious beliefs, but by the prospect of having his accuser publicly testify.  Such a situation would be distressing for any rational person.  Similarly, there was nothing irrational in Mitchell's "disappointment" when the state rejected his proposed plea deal or in his characterization of the state's strongly worded letter as "hateful/condemning."  (Tr. at 1695; Gov't Ex. 28 at 8-9.)  Dr. Skeem's notes reflect an

individual who is distressed not by his religious beliefs, but by the state's refusal to drop the sex abuse charge.  (Gov't Ex. 28 at 8.)

(2)        Preoccupation

The defense further suggests that Mitchell's behavior could be driven by preoccupation with religious delusions that an observer is simply unable to discern.  Assuming that Mitchell is preoccupied because there might be an unarticulated religious reason for his behavior is sheer speculation not grounded in the evidence.  Such an unsupported assumption does not provide an adequate basis for finding, by a preponderance of the evidence, that Mitchell suffers from a mental disease or defect rendering him incompetent.

Mitchell presents himself as preoccupied with extreme religious themes when he is being evaluated.  However, his behavior during his three years of observation at the Utah State Hospital "exhibits the antithesis of being preoccupied with religion, let alone religious ideas of a pathological nature."  (Gov't Ex. 20 at 185.)  During his time at the Utah State Hospital, Mitchell did not openly minister or aggressively seek to share his extreme religious ideas with others. (Gov't Ex. 20 at 186.)  He also respected requests not to talk about religion.  Before his prolonged silence, Mitchell spoke with others about a variety of non-religious topics, including literature, music and health.  Unlike when he spoke with evaluators, Mitchell did not always bring the conversation back to religion.  Even when speaking with patient John, who was especially devout, Mitchell spoke not only of religion but of politics, chess, television, movies and pop culture.  (Tr. at 187.) He "read extensively – not religious books or scripture – but novels and biographies."  (Gov't Ex. 20 at 186.)  He watched countless movies and hours of television per day.

101

Even when talking to psych techs about religion, he did not share his extreme beliefs with them. One psych tech reported a normal conversation with Mitchell about his past as a mainstream member of the LDS Church, even though he was later excommunicated for his extreme beliefs. Mitchell was able to talk about being an ordinance worker in an LDS temple without delving into his beliefs that the mainstream LDS Church was now being led by an "anti-christ." If he was truly preoccupied with his extreme beliefs, he would have been unable to keep himself from asserting them in this type of conversation.

Other religious discussions at the hospital do not demonstrate a preoccupation with his extreme beliefs and divine role. During that time, he never claimed to have received revelation. He did not claim to be the One Mighty and Strong or the person who would fight and defeat the anti-christ. "He comes into the hospital, references himself as a prophet and within a matter of weeks, maybe months, stops. No longer characterizes himself in any special way" – except to evaluators. (Tr. at 1095.) Indeed, his deference to patient John demonstrates that Mitchell did not truly believe himself to be the most powerful religious figure on the planet. The staff who had daily contact with Mitchell noticed that his behavior was inconsistent with his professed beliefs. Moreover, the evidence from the Utah State Hospital shows that if Mitchell was, or became, preoccupied with anything, it was with watching the television show "Charmed."

After three years of having no "revelations," Mitchell suddenly began to write a Second BIDI after the federal government decided to pursue charges against him. (Tr. at 12-13.) When he was transferred to Springfield for an evaluation, he provided "all of this material about being the Davidic King to Dr. DeMier who obviously takes that information and uses it with his interpretation that those are psychotic delusions." (Tr. at 746.) The sudden reinvigoration of his

102

religious persona when the federal case commenced demonstrates that Mitchell is only preoccupied with religious themes when it can serve his interests.

There is no question that Mitchell has always had a keen interest in religion and frequently discussed religion with family members, co-workers, and like-minded individuals.  He used religion to provide a basis for things he wanted–to control his step-children, to manipulate Barzee and Elizabeth, to justify carnal desires.  However, the evidence does not support the conclusion that he has been "preoccupied" with religion to a pathological degree.

During Elizabeth's captivity, she testified that Mitchell was preoccupied with sex. (10/01/09 Tr. at 11.)  Elizabeth could not recall a time when Mitchell did not talk about sex or want sex.  (Id. at 12.)   Mitchell's preoccupation with sex is discounted or ignored by many of the experts even though the evidence shows a pattern of preoccupation with it throughout his life. "[W]hatever the religious aura of some of the discussions and preaching of Brian Mitchell, that . . . took a back seat to his sexual libido, [his] decisions were made with that as a first priority." (Tr. at 831.)

One example was Mitchell's revelation of the schedule for sexual relations.  The revelation had the effect of assuaging Barzee's jealousy, but Mitchell did not feel compelled to adhere to the schedule.  When Elizabeth told Mitchell that it was not her day, Mitchell responded that nobody would find out.  Dr. Welner correctly recognized that this incident shows that Mitchell is not passively driven by what he perceives to be God's will.  (Tr. at 831.)  "[S]omeone who is a man of God saying 'who will know,' when he is referencing a calendar that is supposed to be ordained by God and revelation, well, it's just phoney.  It's just a lie." (Tr. at 831.)  For Mitchell, "lust trumped religion."  (*Id.*)

103

Mitchell is not preoccupied with religion, but he uses it frequently as a means to justify his actions.  His self-serving revelations fit Mitchell's needs at the moment, and he has demonstrated that he does not believe there is a need to consistently adhere to them.  When he had a revelation to begin polygamy, but could not get any adult women to voluntarily become his plural wife, he had a revelation to take young girls as his wife.  When Barzee was upset about his drinking and smoking, he had a revelation that he could do whatever he wanted and she needed to support him in it in order to be an elect woman of God.  When his plea negotiations with the state broke down, he had a revelation that his trial would be a martyrdom and he would miraculously be released.  It is not preoccupation with religion, if anything, it is a preoccupation with having an excuse or justification for his actions.  Because the revelations change and fit his needs of the moment, there is no credible evidence that the revelations cause him any distress.  If anything, he uses revelations to soothe himself.

       d.     "Encapsulation"

The defense has suggested that all the evidence of Mitchell's normal functioning and lack of preoccupation with religion is a result of his delusions being "encapsulated."  The facts, however, do not support this theory.  The record shows that the defendant has full control of his thoughts and deliberately chooses when to use religion.

Dr. Gardner explained that it is possible for delusions to be "quite walled off.  And individuals will try to keep them out of normal discourse.  As such they can go to work and do some activities and be quite functional."  (Tr. at 1875.)  A person with "encapsulated" or "circumscribed delusions" may "try to hide those."  (Tr. at 740.)  "However, if they really have a delusional disorder, it is one that they think about that is sort of brewing just under the surface, it

is like an itch waiting to be scratched." (Tr. at 1875.) Dr. Whitehead described encapsulation as "wherein a person basically has two gears." (Tr. at 1432.) "[I]n non-delusional mode they appear completely ordinary," and "[t]hey're completely making sense to a point." (Tr. at 1432.) In delusional mode, the person has "much more intense rambling in their discussions, [is] tedious to listen to, doesn't make a lot of sense, has difficulties reaching the point and has behaviors reflective of the delusion." (Tr. at 1432.)

In contrast to this description, the recordings that were played in court of Mitchell explaining his religious beliefs to Dr. DeMier show a man who spoke clearly, calmly, and was completely comprehensible. Even Dr. DeMier experienced Mitchell as articulate and described Mitchell as "quite articulate in his verbal abilities[,] suggesting above average intelligence." (Tr. at 1582.)

Moreover, a delusional person would be expected to act consistent with the delusion when they are in a "situation [where] the delusional system is engaged." (Tr. at 329.) Yet Mitchell's "delusions" do not consistently manifest themselves even during religious discussions. Mitchell completely concealed his religious beliefs in order to gain access to the Kemp home for the purpose of targeting their daughter. Mitchell attended services at an LDS church – a church from which he had been excommunicated for apostasy – yet Kemp noticed "'nothing shaky about him.'" (Gov't Ex. 20 at 13.) After the services, Mitchell enjoyed a lengthy visit at the Kemp home, along with "a number of missionaries" who were under the impression that Mitchell was an investigator interested in the LDS church. (*Id.*) During the visit, Mitchell had a "'nice conversation,'" which included a discussion of the LDS faith. (*Id.*) In spite of his religious beliefs being directly engaged, Mitchell was composed, rational, and polite. He did not preach;

105

he did not call them to repentance.  Instead, "'He pretended, quite well, to know nothing about the Mormon faith,' recalled Mr. Kemp, who added, 'there was nothing shocking he revealed about his beliefs or habits.'"  (*Id.*)

Similarly, Mitchell feigned interest in and agreement with Seventh-Day Adventist's beliefs to secure food and lodging.  He discussed religion and the history of Catholicism with Phyllis Koch, yet never mentioned his eccentric religious beliefs.  He discussed religion with police and FBI investigators and used religious themes, but expressly denied any claim that he was a prophet.

The defense suggests that Mitchell's delusions are "more engaged" in the clinical evaluation setting with mental health experts because they ask more probing questions.  Dr. DeMier testified that he has encountered patients who appear normal to staff but, nonetheless, suffer from mental illness that is obvious in the clinical interviews.  In this case, however, there is no evidence to suggest that the interviews Mitchell had with mental health experts delved more deeply into his religious beliefs than some of these other lengthy conversations did.  The lengthy visit at the Kemps with LDS missionaries and members of the Kemp family trying to convert him to their faith would have delved deeply into his belief system.  If Mitchell could chose to withhold his extreme beliefs during that experience, he could choose to withhold his beliefs during a clinical interview.

As Dr. Gardner explained, the evidence shows that Mitchell had "extensive discussions about religion.  Now if he were delusional, that would have scratch[ed] that itch and out would have come all of these ideas if he truly believed in them."  (Tr. at 1875.)  The evidence conclusively rebuts any claim that Mitchell's lack of preoccupation is due to "encapsulation."

These were situations where his religious beliefs should have been fully "engaged," and yet he was able to turn off those beliefs to serve his purposes. Someone suffering from a delusional disorder, even an encapsulated delusional disorder, could not have that type of control over an actual delusion.

2.     Mitchell's Presentation and History

Neither Mitchell's presentation nor history support a finding that he is suffering from a psychotic illness. Mitchell displays none of the cognitive impairments associated with psychosis and functions in a manner inconsistent with a severe mental illness. Moreover, Mitchell's family history, prior mental health evaluations, decision to go off the grid, and response to the state court plea negotiations, do not support the conclusion that Mitchell is psychotic.

a.     Cognitive Abilities

"It is impossible to think and function the way Mr. Mitchell has demonstrated repeatedly over time if he had a severe psychotic illness." (Tr. at 633.) During his career, Dr. Gardner has treated hundreds, if not thousands, of psychotic patients. (Tr. at 613-14.) In his opinion, Mitchell has "repeatedly demonstrated patterns of behavior and thinking" that are "simply incompatible" with psychosis. (Tr. at 633.) Research has shown that all "schizophrenics have significant measurable cognitive deficits" independent of their hallucinations, delusions or other symptoms. (Tr. at 626-27 & 703.) Yet Mitchell has demonstrated a remarkable ability for abstract, complex thinking as well as sophisticated cognitive capacities.

The BIDI is evidence that Mitchell's cognitive processes are not impaired. Dr. Peterson, an expert in the study and analysis of religious texts, explained that the writing shows rational organization, research, and extensive knowledge of texts. (Tr. at 109-10 & 112-14.) Mitchell's

107

interpretation of biblical imagery and symbolism into the BIDI is very sophisticated and his allegorical efforts display "an extraordinarily skillful bit of writing."  (Tr. at 54-55.)  Mitchell's incorporation of other texts, including Avraham Gileadi's book *The Literary Message of Isaiah*, is "very skillful.  It's very well done."  (Tr. at 53.)  Dr. Gardner, who has read Gileadi's book, observed that it is not "light reading," but an "extraordinary text" and could not "imagine [a] psychotic patient reading this kind of text and then incorporating it with the kind of sensitivity and application that Mr. Mitchell does."  (Tr. at 641.)

In addition, Mitchell's stay at the Utah State Hospital provides evidence of his cognitive capacities.  He played games such as chess and *Axis and Allies*, both of which require significant concentration and strategic thinking.  Mitchell spent countless hours at the hospital reading lengthy, complex books and having extensive conversations about them with hospital staff.  As Dr. Gardner explained, "These are not things that schizophrenics do, period.  They simply don't have the cognitive processing to do these abstract kind of things.  It's been well known for a long time they are rigid, concrete.  They lose their ability for abstract kind of thinking.  And what part of their core cognitive deficits underlie the fact that they don't spend time reading complex material and discussing them with other individuals."  (Tr. at 659.)

Mitchell has also repeatedly demonstrated an ability to make diverse, self-serving decisions in a variety of contexts.  (Tr. at 637.)  There are "many complex cognitive emotional processes that underlie the ability to accurately read situations and to modulate appropriately one's behavior to be able to serve one's own interests."  (*Id.*)

As Dr. Gardner observed, "Perhaps the most compelling direct evidence of Brian Mitchell's ability to sustain intense focused attention[,] his ability to modulate emotional

responses while processing complex cognitive and interpersonal data[,] and his ability to adapt to

constantly changing environmental cues and challenges while recognizing and responding to

overt and subtle cognitive emotional changes is his videotaped interview of the day of his arrest

by the FBI." (Tr. at 646.)  As Dr. Welner observed:

> Let's keep in mind, he is wandering all over the west before he actually gets
> picked up.  He is on the road with Elizabeth and Wanda.  They get arrested
> unexpectedly and brought in.  He hasn't seen an attorney.  He has no preparation.
> And he sits down and he dispatches the questions that they have like a matador.
>
> . . . [H]is demeanor is calm, relaxed.  He is engaged with the interrogators,
> but he is confident.  He comes back at them.  He doesn't at all reflect to be
> intimidated and he most significantly derails them from discussions about how
> she came to be with him.

(Tr. at 978.)  The credible evidence from the experts at the competency hearing was that no

psychotic individual could have handled himself the way Mitchell did in that interrogation.

In Mitchell's self-serving San Diego court appearance, he provided "very convincing and

appropriate answers that happened to be completely false."  (Tr. at 655-56.)  Mitchell was able to

"present himself to the judge as a very repentant individual" and "some kind of an evangelical

itinerant preacher."  (Tr. at 653.)  He gave no hint of his true identity or his connections to Utah.

As Dr. Welner observed, Mitchell's answers portrayed him as someone with

> family, contrition, connectedness, harmlessness, religion, sobriety.  All false, but
> all sympathetic qualities.  So he had the presence of mind to understand that if he
> represented himself this way to a judge, he not only would be effectively
> misleading, but the effectiveness was in how he helped his defense by making
> himself a sympathetic character.  He is especially able to be whom he needs to be
> for whatever his audience happens to be.

(Tr. at 952.)  This court appearance demonstrated that Mitchell is "very savvy for the purpose of

taking care of his own needs, very capable."  (Tr. at 655.)  "He wasn't acting out of his own

detached disorganized or preoccupied psychotic process. He was very appropriately engaged in

his environment and adapting cognitively and emotionally appropriately to his environment."

(Tr. at 655.)

Mitchell has repeatedly demonstrated such an ability to perceive and accurately interpret

and respond appropriately to the world around him. (Tr. at 1013.) When Mitchell was trying to

control Barzee and Elizabeth, "[i]t was very useful to be this Immanuel David Isaiah." (Tr. at

656-57.)

> But that wouldn't be useful for him in the courtroom, so he suddenly
> changes, and he's Mr. Jensen. And he's later stopped by police, and now he's
> Peter Marshall. Now he turns one name off and turns on another name, and turns
> off one persona and turns on another. And each time they are completely
> appropriate to the situation in a way that helps him to avoid responsibility for his
> behavior so that he doesn't have to confront his anti-social potential predicaments.

(Tr. at 657.) As Dr. Welner observed, Mitchell has demonstrated an ability to "pick[] up on the

environment" and respond in a way that is "not just believable and rational but persuasive in his

capacity to be sympathetic, portraying him in a sympathetic way." (Tr. at 1014.) Such complex

cognitive abilities are incompatible with a diagnosis of psychotic illness.

The defense experts have focused on three facts in Mitchell's history to suggest that his

religious fanaticism is psychotic and not simply a product of his culture: (1) his family history;

(2) his behavior as an adolescent; and (3) his decision to quit his job and become homeless in the

mid-1990s.

      b.    Family History

First, the defense has suggested that Mitchell has inherited a mental illness that runs in his

family. His grandfather was diagnosed with paranoid schizophrenia and his father, despite

having never been diagnosed with a mental illness, "certainly holds some very unusual beliefs, as reflected in his writings." (Tr. at 1543.) Although psychotic illness has some genetic component, the frequency of transmission within families is relatively small – roughly 10 percent from parent to child and only 2 or 3 percent from grandparent to grandchild. (Tr. at 1115.) It is far more likely that Mitchell was influenced by his exposure to his father's eccentric religious ideas. Mitchell's father, Shirl, considered himself an elect man of God and wrote an extensive religious manifesto. (Tr. at 872-73.) Not surprisingly, Mitchell fashioned himself after his father.

> Dr. Welner testified the he has had the opportunity
>
> to study over 60 fundamentalist sect leaders who refer to themselves as one mighty and strong or some variable. And one of the things [he came] to learn is that there's an unusually high incident of children of these sect leaders who take on the mantle and see in themselves some special purpose. The royalty seems to pass down in the family. And so ultimately we have to offset that against the inheritability of psychotic illness.
>
> You offset that against the inheritance of the prophet mantle from father to son amongst people who are within the fundamentalist culture, and the evidence is far greater from Brian Mitchell having caught the fundamentalist bug as opposed to mental illness.

(Tr. at 1115.) In this case, it is more probable that Mitchell's increasingly radical religious views grew out of his exposure to such views as a child. Like many other fundamentalists, Mitchell believed that he, like his father, was an elect man of God.

The presence of a psychotic disorder is also far less probable given Mitchell's diagnosis of pedophilia – a diagnosis that has not been disputed or rebutted. "Research on pedophilia shows that the incidence of pedophilia occurring at the same time with schizophrenia, delusional disorder or any other psychotic condition combined, if you combined all those categories, they

only occur with pedophilia 2.2 percent of the time." (Tr. at 1074.)  In contrast, the co-morbidity

rate of pedophilia and antisocial personality disorder is over 20 percent.  (*Id.*)  Thus, it is "very,

very uncommon" for psychotic people to be pedophiles.  (Tr. at 1075.)

        c.      Adolescent Behavior

        Next, the defense experts claim that Mitchell's referral to a psychologist in his teens was

evidence of an incipient psychotic disorder.  (Tr. at 1223.)   The defense relies heavily on the

statement by the referring probation officer – not a mental health professional – that Mitchell's

"behavior is bordering on psychotic." (Tr. at 716.)  However, that suspicion was not borne out

by the evaluation and psychological testing performed by Dr. Thomas.  Instead, Dr. Thomas

diagnosed Mitchell with Behavioral Disorder of Adolescence, a type of conduct disorder.  The

psychological testing revealed no significant mental disorder and "only one significant elevation

on the A-social Index." (Def. Ex. E at 3; Tr. at 1625 & 1897.)  In her report, "Dr. Thomas

articulated a number of unusually aggressive and sadistic features." (Tr. at 1898.)  Dr. Thomas'

observations are consistent with Dr. Welner's conclusion that Mitchell is not psychotic, but a

psychopath.

        While it is still possible that Mitchell's behavior could have been an early indicator of

psychosis, his subsequent history did not bear that out.  (Tr. at 714-15.)  When he was evaluated

by Dr. Thomas, there was evidence that he had molested a neighbor girl, was displaying

aggressive and sadistic behavior, and was highly manipulative.  Although there are "other

references that suggest possibly some early paranoia, some social withdrawal," those features did

not progress into psychosis.  Significantly, Mitchell underwent an evaluation and psychological

testing thirteen years later in connection with the adoption of his children and was found to have

no mental illness. (Gov't Ex. 20 at 55.) "He went on to have an extended employment at O.C. Tanner, he ended up in the Bishopric. He did many things that would not reflect the progression from that point to what might have shown progression into psychosis and clearly didn't." (Tr. at 714-15.)

                  d.      Homelessness/Functioning

Despite the defense experts' narratives, the evidence in this proceeding has demonstrated that Mitchell's decision to become homeless is not, in fact, evidence that he "fell off the cliff" in 1995. Instead, it appears to have been a calculated decision that enabled him to be a "free man." In the mid-1990s, Mitchell told Barzee's sister that he did not want to work, but preferred to panhandle as he did as a young man. (Tr. at 237-38.) That decision was not driven by an inability to maintain stable employment, but by a desire to be a "free man" and avoid taxes and other financial obligations. (Gov't Ex. 20 at 63 & 65.) Moreover, this was not a sudden decision. For years, Mitchell had been reading "literature about tax evasion, living below the grid and unaffiliated, and living in sort of a survivalist kind of circumstance." (Tr. at 892.)

As Dr. Welner explained:

   The available information provided to me is twofold. First of all, that this functional period [for Mitchell] with Wanda Barzee was cosmetically functioning. The available information from the inside of the home was that there was a lot of dysfunction and deterioration even as he was working at OC Tanner. The debts mounted and his identification with the patriot movement and essentially rejection of institution[s] intensified. And so for years, and I'm talking about from even before 1990, he was reading and anticipating going off the grid, not having to pay taxes, not having to pay child support, not having to [tithe] and increasingly identifying with the more fundamentalist strands of the LDS. And that coincided with the life-style choices he made.

(Tr. at 1888-89.)  The evidence shows that Mitchell's unusual lifestyle was a conscious choice, made after years of study and deliberation, and not evidence of a psychotic break.

The assertion that "Mitchell's belief system led to clear social and vocational deterioration" is contradicted by the evidence.   There was no "dramatic decline in functioning" in the early to mid-1990s.  Mitchell left his job with OC Tanner on his own terms to take a higher paying position.  (Tr. at 393-94.)  Likewise, he was a valued employee at Historical Artifacts and voluntarily left to take a position with the American Academy of Lymphology.  (Tr. at 1010.) Mitchell was so successful at selling lymphology products that Dr. West wanted him to run the business.  (Tr. at 1106.)

It is also false that Mitchell's "beliefs were so extreme that he could not gain a foothold with members of ostensibly like-minded 'fringe' groups."  Both Dr. Daniel Peterson and Richard Forbes testified that Mitchell's beliefs were fully consistent with the beliefs of fundamentalist LDS groups.  Scott Dean testified that Mitchell's beliefs were not what Dean "would consider radical or unusual" and "would have easily fit into . . .  a number of religions that are out there as far as not being too far off from what others believe."  (Tr. at 228.)  In addition, Allyssa Phillips testified that the West family shared Mitchell's religious views and that he was respected by the Wests.  (Tr. at 269-71.)  Even Julie Adkison testified that she did not find Mitchell's beliefs odd based on her upbringing in a polygamist community.  (Tr. at 293.)

Mitchell and Barzee's "Journey through the Land" does not evidence any impairment in Mitchell's functioning.  To the contrary, Mitchell demonstrated that he could navigate their trip across country, plan visits to places of significance to the Mormon faith, arrange for Barzee to play three sparsely attended organ recitals, and secure money, food, transportation, and shelter.

114

The evidence further establishes that Mitchell did not become alienated from his family or his extended social network during that time period. Indeed, he and Barzee lived next to Barzee's sister Evelyn Camp in the mid-1990s (Tr. at 236), lived with Barzee's mother Dora Corbett in 1997 (Gov't Ex. 20 at 68), and lived with Mitchell's mother Irene in 1999 and 2000 (Tr. at 210). Mitchell also maintained his association with the Wests and stayed at their home for several months during 1997 and 1998. (Tr. at 267-68.)

Moreover, Mitchell's excommunication from the LDS church was not part of an alleged "dramatic decline in functioning." (Def. Br. at 59-60.) Mitchell was not excommunicated from the LDS Church until 2002. Although he had clearly drifted away from the mainstream Church by the mid-1990s, that was a gradual process that began in the 1980s when Mitchell began privately expressing anger with the Church and referring to himself as a prophet. (Tr. at 196.) It also coincided with his interest and involvement in various fundamentalist groups. (Tr. at 896.) It was not a manifestation of a sudden deterioration or impairment in functioning.

The defense experts have relied on a false narrative that has perpetuated the myth that Mitchell "fell off the cliff" in the early to mid-1990s. The evidence presented to this court refutes the claim that Mitchell suffered a sudden deterioration in functioning consistent with the onset of a psychotic illness.

e.      State Plea Negotiations

The final period of time in Mitchell's history that the defense focuses on is the break down of plea negotiations in the state court proceedings. Under the defense's theory Mitchell was delusional, but competent to enter an *Alford* plea in the state court. Separate from the *Alford* plea context, the defense asserts that Mitchell was not competent to stand trial either because

115

there is a different standard to apply in different procedural contexts or Mitchell had a change in his condition that occurred when plea negotiations fell through.

The defense refers to situational competency, but the Supreme Court has rejected the idea that there are different standards for competency depending on the context of the proceedings. Competency to stand trial and competency to plead guilty or waive other constitutional rights are measured by the same standard enunciated in *Dusky*. *Godinez v. Moran*, 509 U.S 389, 398-402 (1993). In other words, Mitchell could not be "situationally competent" to enter a plea and simultaneously incompetent if he were to proceed to trial.

A separate and distinct proposition is that a defendant's competency to stand trial must be reconsidered whenever there is evidence of a change in the defendant's mental state. *See, e.g., Pate v. Robinson*, 383 U.S. 375 (1966); *Drope v. Missouri*, 420 U.S. 162 (1975). The defense claims that *Pate* is "potentially triggered when the context changes," but none of the cases cited in the defense brief stand for this proposition. Instead, it is a change in the defendant's condition, not a change in the case context, that triggers a reassessment.

The defense claims that "there is absolutely no contradiction between Dr. Skeem's finding that Mr. Mitchell was competent *at the time* he was evaluated in the specific context of entering an *Alford* plea, and her subsequent finding that he was incompetent at a different time and context (primarily a deterioration of his mental state)." The court can only read this to mean that the defense claims a change in Mitchell's mental condition occurred. But, the evidence shows that there was no "deterioration of his mental state" during the six week period between

116

filing of Dr. Skeem's initial report[10] on September 16, 2004, and the interview on October 29,

2004, when she concluded that Mitchell was incompetent.[11]

Dr. Skeem's recently revealed notes make clear that Mitchell had been under the

impression that the victim's family was agreeable to the state dropping the sexual abuse charge.

(Gov't Ex. 28 at 8.)  This was important to Mitchell because the "sex abuse charge is the one that

really arouses hatred."  (*Id.*)  He had hoped that if the state dropped the sex abuse charge, it might

"stir . . . people's hearts" and make them wonder what he was all about.  (*Id.* at 9.)  Once he

received the letter from the prosecution refusing to drop the sexual abuse charge, Mitchell "had a

deep sense of disappointment" and felt he should not accept their offer.  (*Id.* at 8-9.)        Dr.

Skeem's notes reflect that Mitchell fully understood the details of the plea negotiations, the basis

for the charges he faced, the potential sentence and his legal options.  This evidence supports the

conclusion that Mitchell's change of heart about entering a plea was based not on a deterioration

of Mitchell's mental state but on the deterioration of the plea negotiations.  The evidence shows

that it is more likely that Mitchell decided to disengage from the process as a strategic defense

because he could no longer control the process than it is that he had a decline in his mental

condition.  Moreover, Mitchell's response that the State's letter was hateful and condemning or

---

[10] Dr. Skeem now claims that her initial report was a "blue plate special" because Mitchell was already "teetering on the edge" of incompetence.  (Tr. at 1822.)  Yet her initial report reflects that she found Mitchell's level of impairment in seven of nine competency abilities to be "none." (Def. Ex. J; Tr. at 731.)

[11] The defense brief claims that things changed "four months" after the initial report. (Def. Br. at 32.)  In fact, the evidence shows that Dr. Skeem determined Mitchell to be incompetent on October 29, 2004, the day she interviewed Mitchell and then assisted defense counsel in drafting a motion to reconsider competency.  (Tr. at 928.)  The following day, Dr. Skeem actually told Mitchell she believed he was incompetent.  (Tr. at 1000.)

that they were "on Satan's side" is not an irrational delusion for a criminal defendant who is talking through a stressful situation.

This evidence involving the failed plea negotiations was not available to the state court because Dr. Skeem neglected to include this information in her second report. Moreover, she testified at the state competency hearing that she did not "know when plea negotiations shut down" and did not know much about the plea negotiation process at all. (Tr. at 1832.) The omission of this highly probative information regarding the plea negotiations left the state court with the impression that Mitchell had experienced an inexplicable deterioration in his mental state, as opposed to disappointment and a need to modify his strategy in response to the rejection of his desired plea. The court finds nothing to indicate that Mitchell had a significant change in his mental condition as a result of the state court plea negotiations.

After considering all the evidence presented, the court agrees with the Untied States that Mitchell's mental condition has not dramatically changed over time. Unlike the portrayal of Mitchell in the state court proceedings, he had no significant decline in function at any given point that may indicate the presence of an active psychotic condition.

      3.      Diagnostic Criteria

            a.      Delusional Disorder and Schizophrenia

Two diagnoses[12] of psychotic mental illness have been suggested by the defense – schizophrenia and delusional disorder. The defense argues that it is insignificant whether he "meets the criteria for delusional disorder or schizophrenia because delusions are included in

---

    [12] Dr. Golding did not commit to a specific diagnosis but simply stated that Mitchell suffered from "a disorder within the psychotic spectrum." (Def. Ex. X at 41.)

both disorders."  As discussed above, the fundamental problem with both diagnoses is that Mitchell's professed religious beliefs do not meet the definition of a delusion.

But, additionally, the two diagnoses "are mutually exclusive."  (Tr. at 1611 & 1870.) "The primary or the essential criterion for delusional disorders is that it is a non-bizarre delusion."  (Tr. at 1611-12.)  As Dr. DeMier explained, "the distinction between a bizarre and a non-bizarre delusion is not whether or not they are odd or strange beliefs, but whether or not they are physically possible."  (Tr. at 1532-33.)  A nonbizarre delusion is one that is capable of happening in the real world.  (Tr. at 1612.)  "[I]n other words, something that is possible, no matter how unlikely it seems."  (Tr. at 1533.)  Dr. DeMier eliminated a diagnosis of delusional disorder because Mitchell's religious beliefs "are not possible.  And, if I strictly adhere to the diagnostic criteria in the DSM, that's where I have to go."  (Tr. at 1538.)  For example, Mitchell's "revelation" in the BIDI that Barzee, who had undergone a hysterectomy, would have her womb opened up would be classified as "bizarre" because it is not possible in the real world. (Tr. at 1612.)

Because he classified Mitchell's delusions as bizarre, Dr. DeMier concluded that Mitchell met the diagnostic criteria for schizophrenia.  (Tr. at 1612.)  Under the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision ("DSM-IV"), two or more symptoms (such as delusions, hallucinations, or grossly disorganized speech) are generally necessary to support a diagnosis of schizophrenia.  DSM-IV at 312.  However, only one symptom is required "if delusions are bizarre."  DSM-IV at 312.  The DSM-IV contains this cautionary note:

> Although the determination of whether delusions are bizarre is considered to be especially important in distinguishing between Delusional Disorder and Schizophrenia, "bizarreness" may be difficult to judge, especially across different

119

cultures.  Delusions are deemed bizarre if they are clearly implausible, not
understandable, and not derived from ordinary life experiences (e.g., an
individual's belief that a stranger has removed his or her internal organs and
replaced them with someone else's organs without leaving any wounds or scars).
In contrast, nonbizarre delusions involve situations that can conceivably occur in
real life (e.g., being followed, poisoned, infected, loved at a distance, or deceived
by one's spouse or lover).

DSM-IV at 324.

In this sense, religious ideas are "not possible."  (Tr. at 688.)  "They're magical ideas that

. . . deal with miracles that don't follow the rules of science and history.  They deal with unseen

reality that cannot be disproved."  (Tr. at 688.)  However, the DSM-IV recognizes that it is

important to take cultural differences into account when assessing the symptoms of

schizophrenia.  "Ideas that may appear delusional in one culture (e.g., sorcery and witchcraft)

may be commonly held in another.  In some cultures, visual or auditory hallucinations with a

religious content may be a normal part of religious experience (e.g., seeing the Virgin Mary or

hearing God's voice)."  DSM-IV at 306.

Even if sincere, Mitchell's professed beliefs are not delusions, but religious ideas that

stem from his culture.  While a delusional person's culture may "bleed into their psychotic

ideas," a delusion will necessarily be inconsistent with shared belief. (Tr. at 743-44.)  Mitchell's

ideas are not just derivative of his culture or experience, but entirely consistent with the religious

doctrine of his fundamentalist subculture.  (Tr. at 743.)

In his report, Dr. DeMier rejected a cultural explanation for Mitchell's beliefs.  He wrote,

"Certainly his beliefs are in conflict to the mainstream LDS church.  Moreover, I am unaware

that his beliefs are shared by any fringe or radical element of that (or any other) church."  (Def.

Ex. BB at 34.)  Dr. Peterson, an expert in LDS beliefs and scriptural texts, testified that he could

120

not disagree more strongly with that conclusion.  (Tr. at 77.)  Mitchell's beliefs are explainable within a cultural context and are completely derivative of  LDS and schismatic LDS groups. (*Id.*) He is one of hundreds of men claiming to the One Mighty and Strong and desiring religious power of their own sect.  Richard Forbes, an expert in religious cults, also disagreed with Dr. DeMier's assessment.  (Tr. at 547.)

During his testimony, Dr. DeMier recognized that the bulk of Mitchell's beliefs were shared by fringe LDS groups, but maintained that Mitchell's delusions were bizarre because he "has placed himself, in his belief system, into this divinely ordained role."  (Tr. at 1533.)  These "bizarre delusions" include Mitchell's belief that he is "divinely ordained to fulfill a special role at the end of the world involving battling the Antichrist and putting himself on par with Jesus or God."  (Tr. at 1545.)

First, Dr. DeMier testified that he considered it "a bizarre belief that one has been divinely ordained and appointed by God to play a role in the end times, wherein he will battle the Antichrist and lead -- be the Davidic King or the Father of Zion, or he referenced it in different ways."  (Tr. at 1539.)  However, this claim about battling the antichrist appears nowhere in the BIDI.  Mitchell never made the claim to Dr. Whitehead (Tr. at 1485) or Dr. DeMier (Tr. at 1600). In fact, there is no evidence that Mitchell made this claim to anyone except Barzee and Elizabeth as part of Elizabeth's indoctrination and brainwashing.  (Tr. at 1207-09.)  Mitchell's claim that he, personally, would be the one to fight and kill the antichrist was a manipulation of Elizabeth's existing beliefs to create the illusion that he was all-powerful.[13]

---

[13]  Moreover, the idea that an antichrist will arise in the latter days and that the followers of God will battle the antichrist is a "recurring theme" in LDS scripture and belief as well as in other Christian religions.  (Tr. at 64.)  To the extent that Mitchell believed he would take part in a

In addition, Dr. DeMier does not account for the fact that several other leaders of fringe groups put themselves in a position of authority at the top of the group and claim special powers and abilities.  Mitchell was familiar with these types of groups and there is testimony that he patterned his beliefs after those groups.  He merely put himself in the same kind of role.

Second, Dr. DeMier relied on the fact that Mitchell put "himself on par with Jesus or God."  (Tr. at 1545.)  This conclusion is based on a misreading of the BIDI.  As Dr. Peterson explained, Mitchell never equated himself with God or Christ in the BIDI.  (Tr. at 79.)  The revelatory voice of the BIDI is represented as Jesus Christ, not Immanuel David Isaiah.  (Tr. at 30.)  Moreover, the referenced portion of the BIDI is an example of intertextuality.  As evidence that Mitchell believes "he has powers greater than God's or that he will control God," Dr. DeMier quotes the following passage from the BIDI:  "Behold, thou art Immanuel, and I am God. . . . And behold, if ye shall say that God shall smite this people, it shall come to pass."  (Def. Ex. BB at 31-32.)  As Dr. Peterson explained, that part of the BIDI is almost a direct quotation from Helaman, Chapter 10, of the Book of Mormon.  Further, in the context of LDS and other biblical scripture, this statement does not imply that Mitchell is claiming power greater than God.  (Tr. at 63-73.)

It is true that Mitchell claims that he has been given great authority from God, including the promise he will be a Davidic King, but that is true of many other schismatic groups as well. (Tr. at 31.)  Mitchell's claim to be the One Mighty and Strong places him squarely in the

---

battle with the antichrist, this was consistent with beliefs in his LDS culture and fundamentalist LDS subculture.  Themes involving a final battle with the antichrist are found "throughout New Testament apocalyptic literature.  It's repeated in Mormon literature and Mormon belief more widely.  And it's very common beyond Mormons, as well, the idea of Antichrist."  (Tr. at 64.)

mainstream of Mormon schismatics.  (Tr. at 39.)  This is not a delusion, but an oft-repeated claim to religious authority made by like-minded individuals seeking to establish new religious sects.

For these reasons, the court concludes that the diagnosis of paranoid schizophrenia is flawed because Mitchell's religious beliefs have a cultural explanation.  The diagnosis of delusional disorder is also flawed because there is a cultural explanation for Mitchell's beliefs, the beliefs are not fixed, the beliefs do not cause Mitchell distress, he is not preoccupied with the beliefs, they have caused no decline in functioning, and there is no evidence that they are encapsulated because there is no evidence that they are ever involuntarily triggered.

b.      Personality Disorders

Mitchell's behavior is best explained as a manifestation of one or more personality disorders, not of psychotic illness.  "A personality disorder is a collection of personality traits that are maladaptive, that don't serve the person well."  (Tr. 1556.)  These individuals "have a pattern of learned and relearned behavior, a pattern of responses to thinking and feeling about themselves and the others in their world that are maladaptive."  (Tr. at 630.)   In other words, these individuals "have the ability for a rational and factual understanding of the issues they face but may make very maladaptive choices, based on their interpretation of the world."  (Tr. at 630-31.)

(1)      Narcissistic Personality Disorder

Both Dr. Welner and Dr. Gardner diagnosed Mitchell with Narcissistic Personality Disorder.  (Gov't Ex. 5 at 42-44; Gov't Ex. 20 at 142-44.)  "The essential feature of Narcissistic Personality Disorder is a pervasive grandiosity, need for admiration, and lack of empathy."  (Gov't Ex. 20 at 142.)  As Dr. Gardner correctly observed, Mitchell's "involvement in, and use

123

of religion is best explained not by a psychotic mental illness, but by his authoritarian, narcissistic personality and drive to power." (Gov't Ex. 5 at 23.)

Mitchell has always used religion "as a vehicle for his own advancement, power, or another self-serving agenda." (Gov't Ex. 5 at 24.)  It is striking that, "even during his more conventional mainstream LDS period, religion was a vehicle for acquiring a position of privilege, power, or importance." (*Id.*)  Mitchell projected a false image that enabled him to obtain significant positions in the LDS Church, yet he constantly sought to exceed his authority.  By the late 1980s, Mitchell was angry with the church because he was not progressing quickly enough in obtaining the level of authority and power he wanted.

Mitchell married Barzee, an emotionally unstable and deeply religious woman, and preyed on her religious fervor, setting himself up in the household as a prophet in order to ensure that she would acquiesce to his will.  "Once Wanda fully accepted his religious authority, he had complete and absolute power over her." (Gov't Ex. 5 at 30.)  He used culturally accepted religious authority to control and dominate Barzee, and later Elizabeth.

Like many fundamentalist sect leaders before him, Mitchell was in the process of establishing a schismatic Mormon sect in which he would enjoy unquestioned power as the leader and prophet.  Mitchell was attracted to the fundamentalist idea of polygamy, especially as it is practiced in many modern communities "where older men, supported by claims of religious authority, exercise enormous power over their communities, especially over the women and young girls." (Gov't Ex. 5 at 31.)  "[R]eligion and religious authority became increasingly a convenient vehicle from which [he] could derive power and through which he could exercise power, power that could then be exercised in any way he chose." (*Id.* at 27.)  Mitchell set out to

124

kidnap ten- to fourteen-year old girls for the express reason that they were more malleable.  He targeted only LDS girls because he could exploit their faith in revelation and the authority of the priesthood.

During Elizabeth's captivity, Mitchell used religion to brainwash Elizabeth and press her into submission.  Mitchell's tales of his role in the last days, including his battle with the antichrist and his martyrdom, were designed to reinforce his all-powerful image in the camp.  He never told these stories outside of that setting – not in his post-arrest interviews, not in his competency evaluations, and not during his three years at the Utah State Hospital.  These "prophecies" were not the product of a delusion or of a sincere belief, but another means by which he controlled others.

Mitchell's use of religion for power was also evident in the way he received revelation whenever "he wanted something."  (10/01/09 Tr. at 64.)  He received revelation that he was permitted to smoke and drink and that he was to kidnap virgin brides.  He used religious authority to dominate Barzee through blessings, which were successful in overcoming Barzee's resistence to the kidnaping, to "demonstrating" in front of Elizabeth, and to Mitchell's pursuit of his insatiable sexual appetites.

In a controlled environment like the Utah State Hospital, he likely had no revelations because he could not gain anything from them and he knew he had no control.  While at the hospital, he never claimed to have a revelation that it was God's will that he should watch "Charmed" a certain number of hours a day.  He knew a "revelation" would have no effect on the staff and it would make no difference.  Instead, he managed to figure out viewing schedules and patient privilege levels to meet his needs.  With respect to competency, he asserted what little

power or control he had to negotiate fewer meetings with his treatment team, refusing to meet

with the doctor who evaluated competency, and to stop talking to staff when he discovered they

could have an impact on the competency evaluation.  He did not claim revelations to mundane

matters as he had with Barzee and Elizabeth.

The final element of a narcissistic personality disorder is met because, despite his

professed religious beliefs, Mitchell lacked empathy and a pattern of sadism.  (Tr. at 741.)

"[U]sually genuine religion will cause people to see the importance of other human beings, their

dignity and value, and would cause them to perform some sort of altruistic service as part of their

religious life."  (Tr. at 665.)  Yet, as Elizabeth explained, Mitchell never showed empathy for

others and never performed an act of charity or kindness toward another person.  (10/01/09 Tr. at

16-17.)  "He was not spiritual.  He was not religious.  He was a manipulator."  (Tr. at 741.)  As

discussed more fully below, there is significant evidence in the record that Mitchell not only

lacks empathy, he has a pattern of sadism.

### (2)   Malignant Narcissism

Malignant narcissism "is a much more severe form of narcissism than we see in DSM,

but it is widely used in the literature."  (Tr. at 679.)  As Dr. Gardner explained, Mitchell readily

meets the description of a malignant narcissist.  (*See* Gov't Ex. 5 at 43.)

First, the "'behavior of these narcissists is characterized by an arrogant sense of

self-worth and indifference to the welfare of others.'"  (Tr. at 681 (quoting Theodore Millon,

*Disorders of Personality: DSM IV and Beyond*).)  Mitchell fits this characteristic "based not only

on his grandiose claim to a prophetic identity and insistence on power and control, but also on his

shameless use of sacred religious practices to manipulate vulnerable others for his personal

power, sexual gratification, and avoidance of responsibility." (Gov't Ex. 5 at 44.) He described

his plans to kidnap young girls from their families as "rescuing them from Babel." (Tr. at 681.)

Yet he took them to "use them for his sexual purposes," which included being "initiated into this

religious cult by what sounds like group sex in which they observe each other having sex with

[Mitchell]." (Tr. at 681-82.) Mitchell expressed "no sense of how that impacts these young girls

between the ages of 10 and 14, how it impacts their families. No concern for that, these separate

individuals. It's all about what [Mitchell] wants and needs for himself." (Tr. at 682.)

      A malignant narcissist displays "'a fraudulent and intimidating social manner.'" (Tr. at

682 (quoting Millon).) As Elizabeth recalled, Mitchell can be forceful and determined in an

argument. (10/01/09 Tr. at 38.) At the hospital, Mitchell would "stare down" staff when he did

not like what they were saying. (Tr. at 301.) Mitchell similarly attempted to intimidate Dr.

Gardner "with the intensity of his stare directly into [Dr. Gardner's] eyes." (Tr. at 618.) He also

acted aggressively toward Dr. Welner by singing loudly and shouting "Repent!" (Tr. at 861.)

When dealing with investigators after his arrest, Mitchell was not intimidated by the officers, but

was verbally combative. (Tr. at 682.)

      Malignant narcissists also show "'a desire to exploit others, to expect special recognition

and considerations without assuming reciprocal responsibilities.'" (Tr. at 682 (quoting Millon).)

He exploited the kindness of family, friends, and strangers for years and appears to have never

given anything reciprocal in return. For years, he led a parasitic lifestyle "leeching onto" others

and providing nothing in return. And, while Mitchell was in the mainstream LDS church, he

wanted high-ranking positions and "authority, but didn't provide commensurate service to the

community." (Tr. at 682-83.)

Moreover, the more "severe forms of malignant narcissism have strong sadistic elements consistent with psychopathy." (Gov't Ex. 5 at 44.) Mitchell's sadism is evident in the pleasure he derives from "humiliating and debasing his victims (the pornography, use of intoxication to promote prohibited [activities], the use of dead mice to horrify his wife, and the feeding of a pet rabbit to his step-daughter in the guise of a chicken dish) as well as the pleasure he derives in deceiving his victims (including the court and law enforcement - bragging to other inmates of the Utah State Hospital, overhead by staff, that he will never be found competent.)" (Gov't Ex. 5 at 44.)

Finally, in malignant narcissists, a "'deficient social conscience is evident in the tendency to flout conventions, to engage in actions that raise questions of personal integrity, and to disregard the right of others. Achievement deficits and social irresponsibilities are justified by expansive fantasies and frank prevarications.'" (Tr. at 683 (quoting Millon).) Mitchell's professed religious beliefs are precisely that – "expansive fantasies that justify his social deviance." (Tr. at 683.)

Mitchell used religious explanations to justify his carnal desires. He received "revelation" that God had commanded him to kidnap virgin wives and that the wives were required to "demonstrate" sexual acts in each other's presence. (Gov't Ex. 10 at 3-5 & 46.) He explained his sexual appetite and treatment of Barzee and Elizabeth as a necessary process of bringing them low to the dust so that they could be exalted.

After he was in state custody, Mitchell wrote an Addition to the BIDI providing religious justifications for his actions relating to Elizabeth's kidnaping. In the Addition to the BIDI, Mitchell claimed that the Smarts had heard the voice of the holy spirit and had left their doors

unlocked and turned off the security alarm.  (Gov't Ex. 1 at 26-27.)  He claimed that Elizabeth had heard and followed the Lord's command and left with Mitchell willingly and met her "wedding day" with "great joy and peace and exultation."  (*Id.*)   He further claimed that Elizabeth was free to return to her family at any time and that the only thing that bound her was "the power of the Holy Spirit, confirming the truth of the words of God in her heart."  (*Id.*)   The fact that he never told this story to Elizabeth and did not provide these explanations to investigators demonstrates that they are not delusions or sincere beliefs but merely the type of cognitive distortions most sex offenders use to justify their behavior.

Cognitive distortions are an "established, well understood phenomenon among sex offenders."  (Tr. at 943.)  They are "ways in which sex offenders explain their actions in a way to manage the impressions of others and in a way to make themselves more socially palatable." (*Id.*)  Cognitive distortions are not considered psychotic because they are "not a reflection of the inner state.  It's not a reflection of inner mind.  It is what a person does in order to take on the beliefs that they need to do in order to deny, justify, minimize and rationalize."  (Tr. at 945.)

Cognitive distortions of a religious nature have been documented in studies focusing on Catholic priests who have molested children.  The studies have found that molesting priests "routinely and dramatically distort their relationship with God and exploit how they represent their relationship with God to the child in their custody in order to facilitate sex offending and sometimes grooming and otherwise molesting and other pedophilic behavior."  (Tr. at 959.)

Both these priests and Mitchell hold themselves out as men of faith and "exaggerate their closeness to God and the special relationship they have with God."  (Tr. at 961.)  In order to convince the child that the behavior is acceptable, the offender "has to represent to the child that

129

his relationship to God is special and this facilitates this exploitative behavior." (Tr. at 961.) Mitchell's claim of religious authority is not reflective of genuine belief or of a psychotic delusion, but instead serves as a tool that enables him to both satisfy and justify his base, antisocial desires.

(3)     Antisocial Personality Disorder

Both Dr. Welner and Dr. Gardner also agree that Mitchell meets the criteria for Antisocial Personality Disorder. (Gov't Ex. 5 at 42 & Gov't Ex. 20 at 120.) Mitchell demonstrates: (1) failure to conform to social norms of lawful behaviors; (2) deceitfulness; (3) reckless disregard for the safety of others; (4) consistent irresponsibility; and (5) lack of remorse. (Gov't Ex. 20 at 120.) Each of these elements are well established in the evidence cited above.

Psychopathy is a construct within Antisocial Personality Disorder that is noted in the DSM-IV, but is developed much more extensively in the scientific literature. (Tr. at 1075.) Psychopathy captures "a much more selfish and grandiose and parasitic personality." (*Id.*) It is similar to narcissistic personality disorder in the qualities of "grandiosity, lack of empathy, and exploitiveness." (Gov't Ex. 20 at 120.)

As explained in Dr. Welner's report, Mitchell displays all the symptoms of psychopathy contained in the PCL-R, a "twenty item inventory for the assessment of psychopathy in clinical and forensic settings." (Gov't Ex. 20 at 122-42.) Several of those symptoms are of particular note. One of the qualities of psychopathy is glibness. Mitchell is known to be verbally skilled, articulate and convincing. Elizabeth noted his ability to adapt to his surroundings and talk his way out of any situation. (10/01/09 Tr. at 37-38.) He took pleasure in "getting away with things." Indeed, he was able to talk his way out of trouble on numerous occasions, including his

arrest in San Diego, his encounter with the officer in the Salt Lake City library, and his run-in

with police in Las Vegas.  As his initial interview with investigators shows, Mitchell is quick on

his feet and can skillfully parry questions.  Mitchell also demonstrates his glibness in "how

effectively he can communicate yet say as little about himself as possible."  (Gov't Ex. 20 at

123.)

A second prominent feature of Mitchell's psychopathy is grandiosity, which is evident in

his portrayal of himself as a prophet and the One Mighty and Strong as already discussed.

Throughout his life, Mitchell has always sought power and importance.  Even as an adolescent,

he related to others "with an air of intellectual superiority."  (Gov't Ex. 20 at 124.)  Elizabeth

noted that Mitchell thought highly of himself, held himself out as an authority on every topic, and

always had to be right.  (10/01/09 Tr. at 17 & 32-33.)

Mitchell exhibits pathological lying, another feature of psychopathy.  He presents a

variety of facades to serve his purposes, including a repentant preacher in San Diego, an LDS

church investigator in the Kemp home, a religious minority who could not permit Elizabeth to

remove her veil in the Salt Lake City library, a couple traveling with their daughter from back

east in Las Vegas, and a "naive and inept" patient when speaking to Dr. Whitehead.  He used a

series of aliases and instructed Elizabeth on exactly what to say if approached.  Elizabeth

observed that Mitchell was a convincing liar and enjoyed fooling others.  (10/01/09 Tr. at 32-34.)

The evidence also demonstrates that Mitchell is highly manipulative.  As Dr. Welner

observed, "it takes an unusual individual to single handedly brainwash two people."  (Tr. at

1077.)  Not only did Mitchell "significantly brainwash Wanda Barzee over the course of their

relationship," he was successful, "to a degree, [in] brainwash[ing] Elizabeth Smart, while she

was in their custody." (Tr. at 1078.)  Mitchell used threats he knew would strike at Elizabeth's vulnerabilities, such as threatening to kill her family.  When Elizabeth was questioned by the officer in Sandy she was afraid to identify herself.  "The whole who, what, when and where of Elizabeth Smart's life was reconfigured singlehandedly by Brian David Mitchell." (Tr. at 1078.) Mitchell purposefully targeted Elizabeth because her young age would make her more malleable and her Mormon upbringing would make her more susceptible to his brand of religious manipulation.  (Tr. at 1078; Gov't Ex. 20 at 129-31.)   Moreover, the court has discussed above how Mitchell targets people's vulnerabilities to manipulate a situation.

In addition, Mitchell has clearly lived a parasitic lifestyle, taking advantage of the generosity of others.  Mitchell is a man who preferred panhandling to working.  He "took advantage of other people's generosity" and "leached (sic) onto" people.  (10/01/09 Tr. at 62.) He told Elizabeth that he had taken advantage of the West family policy of not turning away anyone in need.  (10/01/09 Tr. at 69.)  He stole what he needed and referred to it as "plundering." (Gov't Ex. 20 at 140.)

Finally, Mitchell has demonstrated not only callousness and a profound lack of empathy, but also sadistic behaviors.  "Sadism manifested in Brian Mitchell from early in life." (Tr. at 1080.)  Remarkably, Dr. Thomas actually characterized Mitchell as "sadistic" when he was seventeen based on the way he used his intellect to frighten people and exploit their weaknesses. (Tr. at 1080-81.)  The evidence demonstrates a pattern of sadism continued across his life.  "He kidnaped the children of his first marriage and cut off all contact from their mother." (Tr. at 1081.)  "And then, when he put his children up for adoption, the same children he kidnaped, he sought to prohibit any contact that they would have with their grandmother, his own mother, so

132

again inflicting this emotional consequence and pain on her by preventing her from having access to her children," not to mention the emotional damage these acts inflicted on the children themselves.  (Tr. at 1081.)

Because Mitchell knew that his second wife was terrified of mice "he filled up an entire cookie sheet in the oven with mice laid neatly in rows, just so she could open up the oven door and have, you know, a panic-stricken reaction and did the same not only with mice but with roaches during the course of their marriage."  (Tr. at 1081-82.)  He served his step-daughter her pet rabbit for dinner and later gloated over having tricked her into thinking it was chicken.  (Tr. at 1082; Gov't Ex. 17f.)

Mitchell's sadism was also evident in his dehumanizing treatment of Elizabeth.  First, he "took her name, then her virginity, then her identity, then her red pajamas, then her ties to her parents, then her dignity . . . as she was being made 'humble.'"  (Gov't Ex. 20 at 138.)   All of these qualities, along with others detailed in Dr. Welner's report, support the conclusion that Mitchell is not psychotic, but a psychopath.

The defense attacks Dr. Welner's scoring under the Psychopathy Checklist-Revised (PCL-R).  Despite two opportunities to cross-examine Dr. Welner during the evidentiary hearing, the defense raised none of these issues at the hearing.  Moreover, although Dr. Skeem suggested that one "could critique the way that the measure was used," she declined to do so.  (Tr. at 1765-66.)  As a result, there is absolutely no evidence in the record that contradicts Dr. Welner's professional opinion that Mitchell meets the criteria for psychopathy set out in the PCL-R.

Dr. Skeem did, however, testify that the PCL-R can be unreliable in adversarial settings because different examiners can reach differing results.  (Tr. at 1765-67.)  But, since none of the

defense experts applied the PCL-R, it is mere speculation that another examiner would arrive at a different result in this case.  Indeed, Dr. DeMier conceded the possibility that Mitchell is a psychopath and agreed that he displays many of the traits typical of psychopathy, including grandiosity, lying, sadistic behavior,[14] parasitic lifestyle, lack of remorse and lack of responsibility.  (Tr. at 1624-27.)  While disagreeing with the ultimate conclusion, Dr. DeMier candidly acknowledged, "You can construct an explanation by which many of his behaviors are explained by psychopathy."  (Tr. at 1628.)

        The outcome of this proceedings does not turn on whether Mitchell's personality disorder is best classified as psychopathy or some other variation of Antisocial or Narcissistic Personality Disorder.  Both Dr. Welner and Dr. Gardner agree that Mitchell meets the diagnostic criteria for both Antisocial Personality Disorder and Narcissistic Personality Disorder.  (Gov't Ex. 5 at 42-44; Gov't Ex. 20 at 120 & 142-44.)   The evidence shows that Mitchell's behaviors do not fit a diagnosis of delusional disorder or schizophrenia, but are entirely consistent with a personality disorder.  Mitchell's extreme beliefs, painting himself in a prominent religious role is an attempt to gain power and authority.  They are not delusional because he has voluntarily employed those beliefs for his own self-interested purposes.  After weighing the evidence presented, the court agrees with the psychiatric expert opinion that Mitchell does not suffer from a psychotic mental illness but rather one or more personality disorders.

_____

        [14]  Dr. DeMier testified that the evidence regarding Mitchell's behavior makes a compelling case for sadism, that sadism is a quality of psychopathy, and that no other diagnosis "captures it the same way like the construct of psychopathy."  (Tr. at 1624.)

**B.  Do Mitchell's Personality Disorders Impact His Competency to Stand Trial?**

Expert testimony at the competency hearing established that, unlike psychoses, personality disorders do not impair a person's ability to accurately interpret reality.  (Tr. 629-630.)  Individuals with personality disorders "have the ability for a rational and factual understanding of the issues they face but may make very maladaptive choices, based on their interpretation of the world."  (Tr. 630-31.).  In this case, the experts agree that Mitchell's personality disorders would not be a basis for a finding of incompetency.  (Tr. 632, 816 & 1879.)  Mitchell's personality disorders do not detach him from reality or affect his rational ability to understand the world around him. They are merely maladaptive personality traits that lead to poor decisions.  These are not competency limiting because they are voluntary decisions.

Mitchell's condition has not dramatically changed over time.  Unlike someone suffering from actual delusions, who cannot control his actions, Mitchell selectively uses his belief system to achieve his own self-interested purposes.  After his plea negotiations with the State broke down, Mitchell's decision not to participate in "a corrupt system" and not to be "judged of man" appears to be consistent with his personality disorders.  His refusal to participate is a reaction to his loss of power over the situation and it is the only way he knows to exert power over the process.  In addition, there is nothing particularly irrational about a criminal defendant not wanting to participate in a corrupt system or be judged of man.  It is also consistent with the rejectionist philosophy of his fundamentalist and constitutionalist culture.  His statements regarding his trial being a martyrdom and his miraculous release from prison are contradicted by statements that he knows he will spend all of his days in custody.  The "martyrdom/miraculous release" statements appear to be an attempt to make himself more acceptable to society.  His

135

conversation with Dr. Skeem demonstrated that he was concerned about how he would be viewed if he had a sexual assault conviction.  Mitchell shows a rational appreciation for the consequences of going to trial.  The court finds that his statements and conduct are voluntary and not the manifestations of a psychotic mental disease or defect.

Furthermore, Mitchell's involvement with his lawyers has been similarly selective based on his own self interests.  He stated to Dr. DeMier that he wanted a like-minded constitutionalist to represent him.  Mitchell, however, does not get to select the type of court-appointed attorney he wants.  The evidence shows that he has the ability to participate when it is in his interest to do so.  Mitchell's decision not to participate in the process does not render him incompetent.

Accordingly, the court finds that Mitchell's personality disorders do not affect his ability to rationally understand the proceedings against him or his ability to consult with his lawyers with a reasonable degree of rational understanding.

## C.  Even if Mitchell has Mental Disease or Defect, Does He Have the Requisite Competency Abilities?

Even if the Court were to accept the defense experts' opinion that Mitchell suffers from a psychotic mental illness, the evidence demonstrates that Mitchell nonetheless possesses the requisite competency abilities.  As both Dr. Skeem and Dr. DeMier readily acknowledged, a person suffering from delusional disorder or schizophrenia may still be competent to stand trial. (Tr. at 1601 & 1812.)  "That a defendant suffers from some degree of mental illness or disorder does not necessarily mean that he is incompetent to assist in his own defense."  *United States v. DeShazer*,  554 F.3d 1281, 1286 (10th Cir. 2009); *see also United States v. Vamos*, 797 F.2d

136

1146, 1150 (2d Cir. 1986) ("It is well-established that some degree of mental illness cannot be equated with incompetence to stand trial.").

1.   Rational and Factual Understanding of the Proceedings

The record is replete with evidence that Mitchell has such a rational and factual understanding of the proceedings against him." *Dusky*, 362 U.S. at 402.  Mitchell's intellectual capacity to understand these proceedings is not disputed.  He is a well-read, largely self-educated man who has consistently been described as highly intelligent by the people who have known him outside a forensic setting.  He has the ability to understand, process and interpret complex information, as demonstrated by the construction of the BIDI.  This is also reflected in his ability to "read books of  great length and depth and substance and then to have extensive conversations with [clinical staff] which they found to be full of insight, very thoughtful, and in certain instances very compelling."  (Tr. at 902.)  Mitchell has more than sufficient cognitive capacity to understand these legal proceedings.

Mitchell has also demonstrated that he fully understands the proceedings in which he is engaged.  While at the Utah State Hospital, Mitchell advised other patients about competency hearings (Gov't Ex. 20 at 36), and explained the role of the hospital, the courts, and the attorneys in the legal system (Tr. at 171-73).  During his interview with Dr. DeMier, Mitchell described the evaluation process.  He accurately explained that there is an initial one month evaluation, that the court rules as to competency, that a finding of competence would lead to trial and that a finding of incompetence would lead the court to consider whether to order involuntary medication.  (Gov't Ex. 33c; *see also* Tr. at 909.)  As Dr. DeMier testified, this exchange showed that Mitchell has an "accurate factual understanding of the proceedings."  (Tr. at 1579.)

137

During the state proceedings, Mitchell expressed an understanding of and particular interest in the involuntary medication hearing.  Mitchell's social worker noted that Mitchell "'asked pertinent questions about medication hearings without religious overtones.'"  (Govt' Ex. 20 at 47.)  Mitchell and his father discussed the application of new involuntary medication legislation.  (*Id.*)  Mitchell also asked another patient how his medications made him feel because it was likely that he would be forced to take medications.  (Tr. at 141-42.)  Mitchell even had the foresight to ask his treatment team whether his singing in court would cause the judge to order him involuntarily medicated.  Mitchell showed "an awareness of the consequence of his singing in a court proceeding and how it could have broader legal ramifications."  (Tr. at 910.)

The Addition to the BIDI also shows that Mitchell has a keen awareness and understanding of the charges.  The Addition, which was written after Mitchell was arrested, interrogated, and advised by counsel, "eloquently addresses every one of his charges with a defense."  (Tr. at 903.)  "He accounts for burglary.  He accounts for sexual assault.  He accounts for kidnaping."  (Tr. at 903.)  "He's not writing randomly.  He's writing about his charges.  And so intellectually he's reflecting an understanding of his charges because he's writing a defense to them."  (Tr. at 904.)  In fact, Mitchell displayed an understanding of the potential charges even in his very first law enforcement interview in which he skillfully avoided answering incriminating questions about Elizabeth's age, his entry into the Smart home, the manner in which Elizabeth was restrained, and the sexual assaults.

Mitchell has a rational appreciation for the strength of the evidence against him.  He told both Dr. Skeem and Dr. DeMier that he knew he would be convicted if he went to trial.  (Tr. at 1593 & 1696.)  As Dr. DeMier recognized, Mitchell's statement "reflects the factual assessment,

and I think a rational assessment, he understands the evidence against him is extremely strong." (Tr. at 1594.)  Mitchell even displays an accurate understanding of the type of evidence admissible at trial and told Dr. DeMier that the prosecutors would likely object to his testimony as immaterial.  (Tr. at 1599.)

Finally, Mitchell also displays a rational understanding of the seriousness of the charges and the potential sentence.  Mitchell recognizes the high-profile nature of his case (Gov't Ex. 33b), and that the world is likely to view him as "a child predator, sexual deviant and a monster" (Tr. at 422).  During the plea negotiations, he had clear knowledge of the potential sentence and explained to Dr. Skeem that the state was seeking at least 30 years.  (Tr. at 1695 & 1838.)  Even though he has stated to some evaluators that he will be miraculously released, he told his social worker that he expected to be locked up for the rest of his days.  (Gov't Ex. 20 at 35.)

While the defense concedes that Mitchell appears to have "a clear, factual understanding of the charges," they maintain that his "rational appreciation is limited . . . by the belief that he is only being held according to God's will and that he may be miraculously released."  (Tr. at 1904.)  But he has also stated that he expects to spend the rest of his days in custody.  (Gov't Ex. 20 at 35.)  His reaction to the state prosecutor's letter stating that the federal government would prosecute if he was sentenced to less than 30 years expressed a rational understanding of and concern with the sentence he faced.  His engagement in plea negotiations itself shows that he was interested in seeking a lower sentence.  Mitchell has also expressed a keen interest in his housing arrangements and concern for his safety if placed in the general prison population.  If Mitchell was compelled to passively submit to God's will, there would be no reason for him to engage in plea negotiations for a lower sentence or to raise the issue of protective custody.

139

There is no evidence that the failure of the state plea negotiations led to some psychotic break or that it caused him to have an irrational understanding of the proceedings.  The fact that he was attempting to get spiritual guidance at such a stressful time would be entirely consistent with his cultural background.  Religious references to seeking "God's will" about what he should do at such a time, do not indicate irrational behavior.  It is consistent with a finding that he realized the importance of the situation and realized that a breakdown in plea negotiations would lead to serious consequences.

Moreover, the defense claim that Mitchell cannot rationally understand the proceedings because he is passively awaiting to be "symbolically martyred" at trial is not supported by the evidence.  Standing trial for one's accused crimes is not martyrdom, symbolic or otherwise. The evidence demonstrates a pattern of activity suggesting that Mitchell has done everything possible to delay and avoid trial.  There is no evidence in the record suggesting that Mitchell has ever "tried" to be determined competent so that he can stand trial and be "martyred."  In the state court proceedings, Mitchell refused to speak to either Dr. Gardner or Dr. Golding for purposes of determining his competency to stand trial.  In contrast, he opened up to Dr. Skeem in order obtain an opinion that he was competent to enter a plea deal.  Once his desired plea fell through, he spoke with Dr. Skeem again. And, as soon as Dr. Skeem told Mitchell that she believed he was incompetent, he did not attempt to dissuade her.  Instead, he refused to speak with her again. While the defense speculates that his refusal to meet with Skeem after she stated he was incompetent was because he was offended or desired to be found competent, it is just as, or more, likely that he refused to continue meeting with her because he had nothing else to gain.

After he was adjudged incompetent in the state court proceedings, he refused to speak with Dr. Berge, who could have reassessed the finding of incompetence. (Tr. at 1002.) He also consistently refused to attend any competency classes at the Utah State Hospital that could have led to a finding that his competency had been restored. (Tr. at 1876.) Mitchell specifically avoided contact with people who would be in a position to evaluate his competency. Not only did he refuse to meet with Dr. Berge, he also negotiated with his treatment team to meet with them less frequently. (Tr. at 972.)

During the federal proceedings, Mitchell never told Dr. DeMier that he wanted to be found competent or that he wanted to be martyred. (Tr. at 1600.) After he discovered that Dr. DeMier considered him incompetent, Mitchell had two more opportunities to disabuse evaluators of this notion. Nonetheless, he refused to speak with Dr. Welner in April 2009 and refused to speak with Dr. Gardner in November 2009. (Tr. at 1876.)

Mitchell has also refused to undergo psychological testing that might yield valuable information about his competency to stand trial. Significantly, Mitchell has been psychologically tested twice before – once as an adolescent and once in the 1980s – and that testing did not reveal any psychological illness. In Dr. Welner's professional opinion, Mitchell has made "conscious efforts to avoid detection by people who are in a position to assess competency in the case of no other evidence of paranoia, no other evidence of psychotic disorganization, no other evidence of religious hyper absorption." (Tr. at 1007.) Mitchell's selective engagement when he stands to benefit demonstrates that his rational appreciation of the proceedings is not impaired.

      2.      Ability to Consult with Counsel With Reasonable Degree of Rational Understanding.

The court also finds that Mitchell has a sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding.  Mitchell has a demonstrated ability to cooperate with counsel when it serves his purposes.  In San Diego, for example, Mitchell discussed his case with his lawyer and the best way to proceed.  (Gov't Ex. 19 at ¶ 2.)  In his dealings with his lawyer, Mitchell was "a pleasant, pathetic person" who "seemed very peaceful, friendly and remorseful." (Gov't Ex. 19 at ¶ 1.)  His lawyer advised Mitchell to plead guilty and Mitchell followed that advice and was successful in securing his release.  (10/01/09 Tr. at 29.)  During the hearing itself, when his lawyer interrupted and directed him to answer the court's question, Mitchell responded to his lawyer and followed his direction.  (Tr. at 656; Gov't Ex. 18.)  Mitchell showed the capacity to cooperate with counsel when it was in his best interests to do so.

Mitchell has also demonstrated a capacity to have relevant legal discussions without resorting to religious rhetoric or breaking into song.  For example, during his third interview with Agent Dougherty, Mitchell engaged in an open dialogue about the legal process.  He asked relevant questions, was especially attentive and inquisitive, and appeared to fully understand.  (Tr. at 415-18.)  During this conversation, Mitchell did not speak at all about religion.  (Tr. at 419.)  Mitchell also discussed the involuntary medication proceedings with his treatment team "'without religious overtones.'"  (Govt' Ex. 20 at 47.)  Similarly, when Mitchell was describing the competency proceedings to Dr. DeMier he was "articulate and coherent."  (Tr. at 1579.)  These examples show that Mitchell has the ability to engage in legal discussions without singing or speaking religiously.

142

In addition, Mitchell has the ability to disclose pertinent facts about his case to counsel. Mitchell knows what facts are pertinent to his case as illustrated by his response to the charges in the Addition to the BIDI. (Tr. at 1012.) This knowledge was also demonstrated in his initial law enforcement interview through his skillful avoidance of key facts while responding to more innocuous questions. (Tr. at 1012-13.) Finally, Mitchell has no history of brain damage or memory loss that would impede his ability to recall and communicate pertinent facts. (Tr. at 1013.) Therefore, the "available evidence reflects that Brian Mitchell has the organic brain capacity as well as the demonstrated competence in disclosing pertinent, very specific details as they relate to his case." (Tr. at 1013.)

Mitchell has also demonstrated the ability to work with and take advice from others. His relationship with patient John is significant because it shows that if Mitchell is "working with someone who he respects, that he changes, that he evolves." (Tr. at 1018.) Mitchell and John spoke not only of religion, but also of legal matters. Mitchell would listen and take notes when John explained how things worked in the legal system. (Tr. at 168.) Mitchell would ask questions and John would respond by taking out his legal papers and explaining them to Mitchell. (Tr. at 169.) Mitchell and John did not discuss legal matters merely in general, but specifically collaborated on this case, as evidenced by the thirteen-page document John generated containing references to both Mitchell and Elizabeth. (Tr. at 345-46.) Mitchell later told Dr. DeMeir that he would like to be represented by an inmate who was a prophet and expert in constitutional law, a clear reference to John. (Tr. at 1598.) Mitchell's desire to be represented by someone who not only shares similar religious beliefs, but also has expertise in constitutional law, shows his capacity to work within the legal system. (Tr. at 1021.)

Furthermore, the evidence shows that Mitchell has demonstrated the ability to work with his attorneys on the present charges when he chooses to do so.  The most significant example is Mitchell's collaboration with his attorneys during the state plea negotiations.  "Because the decision whether or not to plead guilty is of paramount importance, and tests the defendant's ability to communicate with counsel and assist in his own defense, evidence surrounding a defendant's decision not to accept a plea bargain is relevant to the competency determination." *United States v. Montoya*, 1996 WL 229188, *2 (10th Cir. 1996) (internal citation omitted).

During plea negotiations, the evidence demonstrates that Mitchell was actively engaged. (Tr. at 1688.)  Mitchell was amenable to pleading guilty, but not to the sexual assault count. (Gov't Ex. 11 at 1; Tr. at 923-24.)  After the state rejected this proposal, Mitchell told Dr. Skeem that he was disappointed that the Smart family had apparently had a change of heart and that the state was no longer willing accept a plea that did not include the sexual assault charge.  (Tr. at 1695, 1823-25 & 1834.)  Mitchell was involved enough in discussions with his attorneys that he explained to Dr. Skeem that the federal government would prosecute if he was not sentenced to at least 30 years on the state charges.  (Tr. at 1695 & 1838.)

In correspondence with the State, Mitchell's attorneys stated, "After fully advising Mr. Mitchell about your offer, he has authorized us to inform you that he will not accept your offer." (Gov't Ex. 11 at 4; Tr. at 924.)  In a separate letter, defense counsel represented that they had kept their client "fully informed of any plea offers" and that "the acceptance or rejection of any plea offer and when it occurs is in the sole discretion of our client."  (Gov't Ex. 11 at 8; Tr. at 925.)  While defense counsel questions whether these statement accurately portray Mitchell's

144

involvement in the process, his discussions with Dr. Skeem would indicate that they do in fact represent his involvement and interaction in the process.

The evidence demonstrates that Mitchell was actively engaged in plea negotiations, communicating with counsel and controlling the terms on which he would plead guilty.  There is nothing irrational about a defendant finding a plea to sexual assault unpalatable.  Likewise, there is nothing irrational about a 50-year-old defendant choosing to take his chances at trial when the only plea offer on the table comes with a sexual assault conviction and a 30-year sentence. Mitchell has demonstrated an ability to work with counsel when he perceives it to be in his best interests and to shut down when that is no longer the case.

More recently, Mitchell has spoken with his federal defense team even though he told Dr. DeMier that he had never spoken to counsel and was unlikely to do so.  Mitchell has been observed talking with his defense team for long stretches of time and outwardly behaving normally.  (Tr. at 479 & 497.)  In addition, defense counsel informed Dr. Welner that Mitchell had been speaking to them.  (Tr. at 834.)   At the competency hearing, the defense presented no specific evidence regarding the defense team's interaction with Mitchell despite the fact that this evidence is uniquely in their possession.  This is unusual in the court's experience with competency proceedings.

The only representation made by the defense occurred during closing argument when Mr. Steele stated that his "interaction with Mr. Mitchell has reflected an indifference to the task faced by the defense team and to the outcome here, and evidenced nonparticipation" similar to that displayed in the courtroom.  (Tr. at 1904.)  In light of the evidence showing Mitchell's capacity to work with an attorney, this representation simply reinforces the court's conclusion that

145

Mitchell makes a volitional decision whether to participate based on whether he perceives it to be in his best interests to do so.

Mitchell's actions demonstrate that he is "a very effective advocate" for himself and is actively engaged in promoting his best interests. (Tr. at 936.)  Mitchell "has advocated for himself even in the legal sense." (*Id.*)  He has been "very effective in thwarting questioning, and that has assisted his defense.  And Mr. Mitchell has been very effective in thwarting any scrutiny that might be cast upon him that would reflect upon his capacity to go to trial." (*Id.*)  Mitchell has controlled his message by referring people to the BIDI "the way a corporation would a press release." (Tr. at 903.)  He has chosen not to talk to the media for fear it would hurt his case, even though it would provide a platform for his religious ideas. (Gov't Ex. 20 at 36.)  Mitchell's professed religious mission "has taken a back seat to his priority and his mission to advance his defense to his best self-interest." (Tr. at 956.)

To the extent that his presence in the courtroom is necessary to aid in his own defense, which this court recognizes is not necessarily the case, Mitchell has the capacity to behave appropriately and be present in court.  The court agrees with Dr. Welner that Mitchell's singing in court is a contrivance to derail the proceedings and create the false impression that he is unable to control his behavior. (Tr. at 934.)  Although the defense has suggested that Mitchell's singing is a psychotic response to stress, Mitchell has repeatedly demonstrated that he has the capacity to be composed and in control, even in stressful situations.  Mitchell never broke into song when he was confronted by police. (10/01/09 Tr. at 32.)  During his court appearance in San Diego, he did not sing or cry repentance and he maintained his composure even in the face of a prolonged and stressful silence. (Tr. at 654.)  Mitchell was also remarkably calm, collected, and confident

146

in his initial interrogation by officers.  (Tr. at 976-78.)  In Dr. Welner's professional opinion, there is nothing in the courtroom that would approximate the stress that Mitchell was under in that interrogation, and yet in the video "he is not singing, he is maintaining his composure."  (Tr. at 991.)  Mitchell's lack of distress in the interrogation speaks to "what a cool and composed character he is under stress."  (Tr. at 984.)  His ability to maintain an unflappable demeanor during such intense questioning shows that his ultimate resort to singing was not an uncontrolled response to stress, but rather a conscious decision to reassert control of the interrogation and shut down further questioning.

Mitchell remained composed and quiet during the video of Elizabeth's interview in Dr. Welner's evaluation.  Watching the video of Elizabeth describing his alleged crimes approximated the experience of confronting one's accuser in court.  (Tr. at 846-47.)  Mitchell was attentive and pressed close to the screen, but was "quiet, composed, appropriate, not disruptive, [and] did not sing."  (Tr. at 855.)  In addition, while Mitchell had sung loudly and cried repentance during the most non-threatening part of the interview, he sat calmly and quietly while Dr. Welner asked questions about pedophilia.  (Tr. at 856.)  Mitchell's composure in such a variety of highly stressful situations shows that "he's perfectly capable of sitting in court quietly if he wishes to."  (Tr. at 855.)

Indeed, Mitchell demonstrated his capacity to behave appropriately in court during his early state court appearances.  For example, after both sides had stipulated to Mitchell's competency in order to pursue plea negotiations, Mitchell was arraigned and entered pleas of not guilty without singing or otherwise disrupting the proceeding.  (Gov't Ex. 42; Tr. at 923.)  The

abrupt change in Mitchell's courtroom behavior after plea negotiations broke down shows that the behavior is "contrived" and "theatrical."  (Tr. at 864-65.)

As Mitchell has admitted, he purposefully sings in court to disrupt the process.  (Tr. at 175-76.)  Dr. Welner correctly concluded that "Mitchell made the decision that he needed to derail the process because the plea option was unacceptable to him."  (Tr. 934.)  He has stated that he will be found guilty if he goes to trial.  (Tr. 934-35.)  He understood that "he was approaching trial with evidence very much stacked against him with a sentence that he was facing to be quite significant so there would be no incentive for him to go to trial and every incentive to derail the process."  (Tr. at 935.)  "Brian Mitchell stopped this train in 2004 because he was confronting a situation that was very much not in his interest and there was no incentive for him to continue with the trial process, and this is what he figured out to do."   (Tr. at 935-36.)

Mitchell has stated that he will "never be out of the hospital as I will never acknowledge guilt and they will never parole me nor find me competent as I will not participate in a corrupt system."  (Gov't Ex. 20 at 35 & 83.)  Ultimately, however, the extent to which Mitchell cooperates with counsel is irrelevant.  The question is whether he has a sufficient present *ability* to consult with his lawyer with a reasonable degree of rational understanding.  The evidence proves that Mitchell has the capacity to assist his counsel in his defense and the ability to behave appropriately in the courtroom.  A defendant cannot voluntarily stop the process.  Regardless of whether he chooses to participate in the process, this court finds that Mitchell is competent to proceed and will stand trial for his alleged crimes.

**CONCLUSION**

Based on the evidence presented at the competency hearing, the analyses of Drs. Welner and Gardner, and the court's analysis as set forth above, the court finds that Mitchell does not presently suffer from a mental disease or defect that impedes his rational and factual understanding of the nature and consequences of the proceedings against him or his ability to consult with his lawyer with a reasonable degree of rational understanding. And, even if Mitchell suffers from a mental illness, he nonetheless possesses both a rational and factual understanding of the nature and consequences of the proceedings against him and a sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding. The court, therefore, finds Defendant Brian David Mitchell competent to stand trial.

A scheduling conference to set the trial date and pre-trial deadlines is set for March 26, 2010, at 11:00 a.m.

DATED this 1st day of March, 2010.

BY THE COURT:

DALE A. KIMBALL,
UNITED STATES DISTRICT JUDGE

149