**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH**

**CENTRAL DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| Plaintiff, | |
| | **ORDER** |
| v. | |
| | **Case No. 2:08CR125DAK** |
| **BRIAN DAVID MITCHELL, et al.,** | |
| Defendants. | |

On February 5, 2010, the Salt Lake Tribune sent a letter to this court's Clerk of Court requesting copies of video clips played during the recent competency hearing for Defendant Brian David Mitchell. On February 23, 2010, ABC News sent a letter to the court by electronic mail requesting copies of all the videotapes shown at the competency hearing and several documentary exhibits. The court forwarded these requests to the parties and requested an informal response regarding media access. When the parties' informal responses appeared to conflict and counsel for the Salt Lake Tribune requested an opportunity to file a memorandum on the issue, the court requested that the parties and media outlets to file more formal briefing on the issue by March 5, 2010. Both the government and Defendant filed responses.[1] Counsel for

---

[1] Counsel for Defendant stated that the court requested them to respond to "purported press inquiries and requests for materials and exhibits." The court forwarded the media's written requests for copies of exhibits to defense counsel. Thus it is unclear to the court why defense counsel would refer to the written media requests as "purported." The fact that the requests were not entered into the court's docket does not make them "purported." The court must still address the issues raised by the requests and determine the proper response.

the Salt Lake Tribune, however, notified the court that although his client believes it is entitled to copies of the court's exhibits, it decided not to file a brief on the issue because it concluded that it would not impact its coverage of the story. ABC News also notified the court that while it is interested in the court's decision on the subject, it intended to merely monitor what others filed. Despite the media outlets' decisions not to brief the issue regarding their right to access, the court believes that the parties to the case have thoroughly addressed the issue presented by the media outlets' requests.

The court has already declined to allow access to mental health reports until such time as those materials were relied on by the court and are redacted by counsel. The court's decision on Defendant's competency relied on those reports, and the court has been informed by counsel that they are in the process of redacting the materials. The crux of the media requests for exhibits, therefore, is whether they are entitled to physical copies of the videos shown at the public competency hearing. The videotapes at issue are: (1) Government Exhibit 16, Mitchell's initial interview with law enforcement after his capture on March 12, 2003; (2) Government Exhibit 17 and Defense Exhibit A, Wanda Barzee's interview with Dr. Michael Welner; (3) Government Exhibit 18, Mitchell's court appearance in San Diego, California; (4) Government Exhibit 31, Mitchell's interview with Dr. Welner; and (5) Government Exhibit 33, Mitchell's interviews with Dr. Richert DeMeir. While the media outlets did not specifically limit their requests to the portions of those videotapes that were shown in open court, it is the court's understanding that they are not seeking more access than the public had at the competency hearing.

The government's response recognizes the media's right to access the video clips shown at the competency hearing but expresses concern that physical access to the videotapes presents

substantial problems in the pretrial context. Defense counsel's main concern focuses on their client's due process rights to a trial by an impartial jury. Given the media's ability to view the videotapes in the public competency hearing and to report on what was seen, the government proposes that the media be allowed similar post-hearing access through viewing the videotapes in the courthouse rather than actual physical access to copies of the videos. Defense counsel question the legality of the government's proposal, but agree with the due process concerns presented by the potential of excessive or prejudicial publicity.[2] Defense counsel state that they

---

[2] Defense counsel state in their introduction that "any sensationalism regarding this case has long since occurred." While the events associated with Defendant's alleged crime received significant publicity in the past, the court does not believe that any sensationalism has occurred as a result of the court proceedings or the conduct of any of the attorneys in this case. Defense counsel takes issue with the court's recent decision on competency, stating that the court was "wide ranging rather than circumspect in the findings it found 'essential' to the competency ruling." The court explained in its decision on competency that Defendant's refusal to participate in the evaluation process and the conflicting expert opinions required the court to fully analyze the facts relevant to the issue. For example, the court was presented with a mental health expert who diagnosed Defendant with schizophrenia, citing no cultural explanation for his allegedly delusional beliefs. Even in response to questions regarding the evidence of Defendant's cultural influences that had been presented at the hearing, the expert did not consider it necessary to reevaluate his analysis of the issue. The court, however, believed that Defendant's cultural influences were essential to an understanding of his mental condition. The court, therefore, was required to explain those facts it felt essential to its determination that the expert's analysis should be discounted. The court was also presented with evidence that the state court judge, who found Defendant incompetent, was presented with an incomplete historical narrative that appeared to demonstrate a psychotic break when Defendant became homeless and potentially another when plea negotiations broke down with state prosecutors. The court, therefore, was required to explain the facts it deemed essential to an understanding of its determination that no psychotic break occurred. The issue of competency is highly fact intensive, and the court has an obligation to explain the basis for its decision. Despite the court's decision, the media coverage of the decision has done little more than make a reference to the fact that it was a lengthy decision and then recite the court's ultimate findings with respect to the *Dusky* standards. Most of the press coverage included one or two of the court's specific findings and then also included quotes from defense counsel as to their disagreement with the court's decision and their belief that Defendant is extremely mentally ill. The court has monitored the press coverage of the decision and has found nothing, to date, that is unduly prejudicial to Defendant.

support any measures the court finds appropriate to protect their client's due process rights.

## DISCUSSION

The Tenth Circuit Court of Appeals has recognized that a "high-profile case such as this imposes unique demands on the trial court, and requires the trial court to establish procedures for dealing effectively, efficiently, and fairly with recurring issues" involving the balancing of the accused's due process rights and the public's access to information. *United States v. McVeigh*, 119 F.3d 806, 813 (10th Cir. 1997). "There is not yet any definitive Supreme Court ruling on whether there is a constitutional right of access to court documents and, if so, the scope of such a right." *Id.* at 812. It is, however, "clearly established that court documents are covered by a common law right of access." *Id.* at 811.

A.     First Amendment

The "First Amendment protects the right of the public and the press to attend criminal trials" and pretrial proceedings. *Id.* While a number of circuit courts have applied this First Amendment right to attend proceedings to the right to access court documents, "it is uncertain whether the Tenth Circuit would apply the First Amendment standards . . . or the common law standard . . . to a media request for access to court documents, where as here the press was present at the hearings involving those documents." *Id.*

In *Nixon v. Warner Communications, Inc.*, 435 U.S. 589 (1979), various media outlets sought to copy audio tapes admitted into evidence at the Watergate criminal trial. *Id.* at 591. In response to the media's contention that *Cox Broadcasting Corp v. Cohn*, 420 U.S. 469 (1975), provided the media with a First Amendment right to copy and publish materials displayed in open court, the *Nixon* Court stated that *Cox* provided nothing more than an affirmation of the

media's right "to publish accurately information contained in court records open to the public." *Nixon*, 435 U.S. at 608-09. The *Nixon* Court then explained why the First Amendment was not implicated in that case:

> there is no claim that the press was precluded from publishing or utilizing as it saw fit the testimony and exhibits filed in evidence. There simply were no restrictions upon press access to, or publication of any information in the public domain. Indeed, the press-including reporters of the electronic media-was permitted to listen to the tapes and report on what was heard. Reporters also were furnished transcripts of the tapes, which they were free to comment upon and publish. The contents of the tapes were given wide publicity by all elements of the media. There is no question of a truncated flow of information to the public. Thus, the issue presented in this case is not whether the press must be permitted access to public information to which the public generally is guaranteed access, but whether these copies of the White House tapes-to which the public has never had physical access-must be made available for copying.

*Id.* at 609.

The Sixth Circuit has noted that the *Nixon* Court indicated in this passage that there is clearly "a difference between an opportunity to hear the tapes and access to the tapes themselves." *United States v. Beckham*, 789 F.2d 401, 409 (6th Cir. 1986). Similarly, the Tenth Circuit explained that "*Nixon* did not hold that there is no First Amendment right to access court documents. Rather, the Court there merely held that, in a situation where there 'was no question of a truncated flow of information to the public,' there was no right to physically access and copy the Watergate tapes that had already been played in open court where transcripts of the tapes were available to the media and the public generally." *United States v. McVeigh*, 119 F.3d 806, 812 (10th Cir. 1997) (quoting *Nixon*, 435 U.S. at 609).

Following *Nixon*, other circuit courts have held that there is no First Amendment right to

copy and publish recordings played in open court where the media could hear and report on the contents.  In *Belo Broadcasting Corp. v. Clark*, 654 F.2d 423, 426 -27 (5th Cir. 1981), the Fifth Circuit held that there is no First Amendment right to copy and publish tapes admitted into evidence where "[m]embers of the press were allowed to listen as the tapes were played in court; transcripts were prepared and distributed for their use; reporters and broadcasters were free to report this information as they wished."  And, in *Beckham*, already cited, the Sixth Circuit held that the media had no First Amendment right to copy tape recordings admitted at trial where "there were no restrictions on media access to the trial or on the publication of information in the public domain."  789 F.2d at 409.

As in *Nixon*, the First Amendment right to access is not implicated in this case because there is "no question of a truncated flow of information to the public."  435 U.S. at 609.  The videotapes in question were played in an open and public court proceeding.  During the course of the competency hearing, the public and press had the opportunity to view the evidence, and the press was free to report on the content of the videotapes.  *See Beckham*, 789 F.2d at 415.  In fact, this court went "to great lengths to facilitate access to the trial proceedings by, for example, reserving seats in the courtroom for members of the press and providing an overflow room for remote viewing."  *In re Providence Journal*, 293 F.3d 1, 16 (1st Cir. 2002.)  "By affording interested members of the media ample opportunity to see and hear the tapes as they are played for the jury, the court has fulfilled its pertinent First Amendment obligations."  *Id.*

In this case, not only has the press and public had an opportunity to witness the materials in open court proceedings, the government's proposal with respect to the videos played at the competency hearing would allow similar post-hearing access.  The proposal allows members of

the press to make arrangements with the Clerk of Court to review the materials at the courthouse and report on them. The court, therefore, concludes that the First Amendment is not implicated by the degree of access allowed.

B. Common Law Right of Access

Assuming that the common law right of access applies, the *Nixon* Court recognized that "the right to inspect and copy judicial records is not absolute. Every court has supervisory power over its own records and files." *Nixon*, 435 U.S. at 598. The court agreed with prior cases "that the decision as to access is one best left to the sound discretion of the trial court, a discretion to be exercised in light of the relevant facts and circumstances of the particular case." *Id.* at 599.

The *Nixon* Court noted that "[i]t is difficult to distill from the relatively few judicial decisions a comprehensive definition of what is referred to as the common law right of access or to identify all the factors to be weighed in determining whether access is appropriate." *Id.* at 598-99. Since Nixon, however, the Tenth Circuit has stated that under the common law right of access, "judicial documents are presumptively available to the public, but may be sealed if the right to access is outweighed by the interests favoring nondisclosure." *United States v. McVeigh*, 119 F.3d 806, 811 (10th Cir. 1997). "The party seeking to overcome the presumption bears the burden of showing some significant interest that outweighs the presumption." *Mann v. Boatright*, 477 F.3d 1140, 1149 (10th Cir. 2007) (quoting *Rushford v. New Yorker Magazine, Inc.*, 846 F.2d 249, 253 (4th Cir. 1988)).

Citing to the Tenth Circuit's decision in *McVeigh*, another district court recognized that "judicial documents are presumptively available to the public," but also identified several "countervailing factors favoring nondisclosure." *United States v. Salemme*, 985 F. Supp. 193,

195 (D. Mass. 1997).  These factors include: "(i) prejudicial pretrial publicity; (ii) the danger of impairing law enforcement or judicial efficiency; and (iii) the privacy interests of third parties." *Id.* (citing *United States v. Amodeo*, 71 F.3d 1044, 1050 (2d Cir. 1995); *McVeigh*, 119 F.3d at 813-14; *In re Globe Newspaper Co.*, 729 F.2d 47, 59 (1st Cir. 1984).  The court concludes that these countervailing factors favor nondisclosure of physical copies of the videos in the present case.

       (1)      Pretrial Publicity

In contrast to the present case and the court's concerns about empaneling a jury, the circuit court opinions addressing the right to copy audio or video tape evidence in a criminal case involve exhibits admitted at trial.  Many of these cases are factually distinguishable because they rightly are not concerned with empaneling an unbiased jury.  The government cites to cases, however, where additional pending charges against the defendant or against other co-defendants raised jury venire concerns.  In those circumstances, the courts recognized that the risk of prejudice to a fair trial was the most compelling reason to deny the right to copy audio and video tape exhibits for subsequent broadcast.

For example, in *United States v. Belo*, 654 F.2d 423 (5th Cir. 1981), the Fifth Circuit affirmed the district court's decision to deny media requests to copy and broadcast audiotapes admitted as evidence at trial. In denying the requested access, "the district judge made clear his concern that broadcast of the tapes outside his courtroom would have a deleterious effect on the pending trial of defendant Moore."  *Id.* at 425.  In his memorandum opinion, the judge wrote, "Widespread publication of these tapes prior to trial will severely prejudice Mr. Moore's sixth amendment right to a fair trial, as well as potentially deny him rights guaranteed by the fourth

and fifth amendments. Moreover, if the tapes are prematurely heard by the public, this court would be severely hampered in selecting a fair and impartial jury in the forthcoming trial." *Id.*

On appeal, the Fifth Circuit held that the district judge did not abuse his discretion in denying the broadcasters physical access to the tapes. "The judge's concern was with the rights of a yet-to-be tried defendant; the provision to a defendant of a fair trial is a reasonable and necessary concern of the presiding judge." *Id.* at 431. Unlike the situation where a case is on appeal and the chance of a retrial is remote, the postponed trial of the co-defendant was "not of a 'hypothetical' nature." *Id.* Although the trial court had no difficulty selecting a jury for the first trial, it was unclear what effect "media access to and rebroadcast of the tapes could have." *Id.* at 432. Significantly, the Fifth Circuit noted that the "choice" was "between an undeniably important but nonconstitutional right of physical access to courtroom exhibits and a defendant's due process right to a fair trial, 'the linchpin of our criminal justice system.'" *Id.* (quoting *United States v. Criden*, 648 F.2d 814, 827 (3d Cir. 1981)).

In *United States v. Webbe*, 791 F.2d 103 (8th Cir. 1986), the Eighth Circuit also affirmed the district court's denial of a media request to copy tapes admitted into evidence in a criminal trial. *Id.* at 105. The Eighth Circuit found that the district court judge properly considered a number of factors in denying the application to copy the tapes. *Id.* at 106. One of these factors included "concern that defendant Webbe's right to a fair trial under the Sixth Amendment to the Constitution would be affected by release of the tapes," given that one trial was currently underway and Webbe had two other pending charges in which the tapes might also be used. *Id.* The court was "satisfied that the district court properly considered the relevant factors" and found "no abuse of discretion in the court's determination here that Webbe's constitutional right

to a fair trial outweighs CBS' common law right of access to the tapes." *Id.* at 107.

In *United States v. Edwards*, 672 F.2d 1289, 1294 (7th Cir. 1982), the Seventh Circuit affirmed the district court's refusal to release copies of an audio recording admitted into evidence and played in open court during a criminal trial. In part, the district court's refusal relied on the fact that the defendant "had yet to stand trial upon several counts of tax evasion that had been severed from the instant charges and that public broadcast of the tape might make it 'doubly difficult' to draw a jury for that subsequent proceeding." *Id.* at 1291. On appeal, the Seventh Circuit noted, "Where there is a clash between the common law right of access and a defendant's constitutional right to a fair trial, a court may deny access, but only on the basis of articulable facts known to the court, not on the basis of unsupported hypothesis or conjecture." *Id.* at 1294. The pending charges made a trial "more than merely hypothetical," however, and the "trial judge properly recognized that adverse publicity arising from broadcast of the tape, which clearly implicated Edwards in the extortion scheme, posed a threat to drawing a fair and impartial second jury." *Id.*

Similarly, the prospect of a trial in this case not merely a remote possibility. *Cf. In re National Broadcasting Co.*, 653 F.2d 609, 618 (D.C. Cir. 1981) (reversing denial of access to audio and videotapes in part because "the interest in avoiding the risk of potential prejudice at a hypothetical second trial is seldom of sufficient weight to justify denying access to judicial records which have been displayed in open court"). This court's ruling that Mitchell is competent to stand trial means that a trial is imminent.

As in the cases cited above, there is a significant risk that the broadcast of the tapes will prejudice the upcoming trial. Media coverage of the court's determination on competency has

subsided.  However, releasing copies of the videotapes will certainly result in additional pre-trial publicity that carries with it the potential for prejudicing Defendant's right to a fair trial. Moreover, videotapes can be widely broadcast and rebroadcast, edited, and taken out of context. Even though the information contained on the tapes has been extensively reported in the press, viewing the videos firsthand is far more likely to make a longstanding impression that potential jurors may find more difficult to set aside.  *See Myers*, 635 F.2d at 953 (noting that "seeing the tapes on television will create a stronger impression of the events among those who have already been exposed to news accounts of their contents"). The exhibits in this case portray Defendant in an unflattering light and "[t]elevison indubitably has a much greater potential impact on jurors than print media."  *In re NBC Universal*, 426 F. Supp. 2d 49, 58 (E.D.N.Y. 2006).

Furthermore, the court agrees with the government that other procedural devices – such as voir dire, cautionary instructions, jury sequestration, or change of venue – are poorly suited to protect Defendant's right to a fair trial against the additional publicity that will result from release of the videotapes.  *See Beckham*, 789 F.2d at 415 (affirming district court's determination that the dangers to the defendant's right to a fair trial could not be adequately protected through jury sequestration, voir dire and cautionary instructions); *Belo*, 654 F.2d at 432 (refusing to "second guess the trial judge on the relative costs and benefits to the efficient administration of justice of such protective measures" as "searching voir dire examination of potential jurors; empaneling a larger body of veniremen; and change of venue").

Because an impartial jury has not yet been impaneled, this court cannot guard against prejudicial publicity either by sequestering the jury or by issuing cautionary instructions to avoid media reports.  Given the extensive pretrial publicity already associated with this case, the

selection of a fair and impartial jury will already require a large venire, a juror questionnaire, and lengthy voir dire. The additional publicity created by releasing copies of the videotapes will pose a further challenge to this court's ability to impanel a jury.

A continuance in this case to allow for any resulting publicity to subside is also an untenable option given the delay already experienced in bringing Defendant to trial. Finally, a change of venue would be inadequate given the national publicity associated with this case and the expressed desire of national news media to obtain copies of the videotapes for broadcasting.

The "trial judge has primary responsibility to provide the fair trial that the Constitution guarantees." *Beckham*, 789 F.2d at 415. At this pretrial stage, the release of videotapes for broadcasting, and potential re-broadcasting by less reputable outlets, presents an unacceptable risk to the court's ability to impanel an impartial jury and to ensure that the ultimate verdict is based solely on the evidence presented in court. The government's proposal of allowing the press access to view the videos and report on the contents is a superior alternative. The court relied on the videos in making its competency determination, the contents of the videotapes are detailed in the court's public decision, and the media can view the videos and report whether it agrees with the court's characterization of the videos. A nation-wide broadcast of the videotapes is unlikely to add appreciably to the public understanding of the issues than it is to merely appeal to more prurient interest in the case. While releasing copies of the videos may have some marginal value in furthering the public's understanding of the competency proceedings and the basis for the court's ruling, the media can fulfill its role in that respect through viewing the videotapes and doing its own reporting on their content. The court concludes that the presumption in favor of public access is outweighed by the significant interests in safeguarding

Defendant's right to a fair trial.

        (2)      Efficiency of Justice

The present case is proceeding to trial after a significant delay in the state court and the necessity of addressing Defendant's competency at the outset of this federal prosecution. Defense counsel mention in their response that they have repeatedly voiced concerns over pre-trial publicity. Such concerns are only hurt by delay. Given the public interest in this case, the court believes that both it and the parties have proceeded thus far without any undue publicity. The court, however, has significant concerns regarding the release of unflattering videos to a national audience on the eve of trial. As stated above, the release of the videos could result in potential delays, such as a request to change the trial's venue or a request for a continuance to allow for any resulting publicity to subside. Neither of these alternative, however, would address the underlying problem of the potential publicity generated by a release of the videos. And, they would cause further delays which the court considers unacceptable.

        (3)      Privacy Interests

While the court believes that Defendant's due process rights at this pretrial stage sufficiently outweigh the media's right to physical copies of the videos, this case also presents privacy interests of the victim. The video of Dr. Welner interviewing Defendant includes a video of Elizabeth Smart being interviewed within days of being recovered. If copies of the video are released, the sensitive issues recorded on the videotapes and the traumatic events could remain in the public indefinitely. And, with modern technology, including editing software and sites such as YouTube, there is no limit to the number of times the videotapes could be distributed and viewed, the manner in which the contents could be manipulated, or the purposes

for which the recordings could be used.

Significantly, the victim in this case has a statutory "right to be treated with fairness and with respect for the victim's dignity and privacy." 18 U.S.C. § 3771(a)(8). The victim's right to be treated with respect for her dignity and privacy would be ill-served by the release and subsequent broadcast of videotapes that detail her sexual abuse. *See United States v. Shuie*, 504 F. Supp. 360, 363-64 (D. Minn. 1980) (refusing to release copies of videotape exhibits based on large part on victim's privacy interests). The court "has a responsibility to exercise an informed discretion as to release of the tapes, with a sensitive appreciation of the circumstances that led to their production." *Nixon*, 435 U.S. at 603. The Supreme Court has recognized that the common law right of inspection has been limited in "the painful and sometimes disgusting details of a divorce case." *Id.* at 598. Certainly, the common law right to access must be limited in situations involving the alleged sexual abuse of a minor. In a case involving allegations of the sexual abuse of a minor, the court agrees with the government that there is a risk that broadcast and potentially re-broadcasts of the videos could essentially amount to revictimization. The court, therefore, concludes that the significant privacy concerns of the victim and the victim's statutory right to have her privacy respected outweigh the media's right to a physical copy of the videos.

(4)     Substantial Access

In addition to the above factors weighing against the court's release of the videos, the *Nixon* Court recognized that "the fact that substantial access already has been accorded the press and public" is one factor to be weighed when balancing the common law right of access against other competing interests. 418 U.S. at 599 n.11. In this case, the media and the public have had

substantial access to the information contained on the videotapes. The videotapes were played in open court on a large screen visible to the members of the public and press in attendance. The media had the opportunity to view the videotapes, take notes, and fully report on their contents. *See United States v. McDougal*, 103 F.3d 651, 658 (8th Cir. 1996) (noting the fact that substantial access had already been afforded was a circumstance weighing against release of President Clinton's videotaped deposition played in court); *Webbe*, 791 F.2d at 106 (noting that district court properly considered the fact that the public had already been afforded substantial access to the information given that "the news media had attended the trial and pre-trial hearings, had reported the events of the trial to the public, and had received transcripts of the tapes").

Where, as here, "the right to make copies of tapes played in open court is essentially a request for a duplicate of information already made available to the public and the media, then the district court has far more discretion in balancing the factors." *Beckham*, 789 F.2d at 414-15. In this case, there are "sufficiently weighty reasons to justify the denial of permission to make copies of the tapes under the common law." *Id.* at 415.

The Eastern District of New York previously employed an approach similar to the government's proposal in order to protect the defendant's Sixth Amendment right to a fair trial untainted by exposure to irrelevant, prejudicial information. *In re NBC Universal*, 426 F. Supp. 2d 49, 52-53 (E.D.N.Y. 2006). The court allowed for inspection of audio-video recordings admitted into evidence by the government in support of its motion to disqualify defense counsel, but prohibited the reproduction and distribution of recordings based on the risk of prejudice caused by increased pretrial publicity. The court noted that its "restriction on public and media access to the audio-video recordings is minimal." *Id.* at 58. Because nothing was sealed, "[a]ny

member of the press or of the public may view the recordings, unredacted, upon request." *Id.*

This court agrees that the appropriate balance is best struck by permitting public inspection of the videotapes and restricting only the right to obtain copies of the videos. This approach will satisfy the public's interest in the opportunity to inspect exhibits admitted into evidence at a public hearing and the media's desire to monitor the functioning of the court without implicating the substantial competing interests identified above. Under this approach, any member of the press or public desiring to inspect the videotape exhibits presented at the competency hearing are free to make arrangements with this court's Clerk's Office.

## CONCLUSION

For these reasons, the court concludes that the public's presumptive right of access to physical copies of the videotapes played at Defendant's competency hearing is outweighed at this pretrial stage by Defendant's right to a fair trial and the privacy interests of the victim. Rather than deny access altogether, however, the court agrees with the government's less restrictive proposal of permitting interested members of the media or public to make arrangements for viewing the exhibits at the courthouse. This approach does not limit all access, it only limits the form of access. The court concludes that, based on the circumstances presented in this case, this approach will best serve the interests of the public, the victim, and the parties.

Dated this 8th day of March, 2010.

BY THE COURT:


DALE A. KIMBALL,
UNITED STATES DISTRICT JUDGE