# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

## CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | **MEMORANDUM DECISION AND ORDER** |
| v. | **Case No. 2:08CR125DAK** |
| BRIAN DAVID MITCHELL, et al., | **Judge Dale A. Kimball** |
| Defendants. | |

This matter is before the court on Defendant Brian David Mitchell's Motion to Transfer Venue pursuant to the Fifth and Sixth Amendments to the United States Constitution, Rule 21(a) of the Federal Rules of Criminal Procedure, and the court's general supervisory powers. The court held a hearing on the motion on July 29, 2010. At the hearing, Plaintiff was represented by Diana Hagen, David Schwendiman, and Felice John Viti, and Defendant was represented by Parker Douglas, Robert L. Steele, and Audrey K. James. The court heard oral argument and took the motion under advisement. Having carefully considered the parties' memoranda submitted prior to the hearing and their arguments at the hearing, as well as the law and facts relevant to the motion, the court enters the following Memorandum Decision and Order.

## BACKGROUND

On March 5, 2008, Defendant Brian David Mitchell was indicted in this court for allegedly kidnaping Ms. Elizabeth Smart in violation of 18 U.S.C. § 1201(a)(1) and unlawfully transporting her across state lines for improper purposes in violation of 18 U.S.C. § 2423(a). The

kidnaping is alleged to have occurred from June 5, 2002, until March 12, 2003.

The federal indictment against Mr. Mitchell was issued after several years of proceedings had occurred in Utah state courts. The Utah state court determined that Mr. Mitchell was not competent to stand trial and would not benefit from forced medication. This court, however, held its own competency hearing in December 2009 and found Mr. Mitchell competent to stand trial in a Memorandum Decision and Order, dated March 8, 2010.

Mr. Mitchell was indicted in this matter with a co-defendant, Ms. Wanda Barzee. Ms. Barzee, whose competency was restored through forced medication ordered by the Utah state court, pleaded guilty to the charges in the federal indictment on November 17, 2009. The court sentenced Ms. Barzee on May 21, 2010.

Mr. Mitchell's trial is scheduled to begin November 1, 2010. Mr. Mitchell, however, has now filed a motion to change the venue in which that trial should occur. In setting the trial date, the court and parties agreed to several pretrial deadlines, including a deadline of the preparation of an extensive pretrial juror questionnaire.

## DISCUSSION

Pursuant to the Fifth and Sixth Amendments to the United States Constitution and Rule 21(a) of the Federal Rules of Criminal Procedure, Defendant asks this court to transfer venue to another federal district based on allegedly prejudicial pretrial publicity and community investment in the outcome of the case in the District of Utah.

### I. Legal Standard

The United States Constitution provides that a criminal trial is to occur in the state where the crime has been committed. U.S. Const. Art. III, §2, cl. 3. The Sixth Amendment to the

United States Constitution also provides that criminal prosecutions shall occur in "the State and district wherein the crime shall have been committed." U.S. Const. amend VI. But, the Sixth Amendment also grants the accused "[i]n all criminal prosecutions" the right to a trial by "an impartial jury." *Id.* And the Fifth Amendment to the United States Constitution ensures that no person shall "be deprived life, liberty, or property, without due process of law." *Id.* amend V. Accordingly, the "right to an impartial jury in the Sixth Amendment and the fundamental fairness requirement of the Due Process clause will override the place of trial provisions in both Article III and the Sixth Amendment in extraordinary cases." *United States v. McVeigh*, 918 F. Supp. 1467, 1469 (W.D. Okla. 1996). The United States Supreme Court has specifically recognized that "[t]he Constitution's place-of-trial prescriptions . . . do not impede transfer of the proceedings to a different district at the defendant's request if extraordinary local prejudice will prevent a fair trial." *United States v. Skilling*, 561 U.S. —, 130 S. Ct. 2896, 2913 (2010).

Federal Rule of Criminal Procedure 21 governs transfers of venue in federal criminal cases. Rule 21 instructs that, "[u]pon defendant's motion, the court must transfer the proceeding . . . to another district if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there." Fed. R. Crim. P. 21(a).

The parties agree that the constitutional standard for presumed prejudice is a heightened standard to that required under Rule 21. "[T]he bar facing the defendant wishing to prove presumed prejudice from pretrial publicity is extremely high." *United States v. McVeigh*, 153 F.3d 1166, 1181 (10th Cir. 1998). "[T]o reach a presumption that inflammatory pretrial publicity so permeated the community as to render impossible the seating of an impartial jury, the court

must find that the publicity in essence displaced the judicial process, thereby denying the defendant his constitutional right to a fair trial." *United States v. McVeigh*, 153 F.3d 1166, 1181 (10th Cir. 1998). Thus, "the claim of presumed prejudice is 'rarely invoked and only in extreme situations.'" *Id.* (citations omitted).

Although Rule 21 adopts the constitutional guarantees of a fair and impartial trial, courts have recognized that the rule does not require a defendant to meet the same constitutional standards for a change of venue that a defendant must show in a post-conviction constitutional attack. *United States v. Marcello*, 280 F. Supp. 510, (E.D. La. 1968). It is a "well-settled rule that a motion for a change of venue" under Rule 21 "is directed to the sound discretion of the court." *Id.* Rule 21 "is preventative. It is anticipatory. It is not solely curative as is a post-conviction constitutional attack." *Id.* Thus, "it is the well-grounded fear that the defendant will not receive a fair and impartial trial which warrants the application of the rule." *Id.*

In *Skilling*, the United States Supreme Court recognized that the discretion granted to trial courts under Rule 21 has been invoked "to move certain highly charged cases, for example the prosecution arising from the bombing of the Alfred P. Murrah Federal Office Building in Oklahoma City," and "to deny venue-transfer requests in cases involving substantial pretrial publicity and community impact, for example, the prosecutions resulting from the 1993 World Trade Center bombing, and the prosecution of John Walker Lindh, referred to in the press as the American Taliban." 130 S. Ct. at 2913 n.11 (citations omitted). Because Skilling did not argue that the district court abused its discretion under Rule 21, the *Skilling* decision addressed only whether the district court's venue-transfer decision complied with the Constitution. *Id.*

Defendant, however, asserts that his case meets both the constitutional presumed

prejudice standard and Rule 21 standards for transfer of venue. The court, therefore, will address whether Defendant's case meets the constitutional standards for presumed prejudice and then whether Defendant's case should be transferred under Rule 21 standards.

## II. Presumed Prejudice

The recent Supreme Court decision in *United States v. Skilling*, 561 U.S. —, 130 S. Ct. 2896 (2010) guides this court's analysis of presumed prejudice. The *Skilling* Court addressed presumed prejudice because the Fifth Circuit Court of Appeals found presumed prejudice in the Southern District of Texas against Skilling based on the volume and tone of media coverage surrounding Enron's collapse, potential prejudice stemming from a co-defendant's guilty plea, and the large number of victims in the Houston area. *Id*. at 2911.

The Supreme Court began its analysis by asking: "When does the publicity attending conduct charged as criminal dim prospects that the trier can judge a case, as due process requires, impartially, unswayed by outside influence?" *Id.* at 2913. "Because most cases of consequence garner at least some pretrial publicity," the Court recognized that "courts have considered this question in diverse settings." *Id.* The Court then proceeded to discuss three cases in which convictions had been overturned because the "trial atmosphere . . . [was] utterly corrupted by press coverage." *Id.* at 2914. Nonetheless, the Court explained that these decisions "cannot be made to stand for the proposition that juror exposure to . . . news accounts of the crime . . . alone presumptively deprives the defendant of due process." *Id.* "Prominence does not necessarily produce prejudice, and juror impartiality . . . does not require ignorance." *Id.* at 2914-15.

Noting that the standard for presumed prejudice "attends only the extreme case," the Court analyzed the issue by focusing on several factors relevant to a determination of presumed

prejudice.  *See id.* at 2915-17.  Those factors include: (1) "media interference with courtroom proceedings"; (2) the size and characteristics of the community in which the crime occurred"; (3) the nature and tone of the media publicity; (4) the amount of time that had elapsed between the crime and the trial; (5) the impact of the crime on the community; and (6) the effect of a co-defendant's "well publicized decision to plead guilty."  *Id.*  This court will analyze the same factors in determining whether presumed prejudice exists in the present case.

### 1. Media Interference With Proceedings

The *Skilling* Court distinguished the cases of *Estes v. Texas*, 381 U.S. 532, 538 (1965) and *Sheppard v. Maxwell*, 384 U.S. 333 (1966) because both of those cases "involved media interference with courtroom proceedings during trial."  130 S. Ct. at 2915 n.14.  As in *Skilling*, there are no allegations in this case of media interference with courtroom proceedings during trial.  While Defendant mentions one instance in which this court's Decorum Order was breached by the *Salt Lake Tribune*, the breach was not prejudicial and did not interfere with courtroom proceedings.  The breach involved the electronic transmission of witness testimony during the competency hearing.  The transmission of the testimony was from an overflow media room, was in the form of a written transcript, and did not disrupt proceedings.  Moreover, the same testimony was available to the public through certified transcripts by the next working day.

The media has undoubtedly been interested in covering the proceedings in this case, but the court has not sensed any kind of "carnival atmosphere."   While this court cannot speak to the atmosphere present in initial matters before the state court, the media presence during the federal court proceedings has been reserved and respectful.  In no way can the media presence in this case be considered similar to the description of the atmosphere in *Sheppard*, where "bedlam

reigned at the courthouse during the trial and newsmen took over practically the entire courtroom, hounding most of the participants in the trial, especially Sheppard." 384 U.S. at 355.

This court's Decorum Orders have precluded any member of the media from approaching Defendant, counsel, or witnesses inside the courthouse. Prior to hearings in this case, the court has repeatedly witnessed members of the public and media in the public gallery speaking with each other and then becoming silent when Defendant comes into the court. Defendant, therefore, has not been deprived of any of the solemnity and sobriety associated with the courtroom setting.

### 2. Size and Characteristics of the Community

The *Skilling* Court recognized that "the size and characteristics of the community in which the crime occurred" is relevant to a determination of presumed prejudice. 130 S. Ct. at 2915. The court distinguished the small parish of 150,000 residents in *Rideau v. Louisiana*, 373 U.S. 723 (1963), with the 4.5 million people eligible for jury duty in the Houston area. *Skilling*, 130 S. Ct. at 2915. Noting the "large, diverse pool of potential jurors," the Court found that "the suggestion that 12 impartial individuals could not be empaneled is hard to sustain." *Id.*

While the parties in this case dispute the exact number of eligible jurors in the District of Utah, the size of the potential jury pool in the District of Utah is much more akin to the pool in *Skilling* than *Rideau*. The District of Utah is comprised of the entire State of Utah, which has a population of 2.8 million. The jury pool, therefore, draws from a large geographic area and consists of a diverse set of people. This is not a case where there is a heightened risk of prejudice in a small community.

Defendant raises concerns about the involvement of the community in the search for Elizabeth Smart. While Defendant estimates that 9,000 to 10,000 members of the community

volunteered in the search, the majority of volunteers were likely drawn from only Salt Lake County where the search was focused. More than 1.7 million people live outside of Salt Lake County. Even excluding the large number of volunteers who helped search, the court has a large population to draw from in selecting potential jurors. The court, therefore, finds that the size of the jury pool in this district does not support a presumption of prejudice.

3. *Nature of the Publicity*

Next, with respect to pretrial publicity, the *Skilling* Court focused more on the nature of the publicity than the volume. The Court looked at whether the news stories were "the kind of vivid, unforgettable information we have recognized as particularly likely to produce prejudice." *Id.* at 2916. The Court explained that "although the news stories about Skilling were not kind, they contained no confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight." *Id.* In contrast to the case before it, the Court explained that "Rideau's dramatically staged admission of guilt," which was repeatedly televised in a small community, "was likely imprinted indelibly in the mind of anyone who watched it." *Id.*

In this case, Defendant points to the large volume of articles published about Elizabeth Smart's kidnaping, her recovery, her family's involvement in assisting other victims, and the legal proceedings against Mr. Mitchell. While the number of articles regarding the kidnaping may demonstrate the interest of the public at that time, only the coverage identifying Mr. Mitchell with the kidnaping and discussing the present legal proceedings are relevant to the court's determination of potential juror prejudice. Less than half of the *Salt Lake Tribune* articles cited by Defendant, make any mention of Mr. Mitchell. *Cf. Skilling,* 130 S. Ct. at 2916 n.17

(noting that "[t]he Fifth Circuit . . . did not separate media attention aimed at Skilling from that devoted to Enron's downfall more generally"); *United States v. Haldeman*, 559 F.2d 31, 60-60 (D.C. Cir. 1976) (noting that "appellants' submissions overstate the amount of publicity by including, apparently, every story concerning the many difficulties of the last years of the Nixon administration, whether or not those stories discussed appellants"). Therefore, Defendant has significantly overstated the volume of publicity relevant to the issue before the court.

In addition, with respect to the nature of the publicity, Defendant's expert has exaggerated the inflammatory nature of the media coverage by failing to target the use of inflammatory words to Mr. Mitchell or his alleged conduct. Defendant's expert produced a superficial, rudimentary word count to support the defense's position. While claiming that the word evil has been used in reference to Mr. Mitchell on 43 occasions, only five references to "evil" in the *Salt Lake Tribune* relate to Mr. Mitchell. Of the five references, three are quotes from Elizabeth Smart's testimony at the competency hearing giving words to describe Mr. Mitchell and one is a quote from a deputy county attorney's statement during legal proceedings in state court in which the attorney stated that Mr. Mitchell sought to do "unspeakable evil" based on his religious beliefs. *See United States v. Sabhnini*, 599 F. 3d 215, 232-33 (2d Cir. 2010) ("While a district court may consider the government's role in generating adverse publicity in deciding a motion for change of venue, legitimate advocacy at a court proceeding – even advocacy resulting in adverse publicity – does not constitute conduct for which the government is properly held responsible in a Rule 21(a) inquiry."). The only other reference to Mr. Mitchell's conduct being evil appeared in a point/counterpoint commentary in the *Salt Lake Tribune* in 2003. All of these references will have been published from one to seven years prior to trial.

In addition, the defense points to the use of the term "scum-sucking slugs" as demonstrating media coverage prejudicial to Defendant. However, the term was used in a 2003 article warning against excessive or prejudicial publicity. The article stated that it would be nice to empanel a jury that "hasn't been drubbed senseless with media musings about what scum-sucking slugs these two defendants are." The defense's reliance on this term to show prejudice demonstrates that it has given no regard to the context in which some of these allegedly inflammatory terms were used. Under the dictates of *Skilling*, however, the court must focus on the nature of the publicity, not just word counts.

Furthermore, the defense claims words such as disappearance, missing, rape, tethered, chained, and polygamy are inflammatory, but they are nothing more than descriptions of the facts at issue in the case. The "media coverage of this case 'was essentially factual and was not directed at arousing or inciting the passion of the community.'" *Mills v. Singletary*, 63 F.3d 999, 1011-12 (11th Cir. 1995). The *Skilling* Court noted that "when publicity is about the event, rather than directed at individual defendants, this may lessen any prejudicial impact." *Skilling*, 130 S. Ct. 2916 n.17.

While coverage of the hearing to determine Defendant's competency to stand trial was factually extensive, the court found the reporting to be even-handed and limited to the evidence presented by both the prosecution and the defense. The defense expert's assertion that little or no cross-examination was reported is not supported by the evidence. Defendant's evidence was as fully reported as the prosecution's. Moreover, to the extent that there may have been some limited reporting of evidence that was admissible at the competency hearing but may not be admissible at the trial, the court can deal with that issue during voir dire. However, the majority

of evidence admissible at the competency hearing will also be admissible at trial. In any event, such evidence was not extensive or inflammatory enough to rise to the level of demonstrating presumed prejudice.

The court recognizes that its finding that Defendant is competent to stand trial was widely reported. While the court's decision was lengthy, the articles reporting on the decision were not. Most of the articles gave little more than the *Dusky* standard. Defendant expresses concern over the court's decision, in part, because the *Salt Lake Tribune* included a link to the entire court ruling on its website. But the relatively few members of the potential jury pool who read the entire ruling on-line could easily be identified through the use of an initial juror questionnaire.

After the court found Defendant competent to stand trial, there were news reports expressing the view that the trial in this matter was overdue. Those views, however, were directed at the legal process and made no comment on the guilt or innocence of Defendant. None of the news media expressed whether they agreed with the competency decision or took a position on Defendant's intention to raise an insanity defense at trial. In fact, the news reported a quote from defense counsel disagreeing with the court's ruling and expressing how extremely mentally ill he believed his client to be.

The court finds that media coverage regarding Defendant's mental health has been fact-based and even-handed. Even though Defendant's main defense at trial will be an insanity defense, Defendant has not demonstrated any media prejudice in this regard. In fact, reports referring to Defendant's homeless lifestyle, his grandiose religious beliefs, and his disruptive singing in court are likely more favorable than unfavorable to his insanity defense.

As in *Skilling*, after reviewing all of the evidence Defendant presented regarding pretrial

publicity, the court finds that "'incidents [of news reports using] less-than-objective language' were dwarfed by 'the largely fact-based tone of most of the articles.'" 130 S. Ct. 2908 n.3. Isolated statements over the span of eight years are not enough to demonstrate presumed prejudice throughout the entire District of Utah. *See id.* at 2916 (taking issue with Fifth Circuit's reliance on only the magnitude and tone of media attention and explaining that "pretrial publicity–even pervasive, adverse publicity–does not inevitably lead to an unfair trial").

      *4. Time Between Alleged Crime and Trial*

In determining whether presumed prejudice existed, the *Skilling* Court also found it relevant that four years had elapsed between Enron's collapse and Skilling's trial. 130 S. Ct. at 2916. Whereas, in *Rideau*, where the Court found presumed prejudice, the trial "swiftly followed a widely reported crime." *Id.* In this case, trial is set to begin on November 1, 2010, which is more than eight years after Elizabeth Smart was kidnaped and more than seven years after Defendant was arrested.

Defendant, however, argues that even a lengthy delay can be prejudicial if members of the potential jury pool have already made up their minds about the guilt or innocence of the defendant. This argument, however, is not supported by case law which routinely refers to continuances as a remedial measure. In *Sheppard v. Maxwell*, 384 U.S. 333 (1966), the Supreme Court explained that "where there is a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial, the judge should continue the case until the threat abates, or transfer it to another county not so permeated with publicity." *Id.* at 363 ; *see also* 130 S. Ct. at 2917 (when co-defendant entered a well-publicized guilty plea shortly before trial, court appropriately "delayed the proceedings by two weeks").

Furthermore, courts generally find "no presumption of inherent unfairness where there has been a substantial delay between the criminal act and the trial." *United States v. Nelson*, 347 F.3d 701, 709 (8th Cir. 2003); *see also Goss v. Nelson*, 439 F.3d 621, 632-33 (10th Cir. 2006) ("The passage of time before trial–in this case over a year–also diminishes the presumptive impact of publicity occurring at the time the crime was committed."). The *Skilling* Court noted that although reporters continued to cover Enron-related stories, "the decibel level of media attention diminished somewhat in the years following Enron's collapse." 130 S. Ct. 2916.

Similarly, in this case, more than half of the articles Defendant cites were published within the first two years of Elizabeth Smart's disappearance. Since the beginning of this year, the *Salt Lake Tribune* has published only 13 articles mentioning Defendant despite the fact that competency issues were briefed by the parties and decided by the court, Defendant's co-defendant was sentenced, Defendant's trial was set, Defendant filed the present motion for change of venue, Defendant filed his notice of insanity defense, and the government requested a pre-trial hearing regarding the insanity defense. The media coverage has significantly diminished over time and consists of fact-based reporting of significant case proceedings. The court does not view that type of routine publicity to be prejudicial. The court finds, therefore, that Defendant has presented no evidence to demonstrate that the delay in his case has caused him any prejudice in being able to select a jury in this district.

### 5. *Community Impact*

The *Skilling* Court further determined that despite the Fifth Circuit's reliance, in part, on community impacts to find a presumption of prejudice, "Enron's 'sheer number of victims,'" did not "trigger a presumption of prejudice." 130 S. Ct. at 2917 (citation omitted). The *Skilling*

Court emphasized that an extensive questionnaire and follow-up voir dire were measures well-suited to counteracting the widespread community impact. *Id.*

In this case, Defendant makes several arguments related to community impact or community investment in the case. First, Defendant equates the number of people who searched for Elizabeth Smart with the number of victims in other high-profile cases, such as the victims of the Oklahoma bombing and victims of Enron's collapse. In addition, Defendant argues that the community impact can be seen in the number of people who perceive Mitchell as guilty and know that a judge has found him competent to stand trial.

Although Defendant estimates that 9,000 to 10,000 members of the community participated in the search for Elizabeth Smart, Defendant fails to demonstrate how or why those people, or people who know someone who participated in the search, should be considered victims of the alleged kidnaping. In comparing this case to *McVeigh* and *Skilling*, Defendant fails to look at the nature of the impact. Defendant repeatedly refers to those who searched for Elizabeth Smart and people who knew someone who searched as equivalent to someone who died or knew someone who died in the Oklahoma City bombing. But the nature of the impact is strikingly dissimilar. Someone who knows someone who spent part of a day searching for a missing child is not impacted to the same extent as someone who knows someone who was killed or injured. Similarly, knowing someone who searched for a missing child is different than knowing someone whose retirement was wiped away as a result of white collar crimes. While a white collar crime may not evoke the same kind of animosity as a child kidnaping, the personal impact from Enron's collapse in the Houston area was much more widespread than the personal impact resulting from the kidnaping of one child in the State of Utah. By attempting to expand

the scope of victims to those who know someone who searched, the defense's arguments lose credibility. Merely knowing someone who participated in the search is such a remote connection to the case that it could not be reasonably expected to influence a potential juror.

In *McVeigh*, every district judge in the district recused from hearing the case. And, in *Skilling*, the prosecution had to be turned over to attorneys from outside of the district because of the numerous conflicts within the United States Attorney's office. In this case, there are no such conflicts as a result of Elizabeth Smart's kidnaping. And, in fact, one member of the defense team participated in the search and is able to set that prior involvement aside to zealously advocate for his client. While the circumstances of Elizabeth Smart's kidnaping and recovery captured the attention of the country and community more than most kidnapings, that attention did not create a large number of victims in the same nature as Enron's bankruptcy or the bombing of an entire office building of workers. In Houston and Oklahoma City, large numbers of the community were actually victimized. In this case, the victims are the same as other kidnaping cases, the child and her family.

Moreover, even though the Smart family chose to become involved in legislative action as a result of the kidnaping, those efforts do not demonstrate community prejudice against Defendant. While the legislation is a positive community impact, there is no evidence that the family's involvement in getting the legislation passed will cause juror's to decide Defendant's case differently. Neither the legislation nor the Smart's family public involvement bears on a finding of community prejudice.

The widespread community involvement in searching for Elizabeth Smart was commendable, but that effort does not demonstrate a presumption of prejudice as to the millions

of Utahns eligible to serve on a jury. Given the number of the people who participated in the search and the number of people eligible to serve on the jury, the court can easily exclude anyone who participated in the search. Moreover, as the *Skilling* Court instructs, the court can employ extensive questionnaires and voir dire to identify members of the community who may be too invested in the outcome of the case. As discussed above, the number of searchers does not unduly limit the number of potential jurors. There are still millions of citizens who had no involvement in the search. The community impact is not so vast that the court cannot expect to find twelve disinterested jurors.

Defendant, however, questions the court's ability to find twelve disinterested jurors based on his expert's survey finding that 92% of Utahns believe Mitchell is probably or definitely guilty. Defendant's surveys also show that 77% of Utahns answered affirmatively when asked if they had read, seen, or heard that a judge had declared Mr. Mitchell competent to stand trial. While the court recognizes that Defendant contests his factual guilt and it is the government's burden to prove that guilt beyond a reasonable doubt, the court notes that Defendant did not conduct a survey relating to his insanity defense. Defendant's counsel publicly announced that they would rely on an insanity defense in his public statements regarding the court's ruling on competency. While Defendant is fully entitled to attack the government's evidence regarding factual guilt, his counsel has not indicated an intention to do so until the reply brief supporting this motion. Curiously, Defendant's attacks on factual guilt were not included in the survey. Defendant could have easily asked questions regarding whether Defendant had permission to take Elizabeth Smart or was mistaken for someone else who may have taken her. His survey could have asked whether respondents knew that such matters were contested, but it did not.

Defendant's survey did not even require respondents to identify Mr. Mitchell by name. It actually supplied his name to the respondents. Therefore, the court does not even have data on how many respondents may or may not have been able to identify Mr. Mitchell as Elizabeth Smart's alleged kidnaper. In addition to not asking respondents an open-ended question regarding who was alleged to have kidnaped Elizabeth Smart, the survey also failed to mention the specific crimes alleged, the elements of those crimes, and the burdens of proof in the legal proceedings. The court has serious concerns regarding the validity of the responses given the failure to ask these relevant questions.

Defendant's survey was most strikingly silent on the insanity defense. Academically, Defendant may want to focus on his presumption of innocence. But, in reality, he must focus on the nuts and bolts of his defense. Defendant cannot ignore, for purposes of his change of venue motion, that the main focus of his defense at trial will be the insanity defense. His experts completely ignored his main defense. The court is left with no data relevant to the public's perception of Defendant's insanity defense or his perceived mental health. This information is of critical importance in this case because it relates to Defendant's perceived legal guilt.

The court also has serious reservations regarding the methodology used by Defendant's experts. The court finds that the survey's use of leading questions and failure to include meaningful details renders the survey nearly useless in determining the present motion. Moreover, the survey is inadequate in demonstrating whether potential Utah jurors have a fixed opinion as to whether Defendant is legally responsible for his alleged actions. The survey asked respondents if they were aware of this court's ruling on competency, but did not ask what they knew with respect to the ruling or whether they agreed with it. The question that was used does

nothing to demonstrate any effect this court's prior ruling had on the jury pool. Nonetheless, the court believes that an extensive juror questionnaire and voir dire can be employed to determine prejudice that may have resulted from this court's extensive findings on competency. If any member of the jury pool has actually read the court's competency decision, the court can excuse the person for cause.

The court concludes that Defendant has not demonstrated the kind of widespread community impact or community investment in the outcome of a case that is required for finding presumed prejudice. As in *Skilling*, Defendant has failed to demonstrate that his concerns regarding community impact cannot be adequately addressed and ameliorated through an extensive juror questionnaire and voir dire.

### 6. Co-defendant's Plea

Unlike the co-defendant in *Skilling* who pleaded guilty on the eve of trial, necessitating a two-week continuance of the trial, Mitchell's co-defendant pleaded guilty a year before his scheduled trial date. *See* 130 S. Ct. at 2917. The *Skilling* Court recognized that "[a]lthough publicity about a codefendant's guilty plea calls for inquiry to guard against actual prejudice, it does not ordinarily . . . warrant an automatic presumption of prejudice." *Id.* In the present case, the codefendant's plea may have been highly publicized, but the plea and sentencing occurred well before Defendant's scheduled trial. Moreover, to the extent that Defendant's main defense is the insanity defense, her plea has little relevance to Defendant's state of mind at the time of the alleged crime. The court believes that the fact that a co-defendant pleaded guilty can be addressed in the juror questionnaire and voir dire.

Having analyzed each of the factors considered in *Skilling* for determining presumed

18

prejudice under the constitutional standard, the court concludes that this is not one of the extreme cases were a change of venue based on presumed prejudice is constitutionally required.

## III.  Rule 21

Even though the court finds that Defendant has not demonstrated presumed prejudice under the constitutional standard, the court could choose to exercise its discretion under Rule 21 and transfer venue to another district.  As stated above, under the Rule 21 standard, "it is the well-grounded fear that the defendant will not receive a fair and impartial trial which warrants the application of the rule."  *United States v. Marcello*, 280 F. Supp. 510, 514 (E.D. La. 1968). Rule 21 requires the court to be "satisfied" based on the evidence before the court "that there exists in the district where the prosecution is pending so great a prejudice against the defendant that the defendant cannot obtain a fair and impartial trial."  Fed. R. Crim. P. 21(a); *see also McVeigh*, 918 F. Supp. 1467, 1469-70 (E.D. Okla. 1996).

The government argues that the issue of transferring venue under Rule 21 is a much closer call than the constitutional inquiry.  However, based on most of the same factors the court analyzed under the constitutional standard for presumed prejudice, the government argues that Defendant has failed to meet his burden of demonstrating prejudice and the court should not exercise its discretion under Rule 21 to change venue at this time.  The government asks the court to review the issue again after juror questionnaires are completed.

When the court set the trial date in this case, the parties and court agreed to several pretrial deadlines.  These deadlines included dates for the parties to prepare and the court to review an initial juror questionnaire that would be sent to approximately 500 eligible jurors.  The parties and court have since agreed to summon potential jurors to appear at the courthouse to fill

out a juror questionnaire one month prior to trial. The court will then conduct individual voir dire of the smaller number of potential jurors summoned at the beginning of trial. The court and parties, therefore, will have approximately a month between the time that the questionnaires are filled out and the individual voir dire occurs at the beginning of trial.

The *McVeigh* court recognized that "the preferred practice in this judicial district" is to determine the effect of pre-trial publicity on the pool from which jurors are drawn through "a careful and searching voir dire." *Id.* at 1470. Other courts discussing the timing of change of venue motions have recognized that the "rule itself provides that the transfer may be made when the court is 'satisfied." Thus by the very terms of the rule, venue may be changed whenever the court 'satisfied, whether this be at some time prior to the voir dire, at the voir dire, or at the trial itself." *Marcello*, 280 F. Supp. at 514. Therefore, at any time the court is satisfied that a totality of the circumstances favor transfer, the court can make its determination.

At this time, based on the evidence presented by Defendant, the court is not satisfied that so great a prejudice exists in this district that Defendant cannot receive a fair and impartial trial. Although the court's analysis above relates to the constitutional standard for presumed prejudice, the court believes many of the same factors are relevant to court's decision under Rule 21. The court, therefore, relies on its analysis above for purposes of Rule 21 as well. While the court may have relied more heavily in its Rule 21 analysis on Defendant's survey data, the inadequacies in Defendant's survey, outlined above, leaves the court with considerable questions as to whether there is a reasonable likelihood of prejudice against Defendant in this district. In general , the questions in the survey were too broad, too leading, and too lacking in details relevant to legal proceedings to provide useful information. These inadequacies call into question the percentages

regarding Defendant's guilt and provide no real data regarding the perception in this district of Defendant's legal guilt.

Due to the high-profile nature of this case, however, the court undoubtedly has concerns regarding the appropriateness of holding Defendant's trial in this district. But the court believes that its concerns may be effectively addressed and answered through the use of the juror questionnaire that the court and parties plan to employ prior to the actual voir dire. Because the juror questionnaire can be tailored to ascertain pertinent information prior to the actual voir dire, the court concludes that it will reserve its ruling on a transfer of venue under Rule 21 standards until after it has reviewed the responses to the juror questionnaire.

Defendant relies on the district court's decision in *McVeigh* to assert that it may be prejudicial for the court to delay its transfer of venue ruling. The *McVeigh* court stated that "a failed attempt to select a jury would, itself, cause widespread public comment creating additional difficulty in beginning again at another place for trial." 918 F. Supp. at 1470. Although a failed attempt to seat a jury during voir dire at trial may garner widespread publicity, determining the change of venue motion after juror questionnaires are filled out is not significantly different than deciding the motion at the present time. The determination will still be made in the pretrial stages of the case. Moreover, the value of the information that can be gained through the responses to that questionnaire substantially outweighs the slight delay in the court's determination. Accordingly, the court reserves its ruling on Defendant's change of venue motion until such time as it has viewed the responses to the upcoming juror questionnaire. The court is not satisfied at this time that Defendant has demonstrated so great a prejudice in this district as to require a transfer of venue under Rule 21.

## CONCLUSION

Based on the above reasoning, Defendant's Motion to Change Venue is denied under the constitutional standards of presumed prejudice. The court, however, will rule on Defendant's change of venue motion under Rule 21 after it has reviewed the responses to the juror questionnaire. One week after the parties receive the responses to the juror questionnaires, they may each file a ten-page supplemental memorandum in relation to the motion to transfer of venue. The court will then issue its final ruling on the motion as expeditiously as possible.

DATED this 16th day of August, 2010.

BY THE COURT:

DALE A. KIMBALL
United States District Judge