# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

# CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>v.<br><br>BRIAN DAVID MITCHELL, et al.,<br><br>        Defendants. | **MEMORANDUM DECISION AND ORDER**<br><br>**Case No. 2:08CR125DAK**<br><br>**Judge Dale A. Kimball** |

      This matter is before the court on Media Intervenors Deseret News Publishing Company, The Salt Lake Tribune, The Associated Press, the Utah Headliners Chapter of the Society of Professional Journalists, and the Utah Press Association's Motion for Access to Blank Juror Questionnaire and Completed Juror Questionnaires with Identifying Information Redacted. The United States and Defendant have filed memoranda in opposition to the motion, and the Media Intervenors have filed a reply memorandum. Therefore, the matter is fully briefed. Because of the need for an expedited ruling on the issues presented in the motion, the court issues the following Memorandum Decision and Order without oral argument.

## BACKGROUND

      In mid-September 2010, the court summoned 600 jurors to fill out a preliminary juror questionnaire at the courthouse. Approximately 500 jurors attended sessions on September 30, 2010, and October 1, 2010. After the court assessed potential hardships for the five-week trial period and released several jurors on hardship grounds, approximately 330 jurors completed the

juror questionnaires.

Prior to completing the juror questionnaires, the court instructed the potential jurors that their responses would be used solely to assist the judge and the attorneys in selecting a fair and impartial jury for this case. The court further told the potential jurors that, during the jury selection process, the completed questionnaires would be kept confidential by the court and the attorneys representing the parties to the case and that, after a jury was selected, the court would keep the completed questionnaires under seal until the conclusion of all legal matters in the case.

The court's instructions to the potential jurors were based on past procedures used in other high-profile cases in this district and also on the parties' Joint Proposal for Protocol and Procedures for Juror Questionnaires and Voir Dire, which was publicly filed on September 7, 2010. The Joint Proposal specifically stated that the completed questionnaires would be kept under seal. Although the Joint Proposal was publicly filed and the Media Intervenors are intervenors in this action for the purpose of ensuring access to judicial documents and court proceedings, the Media Intervenors did not file any opposition to the proposal stating that the completed questionnaires would be kept under seal. Instead, the Media Intervenors waited approximately six weeks to file their motion seeking immediate access to the blank questionnaire and prompt access to the completed questionnaires. Had the media timely filed an opposition to the proposal to keep the questionnaires under seal, the court could have addressed their concerns prior to the completion of the questionnaires. The court is now in the position of addressing the media's access concerns after having promised jurors that their responses were confidential and would be kept under seal.

# DISCUSSION

The Media Intervenors seek immediate access to the blank juror questionnaire used in this case and, prior to the start of individual voir dire, copies of the questionnaires completed by potential jurors with personal identifying information redacted. The United States and Defendant both agree that the media is entitled to a copy of the blank questionnaire and redacted copies of the completed questionnaires. The disputed issue, however, is the timing of the court's release of that information.

## A. Completed Questionnaires

The standard in the Tenth Circuit for public access to documents in the court's possession is addressed in *United States v. McVeigh*, 119 F.3d 806 (10th Cir. 1997). The *McVeigh* court stated that, assuming the First Amendment standard "extends to at least some types of judicial documents, the question remains whether that right applies to the particular types of documents at issue in this case." *Id*. at 812. "In determining whether a particular type of document is included within the First Amendment right of access, courts engage in a two-pronged inquiry in which they ask: (1) whether the document is one which has historically been open to inspection by the press and the public; and (2) 'whether public access plays a significant positive role in the functioning of the particular process in question.'" *Id.* at 812 (quoting *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 8 (1986) ("*Press-Enterprise II*")). This test is also referred to as the "experience and logic" test. *Id.* at 813. "If the qualified First Amendment right of access is found to apply to the documents under the 'experience and logic' test, the district court may then seal the documents only if 'closure is essential to preserve higher values and is necessary to serve that interest.'" *Id.* at 812-13 (quoting *Press-Enterprise Co. v. Superior Court*, 464 U.S. 501, 510

(1984) ("*Press-Enterprise I*")).

The first question for the court to consider is whether the written questionnaires in this case are part of the voir dire process. While the Media Intervenors state that several state court decisions have considered the questionnaires part of voir dire, there is no controlling federal law on the subject. In fact, the Tenth Circuit's recent ruling in this case denying Defendant's Petition for Writ of Mandamus stated that "voir dire has yet to take place" and consideration of Defendant's arguments "prior to voir dire would be premature and uninformed." The Tenth Circuit was well aware that the dispute regarding venue has been decided using preliminary juror questionnaires.

Admittedly, the Tenth Circuit was considering a separate issue. But its decision that consideration of the transfer of venue motion prior to voir dire would be premature and uninformed appears to equally apply to the propriety of reporting on the substance of the questionnaires prior to the completion of a prospective jurors' completed voir dire. The Tenth Circuit's decision also suggests that there is no present right to the contents of the questionnaires for purposes of commenting on the jurors' attitudes toward this case because they will be clarified during individual voir dire.

The court's only concern in this regard is that the court relied on portions of the questionnaires to determine that it was not satisfied under Rule 21 of the Federal Rules of Criminal Procedure that there were fixed beliefs regarding Defendant's factual or legal guilt. The court recognizes that once it has relied on documents to make a public ruling, there is a greater argument that the press should be allowed access to the documents to perform its watchdog function. The parties and court have also relied on responses to the questionnaire to

dismiss 123 potential jurors from the venire. If the court and parties were inclined to believe that those juror's responses appeared to be sufficiently fixed on given issues to discontinue that juror's participation in the case and excuse the juror prior to live voir dire, the court and parties have essentially used the questionnaires as part of the voir dire process.

In *Press-Enterprise I*, the Supreme Court recognized that the voir dire process is an important aspect of a criminal trial that has been traditionally open to the public. 464 U.S. at 508. "The value of openness lies in the fact that people not actually attending trials can have confidence that standards of fairness are being observed; the sure knowledge that anyone is free to attend gives assurance that established procedures are being followed and that deviations will become known." *Id.* An open process, therefore, "enhances both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system." *Id.*

The Court also explained, however, that "the jury selection process may, in some circumstances, give rise to a compelling interest of a prospective juror when interrogation touches on deeply personal matters that the person has legitimate reasons for keeping out of the public domain." *Id.* at 511. As stated by Justice Blackmun in his concurring opinion, "[c]ertainly, a juror has a valid interest in not being required to disclose to all the world highly personal or embarrassing information simply because he [or she] is called to do his [or her] public duty." *Id.* at 514 (Blackmun, J. concurring). The *Press-Enterprise I* Court also recognized that "[n]o right ranks higher than the right of the accused to a fair trial." But, as for guidance in this area, the Court merely stated that "the primacy of the accused's right is difficult to separate from the right of everyone in the community to attend the voir dire which promotes fairness." *Id.* at 508.

The trial in *Press-Enterprise I* involved an alleged rape of a teenage girl. *Id.* at 512. In that context, the Court recognized that "[s]ome questions may have been appropriate to prospective jurors that would give rise to legitimate privacy interests of those persons." *Id.* The court provided as an example a prospective juror who may "privately inform the judge that she, or a member of her family, had been raped." *Id.* In such an instance, "the privacy interests of such a prospective juror must be balanced against the historic values we have discussed and the need for openness of the process." *Id.* The Court provided the following guidance for conducting the balancing test:

> To preserve fairness and at the same time protect legitimate privacy, a trial judge must at all times maintain control of the process of jury selection and should inform the array of prospective jurors, once the general nature of sensitive questions is made known to them, that those individuals believing public questioning will prove damaging because of embarrassment, may properly request an opportunity to present the problem to the judge *in camera* but with counsel present and on the record. By requiring the prospective juror to make an affirmative request, the trial judge can ensure that there is in fact a valid basis for a belief that disclosure infringes a significant interest in privacy. This process will minimize the risk of unnecessary closure.

*Id.*

Because of the nature of this case, the preliminary written questionnaires asked prospective jurors about several intimately personal issues. Specifically, the questionnaires asked for details about the person's or the person's family members' mental health, history of therapy and counseling, sexual abuse and other similar crimes, and details of the person's religious beliefs and practices. Because the court promised potential jurors that the information would be kept under seal, prospective jurors were remarkably candid and forthcoming.

The court now recognizes that its promise to the jurors regarding the confidential nature

6

of their questionnaire responses was potentially at odds with the process detailed in *Press Enterprises I* if the court considers the written questionnaires to be part of voir dire. Under the *Press-Enterprise I* process, the court may have more properly informed the jurors of the presumed openness of the voir dire process and the necessity for them to affirmatively seek to have the information kept private. These issues, however, were not raised at the time this court was preparing its instructions to the prospective jurors. As noted above, the Media Intervenors did not object to the Joint Proposal of the parties requesting that the questionnaires be kept under seal.

In any event, the court's instructions to the prospective jurors that their responses to the questionnaires would be kept sealed throughout the legal proceedings in this case has caused no harm to the media's rights to date. The media has not cited to any controlling case requiring media access to a written questionnaire at the time it is filled out and such a requirement would appear to be contrary to case law stating that documents in the court's possession are not public until the court relies on the information for some public purpose. Unlike *Press Enterprises I*, this case involves not just in-court, live voir dire but a two-step process with a written questionnaire and in-court, live voir dire. Because of that distinction, *Press-Enterprise I* is not entirely instructive in this matter. As discussed above, the court is not convinced that the written questionnaire can be deemed voir dire. To the extent that the questionnaires were used to determine "for cause" dismissals of potential jurors those questionnaires were part of voir dire. But it is clear that the voir dire process is not complete for a majority of the venire members.

In a typical criminal case, the media is given no advance copy of the proposed voir dire questions. Generally, the media attends the session of court and then reports on what happened.

In this case, the Media Intervenors assert that they are somehow disadvantaged because the parties will have spent "hundreds of hours reading and analyzing the questionnaires," but the public has not had the same opportunity to study the questionnaires and consider their importance in the process. This argument ignores the fact that the parties, not the public or the press, are charged with selecting a fair and impartial jury in this case. The parties will be conducting the questioning at the live voir dire, with limited questioning by the court.[1] As is typical, the press and public will not participate in that process other than to observe and report on what occurs.

Under the experience and logic test, the live voir dire process is open to the public. Because the written questionnaire are relied on as part of that process, the court understands why the cases cited by the Media Intervenors have found the questionnaires presumptively public documents. But there is no historic tradition of granting access to a document before it is relied upon by the court for some purpose. In addition, the second prong of the experience and logic test, asking whether public access plays a significant positive role in the functioning of the particular process in question, would support a finding that written questionnaires are not public until they are relied on by the court. Traditionally, the media has played a positive role in the voir dire process by reporting on the process for selecting a fair and impartial jury.

In this case, however, access to and reporting on only part of an prospective juror's voir dire responses would not necessarily be beneficial and could actually give an inaccurate

---

[1] Contrary to the court's usual practice, the court has agreed to allow counsel to conduct the individual voir dire in this case. If the court has concerns with the way such questioning proceeds, the court may resume primary responsibility for the questioning. But, in no event, will the court allow members of the media or their counsel to participate in questioning.

8

perception to the public.  The court has already ruled that many of these potential jurors require additional questioning before the court can determine whether to excuse them for cause.  Due to the nature of the process, a juror may have misread a question or given an answer that needs to be explained or clarified.  Reporting on such answers prior to clarification may actually mislead the public.

The government proposes that the press be given copies of redacted questionnaires at the end of each trial day for the prospective jurors who complete their live voir dire on that day.  The Media Intervenors do not address this proposal in their reply.  The court, however, considers the proposal a helpful means for accommodating the media's need to cover the trial proceedings each day while also allowing the court to notify the prospective jurors of the need to assert a privacy right to certain information and the parties' and court's need to further question these prospective jurors prior to determining dismissals for cause.  The court intends to make rulings on dismissals for cause at the conclusion of each potential juror's individual voir dire.  Therefore, the government's proposal would allow for media access to the questionnaire on the same day as the voir dire for that prospective juror is complete.  Such a process would not significantly alter the press' traditional role or type of coverage for voir dire proceedings.

And, importantly, the government's proposal would allow the court to inform the prospective jurors that, while all identifying information will be redacted, other information may be released.  The Media Intervenors unduly discount the parties' concerns relating to the court's promise to prospective jurors as speculative.  The court recognizes that appellate courts have stated that such promises cannot override constitutional requirements.  While this is true, none of those courts was in a position to notify prospective jurors of their privacy rights and assess the

9

prospective jurors reaction to a release of the previously provided written information. The overriding principles in the area is to balance the rights of the individuals involved with the rights of the Defendant and the rights of the public. Moreover, if Defendant has concerns with respect to a prospective juror's reaction to learning that his or her information may become public, the best approach would be for the court to assess that individual's reaction in the context of the individual voir dire.

The court specifically relied on the potential jurors' responses to questions 22 to 46 and 66 to 71 on all 330 written questionnaires in ruling on the change of venue motion. These same responses were the basis for the court's eight "for cause" dismissals prior to trial. Because no other part of those eight questionnaires was relied upon by the court to make its for cause determinations, the court finds no basis for releasing the other portions of those prospective jurors' questionnaires. The court is willing to allow the Media Intervenors access to those portions of those eight questionnaires immediately.

While the court agreed with the parties' stipulation to excuse 115 of the prospective jurors for cause based on the contents of their written questionnaires, the court does not know the specific reasons for the dismissal of each of the 115 prospective jurors. Many may have been removed based on their responses to the questions relied upon for the venue ruling. Some of those jurors, however, may have been removed for knowing participants in the trial or other responses not related to the change of venue motion. The court requests the parties to identify the basis for each of the 115 stipulations for cause so that the court can release the relevant response relied upon for finding a "for cause" dismissal. If the removal for cause is related to a response other than the change of venue responses, the media should be given access to that

response in addition to the venue related questions so it can accurately report how the jury was selected in this case.

With respect to the remaining prospective jurors who may be called in for individual voir dire, the court will not release the portions of their questionnaires relating to the venue ruling until that prospective juror has concluded individual voir dire. Because those jurors will be further questioned, their responses may be clarified or modified during the live voir dire. It would not be helpful to the process for those jurors' written responses to be reported on before the live voir dire is complete. Those prospective jurors' questionnaires will be released at the end of the day on which that juror has concluded their individual, live voir dire.

If there are prospective jurors in this category who are eventually not needed for live voir dire because the court reaches the number of jurors necessary to empanel a jury before those prospective jurors' questionnaires will be released after the jury is empaneled and only the venue related questions, questions 22-46 and 66-71, will be released at that time. *See In re Derderian*, 2006 WL 2942786, *2 (R.I. Super. Oct. 12, 2006) (unpublished) (refusing request to release completed questionnaires when defendant changed plea before trial and explaining that because no juror was called to be orally questioned and no jury seated "the release of the filled-in juror questionnaires serves no legitimate public interest under the First Amendment except to engage in rank speculation or to satisfy idle curiosity.")

The parties also dispute what information should be redacted from the questionnaires when access to the questionnaires is allowed. The Media Intervenors agree to a redaction of personal identifying information but nothing else. The main dispute, therefore, focuses on the release of responses relating to highly personal and sensitive topics such as sexual abuse, mental

11

health and counseling issues, and religious beliefs and practices. Relying on Justice Marshall's concurring opinion in *Press-Enterprise I*, the Media Intervenors assert that "the constitutionally preferable method for reconciling the First Amendment interests of the public and the press with the legitimate privacy interests of jurors and the interests of defendants in fair trials is to redact transcripts in such a way as to preserve the anonymity of jurors while disclosing the substance of their responses." 464 U.S. at 520 (Marshall, J., concurring).

The majority opinion in *Press-Enterprise I* found that the trial judge erred in not considering "whether he could disclose the substance of the sensitive answers while preserving the anonymity of the jurors involved." *Id.* at 513. This language does not require a court to disclose the substance of all sensitive information just because the prospective juror's name is withheld. It merely tells the court to consider what impact the anonymity of the juror has on the release of the information. It most cases juror anonymity would probably allow the release of substantive information, but it may not be the answer in every case. If it were, the *Press-Enterprise I* Court could have announced a bright-line rule for disclosures. It did not do so. It established what it considered the appropriate process for balancing a prospective juror's privacy interests with the public's right of access and the defendant's right to a fair trial. The Court stated that by requiring the prospective juror to make an affirmative request, "the trial judge can ensure that there is in fact a valid basis for a belief that disclosure infringes a significant interest in privacy." *Id.*

In this case, where the court has already promised prospective jurors that the information would be kept under seal, a majority of questionnaires contain responses in the sexual abuse or mental health and counseling sections that appear to be potentially embarrassing to prospective

12

jurors and/or their family members. The court, however, cannot assume that every prospective juror would find this disclosure embarrassing if they knew that their name and other personal identifying information would not be released. The court will keep all personal identifying information sealed, such as the responses to Parts I and II of the questionnaire and question #80 if it identifies a specific individual by name. With respect to the potentially embarrassing information, if the court does not inquire of each prospective juror called in for individual voir dire, the court, on its own, might decide to seal more information than would the prospective jurors. And, conversely, without any individual juror input, the court could unknowingly release information that could potentially identify a prospective juror. The court agrees with Defendant that the nature of the questions and the forthcoming responses of some of the prospective jurors could lead to the potential identification of some jurors.

Accordingly, the court will employ the approach proposed by the government. If a prospective juror has the ability to address the issue of what information may be potentially embarrassing or make the prospective juror identifiable even with all apparent identifying information redacted, the court can properly balance the interests involved at the time of voir dire. The court finds that the prospective jurors are entitled to an explanation of their rights and an opportunity to assert their rights before the court determines what potentially sensitive information can be released. Because the release of the individual juror's written responses can be timely accomplished on the day of the prospective juror's individual voir dire, the court finds no undue harm to the rights of the media in gaining access to the responses on that day and reporting on them in the context of that prospective juror's entire voir dire.

This process will also allow the court to assess the juror's reaction to the public release of

his or her written responses. The Media Intervenors improperly discount Defendant's valid concerns regarding the prospective jurors' reactions. By necessity it can only be described in terms that appear speculative at this point, but the court does not believe that it is unfounded speculation. If a prospective juror demonstrates that he or she has difficulty with releasing information, the court can consider excusing that juror for cause. The court believes that the proper course is to give the juror the information and assess his or her response accordingly.

**B. Blank Questionnaires**

Furthermore, the United States and Defendant oppose the release of the blank juror questionnaire on the grounds that the court may need to have additional jurors fill out the questionnaires at a later date. The court does not believe it is likely that additional questionnaires will need to be filled out. However, even if there was such a need, the court fails to see how knowledge of the questions on the blank questionnaire would influence a prospective juror to provide false or less than candid information. As it did before, the court would instruct the prospective juror to fill out the questionnaire truthfully and require that he or she complete the questionnaire under oath. The court cannot assume that these traditional safeguards are inadequate. The court, therefore, finds that the Media Intervenors are entitled to immediate access to the blank questionnaire. The court will publicly docket both the blank questionnaire and the court's instructions relating to the questionnaires which it read to the prospective jurors prior to their completion of the questionnaires.

**C. Access to Courtroom During Individual Voir Dire Proceedings**

In the parties' briefing on the issue of the media's access to the blank and completed questionnaires, the Media Intervenors and the Defendant also raise the issue of the media's

courtroom access to the individual voir dire proceedings. Defendant requests that public access to the voir dire proceedings be accommodated via transmission to a separate room in order to maintain an atmosphere of candor. At past proceedings in this case, which the court would consider equivalent to the importance of jury selection, the courtroom has been full and there has been a need to allow seating in overflow areas. The legal teams on each side are themselves extensive in numbers.

The court agrees with Defendant that the number of sensitive topics that will be the subject of follow-up questioning, such as sexual abuse, rape, mental health, counseling, and religious beliefs, all provide a basis for the court to balance competing interests. The court agrees that the process is benefitted by a courtroom atmosphere conducive to full and honest disclosure and that it may be hampered if the prospective juror is asked these types of sensitive questions in the presence of 100 people. While an atmosphere conducive to candor would most likely be achieved by reasonably limiting the number of people in the courtroom, the court recognizes that the press and public generally have a right to be see and hear voir dire proceedings and a prospective juror cannot expect an empty courtroom. The court, therefore, must narrowly tailor any alternative.

Room 140 at the courthouse, which has been used as a media overflow room, has both a video and audio feed of the courtroom. While the video is in black and white, it gives a full view of counsel tables, the podium, the judge's bench, and the witness stand. The court intends to seat each prospective juror on the witness stand during that prospective juror's individual voir dire. The video generally gives an adequate feel for the proceedings in the courtroom. The court would also be benefitted by the efficiency of being able to turn off the audio feed when a juror

raises a request to speak privately on a sensitive topic rather than convening a "sidebar" conference in each such instance. None of the parties has cited a case finding a video and audio feed to be insufficient. Therefore, Room 140 appears to be a viable alternative.

The only limitations to use of Room 140 is that the available video does not permit the viewer to see the specific expression on the face of the person sitting in the witness stand and there may be space constraints. Room 140 holds approximately 45 people. Because of these limitations, the court is willing to allow nine pool reporters and two sketch artists to be present in the courtroom during the voir dire proceedings in the courtroom. The court will allow a similarly limited number of members of the public to attend the voir dire proceedings in the courtroom. Rather than being able to turn off an audio feed, the presence of the press and public in the courtroom will necessitate "sidebar" conferences when a juror requests to speak privately on sensitive topics. The court, however, believes that court's interests in efficiencies are secondary to the press and public's right of access.

The nine pool reporters in the courtroom should be a representation of the various types of media–for example, three from print media, three from broadcast media, two from radio, and one from online media. These pool reporters will be allowed to have laptop computers with them in the courtroom during the voir dire proceedings but they will not be allowed to transmit information from the courtroom. The pool reporters can share their information with other reporters at breaks and at the conclusion of each trial day in Room 140. The sketch artists in the courtroom during the proceedings must blur and make unidentifiable any image of a potential juror. The court's media contact shall ensure that all sketches meet with this requirement prior to the sketch's use.

The court also notes that under the Crime Victims Rights Act ("CVRA"), victims of the alleged crime are generally allowed to be present at all proceedings. *See* 18 U.S.C. § 3771. For the voir dire proceedings in this case, the court will allow the members of Elizabeth Smart's family to be present in the courtroom.

The court will assess the number of members of the public to allow in the courtroom on the morning of trial, but it intends to allow no more than twelve. The court concludes that the courtroom presence of nine pool reporters, a sketch artist, members of the Smart family, and approximately ten members of the public should not be a hindrance to an atmosphere of candor. The use of several pool reporters and the video and audio feed in Room 140 will also balance the press and public's right of access to the proceedings. Given the number of sensitive issues relevant to the voir dire necessary in this case, this approach is intended to balance the interests of the public, the victim, and the parties. Prior to the start of trial, the court will issue a decorum order specific to the voir dire proceedings.

## CONCLUSION

Based on the above reasoning, the Media Intervenors' Motion for Access to Blank Juror Questionnaire and Completed Juror Questionnaires with Identifying Information Redacted is GRANTED IN PART AND DENIED IN PART as discussed above.

DATED this 29th day of October, 2010.

BY THE COURT:

_____
DALE A. KIMBALL,
UNITED STATES DISTRICT JUDGE