# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

## CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> BRIAN DAVID MITCHELL, et al., <br><br> Defendants. | MEMORANDUM DECISION AND ORDER <br><br> Case No. 2:08CR125DAK <br><br> Judge Dale A. Kimball |

This matter is before the court on *The Salt Lake Tribune*'s ("Tribune") motion for physical access to and copying of the police interrogation video of Defendant Brian David Mitchell. The video recording of the police interrogation of Defendant was played in open court during the government's case-in-chief and received into evidence as Government Exhibit 54. This motion was filed after the court indicated to counsel for the Media Intervenors[1] that it was releasing a written transcript of the video rather than a physical copy of the video. The government and defense have both indicated to the court that they defer to the court's decision to release a transcript, rather than a physical copy of the videotape, and will file briefs only if required by the court. The court does not believe that briefing from the government or the defense is necessary.

---

[1] The Tribune is one of several media outlets who have intervened in the present case. That group of media outlets has been referred to throughout proceedings as the Media Intervenors.

The Tribune acknowledges that there is no First Amendment right to access the actual copy of the videotape under *Nixon v. Warner Communications, Inc.*, 435 U.S. 589 (1979). In *Nixon*, various media outlets sought to copy audio tapes admitted into evidence at the Watergate criminal trial. *Id.* at 591. In response to the media's contention that *Cox Broadcasting Corp v. Cohn*, 420 U.S. 469 (1975), provided the media with a First Amendment right to copy and publish materials displayed in open court, the *Nixon* Court stated that *Cox* provided nothing more than an affirmation of the media's right "to publish accurately information contained in court records open to the public." *Nixon*, 435 U.S. at 608-09. The *Nixon* Court then explained why the First Amendment was not implicated in that case:

> there is no claim that the press was precluded from publishing or utilizing as it saw fit the testimony and exhibits filed in evidence. There simply were no restrictions upon press access to, or publication of any information in the public domain. Indeed, the press-including reporters of the electronic media-was permitted to listen to the tapes and report on what was heard. Reporters also were furnished transcripts of the tapes, which they were free to comment upon and publish. The contents of the tapes were given wide publicity by all elements of the media. There is no question of a truncated flow of information to the public. Thus, the issue presented in this case is not whether the press must be permitted access to public information to which the public generally is guaranteed access, but whether these copies of the White House tapes-to which the public has never had physical access-must be made available for copying.

*Id.* at 609.

The Sixth Circuit has noted that the *Nixon* Court indicated in this passage that there is clearly "a difference between an opportunity to hear the tapes and access to the tapes themselves." *United States v. Beckham*, 789 F.2d 401, 409 (6th Cir. 1986). Similarly, the Tenth Circuit explained that "*Nixon* did not hold that there is no First Amendment right to access court

documents. Rather, the Court there merely held that, in a situation where there 'was no question of a truncated flow of information to the public,' there was no right to physically access and copy the Watergate tapes that had already been played in open court where transcripts of the tapes were available to the media and the public generally." *United States v. McVeigh*, 119 F.3d 806, 812 (10th Cir. 1997) (quoting *Nixon*, 435 U.S. at 609). As in *Nixon*, the Tribune recognizes that the First Amendment right to access is not implicated in this case. There is "no question of a truncated flow of information to the public." 435 U.S. at 609. The videotape in question was played in an open and public court proceeding, the public and press had the opportunity to view the evidence, the press was free to report on the content of the videotapes, and the press has been provided with a transcript of the video.

The Tribune, however, argues that *Nixon* leaves open the question of whether there is a common law right of access to an actual copy of the videotape. In the context of the common law right of access, the *Nixon* Court recognized that "the right to inspect and copy judicial records is not absolute. Every court has supervisory power over its own records and files." *Nixon*, 435 U.S. at 598. The Court agreed with prior cases "that the decision as to access is one best left to the sound discretion of the trial court, a discretion to be exercised in light of the relevant facts and circumstances of the particular case." *Id.* at 599. But the *Nixon* Court also noted that "[i]t is difficult to distill from the relatively few judicial decisions a comprehensive definition of what is referred to as the common law right of access or to identify all the factors to be weighed in determining whether access is appropriate." *Id.* at 598-99. Because the *Nixon* case involved the Presidential Recording Act and the Court determined that it governed the release of the recordings, the Court did not proceed to "weigh the parties' competing arguments."

3

*Id.* at 605-06 & n.20.

Since *Nixon*, the Tenth Circuit has not addressed the media's right of access to a video exhibit shown during trial, but it has addressed access to court documents related to court proceedings. In *United States v. McVeigh*, 119 F.3d 806 (10th Cir. 1997), the Tenth Circuit discussed both the common law right of access and the First Amendment right of access. *Id.* at 811. The court stated that "[i]t is uncertain whether the Tenth Circuit would apply the First Amendment standards of *Press-Enterprise II* or the common law standard of *Nixon* to a media request for access to court documents, where as here the press was present at the hearings involving those documents." *Id.* The court explained, however, that "both the common law and First Amendment standards ultimately involve a balancing test, and the First Amendment right of access receives more protection that the common law right." *Id.* Accordingly, the court proceeded to determine whether the district court orders satisfied the First Amendment standard because if it did, the court would "necessarily find that the orders satisfy the common law standard as well." *Id.* at 812.

Therefore, *McVeigh* brings the issue of access back to First Amendment standards. If there is no problem under First Amendment standards, it necessarily satisfies the common law standard as well. The Tribune acknowledges that under *Nixon* the media's First Amendment rights are not implicated when there is access to transcripts and when there has been no question of a truncated flow of information. This case is nearly identical to *Nixon*. As stated above, the court has provided considerable access to the videotape through the trial and the release of a written transcript. The full transcript of the interrogation video is now available on several websites. The public is fully aware of the contents of the video. The public has all the access to

the video that it has had to the testimony of live witnesses. Although the Tribune cites to several cases from other circuits, under the law in the Tenth Circuit and based on the circumstances of this case, the court concludes that the Tribune has no right to an actual copy of the interrogation videotape. The court, therefore, denies the Tribune's motion for access to and copying of the police interrogation video played at trial.

DATED this 3rd day of December, 2010.

BY THE COURT:

_____
DALE A. KIMBALL,
UNITED STATES DISTRICT JUDGE