STEVEN B. KILLPACK, Federal Defender (#1808)
ROBERT L. STEELE, Assistant Federal Defender (#5546)
PARKER DOUGLAS, Assistant Federal Defender (#8924)
WENDY M. LEWIS, Assistant Federal Defender (#5993)
AUDREY K. JAMES, Attorney at Law (#9804)
UTAH FEDERAL DEFENDER OFFICE
46 West Broadway, Suite 110
Salt Lake City, Utah   84101
Telephone: (801) 524-4010
Facsimile: (801) 524-4060
*Counsel for Mr. Mitchell*

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>BRIAN DAVID MITCHELL<br><br>Defendant. | **DEFENDANT'S SUPPLEMENTAL MEMORANDUM REGARDING PRESENTENCE REPORT AND SENTENCING GUIDELINES**<br><br>Case Nos. 2:08 CR 125 DAK |

Defendant, Brian David Mitchell, by and through his attorneys of record, Robert L. Steele, Parker Douglas, Audrey James, and Wendy Lewis, submits the following memorandum in response to guideline issues[1] raised in the Presentence Report ("PSR")[2] prepared in this matter,

---

[1] As is proper in this case, defense counsel has used the 2002 Guidelines Manual for all Sentencing Guidelines calculations.

[2] Defense counsel references in all cases herein the PSR prepared by the United States Probation Office dated April 20, 2011. Defense counsel have consulted with the preparer of the PSR and counsel for the government, concerning certain revisions to that report, but as yet have not received a revised PSR. As a result, in this filing, references are to the original report.

and in advance of arguments defense counsel anticipate, due to discussions with counsel for the government, that defense counsel understand the government will advance.  The purpose of this memorandum is to provide the Court with the legal and, where possible, factual basis for application of the United States Sentencing Guidelines to Mr. Mitchell's sentence.

## DISCUSSION

There are four sentencing guidelines which defense counsel find need legal briefing.  The relevant guidelines at issue are, in the order they are raised in the PSR: 1) the applicability of the obstruction of justice enhancement, under U.S.S.G. § 3C1.1, PSR ¶ 18; 2) the organizer/leader enhancement, applied in PSR ¶¶ 29, 37, under U.S.S.G. § 3B1.1(c); 3) the departure guideline for extreme conduct, under U.S.S.G. § 5K2.8, PSR ¶ 94; and 4) the vulnerable victim enhancement, under U.S.S.G. § 3A1.1(b)(1), referenced in the government's feedback to the probation office regarding the PSR, as well the United States' Position with Respect to Sentencing Factors regarding Ms. Barzee's sentencing, Doc. # 245, at 3-4.  Of these, items 1, 3, and 4 presently are not applied by the PSR in calculating Mr. Mitchell's sentencing range, though number 2 is.  Each of these guidelines, as they may apply to this case, is addressed by defense counsel in turn below.

**I.        Obstruction of Justice**

Currently the PSR does not apply an enhancement for obstruction of justice.  PSR ¶ 18.  This is the proper result.  United States Sentencing Guideline Section 3C1.1 provides for enhancement if:

> (A) the defendant willfully obstructed or impeded, or attempted to impede the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense of conviction, **and** (B) the obstructive conduct related to (i) the defendant's offense conviction and any relevant conduct; or (ii) a closely related offense[.]

U.S.S.G. § 3C1.1 (emphasis added). As the application notes to this guideline provision make clear, the provision is reserved for such things as witness intimidation or tampering, suborning or committing perjury, producing counterfeit documents at trial or during an investigation, escaping from custody, providing false information to the court, etc. *Id.*, Application Note 4. Neither these actions nor those listed as possible conduct not ordinarily but sometimes calling for the application of the guideline are present in this case. *Id.*, Application Note 5.

As for singing and the fact that Mr. Mitchell refused to otherwise participate in the proceedings, defense counsel notes that Mr. Mitchell's activities were noted from his first appearance on these federal charges, and defense counsel worked with the Court and the prosecution to develop a strategy to deal with the situation. As the Court is well-aware, defense counsel insisted on Mr. Mitchell's partial presence before the jury as defense counsel felt it necessary for the jury to see Mr. Mitchell in person so the jury could evaluate Mr. Mitchell's demeanor for possible signs of mental illness. The Court approved this method, and, as the proceedings reflect, the method actually "prevent[ed] delays in the proceedings." PSR ¶ 18. The Court will well remember that a usual course of beginning a day in Mr. Mitchell's trial, began with the Court questioning Mr. Steele or Mr. Douglas about whether Mr. Mitchell could be expected to behave as he had the previous day, followed by the Court ordering the jury to be brought in, and then Mr. Mitchell escorted out–hardly a significant delay in the proceedings,

especially since, as mentioned above, defense counsel thought it necessary given the nature of the affirmative defense of insanity at issue. As such, it would be particularly unfair to apply to Mr. Mitchell a guideline enhancement for a procedure which defense counsel advanced, and which the Court approved and facilitated through daily procedure. Given the foregoing, and, more importantly, the plain language of the guideline which requires that the conduct be related to the "offense conviction and any relevant conduct[,] or ... a closely related offense," the PSR is correct in its conclusion that U.S.S.G. § 3C1.1 does not apply to Mr. Mitchell in this case.

## II.     Organizer/Leader

The PSR applies to Mr. Mitchell the organizer/leader enhancement under U.S.S.G. § 3B1.1(c).  PSR ¶¶ 29, 37.  This guideline applies: "If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than [criminal activity that involved five or more participants]."  U.S.S.G. § 3B1.1(c).  As the application notes to this guideline intimate, this guideline customarily applies in cases involving criminal enterprises or organizations, usually drug conspiracy cases, where it is applied to enhance the sentencing liability of those convicted of the same crime based on their relative level of authority with respect to the subject criminal endeavors at issue in a given sentencing proceeding.  *Id.*, Application Notes 2-4.  In non-drug cases, defendants have been found to be leaders or organizers when they led or organized the illegal activity or significant parts of the operation or participants.  *See*, *e.g.*, *United States v. Ngo*, 132 F.3d 1231 (8th Cir. 1997) (upholding leadership increase because two coconspirators appeared deferential to defendant).  While defense counsel understands the logical appeal of the guideline's application in this case, the facts at trial demonstrate that Mr. Mitchell

4

and Ms. Barzee acted in accord and in concert during the commission of the crimes at issue. As the Court can take judicial notice of the evidence at trial for determining sentence in this case, defense counsel would specifically ask the Court to recall both that Ms. Barzee admitted that she prompted Mr. Mitchell when he felt reticent just before the kidnaping of Ms. Smart (such that she answered "yes" when the prosecutor on cross-examination asked her if "it was all her fault") and that during that Ms. Barzee arranged much of the ceremony before the rape the first night of the kidnaping. The point here is not to suggest that Ms. Barzee should have received an organizer/leader increase under the guidelines. Rather, the point is that the organizer/leader guideline makes little sense applied here, as the history of Mr. Mitchell and Ms. Barzee's relationship demonstrates almost without exception that they supported each other and worked in concert, not only in criminal activities in this case, where they shared the fantasy of Ms. Smart as a sister-wife in their "family," but also in the religious beliefs they felt they were developing and fostering up to ten years before the incidents at issue in this sentencing and through their apprehension for Ms. Smart's abduction. In this matter the two acted in concert, and for this reason the application of this guideline is improper under the facts.

### III.    Extreme Conduct/Psychological Injury to Victim

The PSR notes the following factors may warrant departure–psychological injury to the victim, warranting an enhancement under, U.S.S.G. § 5K2.3, and enhancement, under U.S.S.G. § 5K2.8, for unusually heinous, cruel, brutal, or degrading conduct toward the victim. PSR ¶¶ 93, 94. The government has indicated to defense counsel that it will not seek a departure on the first ground–psychological injury to the victim. The facts of this case at this point do not support, and

have not been developed, to warrant an enhancement due to specific psychological injury to Ms. Smart.

The government has, however, indicated to defense counsel that it intends to move for an upward departure of five levels pursuant to U.S.S.G. § 5K2.8, Extreme Conduct. Defense counsel would note, as the Court will recall, that the entirety of Mr. Mitchell's defense at trial (and before) was based on a mental health affirmative defense. Defense counsel never once during this case attempted to diminish in any way the fact of the suffering caused by this crime to Ms. Smart. This was a touchstone of defense counsel's approach to the case: Mr. Douglas warned the jury in opening statement that they would hear horrific evidence demonstrating violence and harm to the victim; defense counsel advanced no question toward *any* witness to minimize the fact that Mr. Mitchell and Ms. Barzee engaged in extremely harmful conduct; Mr. Steele made a centerpiece of his closing argument the fact that Mr. Mitchell "was not a nice guy" and that he took actions that were extremely hurtful to Ms. Smart and her family. The Court will recall that at no time did defense counsel suggest that Mr. Mitchell was not a malefactor; rather, they argued vigorously that he was an extremely mentally ill malefactor. Defense counsels' position remains unchanged.

The legal question left to the Court given this state of the proceedings is whether a departure is warranted. U.S.S.G. § 5K2.8, Extreme Conduct, reads as follows:

> If the defendant's conduct was *unusually* heinous, cruel, brutal, or degrading to the victim, the court may increase the guideline range to reflect the nature of the conduct. Examples of extreme conduct include torture of the victim, gratuitous infliction of injury, or prolonging of pain or humiliation.

U.S.S.G. § 5K2.8 (emphasis added). As the plain language of the guideline provision suggests, for a departure to be warranted under § 5K2.8, a defendant's conduct must be "unusually" egregious, relative not to the general population, **but to other offenders being sentenced under the same Guidelines provision**. While defense counsel does not assert, as it could not, that Mr. Mitchell's conduct was not egregious, and Ms. Smart's suffering was no doubt horrible, there is no comparative evidence to suggest that Mr. Mitchell's conduct in this case was more "heinous, cruel, brutal, or degrading to the victim" than that of other perpetrators of kidnaping, coupled with unlawful transportation of a child and aggravated sexual abuse. Defense counsel suspects–though because it is not their burden to do so as they are obviously not the proponent of such a departure–that victims of such crimes, when the perpetrator(s) are not family members, are incredibly brutalized and/or customarily killed. However, without such comparative information or evidence, the Court cannot make a logical factual finding that Mr. Mitchell's conduct was "*unusually* heinous, cruel, brutal, or degrading to the victim." U.S.S.G. § 5K2.8 (emphasis added).

A comparative analysis is required by the plain language of the guideline itself. Defense counsel concedes, with appropriate candor, that the recent case of *United States v. Begaye*, 635 F.3d 456, 469-70 (10th Cir. 2011), likely suggests that such a comparative analysis is not required according the reading of the guideline by the United States Court of Appeals for the Tenth Circuit. However, counsel submits, to preserve the issue if for no other reason, that: 1) the comparative language of the guideline mandates that a comparative analysis must be undertaken by this Court; 2) it is the government's burden to provide such comparative evidence if it seeks

an enhancement under this guideline; and 3) the government cannot rely on an argument that the facts of this case make it self-evident that such an enhancement under Section 5K2.8 is warranted here.

IV.     **Vulnerable Victim**

The PSR does not recommend a vulnerable victim enhancement, under U.S.S.G. § 3A1.1(b)(1). However, the government's feedback to the probation office regarding this PSR, as well the United States' Position with Respect to Sentencing Factors regarding Ms. Barzee's sentencing, Doc. # 245, at 3-4, suggest that the government will seek such an enhancement on the theory that Ms. Smart was especially vulnerable at the time because she was a young, female member of the Church of Jesus Christ of Latter Day Saints. The prosecution specifically stated at Ms. Barzee's sentencing that it reserved the right to seek an enhancement against Mr. Mitchell on these grounds. It is now defense counsel's understanding, after discussion with the prosecution, that the government is not seeking an enhancement under this provision consistent with this earlier theory. If this remains the case, defense counsel commends the prosecution for its wisdom in not pursuing this line of argumentation, as it would not only be inappropriate under the guideline itself, but also unconstitutional in application under the Equal Protection Clause of the Fourteenth, and the Establishment Clause of the First, Amendments to the United States Constitution. As defense counsel understands the government's present theory, the government now intends to advance the argument that the enhancement applies because Ms. Smart was made and/or kept vulnerable under the development of the crime's commission. Though defense counsel will respond, if necessary, to the government's argument when given its particulars in

8

briefing, counsel offers the following as a starting (and perhaps ending) point, concluding with a reading of the cases upon which the government has related to defendant it intends to rely.

The guideline itself provides for an enhancement due to the victim's status: "If the defendant knew or should have known that the victim of the offense was a vulnerable victim." U.S.S.G. § 3A1.1(b)(1). Under binding precedent, the vulnerable victim enhancement is properly applied when it is based on the victim's qualities: "The vulnerable victim enhancement inquiry must remain focused on the **victim's status**." *United States v. Proffit,* 304 F.3d 1001, 1008 (10th Cir. 2002) (emphasis added). While acknowledging that "the concept of 'vulnerability' under the Guidelines is potentially confusing," the Tenth Circuit Court of Appeals has nevertheless made clear that the fact of having been the victim of a crime does not make one a vulnerable victim for purposes of that crime:

> Success of all fraudulent schemes depends in some measure on a victim's vulnerability, and perpetrators of fraud routinely target vulnerable individuals. The Guidelines' enhancement, however, is reserved for exceptional cases in which the victim is unusually vulnerable or particularly susceptible to the crime committed. "Vulnerable victims" are individuals unable to protect themselves who therefore require greater societal protection. Membership in a class of individuals considered more vulnerable than the average individual is insufficient standing alone.

*Id.* at 1006–1007 (citations omitted).

This focus on victims' characteristics (rather than defendants' conduct) is supported by the rationale for the enhancement: "'The theory behind the vulnerable victim enhancement is that conduct against the particular victim or group of victims is more blameworthy than the conduct of other offenders and thus deserves greater punishment.'" *United States v. Scott*, 529 F.3d 1290,

1301 (10th Cir. 2008).  Conduct is more blameworthy in this sense when directed toward a victim who "require[s] greater societal protection" than the "typical victim."  *Proffit*, 304 F.3d at 1007.  In order to justify imposition of the vulnerable victim enhancement, the "evidence must ... distinguish the victim as atypical of the usual targets of the relevant criminal conduct."  *United States v. Caballero*, 277 F.3d 1235, 1251 (10th Cir.2002).  Moreover, a characteristic already taken into account under a different provision of the offense guideline cannot serve double-duty as the basis for a vulnerable victim enhancement:

> The application notes caution that the vulnerable victim enhancement cannot be applied "if the factor that makes a person a vulnerable victim is incorporated in the offense guideline"-that is, a particular characteristic cannot be "double-counted" for purposes of the Guidelines calculation.

*Scott*, 529 F.3d at 1301.  The PSR recommends increases for the age of the victim, under U.S.S.G. § 2A3.1(b)(2)(B), the length of time Ms. Smart was held, under U.S.S.G. § 2A4.1(b)(4)(A), the use of a dangerous weapon, under U.S.S.G. § 2A4.1(b)(3), and sexual exploitation and abuse, under U.S.S.G. §§ 2A3.1(b)(1), 2A4.1(b)(5).  PSR ¶¶ 25-28, 32-35. As such, these factors cannot serve additionally as the basis for a vulnerable victim enhancement.

In order for the vulnerable victim enhancement to apply as well, therefore, there must be some other factor not taken into account by these provisions that "distinguish the victim as atypical of the usual targets of the relevant criminal conduct."*Caballero*, 277 F.3d at 1251.  The weight of authority is against the proposition that a defendant's conduct, rather than a victim's characteristics, can make a victim vulnerable for the purposes of § 3A1.1.  Victims who "struggle with the English language, are uneasy dealing with the legal system, or are in an illegal immigrant status," can be vulnerable victims under § 3A1.1.  *See Caballero*, 277 F.3d at 1251.

10

The young victim of a Mann Act violation was a vulnerable victim because she was "**both** particularly small and frail, and unusually naive and immature, for her age." *Scott*, 529 F.3d at 1303 (emphasis added).

Finally, the argument that a victim can be made a vulnerable victim by the offense conduct must take into account the time at which a defendant knew of the victim's vulnerability. "[T]he law requires that [the defendant] hold this knowledge [of victim's particular vulnerability] at the time that he placed S.H. in his car and transported her across state lines, the offense for which he was convicted." *Scott*, 529 F.3d at 1302. Even assuming the offense conduct here created a species of vulnerability cognizable under § 3A1.1, that vulnerability would have been created after the offense of kidnaping and so would not have existed at the time of the kidnaping. And there is nothing to suggest that such a vulnerability would have been relevant to the other offense of conviction, making the victim more vulnerable than other Mann Act victims to transportation across state lines. *See, generally*, Scott 529 F.3d at 1302 (runaway status did not make Mann Act victim vulnerable for purposes of § 3A1.1 since "an unstable personal life is sufficiently common among Mann Act victims that S.H.'s runaway status cannot support the enhancement."); *accord United States v. Williams*, 291 F.3d 1180, 1195-96 (9th Cir.2002).

As mentioned above, in discussions, the prosecution related to defense counsel that it intended to rely on four cases to base its argument for vulnerability caused by ongoing conduct: *Unites States v. Dock*, 426 F.3d 269 (5th Cir. 2005), *United States v. Bell*, 367 F.3d 452 (5th Cir. 2004), *United States v. Lambright*, 320 F.3d 517 (5th Cir. 2003), and *United States v. Redhouse*, 1990 WL 159529 (9th Cir. Oct. 18, 1990) (unpub.). These cases are a mixed bag, even from the

government's point of view. Three of the four are from the Fifth Circuit, and the other is an unpublished Ninth Circuit case, and therefore they constitute, at best, a non-binding and parochial reading of the guideline and its application.

*Bell*, 367 F3d 452 (5th Cir 2004), is not relevant to the government's apparent argument. In that case, the heart of the district court's determination on the vulnerable victim enhancement was that the victim was an alcoholic, unable to communicate with others, as well as financially vulnerable. While the Fifth Circuit's opinion recount the details of the particular assault, the court does not explicitly use that as a justification for the enhancement. Indeed, what does appear to be central to the *Bell* court is the finding that the defendant admitted to having humiliated the victim on previous occasions, and that, combined with the district court's observation of the victim, convinced the district court that this "just doesn't sound to me like a man who can fend for himself." *Id*. at 470. As such, the Fifth Circuit relied on the fact that the district court had found that the victim had an inherently vulnerable status and condition, unrelated to ongoing offense conduct.

*Lambright*, 320 F.3d 517 (5th Cir. 2003) is not helpful to the government's position either, as it does not directly address the argument that the enhancement is inapplicable when the defendant's actions create the vulnerability. The district court "based its conclusion . . . on the findings that [the victim] was completely dependent upon the care of the correction officers, that he was locked in his cell prior to the assault, and that he could not protect himself from the assault." *Id.* at 518. These factors sound like those common to the class of incarcerated persons (defendant was prison guard). The enhancement was appropriate because defendant exploited

the vulnerabilities of a member of a class, not because he created vulnerabilities he then exploited.

The third Fifth Circuit case, *Dock*, 426 F3d 269, does address the issue, but does not rule on it since the defendant waived the arguments. It is worth noting initially that the district court based the enhancement on three victim characteristics, only one of which was created by the offense conduct. In a footnote, though, the Circuit does indicate that the Ninth, Second, and Third Circuits have upheld district court's determinations of victim vulnerability "based, at least in part, on vulnerability created by the defendant during the course of the crime." *Id.*, n.2. This is slim (poorly reasoned–as discussed below–*dicta* from another circuit) authority indeed for the government's position, a position which runs counter to the plain and customary application of the guideline outlined above.

Moreover, the Ninth Circuit case *Dock* cites, significantly does not support the proposition *Dock* notes in its footnote. In *United States v. Veerapol*, 312 F.3d 1128 (9th Cir 2002), the court does note, in a list of characteristics, the treatment of the victim by the defendant during commission of the crime, but that factor does not inform the court's analysis. The Court begins by noting victim traits included and not included as specific offense characteristics in the pertinent guideline:

> The Specific Offense Characteristics for a § 1584 conviction do not provide an adjustment for victim characteristics such as Saeieo's immigrant status and the linguistic, educational, and cultural barriers that contributed to her remaining in involuntary servitude. *See* U.S.S.G. § 2H4.1(b) (providing adjustments for (1) permanent, life-threatening, or serious bodily injury to the victim; (2) use, brandishment, or threat of use of a dangerous weapon; (3) certain terms of involuntary servitude; and (4) commission of a related felony). Indeed, at

> sentencing, the district court cited none of the Specific Offense Characteristics named in § 2H4.1 to justify its application of the vulnerable victim adjustment. . .

*Veerapol* at 1132–33. The Court goes on to set out a two-step process for district courts to use in determining whether to apply the enhancement:

> First, the judge must determine whether one or more of the victims belong to a class that is particularly vulnerable to the criminal activity in question, and second, is there one or more specific individual victims whom the defendant knew or should have known were unusually vulnerable by virtue of membership in the class identified.

*Id*. at 1133 (*quoting United States v. Luca*, 183 F.3d 1018, 1025 (9th Cir.1999)). The analysis thus focuses on pre-existing traits, not those created by virtue of an ongoing offense (thus this appears that this was an unscrupulous cite by the Fifth circuit in *Dock*).

Additionally, and offering more authority against the government's position, the Seventh Circuit cites *Veerapool* approvingly in *United States v. Calimlim,* 538 F.3d 706 (7th Cir. 2008).

> In *Veerapol*, on facts very similar to those before us, the Ninth Circuit upheld the use of the vulnerable-victim enhancement. . . . *We have described the key concern behind the vulnerable-victim enhancement as the desire to deter criminals from targeting certain groups* by increasing the penalties for doing so. . . . Lest there be any doubt about our position on the question raised by the Calimlims, we clarify today that where vulnerability is not already accounted for in the Guidelines, we will apply the vulnerable-victim enhancement when the victim is a member of a group typically vulnerable to the particular manifestation of the general offense committed by the defendant, whether or not the victim is otherwise unusually vulnerable. In this case, Martinez was a member of a group typically targeted by those desiring forced labor, but her group (illegal aliens) is only part of the broader set of possible victims. She was therefore a vulnerable victim for the purposes of U.S.S.G. § 3A1.1(b)(1). The district court erred when it denied this enhancement.

*Calimlim*, 538 F.3d at 717 (emphasis added). Put plainly: it makes very little sense to include in the *class* of people we want to deter criminals from targeting those they have already targeted.

Such a method of guideline application would rest on tautology, a particular logical weakness of the government's argument here.

The Fifth Circuit in *Dock* also cites *United States v. Altman*, 901 F.2d 1161 (2d Cir. 1990) in support of a (possible, but not reached in their case) conclusion that offense conduct can create a vulnerable victim, but this case, too, offers questionable support for such a proposition. In *Altman*, the grouping rules resulted in the defendant being sentenced under a count that did not include as a special offense characteristic for drugging the victim, the other count of conviction did, and the Second Circuit uses that fact as a reason to import the drugging-the-victims factor in under vulnerable victims. This is odd reasoning to say the least, and, in any event, the Court does not consider the argument advanced by the government here.

Finally, the *Dock* court identifies *United States v. Zats*, 298 F.3d 182 (3d Cir. 2002) as a case in which offense conduct generates victim vulnerability. But *Zats* is concerned with pre-existing, rather than offense created vulnerabilities:

> The first requirement under *Iannone* for imposing a vulnerable victim enhancement is that the victim be "particularly susceptible or vulnerable to the criminal conduct." 184 F.3d at 220. Zats' victims, many of whom were poor, sick, facing personal emergencies, or all three, qualify. Victims can be vulnerable for the reasons listed in the application note—age, physical or mental condition—or simply because one is "otherwise particularly susceptible to the criminal conduct." U.S.S.G. § 3A1.1, cmt. n. 2. Financial vulnerability is one way a victim can be "otherwise particularly susceptible." . . . *Our objective is to provide extra deterrence for defendants who are especially likely to succeed in their criminal activities because of the vulnerability of their prey*. An extra dose of punishment removes the criminal's incentive to facilitate his crime by selecting victims against whom he actually will enjoy a high probability of success. . . . Many of Zats' victims were particularly vulnerable to his Scrooge-like practices because they could not afford to have their accounts frozen, even temporarily. Many were poor and lacked access to outside funds or support. Some were severely ill, which is not surprising because Zats specialized in collecting debts for doctors. And, given

> their responses to Zats, many of the debtors were completely ignorant of their legal rights.

*Zats*, 298 F.3d at 187–88.  Again, the Third Circuits deterrence rationale makes no sense where the defendant has already selected the victim (who did not, at the time of selection, possess any of the vulnerabilities on which the government relies).  More generally, the Third Circuit employs a three-step test to determine whether the vulnerable victim enhancement should apply:

> The enhancement may be applied where: (1) the victim was particularly susceptible or vulnerable to the criminal conduct; (2) the defendant knew or should have known of this susceptibility or vulnerability; and (3) this vulnerability or susceptibility facilitated the defendant's crime in some manner; that is, there was "a nexus between the victim's vulnerability and the crime's ultimate success."

*United States v. Iannone*, 184 F.3d 214 (3d Cir. 1999).  As such, none of the cases the government has so far pointed to defense counsel offer support for an application of U.S.S.G. § 3A1.1(b)(1) on the rationale the government apparently intends to advance.  For these reasons, as well as those outlined above, the Court should follow the PSR on this point, and decline the government's possible invitation to do so.

## **CONCLUSION**

Based on all of the above, defense counsel requests that the Court make findings and recommendations consistent with those addressed in Mr. Mitchell's Sentencing Memorandum, Doc. # 470.

RESPECTFULLY SUBMITTED this 18th day of May, 2011.

/s/ Parker Douglas
PARKER DOUGLAS
Assistant Federal Defender

**CERTIFICATE OF DELIVERY**

      I hereby certify that a true and correct copy of the foregoing was served electronically, mailed or hand delivered to all parties named below on this 18th day of May, 2011:

Felice John Viti
Dave Backman
Diana Hagen
Alicia Cook
United States Attorney's Office
185 South State Street, Suite 400
Salt Lake City, Utah 84111

Michael P. O'Brien
Ryan M. Harris
Shane J. Shumway
Jones Waldo Holbrook & McDonough

Wendy White
United States Probation Officer
350 South Main Street, Room 160
Salt Lake City, UT 84101

                          /s/ Parker Douglas
                          ASSISTANT DEFENDER OFFICE